UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**ORIGINAL**

FILED

----------------------------------------------------------------X

ROYAL INSURANCE COMPANY OF AMERICA,

Case No. CIV 3:01 1317 (JBA)

Plaintiff,

- against -

ZYGO CORPORATION,

Defendant.

----------------------------------------------------------------X

ROYAL INSURANCE COMPANY OF AMERICA,

Third-Party Plaintiff,

- against -

NAN YA TECHNOLOGY CORPORATION,

Third-Party Defendant.

----------------------------------------------------------------X


**ROYAL INSURANCE COMPANY OF AMERICA'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT
DISMISSING WITH PREJUDICE ZYGO'S
BAD FAITH AND PUNITIVE DAMAGES COUNTERCLAIMS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................................iii

PRELIMINARY STATEMENT .................................................................................1

UNDISPUTED FACTS ..............................................................................................1

    I.     The Marine Open Cargo Insurance Policy..............................................1

    II.    The AFM Purchase and Transport to Taiwan ........................................2

    III.   Zygo's Deliberate Failure to Permit Royal to Inspect the Damaged AFM ...........3

    IV.   Coverage is Declined and Royal Seeks a Declaratory Judgment Against Zygo .....8

    V.    Zygo Counterclaims Against Royal for the AFM Purchase
           Price and Seeks Punitive Damages for Alleged Bad Faith .....................9

    VI.   Royal Files a Third-Party Complaint Against Nan Ya,
           Which Denies Liability, Claiming that Zygo Released
           it from Responsibility for this AFM and That All
           Damages Were Due to Inadequate Packaging for
           Which Zygo is Responsible...............................................................10

    VII.  Judge Goettel Grants Nan Ya's Motion for Summary Judgment.......................10

    VIII. Judge Goettel Denies Royal's Motion for Summary Judgment on the
           Grounds that Pertinent Policy Language is Ambiguous, Requiring
           Adjudication of Issues Relating to the Parties' Intent .........................12

    IX.   Zygo Continues its Unjustifiable Refusal to Withdraw its Bad Faith Claims ......13

ARGUMENT...............................................................................................................14

    I.     Standard of Review for a Motion for Summary Judgment .........................14

    II.    Choice of Law...................................................................................15

    III.   The Standards Applicable to Zygo's Bad Faith Claims
           Under Connecticut Law .....................................................................15

IV.    Zygo's Unsupported Claims that Royal Acted in Bad Faith are Untrue.................19

A.   Zygo's Failure to Declare the AFM and Pay a Premium
for Unpaid Vendor Coverage .......................................................................19

B.   Zygo's Deliberate Failure to Permit Royal to Inspect the Damaged AFM....20

C.   Zygo's Apparent Settlement Negotiations With Nan Ya .............................22

D.   Zygo Cannot Meet Connecticut's Legal Standards
on its Bad Faith Claims .............................................................................23

CONCLUSION ....................................................................................................24

ii

# **TABLE OF AUTHORITIES**

**Cases**

Agency Rent-A-Car v. ITT Hartford Accident and Indemnity Co.,
   1997 WL 684916, 20 Conn. L. Rptr. 673 (Conn. Super. Oct. 23, 1997) ......................................16

Bergen v. The Standard Fire Ins. Co., 1997 WL 809957,
   21 Conn. L. Rptr. 154 (Conn.Super. Dec. 31, 1997) ...................................16, 17, 22, 23

Buckman v. People Express, Inc., 530 A.2d 596, 205 Conn. 166 (Conn. 1987)..............................15

Bushey v. Allstate Ins. Co., 670 A.2d 807, 164 Vt. 399 (Vt. 1995) ....................................................17

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)...........................14

Grand Sheet Metal Products Co. v. Protection Mutual Ins. Co.,
   375 A.2d 428, 34 Conn.Supp. 46 (Conn. Sup. Ct. 1977) ...............................................16

Hunte v. Amica Mutual Ins. Co., 792 A.2d 132, 68 Conn.App. 534 (Conn. App. Ct. 2002) ...........19

Janicki v. Massachusetts Casualty Ins. Co.,
   1996 WL 694590 (Conn. Super. Nov. 15, 1996)...............................................................18

Martin v. American Equity Ins. Co., 185 F.Supp.2d 162 (D. Conn. 2002) ......................................18

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...............................................14

McCarthy v. Travelers Indemnity Co., 2000 WL 372801 (Conn. Super. March 29, 2000) .............18

McCauley Enterprises, Inc. v. New Hampshire Ins. Co.,
   716 F.Supp. 718 (D. Conn. 1989) ....................................................................................18

Mead v. Burns, 509 A.2d 11, 199 Conn. 651 (Conn. 1986) ...............................................................15

Page v. Connecticut Dep't of Public Safety, 185 F. Supp. 2d 149 (D. Conn. 2002)..........................14

R.E.O., Inc. v. The Travelers Companies,
   1998 WL 285836 (Conn. Super. May 20, 1998) .........................................................16

Soares v. University of New Haven, 154 F. Supp. 2d 365 (D. Conn. 2001) .....................................15

Verrastro v. Middlesex Ins. Co., 540 A.2d 693, 207 Conn. 179 (Conn. 1988) ...........................18, 22

Webster v. U.S. Fidelity & Guaranty Co., 1993 WL 182194,
    9 Conn. L. Rptr. 147 (Conn.Super. May 21, 1993).................................................................15


## RULES AND STATUTES

Fed. R. Civ. P. 56(c) ...........................................................................................................14

Fed. R. Civ. P. 56(e) ...........................................................................................................14

C.G.S.A. § 38a-816 at para. (6) ............................................................................................15

iv

## PRELIMINARY STATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and District of Connecticut Local Rule 56(a)(1), Plaintiff/Third-Party Plaintiff Royal Insurance Company of America ("Royal") respectfully moves this Court to grant its motion for summary judgment dismissing with prejudice Zygo's bad faith and punitive damage counterclaims against Royal on the grounds that, as demonstrated by the discussion and evidence offered in support of that motion, substantial evidence exists supporting Royal's several defenses against the claimed coverage, so that, under applicable law, said claims are patently unjustified and unsustainable.

## UNDISPUTED FACTS

### I.   The Marine Open Cargo Insurance Policy

The claims asserted against Royal by Zygo Corporation ("Zygo") in these proceedings allegedly arise under a Marine Open Cargo Policy (policy no. POC102950), with an effective date of May 1, 1999 (hereinafter the "Policy"), that was issued by Royal to Zygo as the named insured.  See Facts ¶ 1.[1]

Clause 55 of the Policy provides:

> **FOB/FAS SHIPMENTS**
> 55.   This Policy is extended to cover shipments sold by the Assured of (*sic*) F.O.B., F.A.S., cost and Freight or similar terms whereby the Assured is not obligated to furnish ocean marine insurance.  This insurance attaches subject to Policy terms and conditions and continues until the goods are loaded on board the overseas vessel or until the Assured's interest ceases, whichever shall first occur.  The particulars of all such shipments shall be reported promptly to the Assurer and premium paid on the amounts so declared at the rate of N/A for not exceeding thirty (30) days after attachment of risk.

---

[1] Citations to "Facts ¶ ____" refers to Royal Insurance Company of America's Local Rule 56(a)(1) Statement filed contemporaneously with this Motion.

Extension of risk beyond thirty (30) days held covered at rates to be agreed.

Facts ¶ 4.

Clause 52 of the Policy provides:

**CONTINGENCY**

52.     It is agreed that on all shipments sold by the Assured on cost and freight or other terms whereby the Assured is not required to furnish ocean marine insurance, this Policy is extended (subject to all its terms and conditions) to cover only the interest of the Assured as an unpaid vendor from the time shipments become at the risk of the customer under the terms of sale until payment of draft but in no event beyond the time when this Company's risk would normally cease under the terms of this Policy.

It is further understood and agreed that in no event shall this insurance inure to the benefit of the buyer or his underwriter but in the event of a loss occurring which would be collectible hereunder but for such terms of sale and the Assured is unable to collect the purchase price from the buyer in regular course, this Company will advance the amount of such loss pending collection from the buyer. The Assured hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse this Company, the latter sharing the expense of such collection in proportion to its interest herein.

The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed.

Facts ¶ 5.

## II.    <u>The AFM Purchase and Transport to Taiwan</u>

In January 2000, Nan Ya Technology Corporation ("Nan Ya") ordered from Zygo an Atomic Force Microscope ("AFM") (hereinafter the "Cargo" or, as referred to in the pleadings, the "second AFM") to replace another AFM that had previously been ordered from Zygo but had allegedly been damaged in transit to Nan Ya. Facts ¶ 5.

2

On or about January 31, 2000, Nan Ya provided Zygo with a purchase order for the Cargo with a purchase price of $690,000. Facts ¶ 6.    The delivery terms of that purchase order for the Cargo stated, "FOB US Airport".    Facts ¶ 7.    Under the terms of the sale between Zygo and Nan Ya, Zygo had no obligation to insure the Cargo during its air carriage between the United States and Taiwan. Facts ¶ 8.

On or before February 4, 2000, Zygo contracted on behalf of Nan Ya with Lynden Air Freight (also identified as Lynden International, hereinafter "Lynden Air") to deliver the Cargo to a United States airport for ultimate air carriage to Taiwan for Nan Ya's account. Facts ¶ 10.

On or about February 4, 2000, Lynden Air issued a clean air waybill bearing the number 40133373 for the Cargo in which it certified that the "goods described below [i.e., the Cargo] were received for carriage . . . in apparent good order and condition except as noted hereon," and in which no damage, defects or problems of any sort, relating to the Cargo, were noted.  Facts ¶ 11.

**III.    Zygo's Deliberate Failure to Permit Royal to Inspect the Damaged AFM**

On or about February 11, 2000, Nan Ya advised Zygo that an inspection of the Cargo carried out after it had been discharged in Taiwan had determined that it was in damaged condition.    Facts ¶ 14.      Zygo has admitted that, the crate containing the Cargo's main component was severely damaged during transit, after it was loaded aboard the carrying aircraft at the U.S. airport and before it was inspected by Nan Ya in Taiwan, where said damage was first noted. Facts ¶¶s 15 and 16.

On or about February 10-11, 2000, shortly after learning from Nan Ya that the Cargo had arrived at Nan Ya in damaged condition, Zygo had one of its engineers familiar with these AFMs, Mr. Kelvin Walch,  conduct a preliminary inspection of the Cargo.    Facts ¶ 15.    At the

time that the first and second AFM's arrived at Nan Ya Taiwanese facility in damaged condition, Mr. Kevin Walch was employed by Zygo to assist its customers with the installation and repair of these instruments.    Facts ¶ 16.    Mr. Walch and Zygo's Vice President, Larry Martin, both testified that Mr. Walch was not qualified as an expert in the rigging and packaging of AFMs or in conducting a forensic analysis of transit damage suffered by them in order to determine the cause of that damage and the adequacy of their packaging.    Facts ¶ 17.

Kelvin Walch testified that his initial inspection of the second damaged AFM was very limited and restricted to removing only one or two wooden slats of its outside protective packing so that he could look inside to ascertain that it had in fact been severely damaged in transit. Facts ¶ 18.    Mr. Walch testified that he limited that first inspection in this manner because he knew how important it was to retain the damaged AFM in is original as-delivered condition without disturbing the evidence it represented until such time as a joint survey could be conducted by all interested parties, thereby providing to them a fair opportunity to have their experts inspect the damage in order to ascertain its nature, extent and possible causes, as well as its repairability and salvage value, if any.    Facts ¶ 19.

Mr. Walch confirmed that it was obvious to him from even this cursory inspection that the machine had suffered severe damage and might not be repairable and that the parties and their insurers would need to survey the damaged AFM.    Facts ¶ 20.    Accordingly, Mr. Walch suggested to Zygo in a February 11, 2000 memo that Zygo notify Royal of the scheduled February 14, 2000 survey so that Royal could arrange for its own cargo damage expert to attend and inspect the subject AFM.    Facts ¶ 21.

Zygo gave no such notice to Royal and as a result, no one attended that joint survey on Royal's behalf – Mr. Walch saw no one at the survey who was represented as being from Royal.

4

Facts ¶ 22.   Nor did Zygo ever engage any cargo packaging expert on its own behalf to inspect the damaged AFMs, relying instead on Kelvin Walch, who by his own admission and that of Zygo's Vice President, Larry Martin, was not qualified to do any expert forensic analysis of the AFM damages in order to ascertain the cause of the damages and the adequacy of these cargoes' packaging.  Facts ¶ 23.

At the February 14, 2000 joint survey, Nan Ya, its underwriters and the independent cargo surveyors engaged by Nan Ya concluded that inadequate packaging had caused the subject damages.  Facts ¶ 24.   Nan Ya and its underwriters took the position at that joint survey that, as the damages in question had been caused by inadequate packaging, this relieved Nan Ya of any obligation to pay for the subject AFM's purchase price.  Facts ¶ 25.

Even Zygo's local Taiwanese agent, Billy Wu, the President of Lee Tech, who was very familiar with these types of AFM machines, remarked to Zygo that said packaging seemed very inadequate for such a delicate and expensive instrument, and was quite dissimilar from the packaging done for similar machines by Zygo's competitor, Veeco.  Facts ¶ 26.   Zygo had in fact supervised and was responsible for the rigging and packaging of the second AFM, which was done at the manufacturer IBM's Florida facility by IBM-hired rigging contractors under supervision of Zygo personnel.  Facts ¶ 27.

It was obvious to Mr. Walch from Nan Ya's vociferous claims of inadequate packaging at the February 14, 2000 joint survey that insurance claims might be lodged against the packing company or IBM, and he reported this to Zygo.  Facts ¶ 28.   Despite Mr. Walch's suggestion on February 11, 2000 that Royal be notified of the February 14, 2000 joint survey so that it could send its own expert to attend there, Zygo waited until March 7, 2000, three weeks after that survey's completion before notifying Royal of the subject damages.  Facts ¶ 29.

5

Promptly after receiving this late notice of claim from Zygo, on March 8, 2000, Royal's claims manager, Joseph Daneman, notified Zygo that Royal would assign a surveyor to inspect the damaged AFMs and he asked Zygo to advise him of said cargo's location and to provide him with a contact name, telephone and fax number so that this inspection could be arranged. Facts ¶ 30.

Almost two weeks passed after Mr. Daneman's request without any response from Zygo, and so, on March 20, 2000, he wrote again to Zygo asking again for the information needed to arrange the damaged AFMs' inspection. Facts ¶ 31. A month passed with still no response from Zygo, and on April 19, 2000, Mr. Daneman wrote yet again to Zygo, asking for the cargo's location and contact information so that Royal could send its own surveyor to inspect the damaged AFMs. Facts ¶ 32. It was not until May 8. 2000 that Royal was provided with the requested contact information. Facts ¶ 33.

On May 12, 2000, Mr. Daneman, believing after his review of the matter that it involved a claim for transit damage occurring after the cargo had been loaded aboard the aircraft for overseas shipment, so that under Policy Cl. 55, Zygo had no insurable interest (this was months before Zygo's broker indicated for the first time that it was claiming unpaid vendor coverage – Facts ¶ 33), wrote to Zygo informing it that, since Zygo had no insurable interest, Royal would not be assigning a surveyor to inspect the cargo Facts ¶ 33.

However, just a week later, on May 19, 2000, because Zygo's insurance brokers had submitted a claim on this cargo, Mr. Daneman changed his mind and asked Royal's surveyors in Taiwan to arrange for an independent survey of the damaged AFMs in order to ascertain the cause of the subject damages.

But, despite repeated attempts over the succeeding months to arrange for an inspection of the damaged AFMs, Royal's surveyors were never given access to them, and, the AFMs were disposed of by Zygo without any such inspection having taken place.  Facts ¶ 34.

Zygo's Kelvin Walch admitted that it was important to insure that said damaged AFM would be preserved as evidence, making sure that none of that evidence was removed or was altered from its original state on arrival at Nan Ya's loading dock so that it could be inspected by experts representing the various parties and their underwriters.  Facts ¶ 35.  Mr. Walch also testified that, after completion of the February 14, 2000 joint survey, Zygo could have removed that second damaged AFM from Nan Ya's premises and stored it safely at Zygo's Taiwanese offices, where its security could be assured, but it did not do so, and, instead, merely left the AFM at the loading dock.  Facts ¶ 36.

Kelvin Walch testified that he'd asked Nan Ya's loading dock personnel to not disturb the second damaged AFM, but, he admitted that he did not know whether or how portions of that evidence may have been taken away, altered or otherwise lost.  Facts ¶ 37.  In fact, Mr. Walch admitted that when he reinspected the damaged AFM in November 2000 in order to ascertain its salvage value, he made no effort to determine whether its evidentiary integrity had been compromised, since by then, he regarded it as only so much scrap.  Facts ¶ 38.

Mr. Walch was not aware of any access ever given by Zygo to Royal in respect of an inspection of these AFMs.  Facts ¶ 39.

Due to the aforesaid damage to the Cargo, Nan Ya, *continuing to maintain that it had been caused by inadequate packaging for which Zygo not Nan Ya was responsible under their sales contract,* refused to pay Zygo for any portion of the Cargo's $690,000 purchase price.  Facts ¶ 40.

7

## IV.  Coverage is Declined and Royal Seeks a Declaratory Judgment Against Zygo

On or about March 7, 2000, Zygo gave notice of its claim for the subject Cargo loss to its insurer, Royal.  Facts ¶ 41.  On July 16, 2000, Royal issued a formal letter declining coverage.  Admission at para. 19.  Facts ¶ 42.  That July 16, 2000 letter from Royal set out the Policy provisions whose breach or non-compliance with by Zygo had resulted in denial of coverage.  Facts ¶ 43.

On June 8, 2001, Zygo's insurance manager, Richard Dressler, notified Zygo's insurance brokers that Zygo had decided to obtain Ocean Cargo coverage from the St. Paul Insurance company because of the lower premiums St. Paul offered, and because, Royal had declined to offer any contingency [i.e., unpaid vendor] coverage in connection with any extension or renewal of the Zygo-Royal Policy.  In that email notice, Mr. Dressler noted that Zygo's pending claim with Royal [now before this Court] was "going to be difficult," and that, whether or not Zygo continued to obtain marine insurance from Royal would "probably not influence their [i.e., Royal's] decision on that claim one way or the other."  Facts ¶ 44.

On or about July 13, 2001, Royal then commenced a declaratory judgment action against Zygo, seeking a determination that coverage for the subject claim did not exist under the Policy.  Facts ¶ 45.  In its Complaint, Royal asserted, inter alia, that due to Zygo's failure to declare the subject Cargo and pay for unpaid vendor coverage under Clause 52, such coverage never attached to the Cargo.    Facts ¶ 46.  Royal also asserted in its Complaint that the claimed coverage did not exist because Zygo had breached the Policy by impairing and/or waiving Royal's right of subrogated recovery against Nan Ya under the original Zygo/Nan Ya sales contract for the second AFM.  Facts ¶ 47.

8

**V.    Zygo Counterclaims Against Royal for the AFM Purchase
Price and Seeks Punitive Damages for Alleged Bad Faith**

On or about September 20, 2001, Zygo filed its Answer and Counterclaims in this action,

in which, inter alia, citing Clause 52 of the Policy and asserting that Zygo had attempted without

success to "collect the amount due on the second AFM" from Nan Ya and put Royal on notice of

its claim regarding the second AFM, Zygo counterclaimed against Royal for breach of contract

and sought a declaration from this Court that Zygo's aforesaid claim is covered under the Policy.

Facts ¶ 48.    Zygo denied in its Answer that it had impaired and/or waived Royal's rights of

subrogated recovery against Nan Ya and denied that it had any obligation to declare the Cargo

and pay any additional premium for vendor coverage  in advance of the claim arising.   Facts ¶

49.

In its second counterclaim against Royal, Zygo alleges that Royal owed to Zygo a duty of

good faith and fair dealing under the Policy and that Royal breached that contractual duty by

allegedly,

      a.    intentionally failing or refusing to pay Zygo's claim when Royal knew or
should have known that said claim was covered under the Policy;

      b.    failing to fairly and adequately investigate Zygo's claim by declining to
inspect the damaged machines (Zygo alleges that if Royal had performed a fair
and adequate investigation it might have reached a different conclusion regarding
coverage);

      c.    misrepresenting and/or mischaracterizing Zygo's efforts to collect the
purchase price of the second AFM from Nan Ya (Zygo alleges that, if Royal had
not so misrepresented and /or mischaracterized Zygo's collection efforts, Royal
might have reached a difference conclusion regarding coverage); and

      d.    taking sixteen months to render its formal declination of coverage, not
formally declining coverage until after Zygo had declined to renew the Policy
and even then, not supporting its declination with facts tending to establish that
Zygo's claim is not covered under the Policy.

Facts ¶ 50.

9

Zygo alleges in its third counterclaim that Royal has engaged in bad faith with respect to its response to Zygos's claim by virtue of the conduct alleged in Zygos's second counterclaim and, additionally, by allegedly recklessly and carelessly failing to pay Zygo's claim Facts ¶ 51.

Presumably based upon the aforesaid allegations made against Royal of bad faith and recklessly and carelessly failing to pay Zygo's claim, Zygo has claimed against Royal in this action for punitive damages and attorney's fees and costs in addition to its claim for compensatory damages.   Facts ¶ 52.

### VI.   Royal Files a Third-Party Complaint Against Nan Ya, Which Denies Liability, Claiming that Zygo Released it from Responsibility for this AFM and That All Damages Were Due to Inadequate Packaging for Which Zygo is Responsible.

On or about October 8, 2001, Royal served and filed its Third-Party Complaint against Nan Ya, asserting, contingent upon a finding that coverage did exist under the Policy, that Royal would in that event have the right to claim against Nan Ya as Zygo's insurer subrogated to Zygo's right of recovery against Nan Ya of the subject AFM's purchase price.  Facts ¶ 53.

On or about February 6, 2001, Nan Ya responded by serving and filing its Amended Answer, Affirmative Defenses and Jury Demand to Royal's Third-Party Complaint, advancing amongst various affirmative defences the defenses that Zygo had released and absolved Nan Ya from any liability for the subject AFM and that, under the sales contract between Zygo and Nan Ya, Zygo was obliged to compensate Nan Ya for inadequate packaging.  Facts ¶ 54.

### VII.   Judge Goettel Grants Nan Ya's Motion for Summary Judgment

On or about June 13, 2002, Nan Ya moved for summary judgment on the grounds that, in November 2000, a dispute between Nan Ya and Zygo over whether the damage to AFMs

Numbers 1 and 2 was caused by inadequate packaging or rough handling was amicably resolved by them as a result of written communications and face-to-face discussions between their representatives, with Nan Ya agreeing that it and its underwriters would accept responsibility only for the loss of the first damaged AFM, while Zygo and its underwriters would accept responsibility for the second damaged AFM, for which Nan Ya and its underwriters would bear no responsibility or liability whatsoever. Facts ¶ 55.

As Zygo had not notified Royal of the discussions and meetings which Nan Ya alleged had resulted in its release in respect of the second AFM, and Royal had not participated therein, Royal was not in a position to rebut or oppose Nan Ya's motion for summary judgment, and in a July 26, 2002 letter to Zygo's counsel, Royal's counsel insisted that Zygo do so, since it had participated therein, denied any settlement had taken place and purported to have knowledge and evidence supporting that position. Facts ¶ 56. That letter to Zygo's counsel stated that Nan Ya's Motion for Summary Judgment established that Royal had had and still had reasonable basis to deny Zygo's claim in this action, and, accordingly, demanded that Zygo withdraw any bad faith claim that it was asserting. Facts ¶ 57. But, Zygo refused to withdraw its unjustified bad faith claims, a refusal that it reasserted most recently in the July 8 and 9, 2004 telephone conferences between Royal's and Zygo's counsel. Facts ¶ 57.

On or about August 19, 2002, Zygo served and filed its opposition to Nan Ya's Motion for Summary Judgment, vigorously denying that it had released Nan Ya and offering affidavits and documents which it purported contradicted Nan Ya's claim that such a settlement had been effected. Facts ¶ 58.

Since Royal's assured, Zygo, a party to the action with a clear vested interest in the outcome of Nan Ya's Motion for Summary Judgment, had filed its aforesaid opposition to that

motion, and since Royal had no knowledge or evidence pertaining to the discussions that Nan Ya claimed had led to its release by Zygo, Royal filed no separate opposition to Nan Ya's motion. Facts ¶ 59.

On or about September 11, 2002, Judge Goettel granted Nan Ya's Motion for Summary Judgment saying nothing more than, "Motion Granted absent objection from the Third Party Plaintiff. This is not a ruling on the merits and will have no collateral estoppel effect in this litigation." Facts ¶ 60.

On September 18 and 24, 2002, Royal asked that Judge Goettel reconsider his ruling, but he declined to do so. Facts ¶ 61.

Nan Ya, fully cognizant of the fact that the law in this Circuit does not permit a judge to grant summary judgment "not on the merits", thereby making Judge Goettel's order granting its motion for summary judgment reversible on that ground alone, moved for Rule 54 certification of that grant, but the judge declined to do so. Facts ¶ 62.

**VIII.  Judge Goettel Denies Royal's Motion for Summary Judgment on the Grounds that Pertinent Policy Language is Ambiguous, Requiring Adjudication of Issues Relating to the Parties' Intent.**

Zygo has admitted that it did not separately report the shipments of, or separately declare the value of, the shipments of AFM Nos. 1, 2 and 3. Facts ¶ 63. On or about April 4, 2003, Royal moved for summary judgment in this action, asserting that Policy Cl. 52 unambiguously required as a precondition to the unpaid vendor coverage claimed by Zygo herein that Zygo first separately declare the subject shipment and pay an additional premium for such coverage. Facts ¶ 64.

On or about May 5, 2003, Zygo opposed Royal's aforesaid motion for summary judgment, asserting, inter alia, that Zygo was under no obligation to separately declare the

12

subject shipment and pay any additional premium for unpaid vendor coverage, because, according to Zygo, the Policy was of the annual reporting type, with all required declarations being made at the end of the Policy year and without any additional premium due beyond that provided under the Policy's "Schedule of Rates" setting a premium rate of .023 per 100 dollars of Zygo's gross sales, declared at year's end. Facts ¶ 65.

In an opinion dated August 15, 2003, Judge Goettel denied Royal's Motion for Summary Judgment, reasoning, inter alia, that Clause 52's language was ambiguous as to whether and when additional declarations had to be made and additional premiums paid for contingency cover under Clause 52, thereby rendering it subject to varying reasonable interpretations, making the issue of the parties' intent a question of fact and rendering summary judgment inappropriate. Facts ¶ 66.


**IX.  Zygo Continues its Unjustifiable Refusal to Withdraw its Bad Faith Claims**

On July 8 and 9, 2004, Royal's counsel informed Zygo's counsel by phone that this motion for summary judgment was being prepared and reminded him of the demand made in Royal's counsel's July 26, 2002 letter to Zygo's counsel that Zygo withdraw its unjustified bad faith claims in this action. Facts ¶ 67. In those discussions, Royal's counsel referenced specific examples of the substantial evidence supporting Royal's several defenses to coverage in this action and reminded Zygo's counsel that under the bad faith standard applicable to insurers in Connecticut, there could be no bad faith on the part of the insurer where, as in this case, it had viable defenses supported by substantial evidence requiring adjudication of factual and legal issues. Facts ¶ 68. As in the July 26, 2002 letter, Royal's counsel stated again that if those bad faith claims were not withdrawn, Royal would ask the Court to impose Rule 11 sanctions against

Zygo, requesting that Zygo be required to reimburse Royal for the cost of this motion.  Facts ¶ 69.  None of the foregoing had any apparent effect, and Zygo continues to refuse to withdraw its baseless bad faith claims.  Facts ¶ 70.

**ARGUMENT**

#### I.    Standard of Review for a Motion for Summary Judgment

The Court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating an absence of genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  After the moving party meets its initial burden, the burden then shifts to the adverse party who "may not rest upon the mere allegations or denials of the adverse party's pleadings," Fed. R. Civ. P. 56(e), because the "essence of summary judgment is to go beyond the pleadings to determine whether a genuine issue of material fact exists," Page v. Connecticut Dep't of Public Safety, 185 F. Supp. 2d 149, 156 (D. Conn. 2002).  Rather, the adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The adverse party,

> ... must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise."  Trans Sport v. Starter Sportswear, 964 F.2d 186, 188 (2d Cir. 1992) (citation and internal quotations omitted); see also Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).  "The possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present."  Gibson v. American Broadcasting Cos., 892 F.2d 1128, 1132 (2d Cir. 1989).

14

Soares v. University of New Haven, 154 F. Supp. 2d 365, 372 (D. Conn. 2001) (alteration in original).

## II.  Choice of Law

In ruling on Royal's Motion for Summary Judgment, Judge Goettel held that Connecticut law governed the Court's interpretation of the Policy.  Facts ¶ 66.

## III.  The Standards Applicable to Zygo's Bad Faith Claims Under Connecticut Law

Connecticut courts "recognize[] an independent cause of action in tort arising from an insurer's common law duty of good faith.  This cause of action is separate and distinct from the plaintiff's statutory claims[2]."  Buckman v. People Express, Inc., 530 A.2d 596, 599, 205 Conn. 166, 170 (Conn. 1987) (citations omitted).  In Buckman, Connecticut's Supreme Court noted the jury instructions of the trial court below, which give a good working definition of "bad faith":

> [g]ood faith and fair dealing mean an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking means faithful to one's duty or obligation ... an honest intention not to take an unconscientious [sic] advantage of another....  The court also instructed the jury that "[b]ad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties....  The court further instructed the jury that *"bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of*

---

[2] Two Connecticut statutes can pertain to insurer bad faith but are inapplicable unless the insurer's misconduct is part of its "general business practice," an allegation that Zygo has not made here and for which there is no supporting evidence in the record. Connecticut's Unfair Insurance Practices Act ("CUIPA"), makes clear that its intended aegeis is unfair practices committed or performed "with such frequency as to indicate a general business practice." C.G.S.A. § 38a-816 at para. (6). Connecticut's Supreme Court has stated that "claims of unfair settlement practices under CUIPA require a showing of more than a single act of insurance misconduct." Mead v. Burns, 509 A.2d 11, 16, 199 Conn. 651, 659 (Conn. 1986). Similarly, while Connecticut's Unfair Trade Practices Act ("CUTPA") provides "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," C.G.S.A. § 42-110b, a plaintiff may not sue under CUTPA where the alleged misconduct is related to the insurance industry and no violation of CUIPA is alleged." Webster v. U.S. Fidelity & Guaranty Co., 1993 WL 182194, *3, 9 Conn. L. Rptr.  147 (Conn.Super. May 21, 1993) (unpublished) (citing Mead v. Burns[2], 509 A.2d 11, 199 Conn. 651 (Conn. 1986)).

15

> *dishonest purpose or moral obliquity ... it contemplates a state of mind affirmatively operating with furtive design or ill will.*

Id. at 599-600, 171, emphasis added (internal quotation marks omitted).

When an insurer fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." See Grand Sheet Metal Products Co. v. Protection Mutual Ins. Co., 375 A.2d 428, 429, 34 Conn.Supp. 46, 48 (Conn. Sup. Ct. 1977).

Although an insurer may not deny a claim on the basis of unsupported determinations resulting from its arbitrary failure or refusal to properly perform the claims examination function, evidence of a mere coverage dispute or mere negligence in an investigation will not demonstrate a breach of good faith and fair dealing") (citation omitted); R.E.O., Inc. v. The Travelers Companies, 1998 WL 285836, *13 (Conn. Super. May 20, 1998) (unpublished) (Plaintiffs request for summary judgment against insurer on the issue of bad faith denied, as the plaintiffs did not show a dishonest purpose); Agency Rent-A-Car v. ITT Hartford Accident and Indemnity Co., 1997 WL 684916. *12, 20 Conn. L. Rptr. 673 (Conn. Super. Oct. 23, 1997) (unpublished) ("In order to make [a claim of breach of the covenant of good faith and fair dealing] the plaintiff must allege that the defendant did more than simply deny the plaintiff's claim for benefits" (citation and internal quotation marks omitted).

In Bergen v. The Standard Fire Ins. Co., 1997 WL 809957, *15, 21 Conn. L. Rptr. 154 (Conn.Super. Dec. 31, 1997) (unpublished) the Court held that Connecticut recognizes the tort of bad faith. However, the "plaintiff has to show that it is entitled to recover under the policy before the insurer can be shown to have acted in bad faith." Id. (citations omitted). "Although the cases

16

say that in every contract of insurance there is a duty to act in good faith and not to unreasonably withhold payment, *the insurer does have a right to fairly dispute a claim made under the policy. . . . The plaintiffs must show that there is no reasonable basis to have denied the claim and that the insurer knew this to be the case . . . .*" Id., emphasis added (citations omitted).  Citing to a Vermont case[3], the court held that procedurally:

> [T]here are two elements to the tort [of bad faith]--whether the insurer had a reasonable basis to withhold payment and, if not, whether the insurer knew or recklessly disregarded the fact that it had no reasonable basis to withhold payment. Insurers may challenge claims that are fairly debatable.  *Thus, if a realistic question of liability exists, an insurer may withhold payment while it determines whether there is a reasonable basis for the claim or amount demanded ... A motion for summary judgment by an insurer compels a court to consider both elements of the bad-faith tort.  If the insurer prevails on either prong, the court must grant the insurer's motion.*  Even if the court determines that denial of payment was unreasonable as a matter of law, it might still find a genuine issue of material fact as to whether denial was intentional, and thus deny the motion.

> Id. at *16, emphasis added.

In addition, "if the insurer's actions in denying a claim are reasonable because the claim was fairly debatable as a matter of law, summary judgment for the insurer should be granted without reaching the question of the insurer's knowledge of whether it had a reasonable basis to deny the claim." Bergen, supra, 1997 WL at *17.

---

[3] The Vermont case which was cited was Bushey v. Allstate Ins. Co., 670 A.2d 807, 164 Vt. 399 (Vt. 1995).  In Bushey, the Court held that to "establish a claim for bad faith, a plaintiff must show that (1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim . . . Thus, the rule limits recovery to instances in which an insurer not only errs in denying coverage but does so unreasonably." Id. at 809, 402 (citation omitted).

17

In Verrastro v. Middlesex Ins. Co., 540 A.2d 693, 699, 207 Conn. 179, 189-90 (Conn. 1988), the Court held that an insurer did not breach its implied covenant of good faith and fair dealing. "At the outset, we note that the examination of good faith and fair dealing in the settling of an insurance claim requires a case-by-case analysis. Here, the record indicates that the plaintiffs hindered the defendant's ability to process their claim properly." Id. at 699, 190 (citation omitted). See also McCauley Enterprises, Inc. v. New Hampshire Ins. Co., 716 F.Supp. 718, 723 (D. Conn. 1989) ("[W]hen a good faith legal controversy exists, such as in this case, the insurer's withholding of the policy proceeds cannot be found to be in bad faith, even if the insurer's position is ultimately found to be erroneous") (citation omitted); McCarthy v. Travelers Indemnity Co., 2000 WL 372801, *9 (Conn. Super. March 29, 2000) (unpublished) ("[I]t is clear that the mere failure of an insurance company to pay a questionable claim is not enough to establish an action under a theory of bad faith. In order to establish bad faith there must be evidence that the [insurer] acted with a dishonest purpose, moral obliquity, furtive design or ill will") (citations omitted); Janicki v. Massachusetts Casualty Ins. Co., 1996 WL 694590, *3 (Conn. Super. Nov. 15, 1996) (unpublished) ("In alleging a breach of the covenant of good faith and fair dealing, courts have stressed that such a claim must be alleged in terms of wanton and malicious injury, evil motive and violence, for punitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with reckless indifference to the interests of others") (citations and internal quotation marks omitted).

In Martin v. American Equity Ins. Co., 185 F.Supp.2d 162 (D. Conn. 2002), the Court dismissed without prejudice the plaintiff's bad faith claim. "Plaintiff has alleged only that defendant failed to provide coverage and failed to provide her with a defense in the underlying state court action. These alleged facts do not set forth a cause of action for bad faith under Connecticut law. Although plaintiff has included naked, conclusory allegations as to the legal status of defendant's

18

acts, plaintiff never specifies how or in what manner defendant's denial of coverage or its refusal to provide her with a defense was 'unreasonable, outrageous, malicious and done in bad faith'. Plaintiff has alleged no acts or conduct by defendant that would demonstrate a dishonest purpose, malice, or bad faith." Id. at 165.

In Hunte v. Amica Mutual Ins. Co., 792 A.2d 132, 68 Conn.App. 534 (Conn. App. Ct. 2002), the Court discussed the requirements prior to recovery for a claim of bad faith.  "For the plaintiff to recover for bad faith she had to allege and prove that the defendant engaged in conduct design[ed] to mislead or to deceive . . . or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's right or duties . . . ." Id. at 140, 544-45 (citation and internal quotation marks omitted).

**IV.    Zygo's Unsupported Claims that Royal Acted in Bad Faith are Untrue**

Zygo's spurious claim that Royal is guilty of bad faith because, according to Zygo, Royal intentionally failed or refused to pay Zygo's unpaid vendor claim when Royal "knew or should have known that said claim was covered under the Policy" is flatly refuted, first, by the lack of any evidence in the record supporting a finding that Royal's defenses were known or should have been known by it to be spurious and without any support in fact or law, and, second, by the sheer weight of the evidence demonstrating that Royal does in fact have several viable complete defenses, including, the following:

**A. Zygo's Failure to Declare the AFM and Pay a Premium for Unpaid Vendor Coverage.**

In his opinion dated August 15, 2003, Judge Goettel denied Royal's Motion for Summary Judgment, reasoning, inter alia, that Clause 52's language was ambiguous as to whether and when additional declarations had to be made and additional premiums paid for contingency cover under Clause 52, thereby rendering it subject to varying reasonable

interpretations, making the issue of the parties' intent a question of fact and rendering summary judgment inappropriate. Facts ¶ II. While Royal is still of the opinion that Clause 52's clear and unambiguous requirement of a separate declaration and payment of premium is in no way contradicted or somehow made "ambiguous" by the Policy's Schedule of Rates, the very fact that the Court was of the opinion that the subject Policy language was capable of two interpretations and that therefore the question of the parties' intent would have to be adjudicated at trial, contradicts Zygo's claim that Royal's defense on this point is so completely devoid of merit as to render its proffer by Royal evidence of bad faith. Nothing could be further from the truth.

**B.    Zygo's Deliberate Failure to Permit Royal to Inspect the Damaged AFM**

In the face of Zygo's deliberate failure to heed its own Mr. Walch's suggestion that Royal attend the only survey ever conducted in respect of the damaged AFM, its failure to engage any cargo or packaging expert on its own behalf, its failure to take any steps to insure that evidence's preservation, and its failure over a period of many months to permit Royal to inspect the damaged AFM, Zygo's claim that Royal is guilty of bad faith because it allegedly failed to fairly and adequately investigate Zygo's claim by declining to inspect the damaged machines, really adds insult to injury, as does Zygo's claim that if Royal had performed a fair and adequate investigation it might have reached a different conclusion regarding coverage.

It is abundantly clear from the record that the only professional cargo surveyors, those hired by Nan Ya, who had an opportunity to inspect the damaged AFM, concluded that its packaging was inadequate, a conclusion shared not only by Nan Ya, but also by Zygo's own local representative, Billy Wu, who was knowledgeable about such matters. At the very least, it cannot be disputed that the inadequacy of that AFM's packaging as a possible cause of the

20

subject damages had certainly been raised, and it was clear to Zygo's Mr. Walch that Nan Ya

and its underwriters were going to use that as their reason for rejecting any responsibility for the

second AFM. Zygo's failure to protect that evidence, to arrange for its own experts to examine

it, and its deliberate blocking of any such inspection by Royal's experts severely impaired

Royal's subrogation rights against Nan Ya, since Nan Ya alone had expert evidence on the point,

and that evidence laid responsibility for the damages at Zygo's feet, exculpating Nan Ya and its

underwriters.

Under Policy Clause 32, "Reporting Losses,"

> *Any loss or damage to the property hereby insured must be promptly reported to the Company or to the nearest Settling Agent of the Company and such Agent must be represented on all surveys* and must approve proofs of loss and bills of expense. If there be no such Agent at or near the port or place where the loss is discovered or the expenses incurred, then such report must be made to the nearest representative of the American Institute of Marine Underwriters or to a Lloyds Agent, and his approval obtained as above. *Failure to report loss or damage promptly* and to file such proof of loss *shall invalidate any claim under this Policy.*

Facts ¶ 2. Emphasis added.

Under Policy Clause 43, "Subrogation and Impairment of Recovery,"

> It is a condition of this insurance that upon payment of any loss the Company shall be subrogated to all rights and claims against third parties arising out of such loss. It is a further condition of this insurance that *if the Assured or his or their assigns have entered or shall enter into any special agreement whereby any carrier or bailee is released from its common law or statutory liability for any loss, or have or shall have waived, compromised, settled or otherwise impaired any right of claim against a third party to which the Company would be subrogated upon payment of a loss without prior agreement of the Company and endorsement hereon, the Company shall be free from liability with respect to such loss,* but its right to retain or recover the premium shall not be affected.

Facts ¶ 3. Emphasis added.

The prejudice to Royal, by Zygo's blatant breaches of Policy Clauses 32 and 43 in denying Royal the opportunity to inspect the damaged AFM on February 14, 2000, the last occasion on which Zygo's own engineer, Mr. Walch, could confirm that evidence as being unspoiled, is so complete and unalterable as to warrant denial of Zygo's claims in this action on that basis alone. For Zygo to suggest that there is no credible evidence of any such wrongdoing on its part and consequent prejudice to Royal sufficient to at least defeat Zygo's claims of bad faith is in fact nothing less than clear evidence of Zygo's own bad faith refusal to withdraw those baseless claims.

It should also be noted that Zygo's failure to give timely notice of these damages, its failure to give any advance notice of the February 14, 2000 joint survey, its months of foot dragging and long delays in providing even the most cursory information, its failure to do anything to safeguard the evidence, and the ultimate refusal of its representatives to give Royal's surveyors any opportunity to inspect that evidence before it was disposed of, all make Zygo's complaint that Royal took too long to decline coverage all the more ludicrous. As was the case in Verrastro v. Middlesex Ins. Co., 540 A.2d 693, 699, 207 Conn. 179, 189-90 (Conn. 1988), the record indicates that the assured hindered its insuror's ability to process the claim properly. Indeed, it would appear that in this case that hindrance was deliberately calculated to conceal possible evidence of improper packaging that, in and of itself, might have resulted in Zygo being unable to recover from either Nan Ya or Royal.

## C.    Zygo's Apparent Settlement Negotiations With Nan Ya

In the face of Nan Ya's submissions of affidavits, correspondence, meeting minutes and other evidence supporting its Motion for Summary Judgment, and of the indisputable fact that

22

Zygo never apprised Royal at the time of these negotiations that they were taking place, Zygo's denial of the availability to Royal of at least the possibility of a viable defense based on Zygo's possible release of Nan Ya is equally outrageous, and, again, evidence of Zygo's bad faith in refusing to withdraw its baseless bad faith claims.    The fact that Nan Ya insists that Zygo released it and offers evidence in support of that claim, at minimum justifies Royal's denial of Zygo's claims for reimbursement of the damaged AFM's purchase price, pending the Court's adjudication of the release issues, and, certainly puts the lie to Zygo's claims of bad faith on Royal's part.  If such negotiations and such a release took place, this would constitute a blatant breach by Zygo of Policy Clause 43 and would necessarily result in a complete denial of coverage to Zygo.

**D.  Zygo Cannot Meet Connecticut's Legal Standards on its Bad Faith Claims**

As discussed in Section III, above, under applicable Connecticut law, an insurer like Royal has a right to fairly dispute a claim made under its Policy, and that insurer's mere denial of a claim does not by itself establish any bad faith on the insurer's part.  In order to succeed on its bad faith insurance claim against Royal, Zygo must show that there was no reasonable basis for Royal to have denied the claim _and_ that Royal knew this to be the case.  In the face of the record presently before the Court, this Zygo cannot do. A motion for summary judgment by an insurer compels a court to consider both elements of the bad-faith tort.    If the insurer prevails on either prong, the court must grant the insurer's motion. Bergen, supra, 1997 WL at *16.

If, as is the case here, a realistic question of liability existed, Royal had every right to refuse to pay the claim while it determined whether there was a reasonable basis for the claim or amount demanded – doing so was _not_ an act of bad faith.    Moreover, if as here, Royal's actions in denying Zygo's claim were reasonable because the claim was fairly debatable as a matter of law, summary

23

judgment for the insurer should be granted without reaching the question of the insurer's knowledge of whether it had a reasonable basis to deny the claim. Bergen, supra, 1997 WL at *17.

## CONCLUSION

For all of the foregoing reasons, Royal respectfully requests summary judgment from this Court dismissing with prejudice Zygo's bad faith and punitive damage counterclaims against Royal, and, pursuant to Rule 11 of the Federal Rules of Civil Procedure, for an order awarding Royal the costs of bringing this motion, and for such other and further relief as may be just, proper, and equitable.

Dated: New York, New York
July 7, 2003

NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE
Attorneys for Plaintiff / Third Party Plaintiff
Royal Insurance Company of America

By: _____
GEOFFREY J. GINOS, ESQ. (ct. 19578)
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830
(FILE NO.: 21000055 JAVN/GJG)

LAW OFFICES OF ROBERT K. MARZIK, P.C.
1512 Main Street
Stratford, Connecticut 06615

24

**TO:**

Honorable Janet Bond Arterton
United States District Judge
United States District Court
for the District of Connecticut
14 Cottage Place
Waterbury, Connecticut 06702

Ian E. Bjorkman, Esq.
Wiggin & Dana.
One Century Tower
New Haven, Connecticut 06508

Daniel L. FitzMaurice, Esq.
& Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

25

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing filing, "Royal Insurance Company of America's Memorandum of Law in Support of Motion for Summary Judgment," was sent *via* first class mail, postage prepaid this 7th day of July, 2004 to:

Honorable Janet Bond Arterton
United States District Judge
United States District Court
for the District of Connecticut
14 Cottage Place
Waterbury, Connecticut 06702

Ian E. Bjorkman, Esq.
Wiggin & Dana
One Century Tower
New Haven, Connecticut 06508

Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

Robert K. Marzik, Esq.
Law Office of Robert K. Marzik, P.C.
1512 Main Street
Stratford, Connecticut 06615

GEOFFREY J. GINOS (CT 19578)

X:\Public Word Files\21\55\Legal\MSJ Bad Faith -- Memo of Law.7.7.04.val.doc

26