UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

---------------------------------------------------------------X    **Case No.:**
ROYAL INSURANCE COMPANY OF AMERICA,         **3:01 CV 1317 (JBA)**

                Plaintiff,

    -against-

ZYGO CORPORATION,

                Defendant.
---------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

                Third-Party Plaintiff,

    -against-

NAN YA TECHNOLOGY CORPORATION,

                Third-Party Defendant.
---------------------------------------------------------------X

## ROYAL INSURANCE COMPANY OF AMERICA'S
## LOCAL RULE 56(a)(1) STATEMENT

Plaintiff Royal Insurance Company of America ("Royal") by its attorneys, Nicoletti Hornig Campise Sweeney & Paige, sets forth below as and for its Statement, pursuant to Local Rule 56 (a)(1), the following material facts as to which Royal contends there is no genuine issue to be tried:

    1.    The claims asserted against Royal by Zygo Corporation ("Zygo") in these proceedings allegedly arise under a Marine Open Cargo Policy (policy no. POC102950), with an

effective date of May 1, 1999 (hereinafter the "Policy")[1], that was issued by Royal to Zygo as the named insured.   Admission at para. 1.[2]

    2.    Clause 32 of the Policy provides:

**REPORTING LOSSES**
32.    Any loss or damage to the property hereby insured must be promptly reported to the Company or to the nearest Settling Agent of the Company and such Agent must be represented on all surveys and must approve proofs of loss and bills of expense.  If there be no such Agent at or near the port or place where the loss is discovered or the expenses incurred, then such report must be made to the nearest representative of the American Institute of Mine Underwriters or to a Lloyds Agent, and his approval obtained as above.  Failure to report loss or damage promptly and to file such proof of loss shall invalidate any claim under this Policy.

    3.    Clause 43 of the Policy provides:

**SUBROGATION AND IMPAIRMENT OF RECOVERY**
43.    It is a condition of this insurance that upon payment of any loss the Company shall be subrogated to all rights and claims against third parties arising out of such loss.  It is a further condition of this insurance that if the Assured or his or their assigns have entered or shall enter into any special agreement whereby any carrier or bailee is released from its common law or statutory liability for any loss, or have or shall have waived, compromised, settled or otherwise impaired any right of claim against a third party to which the Company would be subrogated upon payment of a loss without prior agreement of the Company and endorsement hereon, the Company shall be free from liability with respect to such loss, but its right to retain or recover the premium shall not be affected.

---

[1] A copy of the Policy is annexed to the Complaint, which is attached to the affidavit of Geoffrey J. Ginos as Exhibit "R".

[2] "Admission at para. "_" refers to the numbered paragraph admitting this fact in Zygo's Local Rule 56(a)(2) Statement of May 5, 2003, attached as Exhibit "A" to the affidavit of Geoffrey J. Ginos offered in support of Royal's motion for summary judgment, originally filed by Zygo in response to Royal's Local Rule 9(c)(1) Statement, dated April 4, 2003, supporting Royal's Motion for Summary Judgment in this action., attached to the affidavit of Geoffrey A. Ginos offered in support of Royal motion for summary judgment as Exhibit "B".

4. Clause 55 of the Policy provides:

**FOB/FAS SHIPMENTS**

55. This Policy is extended to cover shipments sold by the Assured of (*sic*) F.O.B., F.A.S., cost and Freight or similar terms whereby the Assured is not obligated to furnish ocean marine insurance. This insurance attaches subject to Policy terms and conditions and continues until the goods are loaded on board the overseas vessel or until the Assured's interest ceases, whichever shall first occur. The particulars of all such shipments shall be reported promptly to the Assurer and premium paid on the amounts so declared at the rate of N/A for not exceeding thirty (30) days after attachment of risk. Extension of risk beyond thirty (30) days held covered at rates to be agreed.

Admission at para. 3.

5. Clause 52 of the Policy provides:

**CONTINGENCY**

52. It is agreed that on all shipments sold by the Assured on cost and freight or other terms whereby the Assured is not required to furnish ocean marine insurance, this Policy is extended (subject to all its terms and conditions) to cover only the interest of the Assured as an unpaid vendor from the time shipments become at the risk of the customer under the terms of sale until payment of draft but in no event beyond the time when this Company's risk would normally cease under the terms of this Policy.

It is further understood and agreed that in no event shall this insurance inure to the benefit of the buyer or his underwriter but in the event of a loss occurring which would be collectible hereunder but for such terms of sale and the Assured is unable to collect the purchase price from the buyer in regular course, this Company will advance the amount of such loss pending collection from the buyer. The Assured hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse this Company, the latter sharing the expense of such collection in proportion to its interest herein.

The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed.

3

Admission at para. 4.

6.  In January 2000, Nan Ya Technology Corporation ("Nan Ya") ordered from Zygo an Atomic Force Microscope ("AFM") (hereinafter the "Cargo" or, as referred to in the pleadings, the "second AFM") to replace another AFM that had previously been ordered from Zygo but had allegedly been damaged in transit to Nan Ya. Admission at para. 5.

7.  On or about January 31, 2000, Nan Ya provided Zygo with a purchase order for the Cargo with a purchase price of $690,000. Admission at para. 6.

8.  The delivery terms of that purchase order for the Cargo stated, "FOB US Airport". Admission at para. 7.

9.  Under the terms of the sale between Zygo and Nan Ya, Zygo had no obligation to insure the Cargo during its air carriage between the United States and Taiwan. Admission at para. 8.

10. On or before February 4, 2000, Zygo contracted on behalf of Nan Ya with Lynden Air Freight (also identified as Lynden International, hereinafter "Lynden Air") to deliver the Cargo to a United States airport for ultimate air carriage to Taiwan for Nan Ya's account. Admission at para. 10.

11. On or about February 4, 2000, Lynden Air issued a clean air waybill bearing the number 40133373 for the Cargo in which it certified that the "goods described below [i.e., the Cargo] were received for carriage . . . in apparent good order and condition except as noted hereon," and in which no damage, defects or problems of any sort, relating to the Cargo, were noted. Admission at para. 11.

12. On or about February 11, 2000, Nan Ya advised Zygo that an inspection of the Cargo carried out after it had been discharged in Taiwan had determined that it was in damaged condition. Admission at para. 14.

13. Zygo has admitted that, the crate containing the Cargo's main component was severely damaged during transit. Admission at para. 15.

14. The Cargo was damaged after it was loaded aboard the carrying aircraft at the U.S. airport and before it was inspected by Nan Ya in Taiwan, where said damage was first noted. Admission at para. 16.

15. On or about February 10-11, 2000, shortly after learning from Nan Ya that the Cargo had arrived at Nan Ya in damaged condition, Zygo had one of its engineers familiar with these AFMs, Mr. Kelvin Walch, conduct a preliminary inspection of the Cargo. Exhibit "C" (Deposition Testimony of Kelvin Walch, dated June 7, 2004) at pgs. 94-96; Exhibit "P" (Report of Kelvin Walch dated February 14, 2000).

16. At the time that the first and second AFM's arrived at Nan Ya Taiwanese facility in damaged condition, Mr. Kelvin Walch, an engineer knowledgeable about these types of machines, was employed by Zygo to assist its customers with the installation and repair of these instruments. Exhibit "C", at pgs. 18-20.

17. Mr. Walch, and Zygo's Vice President, Larry Martin, both testified that Mr. Walch was not qualified as an expert in the rigging and packaging of AFMs or in conducting a forensic analysis of transit damage suffered by them in order to determine the cause of that damage and the adequacy of their packaging. Exhibit "C", at pgs. 21-22, 169-70; Exhibit "T" (Deposition Testimony of Lawrence C. Martin, dated February 5, 2004) at pgs. 102-03.

18. Kelvin Walch testified that his initial inspection of the second damaged AFM was very limited and restricted to removing only one or two wooden panels of its outside protective packing so that he could look inside to ascertain that it had in fact been severely damaged in transit. Exhibit "C", at pgs. 95-96; Exhibit "O" Report of Kelvin Walch, dated February 11, 2000).

19. Mr. Walch testified that he limited that first inspection in this manner because he knew how important it was to retain the damaged AFM in is original as-delivered condition without disturbing the evidence it represented until such time as a joint survey could be conducted by all interested parties, thereby providing to them a fair opportunity to have their experts inspect the damage in order to ascertain its nature, extent and possible causes, as well as its repairability and salvage value, if any. Exhibit "C", at pgs. 96-99, 122-25; Exhibit "O".

20. Mr. Walch confirmed that it was obvious to him from even this cursory inspection that the machine had suffered severe damage and might not be repairable and that the parties and their insurers would need to survey the damaged AFM. Exhibit "C", at pgs. 101-02, 105-06; 108-14; Exhibit "O".

21. Accordingly, Mr. Walch suggested to Zygo in a February 11, 2000 report that Zygo notify its insurer (Royal) of the scheduled February 14, 2000 survey so that Royal could arrange for its own cargo damage expert to attend and inspect the subject AFM. Exhibit "C", at pgs. 124-26; Exhibit "O".

22. Zygo gave no such notice to Royal and as a result, no one attended the February 14, 2000 joint survey on Royal's behalf – Mr. Walch so no one at the survey who was represented as being from Royal. Exhibit "C", at pgs. 132-40, 148-49, 194.

23. Nor did Zygo ever engage any cargo packaging expert on its own behalf to inspect the damaged AFMs, relying instead on Kelvin Walch, who by his own admission and that of Zygo's Vice President, Larry Martin, was not qualified to do any expert forensic analysis of the AFM damages in order to ascertain the cause of the damages and the adequacy of these cargo's packaging. Exhibit "C", at pgs. 21-22, 149, 169-70; Exhibit "I", at pgs. 102-03.

24. At the February 14, 2000 joint survey, Nan Ya, its underwriters and the independent cargo surveyors engaged by Nan Ya concluded that inadequate packaging had caused the subject damages. Exhibit "C", at pgs. 110-11; Exhibit "P"; Exhibit "U" (Survey Report of Cathay Inspection Co., Ltd., dated February 19, 2000 at p. 3).

25. Nan Ya and its underwriters took the position at that joint survey that, as the damages in question had been caused by inadequate packaging, this relieved Nan Ya of any obligation to pay for the subject AFM's purchase price. Exhibit "C", at pg. 110; Exhibit "P".

26. Even Zygo's local Taiwanese agent, Billy Wu, the President of Lee Tech, who was very familiar with these types of AFM machines, remarked to Zygo that said packaging seemed very inadequate for such a delicate and expensive instrument, and was quite dissimilar from the packaging done for similar machines by Zygo's competitor Veeco. Exhibit "W" (Lee-Tech Fax, dated February 15, 2000); Exhibit "X" (Lee-Tech Fax, dated February 16, 2000).

27. Zygo had in fact supervised and was responsible for the rigging and packaging of the second AFM, which was done at the manufacturer IBM's Florida facility by IBM-hired rigging contractors under supervision of Zygo personnel. Exhibit "I", at pgs. 244-46; Exhibit "Y".

28. It was obvious to Mr. Walch from Nan Ya's vociferous claims of inadequate packaging at the February 14, 2000 joint survey that insurance claims might be

7

lodged against the packing company or IBM, and he reported this to Zygo. Exhibit "C", at pg. 105; Exhibit "O".

29.     Despite Mr. Walch's suggestion on February 11, 2000 that Royal be notified of the February 14, 2000 joint survey so that it could send its own expert to attend there, Zygo waited until March 7, 2000, three weeks after that survey's completion before notifying Royal of the subject damages. Exhibit "D" (Letter from Merati to Royal dated 3/7/00).

30.     Promptly after receiving this late notice of claim from Zygo, on March 8, 2000, Royal's claims manager, Joseph Daneman, notified Zygo that Royal would assign a surveyor to inspect the damaged AFMs and he asked Zygo to advise him of said cargo's location and to provide him with a contact name, telephone and fax number so that this inspection could be arranged. Exhibit "E" (Letter from Daneman to Merati dated 3/8/00).

31.     Almost two weeks passed after Mr. Daneman's request without any response from Zygo, and so, on March 20, 2000, he wrote again to Zygo asking again for the information needed to arrange the damaged AFMs' inspection. Exhibit "F" (Letter from Daneman to Merati dated 3/20/00).

32.     A month passed with still no response from Zygo, and on April 19, 2000, Mr. Daneman wrote yet again to Zygo, asking for the cargo's location and contact information so that Royal could send its own surveyor to inspect the damaged AFMs. Exhibit "G" (Letter from Daneman to Merati dated 4/19/00).

33.     It was not until May 8, 2000 that Royal was provided with the requested contact information. Exhibit "H" (Memo from Weidman to Daneman dated 5/1/00). On May 12, 2000, Mr. Daneman, believing after his review of the matter that it involved a claim for transit damage occurring after the cargo had been loaded aboard the aircraft for overseas

shipment, so that under Policy Cl. 55, Zygo had no insurable interest (this was months before Zygo's broker indicated for the first time that it was claiming unpaid vendor coverage – wrote to Zygo informing it that, since Zygo had no insurable interest, Royal would not be assigning a surveyor to inspect the cargo. Exhibit "L" (Letter from Daneman to Weidman dated May 12, 2000). However, just a week later, on May 19, 2000, because Zygo's insurance brokers had submitted a claim on this cargo, Mr. Daneman changed his mind and asked Royal's surveyors in Taiwan to arrange for an independent survey of the damaged AFMs in order to ascertain the cause of the subject damages. Exhibit "M" (Letter from Daneman to Weidman dated May 19, 2000).

    34. But, despite repeated attempts over the succeeding months to arrange for an inspection of the damaged AFMs, Royal's surveyors were never given access to them, and, the AFMs were disposed of by Zygo without any such inspection having taken place. See, e.g., Exhibit "N" (Letters from Daneman to Weidman dated 6/19/00, 7/13/00, 7/21/00 and 11/10/00).

    35. Zygo's Kelvin Walch admitted that it was important to insure that said damaged AFM would be preserved as evidence, making sure that none of that evidence was removed or was altered from its original state on arrival at Nan Ya's loading dock so that it could be inspected by experts representing the various parties and their underwriters. Exhibit "C", at pgs. 149-50, 217-18; Exhibit "O".

    36. Mr. Walch also testified that, after completion of the February 14, 2000 joint survey, Zygo probably could have removed that second damaged AFM from Nan Ya's premises and stored it safely at Zygo's Taiwanese offices, where its security could be assured, but it did not do so, and, instead, merely left the AFM at Nan Ya's loading dock. Exhibit "C", at pgs. 217-18, 295-96.

37. Mr. Walch, testified that he had asked Nan Ya's loading dock personnel to not disturb the second damaged AFM, but he admitted that he did not know whether or how portions of that evidence may have been taken away, altered or otherwise lost. Exhibit "C", at pgs. 218, 245-48, 293-94.

38. In fact, Mr. Walch admitted that when he reinspected the damaged AFM in November 2000 in order to ascertain its salvage value, he made no effort to determine whether its evidentiary integrity had been compromised, since by then, he regarded it as only so much scrap. Exhibit "C", at pgs. 245-48, 293-96.

39. Mr. Walch was not aware of any access ever given by Zygo to Royal in respect of an inspection of these AFMs. Exhibit "C", at pgs. 205, 218-19.

40. Due to the aforesaid damage to the Cargo, Nan Ya, *continuing to maintain that it had been caused by inadequate packaging for which Zygo not Nan Ya was responsible under their sales contract,* refused to pay Zygo for any portion of the Cargo's $690,000 purchase price. See Zygo's Answer ¶¶ 50, 99; Admission at para. 17; Exhibit "O". See Exhibit "R" (¶¶ 50, 59 (Zygo's Answer); Admission at para. 17; Exhibit "T", at p. 11, Twenty-Second Affirmative Defense (Nan Ya's Answer).

41. On or about March 7, 2000, Zygo gave notice of its claim for the subject Cargo loss to its insurer, Royal. Admission at para. 18.

42. On July 16, 2001, Royal issued a formal letter declining coverage. Admission at para. 19; Exhibit "V" (Letter from Daneman to Maritn dated 7/16/01)..

43. That July 16, 2000 letter from Royal set out the Policy provisions whose breach or non-compliance with by Zygo had resulted in denial of coverage. Exhibit "V".

44. On June 8, 2001, Zygo's insurance manager, Richard Dressler, notified Zygo's insurance brokers that Zygo had decided to obtain Ocean Cargo coverage from the St. Paul Insurance company because of the lower premiums St. Paul offered, and because, Royal had declined to offer any contingency [i.e., unpaid vendor] coverage in connection with any extension or renewal of the Zygo-Royal Policy. In that email notice, Mr. Dressler noted that Zygo's pending claim with Royal [now before this Court] was "going to be difficult," and that, whether or not Zygo continued to obtain marine insurance from Royal would "probably not influence their [i.e., Royal's] decision on that claim one way or the other." Exhibit "JJ" (Deposition Testimony of Richard Dressler, dated ), pgs. 48-54; Exhibit "KK" (Email from Dressler to Weidman, dated June 8, 2001).

45. On or about July 13, 2001, Royal then commenced a declaratory judgment action against Zygo, seeking a determination that coverage for the subject claim did not exist under the Policy. Admission at para. 20; Exhibit "Q" (Royal's Declaratory Judgment Complaint).

46. In its Complaint, Royal asserted, inter alia, that due to Zygo's failure to declare the subject Cargo and pay for unpaid vendor coverage under Clause 52, such coverage never attached to the Cargo. Exhibit "Q", ¶¶ 70-76.

47. Royal also asserted in its Complaint that the claimed coverage did not exist because Zygo had breached the Policy by impairing and/or waiving Royal's right of subrogated recovery against Nan Ya under the original Zygo/Nan Ya sales contract for the second AFM. Exhibit "Q", ¶¶ 77-81.

48. On or about September 20, 2001, Zygo filed its Answer and Counterclaims in this action, in which, inter alia, citing Clause 52 of the Policy and asserting that

Zygo had attempted without success to "collect the amount due on the second AFM" from Nan Ya and put Royal on notice of its claim regarding the second AFM, Zygo counterclaimed against Royal for breach of contract and sought a declaration from this Court that Zygo's aforesaid claim is covered under the Policy. Admission at para. 21; Exhibit "R", ¶¶ 105, 118-133.

49. Zygo denied in its Answer that it had impaired and/or waived Royal's rights of subrogated recovery against Nan Ya and denied that it had any obligation to declare the Cargo and pay any additional premium for vendor coverage in advance of the claim arising. Exhibit "R", ¶¶ 70-81.

50. In its second counterclaim against Royal, Zygo alleges that Royal owed to Zygo a duty of good faith and fair dealing under the Policy and that Royal breached that contractual duty by allegedly,

> a. intentionally failing or refusing to pay Zygo's claim when Royal knew or should have known that said claim was covered under the Policy;
>
> b. failing to fairly and adequately investigate Zygo's claim by declining to inspect the damaged machines (Zygo alleges that if Royal had performed a fair and adequate investigation it might have reached a different conclusion regarding coverage);
>
> c. misrepresenting and/or mischaracterizing Zygo's efforts to collect the purchase price of the second AFM from Nan Ya (Zygo alleges that, if Royal had not so misrepresented and /or mischaracterized Zygo's collection efforts, Royal might have reached a difference conclusion regarding coverage); and
>
> d. taking sixteen months to render its formal declination of coverage, not formally declining coverage until after Zygo had declined to renew the Policy and even then, not supporting its declination with facts tending to establish that Zygo's claim is not covered under the Policy.

See Exhibit "R", ¶ 123.

51. Zygo alleges in its third counterclaim that Royal has engaged in bad faith with respect to its response to Zygo's claim by virtue of the conduct alleged in Zygo's second

counterclaim and, additionally, by allegedly recklessly and carelessly failing to pay Zygo's claim. Exhibit "R", ¶¶ 126-29.

52.     Presumably based upon the aforesaid allegations made against Royal of bad faith and recklessly and carelessly failing to pay Zygo's claim, Zygo has claimed against Royal in this action for punitive damages and attorney's fees and costs in addition to its claim for compensatory damages. Exhibit "R" at p. 18 (Wherefore Clause).

53.     On or about October 8, 2001, Royal served and filed its Third-Party Complaint against Nan Ya, asserting, contingent upon a finding that coverage did exist under the Policy, that Royal would in that event have the right to claim against Nan Ya as Zygo's insurer subrogated to Zygo's right of recovery against Nan Ya of the subject AFM's purchase price. Exhibit "S" (Royal's Third-Party Complaint).

54.     On or about February 6, 2001, Nan Ya responded by serving and filing its Amended Answer, Affirmative Defenses and Jury Demand to Royal's Third-Party Complaint, advancing amongst various affirmative defenses the defenses that Zygo had released and absolved Nan Ya from any liability for the subject AFM and that, under the sales contract between Zygo and Nan Ya, Zygo was obliged to compensate Nan Ya for inadequate packaging. Exhibit "T".

55.     On or about June 13, 2002, Nan Ya moved for summary judgment on the grounds that, in November 2000, a dispute between Nan Ya and Zygo over whether the damage to AFMs Numbers 1 and 2 was caused by inadequate packaging or rough handling was amicably resolved by them as a result of written communications and face-to-face discussions between their representatives, with Nan Ya agreeing that it and its underwriters would accept responsibility only for the loss of the first damaged AFM, while Zygo and its underwriters would

13

accept responsibility for the second damaged AFM, for which Nan Ya and its underwriters would bear no responsibility or liability whatsoever. Exhibit "Z" (Third-Party Defendant Nan Ya Technology Corporation's Memorandum of Law in Support of Motion for Summary Judgment on Liability for Damaged Microscope)(for the Court's convenience, only the Memorandum of Law is included as an exhibit).

56. As Zygo had not notified Royal of the discussions and meetings which Nan Ya alleged had resulted in its release in respect of the second AFM, and Royal had not participated therein, Royal was not in a position to rebut or oppose Nan Ya's motion for summary judgment and in a July 26, 2002 letter to Zygo's counsel, Zygo's counsel insisted that Zygo do so, since it had participated therein, denied any settlement had taken place and purported to have knowledge and evidence supporting that position. See Exhibit "BB" (Letter from Royal's counsel John A. V. Nicoletti to Zygo's counsel, Ian E. Bjorkman, dated July 26, 2002).

57. That letter to Zygo's counsel stated that Nan Ya's Motion for Summary Judgment established that Royal had had and still had reasonable basis to deny Zygo's claim in this action, and, accordingly, demanded that Zygo withdraw any bad faith claim that it was asserting. Exhibit "BB". But Zygo refused to withdraw its unjustified bad faith claims, a refusal that it reasserted most recently in the July 7, 2004 telephone conference between Royal and Zygo's counsel. See Ginos Affidavit, ¶ 3.

58. On or about August 19, 2002, Zygo served and filed its opposition to Nan Ya's Motion for Summary Judgment, vigorously denying that it had released Nan Ya and offering affidavits and documents which it purported contradicted Nan Ya's claim that such a settlement had been effected. See Exhibit "AA" (Zygo Corporation's Memorandum of Law in

Opposition to Nan Ya Technology Corporation's Motion for Summary Judgment)(for the Court's convenience, only the Memorandum of Law is included as an exhibit).

59. Since Royal's assured, Zygo, a party to the action with a clear vested interest in the outcome of Nan Ya's Motion for Summary Judgment had filed its aforesaid opposition to that motion, and since Royal had no knowledge or evidence pertaining to the discussions that Nan Ya claimed had led to its release by Zygo, Royal filed no separate opposition to Nan Ya's motion. Exhibit "BB" at p. 2.

60. On or about September 11, 2002, Judge Goettel granted Nan Ya's Motion for Summary Judgment saying nothing more than, "Motion Granted absent objection from the Third Party Plaintiff. This is not a ruling on the merits and will have no collateral estoppel effect in this litigation." Exhibit "CC" (Endorsement Order of Geottel, J., dated 9/11/02).

61. On September 18 and 24, 2002, Royal asked that Judge Goettel reconsider his ruling, but he declined to do so. Exhibit "DD" (Letter from counsel for Royal to Judge Goettel dated 9/18/02); Exhibit "EE" (Letter from counsel for Royal to Judge Goettel dated 9/24/00).

62. Nan Ya, fully cognizant of the fact that the law in this Circuit does not permit a judge to grant summary judgment "not on the merits", thereby making Judge Goettel's order granting its motion for summary judgment reversible on that ground alone, moved for Rule 54 certification of that grant. See Docket Nos. 88 and 89.

63. Zygo has admitted that it did not separately report the shipments of, or separately declare the value of, the shipments of AFM Nos. 1, 2 and 3. Admission at para. 12.

64. On or about April 4, 2003, Royal moved for summary judgment in this action, asserting that Policy Cl. 52 unambiguously required as a precondition to the unpaid

68. In those discussions, Royal's counsel referenced specific examples of the substantial evidence supporting Royal's several defenses to coverage in this action and reminded Zygo's counsel that under the bad faith standard applicable to insurers in Connecticut, there could be no bad faith on the part of the insurer where, as in this case, it had viable defenses supported by substantial evidence requiring adjudication of factual and legal issues. See Ginos Aff., ¶3.

69. As in the July 26, 2002 letter, Royal's counsel stated again that if those bad faith claims were not withdrawn, Royal would ask the Court to impose Rule 11 sanctions against Zygo, requesting that Zygo be required to reimburse Royal for the cost of this motion. See Ginos Aff., ¶3.

70. None of the foregoing had any apparent effect, and Zygo continues to refuse to withdraw its bad faith claims. See Ginos Aff., ¶3.

Dated: New York, New York
      July 9, 2003

                                NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE
                                Attorneys for Plaintiff/Third Party Plaintiff
                                Royal Insurance Company of America

By: _____
      GEOFFREY J. GINOS, ESQ. (ct. 19578)
      Wall Street Plaza
      88 Pine Street, 7th Floor
      New York, New York 10005-1801
      (212) 220-3830
      (FILE NO.: 21000055 JAVN/GJG)

LAW OFFICES OF ROBERT K. MARZIK, P.C.
1512 Main Street
Stratford, Connecticut 06615

LAW OFFICES OF ROBERT K. MARZIK, P.C.
1512 Main Street
Stratford, Connecticut 06615

**TO:**

Honorable Janet Bond Arterton
United States District Court Judge
141 Church Street
New Haven, Connecticut 06510

Ian E. Bjorkman, Esq.
Wiggin & Dana.
One Century Tower
New Haven, Connecticut 06508

Daniel L. FitzMaurice, Esq.
& Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing filing, "Royal Insurance Company of America's Local Rule 56(a)(1) Statement," was sent *via* first class mail, postage prepaid this 7th day of July, 2004 to:

Honorable Janet Bond Arteron
United States District Judge
United States District Court
for the District of Connecticut
14 Cottage Place
Waterbury, Connecticut 06702

Ian E. Bjorkman, Esq.
Wiggin & Dana
One Century Tower
New Haven, Connecticut 06508

Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

Robert K. Marzik, Esq.
Law Office of Robert K. Marzik, P.C.
1512 Main Street
Stratford, Connecticut 06615

_____
GEOFFREY J. GINOS (CT 19578)

X:\Public Word Files\21\55\Legal\Summary Judgment.Bad Faith Claim.56.1 Statement.final.doc

18