UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA, Plaintiff, | ) ) ) ) | Civil No. 3:01 CV 1317 (JBA) |
| v. | ) ) ) | |
| ZYGO CORPORATION, Defendant. | ) ) ) | July 7, 2004 |

## DEFENDANT ZYGO CORPORATION'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Zygo Corporation ("Zygo") submits this memorandum in support of its

motion for partial summary judgment dated July 7, 2004.

### BACKGROUND

This insurance dispute arises out of a Marine Open Cargo Policy (the "Policy") that

Royal Insurance Company of America ("Royal") issued to Zygo in May 1999. Zygo is in the

business of designing and manufacturing, among other things, electro-optical measuring

instruments and components, such as the Atomic Force Microscope ("AFM")[1] involved in this

case. As Zygo regularly ships its high-tech devices around the world, it is and was at all times

insured under a Marine Open Cargo Policy such as the Policy.

---

[1] An AFM is a high-tech measuring instrument that is used as a quality control tool in the manufacturing of microchips. *See* Deposition of Kelvin Walch (hereinafter "Walch Dep.") at 7-8. A true and correct copy of Walch deposition excerpts is attached as Ex. 28 to the Affidavit of Ian E. Bjorkman ("Bjorkman Aff."), dated July 7, 2004. Excerpts to all of the depositions cited in this brief are also attached to the Bjorkman Aff., as Exs. 22-28.

## I.    The Parties' Dispute

### A.    Zygo's Shipments to Nan Ya

In December 1999, Nan Ya Technology Corporation ("Nan Ya") purchased an AFM from Zygo for $690,000 (the "First AFM"). *See* Zygo's Local Rule 56(a)1 Statement of Undisputed Facts (hereinafter "Statement") ¶ 2. The total purchase price of the First AFM was $690,000. *Id.* The terms of sale were as follows: FOB[2] Delray Beach, Florida, with an 80% payment due prior to shipment, by letter of credit, and the remaining 20% payment due when Nan Ya accepted the shipment in Taiwan. *Id.* At Nan Ya's request, Zygo contracted with Lynden Air Freight ("Lynden Air") to deliver the Cargo to a United States airport for transport to Taiwan. *Id.*

In January 2000, Nan Ya advised Zygo that the First AFM had arrived in Taiwan seriously damaged. Statement ¶ 3. Nan Ya desperately needed the AFM for its business, and it therefore issued a purchase order for another AFM (the "Cargo" or "Second AFM") at the same purchase price and with the same delivery terms as the First AFM. *Id.* ¶ 4. The purchase price of the Second AFM was also $690,000, and the delivery terms for the Second AFM were "FOB U.S. Airport." *Id.* As with the First AFM, Zygo contracted with Lynden Air Freight ("Lynden Air") to deliver the Cargo to a United States airport for transport to Taiwan. *Id.*

On or about February 11, 2000, Nan Ya notified Zygo that the Second AFM was damaged. Statement ¶ 7. There is no dispute that the Second AFM was not damaged at the time it was loaded on the aircraft for transit to Taiwan. *Id.* ¶ 6. Zygo personnel in Taiwan evaluated

---

[2] "F.O.B. or Free on Board means that title to property passes from the seller to the buyer at the designated FOB point." *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 842 n.2 (2d Cir. 1985) (citation omitted).

the potential cause and extent of the damage, and determined that the most likely cause of the damage was that the AFM had been dropped and not handled properly. *Id.* ¶ 9.

Because Nan Ya still did not have a workable AFM for its business, Zygo then shipped a third AFM ("the loaner AFM") to Nan Ya in late February 2000 on a loaner basis. Statement ¶ 8. The loaner AFM was to be returned to Zygo by June 30, 2000. *Id.*

### B.    Zygo's Efforts to Collect from Nan Ya

Immediately after shipping the loaner AFM, Zygo made efforts to collect from Nan Ya the amounts due to it for the First and Second AFMs (The First AFM and Second AFM are referred to collectively as the "Damaged AFMs"). Statement ¶ 10. Even though Nan Ya had the risk of loss and the Cargo was likely damaged in Taiwan, Nan Ya refused to pay the $690,000 purchase price for the Second AFM. *Id.* ¶ 11.

In light of Nan Ya's refusal to pay for the Second AFM, on or about March 7, 2000, Zygo, through its insurance broker, Mathog & Moniello Companies, Inc. ("M&M"), put Royal on notice of its claim regarding the Second AFM. Statement ¶ 12. Specifically (as described fully below), under the "Contingency Clause" of the Policy, Zygo expected that Royal would pay the amount that its customer, Nan Ya, was refusing to pay.

Nan Ya refused to return the loaner AFM to Zygo on June 30, 2000, as previously agreed and continued to hold the loaner AFM hostage during the summer and fall of 2000. Statement ¶ 13. Accordingly, Zygo now found itself pursing Nan Ya not only for payment for the Damaged AFMs, but also for return of the loaner AFM. Moreover, Nan Ya's refusal to return the loaner AFM created an additional financial hardship, because Zygo had a customer willing to lease the loaner AFM for about $13,000 per month. *Id.*

3

In light of Nan Ya's steadfast refusal to pay for the Second AFM and the fact that Zygo had filed a claim with Royal over this unit, Zygo understood that the disposition of the Second AFM was in Royal's hands. Zygo's communications throughout the summer and fall of 2000 reflect this understanding. Affidavit of Lawrence Martin, dated August 15, 2002 (hereinafter "Martin Aff."),[3] ¶¶ 20, 22-23 & Exs. 7-13; Deposition of Lawrence Martin (hereinafter "Martin Dep.") (Bjorkman Aff. Ex. 25) at 179-80, 193-99.

At Nan Ya's request, Zygo took the necessary steps to determine the salvage value of the two damaged AFMs, in order to fix the amount that was due and owing from Nan Ya. Statement ¶ 14. Kelvin Walch, an independent contractor involved in the servicing and repair of AFMs, determined that the average salvage value for each of the Damaged AFMs was $28,925. *Id.* In addition, Lawrence Martin, Zygo's Staff Assistant to the President, approved the concept that the salvage values of both of the Damaged AFMs would be deducted from the amounts that were due from Nan Ya. *Id.* ¶ 15.

## C.    The November 2000 Meeting

In November 2000, a meeting was held among representatives of Nan Ya, Nan Ya's insurer and Zygo. Statement ¶ 16. The purpose of the meeting was to establish the salvage values of the Damaged AFMs and to arrange for the return to the United States of all the AFMs, to the extent that Nan Ya decided not to retain either of the Damaged AFMs or purchase the loaner AFM. Timothy Smith, Zygo's Regional Director in Taiwan, was Zygo's representative at the meeting. Statement ¶ 17. Kelvin Walch also attended the meeting. *Id.* Mr. Smith was not authorized to compromise Zygo's claim with regard to the Second AFM. *Id.* ¶ 18.

---

[3] A true and correct copy of the Affidavit of Lawrence Martin is attached to the Affidavit of Erika L. Amarante, dated July 7, 2004.

The meeting was conducted in Mandarin Chinese and English. Statement ¶ 19. Mr. Smith does not speak Mandarin and did not understand all that was said by the Nan Ya representatives. Although there was an informal translation, at no time did anyone attempt to provide Mr. Smith with a formal, word-for-word translation as the discussions were transpiring. *Id.* At the conclusion of the meeting, Mr. Smith was presented with a document written entirely in Mandarin. *Id.* ¶ 20. Mr. Smith signed the document to indicate his attendance at the meeting. *Id.* ¶ 21. At no time was the document presented to Mr. Smith as any kind of legal document, agreement or release, nor did he believe it to be so. *Id.* at ¶¶ 20-21; *see also* Deposition of Timothy Smith (hereinafter "Smith Dep.") (Bjorkman Aff. Ex. 24) at 173-79 ("No agreements were made or commitments reached because you didn't do that in the form of meeting minutes."). More importantly, the terms of the document were never reviewed or approved by Mr. Martin or any Zygo representative with authority to compromise Zygo's claim for the Second AFM. Statement ¶ 22. In fact, Mr. Martin was unaware of the existence of the document until Nan Ya produced it in this lawsuit. *See* Martin Aff., ¶ 27; Martin Dep. at 268-69.

At the November meeting Nan Ya agreed to a formula for establishing the amount due from Nan Ya for the First AFM, and further agreed to pay Zygo the remaining amount due on the First AFM using that formula. Statement ¶ 23. Nan Ya requested that Mr. Martin write a letter confirming Zygo's agreement to offset the salvage value on the First AFM. *Id.* ¶ 24. Accordingly, on November 15, 2000, Mr. Martin sent a letter to Nan Ya confirming Zygo's agreement to offset the balance due on the first AFM by $28,925 (the average salvage value of the Damaged AFMs), provided that payment would be made by December 21, 2000. *Id.* Nan Ya never requested that Mr. Martin confirm in writing any purported agreement or compromise

with respect to the Second AFM, and the November 15, 2000 letter makes no mention of the Second AFM. *Id.* ¶ 25.

Nan Ya also had agreed at the November meeting to return the Damaged AFMs as well as the loaner AFM to Zygo. Statement ¶ 23. Mr. Martin understood that the foregoing represented the complete terms of any agreement between Nan Ya and Zygo. Martin Aff. ¶ 25. Mr. Martin was not informed by Mr. Smith -- *or anyone else* -- that there was any agreement to release Nan Ya from liability for the second AFM, or to change the terms of the deal in any way such that Nan Ya did not have to pay for the Second AFM. *Id.* ¶ 26. Indeed, any such agreement, which would have consisted of releasing a nearly $700,000 claim in exchange for zero payment, would have been clearly beyond the scope of the authority given to Mr. Smith. *Id.*

### D.    Royal's "Investigation" of Zygo's Claim

During 2000 and into mid-2001, Royal and Zygo, through its broker, M&M, communicated concerning the coverage of the Second AFM. See Bjorkman Aff. Exs. 8-10, 13-17. Royal asserted various and changing reasons not to cover the loss. Although Royal received notice of Zygo's claim in early March 2000, Royal contended first that Zygo did not have an insurable interest in the Cargo. Deposition of Joseph Daneman (hereinafter "Daneman Dep.") (Bjorkman Aff. Ex. 22) at 48-50; Bjorkman Aff. Ex. 6. Even though it was notified promptly about the loss, it did not immediately send a surveyor to inspect the Cargo. Indeed, Royal initially decided not to survey the Cargo at all. Bjorkman Aff. Ex. 6. Then in mid-May, it finally assigned a surveyor. Daneman Dep. at 56-58 ("it wasn't a big deal for me to assign a surveyor without prejudice . . . ."); Bjorkman Aff. Ex. 7. It appears that the surveyor did not even try to contact Zygo for at least another month. Daneman Dep. at 66, 73 (adjuster made no investigation about inability to survey the Cargo).

6

Thereafter, Royal asserted various reasons not to cover the loss, such as that Zygo had not separately declared the shipment and paid an additional premium. *See* Bjorkman Aff. Ex 13. It even claimed that Zygo released Nan Ya from its obligation to pay for the Second AFM, even though no one from Royal ever spoke to representatives of Zygo or Nan Ya, and M&M represented that Zygo had ***not*** released Nan Ya. *See e.g.*, Bjorkman Aff. Exs. 12, 16.

Royal sued Zygo on July 13, 2001. Statement ¶ 27. Then, on or about July 16, 2001, a full sixteen months after receiving notice of Zygo's claim, Royal issued a formal letter declining coverage. *Id.* ¶ 28.

## II.    The Present Action

### A.    The Parties' Claims

Royal brought this declaratory judgment action alleging in three causes of action that the loss of the Cargo does not fall within specific terms of the Policy. In a fourth cause of action, Royal alleges that, even if the Policy might have covered the loss at issue, Zygo forfeited its right to recovery by allegedly settling its dispute with Nan Ya. Alternatively, Royal alleges in a fifth cause of action that, if coverage exists, it includes only the cost of repairing the damaged parts of the AFM, and not compensation for its full sale price.

Zygo counterclaimed against Royal for breach of contract, breach of the covenant of good faith and fair dealing, bad faith denial of insurance coverage, and a declaratory judgment that the loss of the Cargo is covered under the Policy. *See* Zygo's Answer and Counterclaims, dated September 20, 2001.

Royal then brought Nan Ya into the action as a Third-Party Defendant. *See* Royal's Third Party Complaint, dated October 9, 2001. In June 2002, Nan Ya moved for summary judgment on liability, arguing that it had settled the claim with Zygo. *See* Nan Ya's Motion for

Summary Judgment and Memorandum of Law in Support, dated June 13, 2002. Royal did not oppose Nan Ya's motion. To protect its rights, Zygo filed an opposition to Nan Ya's motion for summary judgment, asserting that it had not settled the claim with Nan Ya and that Royal's gamesmanship of not responding to Nan Ya's motion was an inappropriate attempt to get the settlement issue decided, absent objection, in its favor. *See* Zygo's Memorandum of Law in Opposition to Nan Ya's Motion for Summary Judgment, dated August 19, 2002. The district court, *Goettel, J.*, did not rule on the merits of Nan Ya's motion, instead granting it as unopposed. *See Royal Ins. Co. of Am. v. Zygo Corp.*, 212 F.R.D. 444, 446-47 (D. Conn. 2003) (hereinafter "*Royal I*") (refusing to consider Zygo's arguments in opposition to the motion because Zygo had not asserted any claims against Nan Ya).[4] The Court further held, however, that its ruling was not a decision on the merits entitled to collateral estoppel effect. *Id.* at 447-48. The Court clarified: "[A]s between the remaining parties, Royal and Zygo, there has been no decision on the merits of any of the issues raised by Nan Ya's summary judgment motion." *Id.* at 447.

### B.    Royal's Motion for Summary Judgment

On April 4, 2003, Royal moved for summary judgment asserting that the Policy did not cover Zygo's loss on the Second AFM. As described in detail below, the district court, *Goettel, J.,* denied the motion. *See Royal Ins. Co. of Am. v. Zygo Corp.*, 2003 WL 21960734 (D. Conn. 2003) (hereinafter "*Royal II*").

---

[4] Royal took a detour to the Second Circuit to try to appeal Judge Goettel's Order. The Second Circuit dismissed the appeal because the Order was not a final judgment. *See Royal Ins. Co. v. Zygo Corp.*, Order Dismissing Appeal With Prejudice, dated February 13, 2003 (Bjorkman Aff. Ex. 1).

C.    **Additional Discovery**

After Judge Goettel's denial of Royal's motion for summary judgment, the parties
continued with discovery. Royal produced two Rule 30(b)(6) witnesses to testify on a myriad of
issues concerning the adjustment of Zygo's claim and the Policy's interpretation.[5]    Zygo
produced four witnesses,[6] and Royal took the deposition of three witnesses who worked for
Zygo's insurance broker, M&M.[7]    This discovery demonstrated that there are no issues of
disputed fact and that, as a matter of law, the Policy provides coverage for Zygo's loss on the
Second AFM.   The discovery also illustrated that Zygo did not release Nan Ya from any
obligation to pay for the Second AFM.   Accordingly, all the facts have been developed to
support a judgment in favor of Zygo, finding that Royal owes Zygo for Nan Ya's unpaid debt of
not less than $661,075 and other damages.

## ARGUMENT

Zygo now moves for summary judgment on Royal's:   (i) Third Cause of Action (no
coverage under Clause 52 of the Policy); (ii) Fourth Cause of Action (no coverage because Zygo
allegedly settled with Nan Ya); and (iii) Fifth Cause of Action (Royal only liable for value of
damaged equipment).   Zygo also moves for summary judgment on its First Counterclaim (breach

---

[5] The Rule 30(b)(6) deposition notice is Exhibit 17 to the Bjorkman Affidavit. Joseph Daneman,
the claims adjuster, testified for Royal on, among other things, its decision to decline coverage
under the Policy, Royal's investigation relating to the damage and salvage value of the AFMs,
Zygo's effort to collect from Nan Ya, and Royal's claim that Zygo had released Nan Ya from
payment. *See* Daneman Dep. at 4-8. Alan Ilias was Royal's underwriter for the Policy and its
Rule 30(b)(6) witness on, among other things, Royal's interpretation of the Policy. Deposition
of Allan Ilias (hereinafter "Ilias Dep.") (Bjorkman Aff. Ex. 23) at 14-16.

[6] Zygo produced Lawrence Martin, its Staff Assistant to the President, Richard Dressler, its
Chief Financial Officer, Timothy Smith, its Managing Director of its Asia/Pacific operations,
and Kelvin Walch, an independent contractor who observed the Damaged AFMs and determined
their salvage value. *See* Bjorkman Aff. Exs. 24-25.

[7] The witnesses for M&M were Zygo's broker, Matthew Weidman, and two other employees,
Carroll Sneed and Jeanette Zdanis.

of contract) and Fourth Counterclaim (declaratory judgment in favor of coverage). Zygo's arguments are straightforward. The only logical and proper interpretation of the Policy requires that Royal cover Zygo's loss. However, even if the Court finds that the Policy does not unambiguously favor Zygo, it is clear that Zygo's interpretation of the Policy is reasonable and, therefore, must be construed against the insurer and in favor of coverage. *See Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. 503, 509, 789 A.2d 974, 977 (2002). To the extent the Policy is ambiguous, the Court will not be in any better position to resolve the "ambiguities" at trial than based on the undisputed evidence presented in this motion. Accordingly, even if the Court finds the contract ambiguous it still should grant this motion for partial summary judgment in favor of Zygo.

## I.    Summary Judgment Standard

Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine factual dispute rests with the moving party. *See Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[W]here, as here, a [party opposing summary judgment] bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out ***an absence of evidence*** to support an essential element of the non-

10

movant's case." *McMillan v. Experian*, 170 F. Supp. 2d 278, 283 (D. Conn. 2001) (emphasis added) (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 271 (2d Cir. 1999)). "The non-moving party must do more than simply show that there is some ***metaphysical doubt as to the material facts***. . . Instead, the party must come forward with enough evidence to support a jury verdict in its favor, and the ***motion will not be defeated merely on the basis of conjecture or surmise*.**" *Id.* (emphasis added) (internal citations, quotation marks omitted). *See also Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."); *Adair v. Pfizer, Inc.*, 245 F. Supp. 2d 437, 440-41 (D. Conn. 2003) (granting summary judgment for defendant where plaintiff failed to proffer any actual evidence to support his allegations).

"It is the function of the court to construe the provisions of the insurance contract and, if no material facts are at issue, the question of whether coverage exists is a question of law that is appropriately decided on a motion for summary judgment." *Peerless Ins. Co. v. Disla*, 999 F. Supp. 261, 263 (D. Conn. 1998). Summary judgment is particularly favored when contract terms are unambiguous. *See Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994). However, summary judgment also may be appropriate "where a court is in position to resolve the ambiguities through a legal, rather than factual construction of its terms." *Andy Warhol Foundation for the Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999). Any ambiguity in an insurance contract must be construed against the insurer, pursuant to the *contra proferentem* rule of contract interpretation. *See Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. 503, 509, 768 A.2d 974, 977 (2002). Accordingly, when an insurance contract is ambiguous, courts can and do grant summary judgment in favor of an insured. *See, e.g., Lefrak Org., Inc. v. Chubb Custom Ins. Co.*, 942 F. Supp. 949 (S.D.N.Y. 1996).

II.    **This Court Should Grant Summary Judgment to Zygo on Royal's Third Cause of Action Because The Loss is Squarely Covered by the Language and Purpose of Clause 52.**

A.    **Applicable Law and Rules of Construction**

In *Royal II*, Judge Goettel succinctly summarized the controlling law for construing the Policy. *See Royal II*, at *3-4. These points are summarized below:

*First*, Connecticut law applies to interpreting the Policy. A federal court looks to state law in interpreting marine insurance policies. *See, e.g., Royal II*, at *2.

*Second*, the Policy should be interpreted as a whole, and to effectuate the intent of the parties. *Royal II*, at *3; *Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. at 509, 789 A.2d at 977; *see also R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 246 (2d Cir. 2002); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 453 (2d Cir. 1995).

*Third*, a court interpreting a contract must, "if possible, give operative effect to every provision in order to reach a reasonable result." *Royal II*, at *3 (quoting *Israel*, 259 Conn. at 509, 789 A.2d at 977); *O'Brien v. U.S. Fid. & Guar. Co.*, 235 Conn. 837, 843, 669 A.2d 1221, 1224 (1996). As the Connecticut Appellate Court has held, "[w]e are reluctant to conclude that a contractual provision constitutes a meaningless gesture by the parties . . . . it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions." *Enfield Pizza Palace, Inc. v. Ins. Co. of Greater New York*, 59 Conn. App. 69, 75, 755 A.2d 931, 935 (2000) (internal quotation marks omitted); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

Notably, these rules of construction – reading the contract as a whole, and giving effect, if possible, to every contract provision – are essential to the task of contract interpretation. They

are not rules that come into play only after a contract has been found ambiguous; indeed, courts must use these rules in determining *whether* a contract is ambiguous:

> [W]e must decide whether, reading the policy "from the perspective of a reasonable layperson in the position of the purchaser of the policy," the policy is ambiguous. *Ceci v. National Indem. Co.*, 225 Conn. 165, 168, 622 A.2d 545 (1993). In construing the document, we "look to the [policy] as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable result." *Hansen v. Ohio Cas. Ins. Co.*, 239 Conn. 537, 545-546, 687 A.2d 1262 (1996).

*Israel*, 259 Conn. at 509, 789 A.2d at 977.

*Fourth*, the Connecticut Supreme Court has recently reaffirmed the "well established principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters," *id.* at 508, 789 A.2d at 977 (internal quotation marks omitted), and held that "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Id. See also Royal II*, at *4. Further, the rule that courts should read an insurance policy "from the perspective of a reasonable layperson in the position of the purchaser of the policy," *Israel*, 259 Conn. at 509, 789 A.2d at 977, does not depend on a finding of ambiguity, but is used in determining whether a policy is ambiguous. *Id.* (citing *Ceci v. National Indem. Co.*, 225 Conn. 165, 168, 622 A.2d 545 (1993)).

*Fifth*, according to the canon of *contra proferentem*, if this Court finds that the Policy is ambiguous, it should resolve ambiguities against Royal, the insurer and drafter, and find that coverage exists under the Contingency Clause. *See Royal II*, at *4. This canon of construction "is more rigorously applied in the context of insurance contracts than in other contracts." *Israel*, 259 Conn. at 509, 789 A.2d at 977.

**B.    The Language and Purpose of the Contingency Clause**

This dispute hinges on the interpretation of the Contingency (or "Unpaid Vendor")

Clause (Policy paragraph 52). This Clause provides:

> It is agreed that on all shipments sold by the Assured on cost and freight or other
> terms whereby the Assured is not required to furnish ocean marine insurance, this
> Policy is extended (subject to all its terms and conditions) to cover only the
> interest of the Assured as an unpaid vendor from the time shipments become at
> the risk of the customer under the terms of sale until payment of draft but in no
> event beyond the time when this company's risk would normally cease under the
> terms of this Policy.
>
> It is further understood and agreed that in no event shall this insurance inure to the
> benefit of the buyer or his underwriter but in the event of a loss occurring which
> would be collectible hereunder but for such terms of sale and the Assured is
> unable to collect the purchase price from the buyer in regular course, this
> Company will advance the amount of such loss pending collection from the
> buyer. The Assured hereby agrees to use all reasonable means to collect the full
> amount due from the buyer and reimburse this Company, the latter sharing the
> expense of such collection in proportion to its interest herein.
>
> The Assured agrees to declare to this Company the value of all shipments covered under
> the terms of this endorsement and to pay premium thereon at rates to be agreed.

Martin Aff., Ex. 4 (the Policy).

Contingency coverage is designed to cover the loss when a customer fails to pay for

goods even though it assumed the risk of loss. When the customer does not pay, the insurer that

wrote contingency coverage is bound to step in, pay for the goods up to the policy limits and, if it

so chooses, seek to recover its payment from the customer under its subrogation rights. "In

describing the purpose of contingency coverage in a marine cargo policy, the Second Circuit has

stated that '[c]ontingency coverage would make [one set of] underwriters liable if [another set

of] underwriters failed to pay on their primary coverage.'" *Royal II*, at *6 (quoting *Armada

Supply, Inc. v. Wright*, 858 F.2d 842, 847 (2d Cir. 1988)).

Zygo's claim under the Contingency Clause is simple and the facts are undisputed. Zygo shipped the Second AFM to Nan Ya under a contract that required Nan Ya to assume the risk of loss after the Cargo was loaded on the aircraft. Royal admits in its Complaint that the Cargo was not damaged when it was loaded on the Aircraft. The Second AFM was then damaged beyond repair and Nan Ya refused to pay for it. Zygo made a claim under Clause 52 of the Policy. Royal should have paid that claim and then sought reimbursement from Nan Ya. The loss is clearly covered by the terms of the Contingency Clause.

**B.    Royal's Positions**

Royal's arguments in support of its denial of coverage under the Contingency Clause are makeweight and easily refuted.

**1.    Royal Claims That There is No Contingency Coverage Because of the FOB Clause.**

Royal asserts that there is no coverage under the Contingency Clause because the Policy covers FOB shipments only until they are loaded on a vessel.[8]  Royal claims, in effect, that the FOB clause controls because the Contingency Clause purportedly limits coverage "to the time when [Royal's] risks would normally cease under the terms of the Policy." Martin Aff, Ex. 4, ¶ 52. Royal then makes the logical leap that since coverage would cease under the *FOB clause* when the Cargo was loaded on the vessel, the contingency coverage also ceases at that time.

---

[8] Clause 55, styled "FOB/FAS Shipments," provides:

This Policy is extended to cover shipments sold by the Assured of F.O.B., F.A.S., cost and Freight or similar terms whereby the Assured is not obligated to furnish ocean marine insurance. This insurance attaches subject to Policy terms and conditions and continues until the goods are loaded on board the overseas vessel or until the Assured's interest ceases, whichever shall first occur.  The particulars of all such shipments shall be reported promptly to the Assurer and premium paid on the amounts so declared at the rate of N/A for not exceeding thirty (30) days after attachment of risk. Extension of risk beyond thirty (30) days held covered at rates to be agreed.

15

When Zygo demonstrated that this interpretation would vitiate virtually any coverage under the Contingency Clause, Royal incredibly countered that contingency coverage extended only to domestic shipments. *See Royal II*, at *4-6. Even before discovery, Judge Goettel recognized the absurdity of Royal's position noting that "Clause 52 would be rendered meaningless if Royal's interpretation were adopted." *Royal II*, at *7. According to Judge Goettel, "it is clear that this contingency coverage was intended to provide some form of extended coverage beyond what was otherwise provided in other coverage sections of the Policy." *Id.* Judge Goettel therefore denied Royal's motion for summary judgment, holding that "Royal has failed to offer a reasonable interpretation of the extension of coverage provided by Clause 52," and that "Royal has failed to carry its burden of establishing that the Policy is unambiguous, subject to only one reasonable interpretation." *Id.*

Judge Goettel has already rejected Royal's assertion that "*all* insurance coverage arising under the Policy terminated" once the AFM "was loaded aboard the overseas aircraft and the risk of loss passed to the customer." *Royal II*, at *6. That finding constitutes the law of the case, and should not be revisited here.[9] However, even if the Court revisits this issue, discovery demonstrated that Royal's own employees did not agree with the interpretation proffered by their attorneys. Allan Ilias, the Royal employee who served as underwriter for the Policy and was

---

[9] *See Wright v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987) (denial of summary judgment is law of the case); *see also* 11 Wm. MOORE, MOORE'S FEDERAL PRACTICE, § 56.10[7] at 56-78 (3d Ed. 2004) ("A denial of summary judgment is generally treated as 'law of the case.'"). Although the law of the case is a discretionary doctrine, and judges are free to reconsider matters if the relevant facts, law or other circumstances have changed, *see, e.g., Doe v. New York City Dep't of Social Servs.*, 709 F.2d 782, 789 (2d Cir. 1983), a trial court's decision "should not be lightly disturbed." *Gillig v. Advanced Cardiovascular Sys.*, 67 F.3d 586, 590 (6th Cir. 1995). *See also Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131, 135-36 (2d Cir. 1956) ("law of the case as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit on their power.").

designated as Royal's Rule 30(b)(6) witness on the interpretation of the policy (Ilias Dep. at 14-

15, Bjorkman Aff. Ex. 17), testified:

> Q:  Does the last clause in the first paragraph of 52 mean that there is no contingency coverage once the product is loaded on board an overseas vessel?
>
> A:  Could you restate that?
>
> Q:  Let's say, for example, the shipment is an FOB sale.
>
> A:  Okay.
>
> Q:  And the assured only has the obligation to insure up to the point of delivery onto the aircraft.
>
> A:  Okay.
>
> Q:  Does the limiting language in Paragraph 52 mean that there is no contingency coverage after that shipment is loaded onto the aircraft?
>
> A:  No.
>
> Q:  Why not?
>
> A:  Because the FOB/FAS provides obviously free board, so once the goods are loaded onto the aircraft and if they choose the option of having contingency insured on that shipment, a contingency endorsement then goes into effect.

Ilias Dep. at 133-34.  Likewise, Joseph Daneman, the Royal claims adjuster presented as a

30(b)(6) witness, testified that he does not believe contingency coverage ends when the cargo is

loaded on the vessel under an FOB contract.  Daneman Dep. at 104-05, 158.

Obviously, Royal cannot present any facts at trial to support its litigation position that

contingency coverage cannot extend beyond FOB coverage under Clause 55.  In contrast, the

undisputed evidence demonstrates that the Contingency Clause is intended to apply to precisely

this type of situation – where FOB coverage does not apply because the risk of loss is on the

insured's customer, contingency coverage provides secondary coverage in the event the customer

does not pay a claim.  There is no merit to Royal's attempt to argue otherwise.

2.    **Royal Claims that Zygo Was Required to Pay Additional Premiums and Separately Declare the Shipment to Royal.**

There is no dispute that Royal purchased an "annual reporting contract." That is, Zygo paid $20,000 as a deposit for all the coverage in the Policy and, at the end of the year, the actual premium was calculated based on the company's reported gross sales. Ilias Dep. at 36-37, 40-41. The premium was calculated at the rate of $0.023 per $100 of gross annual sales. *See Royal II*, at *9; Martin Aff., Ex. 4 (Policy Endorsement No. 3 and Schedule of Rates); Ilias Dep. at 37; Deposition of Matthew Weidman (hereinafter "Weidman Dep." (Bjorkman Aff. Ex. 26) at 192-197; Martin Dep. Ex. 53; Deposition of Carroll Sneed (hereinafter "Sneed Dep.") (Bjorkman Aff. Ex. 27) at 65-70.

But, Royal claims that Clause 52 applied only to the extent Zygo separately declared each shipment and paid additional premiums before the shipment occurred. The parties' positions on this issue are explained in detail in *Royal II*, at *7-9. Judge Goettel correctly observed that "Royal has the burden of proving the Policy unambiguously attaches additional requirements for unpaid vendor coverage under Clause 52 and that the premiums and declarations were not in fact covered under the general provisions of the Policy." *Royal II,* at *10. Royal simply cannot meet this burden, and the facts learned in discovery destroy Royal's asserted interpretation.

First, the Policy provides coverage for all shipments to come within the scope of the Policy, whether "***reported or not...***". Martin Aff., Ex. 4 (the Policy), Clause 1 (emphasis added)). When Mr. Ilias, the underwriter, was asked what the "reported or not" clause meant, he answered, "[t]ruthfully, I don't know." Ilias Dep. at 147.

Second, the claimed additional reporting requirement is not in the contract. Mr. Ilias was asked point blank:

18

> Q.    Where does it say in Paragraph 52 that the shipment has to be declared prior to the voyage?
>
> A.    It doesn't.

Ilias Dep. at 146.  Although Mr. Ilias asserted that it was "standard and customary" for insureds to declare contingency shipments in advance, Ilias Dep. at 173-74,[10] he also testified that, in his entire career as an underwriter, only two insureds had ever called him to declare contingency shipments in advance.  Ilias Dep. at 136-41.  Only one of those shipments was actually declared as a contingency shipment.  *Id.* at 140-41.

Royal contends that even though the separate reporting requirement is not in Clause 52, and the underwriter himself does not know what Clause 1 of the Policy means, Zygo was somehow supposed to divine that contingency shipments had to be reported separately, not as part of its annual reporting.  But representatives of Zygo's insurance broker M&M testified that no one from Royal ever told them that they had to report shipments separately, and that was not their reading of Clause 52.  Weidman Dep. at 220; Sneed Dep. at 68.  To the contrary, the last sentence of Clause 52 requires Zygo to "declare to [Royal] the value of *all* shipments covered under the terms of this endorsement" (emphasis added), which is consistent with the reporting of *all* shipments at year end.  This is also in line with Zygo's experience with other insurance companies, as Zygo's Ocean Marine Cargo policies with insurance companies other than Royal did not require Zygo to declare each shipment separately.  *See* Weidman Dep. at 241-45 (testifying about Zygo's policy with St. Paul).

Had Royal wanted Zygo to declare shipments under the Contingency Clause on a different timeline (not annually), it easily could have so stated.  Royal failed to provide a

---

[10] Mr. Ilias was not disclosed as an expert on industry practice – nor was anyone else.  Indeed, Mr. Ilias only received two notices of a contingency shipment in his entire career.  That is hardly the experience that would permit him to testify about industry practice.

deadline or timeline for reporting shipments under Clause 52, instead including the contingency shipments in the requirement for annual reporting of gross sales. Construing the Policy as a whole from the viewpoint of the layperson insured, the Policy unambiguously requires Zygo to report contingency shipments annually, and that is just what Zygo did.

Royal also claims that Zygo was supposed to intuit that Clause 52's requirement that Zygo "[p]ay premium thereon at rates to be agreed," meant Zygo had to pay for contingency coverage at additional, different rates, as opposed to the agreed-upon rates that were embodied in the contract. The contract certainly is not unambiguous in this regard. Rather, the better interpretation is that the rates specified in the contract included contingency shipments.

A number of provisions in the Policy call for "additional" premiums at rates "to be agreed upon."[11] Royal's underwriter Mr. Ilias could not explain the reason why some of these clauses refer to "additional" premiums, while Clause 52 does not. He admitted that "additional" means "[e]xtra in excess of the deposit premium." Ilias Dep. at 63. Of course, Clause 52 does not call for an "additional" premium, only a premium "to be agreed." Martin Aff., Ex. 4, ¶ 52. The parties agreed, in the Schedule of Rates, that Zygo would pay $.023 per $100 gross sales, reported annually. *Id.*, Schedule of Rates. There is no separate rate listed for contingency

---

[11] *See, e.g.*, Clause 10 ("Accumulation" clause applies only where "<u>additional</u> premium paid if required"); Clause 15 ("Containerization, Consolidation, and Deconsolidation" clause applies beyond thirty days where "<u>additional</u> premium paid if required by the Company [i.e., Royal]"); Clause 21 (At least first 30 days covered the "Warehouse-to-Warehouse" clause applies under certain conditions "at a premium to be arranged"); Clause 24 ("Deviation" clause applies where "<u>additional</u> premium paid if required"); Clause 54 ("Difference in Conditions" clause recites that the insured agrees to "pay premium thereon at rates to be agreed"); Clause 56 ("Return Shipments" clause, the insured agrees to "pay premium, <u>if required</u>, at rates to be agreed"). *See* Ilias Dep. at 55-63. If Royal, in drafting the Policy, was reserving its "right" to decline coverage wherever the Policy referred to premiums to be paid "at rates to be agreed" or "if required," a substantial portion of the Policy would be negated.

coverage, and therefore, on the face of the contract, contingency coverage is included in the $.023 premium.

Mr. Ilias also testified that, even though contingency coverage was included in the Policy (at Zygo's explicit request), Ilias Dep. at 81-85, he did not understand that Zygo really needed the coverage. Ilias Dep. at 66-68, 72. Had Mr. Ilias considered Zygo's need for contingency coverage in the Schedule of Rates, the agreed-upon premium would have been *lower* than .023. That is because contingency coverage is usually written for a premium that is at a rate of about 60% of the applicable marine coverage, and sometimes "can go as low as nothing." Ilias Dep. at 141-43.    If Mr. Ilias understood that some portion of Zygo's shipments would require contingency, as opposed to primary, coverage, then he would have applied a lower rate to those specific shipments, or a lower blended rate to all of Zygo's gross sales, to account for the contingency shipments. Ilias Dep. at 141-43. Either way, the calculation would have resulted in a lower overall premium to Zygo.[12]  Because Mr. Ilias allegedly believed that Zygo did not need contingency coverage (even though it had specifically requested the coverage in the Policy), the premium that Zygo was charged to cover its shipments did not include *any* discount for contingency coverage.  Simply stated, Zygo was paying a full premium on all its shipments, whether they required primary or contingency coverage.  It obviously received the contingency coverage, but without the discount.

Mr. Ilias further testified that if Zygo had given Royal notice before the shipment of the Second AFM, he would have charged it a separate premium of about 60% of the amount of its

---

[12] For example, Zygo's policy with St. Paul first calculated the rates for primary and contingency coverage separately – charging $0.31 per $100 for primary coverage, but only 50% of that rate for contingency coverage.   Weidman Dep. at 242-44 (contingency rate 50% of primary on policy); Bjorkman Aff. Ex. 15. That policy was later changed to an "all-in" rate, like the Royal

marine coverage that it paid under the terms of the contract. Ilias Dep. at 141. This premium would have been about $0.011 per $100 value. So, for the shipment of a $690,000 machine, (according to Royal) Zygo would have had to pay about a $76 premium. Ilias Dep. at 145-46. Thus, Royal is claiming that it should not have to cover the shipment because Zygo failed to pay a premium that was substantially *less* than the premium charged under the terms of the Policy.[13] It simply does not make any sense that this important coverage could be denied for want of paying a nominal sum up front.

Further, Royal has not given any explanation of why a separate premium would be required. The insurer would not do anything differently in covering the shipment except extract the small extra payment.    Even though the Contingency Clause protects Zygo against nonpayment from a customer, the underwriter does nothing to determine the creditworthiness of the ultimate customer in determining the premium. Ilias Dep. at 143. Mr. Ilias also testified that Royal would only need about one hour notice to place contingency coverage. Ilias Dep. at 138-39. So, Royal did not need time to inspect the goods or evaluate the terms of the transaction. In these circumstances, the alleged need to make a separate declaration and pay a separate premium does not make commercial sense or comport with the language of the Policy.

Royal's "explanation" of its position is directly contrary to the interpretation of the policy advanced by Zygo's insurance brokers.    Representatives of Zygo's insurance broker M&M, testified that the Policy required *annual* reporting of sales for the calculation of the premium, that the Policy's premium of $0.023 per $100 of sales included a premium for contingency

---

Policy, that used a single premium rate for all types of coverage. Weidman Dep. at 245-47; Bjorkman Aff. Ex. 15.

[13] While Mr. Ilias claims that this would have been an extra payment, it is unreasonable to conclude that Zygo would have to report and pay again for a shipment at year end that it already paid for at the appropriate rate.

coverage. *See* Weidman Dep. at 197-201, 220-21; Sneed Dep. at 69-70, 86-87, 116-18. Even those experienced in these matters have a different interpretation than the one Royal is advancing. Certainly, Zygo's interpretation was reasonable from a layperson's perspective.

Judge Goettel found that "Royal offers no reasonable explanation as to how the declaration and payment of additional premiums were intended to operate. . . . Royal has not met its burden with respect to this claim." *Royal II*, at *10. This statement is still true after discovery. Undisputed evidence demonstrates that Royal cannot prove that the Policy unambiguously required Zygo to declare and pay for the Second AFM shipment separately. In contrast, the only reasonable interpretation is the one advanced by Zygo – the contract requires annual reporting of sales and the premium of $.023 per $100 gross sales includes both primary and contingency shipments.

### 3.    Royal Claims that Zygo Did Not Make Reasonable Efforts to Collect from Nan Ya.

Apart for the issue of the "release," discussed *infra,* Royal also claims that Zygo should not be able to recover under Clause 52 because it did not take reasonable steps to collect the debt from Nan Ya. This is an egregious misreading of the Policy.

There can be no dispute that Clause 52 unambiguously requires Royal to "advance the amount" of a loss to Zygo and then share the expense of collecting the amount due to reimburse Royal from Nan Ya.[14] *See* Martin Aff., Ex. 4 (Policy) ¶ 52; Ilias Dep. at 167-170. There is also no dispute that Royal did not "advance" Zygo any money, instead sitting on Zygo's claim for 16 months before deciding to deny it.

---

[14]    Under Clause 52, Royal has to "share" the collection costs in "proportion to its interest" in the amount of the loss. Since Zygo had $2.5 million in coverage, Royal is liable for the entire loss and for the entire cost of collection of the debt from Nan Ya.

The plain language of Clause 52 provides that if there is a loss for which Zygo is unable to collect from its customer in the regular course, Royal "will *advance* the amount of such loss pending collection from the buyer." Zygo *then* "agrees to use all reasonable means to collect the full amount due from the buyer and reimburse [Royal], the latter sharing the expense of such collection . . . " *See* Martin Aff., Ex. 4. ¶ 52 (emphasis added). This clause requires Royal to pay a disputed claim first and then work together with Zygo to obtain reimbursement from the customer. *See* Ilias Dep. at 167-70. Zygo's duty to use "reasonable efforts" to collect the amount from its customer does not kick in until after Royal has "advanced" the amount of the loss to Zygo. Before Royal's advance of the funds, Zygo's only obligation is to seek payment from its customer in the regular course.

In any event, Zygo did use reasonable means to try to collect to Nan Ya. Unfortunately, these attempts were unsuccessful. As Mr. Daneman testified:

Q:    Well, do you think Zygo tried to get paid from Nan Ya?

A:    I believe initially they tried to get paid from Nan Ya.

Q:    Do you think they made reasonable attempts to get paid from Nan Ya?

A:    I don't think I have enough information to say that they made reasonable attempts.

Q:    What do you consider a reasonable attempt to get paid from someone, from a vendor?

A:    Original demand for payment plus several follow-ups with some sort of definitive explanation from Nan Ya of why they weren't paying, that they refused to pay.

Q:    Do you have any reason to believe Zygo didn't get that, didn't do that or get that explanation from Nan Ya?

A:    I had no reason to believe it either way. I don't think I have all of the – it seems like there is other documentation and correspondence out there that would help clarify that situation, but I don't think I have all of it.

Daneman Dep. at 182-83. Certainly, even under Royal's view, Zygo met its obligation to try to collect from Nan Ya. It made a demand for payment, made several follow-ups over the course of

about ten months and understood that Nan Ya was not going to pay voluntarily. That is all that the Policy requires, and that is what Zygo did.

> **C.    Any Ambiguities in the Policy Should Be Construed in Favor of Zygo and Against Royal.**

The Policy is unambiguous and clearly provides contingency coverage for the Second AFM. "Language does not become ambiguous solely because the parties offer conflicting interpretations during the course of litigation." *Royal II*, at *2 (citing *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985)). Instead, ambiguity attaches only where "the words of an insurance contract are, without violence, susceptible of two equally reasonable interpretations." *See Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.*, 231 Conn. 756, 771, 653 A.2d 122, 130 (1995) (internal brackets omitted). *See also Israel*, 259 Conn. at 509-10, 789 A.2d at 977 (finding ambiguity where policy had internally inconsistent provisions). Here, there is nothing internally inconsistent in the Policy, and its terms clearly provide for annual reporting of gross sales, including contingency shipments, at the agreed-upon rates in the Schedule of Rates. Royal's interpretation of the contract terms does not impart ambiguity because it is unreasonable and can be sustained only by doing great violence to the plain language of the Policy. Accordingly, this Court should grant Zygo's motion for summary judgment based on the unambiguous contract language.

However, even if the Court determined that the Policy were ambiguous, it should still grant Zygo's motion for summary judgment because ambiguities in insurance contracts must be resolved against the drafter, in this case Royal. *Israel*, 259 Conn. at 509, 789 A.2d at 977. "This canon, commonly styled *contra proferentem*, is more rigorously applied in the context of insurance contracts than in other contracts." *Id.* Where the language of an insurance policy is ambiguous, therefore, a court "must construe the policy in a manner that affords coverage to the

insured." 259 Conn. at 512, 789 A.2d at 978.  The Connecticut Supreme Court has explained this rule as follows:

> The premise behind the rule is simple.  The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of those interests . . . .  A further, related rationale for the rule is that since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are to be resolved in favor of the latter.

*Id.* at 508, 789 A.2d at 977 (brackets and quotation marks omitted).

The dispute between Zygo and Royal well illustrates the soundness of the canon of *contra proferentem*.  In drafting the Policy at issue, Royal intended to give at least the appearance of contingency coverage, "extend[ing]" the Policy "to cover . . . the interest of the Assured as an unpaid vendor from the time shipments became at the risk of the customer under the terms of sale until payment of draft."  Martin Aff., Ex. 4, Clause 52.  It then (according to its litigation position) took away that coverage in the very same clause, by including an un-expressed requirement that contingency shipments be declared and paid for separately and in advance.  To the extent that there is any ambiguity in the Policy, Royal was in the best position to correct it, and that is precisely why any ambiguity in the Policy must be construed against Royal.  Zygo should not be made to suffer for Royal's inexactness of expression.  Instead, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view."  *Israel*, 259 Conn. at 508, 789 A.2d at 977.  Zygo's interpretation of the contract is objectively reasonable and comports with the language, purpose and policy of contingency clauses in insurance contracts.  Accordingly, this Court should grant Zygo's motion for summary judgment on Royal's Third Cause of Action.

**III.    This Court Should Grant Summary Judgment to Zygo on Royal's Fourth Cause of Action Because the Undisputed Facts Illustrate that Zygo Did Not Settle Its Claim with Nan Ya.**

As one of its many excuses for denying coverage under the Policy, Royal asserts that, pursuant to Clause 43 of the Policy,[15] Zygo forfeited its right to coverage by settling its claim with Nan Ya.  *See* Compl., ¶¶ 77-81.   Royal makes this baseless assertion, despite the uncontroverted facts that (1) Zygo denied having settled the claim with Nan Ya, *see e.g.* , Daneman Dep. at 175, 186-88 (M&M told Daneman that Zygo had not settled); Bjorkman Aff. Ex. 12; and (2) Royal did not investigate the existence of a settlement other than ask M&M and its surveyor in Taiwan.  Daneman Dep. at 175-78.  Royal's sole basis for claiming that Zygo settled its claim with Nan Ya is its adoption of Nan Ya's own self-interested representation. *See* Bjorkman Aff. Ex. 21 (Royal's Interrogatory Response No. 10, adopting Nan Ya's position).

Under Connecticut law, a valid and binding settlement agreement exists only where there is "a ***mutual understanding*** of the terms that are definite and certain between the parties. . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an ***identical understanding*** by the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists." *L&R Realty v. Connecticut Nat'l Bank*, 53 Conn. App. 524, 524, 732 A.2d 181 (1999) (emphasis added). *See also Johnson v. Schmitz*, 237 F. Supp. 2d 183, 189, 192 (D. Conn. 2003) (Arterton, J.) (finding no valid and

---

[15] Clause 43 of the Policy provides in relevant part: "It is a further condition of this insurance that if the Assured or his or her assigns have entered or shall enter into any special arrangements whereby any carrier or bailee is released from its common law or statutory liability for any loss, or have or shall have waived, compromised, settled or otherwise impaired nay right of claim against a third party to which the Company would be subrogated upon payment of a loss without prior agreement of the Company and endorsement hereon, the Company shall be free from liability with respect to such loss . . ."

enforceable settlement agreement where there was no "meeting of the minds" between the parties).

The admissible evidence[16] on this issue invariably illustrates that Zygo did not settle its claim with Nan Ya. Zygo engaged in discussions with Nan Ya in an attempt to collect the purchase price of the Second AFM minus its salvage value,[17] but it never entered into an agreement that released Nan Ya of its obligation to pay. Royal likely will argue that Zygo settled with Nan Ya at the November 13, 2000 meeting in Taiwan. But, both Kelvin Walch and Timothy Smith, who were present at the meeting, insisted at their depositions that Zygo did not enter into any agreement with Nan Ya regarding the payment of the second AFM. *See* Walch Dep. at 255-260, 285-87 (indicating that he though Nan Ya agreed to pay for both AFMs minus the salvage values); Smith Dep. at 173-75 (stating that he did not believe any agreement was made). Neither Walch nor Smith had any authority at that meeting to settle the claim on the Second AFM. *See* Walch Dep. at 258-59 (noting that he was at the meeting to deal with valuation, not commercial issues); Smith Dep. at 187-88 (attended meeting but had very little involvement in negotiations between Zygo and Nan Ya). Mr. Martin testified that he never intended to settle the claim with Nan Ya, and it was not his understanding that a settlement on the second AFM had been reached at the meeting. Martin Dep. at 198-99 (never agreed to release

---

[16] It is well established that Royal can rely only on admissible, properly authenticated evidence in opposing this motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in opposition to summary judgment).

[17] Royal's position on these negotiations is particularly ironic, because it simultaneously argues, on the one hand, that Zygo did not use "reasonable efforts" to collect the amount of the loss from Nan Ya and, on the other hand, that Zygo settled its claim with Nan Ya in the course of trying to recover the loss. Royal cannot have it both ways. The undisputed evidence shows that Zygo's correspondence and negotiations with Nan Ya following the loss were simply reasonable efforts

Nan Ya). In fact, Mr. Martin's November 15, 2000 letter confirming Zygo's arrangement with

Nan Ya (sent at Nan Ya's request) does not even mention the Second AFM at all. *See* Martin

Dep. at 213; Martin Ex. 37.

*Johnson v. Schmitz*, 237 F. Supp. 2d at 183, is particularly instructive in this regard.

There, parties to an intellectual property lawsuit engaged in extensive settlement negotiations,

with plaintiff's counsel and defense counsel eventually reaching a purported agreement. After

the court had been advised of the "settlement," the plaintiff refused to sign the agreement, on the

ground that he had not agreed to its terms. Defendants moved to enforce the settlement

agreement. This Court denied that motion, finding that, due to miscommunication or

misunderstanding between the plaintiff and his counsel, plaintiff had never assented to the terms

of the purported settlement agreement. The Court held:

> [P]laintiff's counsel's representation to defendants that plaintiff had agreed to the
> terms of the Agreement is insufficient to establish plaintiff's understanding and
> assent to the terms of the Agreement such that it could be said to memorialize a
> meeting of the minds between Johnson and defendants and thus constitute a
> contract enforceable against plaintiff. *See, e.g., Windsor Hous. Auth. v.
> Fonsworth*, No. HDSP-107882, 2000 WL 949596 at *2 (Conn. Super. Jan. 28,
> 2000) ("A common intention or meeting of the minds of the negotiating parties
> themselves is essential to the making of an accord, and where one party
> understands an agreement of settlement to be one thing, and the other party
> understands it to be another, there is no meeting of the minds of the parties,
> regardless of what the attorney conducting the negotiations believes to be his
> client's understanding.").

*Id.* at 189-90. The Court then went on to hold that the plaintiff's attorney did not have actual or

apparent authority to bind the plaintiff to a settlement agreement. *Id.* at 191-92.

Similarly, there was no meeting of the minds at the November 13, 2000 meeting in this

case. If anything, that meeting was rife with miscommunication and misunderstanding, as the

---

to collect the amount of the loss from its customer. Zygo never entered into any agreement to
settle with Nan Ya, and instead diligently and persistently sought compensation for the loss.

meeting was conducted in Mandarin Chinese, which Zygo's representatives do not understand. More importantly, even if an agreement to settle the dispute over the second AFM had been reached at that meeting, it is undisputed that none of the Zygo representatives present had the authority to bind Zygo to any such settlement.

Royal will be wholly unable to present any admissible, non-hearsay evidence to the contrary. Royal did not investigate the alleged settlement – in fact, Royal's claim adjuster admitted that he never even spoke to anyone that was present at the November meeting. *See* Daneman Dep. at 184; Walch Dep. at 284-86. Instead, Mr. Daneman determined that since there was a "possibility" of a settlement, it was better to bring this declaratory judgment action first and ask questions later. Daneman Dep. at 186 ("so long as [settlement] was a possibility I wanted to investigate through litigation . . . to help resolve the issue."). However, in the last three years, Royal still has not done any investigation into the claim that Zygo and Royal settled this dispute other than again ask Zygo and M&M representatives. It has received consistent answers, but it steadfastly continues to adopt the position of its putative adversary (Nan Ya). Incredibly, Royal answered interrogatories by simply adopting Nan Ya's responses to interrogatories without doing any investigation as to the truth of those responses. Daneman Dep., at 185-200; Bjorkman Aff. Ex. 21.

Clearly, no one from Royal has any personal knowledge of the alleged settlement agreement between Zygo and Nan Ya. In fact, after the district court granted Nan Ya's motion for summary judgment (which Royal failed to oppose), Royal's attorney sent a letter to Judge Goettel saying that, even though it alleged in its Complaint that Zygo had in fact settled with Nan Ya, "Royal . . . had no direct information or documentation with which to refute Nan Ya's assertions . . . . Indeed, if Royal had opposed Nan Ya's motion without any supporting evidence,

it arguably ran the risk of committing a Rule 11 violation . . . ." Bjorkman Aff. Ex. 18 (September 19, 2002 letter from Robert Marzik, Esq. to Judge Goettel). Later, another of Royal's lawyers wrote to Judge Goettel regretting that Royal did not *join* Zygo's opposition to Nan Ya's summary judgment motion. Bjorkman Aff. Ex. 19 (September 24, 2002 letter from John Nicoletti, Esq. to Judge Goettel). Royal is in essentially the same position it was two years ago, facing Rule 11 sanctions for weighing in on the issue of a release. It did not have sufficient information to make that claim when it filed the complaint, when it answered Zygo's discovery requests, or when Nan Ya filed for summary judgment. It still does not have sufficient information to defeat this summary judgment motion. Royal certainly cannot establish by a preponderance of the evidence that Zygo and Nan Ya settled their dispute over the loss of the Second AFM. Accordingly, this Court should grant Zygo's motion for summary judgment on Royal's fourth cause of action.

## IV. The Court Should Grant Zygo Summary Judgment on Royal's Fifth Cause of Action

In its fifth cause of action Zygo claims that, assuming there is coverage under the Policy it should be held liable for only the cost of the component parts or the cost of repairing the component parts, whatever is less. However, this position misconstrues the nature of contingency coverage because it focuses on the value of the damaged equipment rather than the debt owed by the customer. *See Royal II*, at *6 (quoting *Armada Supply, Inc. v. Wright*, 858 F.2d 842, 847 (2d Cir. 1988)). Under the terms of its contract with Zygo, Nan Ya bore the risk of loss for the equipment and therefore, whether or not the Second AFM could have been repaired, it owed Zygo $690,000. As described above, Royal insured against this risk of nonpayment, owes Zygo the full amount due from Nan Ya, and then has the option of seeking to recover that amount from the customer.

31

The facts concerning this part of the dispute are simple and undisputed. *First*, Nan Ya purchased the Second AFM for $690,000. Statement ¶ 4. *Second*, Nay Ya has refused to pay the purchase price. *Id.* at 11. *Third*, the damage to the Second AFM was significant, resulting in a near-total loss. Kelvin Walch, an individual with extensive experience installing and servicing AFMs, testified that it would have cost hundreds of thousands of dollars to attempt to repair the damaged AFMs. Even if repairing the machines were feasible, there would be no market in which to sell the repaired machines, given the high repair cost. Walch Dep. at 224-29. Mr. Walch created a report detailing the value of the salvageable parts from both Damaged AFMs. He determined that the salvage value of the First AFM was $32,100 and that the salvage value of the Second AFM was $25,750. At the November 13, 2000 meeting, Nan Ya and its insurer requested that the two values be averaged, so Mr. Walch prepared a supplemental report with new figures. Walch Dep. at 252-57; Bjorkman Aff. Ex. 10. Nan Ya then paid the full remaining amount on the First AFM minus the averaged salvage value. Martin Dep. at 224-25; Martin Ex. 43. Royal had notice that Nan Ya and its insurer also agreed to accept Mr. Walch's salvage value for the Second AFM. Bjorkman Aff. Ex. 9; Daneman Dep. at 235-36 (admitting he received the reports from Cathay Inspection). Royal cannot dispute Mr. Walch's determination of the salvage value of the damaged AFMs.

Accordingly, Nan Ya owes Zygo $661,075, plus interest and other damages[18] for the Second AFM. This amount is derived by taking the purchase price of $690,000 and subtracting

---

[18] For example, Zygo is entitled to recover the costs it incurred in opposing Nan Ya's motion for summary judgment after Royal brought Nan Ya into the case as a Third Party Defendant. Moreover, Zygo has counterclaimed for Royal's bad faith denial of its claim and breach of the covenant of good faith and fair dealing and reserves all of its rights to proceed for additional damages, including but not limited to attorney fees, based on those causes of action.

the average salvage value of $28,925, the amount by which Zygo was able to mitigate its damages.[19]

## V.    The Court Should Grant Summary Judgment on Zygo's First and Fourth Counterclaims.

In its Counterclaims, Zygo asserted that Royal breached the Policy by declining coverage (First Counterclaim), and sought a declaratory judgment that the Policy provided coverage for its loss relating to the Second AFM (Fourth Counterclaims).  For the reasons set forth at length above, the facts are undisputed and the Court can determine as a matter of law that the Policy provides coverage under the Contingency Clause for Nan Ya's failure to pay for the Second AFM.  Because Royal failed to provide such coverage, it breached the Policy.  *See, e.g., Metropolitan Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 249 Conn. 36, 59, 730 A.2d 51, 63-64 (1999) (where policy provides coverage, denial of coverage breaches the insurance contract).

Accordingly, this Court should grant summary judgment to Zygo on its First and Fourth Counterclaims, awarding damages in the amount of at least $661,075, plus prejudgment interest in an amount to be determined based on further proceedings.

---

[19] Although Mr. Daneman testified that, if the Court determined that there was coverage in this case, Royal would owe Zygo $690,000, *see* Daneman Dep. at 241, Zygo does not contest that Royal would be entitled to offset Zygo's actual salvage amount. Notably, Royal benefited from Zygo and Nan Ya's agreement to average the salvage values of the damaged AFMs, as Royal thereby received a credit of $28,925 subtracted from the purchase price, instead of $25,750 – a difference of over $3,000.

## CONCLUSION

For the reasons set forth in this memorandum, defendant Zygo respectfully requests that the Court grant is Motion for Partial Summary Judgment.

DEFENDANT
ZYGO CORPORATION

By: _____

Ian E. Bjorkman (et 11648)
Erika L. Amarante (ct 22393)
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT 06508-1832
Tel. 203-498-4496
Fax: 203-782-2889
ibjorkman@wiggin.com
Its Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 7th day of July 2004, a copy of the foregoing has been

mailed, postage prepaid, to the following:


Robert K. Marzik, Esq.
Law Offices of Robert K. Marzik, P.C.
1512 Main Street
Stratford, CT  06615

John A.V. Nicoletti, Esq.
Geoffrey J. Ginos, Esq.
Nicoletti, Hornig, Campise, Sweeney & Paige
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY  10005-1801

Daniel L. FitzMaurice, Esq.
Charlsa D. Broadus, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT  06103

C. Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA  94304-1050

_____
Ian E. Bjorkman


\15160\1\46120.4