UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>ZYGO CORPORATION,<br>    Defendant. | Civil No. 3:01 CV 1317 (JBA)<br><br><br>July 7, 2004 |

## DEFENDANT ZYGO CORPORATION'S LOCAL RULE 56(a)1 STATEMENT

Pursuant to Local Rule 56(a)1, defendant Zygo Corporation ("Zygo") sets forth this statement of material facts for which there is no genuine issue to be resolved at trial.

1. In 1999, Royal Insurance Company of America ("Royal") issued a Marine Open Cargo Policy, policy no. POC102950 with an effective date of May 1, 1999 (the "Policy") to Zygo. *See* Royal's Complaint ("Compl."). ¶ 13 and Ex. A thereto (the Policy); Affidavit of Lawrence Martin, dated August 14, 2002 (hereinafter "Martin Aff."),[1] Ex. 4 (the Policy).

2. In December 1999, Zygo contracted with Nan Ya for the sale of an Atomic Force Microscope ("the First AFM"). *See* Martin Aff., ¶3 & Ex. 1. The total purchase price of the First AFM was $690,000. *See id.* The terms of the sale were as follows: FOB Delray Beach, Florida, with an 80% payment due prior to shipment, by letter of credit, and the remaining 20% payment due when Nan Ya accepted the shipment

---

[1] A true and correct copy of the Affidavit of Lawrence Martin is attached to the Affidavit of Erika L. Amarante, dated July 7, 2004.

in Taiwan. *See id.* Nan Ya specified that Zygo use Lynden International to transport the First AFM from the United States to Taiwan. *See* Compl., ¶ 33.

3. In January 2000, Nan Ya advised Zygo that the First AFM had arrived in Taiwan seriously damaged. *See* Martin Aff., ¶ 4; Deposition of Kelvin Walch, dated June 7, 2004 (hereinafter "Walch Dep.")[2] at 76-78, 255. Specifically, the First AFM had been shipped in four separate boxes, and the main box had been destroyed, rendering the First AFM unusable. *See* Compl., ¶ 32-35.

4. Nan Ya insisted that Zygo ship a replacement AFM ("the Second AFM") immediately, because Nan Ya was in the middle of a project for which the AFM was urgently needed. Martin Aff., ¶5. To that end, on or about January 31, 2000, Nan Ya provided a purchase order to Zygo in the amount of $690,000 for the second AFM. Martin Aff., ¶6 & Ex. 2. The delivery terms for that purchase order for the Second AFM stated "FOB US Airport." Martin Aff., ¶ 7; Compl., ¶ 43. As with the First AFM, Zygo contracted with Lynden Air Freight ("Lynden Air") to deliver the Cargo to a United States airport for transport to Taiwan. Compl., ¶ 44.

5. In early February, 2000, Zygo shipped the Second AFM to Nan Ya. Martin Aff., ¶7. Due to Nan Ya's urgent need for the Second AFM, Zygo did not require Nan Ya to obtain a letter of credit before shipping the Second AFM. *Id.*; *see also* Bjorkman Aff. Ex. 10. Rather, Zygo shipped the Second AFM on an open account basis, FOB U.S. Airport. Martin Aff., ¶ 7. The Second AFM was also transported at Nan Ya's

---

[2] A true and correct copy of excerpts of the deposition transcript of Kelvin Walch is Exhibit 28 to the Affidavit of Ian E. Bjorkman ("Bjorkman Aff."). Excerpts to all the deposition transcripts cited in this Statement are also attached to the Bjorkman Aff., as Exs. 25-31.

instructions from the United States to Taiwan by Lynden International via China Airlines. Compl., ¶ 44-45.

6. The Second AFM arrived at the U.S. Airport for shipment to Nan Ya in Taiwan and was loaded on the aircraft in an undamaged condition. Royal Compl. ¶68 (admission that any damage occurred after delivery to the U.S. airport).

7. On or about February 11, 2000, Nan Ya advised Zygo that the Second AFM had arrived in a damaged condition. Martin Aff., ¶8.

8. Because Nan Ya still did not have a workable AFM for its business, Zygo then shipped a third AFM ("the loaner AFM") to Nan Ya in late February 2000 on a loaner basis. *See* Martin Aff., ¶9 & Ex. 3; Compl., ¶ 52. The loaner AFM was to be returned to Zygo by June 30, 2000. Martin Aff., ¶9 & Ex. 3

9. After being notified that the Second AFM had arrived damaged, Zygo personnel went to Taiwan to evaluate the potential cause and extent of the damage. *See e.g.,* Walch Dep. at 94-95. Zygo determined that the most likely cause of the damage was that the AFM had been dropped and not handled properly. *See* Walch Dep. at 42-45, 101-02, 108-09, 143-46, 201-12, 215-17; *see also* Bjorkman Aff. Exs. 2-4.

10. Immediately after shipping the loaner AFM, Zygo made efforts to collect from Nan Ya the amounts due to it for the First and Second AFMs (The First AFM and Second AFM are referred to collectively as the "Damaged AFMs"). *See* Martin Aff., ¶10.

11. Nan Ya refused to pay the $690,000 purchase price for the Second AFM. Martin Aff., ¶ 15; Deposition of Lawrence Martin, taken on February 5, 2004 (hereinafter "Martin Dep.") (Bjorkman Aff. Ex. 25) at 47-48.

12. On or about March 7, 2000, Zygo, through its insurance broker and agent, Mathog & Moniello ("M&M"), put Royal on notice of its claim regarding the Second AFM. Compl. ¶53; Deposition of Joseph Daneman (hereinafter "Daneman Dep.") (Bjorkman Aff. Ex. 22) at 36-38; Martin Aff. ¶11; Bjorkman Aff. Ex. 5.

13. Nan Ya refused to return the loaner AFM to Zygo on June 30, 2000 as previously agreed and continued to hold the loaner AFM hostage during the summer and fall of 2000. Martin Aff., ¶13; Martin Dep. at 193-96. Moreover, Nan Ya continued to hold the loaner AFM hostage during the summer and fall of 2000. Martin Aff., ¶13. Accordingly, Zygo now found itself pursuing Nan Ya not only for payment for the Damaged AFMs, but also for return of the loaner AFM. *Id.* Moreover, Nan Ya's refusal to return the loaner AFM created an additional financial hardship for Zygo, because Zygo had a customer willing to lease the loaner AFM for about $13,000 per month. Martin Aff., ¶14; Martin Dep. at 27-31, 190.

14. Zygo retained Kelvin Walch, who had an extensive background relating to AFMs, to evaluate the salvage value of the Damaged AFMs. Martin Aff. ¶19; Martin Dep. at 210; Walch Dep. at 252, 279-84. Mr. Walch determined that the average salvage value for each of the Damaged AFMs was $28,925. Walch Dep. at 279-84; Bjorkman Aff. Ex. 10.

15. Lawrence Martin, Zygo's Staff Assistant to the President, approved the concept that the salvage values of both of the Damaged AFMs would be deducted from the amounts that were due from Nan Ya. Martin Aff., ¶20; Martin Dep. at 211-13.

16. In November 2000, a meeting was held among representatives of Nan Ya, Nan Ya's insurer and Zygo. *See* Martin Aff., ¶24; Deposition of Timothy Smith

4

(hereinafter "Smith Dep.") (Bjorkman Aff. Ex. 24) at 160-178, 204-05, 208-09, 214-218; Walch Dep. at 254-60, 285-87.

17. Timothy Smith, Zygo's Regional Director in Taiwan, was Zygo's representative at the meeting. Martin Aff., ¶24; Smith Dep. at 208. Kelvin Walch also attended the meeting. Martin Aff., ¶24; Walch Dep. at 254-60.

18. Mr. Smith was not authorized to compromise Zygo's claim with regard to the Second AFM. Martin Aff., ¶24; Smith Dep. at 173-79, 220-21.

19. The meeting was conducted in Mandarin Chinese and English. Smith Dep. at 163-64; Walch Dep. at 256-67. Mr. Smith does not speak Mandarin and did not understand all that was said by the Nan Ya representatives. Although there was an informal translation, at no time did anyone attempt to provide Mr. Smith with a formal, word-for-word translation as the discussions were transpiring. Smith Dep. at 177-79.

20. At the conclusion of the meeting, Mr. Smith was presented with a document written entirely in Mandarin that purported to summarize the points of the meeting. *See* Smith Dep. at 26. Because Mr. Smith does not read Mandarin, he was forced to rely upon a cursory verbal translation of the points contained in the document. Smith Dep. at 173-79.

21. Mr. Smith signed the document to indicate his attendance at the meeting. At no time was the document presented to Mr. Smith as any kind of legal document, agreement or release, nor did he believe it to be so. Smith Dep. at 173-79.

22. The terms of the document were never reviewed or approved by Mr. Martin or any Zygo representative with authority to compromise Zygo's claim for the Second AFM. Martin Aff., ¶¶27-29.

23. At the November meeting Nan Ya agreed to the proposed formula for establishing the amount due from Nan Ya for the First AFM, and further agreed to pay Zygo the remaining amount due on the First AFM using this formula. Martin Aff., ¶25. Nan Ya also agreed to return the Damaged AFMs as well as the loaner AFM to Zygo. *Id.*

24. Nan Ya requested that Mr. Martin write a letter confirming Zygo's agreement to offset the salvage value on the First AFM. Martin Aff., ¶25. Accordingly, on November 15, 2000, Mr. Martin sent a letter to Nan Ya confirming Zygo's agreement to offset the balance due on the First AFM by $28,925.00 (the average salvage value of the Damaged AFMs), provided that payment would be made by December 21, 2000. Martin Aff., ¶25; Martin Dep. at 213.

25. Nan Ya never requested that Mr. Martin confirm in writing any purported agreement or compromise with respect to the Second AFM, and the November 15, 2000 letter makes no mention of the second AFM. Martin Aff., ¶29.

26. Nan Ya and its insurer agreed to Mr. Walch's salvage value for both of the Damaged AFMs. It paid the balance due to Zygo on the First AFM, less the salvage amount. Nan Ya also gave notice through its surveyor that it agreed to the salvage value for the Second AFM. Bjorkman Aff. Ex. 9.

27. During 2000 and into mid-2001, Royal and Zygo, through its broker, M&M, communicated concerning the coverage of the Second AFM. Royal asserted various and changing reasons not to cover the loss. *See, e.g.,* Bjorkman Aff. Exs. 11-14.

28. On or about July 13, 2001, Royal brought suit against Zygo seeking a declaratory judgment that the Policy did not cover Zygo's loss on the Second AFM. *See generally* Compl.

6

29. On or about July 16, 2001, Royal sent a letter to Zygo declining coverage under the Policy. Bjorkman Aff. Ex. 16.

30. The Policy does not expressly provide that Zygo had to declare a shipment to Royal separately and in advance in order to obtain contingency coverage. Martin Aff. Ex. 4 ¶52; Deposition of Allan Ilias (hereinafter "Ilias Dep.") (Bjorkman Aff. Ex. 23) at 146.

31. The Policy does not expressly provide that, in order to obtain contingency coverage, Zygo had to pay a premium in addition to the $0.023 per $100 gross sales rate that is set out in the Policy's Schedule of Rates. Martin Aff. Ex. 4 ¶52.

By: /s/ Erika Amarante
Ian E. Bjorkman (ct 11648)
Erika L. Amarante (ct 22393)
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT 06508-1832
Tel. 203-498-4496
Fax: 203-782-2889
ibjorkman@wiggin.com
Its Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 7th day of July 2004, a copy of the foregoing Statement of Undisputed Facts has been mailed, postage prepaid, to the following:

Robert K. Marzik, Esq.
Law Offices of Robert K. Marzik, P.C.
1512 Main Street
Stratford, CT  06615

John A.V. Nicoletti, Esq.
Geoffrey J. Ginos, Esq.
Nicoletti, Hornig, Campise, Sweeney & Paige
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY  10005-1801

Daniel L. FitzMaurice, Esq.
Charles D. Broadus, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT  06103

C. Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA  94304-1050

_____
Erika L. Amarante

\15160\1\46123.2