# EXHIBIT 22

```
                                                              1
 1

 2      UNITED STATES DISTRICT COURT

 3      FOR THE DISTRICT OF CONNECTICUT
        - - - - - - - - - - - - - - - - -x
 4      ROYAL INSURANCE COMPANY OF AMERICA, :

 5              Plaintiff,

 6              -against-                    Case No.
                                             3:01CV1317
 7      ZYGO CORPORATION,                      (GLG)

 8              Defendant.
                                           :
 9      - - - - - - - - - - - - - - - - -x

10

11          DEPOSITION of JOSEPH DANEMAN, taken by

12   Defendant at the offices of Nicoletti, Hornig,

13   Camprise & Sweeney, 88 Pine Street, 7th Floor, New

14   York, New York 10005-1801, on Thursday, November 20,

15   2003, commencing at 10:20 a.m., before Karen Ann

16   Carney, a Certified Shorthand (Stenotype) Reporter and

17   Notary Public within and for the State of New York.

18
19
20
21
22
23
24
25
```

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
[3] FOR THE DISTRICT OF CONNECTICUT
[4] ROYAL INSURANCE COMPANY OF AMERICA, :
[5]     Plaintiff,
[6]     -against-    Case No.
              3:01CV1317
[7] ZYGO CORPORATION,            (GLG)
[8]     Defendant.
[9]
[10]
[11]    DEPOSITION of JOSEPH DANEMAN, taken by
[12] Defendant at the offices of Nicoletti, Hornig,
[13] Camprise & Sweeney, 88 Pine Street, 7th Floor, New
[14] York, New York 10005-1801, on Thursday, November 20,
[15] 2003, commencing at 10:20 a.m., before Karen Ann
[16] Carney, a Certified Shorthand (Stenotype) Reporter and
[17] Notary Public within and for the State of New York.
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2] APPEARANCES:
[3]
       NICOLETTI, HORNIG, CAMPRISE & SWEENEY
[4]       Attorneys for Plaintiffs
          Wall Street Plaza
[5]       88 Pine Street, 7th Floor,
          New York, New York 10005-1801
[6]
[7] BY: GEOFFREY J. GINOS, Esq., of Counsel
       WILLIAM M. FENNELL, Esq., of Counsel
[8]
[9]    WIGGIN & DANA
          Attorneys for Defendant
[10]      Century Tower
          New Haven, Connecticut 06508-1832
[11]
       BY: IAN E. BJORKMAN, Esq., of Counsel
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2]    IT IS HEREBY STIPULATED AND
[3] AGREED that the filing and sealing of
[4] the within deposition be, and the
[5] same are hereby waived;
[6]    IT IS FURTHER STIPULATED AND
[7] AGREED that all objections, except as
[8] to the form of the question, be and
[9] the same are hereby reserved to the
[10] time of the trial;
[11]   IT IS FURTHER STIPULATED AND
[12] AGREED that the within deposition may
[13] be sworn to before any Notary Public
[14] with the same force and effect as if
[15] sworn to before a Judge of this
[16] Court;
[17]   IT IS FURTHER STIPULATED that
[18] the transcript is to be certified by
[19] the reporter.
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]           **Daneman**
[2] J O S E P H  D A N E M A N, called as a witness,
[3] having been first duly sworn by Karen Ann
[4] Carney, a Notary Public within and for the
[5] State of New York, was examined and
[6] testified as follows:
[7]    **MR. GINOS:** I just have a
[8] couple of small things I want to put
[9] on the record.
[10]   First, Ian, when we discussed
[11] your re-notice of deposition and we
[12] went through the list as to which
[13] issues Mr. Daneman would be testifying
[14] as a 30(b)(6) witness, I have a minor
[15] correction on a couple of them.
[16]   **MR. BJORKMAN:** Maybe the
[17] easiest thing to do would be, why
[18] don't I mark the deposition notice and
[19] then you can identify which subjects
[20] he will be testifying to. That might
[21] be an easier way to do it.
[22]   (Re-Notice of Deposition was
[23] marked as Daneman Exhibit No. 1 for
[24] identification, as of this date.)
[25]   **MR. GINOS:** With respect to

Page 5

**Daneman**

[1]
[2] Daneman 1, which is the Re-Notice of
[3] Deposition, I believe that I had said
[4] to you that No. 7 would be
[5] Mr. Daneman. It is, but it is split.
[6] To the extent that there may have been
[7] some communication between the
[8] underwriter and the broker, obviously,
[9] those communications will come within
[10] the province of the underwriter in
[11] terms of the 30(b)(6) witness, because
[12] Mr. Daneman would not have been privy
[13] to them, and the underwriter will be
[14] testifying.
[15]     Similarly, on No. 8, I believe
[16] I said 8 would be the underwriter. It
[17] is split. Again, to the extent that
[18] they relate to the renewals of the
[19] policy, placement of the policy, you
[20] know, purchase of the policy, it would
[21] be the underwriter, but all other
[22] communications, meaning the claims
[23] communications, would be Mr. Daneman
[24] under the 30(b)(6).
[25]     On No. 12 — this is the last

Page 6

**Daneman**

[1]
[2] one I have a comment on — Royal's
[3] claim that at no time did Zygo
[4] declare, that is taken from
[5] Mr. Daneman's letter, so certainly he
[6] will be testifying on that.
[7]     But to the extent you can
[8] construe that as to was there a
[9] declaration by Zygo when the policy
[10] was first placed or thereafter made to
[11] the underwriter, he will testify to
[12] that.
[13]     So, all I'm suggesting —
[14] **MR. BJORKMAN:** I'm confused
[15] about No. 12. Say that again.
[16] **MR. GINOS:** Well, I'm just
[17] suggesting that to the extent that
[18] what you are getting at with No. 12 is
[19] the letter that the quote is taken
[20] from, it was written and signed by
[21] Mr. Daneman. He will be testifying
[22] about that letter.
[23]     Now, you can ask him,
[24] obviously, why did you say that, what
[25] was the basis, so forth, who else

Page 7

**Daneman**

[1]
[2] participated in the writing of the
[3] letter.
[4]     But in a broader sense, taking
[5] the quotes away, in the broader sense
[6] of did Zygo ever declare that they
[7] wanted this kind of coverage or
[8] declare that this particular shipment,
[9] the underwriter may have something to
[10] say on that; and to the extent that he
[11] has knowledge on those points, he can
[12] be considered a 30(b)(6) witness.
[13]     Those are the only items.
[14] **MR. BJORKMAN:** Would you mind,
[15] for the record, then, just designating
[16] which numbers —
[17] **MR. GINOS:** The underwriter —
[18] **MR. BJORKMAN:** No, Mr. Daneman
[19] strictly.
[20] **MR. GINOS:** The easy way to do
[21] it is — it's a shorter list — he is
[22] not dealing with 3, 14, 15 or 16. And
[23] he is, in effect, jointly, as I've
[24] described previously, dealing with the
[25] underwriter on 7, 8 and 12.

Page 8

**Daneman**

[1]
[2]     Everything else is
[3] Mr. Daneman.
[4]     The underwriter here is Alan
[5] Ilias, A-l-a-n, I-l-i-a-s.
[6] **MR. BJORKMAN:** Who is going to
[7] be testifying as to No. 3?
[8] **MR. GINOS:** Mr. Ilias, because
[9] he's the underwriter.
[10]     Now, when you say who is going
[11] to be testifying as to 3, as the
[12] 30(b)(6) is Ilias.
[13]     I'm certainly — I have no
[14] objections if you want to ask
[15] Mr. Daneman about interpretation of
[16] the policy. He can give you his
[17] personal opinion, but he's not the
[18] 30(b)(6) witness. You can ask him
[19] anything you want about it, bearing in
[20] mind he's not a 30(b)(6) or an
[21] attorney, but he is the claims
[22] adjuster that dealt with that clause;
[23] so, you're certainly entitled to go
[24] into it.
[25]     For the record, he was noticed

Page 33

[1]                 *Daneman*
[2]   **A:** Yes.
[3]   **Q:** Let me ask you this: When you wrote
[4] this letter on July 16th — strike that.
[5]     Did you write this letter yourself,
[6] exhibit 4, that is?
[7]   **A:** (Perusing document.) Yes.
[8]   **Q:** Did you show drafts to anyone?
[9]   **A:** I believe I showed a draft to my
[10] boss, Tony Corsale.
[11]   **Q:** And did Mr. Corsale approve this
[12] letter that was sent?
[13]   **A:** I believe so.
[14]   **Q:** And he approved the decision to
[15] decline coverage, right?
[16]   **A:** Yes.
[17]   **Q:** Now, when you wrote this letter on
[18] July 16, 2001, did you have information that lead
[19] to you believe that Zygo had released or otherwise
[20] discharged NanYa for payment of the atomic force
[21] microscope?
[22]   **A:** I had information that indicated
[23] that that was a possibility.
[24]   **Q:** When you wrote the letter, did you
[25] believe that Zygo had released Nanya from any

Page 34

[1]                 *Daneman*
[2] obligation to pay for the atomic force microscope?
[3]   **A:** I had information indicating that
[4] that was a distinct possibility.
[5]     I had information indicating that
[6] there were meetings and negotiations between Zygo
[7] and NanYa, negotiations which we were not aware
[8] of, we were not advised of; and, therefore, it
[9] wasn't clear, though, from the communication what
[10] the final decision was, but it was indicative that
[11] there was some sort of deal reached between Zygo
[12] and NanYa concerning Zygo now getting
[13] reimbursement of the 20 percent that was being
[14] withheld for the first shipment and the loaner,
[15] the third shipment now being returned to Zygo.
[16]     There seemed to have been some sort
[17] of deal arranged for that to happen.
[18]   **Q:** Who told you about that?
[19]   **A:** That was in correspondence that was
[20] provided to me by the broker.
[21]   **Q:** You first heard about Zygo's claim
[22] in March of 2000, right?
[23]   **A:** Yes, I believe so.
[24]   **MR. BJORKMAN:** Mark this as
[25] No. 5.

Page 35

[1]                 *Daneman*
[2]     (One-page document captioned
[3] Claim Progress, bearing Bates Stamp
[4] No. RY 00282, was marked as Daneman
[5] Exhibit No. 5 for identification, as
[6] of this date.)
[7]            BY MR. BJORKMAN:
[8]   **Q:** Can you identify No. 5 (handing)?
[9]   **A:** (Perusing document.) It is some
[10] notes that I made concerning documents that I had
[11] in the Zygo claim file.
[12]   **Q:** So this is your handwriting?
[13]   **A:** Yes.
[14]   **Q:** What does it mean where it says
[15] Survey Report?
[16]   **A:** That's a survey report that was
[17] provided to me. It is a survey report done in
[18] Taiwan, I believe. It was not a survey report
[19] done at the request of Royal. It was a survey
[20] report done at the request of someone over in
[21] Taiwan; probably NanYa's insurance company.
[22]   **Q:** And there is no date on this No. 5,
[23] right, on this document?
[24]   **A:** (Perusing document.) Correct.
[25]   **Q:** Do you know, do you have a general

Page 36

[1]                 *Daneman*
[2] idea of when you wrote this?
[3]   **A:** I don't recollect.
[4]   **Q:** And when you noted the survey
[5] report, did that indicate that you had the survey
[6] report?
[7]   **A:** That indicates that I had a copy of
[8] the survey report.
[9]   **MR. BJORKMAN:** Mark this as
[10] No. 6.
[11]     (Letter fax transmission dated
[12] March 8, 2000, on letterhead of Royal
[13] & SunAlliance, from Joe Daneman to
[14] Peggy Merati of Mathog & Moniello,
[15] bearing Bates Stamp No. RY 0027, was
[16] marked as Daneman Exhibit No. 6 for
[17] identification, as of this date.)
[18]            BY MR. BJORKMAN:
[19]   **Q:** Can you identify Exhibit 6?
[20]   **A:** (Perusing document.) No. 6 is a
[21] copy of a fax from me to Mathog & Moniello, the
[22] insurance broker of Zygo.
[23]   **Q:** And this was the day after you
[24] received notice of the claim, right?
[25]   **A:** I believe so, yes. I believe the

Page 37

[1] **Daneman**
[2] first notice to us was March 7, 2000, and this is
[3] a fax dated March 8, 2000, which would then be the
[4] day after.
[5] **Q:** In this letter you ask for various
[6] information, right?
[7] **A:** Yes.
[8] **Q:** And then you note in the paragraph,
[9] third paragraph from the bottom, that the fax from
[10] Mathog & Moniello was dated March 7, 2000, which
[11] was the first report of claim to us, quote, "which
[12] is late notice to us. This has prejudiced our
[13] investigation for this loss and, consequently,
[14] prejudiced the assured's claim against the
[15] policy."
[16] Can you tell me how receiving the
[17] notice on March 8th prejudiced Royal's
[18] investigation of the loss?
[19] **A:** Well, the investigation would
[20] include ascertaining the cause of the loss and
[21] ascertaining who was responsible for the loss and
[22] ascertaining when the loss occurs. And the delay
[23] in reporting it to us makes it more difficult for
[24] the surveyor to ascertain those things than if the
[25] surveyor is appointed right away, as soon as or a

Page 38

[1] **Daneman**
[2] day after the delivery is made. It becomes more
[3] difficult for the surveyor to ascertain those
[4] things as time goes on.
[5] **Q:** And as this claim progressed, is it
[6] your testimony that the fact that you didn't learn
[7] about this until March 7, 2000 actually prejudiced
[8] your investigation?
[9] **A:** It may have prejudiced our
[10] investigation.
[11] **Q:** Now that we know about what has
[12] happened, I'm asking you whether it did prejudice
[13] your investigation?
[14] **MR. GINOS:** Now that we know
[15] what's happened? What are you asking
[16] him to assume as a basis for the
[17] question?
[18] **MR. BJORKMAN:** I'll withdraw
[19] the question.
[20] **Q:** Sir, did the fact that you learned
[21] about this claim on March 7, 2000 prejudice
[22] Royal's investigation of the claim?
[23] **A:** It is difficult to say because if I
[24] had received location information about the
[25] damaged goods and contact information about

Page 39

[1] **Daneman**
[2] arranging for appointment of a surveyor of the
[3] damaged goods shortly after March 8th, and I sent
[4] the surveyor in there, then I would have found out
[5] whether or not it had prejudiced our
[6] investigation.
[7] But my request went unresponded to
[8] for about two months. And by then it is just even
[9] more of a delay, increasing the prejudice of our
[10] investigation of the loss. The surveyor —
[11] **Q:** I didn't ask you about anything that
[12] happened after March 8th. I'm trying to figure
[13] out the period between March 14th and —
[14] February 14 and March 7th.
[15] **A:** It prejudiced our investigation
[16] because we weren't able to do the investigation
[17] promptly.
[18] **Q:** So are you claiming that Royal
[19] denied coverage because this claim was not
[20] reported until March 7th?
[21] **A:** No. We were just reserving our
[22] rights that if it developed that the claim
[23] investigation had been prejudiced because of the
[24] late notice, then that would have been a citation
[25] for declination of coverage.

Page 40

[1] **Daneman**
[2] **Q:** But in this case that wasn't the
[3] reason for declination of coverage, right?
[4] **MR. GINOS:** Clarification.
[5] You mean as of March 8th or as of the
[6] declination letter or ever at all?
[7] **MR. BJORKMAN:** Ever.
[8] **Q:** Learning about this on March 7th did
[9] not eventually become a reason that you declined
[10] coverage, right?
[11] **A:** It wasn't a primary reason of
[12] declination of coverage.
[13] **MR. BJORKMAN:** Mark this as
[14] the next exhibit.
[15] (Document captioned Class
[16] Instruction, on letterhead of Royal &
[17] SunAlliance, bearing Bates Stamp No.
[18] RY 0028, was marked as Daneman Exhibit
[19] No. 7 for identification, as of this
[20] date.)
[21] **BY MR. BJORKMAN:**
[22] **Q:** Showing you what has been marked as
[23] Exhibit 7, can you identify that (handing)?
[24] **A:** (Perusing document.) This is a
[25] Royal form that I've written up, which is the form

Page 45

[1] **Daneman**
[2] through RY 00230, was marked as
[3] Daneman Exhibit No. 8 for
[4] identification, as of this date.)
[5]     **BY MR. BJORKMAN:**
[6] **Q:** Can you identify Exhibit 8?
[7] **A:** (Perusing document.) Exhibit 8 is a
[8] copy of correspondence from Matt Weidman of Mathog
[9] & Moniello to me, dated May 1, 2000.
[10] **Q:** And you received this May 8th, is
[11] that right? Is that what that indicates —
[12] **A:** (Perusing document.) Yes.
[13] **Q:** — on the stamp on the side?
[14] **A:** Yes.
[15] **Q:** What did you indicate, what did you
[16] understand this memo to be?
[17] **A:** Matt is responding to my previous
[18] inquiries for information, and generally giving a
[19] status report that it looks like the machines are
[20] going to be looked at for evaluation for repair
[21] estimates because they believe that they are
[22] fixable.
[23] **Q:** On the second page Mr. Weidman gives
[24] you the name of Sullivan Muckenheim and gave you
[25] his phone number, his cell phone number and his

Page 46

[1] **Daneman**
[2] e-mail and said in this memo he is a good point of
[3] contact with follow-up questions.
[4]     Do you see that?
[5] **A:** (Perusing document.) Yes.
[6] **Q:** Did you ever call Mr. Muckenheim?
[7] **A:** I don't recollect that I did.
[8] **Q:** Why not?
[9] **A:** (Perusing document.) Generally we
[10] try to keep the broker involved in the
[11] communication process because the broker likes to
[12] represent the assured.
[13]     Brokers typically don't like
[14] communication directly between underwriters and
[15] assureds because then they are left out of the
[16] loop; so, I try to funnel all my communications
[17] through the brokers so that they are always kept
[18] abreast of what is going on.
[19] **Q:** Did you understand from
[20] Mr. Weidman's memo that he didn't want you to
[21] contact Mr. Muckenheim?
[22] **A:** No, I didn't understand that from
[23] this memo.
[24] **Q:** Other than wanting to generally keep
[25] the broker in the loop, is there any other reason

Page 47

[1] **Daneman**
[2] that you didn't call Mr. Muckenheim?
[3] **A:** Not that I recollect.
[4] **Q:** And Mr. Weidman also gave you the
[5] name and number and e-mail address for Tim Smith.
[6]     Did you contact Mr. Smith?
[7] **A:** (Perusing document.) I did not
[8] contact Mr. Smith, but I believe the surveyor that
[9] I assigned may have contacted Mr. Smith, or made
[10] attempts to contact Mr. Smith.
[11] **Q:** And do you remember why you didn't
[12] contact Mr. Smith?
[13] **A:** Primarily to keep the communication
[14] simple and keep the broker in the loop, because
[15] once the underwriter starts communicating directly
[16] with the assured, then the broker is not getting
[17] direct communications and they start doing things
[18] third-hand and it can become confusing.
[19]     So, it is primarily to keep the
[20] broker as the main focal point of communication
[21] between the assured and underwriter.
[22] **Q:** Let me ask you this: When you
[23] received this memo on May 8th, did you want to
[24] talk to Mr. Muckenheim and/or Mr. Smith?
[25] **A:** I don't recollect specifically

Page 48

[1] **Daneman**
[2] whether I wanted to talk to them or not.
[3] **Q:** You don't remember calling up to
[4] Mr. Weidman and saying, geez, I would like to talk
[5] to these fellows, why don't you stay on the line
[6] and we'll call them; you didn't do anything like
[7] that?
[8] **A:** I had many telephone conversations
[9] with Mr. Weidman. I can't recollect a specific
[10] conversation about Mr. Muckenheim or Mr. Smith.
[11] **Q:** No one from the broker prevented you
[12] in any way from calling Mr. Muckenheim or
[13] Mr. Smith, right?
[14] **A:** Right.
[15] **MR. BJORKMAN:** Mark this.
[16]     (One-page fax transmission
[17] dated May 12, 2000, to Matt Weidman,
[18] Mathog & Moniello Companies, from Joe
[19] Daneman, bearing Bates Stamp No. RY
[20] 00227, was marked as Daneman Exhibit
[21] No. 9 identification, as of this
[22] date.)
[23]     **BY MR. BJORKMAN:**
[24] **Q:** Would you identify what has been
[25] marked as Exhibit 9?

Page 49

[1] **Daneman**
[2] A: (Perusing document.) A copy of a
[3] fax from me to Mr. Weidman, dated May 12, 2000.
[4] Q: And this is a letter in response to
[5] the May 1st memo that we just looked at as
[6] Exhibit 8, right?
[7] A: Yes.
[8] Q: And you faxed him this four days
[9] after you received it, right?
[10] A: Yes.
[11] Q: And you told him in that letter that
[12] Royal was not going to assign a surveyor because
[13] "we ascertained that the assured does not have an
[14] insurable interest"; do you see that?
[15] A: (Perusing document.) Yes.
[16] Q: How did you come to the
[17] determination that the assured did not have an
[18] insurable interest?
[19] A: From the documents and
[20] correspondence and information that had been
[21] provided to me up to May 12th, which I believe
[22] indicated that the shipment is good for shipment
[23] under an FOB sale from Zygo to NanYa. The FOB
[24] sale point was FOB U.S. airport and, therefore,
[25] the buyer would take the risk of loss for anything

Page 50

[1] **Daneman**
[2] past the FOB point. And the loss appeared to have
[3] happened in Taiwan, which was beyond the FOB U.S.
[4] airport point.
[5] Q: What information did you have that
[6] led you to believe that the damage occurred in
[7] Taiwan?
[8] A: I have to review correspondence that
[9] had been provided to me up until May 12th by the
[10] broker. There was correspondence provided to me
[11] prior to May 12th, I believe, that gave me that
[12] indication.
[13] Q: So you thought there was no — as of
[14] May 12th, you thought there was no reason to
[15] assign a surveyor, right?
[16] A: That's what it appeared to me. I
[17] didn't — I then asked Mr. Weidman if he had any
[18] information contrary to that assessment, to please
[19] advise me in writing within 30 days so that I may
[20] reevaluate this matter. That was my preliminary
[21] assessment.
[22] Q: Do you recall telling him why you
[23] thought that Zygo did not have an insurable
[24] interest?
[25] A: It would have been for the same

Page 51

[1] **Daneman**
[2] reasons that I just told you here.
[3] Q: Other than this letter, did you have
[4] a phone call, did you explain in some way up to
[5] May 12th how you came to that?
[6] A: I probably did.
[7] Q: Are you answering or not?
[8] MR. GINOS: Am I what?
[9] MR. BJORKMAN: I saw you
[10] shaking your head. I wondered what
[11] that had to do.
[12] MR. GINOS: I'm just sitting
[13] here.
[14] MR. BJORKMAN: You are sitting
[15] here nodding your head up and down.
[16] MR. GINOS: No. No. No.
[17] A: I had many conversations with
[18] Mr. Weidman. That probably was one of them. We
[19] spoke frequently on this case.
[20] BY MR. BJORKMAN:
[21] Q: And you don't recall talking to him
[22] between the time you received the memo and the
[23] time you sent this letter, right?
[24] A: I don't recall.
[25] MR. GINOS: Just for the

Page 52

[1] **Daneman**
[2] record, I really wasn't sending
[3] anybody any signals. My head is
[4] moving. I'm moving in the chair. I
[5] can't stand still or sit still all
[6] day.
[7] MR. BJORKMAN: I'm sure it was
[8] my mistake. I apologize.
[9] MR. GINOS: I have my hands on
[10] top of my head and I'm just sort of
[11] rocking back and forth.
[12] MR. BJORKMAN: I apologize.
[13] MR. GINOS: When somebody
[14] reads the record a year later, it
[15] looks like I was nodding actively.
[16] I'm just rocking back and forth in the
[17] chair here.
[18] BY MR. BJORKMAN:
[19] Q: Do you recall before you sent this
[20] letter on May 12th talking to anyone at Royal
[21] about your conclusion that Zygo did not have an
[22] insurable interest?
[23] A: I don't recall.
[24] MR. BJORKMAN: Let's mark
[25] this.

Page 53

[1]                    **Daneman**
[2]     (Document being a fax
[3] transmission from Susan Smith, bearing
[4] Bates Stamp No. RY 00283, was marked
[5] as Daneman Exhibit No. 10 for
[6] identification, as of this date.)
[7]              BY MR. BJORKMAN:
[8]     **Q:** Have you ever seen Exhibit 10
[9] before?
[10]    **A:** (Perusing document.) I probably
[11] have.
[12]    **Q:** Did you see it at or about early May
[13] of 2000?
[14]    **A:** Probably.
[15]    **Q:** Does seeing this refresh your
[16] recollection as to whether you had any discussions
[17] about your determination that the assured does not
[18] have an insurable interest?
[19]    **A:** Could you repeat the question?
[20]    **Q:** I just want to know if looking at
[21] this now refreshes your recollection in any way as
[22] to whether you had any discussions with anyone at
[23] or about the time you came to the determination
[24] that Zygo did not have an insurable interest?
[25]    **A:** It doesn't refresh a specific

Page 54

[1]                    **Daneman**
[2] memory, but I probably had a discussion with Susan
[3] and/or Tony Corsale.
[4]     **Q:** Was Susan your supervisor at this
[5] time?
[6]     **A:** Probably.
[7]     **Q:** Who is Joseph Mistretta?
[8]     **A:** I believe that would have been Tony
[9] Corsale's boss at the time of this, May 1, 2000.
[10]    **Q:** Who is Chris Tye, T-y-e?
[11]    **A:** Chris Tye was the marine
[12] underwriting manager, VP.
[13]    **Q:** Did you have any policy at Royal
[14] prior to sending a letter in which you would tell
[15] your assured that they didn't have insurable
[16] interests, that you were to get some kind of
[17] approval for that?
[18]    **A:** I believe so.
[19]    **Q:** Who would you have had to get
[20] approval from to send that letter?
[21]    **A:** I'm sorry. I must have
[22] misunderstood the last question.
[23]    **Q:** The question basically is you sent
[24] the letter, Exhibit 9, saying, in substance, that
[25] Zygo did not have an insurable interest.

Page 55

[1]                    **Daneman**
[2]     What I'm trying to figure out is
[3] whether you had to get approval to actually send
[4] this letter out or whether that was something you
[5] could do on your own.
[6]     **A:** That was something that I could do
[7] on my own.
[8]     I may have consulted with with Tony.
[9] Typically for cargo claims, if I was going to
[10] discuss issues with someone at Royal, it would be
[11] Tony Corsale as opposed to Susan Smith, because
[12] she was primarily — her expertise was primarily
[13] P&I, although she did have cargo expertise. She
[14] was supervisor for all of the adjusters in the
[15] department. But if it came to cargo issues or
[16] complexities, I typically would talk with Tony as
[17] opposed to talking with Susan.
[18]    **Q:** Now, in order to come to the
[19] conclusion that Zygo had no insurable interest,
[20] did you have to know anything else other than the
[21] shipment was insured by the consignee?
[22]    **A:** Well, I had to know the sales terms
[23] and I had to know the probable place of damage.
[24]    **Q:** And the reserve was then taken down
[25] to $10; is that right?

Page 56

[1]                    **Daneman**
[2]     **A:** Yes.
[3]     **Q:** And is there some sort of procedure
[4] that is required to take a reserve down from
[5] 700,000 to $10?
[6]     **A:** When you say "procedure" —
[7]     **Q:** Who has authority to do that? Was
[8] this e-mail enough? Did Susan Smith need approval
[9] from others in order to take down that reserve?
[10]    **A:** She didn't need approval from
[11] others. She was stating that the reserve has been
[12] taken down to $10. Either she did that herself or
[13] else I may have done it myself.
[14]    **MR. BJORKMAN:** Mark this as
[15] 11.
[16]    (Letter on letterhead of Royal
[17] & SunAlliance, dated May 19, 2000, to
[18] Matt Weidman, Zygo, bearing Bates
[19] Stamp No. 00243, was marked as Daneman
[20] Exhibit No. 11 for identification, as
[21] of this date.)
[22]             BY MR. BJORKMAN:
[23]    **Q:** Would you identify No. 11?
[24]    **A:** (Perusing document.) It is a copy
[25] of a fax from me to Mr. Weidman, dated May 19,

Page 57

*Daneman*

[2] 2000.
[3] **Q:** And you sent that a week after you
[4] told Mr. Weidman that Zygo had no insurable
[5] interests, right?
[6] **A:** Yes.
[7] **Q:** And you told Mr. Weidman that you
[8] were actually going to have a surveyor investigate
[9] the matter, right?
[10] **A:** Yes.
[11] **Q:** Did you change your mind as to
[12] whether there was an insurable interest?
[13] **A:** No.
[14] **Q:** Did you learn any facts that made
[15] you think that there was some chance that Zygo did
[16] have an insurable interest?
[17] **A:** No.
[18] **Q:** Did you talk to anybody about
[19] deciding to assign a surveyor to investigate the
[20] matter?
[21] **A:** Yes.
[22] **Q:** Who did you talk to?
[23] **A:** Mr. Weidman.
[24] **Q:** And what did you talk about?
[25] **A:** Mr. Weidman requested that I assign

Page 58

*Daneman*

[2] a surveyor anyway. He asked me if I could assign
[3] a surveyor and wait to see what facts developed.
[4] That's the conversation that I
[5] remember, because it was a little bit unusual that
[6] the broker was asking me to assign a surveyor
[7] basically on a without prejudice basis pending
[8] development of future facts.
[9] So I agreed to his request.
[10] **Q:** Why did you agree to his request?
[11] **A:** To accommodate him. It wasn't a big
[12] deal for me to assign a surveyor without
[13] prejudice. Normally I wouldn't do such, but
[14] Mr. Weidman was requesting a favor, so I did him a
[15] favor.
[16] **Q:** Did you talk to Mr. Ilias about
[17] this?
[18] **A:** About assigning a surveyor?
[19] **Q:** Yes.
[20] **A:** I don't recall.
[21] **Q:** Wasn't it important to Mr. Ilias to
[22] keep the broker happy?
[23] **A:** I suppose it would be.
[24] **Q:** Why would it be important for him to
[25] keep the broker happy?

Page 59

*Daneman*

[2] **MR. GINOS:** Important to him
[3] or the company or to Mr. Ilias?
[4] **MR. BJORKMAN:** Mr. Ilias.
[5] **A:** I believe to do continued business
[6] with Mathog & Moniello.
[7] **Q:** Do you recall having a conversation
[8] with Mr. Corsale about the assignment of the
[9] surveyor?
[10] **A:** I don't recall, but I probably did.
[11] **Q:** And why would you run it by him?
[12] **A:** Because it was an unusual situation,
[13] to assign a surveyor on a non-waiver basis.
[14] **MR. BJORKMAN:** Let's mark this
[15] as the next exhibit.
[16] (Document on the letterhead of
[17] Royal & SunAlliance, to Thomas
[18] Carroll, NYOM/Royal, from Alan Ilias,
[19] dated May 18, 2000, bearing Bates
[20] Stamp No. 00446, was marked as Daneman
[21] Exhibit No. 12 for identification, as
[22] of this date.)
[23] **BY MR. BJORKMAN:**
[24] **Q:** Can you identify Exhibit 12?
[25] **A:** (Perusing document.) This is a memo

Page 60

*Daneman*

[2] from Alan Ilias to Thomas Carroll of Royal, dated
[3] May 18, 2000.
[4] **Q:** Who is Thomas Carroll?
[5] **A:** Thomas Carroll was the senior cargo
[6] underwriter at Royal.
[7] **Q:** Is he still at Royal, if you know?
[8] **A:** No.
[9] **Q:** When did he leave Royal?
[10] **A:** About two years ago.
[11] **Q:** Do you know where he went?
[12] **A:** I don't remember.
[13] **Q:** So Mr. Carroll would have been
[14] Mr. Ilias' boss; is that right?
[15] **A:** Mr. Ilias would have reported to
[16] Mr. Carroll.
[17] **Q:** Does reading this refresh your
[18] recollection as to whether you had any
[19] conversations with Mr. Ilias about sending out a
[20] surveyor?
[21] **A:** Could you repeat the question?
[22] **Q:** I just want to know if reading that
[23] refreshes your recollection as to whether you
[24] actually did have a conversation with Mr. Ilias
[25] about this matter during the early May, mid-May