**Page 65**

**Daneman**

A: I was probably just passing the comments on verbatim to Mr. Weidman.

Q: Why would you do that?

A: To give him the exact same status that I had. Whatever my agent or my surveyor was going to tell me, I would basically pass that information on to Mr. Weidman.

Q: You didn't say, "Dear Matt, I'm not really sure what this means, but this is what my surveyor says," do you?

A: No, I don't say that.

MR. BJORKMAN: Mark this as 15.

(Fax on letterhead of Richard Chung to Joseph Daneman, dated June 19, 2000, bearing Bates Stamp No. RY 00218, was marked as Daneman Exhibit No. 15 for identification, as of this date.)

BY MR. BJORKMAN:

Q: Can you identify Exhibit 15?

A: (Perusing document.) It is a copy of an e-mail from Mr. Chung to me, dated June 19, 2000.

**Page 66**

**Daneman**

Q: And it says, "Dear Joseph, Sorry for delay in replying to your previous fax."

What did you understand that to mean?

A: (Perusing document.) I had sent Mr. Chung a fax, I guess, inquiring about status and he was, I guess, now going to give me a status in this e-mail, but I guess it was the time between my previous fax and this June 19th fax he felt was a delay.

Q: And then in this e-mail you're told who had been appointed, right?

A: Yes.

Q: Do you know what GAB Robins is?

A: I believe that they are a survey company.

Q: And why do you think that?

A: I have had — from my experience, I know GAB in the United States, GAB Robins is a survey company.

Q: And you were told that the cargo was not available to survey, right?

A: Yes.

Q: Did you do anything to confirm that?

**Page 67**

**Daneman**

A: Well, that's why I passed the exact communication on to Mr. Weidman, to let him know what our surveyor, our agent was telling us so that he could, if he felt there was any problems with that statement, that he could assist.

Q: You received this e-mail on June 19th, right?

A: Yes.

Q: And you sent this letter to Matt Weidman on June 19th, right?

A: Yes.

Q: So you didn't take it upon yourself to do any investigation to find out whether or not, in fact, the cargo was not available to survey, right?

A: No. I took that statement at face value. The surveyor is saying the cargo is not available to survey, I'm passing that on to see if there are any problems with that.

Q: Did you find it to be unusual to find that the cargo was not available to survey?

A: No; considering that it is three months later, I didn't find that unusual. The cargo could have easily been disposed of by now in

**Page 68**

**Daneman**

the three-month time period, from the time of the shipment until the time I'm getting this message.

Q: What was the time period that you thought the — strike that.

Did you learn that the cargo — let me start again.

You understood at the time you got this e-mail that you had asked for a survey a month earlier, right?

A: Yes.

Q: And Mr. Chung wrote to you, according to shipper's statement, they haven't put forward a claim of the damaged cargo.

Do you see that?

A: (Perusing document.) Yes.

Q: Did you ask Mr. Chung what he meant by that?

A: No.

Q: Why not?

A: Because I thought the person that would have the most knowledge about what was going on over there was the assured, which is why I passed that information on to the broker, so that they could then contact the assured and find out

Page 73

[1]                    **Daneman**
[2] tried to contact the consignee; just that they had
[3] been appointed to do that, right?
[4]    **A:** Right.
[5] So what's the question?
[6]    **Q:** You then asked Mr. Weidman for the
[7] information concerning where the damaged goods
[8] are, right?
[9]    **A:** Right.
[10]   **Q:** So what makes you believe that
[11] Robins had enough information to make the contacts
[12] to be told that it was not available?
[13]   **A:** I thought he had enough information
[14] from the 42 documents that I enclosed to Richard
[15] Chung with my fax of May 19th.
[16]      Now, when I get e-mail from Richard
[17] Chung indicating that apparently it's insufficient
[18] information, now I go back to Mr. Weidman and I'm
[19] asking him for the specific location and contact
[20] information for the survey.
[21]   **Q:** And did you look at your file to see
[22] if you had given Mr. Chung enough information?
[23]   **A:** I don't recollect.
[24]      (Whereupon, at 12:20 o'clock
[25] p.m., a recess was taken to 12:25

Page 74

[1]                    **Daneman**
[2] o'clock p.m.)
[3]      (The deposition resumed with
[4] all parties present.)
[5] J O S E P H  D A N E M A N, resumed and testified
[6] further as follows:
[7]          **BY MR. BJORKMAN:**
[8]   **Q:** Mr. Daneman, did the fact that GAB
[9] Robins never surveyed the damaged material play
[10] any role in your decision to deny coverage of
[11] Zygo's claim?
[12]   **A:** No.
[13]   **MR. GINOS:** If you led with
[14] that one, we could have avoided all
[15] the others.
[16]   **Q:** Let me show you Exhibit 16.
[17]      (Fax transmission dated
[18] November 10, 2000, to Matt Weidman
[19] from Joseph Daneman, bearing Bates
[20] Stamp No. RY 00202, was marked as
[21] Daneman Exhibit No. 16 for
[22] identification, as of this date.)
[23]          **BY MR. BJORKMAN:**
[24]   **Q:** Can you identify Exhibit 16?
[25]   **A:** (Perusing document.) It is a fax

Page 75

[1]                    **Daneman**
[2] from me to Mr. Weidman, dated November 10, 2000.
[3]   **Q:** And it says in that fax that Royal
[4] is going to close its file with no claim payment,
[5] right?
[6]   **A:** Yes.
[7]   **Q:** When it says "under the
[8] circumstances," what circumstances are you
[9] referring to which caused you to close your file?
[10]   **A:** Primarily what is laid out in my
[11] first paragraph.
[12]   **Q:** And where you say "The loss was
[13] probably caused by insufficient packaging," how
[14] did you get that information?
[15]   **A:** There was correspondence that had
[16] been supplied to me by the broker that indicated
[17] that.
[18]   **Q:** Who came to that conclusion that it
[19] had been caused by insufficient packaging?
[20]   **A:** I don't recollect.
[21]   **Q:** If, in fact, the damage had not been
[22] caused by insufficient packaging, would that have
[23] changed your coverage decision?
[24]   **A:** No.
[25]   **Q:** What in that first paragraph led you

Page 76

[1]                    **Daneman**
[2] to the determination that you would close your
[3] file with no claim payment?
[4]   **A:** Primarily Taiwan Fire & Marine
[5] Insurance, who apparently is the insurance company
[6] for NanYa, they reportedly agreed to settle the
[7] claim at half the amount and the rest was
[8] reportedly going to be settled by Lee Tech, which
[9] is Zygo's Taiwan agent.
[10]   **Q:** What did you do to satisfy yourself
[11] that that statement was true?
[12]   **A:** I passed it on to the broker. If
[13] the broker of the assured had any doubts about
[14] that statement, then they're entitled to respond
[15] back, which is how I end my fax; if they have any
[16] questions or comments, please feel free to contact
[17] me.
[18]   **Q:** Were you accepting as true that
[19] Taiwan Fire had agreed to settle the claim?
[20]   **A:** I was accepting that at face value.
[21]   **Q:** Where did you get that information
[22] from?
[23]   **A:** Probably from a communication from
[24] Mr. Chung.
[25]   **MR. BJORKMAN:** Mark that.

Page 101

**Daneman**

[2] MR. GINOS: May 2nd?
[3] MR. BJORKMAN: May 7th.
[4] MR. GINOS: May 7th is 23.
[5] MR. BJORKMAN: Exhibit 23.
[6] THE WITNESS: (Perusing
[7] document.)
[8] MR. GINOS: You are asking him
[9] what the letter says. It speaks for
[10] itself.
[11] What is the question?
[12] MR. BJORKMAN: I'm summarizing
[13] it. I'm trying to move on.
[14] MR. GINOS: Ask him a specific
[15] question.
[16] The letter speaks for itself.
[17] Then you —
[18] BY MR. BJORKMAN:
[19] Q: Mr. Daneman, prior to May 7th, did
[20] you have an understanding that Royal was going to
[21] proceed under the contingency clause?
[22] A: You mean Zygo?
[23] Q: Zygo? I'm sorry.
[24] A: I didn't know at the time if they
[25] were proceeding under the contingency clause.

Page 102

**Daneman**

[2] Q: You knew on May 7th when you wrote
[3] the letter?
[4] A: I knew it was a possibility.
[5] Q: You knew it was a possibility.
[6] And this May 7th letter on the
[7] second page asks for additional information
[8] concerning it, right, four paragraphs from the
[9] bottom?
[10] A: (Perusing document.) Yes.
[11] Q: And then after you sent this May
[12] 7th letter, you raised the reserve on this claim,
[13] didn't you?
[14] A: I don't recollect.
[15] (Document from Alan Ilias,
[16] dated May 9, 2001, bearing Bates Stamp
[17] No. RY 00364, was marked as Daneman
[18] Exhibit No. 24 for identification, as
[19] of this date.)
[20] BY MR. BJORKMAN:
[21] Q: Who is Chris Tye?
[22] A: Chris Tye is the marine underwriting
[23] manager.
[24] Q: He's a supervisor of Mr. Ilias?
[25] A: Not the immediate supervisor, but

Page 103

**Daneman**

[2] would be in charge of all marine underwriters. I
[3] believe John Ellis would be the immediate
[4] supervisor of Mr. Ilias and John Ellis would
[5] report to Chris Tye. Chris Tye would be manager
[6] of all of the underwriters, marine underwriters.
[7] Q: The first line of Exhibit — strike
[8] that. Did you ever see this e-mail before?
[9] A: I don't recollect.
[10] Q: It says in the first sentence,
[11] "Chris, Wanted to make you are aware of a large
[12] loss that will be posted by Joe Daneman tomorrow."
[13] Do you see that?
[14] A: (Perusing document.) Yes.
[15] Q: Does that refresh your recollection
[16] as to whether or not you increased the reserve on
[17] Zygo's claim on or about May 10th of '01?
[18] A: (Perusing document.) It doesn't
[19] refresh my recollection, but it indicates that in
[20] all likelihood I did change the reserve.
[21] Q: And what did you change it to?
[22] A: I don't recollect.
[23] Q: Sitting here today, you don't know
[24] what the reserve is on the claim?
[25] A: Yes.

Page 104

**Daneman**

[2] Q: You do know?
[3] A: I'm saying I don't know what the
[4] reserve is.
[5] Q: Do you have any reason to believe it
[6] is anything different than the 700,000 you had
[7] originally put on it?
[8] A: The only reason might be if somebody
[9] else had an idea if the reserve should have been
[10] something different than $10 or $700,000.
[11] Q: And you don't have any recollection
[12] of any conversations on that issue?
[13] A: No.
[14] Q: Let's go back to Exhibit 23 for a
[15] second.
[16] When you wrote that letter on May
[17] 7th, did you have an understanding as to whether
[18] there was any relationship between the contingency
[19] clause and the FOB clause?
[20] A: I understood there could be a
[21] relationship between the contingency clause and
[22] the FOB clause.
[23] Q: And what would that relationship
[24] have been?
[25] A: If the assured was going to sell

Page 105

*Daneman*

[2] something FOB, generally speaking, the policy
[3] would cover the assured's risk of loss, which
[4] would be up until the FOB point. The policy would
[5] not cover the risk of loss after the FOB point,
[6] which would be the buyer's risk of loss; but that
[7] potentially until the buyer paid the assured for
[8] the goods, that assured could opt for contingency
[9] coverage after the FOB point, as far as receiving
[10] payment from the buyer, provided that they
[11] reported it to Royal and paid an additional agreed
[12] premium.
[13]     MR. BJORKMAN: Mark that as
[14] Exhibit 25.
[15]     (Letter dated May 10, 2001, to
[16] Mr. Joseph Daneman from Carroll Sneed,
[17] bearing Bates Stamp Nos. RY 00044
[18] through RY 00046, was marked as
[19] Daneman Exhibit No. 25 for
[20] identification, as of this date.)
[21]     BY MR. BJORKMAN:
[22]   **Q:** Can you identify Exhibit 25?
[23]   **A:** (Perusing document.) It is a letter
[24] from Mr. Sneed to me, dated May 10th, 2001.
[25]   **Q:** And you received that on or about

Page 106

*Daneman*

[2] May 15th?
[3]   **A:** Yes.
[4]   **Q:** Did you receive it by fax, do you
[5] know?
[6]   **A:** I don't recollect.
[7]   MR. BJORKMAN: Mark this as
[8] 26.
[9]     (Fax transmission dated May
[10] 15, 2001, bearing Bates Stamp Nos.
[11] Zygo 00550 through 00552, was marked
[12] as Daneman Exhibit No. 26 for
[13] identification, as of this date.)
[14]     BY MR. BJORKMAN:
[15]   **Q:** You wrote that letter on May 15,
[16] 2001?
[17]   **A:** (Perusing document.) Yes.
[18]   **Q:** Did anyone help you draft it?
[19]   **A:** I don't recollect.
[20]   **Q:** In looking at the fourth paragraph
[21] you say that "It is our ultimate opinion that
[22] there is no coverage for this loss, but a possible
[23] claim under Clause 52, which is entitled
[24] 'Contingency' and which is in the nature of unpaid
[25] vendor insurance."

Page 107

*Daneman*

[2]   **Q:** Do you see that?
[3]   **A:** (Perusing document.) Yes.
[4]   **Q:** So, as of May 15, 2002, you thought
[5] it was possible that the claim could be covered
[6] under the contingency clause, right?
[7]   **A:** Yes.
[8]   MR. GINOS: Wait a minute.
[9]   MR. BJORKMAN: He answered the
[10] question.
[11]     If you have an objection —
[12]   MR. GINOS: You put words in
[13] his mouth.
[14]     I object to the form of the
[15] question.
[16]   MR. BJORKMAN: He answered.
[17]   MR. GINOS: I object to the
[18] form of the question.
[19]   MR. BJORKMAN: Fine. You can
[20] clear it up on redirect. Give me a
[21] break.
[22]     BY MR. BJORKMAN:
[23]   **Q:** I ask you to turn to Page 2, the
[24] last paragraph.
[25]     On Page 2, the last paragraph, you

Page 108

*Daneman*

[2] wrote, "We further acknowledge Zygo's
[3] representation that it had not released NanYa from
[4] any obligations to pay for the second shipment."
[5]     What did you mean when you wrote
[6] that?
[7]   **A:** (Perusing document.) I meant that
[8] there was some communication that had been
[9] provided to me by a broker indicating that Zygo
[10] was not releasing NanYa from paying for the second
[11] shipment which is the subject of this claim, and
[12] just acknowledging that that is what appeared to
[13] be my interpretation of correspondence that was
[14] being provided to me.
[15]   MR. BJORKMAN: Mark that as
[16] 27.
[17]     (Letter dated June 14, 2001 to
[18] Mr. Joseph Daneman from Lawrence C.
[19] Martin, with enclosure, bearing Bates
[20] Stamp Nos. RY 0054 through 0057, was
[21] marked as Daneman Exhibit No. 27 for
[22] identification, as of this date.)
[23]     BY MR. BJORKMAN:
[24]   **Q:** Can you identify Exhibit 27?
[25]   **A:** (Perusing document.) It is a letter

JOSEPH DANEMAN
JOSEPH DANEMAN
November 20, 2003

Case 3:01-cv-01317-JBA   Document 147-7   Filed 07/07/2004   Page 5 of 13

ROYAL INSURANCE v.
ZYGO CORP.

Page 157

*Daneman*

[2] communication and other documentation indicated
[3] that there was the real possibility that this was
[4] an improper or inadequate packaging situation.
[5]   Q: What documents indicated that it was
[6] improper packaging?
[7]   A: (Perusing document.) Some of the
[8] documents have not been provided during my
[9] deposition here, but I recollect there was some
[10] communications issued by individuals of Zygo or
[11] their agents or NanYa indicating that, as well as
[12] I believe the survey reports that were issued in
[13] Taiwan that have not been provided in this
[14] deposition either, also indicate the real
[15] possibility of an inadequate or improper packaging
[16] situation.
[17]   Q: Do you believe that the contingency
[18] clause did not provide cover here because the
[19] insurance terminated when the AFM was loaded onto
[20] the aircraft?
[21]   A: Well, it is all tied together to
[22] various reasons why it was declined. That is part
[23] of — that is one of the reasons why it was
[24] declined.
[25]   Q: I'm not asking you why it was

Page 158

*Daneman*

[2] declined.
[3]   I'm asking you for your — did you
[4] ever tell Zygo or anyone at their broker that the
[5] contingency clause coverage didn't apply because
[6] their coverage terminated when they loaded the AFM
[7] onto the aircraft?
[8]   THE WITNESS: Could I hear the
[9] question, please, again?
[10]   (The question was read.)
[11]   A: I don't recollect making that
[12] statement.
[13]   Q: Do you think that is true? Do you
[14] think the contingency clause coverage was
[15] terminated when the AFM was loaded onto the
[16] aircraft?
[17]   A: Well, they had no contingency clause
[18] coverage until they declared it to Royal and paid
[19] additional premium.
[20]   Q: And if they had declared to Royal
[21] and paid additional premiums, would that
[22] contingency coverage have terminated when they
[23] loaded the AFM onto the aircraft?
[24]   A: I don't believe that it would have.
[25]   Q: Now, tell me your understanding of

Page 159

*Daneman*

[2] the mechanism by which Zygo should have declared
[3] this shipment to Royal?
[4]   A: All they have to do is just send in
[5] some sort of document that clearly indicates with
[6] specific information a particular shipment that
[7] they want to request contingency coverage for. It
[8] doesn't have to be any one specific type of
[9] document. There are various ways that they can
[10] declare it.
[11]   The general procedure is just give
[12] us the information with the shipment particulars.
[13]   Q: Who at Royal should that have been
[14] directed to?
[15]   A: It should have been directed to the
[16] underwriter.
[17]   (Discussion off the record.)
[18]   (Whereupon, at 3:55 o'clock
[19] p.m., a recess was taken to 4:00
[20] o'clock p.m.)
[21]   (The deposition resumed with
[22] all parties present.)
[23] JOSEPH DANEMAN, resumed and
[24] testified further as follows:
[25]   BY MR. BJORKMAN:

Page 160

*Daneman*

[2]   Q: I take it that you have no knowledge
[3] concerning how the premiums on the contingency
[4] coverage would be arrived at, to the extent there
[5] should be additional premiums?
[6]   A: That's correct.
[7]   Q: Are you aware of any notice or
[8] letter or form that is given to the assured to let
[9] them know that they are supposed to declare
[10] shipments prior to the shipments actually —
[11] withdraw the question.
[12]   Are you aware of any forms or notice
[13] or letter that is given to the assured to instruct
[14] them that in order to obtain contingency coverage
[15] shipments have to be declared prior to the actual
[16] loading and voyage?
[17]   A: I'm not aware.
[18]   Q: So, is it your understanding that
[19] the only information given to the assured about
[20] the manner in which the contingency coverage
[21] should be invoked is what is in Clause 52?
[22]   A: I'm not aware whether or not the
[23] underwriter has any additional communications with
[24] the broker about the reporting for additional
[25] coverage.

Page 173

**Daneman**

September of 2000 that, in fact, the arrangement set forth in that e-mail had not been finalized; isn't that right?

**A:** What do you mean by the "arrangement"?

**Q:** You know what you just alluded to in that e-mail in terms of sharing of the loss and that sort of thing, you know that didn't happen, right?

**MR. GINOS:** Objection.

**A:** I don't know that didn't happen.

**Q:** Well, you sent your surveyor, gave instructions for your surveyor five months later to negotiate with NanYa's insurer, didn't you?

**A:** No, that's not correct. I didn't instruct my surveyor to negotiate. I instructed my surveyor to try to find out what was going — what the position of NanYa's insurance company was with regards to the second claim. I was trying to get additional information regarding the situation over there in Taiwan.

**Q:** So from September of 2000 you harbored this fear that Zygo had released NanYa; is that right?

Page 174

**Daneman**

**A:** This e-mail is not copied to me, so I don't know when I got this e-mail. It may have been the same month, it may have been a month later, it may have been three months later.

**Q:** Is that e-mail the basis for your contention that Zygo released NanYa?

**MR. GINOS:** You mean sole basis or part of it or was —

**MR. BJORKMAN:** I'm asking him.

**A:** I'm not contending — I'm not alleging that categorically as a fact that NanYa released — excuse me — that Zygo released NanYa. I'm contending there is the real possibility that may have occurred. This is one of the documents I believe which indicates that that is a possibility.

**Q:** You know that you authorized Zygo to be sued claiming that Zygo released NanYa, you know that, right?

**A:** Can I take a look at the complaint?

**Q:** Sure.

**A:** (Perusing document.)

**Q:** No, you don't know that?

**A:** I don't recollect all the causes of

Page 175

**Daneman**

action listed in the complaint.

**Q:** And at the time that you authorized the suit, you weren't convinced that Zygo had, in fact, released NanYa, right?

**MR. GINOS:** Objection.

**A:** I knew that it was a possibility that Zygo had released NanYa. That would have been one of the issues that I would have been trying to get to the bottom of. And if that is part of the complaint, that would have been the reason why that would have been part of the complaint, to try and find out additional information, communication and documentation to help clarify what happened over in Taiwan between NanYa and Zygo.

**Q:** One of the things that you did to get to the bottom of it was to ask Mr. Sneed, right?

**A:** Yes.

**Q:** And the other thing you did was to sue Zygo, right?

**A:** Excuse me. Ask Mr. Sneed and/or Mr. Weidman.

**Q:** Right.

Page 176

**Daneman**

**A:** And what was your next question?

**Q:** To get to the bottom of whether Zygo released NanYa you asked Mr. Sneed and/or Mr. Weidman, right?

**A:** Yes.

**Q:** And you got an answer, right?

**A:** Yes.

**Q:** The other thing you did to get to the bottom of whether Zygo released NanYa was to sue Zygo, right?

**A:** Yes, part of the reason.

**Q:** Did you do anything else to find out whether or not Zygo actually released NanYa?

**A:** Other than instructing the surveyor to try to find out from NanYa's insurance company what went on, but it seemed like he was being sort — he was being stonewalled over in Taiwan. He was not being provided full cooperation, which is my take of what was going on with my surveyor over in Taiwan.

**Q:** Wasn't being given full cooperation by who?

**A:** Whoever he was contacting there over in Taiwan.

Page 177

[1]  **Daneman**
[2]  **Q:** You don't know who he contacted,
[3]  right?
[4]  **A:** I don't recollect who he
[5]  specifically contacted.
[6]  **Q:** Look at Exhibit 31. You got that
[7]  one, didn't you? Look at the first paragraph of
[8]  that.
[9]  **A:** (Perusing document.) Well, excuse
[10] me.
[11]     When you say surveyor, I'm thinking
[12] GAB. But, okay, if you mean surveyor and/or the
[13] Royal office, I don't technically consider the
[14] Royal office to be the surveyor.
[15] **Q:** You don't know who the surveyor
[16] contacted, do you?
[17] **A:** I don't recollect. I passed the
[18] information that I have on to the Royal office in
[19] Taiwan and I leave it to them to take that
[20] information and make the necessary contacts that
[21] they can to find out the information. I don't
[22] give them the detailed instructions. I give them
[23] generalized instructions.
[24] **Q:** Did you do anything else to find out
[25] whether Zygo had released NanYa?

Page 178

[1]  **Daneman**
[2]  **A:** I don't recollect that I did.
[3]  **Q:** Did Mr. Ilias ever tell you he
[4]  thought it would be prudent for Royal to exercise
[5]  its right to cancel the policy with Zygo?
[6]  **A:** I don't recollect that he did.
[7]  **MR. BJORKMAN:** Mark that as
[8]  the next exhibit.
[9]      (Plaintiff's, Royal Insurance
[10] Company of America's response to
[11] Defendant, Zygo Corporation's First
[12] Set of Interrogatories, was marked as
[13] Daneman Exhibit No. 33 for
[14] identification, as of this date.)
[15]           **BY MR. BJORKMAN:**
[16] **Q:** Did you ever see Exhibit 33 before,
[17] sir?
[18] **A:** (Perusing document.) Yes.
[19] **Q:** Would you turn to Page 18?
[20] **A:** (Perusing document.) Okay.
[21] **Q:** Is that your signature?
[22] **A:** Yes.
[23] **Q:** What did it mean to you when you
[24] signed it?
[25] **A:** That I was providing on behalf of

Page 179

[1]  **Daneman**
[2]  Royal responses to Zygo's interrogatories.
[3]  **Q:** Would you turn to Page 4.
[4]  **A:** (Perusing document.) Okay.
[5]  **Q:** You say that Mr. Mulroy and
[6]  Mr. Mooney were involved in authorizing the
[7]  commencement of the instant declaratory judgment
[8]  action.
[9]      Can you tell me how they were so
[10] involved?
[11] **A:** Mr. Mulroy and Mr. Mooney have to be
[12] aware of and have no objection to the filing of a
[13] declaratory judgment.
[14] **Q:** So did you talk to Mr. Mulroy and
[15] Mr. Mooney?
[16] **A:** I don't believe that I did so. I
[17] believe that that would have been done by
[18] Mr. Corsale.
[19] **Q:** Turn back to Page 3. It says,
[20] "Mr. Corsale authorized the declination of the
[21] claim."
[22]     What does that mean?
[23] **A:** Before I issued the formal
[24] declination of liability to Zygo, I had to get
[25] approval from Mr. Corsale, and Mr. Corsale

Page 180

[1]  **Daneman**
[2]  authorized my issuance of the declination of
[3]  liability to Zygo.
[4]  **Q:** So he knew you were doing that after
[5]  you already sued Zygo, right?
[6]  **A:** Yes.
[7]  **Q:** Do you know whether you saw a draft
[8]  of the complaint before it was filed?
[9]  **A:** I don't recollect. I probably did.
[10] **Q:** What is the Known Loss Doctrine?
[11] **A:** Can you tell me?
[12] **MR. GINOS:** What is what?
[13] **MR. BJORKMAN:** The Known Loss
[14] Doctrine.
[15] **A:** I don't know what you mean by that
[16] phrase just out of context.
[17] **Q:** Look at Page 7 —
[18] **A:** (Perusing document.)
[19] **Q:** — the answer to Interrogatory No.
[20] 7. When you signed it, that answer was true.
[21] What did you mean by the Known Loss Doctrine?
[22] **MR. GINOS:** Objection.
[23] **A:** (Perusing document.)
[24] **MR. GINOS:** Would you point —
[25] that's a question of law.

Page 181

*Daneman*

[2] MR. BJORKMAN: He signed the
[3] interrogatories.
[4] MR. GINOS: It's prepared by
[5] attorneys.
[6] MR. BJORKMAN: It's a factual
[7] question.
[8] MR. GINOS: You say it's a
[9] factual question. And what you point
[10] to says it may be a question of law.
[11] MR. BJORKMAN: Let's find out
[12] if he knows what it is.
[13] MR. GINOS: He's not a lawyer,
[14] so I renew my objection.
[15] MR. BJORKMAN: The objection
[16] is that he's not a lawyer?
[17] MR. GINOS: To the question.
[18] You pose a question relating to a
[19] legal doctrine, you then assert it's a
[20] factual issue, and yet it specifically
[21] says it's a legal doctrine.
[22] MR. BJORKMAN: I'm paying for
[23] the transcript. Let's see if he knows
[24] the answer.
[25] MR. GINOS: You're playing

Page 182

*Daneman*

[2] games.
[3] If you don't know the answer,
[4] I don't want to you guess at it.
[5] MR. BJORKMAN: I'll withdraw
[6] the question. It is not important.
[7] BY MR. BJORKMAN:
[8] Q: Mr. Daneman, do you have any reason
[9] to believe that Zygo did not make reasonable
[10] efforts to collect the purchase price for the AFM
[11] from NanYa?
[12] A: That's a confusing situation, as I
[13] stated in my response to Exhibit No. 31, and
[14] there's other communication that I recollect where
[15] it is confusing about what is going on over in
[16] Taiwan with regards to all three of these
[17] shipments.
[18] Q: Well, do you think Zygo tried to get
[19] paid from NanYa?
[20] A: I believe initially they tried to
[21] get paid from NanYa.
[22] Q: Do you think they made reasonable
[23] attempts to tried to get paid from NanYa?
[24] A: I don't think I have enough
[25] information to say that they made reasonable

Page 183

*Daneman*

[2] attempts.
[3] Q: What do you consider a reasonable
[4] attempt to get paid from someone, from a vendor?
[5] A: Original demand for payment plus
[6] several follow-ups with some sort of definitive
[7] explanation from NanYa of why they weren't paying,
[8] that they refused to pay.
[9] Q: Do you have any reason to believe
[10] Zygo didn't get that, didn't do that or get that
[11] explanation from NanYa?
[12] A: I had no reason to believe it either
[13] way. I don't think I have all of the — it seems
[14] like there is other documentation and
[15] correspondence out there that would help clarify
[16] that situation, but I don't think I have all of
[17] it.
[18] Q: How about now, what do you think now
[19] after the fact?
[20] A: It still seems like there is a
[21] reasonable doubt that I don't have everything
[22] because there was a meeting — there is other
[23] correspondence that I have that has been provided
[24] to me that indicates there was a meeting that went
[25] on over there, and I don't have documents from

Page 184

*Daneman*

[2] that meeting, and that meeting — part of that
[3] meeting was the resolution of the payment for the
[4] second shipment.
[5] Q: How do you know that?
[6] A: I recollect that there was another
[7] document, a piece of correspondence which hasn't
[8] been provided to me in the deposition which
[9] indicated that there was going to be a meeting in
[10] Taiwan.
[11] Q: How do you know what the
[12] resolution — did you ever talk to anyone who ever
[13] attended that meeting?
[14] A: No.
[15] Q: Why not?
[16] A: After so much time had gone by with
[17] this claim, over a year, I was still feeling like
[18] I had insufficient documentation, didn't have a
[19] complete set of correspondence and communications
[20] that went on. It seemed to me the best way to
[21] resolve the situation was to institute the suit,
[22] and during the discovery process it might be
[23] easier to obtain all the necessary communications
[24] that might still be out there to help explain what
[25] went on each step of the way.

Page 185

Daneman

Q: Turn to Page 8.
A: (Perusing document.)
    (Whereupon, at 4:40 o'clock p.m., a recess was taken to 4:44 o'clock p.m.)
    (The deposition resumed with all parties present.)
JOSEPH DANEMAN, resumed and testified further as follows:

BY MR. BJORKMAN:
Q: Mr. Daneman, do you know that Royal sued NanYa?
A: Yes.
Q: Did you have anything to do with authorizing that?
A: Yes.
Q: And when you authorized the suit against NanYa, did you believe that Zygo had released NanYa from payment obligations for the second AFM?
A: I thought that by cross-claiming against NanYa, it would help produce documents and communications and correspondence which would help to resolve that issue.

Page 186

Daneman

Q: Did you believe that Zygo had released NanYa from its payment obligations on the second AFM at the time you authorized suit against NanYa?
A: I believed there was a possibility.
Q: Did you think it was 50/50? What did you think?
MR. GINOS: Objection.
A: I wasn't assessing any particular odds to it. It didn't matter to me whether it was 20/80 or 80/20, so long as it was a possibility. I wanted to investigate through litigation to see if we could have all pertinent communications produced through discovery to help resolve that issue.
Q: And when Mr. Sneed and Mr. Weidman told you that Zygo had not released NanYa, did you ask for more information about that?
A: (Perusing document.) Yes.
Q: Where?
A: My fax of May 15th, Exhibit 26, which was dated five days after Mr. Sneed's letter, wherein he advised that to his knowledge, the "to" meaning the broker's knowledge, Zygo had

Page 187

Daneman

not released NanYa.
Q: Where did you ask for more information? You are referring to the 5-15 letter?
A: Yes.
Q: That is Exhibit 26?
A: Yes. The 5-15 letter also refers to a May 7th letter, which is Exhibit 23. (Perusing document.) It was my statement in the third paragraph that says —
Q: Of which?
A: Exhibit 26, 5-15 letter.
    (Perusing document.) The last sentence which says, "If Zygo does not provide the information requested."
Q: I'm missing you. Where is it?
A: The third paragraph. It is the last sentence.
    (Perusing document.) "If Zygo does not provide the information requested in our May 7th letter, as restated in part and supplemented herein, this could lead to a forfeiture of coverage under Royal's policy for the subject loss."

Page 188

Daneman

Q: Well, Mr. Sneed specifically responded to your question concerning the release issue, right?
A: To the best of its knowledge, I thought there was a reasonable doubt that Mathog and Moniello had all of the knowledge as to what went on over in Taiwan.
Q: So you're claiming that that third paragraph is a request for further information concerning the release issue?
A: Concerning the whole issue over in Taiwan about payment for the second shipment.
Q: What about your statement on the next page where you say, "We further acknowledge Zygo's representation that it has not released NanYa from any obligations to pay for the second shipment," after you wrote that you didn't ask for any further information, did you?
A: I would have to review all my correspondence after May 15th.
Q: Go ahead. It is not much.
A: (Perusing document.) Have you provided me with all my correspondence after May 15, 2001?

Page 189

**Daneman**

[2] MR. BJORKMAN: Mark this.
[3]     (Letter dated July 13, 2000 to
[4] Matt Weidman from Joseph Daneman,
[5] bearing Bates Stamp No. Zygo-00241,
[6] was marked as Daneman Exhibit No. 34
[7] for identification, as of this date.)
[8]     **A:** (Perusing document.) This is
[9] July 13, 2000.
[10]     **Q:** My mistake. I apologize.
[11]     **A:** (Perusing document.) If there is no
[12] other correspondence from me after May 15th until
[13] my declination letter of July 16, 2001, then I
[14] would not have made any more additional requests
[15] beyond May 15, 2002, until the declination letter
[16] was issued July 15th.
[17]     **Q:** Look at —
[18]     **A:** Excuse me. July 16th.
[19]     **Q:** Look at Exhibit 33, which is the
[20] interrogatory response. Turn to Page 8.
[21]     **A:** (Perusing document.) Okay.
[22]     **Q:** One of the contentions in the
[23] complaint that was filed against Zygo is that at
[24] no time did Zygo make any reasonable effort to
[25] collect the purchase price from NanYa for the

Page 190

**Daneman**

[2] second AFM.
[3]     I asked Royal to set forth all the
[4] facts that supported that contention.
[5]     And the answer is that this
[6] contention that Zygo, in fact, did not make
[7] reasonable efforts to collect the purchase price
[8] is based on documents exchanged between the
[9] parties previously produced, specifically
[10] including documents bearing production control
[11] numbers and certain Bates stamp numbers, and I've
[12] given you all those documents that are cited
[13] there. Royal further bases its contention upon
[14] its oral and written communications with Zygo and
[15] its representatives prior to the commencement of
[16] the first party action here.
[17]     Now, you didn't have any oral
[18] communications with Zygo's representatives on this
[19] subject after May 15th, right?
[20]     **A:** I may have had communications with
[21] Mr. Weidman or possibly Mr. Sneed after May 15th.
[22]     **Q:** And they didn't tell you Zygo had
[23] released NanYa or otherwise not made reasonable
[24] efforts to collect, had they?
[25]     **A:** I don't recollect that they said

Page 191

**Daneman**

[2] that.
[3]     **Q:** All right. Then it says that Royal
[4] further incorporates herein NanYa's response to
[5] Interrogatory No. 3 of Zygo's first set of
[6] interrogatories to NanYa.
[7]     Now, did you know that NanYa had
[8] responded to interrogatories from Royal?
[9]     **A:** I don't recollect NanYa's responses
[10] to Royal's interrogatories.
[11]     **Q:** You never read those, right?
[12]     **A:** If Royal issued interrogatories, I
[13] read them. And if NanYa responded to provide
[14] answers to Royal's interrogatories, then I read
[15] them, too.
[16]     **Q:** So do you understand that Royal as a
[17] company has adopted NanYa's response to
[18] interrogatories?
[19]     Do you see that?
[20]     **A:** (Perusing document.) Yes.
[21]     **Q:** And do you understand that you
[22] signed these as being Royal's response, do you
[23] understand that?
[24]     **A:** Yes.
[25]     **Q:** And is it true that you believe

Page 192

**Daneman**

[2] NanYa's version of what happened?
[3]     **A:** It is a real possibility.
[4]     **Q:** No. No. I'm asking you whether you
[5] believe that what NanYa wrote down here is true?
[6]     MR. GINOS: Objection as to
[7] form and asked and answered. This has
[8] been covered several times.
[9]     MR. BJORKMAN: It hasn't been
[10] covered once. It's the first time.
[11]     MR. GINOS: No. It's been
[12] covered. I object.
[13]     Go ahead.
[14]     **A:** I believe that it created a dispute
[15] of positions between NanYa and Zygo, and that I
[16] was willing to let the litigation go forth and let
[17] the judge decide which was the correct position.
[18]     BY MR. BJORKMAN:
[19]     **Q:** What did it mean to you when you
[20] read "Royal further incorporates herein NanYa's
[21] response to Interrogatory No. 3 of Zygo's first
[22] set of interrogatories to NanYa?"
[23]     What did you understand it to mean
[24] that Royal incorporated the answer?
[25]     **A:** That Royal is providing this

Page 193

[1] **Daneman**
[2] response from NanYa as a partial response to one
[3] of Zygo's interrogatories, Interrogatory No. 10 to
[4] Royal.
[5]   **Q:** So you didn't know whether that was
[6] true or not, did you?
[7]   **MR. GINOS:** Objection.
[8]   **Q:** What Royal put in its response to
[9] the interrogatory, you didn't know whether that
[10] was true or not, did you?
[11]   **MR. GINOS:** Objection.
[12]   **A:** I didn't have all of the documents
[13] that NanYa was apparently referring to when they
[14] made this statement of facts.
[15]   **Q:** The question asks, Interrogatory No.
[16] 10 to Royal, "Please set forth all facts
[17] supporting your contention (Royal's) that at no
[18] time did Zygo make any reasonable effort to
[19] collect the purchase price from NanYa for the
[20] second AFM, as set forth in Paragraph 75 of the
[21] complaint."
[22]   Then Royal recites NanYa's answers
[23] in support of its contention. And I'm asking you,
[24] sir, you don't know whether this is true, do you?
[25]   **MR. GINOS:** Objection again.

Page 194

[1] **Daneman**
[2]   **A:** NanYa's —
[3]   **Q:** Why can't you answer that question?
[4] That's a yes or no question.
[5]   Do you know what is written here is
[6] true?
[7]   **MR. GINOS:** He already
[8] answered it.
[9]   **A:** It's a statement, it's a statement
[10] provided by NanYa, so that's a fact, that this is
[11] a statement that has been provided by them and
[12] it's for the courts to decide which, when parties
[13] have different positions, which position is the
[14] correct position.
[15]   **Q:** Why didn't you put Zygo's position
[16] in your answer to this interrogatory?
[17]   **MR. GINOS:** Objection.
[18]   **A:** I believe Zygo's position was
[19] already explained in previous correspondence from
[20] Zygo and Mathog and Moniello.
[21]   **Q:** That's not in response to this
[22] interrogatory. NanYa's position was set forth in
[23] their own letters, right?
[24]   **A:** Repeat the question.
[25]   **MR. GINOS:** There isn't a

Page 195

[1] **Daneman**
[2] question. He's making an argument.
[3]   **MR. BJORKMAN:** I'll withdraw
[4] the question. I'll withdraw the
[5] question.
[6]   **Q:** Look at the next question. Please
[7] identify all — this is Zygo asking Royal to
[8] please identify all persons with knowledge or
[9] information concerning your contention, Royal's
[10] contention that at no time did Zygo make
[11] reasonable efforts to collect the purchase price
[12] from NanYa for the second AFM.
[13]   You refer to different interrogatory
[14] responses. You again incorporate NanYa's response
[15] to the interrogatory where it says two employees
[16] of NanYa's corporate relative, Formosa Plastics
[17] Group, acted as NanYa's agents and signed the
[18] agreement on NanYa's behalf.
[19]   What agreement is being referred to
[20] there?
[21]   **A:** This is a statement that NanYa is
[22] making, so —
[23]   **Q:** But you signed it as true.
[24]   **MR. GINOS:** Can we move on?
[25]   **MR. BJORKMAN:** No, I'm not

Page 196

[1] **Daneman**
[2] going to move on.
[3]   **MR. GINOS:** This is
[4] ridiculous.
[5]   **MR. BJORKMAN:** You put this
[6] garbage in the interrogatories.
[7]   **MR. GINOS:** It's not garbage.
[8]   **MR. BJORKMAN:** Quiet. Quiet.
[9]   **MR. GINOS:** Don't tell me to
[10] be quiet.
[11]   **MR. BJORKMAN:** I am going to
[12] tell you.
[13]   **MR. GINOS:** This deposition is
[14] at an end if you are going to tell me
[15] to be quiet. And we'll take it to the
[16] Judge. I have a right to —
[17]   **MR. BJORKMAN:** Let's do it
[18] outside the presence of the witness.
[19]   **MR. GINOS:** I'll do it here on
[20] the record. That's the whole point.
[21]   **MR. BJORKMAN:** Outside the
[22] presence of the witness. Let the
[23] witness stand aside if you want to
[24] make a speech.
[25]   **MR. GINOS:** I'm not making

Page 197

[1]                    **Daneman**
[2] speeches, but you're wasting our time
[3] here.
[4]     **MR. BJORKMAN:** I am not.
[5]     **MR. GINOS:** It's a complete
[6] waste of time.
[7]     **MR. BJORKMAN:** I want to know
[8] what agreement is referred to in the
[9] Royal —
[10]    **MR. GINOS:** It's in here.
[11]    **MR. BJORKMAN:** — in Royal's
[12] answers to interrogatories.
[13]    **MR. GINOS:** He told you.
[14]              **BY MR. BJORKMAN:**
[15]    **Q:** I want to know what agreement you
[16] are referring to when you signed for Royal that
[17] these people had knowledge of Zygo's efforts, what
[18] agreement are you referring to?
[19]    **MR. GINOS:** Read 10 and 11
[20] both.
[21]    **MR. BJORKMAN:** Tell him what
[22] to do.
[23]    **MR. GINOS:** Absolutely.
[24]    **MR. BJORKMAN:** Why don't you
[25] answer it? You answer it.

Page 198

[1]                    **Daneman**
[2]     **MR. GINOS:** It says here it
[3] incorporates it. He just said it.
[4]     **MR. BJORKMAN:** Take on your
[5] adversary's position against your
[6] assured. Make my bad faith claim.
[7] Fine.
[8]     **MR. GINOS:** There is no bad
[9] faith claim to make sure. You got a
[10] fraudulent claim and you have a
[11] settlement, possibly.
[12]    **MR. BJORKMAN:** I'm not worried
[13] about it.
[14]    **MR. GINOS:** Yeah, right. You
[15] will worry about it when the Second
[16] Circuit reverses the judge and NanYa
[17] comes back into the case.
[18]    **MR. BJORKMAN:** I'm not worried
[19] about that in the least. I want to
[20] find out what agreement Mr. Daneman
[21] was referring to here, that's all.
[22]    **MR. GINOS:** He has a right to
[23] read it.
[24]    **MR. BJORKMAN:** He can read
[25] whatever he wants.

Page 199

[1]                    **Daneman**
[2]     **MR. GINOS:** He has the right
[3] to read 10 and 11 that are linked and
[4] one refers back. He has a right to do
[5] so and I'm telling him he should do
[6] so.
[7]     **MR. BJORKMAN:** You're telling
[8] him to do so.
[9]     **MR. GINOS:** I'm here to
[10] protect —
[11]    **MR. BJORKMAN:** Just point out
[12] where he can read and we can move on
[13] and we'll put it on the record that
[14] you're pointing it out. Point it out.
[15]    **MR. GINOS:** I don't have to
[16] point out any more than I have
[17] already.
[18]    **MR. BJORKMAN:** Exactly. I'm
[19] glad you said it.
[20]              **BY MR. BJORKMAN:**
[21]    **Q:** Did you ever talk to Ms. Yalin Tsan?
[22]    **A:** No.
[23]    **Q:** Did you ever talk to her?
[24]    **A:** No.
[25]    **Q:** Did you ever talk to Mr. Tsung-Wen

Page 200

[1]                    **Daneman**
[2] Lien?
[3]     **A:** No.
[4]     **Q:** Do you know whether these people
[5] even exist?
[6]     **A:** (Perusing document.) I've never met
[7] them.
[8]     **Q:** If you turn to Page 11.
[9]     **MR. GINOS:** Are we on the
[10] interrogatories?
[11]    **MR. BJORKMAN:** Yes.
[12]    **Q:** It asks for all of the facts
[13] supporting Royal's contention that Zygo determined
[14] that the cost of returning and repairing both the
[15] first AFM and the second AFM was in the total
[16] amount of approximately $600,000 or U.S. dollars
[17] $300,000 per AFM as set forth in Paragraph 55 of
[18] the complaint.
[19]     And Royal refers to this document.
[20]    **MR. BJORKMAN:** Mark that.
[21]     (Letter dated June 10, 2000
[22] from Lawrence C. Martin to Billy Wu,
[23] President, Lee Tech, was marked as
[24] Daneman Exhibit No. 35 for
[25] identification, as of this date.)

Page 241

**Daneman**

[1] investigations concerning the packaging of the
[3] AFM, didn't you?
[4] A: I don't recollect when I receive the
[5] Cathay report. And by other reports, I don't know
[6] if you mean reports issued by surveyors or if you
[7] just mean communications.
[8] Q: Does it matter to you when you
[9] received that Cathay report?
[10] A: In what respect? Does it matter to
[11] me? What do you mean?
[12] Q: Concerning your decision to decline
[13] coverage.
[14] A: This report is touching upon one
[15] issue, which is the issue of whether the packaging
[16] was inadequate or not. This doesn't touch upon
[17] other issues such as the lack of reporting for the
[18] contingency or possible waiver given to the buyer
[19] of the goods.
[20] Q: If the Court found that there should
[21] have been coverage in this case, if the Court were
[22] to find that there should be coverage in this
[23] case, do you have a sense of what the amount of
[24] the coverage would be due to Zygo?
[25] A: I suppose it would be $690,000.

Page 242

**Daneman**

[2] MR. BJORKMAN: Okay. I don't
[3] have any other questions at this time.
[4] I'll reserve on the other
[5] issue, whatever you want to call it.
[6] MR. GINOS: We'll get you that
[7] as soon as possible.
[8] MR. BJORKMAN: Just for the
[9] record, what do you call it, Trimex?
[10] MR. GINOS: Trimex. We're
[11] getting you the underwriting file, the
[12] relevant portion. The claim file we
[13] have now, we'll copy that and send it
[14] to you right away.
[15] (Whereupon, at 6:50 o'clock
[16] p.m., the deposition was concluded.)

Page 243

[2] **CAPTION**

[4] The Deposition of JOSEPH DANEMAN, taken in the
[5] matter, on the date, and at the time and place set
[6] out on the title page hereof.

[9] It was requested that the deposition be taken by
[10] the reporter and that same be reduced to
[11] typewritten form.

[14] It was agreed by and between counsel and the
[15] parties that the Deponent will read and sign the
[16] transcript of said deposition.

Page 244

[2] CERTIFICATE

[4] STATE OF_____ :
[5] COUNTY/CITY OF_____ :

[7] Before me, this day, personally appeared
[8] JOSEPH DANEMAN, who, being duly sworn, states
[9] that the foregoing transcript of his/her
[10] Deposition, taken in the matter, on the date, and
[11] at the time and place set out on the title page
[12] hereof, constitutes a true and accurate transcript
[13] of said deposition.

[16] JOSEPH DANEMAN

[19] SUBSCRIBED and SWORN to before me this_____
[20] day of _____, 2003, in the
[21] jurisdiction aforesaid.

[25] My Commission Expires     Notary Public