EXHIBIT 26



Page 1

1                    Weidman
2    UNITED STATES DISTRICT COURT
3    DISTRICT OF CONNECTICUT
     -----------------------------x
4
     ROYAL INSURANCE COMPANY OF AMERICA
5
                    Plaintiff,       COPY
6
          against           Case No.
7                           CIV 3:01 1317(GLG)
8    ZYGO CORPORATION,
9                    Defendant.
10   -----------------------------x
11   ROYAL INSURANCE COMPANY OF AMERICA,
12             Third-Party Plaintiff,
13        against
14   NAN YA TECHNOLOGY CORPORATION,
15             Third-Party Defendant.
16   -----------------------------x
17
18             MATTHEW WEIDMAN
19           New York, New York
20          Monday, March 1, 2004
21
22
23
24

     Reported by:  Steven Neil Cohen, RPR
25   Job No. 157472

1                    Weidman

2    Larry Martin.  Look at that.

3                    Was that cover fax sheet drafted

4    by you?

5                    It says, "Thanks, Matt."

6         A.    The fax cover sheet was drafted

7    by me, yes.

8         Q.    You were passing the enclosed

9    letter from Royal on to Larry, Mr. Martin?

10        A.    It would appear that is what we

11   were doing, is forwarding a response along,

12   yes.

13        Q.    Do you recall having any

14   conversation with Mr. Martin concerning the

15   Royal letter dated May 15, 2001?

16        A.    Not specifically, no.

17        Q.    Here is a letter from Mr. Martin

18   to yourself.  It is Martin 51.  Take a look

19   at that.  Tell us whether you can recall

20   receiving that letter.

21                MR. BJORKMAN:  The date, please?

22                MR. GINOS:  It is dated June 1,

23        2001.  Martin 51.

24                THE WITNESS:  Not specifically

25        but I am sure that I got it and looked

```
 1                    Weidman
 2        at it at the time.
 3    BY MR. GINOS:
 4        Q.    Do you recall having discussion
 5    with Mr. Martin regarding this letter after
 6    receiving it?
 7        A.    Not specifically.
 8        Q.    I will give you Martin 53.  Can
 9    you identify -- Martin 53 dated June 14,
10    2001, a letter from Mathog & Moniello to
11    Mr. Daneman at Royal.
12        A.    What was the question?
13        Q.    First of all, can you identify
14    this letter, 53?
15        A.    It is a letter to Joseph Daneman,
16    senior cargo adjuster at Royal and
17    Sunalliance, regarding the Zygo claim from
18    Carroll Sneed, Matt Weidman and Alan
19    Mathog.
20        Q.    In the first page of this letter,
21    paragraph 3 -- strike that.
22            First of all, three people have
23    signed the letter, correct?
24        A.    Yes.
25        Q.    Can you tell us who the author or
```

Page 194

1                    Weidman
2    authors of the letter actually were?
3        A.    The author would have been
4    Carroll Sneed.
5        Q.    Paragraph 3 of the letter, page 1
6    of paragraph 3 says, "You have raised a
7    question of value reporting as this
8    pertains to clause 52.  It is our opinion
9    and interpretation that the policy is not
10   of the 'reporting form' type.  Instead
11   values are subject to year-end audit based
12   on the assured's gross sales for purposes
13   of determining any additional premium due
14   or returned premium."
15           Of that assertion there, did you
16   have any occasion to discuss that
17   particular assertion that I have just read
18   with Mr. Sneed?
19       A.    I am sure I did.
20       Q.    What do you recall about that
21   conversation or conversations, plural?
22       A.    Nothing specific.  In
23   generalities though it would have probably
24   provided Carroll with a copy of the policy,
25   the quotation that we had from the

```
 1                  Weidman
 2    insurance carrier which indicated that the
 3    claim was on an annual year-end audited
 4    basis, the policy was on an annual year-end
 5    audited basis.
 6        Q.    Aside from providing him with a
 7    copy of the policy, the quotation, did you
 8    actually discuss the basis for the
 9    assertion made in paragraph -- did you
10    actually talk to him and did he say
11    something to you and you to him, a
12    discussion of the policy of particular
13    clauses of language, whatever, where
14    someone made any kind of analysis and
15    offered an opinion in the discussion?
16             MR. WELDON:  Objection; compound,
17        asked and answered, calls for
18        speculation.
19             THE WITNESS:  Yes.  Other than --
20        I am sure we spoke about it but I
21        have -- couldn't put even one word of a
22        quote in.
23    BY MR. GINOS:
24        Q.    Who said what to whom?
25        A.    Right.
```

Page 196

```
 1                        Weidman
 2        Q.     Did you have any discussion about
 3    that point in paragraph 3 with Mr. Mathog,
 4    Alan Mathog?
 5        A.     I don't recall.
 6        Q.     Did you do any analysis of the
 7    policies yourself that led you to conclude
 8    that it was not of the reporting form type?
 9             MR. WELDON:   Objection; asked and
10        answered.
11             THE WITNESS:   Other than between
12        putting the policy together with the
13        quote it was my opinion that it was not
14        of the reporting form as well.
15    BY MR. GINOS:
16        Q.     Let's look at the policy.   Turn
17    to clause 52.
18             MR. BJORKMAN:   Can we take a
19        break for a second?
20             MR. GINOS:   Sure.
21             (Recess)
22    BY MR. GINOS:
23        Q.     I am on -- in Martin 1, page 17,
24    Zygo 17 you will find Contingency Clause,
25    do you see that?
```

Page 197

```
 1                    Weidman
 2        A.    Yes.
 3        Q.    One, you are not an underwriter,
 4    are you?
 5        A.    That is correct.
 6        Q.    You are not a lawyer?
 7        A.    That's correct.
 8        Q.    I don't want to be unfair in
 9    asking you those questions.
10              You said you had reached some
11    conclusion?
12        A.    I said I reached an opinion.
13        Q.    An opinion.  Just your opinion.
14              I want to relate your opinion to
15    a sentence in clause 52.  If you can't
16    answer the question, fine.
17              At the end of clause 52, the last
18    sentence in that clause states, "The
19    assured agrees to declare to this company
20    the value of all shipments covered under
21    the terms of this endorsement and to pay
22    premium thereon at rates to be agreed."
23              Do you see that?
24        A.    Yes.
25        Q.    On the basis of your own
```

```
 1                    Weidman
 2    experience, if you have any, with
 3    contingency clauses, do you know what that
 4    means?
 5              Do you have an opinion as to how
 6    that language is to be interpreted?
 7              MR. BJORKMAN:  Object to the
 8         form.
 9              MR. WELDON:  Same objection.  Go
10         on.
11              THE WITNESS:  I guess I would say
12         that whether it is -- you are spelling
13         out one sentence in a clause, whether
14         it is related to contingency or some
15         other clause in this policy or other
16         policies, it simply means, in my
17         opinion, that the policyholder reports
18         values of their shipments and they pay
19         a premium based on that.
20    BY MR. GINOS:
21         Q.    Do they do that even if they have
22    been told that there won't be any
23    contingency coverage required?
24              MR. BJORKMAN:  Objection to the
25         form of the question.
```

```
 1                    Weidman
 2             MR. WELDON:  Objection.
 3             THE WITNESS:  Does who do what?
 4        I am not sure --
 5   BY MR. GINOS:
 6        Q.    Strike that.
 7             MR. GINOS:  Read his answer back.
 8             (Record read)
 9   BY MR. GINOS:
10        Q.    Do you know what premium was paid
11   in respect of contingency cover under the
12   Royal policy?
13             MR. WELDON:  Do you want him to
14        look at the -- he referred to his
15        quotes.  I don't know if you want him
16        to --
17   BY MR. GINOS:
18        Q.    If he needs to look at his quote
19   or the policy rate schedule, whatever he
20   wants to look at.
21             My question to him is:  Can you
22   tell us if it is possible what the premiums
23   that were paid for contingency cover were,
24   if any were paid?
25        A.    What I can tell is that this
```

1          Weidman

2   entire policy had a rate of 23 cents per

3   $100 of value shipped and it included the

4   coverages, at least as I can tell, that

5   were included in this policy all

6   encompassed within the 23 cents and then

7   again in my -- as I mentioned, my opinion

8   in conjunction with the quote itself was

9   that the reporting basis is on an annual

10  basis.

11       Q.    It is your opinion that the 23

12  cents per hundred which appears -- it is

13  not 23 cents, it is .023 cents per hundred

14  rate found in the schedule of rates which

15  is, to be precise, Bates number page 28?

16       A.    Right.

17       Q.    That .023 basically bought Zygo

18  all coverage described in the policy?

19            MR. WELDON:   Do you want him to

20       read --

21            MR. BJORKMAN:   Objection.

22            MR. WELDON:   Objection.

23            Are you asking with respect to

24       the contingency?   If you want --

25            MR. GINOS:   He just said --

1               Weidman

2          MR. WELDON:  With respect to the

3     contingency?

4          MR. GINOS:  No.  He just finished

5     saying that that gets you the coverage

6     as described in the policy.

7               Didn't you say that?

8          MR. WELDON:  The record will

9     speak for itself.

10          THE WITNESS:  I said if I am not

11     mistaken that the 23 cents covers, as

12     far as I can tell, everything that was

13     covered under this policy.

14          MR. GINOS:  That is what I

15     understood you to say.

16          THE WITNESS:  Whether it is this

17     exhibition cover that I just flipped to

18     or any of these other clauses in here,

19     salesperson samples, it is included in

20     the 23 cent rate.

21     BY MR. GINOS:

22     Q.    Are you aware of the fact,

23     disregarding contingency for the moment,

24     and if you are not aware of it, say so, I

25     will not ask you to read every clause in

Page 220

```
 1                   Weidman
 2        come up.  It looks like it has expanded
 3        over the years though.
 4   BY MR. BJORKMAN:
 5        Q.    Do you recall whether this
 6   particular document or -- was presented in
 7   a meeting where you --
 8        A.    Yes, it was; that one definitely
 9   was.
10        Q.    There came a time when Zygo's
11   marine cargo insurance was placed with
12   Royal, right?
13        A.    Yes.
14        Q.    Did you ever get any written
15   communication from Royal in which you were
16   told that Zygo was required to declare each
17   particular shipment in order to obtain
18   contingency coverage?
19        A.    Not that I recall.
20        Q.    Did anyone from Royal ever tell
21   you that Zygo was required to declare each
22   shipment for which it wanted contingency
23   coverage?
24        A.    Not that I recall.
25        Q.    Did you ever receive anything
```

```
 1                      Weidman
 2    written in which anyone from Royal informed
 3    you that Zygo would have to pay a separate
 4    premium in order to obtain the contingency
 5    coverage?
 6                MR. GINOS:  Objection.
 7                MR. WELDON:  Objection.
 8                MR. BJORKMAN:  What is wrong with
 9         that?
10                MR. WELDON:  To the extent that
11         it calls for a generalization as to any
12         time.
13    BY MR. BJORKMAN:
14         Q.    Fine.
15                At the time that the insurance
16    was first placed with Royal did anyone ever
17    tell you that in order for Zygo to obtain
18    the contingency coverage under that policy
19    it would have to pay a separate premium in
20    the quoted rates?
21         A.    Not that I am aware of.
22                MR. GINOS:  Objection.
23    BY MR. BJORKMAN:
24         Q.    At any time after that policy was
25    placed with Royal up to the time Royal
```

1                     Weidman

2             MR. GINOS:  Objection.

3    BY MR. BJORKMAN:

4        Q.    Did Mr. Ilias say anything to you

5    about how he knew whether or not Zygo had

6    been -- strike that.

7             Did Mr. Ilias explain to you how

8    he knew whether or not Zygo had been prompt

9    or tardy in providing information

10   concerning their claim?

11       A.    I don't recall.

12       Q.    Do you have any knowledge as

13   to -- strike that.

14            Did Mr. Ilias ever tell you what

15   role the underwriting department played in

16   adjusting claims at Royal?

17       A.    I don't recall.

18       Q.    As we have been through Zygo

19   placed its coverage with its ocean marine

20   policy coverage with St. Paul after this

21   policy with Royal terminated, right?

22       A.    Yes.

23       Q.    We have looked at that policy.

24   That policy also has contingent liability

25   coverage, right?

1                    Weidman

2        A.     Yes.

3        Q.     At the time that that policy was

4    written there was a separate claim --

5    strike that -- there was a separate premium

6    for contingency coverage and primary

7    coverage, right?

8        A.     There was a separate rate for

9    each.

10        Q.     It is number?

11             MR. WELDON:   Weidman 4.

12    BY MR. BJORKMAN:

13        Q.     Is the rate spelled out in this

14    policy?

15             MR. WELDON:   Scheduled rates is

16        WEB 8027.

17    BY MR. BJORKMAN:

18        Q.     The rate, premium rate for

19    contingency shipments, was 50 percent of

20    the rate of primary coverage; is that

21    right?

22        A.     That is how I understand it, yes.

23        Q.     Let me show you what has been

24    marked as Dressler number 2.

25             Have you seen that document or

1                    Weidman

2       are you familiar with that form of

3       document?

4            A.    I am familiar with it, yes.

5            Q.    Does this document break out the

6       cost of various coverage on the St. Paul

7       ocean cargo policy for a particular period?

8            A.    Yes, it does.

9            Q.    Where it shows, for example,

10      report 1, it says, ocean, conveyance is

11      ocean, and there is a date and then it

12      shows an insured value and there is a rate

13      per hundred and a premium?

14           A.    Yes.

15           Q.    Does that first line show the

16      value of the shipments for primary

17      insurance?

18           A.    Yes, it does.

19           Q.    Generally it shows that there is

20      roughly 1.1 million dollars in the insured

21      value times the premium rate for both

22      ocean, war and SRCC and then you come up

23      with an ocean premium for that time period,

24      right?

25           A.    Yes.

Page 244

1                    Weidman

2          Q.    If you go down to the next one,

3     the ocean contingent, right?

4          A.    Yes.

5          Q.    Then there is an insured value.

6     That shows the amount of shipments that

7     were on the contingency insurance; is that

8     right?

9          A.    Yes.

10         Q.    Then it applies it by a rate

11    which is 50 percent of the primary, right?

12         A.    Yes.

13         Q.    If you just look at those -- as

14    you go down this there are various, for

15    example, report 1-3 is inland contingent so

16    that shows the difference between domestic

17    primary and domestic contingent; is that

18    right?

19         A.    Yes.

20         Q.    This is the manner in which the

21    premium was calculated for the St. Paul

22    policy during that period July 1/2001 to

23    July 1/2002?

24         A.    July 1, 2001 through April 30,

25    2002.

1                          Weidman

2        Q.     Under the St. Paul policy is

3    there a requirement that Zygo declare the

4    shipments under the contingency policies at

5    or about the time that they are actually

6    shipped?

7        A.     Not that I can tell.

8        Q.     The reporting is just on the

9    quarterly basis?

10       A.     Quarterly basis in this case.

11       Q.     I show you what was -- let's mark

12   this as 25.

13              (Weidman Exhibit 25 marked for

14   identification)

15   BY MR. GINOS:

16       Q.     Can you identify what has been

17   marked as Weidman 25?

18              Just for the record this is a

19   document WEB6635 and 6636.

20       A.     It is the anniversary date with

21   the new premium/rate terms for Zygo's ocean

22   cargo policy to St. Paul.

23       Q.     With this endorsement does that

24   change the manner in which the premium was

25   calculated from the original method with

```
 1                    Weidman
 2    St. Paul?
 3         A.    Yes, it does.
 4         Q.    How does it change it?
 5         A.    It essentially takes it off of a
 6    quarterly reporting basis to an annual
 7    reporting basis and it just provides -- it
 8    changes from multiple rates to an aggregate
 9    rate which would cover everything that is
10    in the policy.
11         Q.    For example, in the exhibit we
12    looked at, Dressler 2, there was a rate for
13    primary and contingent; is that right?
14         A.    Yes.
15         Q.    So beginning May 1 of 2003 there
16    was no separate rate for primary and
17    contingent, it was one all-in rate; is that
18    right?
19         A.    That's correct, as well, there
20    was no difference between domestic or
21    international with this policy starting in
22    2003.
23         Q.    When that change was made was --
24    were you notified of any change in the
25    reporting requirement for shipments for
```

Page 247

```
 1                    Weidman
 2   which there was to be contingency coverage?
 3            MR. WELDON:  Objection; asked and
 4        answered.
 5            THE WITNESS:  No.  I was not
 6        aware of any requirements.
 7   BY MR. BJORKMAN:
 8        Q.    Of any different requirements,
 9   right?
10        A.    Right.  If I am not mistaken the
11   quote letter came down saying all other
12   terms and conditions remain the same.
13            MR. BJORKMAN:  Let me take two
14        minutes to check over my notes.
15            (Recess)
16   BY MR. BJORKMAN:
17        Q.    There came a time when you
18   notified Royal that Zygo would not be
19   renewing the marine ocean policy, right?
20            I can show you --
21        A.    There was a time when I told them
22   the policy was terminated.
23        Q.    Do you have a recollection of any
24   discussions with anyone at Royal about that
25   issue?
```

# EXHIBIT 27

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
 4     --------------------------------x
 5     ROYAL INSURANCE COMPANY OF        |
       AMERICA                           |
 6              PLAINTIFF                 |
                                         |CASE NO. 3:01 CV1317 (GLG)
 7     VS.                               |
                                         |
 8     ZYGO CORPORATION                  |
                DEFENDANTS               |
 9     --------------------------------x
10
11
12
13              DEPOSITION OF:  Carroll D. Sneed
                DATE:  April 9, 2004
14              HELD AT:  Wiggin & Dana
                265 Church Street
15              New Haven, Connecticut 06510
16
17
18
19
20
21              Reporter:  Katrina Loda, LSR #00129
22
23
24
25     Job No: 158962
```



Page 62

1    A  I'm sure I did.
2    Q  The letter on the first page of the Royal
3  letter says in the second paragraph initially please
4  confirm that Zygo corporation is pursuing payment
5  under the Royal policy pursuant to clause 52 of the
6  Royal policy which is entitled contingency.  If Zygo
7  is making claim under any other section of policy
8  please so advise.
9        Now, as of the time that you saw this letter
10  can you recall what your opinion was as to which
11  clauses of the policy gave rise to a claim on Zygo's
12  behalf?
13    A  I don't recall without reviewing first whether
14  or not I responded to this letter.  I believe I did
15  but in so doing I would have made some review of the
16  policy.
17    Q  Well, to facilitate that I'm going to hand you
18  another letter and then let you look at your file.
19  The letter I'll hand you is dated June 14th.  It was
20  previously marked as Martin 53.
21
22        (Interruption from cell phone.)
23
24    Q  I'm trying to speed things up here.  In the
25  deposition marked Sneed 7?

Page 63

1        MR. WELDON:  Exhibit Sneed 7.
2    Q  It's also Martin 47 Mr. Daneman is writing to
3  Mr. Weidman and he asks in that paragraph that I just
4  read please confirm that Zygo Corporation is pursuing
5  payment under the Royal policy pursuant to clause 52
6  of the Royal policy which is entitled contingency.
7  If Zygo is making claim under any other section of
8  policy please so advise.
9        Now, Martin 52 which I handed to you appears to
10  be a letter from Mathog & Moniello signed by you, Mr.
11  Mathog and Mr. Weidman back to Mr. Daneman and in the
12  second paragraph it says to clarify with regard to
13  whether or not Zygo is pursuing the claim under
14  policy clause 52 contingency subject to Royal
15  producing substantial evidence that the loss is not
16  otherwise covered Zygo will opt to pursue payment
17  under 52.  Do you see that?
18    A  I see that.
19        MR. WELDON:  I just note for the
20        record you asked him what letter followed
21        the May 7th letter and asked him to look
22        in his file and I'm trying to expedite
23        it and there was some reference to June
24        14th being the next correspondence.  It is
25        not.

Page 64

1        MR. GINOS:  I'm not saying it is.
2    Q  (By Mr. Ginos)  What I'm about to ask him I'm
3  giving him a couple of specific time frames and
4  asking him if he needs to look in his file to
5  identify whether there was any correspondence prior
6  to June 14, 2001 as reflected in Martin 53 that he
7  sent to -- he or Mr. Weidman sent in response to the
8  May 7, 2001 letter relating to clause 52
9  specifically?
10    A  If I understand the question correctly on May
11  10, 2001 I authored a letter which responded
12  initially to the Royal letter of May 7, 2001.
13    Q  Okay.  Now, prior to the May 10th 2001 letter
14  had you discussed with Mr. Weidman the claim Zygo had
15  arising under clause 52?
16        MR. WELDON:  Objection.
17    A  I don't recall.
18    Q  You don't recall.  All right.  Well, let's look
19  at the final -- I call this the final letter.  Let's
20  look at the June 14th letter the one that was signed
21  by three people this is Martin 53.  Do you have that
22  in front of you?
23    A  Yes.
24    Q  Can you tell us what the basis was as of June
25  14th 2001, the date of that letter, what you believe

Page 65

1  the basis was for asserting that there was in fact a
2  viable claim in respect of the AFM damages in
3  question that arose under clause 52, what was your
4  basis for asserting?
5    A  Essentially because it was my understanding at
6  that point in time Zygo had not been paid the damaged
7  goods.
8    Q  Okay.  It says in the third paragraph of Martin
9  53 you have raised a question of value reporting as
10  this pertains to clause 52.  It is our opinion and
11  interpretation that the policy is not of the
12  reporting form type.  Instead values are subject to
13  year end audit based on the assured's gross sales for
14  purpose of determining any additional premium due or
15  returned premium.  Now, the language that I just
16  read, did you author that or did someone else or was
17  it a combination?
18        MR. WELDON:  Objection.
19    A  I authored that.
20    Q  You authored that?
21    A  Yes I did.
22    Q  Did you discuss that language with Mr. Mathog
23  or Mr. Weidman prior to sending the letter?
24        MR. WELDON:  Objection.
25    A  I had a discussion with Mr. Weidman on

17 (Pages 62 to 65)

Page 66

1  reporting requirements under the policy to the extent
2  according to him at that time that they were on an --
3  reporting was on an annual basis only.
4          MR. GINOS: Could you read that
5      back.
6
7      (Thereupon, the requested portion of the record
8      was read back by the court reporter.)
9
10  Q  In your last answer you said that according to
11  him, him being Mr. Weidman, you were relying on his
12  representations as to what the basis of the policy
13  was, you know, the payment basis and reporting basis
14  or did you review -- independently review the policy?
15  A  The policy was actually endorsed requiring
16  reporting on with an annual basis and I believe the
17  basic language of that endorsement is that the
18  insured was to report growth sales within 30 days of
19  policy anniversary. And I believe this policy was
20  initially effective for the period they were talking
21  about on May 1, 1999.
22          MR. GINOS: Do you have somewhere
23      over there the policy?
24          MR. WELDON: We do -- I'd rather
25      refer to an exhibit.

Page 67

1          MR. GINOS: Well, I handed him one
2      before.
3          MR. WELDON: You're right.
4  Q  (By Mr. Ginos) If you look -- turn to Zygo 28
5  is the bates number.
6  A  Okay.
7  Q  There's a schedule of rates on that page. Do
8  you see that?
9  A  That paragraph three or item three?
10  Q  No, no I'm just referring if you look to the
11  very top of the page.
12  A  Right.
13  Q  In concluding that this policy was not of the
14  reporting form type as mentioned in Martin 53, did
15  you rely at all on schedule of rates which is Zygo 28
16  in reaching that conclusion?
17  A  No.
18  Q  Can you show us what language in the policy you
19  relied upon in concluding that and take as much time
20  as you need to find the provision which you believe
21  confirmed that this is not a reporting form type of
22  policy.
23  A  Well, I believe that's Zygo 00032.
24          MR. WELDON: Bates number?
25  Q  Is that the page entitled annual marine deposit

Page 68

1  premium?
2  A  Annual marine deposit premium.
3  Q  Right. Is there any other provision in the
4  policy that you believe you relied upon in reaching
5  your conclusion that the policy was not of the
6  reporting form type as referenced in Martin 53?
7  A  Was not of the reporting form type?
8  Q  Right. You say in 53 it is our opinion and
9  interpretation that the policy is not of the
10  reporting form type. You've identified endorsement
11  three as in your mind as at least supporting that
12  conclusion. I'm asking whether there was any other
13  endorsement or provision in this policy that you
14  relied on in reaching that conclusion?
15          MR. WELDON: He wants you to look
16      at that.
17  A  I'm thinking here. Let me answer that this
18  way. There is other language in this policy dealing
19  with reporting requirements but nothing in the policy
20  in my opinion requires any reporting on any basis
21  other than an annual report of gross sales on an
22  annual basis.
23  Q  Okay. If you know, can you tell us whether
24  contingency cover such as described in clause 52 Zygo
25  page 17, is the unpaid vendor cover loss 52.

Page 69

1  A  Yes.
2  Q  If you know is that a type of coverage which is
3  found generally speaking in marine cargo policies?
4          MR. BJORKMAN: Objection to the
5      form.
6  A  I don't know.
7  Q  Would you look at clause 52. Do you see it?
8  A  Yes.
9  Q  It says in the last sentence of clause 52 the
10  assured agrees to declare to this company the value
11  of all shipments covered under the terms of this
12  endorsement and to pay premium thereon at rates to be
13  agreed. In reaching your conclusion that there was
14  coverage under clause 52, did you consider whether or
15  not it was necessary for Zygo to make a separate
16  declaration for the shipment in question?
17  A  I concluded that it was not their obligation
18  to make a separate declaration at the time.
19  Q  And can you explain how you reached that
20  conclusion given the language we just read? Why did
21  you feel that the language that I just read did not
22  in your mind -- should not be interpreted as
23  requiring a separate declaration?
24          MR. WELDON: Objection to the form.
25  A  Contingency clause 52 doesn't say when they

18 (Pages 66 to 69)

Page 70

1 should report it. The endorsement in my opinion
2 identifies when they should report it.
3 Q I see.
4 A The endorsement I referred to earlier so on an
5 annual basis.
6 Q Well, that clause says to pay premium thereon
7 at rates to be agreed. Did you consider the meaning
8 of at rates to be agreed being perspective, did you
9 consider that as it might impact on the issue of
10 whether they needed to make a declaration in advance?
11 MR. WELDON: Objection.
12 MR. BJORKMAN: Objection.
13 A I didn't give that any real consideration other
14 than there might be a situation whereby the initial
15 rate might have increased and what might impact that
16 I don't know.
17 Q Did you ever discuss with Mr. Weidman or anyone
18 else at Mathog & Moniello whether any portion of the
19 premiums quoted in this policy covered contingency
20 coverage on unpaid vendor coverage?
21 MR. BJORKMAN: Objection.
22 MR. WELDON: Objection.
23 A The answer is no.
24 Q Did you ever discuss with anyone at Mathog &
25 Moniello what information they provided to Royal

Page 71

1 before this policy was issued?
2 A Meaning in the underwriting process?
3 Q Yes.
4 A I did not.
5 Q Now, if you read at clause 52 in the second
6 full paragraph I'm going to read just the first
7 sentence. It is further understood and agreed that
8 in no event shall this insurance inure to the benefit
9 of the buyer or his underwriter but in the event of
10 a loss occurring which would be collectible hereunder
11 but for such terms of sale and the assured is unable
12 to collect the purchase price from the buyer in
13 regular course, this company will advance the amount
14 of such loss pending collection from the buyer.
15 Can you tell us how you interpreted that
16 language? Whether I should say. Can you tell us
17 whether that language figured into your conclusion
18 that there was coverage under clause 52?
19 MR. WELDON: I'm -- just for
20 clarification do you want him to determine
21 as he sits here today or did you want --
22 Q I don't want him to analyze it now. I'm
23 interested in whether at the time he wrote the June
24 14, 2000 letter that language was considered by him
25 and was relevant to his conclusion?

Page 72

1 MR. WELDON: Because we haven't
2 marked the exhibit May 10th and it
3 addresses that specific issue you just
4 raised.
5 Q Well, he can look at it.
6 A The answer is, yes, I did take that into
7 consideration.
8 Q And can you explain how it factored into your
9 conclusions?
10 A Because as I understood at that point in time
11 Zygo had not been paid and that's what this says
12 based on my interpretation. The insured is unable to
13 collect.
14 Q I'm still in that same sentence the portion of
15 the sentence that says, but in the event of a loss
16 occurring which would be collectible hereunder but
17 for such terms of sale, how did you interpret that at
18 the time meaning in May/June of 2001?
19 A It says in the event of a loss occurring which
20 would be collectible hereunder. Collectible
21 hereunder this clause and it's clearly collectible.
22 It's my opinion then and still my opinion today.
23 Q Well, actually I understand that part of the
24 sentence. As you go into the next five or six words
25 I could use some help. Occurring which would be

Page 73

1 collectible hereunder I took to mean collectible
2 under this clause.
3 It then says but for such terms of sale. Did
4 you have any understanding at the time as to what
5 that meant or at least your interpretation?
6 A My interpretation the terms of the sale is
7 there is an agreement between seller and buyer to
8 deliver a product and the buyer is supposed to pay
9 the seller and that had not happened.
10 Q Did you have any opinion at that time as to
11 whether Nan-Ya would have any obligation
12 to pay Zygo in the event that Zygo had shipped to
13 Nan-Ya an instrument that was damaged before it had
14 even left the United States?
15 MR. BJORKMAN: Object to the form
16 of the question.
17 MR. WELDON: Same objection.
18 A I'm sorry, repeat that.
19 Q I want to keep this as simple as possible. If
20 you are unable to answer the question that's fine but
21 on the basis of the knowledge you had as of May
22 or June 2001, okay, had Zygo shipped an AFM to Nan-Ya
23 which was nonfunctional, broken when it was loaded on
24 board the aircraft, would Nan-Ya have been obligated
25 to pay for that?

19 (Pages 70 to 73)

Page 86

1 policy, the Royal policy? You can look at the policy.
2 I think you still have a copy of it over there.
3        MR. WELDON: Policy is right here.
4   A  Yes those are policy clauses.
5   Q  Now with respect to policy clause one is that
6 on the first page of Martin 1?
7   A  Yes it is.
8   Q  You're drawing attention to the words reported
9 or not. Can you explain how in your opinion those
10 words in clause one support your conclusion that
11 there was no requirement to report the shipment under
12 clause 52 in order to have contingency cover for it?
13  A  It's pretty clear on the face of what it says.
14 It says whether reported or not.
15  Q  Well, does that mean that you never have to
16 report a shipment. I thought you said --
17  A  Only on an annual reporting basis.
18  Q  Well, this says reported or not? I just want
19 his interpretation?
20        MR. WELDON: But you're confusing
21     the two issues.
22        MR. GINOS: I'm trying to have him
23     explain --
24  A  My interpretation of this is that it can easily
25 be interpreted based on this language that there was

Page 87

1 never any requirement to report despite the policy
2 endorsement saying it's reported on an annual basis.
3 This is broader in my opinion than the endorsement
4 itself. It says whether reported or not period.
5   Q  If that was correct, however, would it not then
6 be -- if you did not report cargo how would premiums
7 be calculated?
8   A  They couldn't.
9        MR. WELDON: I guess I'm confused
10     by your question. Are you asking him
11     whether premiums are based on what is
12     shipped or what the sales of the company
13     are?
14        MR. GINOS: I'm not asking that at
15     all. I was asking him to comment on and
16     explain how the words report or not
17     related to clause 52.
18        MR. WELDON: Yeah but you referred
19     to the annual reporting which deals with
20     sales versus this reporting which deals
21     with cargo. I'm confused by your
22     question.
23        MR. GINOS: If you have an
24     objection, object.
25        MR. WELDON: That's my objection.

Page 88

1 You're trying to confuse the witness.
2        MR. GINOS: I'm not trying to
3 confuse him.
4        MR. WELDON: When you bring in a
5 reporting as to sales and a reporting as
6 to cargo and try to tie those two together
7 as to figuring out what the premium would
8 be, that's an at attempt to confuse the
9 witness that one has to do with the other.
10 It's apples and oranges.
11        MR. WELDON: Mr. Weldon, that's a
12 speaking objection.
13        MR. WELDON: Whatever you want
14 to say it is, if you want to confuse the
15 witness we're not going to do that. We'll
16 go before the judge.
17        MR. GINOS: Mr. Weldon, you know
18 full well by raising the objection
19 assuming it's a valid one without putting
20 in the speech that you just put in you
21 have -- if in fact it is a valid objection
22 you have invalidated the answer. You
23 don't have to worry about it. It's
24 stricken. That's why the judges, the
25 court's frown on speaking objections. You

Page 89

1 can protect your client if he's being
2 confused or anything else by the question,
3 the answer is down the toilet and that's
4 accomplished by your simply objecting.
5        MR. WELDON: I appreciate
6 your trying to give me your
7 interpretations of how I'm entitled to
8 object here but I am going to object when
9 you're attempting to confuse a witness on
10 a compound question after we've spent a
11 couple hours here going back and forth
12 between clauses. He's already testified
13 about both clauses, that I'm going to
14 clarify the issues and allow the witness
15 and if we want to come back and have the
16 witness answer the question properly I
17 don't have a problem. But to attempt to
18 confuse the witness with compound improper
19 questions just slows the process down.
20        MR. GINOS: Have you finished?
21 Anything else you want to add? Is there
22 anything else you'd like to add? I'll
23 take your silence to be negative.
24  Q  (By Mr. Ginos) Now, your response to item
25 four on page 2 of the May 10th letter goes on to

23 (Pages 86 to 89)

Page 114

1    A  Yes.
2    Q  Do you recall whether you prepared this after
3  receiving the May 15th letter that we just looked at?
4        MR. WELDON:  Can you read back his
5        last question for me please.
6
7        (Thereupon, the requested portion of the record
8        was read back by the court reporter.)
9
10    A  I believe that memo would strongly suggest that
11  that was written after I reviewed the May 15th letter
12  from Royal.
13    Q  And I'd like you to read into the record what
14  you wrote on under where it says follow-up date and
15  it looks to me like it says I just don't like but if
16  you can read that from there?
17    A  I just don't like Daneman's attitude.  He is
18  misrepresenting important parts -- I'm sorry
19  misinterpreting important parts of the coverage and
20  isn't willing to admit.  He's bowing his neck.
21  Whether right or wrong it would be unfortunate
22  if Zygo has to litigate to prove him wrong.
23    Q  What didn't you like about Mr. Daneman's
24  attitude?
25    A  Maybe attitude was not an entirely appropriate

Page 115

1  word but I didn't like a lot of what was happening in
2  this claim, the way it was happening, the way it was
3  being handled by Royal going back to the beginning
4  where they take a position fairly early on that they
5  had been prejudice with late reporting when in fact
6  based on all circumstances in my opinion as I said
7  earlier this was not a late reported claim for
8  damage.
9        And the fact that he was at that point in time
10  relying entirely on Matt Weidman and Mathog &
11  Moniello to develop a lot of significant and
12  important information surrounding this claim when in
13  my opinion, he or whomever at Royal should have
14  assigned people in the field to investigate or Zygo
15  to investigate Nan-Ya, IBM, the airlines or whoever
16  and I didn't see that as happening.  I just felt they
17  weren't giving proper and appropriate attention to a
18  $600,000 claim.
19    Q  What was your understanding of the purpose
20  of the exchange of letters between Mathog & Moniello
21  and Royal once you got involved?
22    A  Um --
23    Q  As we saw through the deposition you wrote
24  three or four letters and you received letters back
25  from Royal.  Did you have an understanding of why

Page 116

1  there was the letter writing process?
2    A  Well, my understanding was -- is that they were
3  raising questions of coverage and Mathog & Moniello
4  had a client in Zygo and it was up to Mathog &
5  Moniello to assist them in binding coverage for the
6  loss if it was felt it was in fact covered under the
7  policy and that's what I was called upon to do.  To
8  try to persuade Royal that your position is wrong as
9  to coverage.  You covered the loss and you should pay
10  it.
11    Q  Take a look at Martin 53 which is your June 14
12  letter.  And then again there is letter you drafted
13  but you and others signed; is that right?
14    A  That's correct.
15    Q  And this letter also reflects your opinion that
16  the Royal policy provided coverage for the Zygo loss;
17  right?
18    A  That is correct.
19    Q  Now, you say in the third paragraph on the
20  first page you have raised the question of valued
21  reporting as this pertains to clause 52.  It's our
22  opinion and interpretation that the policy is not the
23  quote "reporting form" close quote type.  Instead
24  values are subject to year end audit based on the
25  assured's gross sale for purpose of determining any

Page 117

1  additional premium due or returned premium.  Do you
2  see that?
3    A  Yes.
4    Q  Did anyone from Royal ever notify you why they
5  believe that was the incorrect interpretation under
6  the policy?
7    A  No.
8    Q  Take a look at Martin 54 which is the July 16,
9  2000 cover letter with --
10    A  Um-hum.
11    Q  You received both of these letters; right?
12    A  Yes, that's correct.
13    Q  And did you understand this, the second letter,
14  the one's that's addressed to Zygo Corporation, as to
15  be a notice of declination of coverage by Royal?
16    A  Yes.
17    Q  In this letter does Royal explain why it's
18  declining coverage?
19    A  Well, this letter cites certain clauses of the
20  policy most of which we've referred to previously
21  today and having cited those in this0 letters, the
22  letter goes on to say in view of the foregoing
23  circumstances, we regret to advise no other
24  alternative other than to decline recovery on behalf
25  of the company for the captioned claim.  So to me

30 (Pages 114 to 117)

Page 118

1  that states on these policy clauses and the language
2  therein that that's why they're declining coverage.
3     Q  Well, for example, with regard to contingency
4  clause that's recited on that same page of the July
5  16 letter --
6            MR. WELDON: Page 2, 3. All right.
7            MR. GINOS: Is there a question?
8            MR. BJORKMAN: I didn't get a
9       chance to finish.
10    Q  (By Mr. Bjorkman) For example, with regard to
11 the contingency clause is there anything in the
12 letter that explains why the contingency clause does
13 not provide coverage under the circumstances of the
14 case?
15    A  No.
16    Q  I'd like to direct your attention to the
17 paragraph that's after the resuscitation of the
18 contingency clause where Royal writes, moreover we
19 reserve the right to investigate further into the
20 sales agreements and all subsequent communications
21 including requesting all pertinent documentation
22 regarding payment of the invoice correspondence
23 caption to an order confirmation. What if anything
24 did you understand that to mean in the context of a
25 declination letter?

Page 119

1     A  Well, that to me to me would mean that that is
2  an outright declination of coverage under clause 52
3  because they reserved the right to develop additional
4  information as it pertains to that or they attempted
5  to reserve their right.
6     Q  Now, in your 45 years of experience is that
7  something that's standard within a declination letter
8  to also reserve the right and continue to investigate
9  after you decline coverage?
10           MR. GINOS: Objection.
11    A  It is not normally. You normally would not
12 decline an outright declination of coverage until you
13 complete your investigation and satisfied yourself
14 that there is no coverage.
15    Q  Directing your attention to the first page of
16 the letter which is the second page of the Exhibit
17 Zygo 1.
18           MR. WELDON: That's it.
19    A  Um-hum.
20    Q  The property insured an insurable interest
21 clause is recited at least in part. Is it your
22 understanding that Zygo's claim was also
23 declined under this clause as well?
24    A  Yes.
25    Q  Now, when you received this letter did you

Page 120

1  understand that Royal was declining the coverage as a
2  result of any problem with the packing of the AFM?
3     A  Not specifically. They had raised a number of
4  issues as it pertained to coverage and they were
5  taking in my opinion a broad rush approach to this
6  declining for a number of reasons.
7     Q  After you received the July 16, 2001 letter did
8  you change your opinion as to whether the policy
9  provided coverage for Zygo's loss?
10    A  I did not.
11    Q  So even after you received this you believe the
12 policy did cover Zygo's loss; is that right?
13    A  That's correct.
14           MR. WELDON: You got a lot more?
15           MR. BJORKMAN: Not really.
16      I don't have any other questions.
17           MR. GINOS: Let's mark -- this will
18      just take a minute. Sneed 147, 148 --
19      what's the next, Exhibit Number 9.
20
21      (Plaintiff's Exhibit Sneed 9, 3/23/01
22      letter, was marked for identification.)
23
24 REDIRECT EXAMINATION BY: MR. GINOS
25

Page 121

1     Q  Mr. Sneed, will you look at Sneed 9. This is a
2  March 23, 2001 letter and is that a letter that you
3  drafted and sent to Mr. Daneman? I don't see your
4  signature on it so I'm just asking whether --
5     A  Yes, it appears to be.
6     Q  The only question I have about it is on page 2
7  of this letter it says in Matt Weidman's May 1, 2000
8  correspondence to you, first paragraph, first
9  sentence he refers to Zygo having a distributors
10 contract with IBM. I don't find and I have requested
11 this contract but in my feeling it could have
12 significance to the claim. I have obtained a copy
13 which is enclosed. Do you recall recollect in fact
14 sending to Mr. Daneman a copy of the IBM Zygo
15 distributor shipment agreement contract?
16    A  It's -- I make reference to it here and I would
17 seriously doubt that I didn't include it.
18    Q  Okay. The only other questions I have would
19 you -- can I have just for a second Exhibit 54?
20           MR. WELDON: I just note for the
21      record that we had gone over this exhibit
22      Daneman which is now Sneed 9 and Daneman
23      20.
24           MR. GINOS: I couldn't find it and
25      I know I didn't ask him that question

31 (Pages 118 to 121)