Q. Was it your understanding essentially then that Nan Ya, at least this preliminary basis, that Nan Ya was, appeared as if it was attempting to assert that it was not responsible for this loss and that it was somebody else's problem financially, that it was not its loss or its underwriters?

MR. BJORKMAN: I'm going to object to the form of the question. He is not asking you to speculate as to what was in their minds. He is asking what, based on your experience, if you had any knowledge of what they were claiming.

MR. GINOS: Yes.

A. Based on my experience I would say that this all needed to slow down. That there was a manufacturer. There's a sales agent, Zygo. There's a shipping company. There's air freight. There's a whole stack of people in the chain here. And we had absolutely no indications at that point as to where the damage occurred. Only that there was damage. And it was the second one that it occurred to.

So I'm just trying to be cautious.

Q. But it had appeared to you based on your experience that there would have to be some determination as to the nature of the damage and the cause of the damage?

MR. BJORKMAN: I'm going to object to the form. He explained what his view of the status was and how he proceeded and why he proceeded in that way. You're now trying to, you know, sort of twist it and --

MR. GINOS: No, I'm not trying to twist it.

MR. BJORKMAN: Not twist it. That's the wrong word. But you're trying to, you know, have him project out as to what he already explained. I mean --

MR. GINOS: I don't consider that his explanation necessarily exhausted everything that's in his head. I'm just trying to draw from him in his own words a more expanded version of what he's told us so far as to what he was thinking might be issues, what might have to be looked at here, what he was concerned

with as being possible issues.

MR. BJORKMAN: In asking that question you're limiting it. The previous answer to the question was quite an expansive explanation from his position and from his status working with the company. So I object to the form of the question.

BY MR. GINOS:

Q. Let me ask you this. At this point in time, having opened the two panels, seeing that the machine had shifted, was it apparent to you from what you could see in this preliminary basis that the machine had in fact been damaged?

A. Yes.

Q. Was the granite block chipped in any way or broken?

A. I couldn't see at that point.

Q. You couldn't tell. Could you tell at that point whether the damage was severe enough to require some sort of repair to the machine?

A. Oh, absolutely.

Q. Could you tell at this preliminary juncture whether the damage was so severe as to effectively constitute a constructive total loss?

A. Well, I wouldn't have known that expression of CTL at the time.

Q. By that I just mean basically --

A. I understand the question.

Q. -- you're not going to be able to fix this. We need another machine.

A. Well, it was -- yes, it was close to that. I could feel through the membrane, the plastic container, a wrapping, that several key components on the top of the machine, which are the sensitive parts, had been severely impacted, that they were loose, they were moving parts that would never be loose. Very similar to what had been reported about the first machine.

So at that point in time I was, I think it even says in here, about 98 percent certain that this is seriously damaged as was the first one and quite possibly not recoverable, but...

Page 142

damage.

And again, we're not discussing your views yet. I'm just asking whether there's anything that you left out as to the basis for Nan Ya's opinion.

A. No.

Q. Now, you say in there after you -- you describe their view. Near the end of that it says "they are supposing --"

MR. BJORKMAN: Where are you?

MR. GINOS: I'm in the middle of the paragraph.

Q. "They are supposing that the tool shifted and caused the crate to topple over. My view is that the screws had worked loose and gotten bent. This would only have allowed a few inches of motion."

Can you explain what you meant by that?

A. Can I use photographs? It will be a lot easier.

Q. Yes, you may bring them out.

A. OK. The majority of these photographs by the way, occur in an e-mail

Page 143

from Wilbur. Much about the same time as this 11th or 12th. Because he took these photographs. He scanned them in and he made some comments in his broken English.

So they exist in documentation stream somewhere. If you don't have them, I know I have them.

MR. BJORKMAN: Do you want to mark it?

MR. GINOS: Maybe on the back of it.

MR. BJORKMAN: Sure.

MR. GINOS: You can mark this as Walch 6. This is a photograph showing some bent screws lying on a wooden board. There are numbers on the back. The bottom line of numbers is 2207, space, 3542. There are more numbers, but that should be enough.

(Plaintiff's [Walch] Exhibit 6, photograph, 2207 3542, marked for identification, as of this date.)

BY MR. GINOS:

Q. I hand you Walch 6. Continue.

A. OK. Well, what this shows here is

Page 144

the --

MR. BJORKMAN: Can I just hear back the question so I know what he's answering.

(A portion of the record was read.)

MR. GINOS: I read "My view is that the screws had worked loose and gotten bent. This would only have allowed a few inches of motion, period." And I had asked him what he means by that.

A. Well, as you can see in this picture, there's sort of a zed-shaped bracket. Here, this is the wooden pallet base and two-inch thick pine type timber. And in here in the corner is the polyester film wrapping. And right in the very corner is the leg. And this zed-plate bolt is bolted up into that leg and then this plate is screwed down to the timber with approximately two and a half inches by five-sixteenths inch lug screws.

And what I'm putting in this comment here is that, as you can see, these screws have all been bent to different angles on the top part half of the screw. And my conclusion

Page 145

from this is that they've started to come loose at some point in the shipment. And that with this many, maybe a thousand pounds or so of machinery, beginning to move around a little bit, that the screws have been subject to enough force to bend them. But not necessarily to rip them right out of the timber.

Because I think if they had come loose enough to come completely loose, there would have been a lot more damage to the timber and these screws would have been damaged all the way along the shaft. They are only damaged at the top half where the securing goes on, leading me to believe that the screws had gotten bent with some roadjudda (phon) takeoff noise, whatever it is, and that at the point at which the crate toppled over, fell over, got pushed off a truck, whatever the final outcome seems to be, that then the sheer weight of the SXM frame dropped the last six to nine inches inside the crate and ripped out the last inch and a half of screw.

Q. First of all, let me ask you. At

what point in time, relative to your memo of February 11th, was this Walch Exhibit 6 photo taken?
A. The photo was probably taken on the Monday.
Q. In other words, the second examination.
A. The second examination. We would have been able to see this inside the crate, but the photograph would have been on the second day. Because I'm pretty sure Wilbur didn't take the camera out until the second meeting, the second inspection.
Q. Were all of the screws that appear in Walch 6 loose and out of -- had they all been pulled out of the wood when you --
A. Yes.
Q. -- saw them on the 11th?
A. They were no longer in the wooden base.
Q. I take it though your opinion or theory as to when and how these screws were pulled out is your personal opinion only.
A. It is.

Q. To your knowledge, did any surveyor or other person agree with you concerning the scenario that you described as to how these screws came out?
A. No.
Q. I take it you did not do any sorts of calculations or tests in order to confirm that scenario was accurate.
A. No. But the one observation that I can make, and it relates to something I mentioned earlier, was that inside the wooden crate there was only one significant witness mark to the impact of the machine to the panel, the inside face of the panel.
Had those screws come adrift significantly earlier and the machine had been moving around inside completely loose, then there would have been many more witness marks to the inside of the crate. The witness mark on the inside of the case indicated to me one significant impact.
Q. The zed-shaped bar, one end of which was screwed into the machine's frame and the other screwed into the base, the wooden base,

in this photo, Walch 6, very close to maybe half-inch, there seems to be some sort of gouge or hole, something in the wood. What is that, if you know?
A. That's the broken timbers where the screw has been pulled out of the fixing hole. That would have been the anchor point.
Q. For that zed plate?
A. Yes.
Q. To your knowledge did any representatives of any insurance company observe these screws and the pieces we have been discussing in this photograph?
A. Yes.
Q. Who?
A. Cathay Pacific or Cathay something. I took it to be Cathay Pacific, the aircraft company, but I believe in hindsight that it was more an insurance broker, undertaker, something. They were there on the Monday. They took a series of photographs as well, their series of photographs.
So their people, whether that was Taipei Fire & Marine or Taiwan Fire & Marine

or Cathay Insurance, they took their own series of photographs.
Q. And who did they represent as between Zygo and Nay Ya?
A. They were representing Nan Ya's side of the equation.
Q. Who was present at the second examination of the damaged AFM acting on behalf of Zygo or its underwriters?
A. Its underwriters, nobody. But Zygo itself, myself, Wilbur Chiang, and then I believe two representatives from Zygo. I think Peter was there on that day, and again the young guy that had been driving us. I don't recall his name.
Q. Was any request made at the end of the first examination of the second AFM to not disturb the crate or its contents, leave it alone, just leave it the way it is at this point so that no data is lost?
A. A mutual decision, we moved the crate to the corner of the loading dock. So it was out of the way of everybody else's activity on the loading dock until the Monday.

different."

Is KMS a different supplier?

A. KMS is a different product made by Zygo in Connecticut. And Connecticut's packaging company, Zygo Connecticut, they have packaging designed specifically for the products that are manufactured there.

The SXM was a product manufactured by IBM and it was packaging by IBM's design.

Q. Just so we're not comparing apples to oranges or something even more different, is KMS a large, heavy machine like the AFM or is it something else?

A. A KMS is an optical tool, I guess probably about half the size of the main unit, probably only a quarter to a third of the weight of an SXM, and the most critical component is the optics assembly, and that's removed for shipment into another box.

So it's not -- I wouldn't say it was an apples-for-apples comparison. That would be completely wrong. But it's not necessarily an apples-for-oranges comparison. It's a little bit mid ground on that.

Q. Were you familiar with the packaging that was done of the KMS units in the Connecticut facility?

A. No, not at all.

Q. Did you ever have any discussion or any kind of communication with Mr. Wu at Lee-Tech concerning the adequacy or inadequacy of the packaging realized for the AFMs we've been discussing?

A. No. I didn't have a conversation with Billy about my beliefs on the adequacy of the packaging. It's highly likely that we had a conversation about Nan Ya's viewpoint on the packaging, which we have already covered a little bit earlier on.

Q. Can you recall him offering any of his own opinion as to what it's referring to there about the --

A. In those meetings, Billy Wu is very much the senior executive position in his company at Lee-Tech, and in meetings with Billy you sit there, he asks some simple questions.

It's very courteous, but it's not a

really eventful meeting. You don't really resolve anything. It's very much "Please come to my office." It's executive leather chairs, and you sit there for five minutes. It's courtesy more than anything. He's not a technical person in respect to the AFM at least. So...

Q. Tell us what you know, if anything, concerning Billy Wu's attempts to resolve the damaged AFM and the two problems being had with Nan Ya over the second AFM.

And I don't want you to speculate. Just on the basis of your attending the meetings.

A. To be honest with you, I can't answer that question at all. Because whatever Billy would have done discussing with Nan Ya, he would have done in his office or on the telephone and it would have been in Chinese, and very much to himself. It would have been a private thing. I have absolutely no --

Q. So you're not privy to what he did or didn't do.

A. Not at all.

Q. Or what he said or didn't say to them.

A. No. And equally with his communications, if any, with Zygo. I'm outside of that loop entirely. It's way too high up the tree for me.

Q. Let me give you Martin 14. The first question simply is whether you've ever seen a copy of this before today.

A. No.

Q. At the bottom, paragraph numbered 5, Billy Wu says in this February 16, 2000 fax to Zygo, "Now we can only do is delivery 3rd on time. And also provide the formal statement to Nan-Ya shows: The same packing (60 units) to other countries never happened this mistake."

Let me stop there. From your own personal knowledge, were you aware of any attempt made to demonstrate to Nan Ya that other units with similar packing had been shipped without any problems?

A. Yes.

Q. Tell us about that.

A. I can't remember the date exactly, but it was the end of the trip. We had a meeting with Mr. Hanson Lee or Hanson Lian, and in that meeting I gave him a document that I had taken from a spreadsheet that I have on my computer showing the locations of all the machines around the world, and I had taken an extract relating to this particular hardware, the SXM 320, or actually it's the LSM 320. But from your documentation it's called SXM, so I'm going to leave it the same.

And on there I'm showing the installation locations where these machines are and an indication of how many times they've been shipped. Because in some cases they shipped to one site and moved to another site. Other times they've gone to trade shows and come back. And that document shows 26, 27 shipments of the SX 320 size machine where essentially no damage was reported.

There are a couple of damage reports that I didn't witness, but they were related about six, nine months earlier to fork truck damage to the corners of the crates. Not the

scanner assembly as it happens, but there's another much bigger case which houses the enclosure for the machine. It's a fully assembled enclosure. So the enclosure itself is bigger than the crate concerned in this litigation.

Q. Is this enclosure in effect kind of a miniature room that encloses the machine to seal it from dirt and dust?

A. Exactly. It has a filter system in the top, a hand filter pack on the top.

Q. Do you know for a fact whether the packaging utilized in respect of all of these other shipments was identical or almost identical to that used in this case that we've been talking about?

A. I can't say I know for a fact, but it was the same, to the best of my knowledge, the same shipping company and the same packaging design all the way through.

Q. But, I mean, that's an assumption on your part?

MR. BJORKMAN: No, he just said what he said.

A. It is an assumption, but I've seen a huge amount of them. I've been involved with the delivery of quite a few of the machines. I've been involved on the trade shows when they arrive and I've taken them out and put them back in and shipped them back. I've seen them packed on the docks when I'm walking past.

So in principle I know with a 95 percent certainty that they're all the same.

Q. Do you have as you sit here today any explanation for why there would be severe damage to two AFM shipments back to back as occurred here?

A. None.

Q. Continuing, very end of that first page, Martin 14, it says "please also provide the document," it says "form," but he may have meant "from" -- "your insurance company or other party or IBM shows," which I assume he meant to say "showing" -- "the package is suitable for transportation."

Do you know whether any documentation was provided from IBM attesting

to the adequacy of the packaging?

A. Not that I know of.

Q. Do you know if any request was made to Zygo's insurance company relating to some attestation as to the adequacy of the packaging?

A. Not that I know of.

Q. Are you aware, personally, not from hearsay, but where you read or where you participated in a conversation, are you aware of any access given by Zygo to its insurance company Royal in respect of an inspection of these units?

A. None.

Q. Damaged units.

A. To be honest, to circumvent some of these questions, and I appreciate you've got to ask the question, up until the times that Ian mentioned to me there was a possible lawsuit, I didn't know of any relationship between Zygo and its insurance company, not the company name, not correspondence, absolutely nothing.

Q. But even leaving aside --

A. No, I appreciate you've to ask the questions, but --

Q. Let me rephrase it then. Assuming at the time, February, March, April, you did not know what the name of the insurance company was --

A. No.

Q. -- did you hear any references to an insurance company, our insurance company, being given access to the damaged AFMs?

A. No.

Q. I think you referred to a final meeting at which an executive from Nan Ya presided?

A. Yes. Well, from Formosa Plastics.

Q. Formosa Plastics.

A. Yes.

Q. Can you tell us what, if anything, was agreed at that meeting as to who would bear the responsibility for the damage to the second AFM?

A. Actually, just give me a second, because I might have mixed two things up here. I want to be sure.

Q. Sure. If you've got something mixed, you can correct yourself.

A. It's just, um -- no, it's right, it was Formosa. I'm just trying to figure out at which point I was made aware that Formosa Plastics was the parent company. Whether it was that meeting or the one later in November, or the next year, whatever it was, and it was that first one. Because I was a little surprised.

Q. And that first one took place in February of 2000?

A. Yes. Towards the end of that week, something like 16, 17.

Q. Was there any agreement reached as to who would bear the loss, the responsibility for the loss of the second AFM?

A. No, no agreement.

Q. What position, if any, did Nan Ya's representatives express on that point?

MR. BJORKMAN: Objection to the form.

Q. At that meeting what position --

A. At that meeting. I can speculate --

Q. Wait, wait. All three of us are talking at once. He has the right to object. I want to have a clear question, so that if it survives his objection we can use it.

At that meeting presided over by the executive from Formosa Plastics, which occurred near the end of that week, sometime February of 2000, what position, if any, was expressed on behalf of the Nan Ya interest with respect to who should bear the loss or the responsibility for the damage that had occurred to the second AFM?

MR. BJORKMAN: I'm going to first object to the form because I think it assumes that there was some decision or discussion on that.

Secondly, and if this is helpful, fine, if it's not, we can move on, but there is a document that refers to that meeting, and it may be helpful.

MR. GINOS: First of all --

MR. BJORKMAN: I'm not saying you shouldn't ask, but --

MR. GINOS: Right, but to address

your objection in the two stages, one, I said what, if any. If any. I said if any.

MR. BJORKMAN: OK, fine.

BY MR. GINOS:

Q. What position did they take, if any, that you can recall? That's all.

We will come to the documents if that helps refresh your recollection. I'm just asking you based on your recollection did they express any position on who should bear the loss and what was that position, if there was one.

A. I don't recall the conversation being about who should bear the loss. But there was definitely as we started the meeting a viewpoint, without speculating exactly the words, there was a viewpoint on their end that this wasn't their responsibility. What are we going to do about it? Sort of generic conversation like that.

But I reported with these documents that we're going through now, my reports, I showed them the reports and the photographs,

and showed them that clearly the crate had been dropped.

And by the end of that meeting the guy was far more receptive to our ideas. He started off in the usual hostile manner, this is a meeting about who takes that blame, or something like this, and he wanted to make his point for Nan Ya or Formosa right at the beginning this is your problem -- that this is our problem to resolve.

So I presented the reports and he began to see quite clearly that there were a lot of instances here, a lot of references here to some sort of accident or negligence or something in the shipping routine along the way that puts it outside of our control.

But clearly his position in the company was he wasn't about to agree to anything in writing or anything formal, but he definitely had mellowed by the end of the discussion.

Q. But I take it he did not concede the point and admit you're right, it's not your fault.

A. No, there was no formal admission.

Q. Do you recall --

A. One second, let me finish. There was towards the end of the discussion, there was not so much an agreement, but he definitely was leaving that meeting with an intention to raise the necessary paperwork at his end to move on, to find another machine, whatever. I don't know what that is, because I don't get involved too much in the commercial side of what goes on in the organization.

But that would have been more Wilbur or Billy Wu or Peter even, but there was definitely towards the end of the meeting, he realized that he had to do something in the way of internal documentation to start the ball rolling on another machine, a replacement, something. So no acceptance of responsibility, but clearly he had actions to complete.

Q. Would it be fair to say that it appeared to you at the end of that meeting that Nan Ya was willing to at least stick with

Zygo's inventory as a source for a replacement machine?

A. I wouldn't necessarily say stick. He definitely left that meeting knowing that he had to make some actions.

Q. But it wasn't clear what actions.

A. Right.

Q. So you couldn't tell definitively whether he was going to go to Veeco or get the machine from Zygo.

A. No.

MR. GINOS: This has not been previously marked as an exhibit. I would like to have this marked as Walch 9. I think the Bates number is Zygo 385.

(Plaintiff's [Walch] Exhibit 9, e-mail to Muckenhirn, Robinson, Girardi from Walch of 2/16/00, Bates No. ZYGO-385, marked for identification, as of this date.)

Q. If you look at this memo, which appears to have been offered by you.

A. It was.

Q. It's Walch 9. Identify it for us.

What is this chart?

A. This chart is an extract from an Excel spreadsheet of installed SXMs around the world. Highlighted on this page is the LSM 300s, which is essentially the same SXM 320. It's only a naming convention.

And here you have a table of the customers they're installed at, which is somewhat confidential by the way. It's not for circulation generally. It also identifies whether they're in the USA, Japan, Europe, Asia or not yet in the field, in somebody's warehouse, for example.

So it identifies all of the machines and where they've been shipped. And there's a little comment to the side here, for example, against machine number 54. That's L80354. It says on it "Shipped Twice." That's because it was shipped once from Delray to Santa Barbara and from Santa Barbara to San Jose. But it would be packed and unpacked in between.

Further down the list there's one that belongs currently at that time to Zygo, tool number 61. That was resident at that

point in Sunnyvale, California. That had already been shipped three times by this point in time.

Then there's a few that had not been shipped, and at the bottom of that table it identifies recent trade shows where the LSM or SXM series had been shipped. It had been to Semicon West 98, Semicon West 99, Semicon Europa 99 and Semicon Taiwan 99. Each of those was a two-way shipment. And if you add the numbers up, it comes to approximately 27 shipments.

That's of this specific type of hardware in this specific type of case. It's a document that I referred to in another e-mail correspondence as a document called shipments, or something like that. Maybe even on your next page over there.

Q. Where did you get the data for this?

A. I monitor this stuff all the time. I was involved in servicing support, all of these machines at different times, and all of us in the group had the same document. I just enhanced and highlighted this area to make

this document clear.

Q. Do you know whether at any point in time corresponding to the shipments summarized here Zygo's insurance company was given an opportunity to inspect the adequacy of packaging for these units?

A. No, to be honest, the amount of damage on these ones that were reported here at the bottom of the page, it refers to a machine at AMD in Dresden, that's in Germany, and two other incidents on return shipments from trade shows.

These were all small incidents and I don't think they were covered by any insurance claims. I think they were just dealt with internally by Zygo and IBM. In fact, to be fair, I'm not even sure that they were Zygo and IBM. I think they were -- some of these were in Veeco's time.

Q. Let me give you Smith 8. It appears to be an e-mail passing on another e-mail, the original message being from K.R. Walch, that's yourself, and that was sent on February 18th.

Look at it as much as you need to

and tell us if you can identify the report or memorandum dated February 17th, which is the second page of this.

A. OK, yes. This is my sort of concluding report at the end of the trip. I started preparing this in the hotel in the last evening. So that the date may be the date I started preparing it as opposed to necessarily the date I shipped it. This e-mail has got Friday, the 18th, on the covering page. So 17, 18.

This discusses the meeting that I had with Hanson Lian, with Wilbur and I think Peter from Lee-Tech, I'm not a hundred percent sure who was in that meeting, where -- we just had this discussion a few minutes ago. This is my notes on that meeting.

Q. Can you tell us what steps, if any, were being taken as of February 17, 2000 to maintain the second damaged AFM in its condition, in the condition it was in when you had finished inspecting it?

A. OK, when I had finished inspecting it we -- if I remember correctly, and this is

really if I remember correctly because it's a long time ago now. I don't have any notes to back me up on this one. I believe we moved it inside the opened crate. We moved it inside and put it alongside shipment number 1 in that semiclean room.

Q. And that would have occurred approximately the day of this memo?

A. To be honest, I think it was a day or two before. It would have been at my third inspection, the end of the third inspection that I did.

Q. Were any requests made or instructions given to Nan Ya's personnel with respect to safeguarding the information or the evidence contained in that?

A. I recall asking them not to dispose of the cases. But I had little control over exactly what they were going to do once I left. I had requested that the cases, the packing case that we had dismantled, did not get destroyed. But unfortunately, timber packing cases on a loading dock have a tendency not necessarily to be very well

Page 222

MR. GINOS: RY-229 and 230 are the Bates numbers on Walch 11.
BY MR. GINOS:
Q. Have you ever seen this, Walch 11?
A. No.
Q. Did you go to IBM's location in Florida and oversee the shipment of a third unit to Nan Ya?
A. No.
Q. There's a reference in this to Zygo having "their own shipping guru go to IBM's location in Florida."
Do you see that?
A. I just read that paragraph, yes.
Q. Do you know, I don't want you to guess, but do you know who that is?
A. My take on that is that that's Stan Sadlowski, whatever his name is, from the earlier documents. Because I do recognize his name from somewhere, and this would make the most sense and I seem to recall someone telling me that someone from Zygo was going down to oversee the packaging.
Q. This same letter, from Mr. Weidman

Page 223

to Mr. Daneman, dated May 1, 2000, his next to last paragraph on the first page says, "The plan from here is to get someone from IBM to visit the machines in Taiwan to assess the exact damage and estimate the repair expense. Following that, Nan-Ya's insurance carrier will be engaged."
Do you have a recollection of participating in any discussions where what I just read was discussed?
A. No, not anywhere near that date or prior to that.
Q. To your knowledge based on your discussions or what you saw in the year 2000 was there a plan or at least was it discussed to have IBM visit the machines in Taiwan to inspect them?
A. Not that I'm aware of.
Q. Were you privy to any discussions relating to the second or first damaged AFMs after February 17, 2000 in which there was discussion of some sort of repairs being effected to them?
MR. BJORKMAN: Can I hear that back?

Page 224

(A portion of the record was read.)
A. To be honest, the answer to that is no. I don't recall there being any discussions about repairs to them. I would have possibly had discussions mainly with Sylvain about what the next plan of action is, if there is one. Because with two weeks left to go in my employment, I needed to know.
And I think the only thing that was on the cards was to get them the loaner machine shipment, number 3, out there up and running before the end of March.
Q. Would it be fair to state that by the time you had finished your inspections through the 17th of February you had come to the conclusion that the second and first AFM units were not economically repairable?
A. No, not at all. I had been focusing during those visits on much more on the cause of the damage, the reason. I wasn't really looking at the precise number of broken components.
Q. Tell us whether you ever reached any opinion based on your examination of AFM

Page 225

number 2 whether it was feasible to repair that unit and put it back into service.
MR. BJORKMAN: I'm just going to object to the form of the question. I think that the term "feasible" is vague.
MR. GINOS: Economically viable.
MR. BJORKMAN: Economically viable.
Q. So you're not spending more than it's worth.
A. Well, that's the problem. Yes, it would have been feasible to have made a repair to the machine, but at a significant cost. There's a huge amount of specific IBM components in there and a lot of critical parts that would have needed to have been rebuilt, retested, recertified, and a team to do that, and then ultimately you would have had to have wanted to sell or deliver that to somebody and support it with a warranty. So a viable repair, I seriously doubt it.
Q. Well, was such a repair not viable because of the cost that would be entailed or because Zygo's relationship with IBM was terminating or some combination of those

Page 226

factors, possibly also with additional factors?
A. I think --
MR. BJORKMAN: Object to the form, but you may answer.
A. I think a mixture. At the time the project was closing not only was Zygo and IBM breaking their relationship, I've read in a couple of these that Zygo was terminating its agreement with IBM. That's not how I understood it at the time. I understood it that IBM had announced they were closing the program, and that they were breaking the agreement with Zygo, giving Zygo some right, some access to the technology skill.
So with IBM closing there was not an engineering team to support a rebuild. There were one or two people with the necessary experience, but now working or soon to be working for different organizations.
So there was an implication there in the capability to do it. There was an implication there in the sheer cost of doing it, shipping the machine back and essentially

Page 227

rebuilding the most critical component. It was going to be a 250, $300,000 type repair. As a nominal number. I mean, I can't be precise about that.
Q. But I take it that had the relationship, what you're saying is had the relationship with IBM not been terminating, whichever way it terminated, even without that complication and people leaving the employ who would have been needed for the repair, it would have been a substantial cost to bring this unit into operation.
A. Oh, yes.
Q. On the order of 250, 300,000.
MR. BJORKMAN: Objection.
A. Something like that. It does make it a complicated thing to discuss, so I have a lot more information in hindsight of what I saw go on the next few months later, because this is now four years later.
So it's difficult sometimes to separate what was the status and mind-set then versus what it was six months later. We all knew the team was breaking up. There was no

Page 228

tangible buyer in the equation at the time to take it on. And yes, it was getting complicated.
But there's another component to that, and that is that this price was a significantly lower sales price than would normally have been the case. It was the end of the project. There was a price reduction to assist in the sale to Nan Ya.
Q. What was the price before the price reduction?
A. Well, the best way for me to answer that is not so much a price list, because I wasn't involved in commercial, but I'm aware that around about August, September, sometime around there, maybe October, Zygo sold another one of these units to IBM for approximately $1.1 million.
Q. And that's in 1999?
A. Yes.
Q. So would I be correct on the basis of what you've just said that getting to the end of this relationship they were basically trying to clear inventory and therefore

Page 229

reducing the price?
A. Yeah, I think that's a fair statement. It's how I understood it anyway.
Q. Can you tell us what involvement you had, if any, with respect to the third AFM unit that was sent to Nan Ya as a loaner?
A. OK, yes.
Q. What was the nature of any involvement in that?
A. The nature of my involvement in that is that I was scheduled to make sure that was switched on, up and running before the end of March before I was terminated. And the last week of March that's exactly where I was, in Taiwan making sure that was working.
The week prior to that there was another service engineer out there physically making the installation.
Q. When was that third loaner, the loaner you made, when was that third AFM up and running for the first time at Nan Ya?
A. That's a difficult question to answer. It was physically in tune and functional by about the 24th/25th of March.

sure that it's the same one or a different one.

Q. Take your time.

A. OK, yes, I have seen this document at approximately five, six months ago. Five months ago. The exact date would have been -- this is in the correspondence file that Ian sent me to update me with what's happening. That would have been the first I had seen of this.

Q. Going back then to the end of October 2000, the date October 27th here.

A. OK, this date, sorry, yes.

Q. In looking at numbered paragraph 1, were you notified by Zygo at about this time that you were going to be making an appraisal --

A. No.

Q. -- of the salvage value?

A. It's possible that Larry may have sent me an e-mail asking me if I would be prepared to, but I don't recall it. It's possible, but I don't recall it.

Q. Paragraph 3 says, "I agree that Zygo

will, and has, filed a claim for the second unit shipped with its insurance company and this claim is in their hands."

In October or November of 2000 what, if anything, were you told concerning any claim that Zygo might have filed with its insurance company in respect of the second AFM?

A. In reference to your question earlier on this document -- in Martin 38 was it? When you asked me about unit number '50.

Q. Right.

A. Belonging to Zygo and the insurers. I had a feeling. How I have that information I can't say. It may have been an e-mail. It may have been a discussion with Sylvain that this whole deal had not been resolved. I honestly can't tell you how, but I'm aware that it hadn't been resolved. And that's as much as I can say.

Q. When you say it hadn't been resolved, what do you mean?

A. It hadn't been resolved as in -- as in Nan Ya were not necessarily paying for the

second machine. Not that anybody else was, but that Nan Ya was not.

Q. And you don't recall where you got that impression?

A. No. The most likely scenario for that would be communication with Sylvain. He and I have been working together on and off six, seven years. Barely a few days go by sometime without us have communication. So that's the most likely source, but I can't be sure.

Q. I'm done with that one.

MR. GINOS: Let's mark this as Walch 14. The Bates numbers on this are RY-65 and 66.

(Plaintiff's [Walch] Exhibit 14, e-mail under headed of ASH-Semi Services Limited, 11/5/00, Bates Nos. RY-65 and 66, marked for identification, as of this date.)

Q. Would you look at Walch 14 and, please, after you had have a chance to look at it, identify it for us if you can.

A. Yes, I can identify this. This is

the nominal valuation that I did on the salvageable value of Nan Ya shipment Number 2. I did a similar one for Nan Ya shipment Number 1.

Q. And when you say "nominal valuation," what do you mean by that?

A. Well, nominal as in this one appears to be not the original, not the first one. And it carries my signature, I agree with that.

But the original report that I did, two of these, had different values. Very similar, but different values and for the machines 1 and machine 2.

And when I went into the meeting to present this in Taiwan, I walked in 25, 30 minutes or so late with Tim Smith and all the other attendees had been in the meeting for half an hour, I went in expecting to present my valuation. At which point they said No, no, Kelvin, thank you, we have this. It's all acceptable to us, but please would you balance the two documents. Make the two read with the same cash value, residual value for their

accounting purposes.
Q. What was the date of that meeting that you walked into with Tim Smith? Do you recall if it was November 15, 2000 or some other date?
A. I don't recall the date to be honest.
Q. Was the meeting after the November 9th date on this report, which is Walch 14?
A. I have to be a little careful here, because as I went back and amended the documents to be a certain value, I may not have changed the dates.
MR. BJORKMAN: There is a date on the next page.
THE WITNESS: Is there? Oh, 13/11. That was the date I signed it in their meeting.
A. So this date technically would be incorrect.
Q. This date being the 9th, but the date of your signature at the meeting, the 13th of November, would be the date at which

you signed it?
A. Let me think. Because I wasn't prepared before the meeting as balanced.
Q. Let's stop for a second. Let me give you the appraisal on the first unit.
MR. GINOS: This is Martin 39. It's already been marked.
Q. Is that in fact the salvage report on Shipment Number 1?
A. This is Shipment Number 1, 32,000. That was my original valuation dated on the 9th, yes.
Q. Does Walch 14 reflect the balance valuation as opposed to the --
A. Sorry?
Q. Does Walch 14 reflect your balancing or equalizing the valuations in --
A. It does.
Q. Consistent with what you were told had been the parties' agreement.
A. Had been agreed, exactly.
Q. What else, if anything, did you understand had been agreed at that November 13th meeting based on what you were told or

what you heard?
A. Parts of the meeting were in Chinese. Not all, but parts of it. Will -- actually, I'm not sure Wilbur was there. Tim Smith was there. I'm not sure Wilbur was there. So Tim would have been the only translation. So most of the meeting was English. Lee-Tech were involved in the meeting.
And a little difficult to understand the meeting, as I walked in about a half an hour late with Tim. We had gone to the wrong building as it happens. And I was expecting to make a presentation of the two salvage reports and justify my numbers, but that was all mutually agreed before I walked in the door. And I walked in at the same time as Tim, so he was in just the same situation, that we walked into this, Oh, no, that's OK. That's accepted.
So no problem, just would you mind adjusting the numbers so they both reflect the same amount for simplification, and everybody seemed to be in agreement with that.

So as much as I felt a little uncomfortable about changing a document that was going to an insurance company, they were in the room as well, the insurance company, they were happy with that. So since everybody was happy, I reassessed the reports.
And to be honest, I must have done that that evening, because I definitely didn't do it in advance.
Q. You said that the insurance company was there. Which insurance company are you referring to?
A. Taiwan Fire & Marine.
Q. Nan Ya's insurance company was there.
A. Yes.
Q. To your knowledge was anyone there on behalf of Royal Insurance or --
A. No.
Q. If you weren't familiar with the name, then let me restate it as Zygo's insurance company.
A. Not that I know of.
Q. What understanding did you get from

Page 258

that meeting, if any, concerning whether Zygo and its insurance company or Nan Ya and its insurance company would be responsible for the second AFM?

A. Absolutely none. I came away from that meeting absolutely totally convinced that Nan Ya were agreeing to settle both cases.

Q. Meaning what?

A. Settle the payment on both tools.

Q. And --

A. Less the salvage values on each one.

Q. Where did you get that understanding?

A. Just in that meeting in the conversation that was going on. Specifically which person I don't really recall. There was a main Nan Ya person, the other end, Nan Ya contact, I don't recall who it was, was at the end of the table chairing the meeting and a lot of the conversation was with Tim rather than with me, because my part was purely evaluation, not a commercial discussion.

But I came away from that meeting absolutely and totally convinced that they

Page 259

were settling both claims. I even said so to Tim as I walked out the door. I said, Tim, I couldn't believe how simple that was. I was expecting this to be somewhat a fight over valuation, and then once the valuation was resolved there would still be some issues, but no, not the case at all.

Q. Would it surprise you to learn that Mr. Smith testified that he was frustrated by the end of that meeting because he didn't think anything had been resolved?

MR. BJORKMAN: I'm going to object to the form of the question and object to your characterization of Mr. Tim Smith's testimony.

MR. GINOS: Other than the salvage values.

MR. BJORKMAN: I'm going to object.

A. I'm not sure that I could accept that as a valid statement. Tim came out quite happy as well, would be my impression. He came out quite content that it was resolved. We went across the road to a coffee shop, sat down and discussed it for 15 or so minutes and

Page 260

seemed happy that it was contained, closed, sealed.

MR. BJORKMAN: Contained?

THE WITNESS: "Contained" is the word I used.

Q. Well, Mr. Smith's testimony is what it is. Let me ask, was someone translating to and from Chinese for Mr. Smith and you?

A. No, there was no direct translation. There was elements of the conversation in Chinese between the insurance brokers and Nan Ya, but the majority of the conversation was in English.

But please don't ask me to quote the words. I don't recall the people, the exact conversation. Just I came out --

Q. But your recollection is the majority of the conversation as between Zygo's side and Nan Ya's was in English?

A. Yes.

Q. If you look at Walch 14, near the bottom of the first page it says "This crate has not yet been inspected! When the packing company arrives, I will open the other crates

Page 261

to establish whether or not they have been opened by anybody else."

This is not a reference to the damaged crates.

A. No, this is a reference to the good crates. It doesn't look as though they've been opened. So it really should have said these crates.

Q. I'm done with 14. Let me give you Smith 9. Look at that and tell us if you recall seeing it before.

A. Yes, I remember seeing a document in the correspondence that Ian sent me to browse through.

Q. Before Ian sent you a copy of this to look at, at the time that this particular survey report had been authored in February of 2000, or maybe shortly thereafter, March, April, did you see a copy of this?

A. No, not until literally say four months ago, something like that, when Ian sent me a package.

Q. So as of the time that you attended the November 2000 meeting that we were

A. Yes.
Q. Then not more than two weeks later you went and did a salvage value assessment of those two units, right?
A. Correct.
Q. When you did that, did you find that any salvageable components were missing?
A. Nothing discernible. Virtually all of the key critical parts were there. Nothing looked like it had been seriously disturbed or anything. It didn't look like the crates had been opened, so it all looked sound.
Q. When you say it looked like the crates had not been opened, do you mean the three crates that had not been damaged?
A. As it happens six crates out on the loading dock, because the other three from shipment number 1 were still there as well.
Q. So these three crates were still on the loading dock?
A. Yes.
Q. I'm sorry, three crates from the shipment. So six crates were still on the loading dock.

A. Correct.
Q. And they were in intact condition.
A. Yes.
Q. How about the damaged components of Nay Ya's shipment 2, where were they located when you went to do your review in November of 2000?
A. They were still in the clean room, clean/semiclean room and ancillary room up into the FAB area.
Q. And as far as you could tell, was that equipment in any different condition than when you had last seen it?
A. No, it all seemed to be pretty much intact. There may have been odd screws, brackets not laying on the top of the machine where they had been before, but there was nothing significantly missing.
Q. Where was the crate for crate 1 of Nan Ya shipment 2? Where had that been maintained?
A. That was still on the loading dock.
Q. And that was segregated in some fashion?

A. Yes, it was in a different corner of the loading dock, but it was all there together.
Q. I believe you testified when Mr. Ginos asked you some questions that, in words or substance, that you thought that for another surveyor to come in and do an evaluation of when the damage may have occurred, the last point in time you were aware of was February of 2000.
Do you remember that testimony?
A. Can you repeat that or read it back, either way?
MR. GINOS: I think he said March.
MR. BJORKMAN: OK, thank you.
Q. In response to Mr. Ginos' testimony, I believe you testified that you thought that the last time that a surveyor could come in and inspect, to do an evaluation of what happened to damage the Nan Ya shipment 2, was in March of 2000. Do you recall that?
A. OK, that may be my slight misunderstanding of Mr. Ginos' question. My interpretation was the last time I could

confirm its condition for any other inspection. But in hindsight of what we've just discussed now, perhaps even that could have been as late as the November visit since there didn't appear to be much more or any more sustainable damage or missing parts.
So the reality is it was there, but in the context that Mr. Ginos was asking the question, I took that as when I could confirm, it was in a condition as which we had opened the crates.
Q. But as far as you knew, the damaged elements of Nan Ya 2 were essentially all there in November of 2000 as well.
MR. GINOS: Objection.
THE WITNESS: Does that mean I still answer that?
MR. GINOS: You can answer. I don't know what he means by essentially. Sort of? Mostly? Kind of? Essentially all there?
MR. BJORKMAN: I'll withdraw the question.
MR. GINOS: Except for one critical

component missing? You know.
BY MR. BJORKMAN:
Q. When you did the evaluation in November for the salvage value was there any critical components missing from Nan Ya 2?
A. No.
MR. GINOS: Objection.
MR. BJORKMAN: What was wrong with that?
MR. GINOS: Any critical components. He was doing a salvage valuation of undamaged stuff. You're now trying to extend that over to the damaged AFM? I'll cover that when I re-question. Go ahead.
MR. BJORKMAN: I will cover it now.
BY MR. BJORKMAN:
Q. When you looked at the Nan Ya Number 2 to determine its salvage value, did you look to see what components were there?
A. No. Having been there as we opened the crates, I had no reason to suspect anything was not there.
Q. Did you look only, did you examine

only the pieces of that equipment that had not been damaged?
A. No, no. Not at all.
MR. GINOS: What point in time?
MR. BJORKMAN: In November.
A. Oh, November?
Q. Yes.
A. In November I didn't open the other crates.
Q. No, no, I'm talking about the crate 1.
A. The crate that was open I was observing to see if and how much of the parts in the system looked tangible enough to salvage. I have to take an assessment of risk in that, that some of those parts may have looked good, but not been good. And on the other hand, some parts may have looked damaged, but in reality it would have had negligible effect.
Q. And when you did that examination and you looked at what was the contents of crate 1 of that shipment, did you see, did you notice that there were any parts that you would normally find within that unit, in that

crate, that were not there?
A. No.
Q. Let me ask you to take a look at Walch Number 10.
A. OK.
Q. Attached to this document RY 280 is a memo that you wrote; is that right?
A. Correct.
Q. Do you recognize that handwriting in the upper right-hand corner, 5/19 to Richard Chung?
A. No.
Q. You said that you had no contact with anyone from Zygo's insurer; is that correct?
A. Correct.
Q. Well, did Mr. Chung ever call you to find out any facts about --
A. Mr. Chung is referred to in this document, no.
Q. Did you ever get a call from Mr. Richard Chung?
A. No.
Q. Did you ever get an e-mail from

Mr. Richard Chung?
A. No.
Q. Did you ever get a message by any means of communication that Mr. Richard Chung wanted to talk to you?
A. No.
Q. How about Joseph Daneman, did you ever learn in any way, shape or form that Joseph Daneman wanted to talk to you?
A. No.
Q. Did you ever hear of a company called GAB Robbins?
A. No.
Q. So you never learned by any means that someone from GAB Robbins wanted to talk to you?
A. Not at all.
Q. I just have one other series of questions. Mr. Ginos had asked you some questions about the November 13th meeting. Do you remember that?
A. OK, yes.
Q. And in that, in your answer, and I'm afraid it might be an issue between American

Page 286

English and British English, but you used the term Nan Ya "settled the value." Do you remember using that?

MR. BJORKMAN: Can we have that read back.

(A portion of the record was read.)

Q. The court reporter read back to you part of your testimony where you referred to the November 13th meeting and you said that Nan Ya had become -- you came away from that meeting totally convinced that Nan Ya had agreed to settle the two claims by paying for the equipment.

What I want to understand is what you meant by the term "settled?"

A. I came away from that meeting believing that Nan Ya and/or its insurance companies had agreed to settle both claims and that they were accepting -- they were accepting the loss less the valuations.

Q. When you say agreed to settle the claims, are you saying that they agreed that they would pay for both Nan Ya 1 and Nan Ya 2 less the salvage value?

Page 287

A. That was my understanding. But when I say "settled" there, I don't necessarily mean physically with a rubber stamp and everybody signs over the rubber stamp.

I was meaning the discussion and the statements led me to believe as I left that building that Nan Ya were going to settle both claims or Nan Ya insurance were going to settle both claims and it was not Zygo's responsibility.

Does that answer your question?

Q. Right.

When you were at that meeting on November 13th did you ever hear Mr. Smith say to anyone that Nan Ya did not have to pay for the second AFM?

A. No, not that I recall.

MR. BJORKMAN: I don't have anything else..

BY MR. GINOS:

Q. I thought you had told me earlier when I was questioning you that you had not been privy to any commercial discussions between Zygo, for example, Mr. Martin, or on

Page 288

his behalf, Mr. Smith, Mr. Wu or Mr. Martin on the one hand and Nan Ya's people on the other concerning how to resolve disputes relating to who would be responsible for these damaged AFMs.

Did I misunderstand you?

A. I don't think so.

Q. Then you weren't privy to them?

MR. BJORKMAN: No, no, no. The November meeting.

MR. GINOS: Other than the November meeting. Because there were a lot of -- there was a lot of discussions with correspondence we have had testimony about and a lot of documents I haven't shown him relating to those communications/negotiations that I haven't shown him, because I thought he said he wasn't privy to any of them.

MR. BJORKMAN: What makes you say now that he was? I don't understand that.

MR. GINOS: I just want to confirm that he wasn't privy to any commercial

Page 289

discussions prior to the November 13th meeting of 2000.

A. That's correct.

Q. So you do not know what Billy Wu or Mr. Martin may have said to Nan Ya regarding how to resolve these claims, nor do you know what Nan Ya said to them in response about how to resolve these claims outside whatever impression you got at the November 13th meeting; is that right?

A. That's correct.

MR. BJORKMAN: Objection.

Q. That's correct.

A. Yes.

Q. And at the November 13th meeting who was it -- I want a specific recollection if you have one, who was it that told you that Nan Ya had agreed to pay for both the first and the second damaged AFM? Either Nan Ya or its underwriter --

A. I can't say that I have a specific recollection of any one person making that statement to me that they were paying it. It's just as we came away, the feeling I came