UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA,<br>  Plaintiff,<br><br>v.<br><br>ZYGO CORPORATION,<br>  Defendant. | Civil No. 3:01 CV 1317 (JBA)<br><br><br>July 9, 2004 |

### SUPPLEMENTAL AFFIDAVIT OF IAN E. BJORKMAN IN SUPPORT OF ZYGO CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COUNTY OF NEW HAVEN )
                            : ss.
CITY OF NEW HAVEN    )

I, Ian E. Bjorkman, being duly sworn, depose and say:

1.    I am over the age of 18 and believe in the obligation of an oath.

2.    I am a partner in the law firm of Wiggin and Dana LLP, counsel for defendant Zygo Corporation ("Zygo").

3.    I am fully familiar with all the facts, pleadings, and proceedings in this action.

4.    It has come to my attention that Zygo's Memorandum of Law in Support of its Motion for Partial Summary Judgment cites to some materials that were not provided to the Court as Exhibits to my Affidavit. The purpose of this Supplemental Affidavit is to provide those materials to the Court.

5.  Specifically, pages 9 (n. 5) and 21 of Zygo's Memorandum of Law cite to Allan Ilias' Deposition at pages 16 and 81-85, respectively. True and correct copies of those pages of Mr. Ilias' deposition transcript are attached to this Affidavit as Exhibit 1.

6.  Page 32 of Zygo's Memorandum of Law cites to Joseph Daneman's Deposition at pages 235-36. True and correct copies of those pages of Mr. Daneman's deposition transcript are attached to this Affidavit as Exhibit 2.

7.  Further, there are two references in the brief that need correction. On page 18, first paragraph, line 7, the citation to "Martin Dep. Ex. 53" should be "Bjorkman Aff. Ex. 14." On page 29, first paragraph, third line, the reference to "Martin Ex. 37" should be "Martin Aff. Ex. 14."

Ian E. Bjorkman

Subscribed and sworn before me
this 9th day July 2004.

Notary Public    JAIME A. McELHILL
                 *NOTARY PUBLIC*
                 MY COMMISSION EXPIRES 4/1/09

2

**CERTIFICATE OF SERVICE**

This is to certify that on this 9th day of July 2004, a copy of the foregoing Affidavit of Ian Bjorkman with attached Exhibits has been mailed, postage prepaid, to the following:

Robert K. Marzik, Esq.
Law Offices of Robert K. Marzik, P.C.
1512 Main Street
Stratford, CT  06615

John A. V. Nicoletti, Esq.
Geoffrey J. Ginos, Esq.
Nicoletti, Hornig, Campise, Sweeney & Paige
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY  10005-1801

Daniel L. FitzMaurice, Esq.
Charles D. Broadus, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT  06103

C. Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA  94304-1050

                                        _____
                                        Erika L. Amarante

\15160\1\46282.1

# EXHIBIT 1

```
                                                          16
1                          Ilias
2              asking him what role he played, if
3              any.
4    BY MR. BJORKMAN:
5         Q     In or around May of 1999, who did
6    you report to?
7         A     In May of 1999 I reported to -- I
8    had a dual report basically to Tom Carroll and
9    Christina Tye.
10        Q     And were they senior underwriters?
11        A     Tom Carroll was at that time, to the
12   best of my recollection, the underwriting manager
13   countrywide.
14              And Christina Tye was the manager
15   countrywide.
16        Q     Just generally what does that mean,
17   they were managers?
18        A     They were responsible for the United
19   States, for Royal Sunrise Marines U.S.A.
20        Q     Essentially all underwriters would
21   report to them?
22        A     All the underwriters reported to
23   Christina.  Thomas was more of a referral
24   underwriter.
25        Q     Was Christina in the New York
```

```
                                                            81
 1                         Ilias
 2         Q     How did you come up with this list
 3   of enhancements?
 4         A     To the best of my recollection,
 5   these were enhancements that, enhancements and
 6   option coverages that Mathog & Moniello insisted
 7   be part of the marine policy.
 8         Q     So you recall having a conversation
 9   between the time you created the front sheet of
10   Ilias 1 and the time you wrote Ilias 2 with Mathog
11   & Moniello?
12         A     I don't recall a conversation.  This
13   is going back obviously a number of years.
14               But generally I would never provide
15   these coverages without a specific request from a
16   broker.
17         Q     Do you have any recollection of
18   conversations with Mathog & Moniello concerning
19   their request for contingency coverage?
20         A     Yes.
21         Q     What do you recall about that?
22         A     What I do recall from our
23   conversations with Mathog & Moniello with respect
24   to contingency was inquiring of them whether there
25   was a contingent exposure which, once again, there
```

```
                                                              82
1                       Ilias
2    was no contingent exposure under this policy.
3         Q    When did you ask that?
4         A    I have no recollection of when that
5    happened.
6         Q    Was it before or after the policy
7    was written?
8         A    Oh, it was before the policy was
9    written.
10        Q.   How do you know that?
11        A    Because I recall seeing the
12   application and seeing the hundred percent primary
13   notification on the application of Ilias 1 and it
14   interested me that they had no contingent
15   shipments whatsoever, and I needed to clarify that
16   before quoting.
17        Q    Did you ask them why they were
18   insisting on contingency coverage if they had no
19   contingency shipment?
20        A    Yes, I did.
21        Q    What did you say?
22        A    I have no recollection of exactly
23   what I said.  I just inquired as to why, if they
24   have no exposure what do they possibly need it
25   for.
```

Ilias  83

1  
2  Q  What were you told?
3  A  To the best of my recollection, they said that it was in current form.
5  Q  Sorry, what?
6  A  It was in the current policy with AIG.
8  Q  Do you recall anything else about that?
10 A  Not at this moment, no.
11 Q  Do you recall who you spoke to about that?
13 A  Either of the two individuals that are listed.
15 Q  You don't know if it was Jeanette or --
17 A  I don't want to lean one way or the other, but I really don't remember which one it was.
20 Q  Sorry. I'm just asking if you recall, I'm not pressing you to come up with that.
        Did you see their policy at AIG?
23 A  No, I did not see their policy at AIG.
25 Q  Did you ask to see it?

```
                                                              84
 1                          Ilias
 2          A     I do not recall if I asked to see
 3    it.
 4          Q     Do you recall conversations about
 5    any of these other enhancements that are listed on
 6    Ilias 2?
 7          A     The only recollection I have with
 8    respect to the other enhancements is part of what
 9    I had, my question about contingency of why they
10    needed them.
11          Q     That's the only one you remember,
12    correct?  I'm not sure I understood your answer.
13                MR. BJORKMAN:  Read back the
14          answer.
15                (The record was read.)
16          Q     Let me tell you my confusion.  I
17    asked if you recalled any conversations about any
18    other enhancements listed.
19                MR. GINOS:  Other than
20          contingency?
21          A     What I was trying to say previously
22    that came out garbled was my recollection being
23    that I asked why they needed these same
24    enhancements, these enhancements listed here, and
25    I got the same response as they gave in the
```

85

Ilias

1
2  contingency, that they had them previously under
3  the AIG policy.
4      Q    At the time did you think that there
5  was any inconsistency between getting the FOB
6  coverage and also getting the contingency
7  coverage?
8      A    How do you mean?
9      Q    In your experience, was there
10 anything abnormal about getting both of those
11 coverages?
12     A    No.
13     Q    Profit sharing says 50, 50, 50 split
14 with a minimum of 25,000 in premium in order to
15 qualify.
16          What does that mean 50, 50, 50?
17     A    Basically what it means is we take
18 50 percent of the total earned premium off the
19 top, we subtract all losses, reserved and paid,
20 and we split the remainder between Royal and the
21 insured.
22     Q    Now, you have handwriting on Ilias
23 2.  Is that your handwriting?
24     A    Where specifically?
25     Q    Well, is any of it your handwriting?

# EXHIBIT 2

Page 233

**Daneman**

[2] MR. GINOS: As I read the
[3] original production request, it was
[4] relating to specifically have you ever
[5] had a claim on a contingency clause
[6] before, if so, I want the claims file.
[7]     I take that to mean any and
[8] all files relating to the contingency
[9] claim, not to extraneous claims.
[10]    MR. BJORKMAN: Why don't you
[11] just give me that now?
[12]    MR. GINOS: We'll probably
[13] send it out to be copied tomorrow and
[14] we'll send it out to you.
[15]    The other thing I'm getting
[16] for you, if I can get it, is the
[17] independent writing file, again,
[18] specifically relating to the Trimex.
[19]    MR. FENNELL: The whole or the
[20] policy, if we can find it —
[21]    MR. GINOS: The policy and
[22] anything relating to the contingency
[23] claims.
[24]    THE WITNESS: Can I take a
[25] five-minute break?

Page 234

**Daneman**

[2]    MR. BJORKMAN: Sure.
[3]        (Whereupon, at 6:20 o'clock
[4] p.m., a recess was taken to 6:30
[5] o'clock p.m.)
[6]        (The deposition resumed with
[7] all parties present.)
[8] JOSEPH DANEMAN, resumed and
[9] testified further as follows:
[10]           BY MR. BJORKMAN:
[11]    Q: Mr. Daneman, did you ever come to
[12] the conclusion that the packaging for the AFM was
[13] inadequate?
[14]    A: I never came to a definitive
[15] conclusion, but I knew that it was a possibility.
[16]    Q: And what did you think were the
[17] other possible reasons for the damage to the AFM?
[18]    A: Other possible reasons are rough
[19] and/or careless handling in transit by the
[20] carrier.
[21]    Q: When you came to the determination
[22] to decline coverage, did you base that decision on
[23] either poor packaging or rough handling of the
[24] AFM?
[25]    A: I felt the assured hadn't met their

Page 235

**Daneman**

[2] burden of proving that the loss was caused by an
[3] insured peril. Rough and/or careless handling by
[4] the carrier during an insured transit is an
[5] insured peril, but I didn't see where the assured
[6] had met the burden of proving that rough and/or
[7] careless handling had been the cause of the loss.
[8]    Q: What would they have to do to meet
[9] that burden, in your mind?
[10]    A: Usually you have a survey report
[11] where the surveyor gets to do a timely inspection
[12] of the damaged goods. And if the surveyor, when
[13] he finishes his investigation and concludes with
[14] his opinion that the cause of loss is due to rough
[15] and/or careless handling in transit, that is
[16] usually sufficient proof to deem the loss to have
[17] been rough and/or careless handling in transit by
[18] the carrier.
[19]    Q: And you were given a survey report
[20] that came to that conclusion, weren't you?
[21]    A: I don't recollect receiving such
[22] report.
[23]    Q: You didn't get the reports from
[24] Cathay Inspection?
[25]    A: I received reports from Cathay

Page 236

**Daneman**

[2] Inspection, but I don't recollect that their
[3] conclusion was that the cause of loss was due to
[4] rough and/or careless handling in transit.
[5]    Q: You know that when the AFM was
[6] loaded on the aircraft there was no damage, right?
[7]    A: From what I recollect, from the
[8] documents, there is no indication that the
[9] microscope — that there was any damage when the
[10] goods were loaded on board the aircraft.
[11]        (Document on the letterhead of
[12] Cathay Inspection Co., Ltd., bearing
[13] Bates Stamp Nos. RY 0061 through RY
[14] 0064, was marked as Daneman Exhibit
[15] No. 37 for identification, as of this
[16] date.)
[17]           BY MR. BJORKMAN:
[18]    Q: Can you tell me what this is?
[19]    A: (Perusing document.) This is a
[20] survey report issued by Cathay Inspection
[21] regarding the second shipment which is the subject
[22] of this claim.
[23]    Q: And what is the date of that report?
[24]    A: (Perusing document.) February 21,
[25] 2000.