UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

                            Plaintiff,

        - against -

ZYGO CORPORATION,

                    Defendant.

-----------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

                    Third-Party Plaintiff,

        - against -

NAN YA TECHNOLOGY CORPORATION,

                    Third-Party Defendant.
-----------------------------------------------------------------X

Case No.
**CIV 3:01 1317 (JBA)**

### SUPPLEMENTAL AFFIDAVIT OF GEOFFREY J. GINOS IN OPPOSITION TO ZYGO CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

STATE OF NEW YORK        )
                         ) s.s.:
COUNTY OF NEW YORK       )

        GEOFFREY J. GINOS, being duly sworn, deposes and says:

        1.      I am an attorney duly admitted to the practice of law in the State and

Federal Courts of New York and before this Honorable Court *pro hac vice*, and am a member of

Nicoletti Hornig Campise Sweeney & Paige, attorneys for Plaintiff/Third-party Plaintiff Royal

Insurance Company of America ("Royal"). The Nicoletti Hornig Campise Sweeney & Paige firm,

1

along with the Law Offices of Robert K. Marzik, P.C., are attorneys of record for Royal in the captioned litigation.

      2.    I am fully familiar with all the facts, pleadings, and proceedings in this action.

      3.    Counsel for Royal inadvertently omitted a footnote on page 37 of Royal's Opposition to Zygo Corporation's Motion for Partial Summary Judgment ("Royal's Opposition"), following the sentence "But, that decision was promoted by Zygo's proposal for a ruling not on the merits."

      4.    The contents of the footnote were as follows: "See Docket No. 72 at p.2 n.1 (Zygo Corporation's Memorandum of Law in Opposition to Nan Ya Technology Corporation's Motion for Summary Judgment)." For the Court's convenience, a copy of Docket No. 72 is attached hereto.

      5.    Accordingly, Royal's counsel submits this Supplemental Affidavit to supplement Royal's Opposition with the aforementioned footnote.

Dated: New York, New York
      July 30, 2004

By: _____
      GEOFFREY J. GINOS, ESQ.

Sworn to before me this
30th day of July, 2004

_____
Notary Public

VALERIE A. CLUNE
Notary Public, State of New York
No. 41-4880479
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Dec. 15, 20___

W:\wfennell\Summary Judgment 2 -- Affidavit in Opposition.doc

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing filing, SUPPLEMENTAL AFFIDAVIT OF GEOFFREY J. GINOS IN OPPOSITION TO ZYGO CORPORATION'S MOTION FOR SUMMARY JUDGMENT was sent *via* Federal Express this 30th day of June, 2004 to:

Honorable Janet Bond Arterton
United States District Court
141 Church Street
New Haven, Connecticut 06510

Ian E. Bjorkman, Esq.
Wiggin & Dana
One Century Tower
New Haven, Connecticut 06508

Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

Robert K. Marzik, Esq.
Law Office of Robert K. Marzik, P.C.
1512 Main Street
Stratford, Connecticut 06615

_____
GEOFFREY J. GINOS (CT 19578)

X:\Public Word Files\21\55\Legal\Supplemental Affidavit GJG-SJ Motion.doc

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA, Plaintiff, | ) ) ) ) |
| v. | ) ) |
| ZYGO CORPORATION, Defendant. ... | ) ) ) ) |
| ROYAL INSURANCE COMPANY OF AMERICA, Third Party Plaintiff | ) ) ) ) |
| v. | ) ) ) |
| NAN YA TECHNOLOGY CORP., Third Party Defendant | ) ) ) |

Civil No. 3:01 CV 1317 (GLG)

August 19, 2002

## ZYGO CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO NAN YA TECHNOLOGY CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Third party defendant Nan Ya Technology Corporation ('Nan Ya') seeks summary judgment on the ground that it cannot be held liable on counterdefendant/third-party plaintiff Royal Insurance Company of America's ('Royal') claim. Remarkably, despite bringing a claim against Nan Ya, Royal has decided neither to oppose the summary judgment motion nor withdraw its action against Nan Ya. This is an obvious ploy by both Royal and Nan Ya to obtain a favorable ruling (on an unopposed motion) concerning the hotly disputed factual issue of whether defendant/counterplaintiff Zygo Corporation ('Zygo') released Nan Ya from liability. While Zygo has no real interest in whether Royal prosecutes its third-party action, it is plain that if Nan Ya's summary judgment motion is granted, unopposed, both Royal and Nan Ya will claim

that the determination has a collateral estoppel effect with respect to the release issue.[1] While Zygo maintains that any such ruling would not have a collateral estoppel effect, there would clearly be litigation concerning that issue. Therefore, since Nan Ya's summary judgment motion should be denied on the merits, Zygo respectfully submits this memorandum of law in opposition to this motion in order to move the litigation forward without getting sidetracked and incurring the costs associated with later litigating collateral estoppel issues.

## INTRODUCTION

This declaratory judgment action involves questions of insurance coverage under a marine cargo policy issued by Royal to Zygo. The disputed claim involves an atomic force microscope ('AFM') worth $690,000 that Zygo sold to Nan Ya that was damaged beyond repair during transit from the United States to Taiwan. Royal sued Zygo in a declaratory judgment action concerning coverage for the AFM. Zygo then counterclaimed against Royal seeking, among other things, the value of the destroyed AFM.

On October 9, 2001, Royal also brought a third-party action against Nan Ya, as the subrogated insurer to Zygo's rights against Nan Ya, for the full value of the AFM, contingent upon a judgment in Zygo's favor on the insurance coverage issue.

On June 13, 2002, Nan Ya filed the instant motion for summary judgment on Royal's third-party claim, essentially arguing that purported 'minutes' of a meeting held in Taiwan in November 2000 among representatives of Zygo, Nan Ya and Nan Ya's insurer amounts to a 'release' and Nan Ya therefore no longer owes Zygo the $690,000.

---

[1]  Zygo has no objection to the Court granting Nan Ya's motion as unopposed, so long as the Court also orders that the granting of the motion is not a determination of fact and had no collateral estoppel effect in this or any other litigation.

The Court should deny Nan Ya's motion for the following two reasons. First, as a preliminary matter, Nan Ya is essentially seeking an advisory opinion from the Court regarding a contingent claim that will not become ripe unless and until there is a finding of coverage in favor of Zygo. And second, as set forth in more detail below, there was no agreement by Zygo either to release Nan Ya from liability, or modify the sales contract. The gist of Nan Ya's claim appears to be that a document, written in Mandarin Chinese, is an unambiguous contract releasing Nan Ya from the obligation to pay Zygo $690,000. Nan Ya makes this claim despite its admission that it gave no consideration for the release. Further, the document Nan Ya relies on has no release language. Moreover, Nan Ya admits that after the November 2000 meeting it asked that Zygo send a formal letter confirming the parties' agreement at the meeting. The ensuing letter from Zygo's headquarters does not even mention the AFM in question, let alone release Nan Ya from a significant liability. If the document that came out of the November 2000 meeting is unambiguous, it is simply not a release or contract modification. And, to the extent that the writing is ambiguous, summary judgment is precluded because there are disputed issues of fact as to its meaning.

Nan Ya's summary judgment motion is full of sound and fury, but little substance. It is instructive to note at the outset that Nan Ya submits more than 70 exhibits in an effort to demonstrate that the "contract" is unambiguous. While it tries to put a spin on the meaning of emails and other correspondence, there is another side of the story that precludes summary judgment. There was simply no agreement to release Nan Ya from its clear obligation to pay for the AFM.

## FACTS

Zygo is in the business of designing and manufacturing, among other things, electro-optical measuring instruments and components. Zygo regularly ships its high-tech devices around the world. Nan Ya is a Taiwanese corporation and customer of Zygo that manufactures, among other things, computer chips.

In May 1999, Zygo procured from Royal a marine open cargo insurance policy (the 'Policy') effective May 1, 1999, and covering certain merchandise imported and exported by Zygo in connection with its business operations.

## THE AFM SHIPMENTS

In December 1999, Zygo contracted with Nan Ya for the sale of an Atom Force Microscope ('the first AFM'). See Affidavit of Lawrence Martin ('Martin Aff.'), ¶ 3. The total purchase price of the first AFM was $690,000. See id. The terms of the sale were as follows: FOB Delray Beach, Florida, with an 80% payment due prior to shipment, by letter of credit, and the remaining 20% payment due when Nan Ya accepted the shipment in Taiwan. See id. Nan Ya specified that Zygo use Lynden International to transport the first AFM from the United States to Taiwan.

In January 2000, Nan Ya advised Zygo that the first AFM had arrived in Taiwan seriously damaged. See id., ¶4. Specifically, the first AFM had been shipped in four separate boxes, and the main box had been destroyed, rendering the first AFM unusable.

Nan Ya insisted that Zygo ship a replacement AFM ('the second AFM') immediately, because Nan Ya was in the middle of a project for which the AFM was urgently needed. See id., ¶5. To that end, on or about January 31, 2000, Nan Ya provided a purchase order in the amount of $690,000 for the second AFM. See id., ¶6.

4

In early February, 2000, Zygo shipped the second AFM to Nan Ya. See id., ¶7. Due to Nan Ya's urgent need for the second AFM, Zygo did not require Nan Ya to obtain a letter of credit before shipping the second AFM. See id. Rather, Zygo shipped the second AFM on an open account basis, FOB U.S. Airport. See id. The second AFM was also transported at Nan Ya's instructions from the United States to Taiwan by Lynden International via China Airlines.

Around mid-February 2000, Nan Ya advised Zygo that the second AFM had arrived in a damaged and unusable condition, and refused to pay Zygo. See id., ¶8. Nan Ya also demanded that Zygo ship a third AFM, claiming that Nan Ya's production capability was being negatively impacted. See id.

After being notified that the second AFM had arrived damaged, Zygo personnel went to Taiwan to evaluate the potential cause and extent of the damage. Zygo determined that the most likely cause of the damage was that the AFM had been dropped and not handled properly. The reports submitted by Nan Ya and its insurer, Taiwan Fire & Marine concede that the AFMs had not been properly handled.[2] Nan Ya has conceded that "Zygo performed it obligations under the . . . Air Freight contract. . . ." See Nan Ya's Complaint Against Lynden Air Freight and China Airlines. ¶25 (attached hereto as Exhibit 1). Nan Ya also concedes that the damage to the second AFM was caused by Lynden Air Freight and China Airlines. Id. at ¶¶15, 26, 30, 33.[3]

Zygo then shipped a third AFM ('the loaner AFM') to Nan Ya in late February 2000 on a loaner basis. See id., ¶9. The loaner AFM was to be returned to Zygo by June 30, 2001. See id.

---

[2] The inspection report submitted by Nan Ya (Ku Decl. Ex. 2) states:

> "The prime cause of the damage is distinctly due to heavy shock/bump, rough handling of workers, tumble onto ground surface through the flight voyage, transferring/warehousing into storage of Air Cargo Terminal of CRS Int'l Airport."

[3] The withdrawn pleading against Lynden Air Freight and China Airlines is an admission. See e.g., United States v. McKeon, 738 F.2d 26, 31 (2d. Cir. 1984).

Immediately after shipping the loaner AFM, Zygo made efforts to collect from Nan Ya the amounts due to it for the first and second AFMs (The first AFM and the second AFM are referred to collectively as the "Damaged AFMs"). See id., ¶10. These efforts occurred via email, telephone and regular mail, with the majority of communications taking place via email and over the telephone. See id.

## ZYGO'S COLLECTION EFFORTS

In light of Nan Ya's failure to pay for the second AFM, on or about March 7, 2000, Zygo, through its insurance broker and agent, Mathog & Moniello ("M&M"), put Royal on notice of its claim regarding the second AFM. See id., ¶ 11. Specifically, under the "Contingency Clause" of the Policy, Zygo expected that Royal would pay the amount that Zygo's customer, Nan Ya, was refusing to pay, and take steps necessary to collect that debt. See id., ¶¶15-16.

Nan Ya refused to return the loaner AFM to Zygo on June 30, 2000 as previously agreed. See id., ¶13; Zygo's Statement of Genuine Issues of Material Fact in Dispute ("Disputed Facts"), ¶1. Moreover, Nan Ya continued to hold the loaner AFM hostage during the summer and fall of 2000. See Martin Aff., ¶13; Disputed Facts, ¶1. Accordingly, Zygo now found itself pursing Nan Ya not only for payment for the damaged AFMs, but also for return of the loaner AFM. See Martin Aff., ¶13. Moreover, Nan Ya's refusal to return the loaner AFM created an additional financial hardship for Zygo, because Zygo had a customer willing to lease the Loaner AFM for more than $13,000 per month. See id., ¶14.

In July 2000, Billy Wu of Lee-Tech advised Zygo that Nan Ya's insurer had agreed to cover the cost of the first AFM. As a result, Nan Ya agreed in principle to pay Zygo the remaining amount due on the first AFM, less an agreed upon salvage value. In light of Nan Ya's steadfast refusal to pay for the second AFM and the fact that Zygo had filed a claim with Royal

over this unit, Zygo understood that the disposition of the second AFM was in Royal's hands. Zygo's communications throughout the summer and fall of 2000 reflect this understanding. See id., ¶¶20, 22-23.

At Nan Ya's request, Zygo took the necessary steps to determine the salvage value of the two damaged AFMs, in order to fix the amount that was due and owing from Nan Ya. See id., ¶19. In addition, Larry Martin, Zygo's Staff Assistant to the President, approved the concept that the salvage values of both of the Damaged AFMs would be deducted from the amounts that were due from Nan Ya. See id., ¶20.

## THE NOVEMBER 2000 MEETING

In November 2000, after the salvage value of the two AFMs was determined, a meeting was held among representatives of Nan Ya, Nan Ya's insurer and Zygo. See id., ¶24; Affidavit of Timothy R. Smith, ('Smith Aff.') ¶6. The purpose of the meeting was to establish the salvage values of the damaged AFMs and to arrange for the return to the United States of all the AFMs, to the extent that Nan Ya decided not to retain either of the damaged AFMs or purchase the Loaner AFM. See Smith Aff., ¶6; Disputed Facts, ¶2. Timothy Smith, Zygo's Regional Director in Taiwan and Korea, was Zygo's representative at the meeting. See Martin Aff., ¶24; Smith Aff., ¶6. Mr. Smith reported to Mr. Martin. See Martin Aff., ¶24; Smith Aff., ¶7. Mr. Martin authorized Mr. Smith to put forth Zygo's position at the meeting, as follows: a) Zygo would agree to offset the amount that Nan Ya owed on the first AFM by the average salvage value of the two damaged AFMs; b) Zygo had placed a claim with its insurer concerning the loss of the second AFM and the matter of collecting the amount due from Nan Ya was in the insurer's hands; and c) Zygo demanded return of the loaner AFM, but at the time was not expecting payment from Nan Ya's use of the loaner AFM, even though Nan Ya had held it for months after it was

due to be returned. See Martin Aff., ¶24; Smith Aff., ¶7. Mr. Smith was not authorized to compromise Zygo's claim with regard to the second AFM. See Martin Aff., ¶24; Smith Aff., ¶10.

The meeting was conducted in Mandarin Chinese. See Smith Aff., ¶6; Disputed Facts ¶5. Mr. Smith does not speak Mandarin and did not understand what was said by the Nan Ya representatives. See Smith Aff., ¶6; Disputed Facts, ¶5. Although Stan Lay of Lee-Tech attempted to translate for Mr. Smith, at no time did anyone attempt to provide Mr. Smith with a formal, word-for-word translation as the discussions were transpiring. See Smith Aff., ¶6. Moreover, Mr. Smith had no way of knowing whether his words were translated correctly at the meeting. See Smith Aff., ¶6; Disputed Facts, ¶5.

At the conclusion of the meeting, Mr. Smith was presented with a document written entirely in Mandarin that purported to summarize the points of the meeting. See Smith Aff., ¶11; Disputed Facts, ¶7. Because Mr. Smith does not read Mandarin, he was forced to rely upon a cursory verbal translation of the points contained in the document. See Smith Aff., ¶11; Disputed Facts, ¶7. There is no evidence that the verbal translation given to Mr. Smith during that meeting was identical, or even similar to the translations that have been submitted by Zygo with its motion. Mr. Smith signed the document to indicate his attendance at the meeting. See Smith Aff., ¶11; Disputed Facts, ¶7. At no time was the document presented to Mr. Smith as any kind of legal document, agreement or release, nor did he believe it to be so. See Smith Aff., ¶12; Disputed Facts, ¶8. More importantly, the terms of the document were never reviewed or approved by Mr. Martin or any Zygo representative with authority to compromise Zygo's claim for the second AFM. See Martin Aff., ¶¶27-29; Disputed Facts, ¶9. In fact, Mr. Martin was unaware of the existence of the document until Nan Ya produced it in this lawsuit. See Martin Aff., ¶27; Disputed Facts, ¶9.

8

Mr. Martin received reports that at the November meeting, Nan Ya agreed to the proposed formula for establishing the amount due from Nan Ya for the first AFM, and further agreed to pay Zygo the remaining amount due on the first AFM using this formula. See Martin Aff., ¶25. Nan Ya requested that Mr. Martin write a letter confirming Zygo's agreement to offset the salvage value on the first AFM. See Martin Aff., ¶25; Disputed Facts, ¶11. Accordingly, on November 15, 2000, Mr. Martin sent a letter to Nan Ya confirming Zygo's agreement to offset the balance due on the first AFM by $28,925.00 (the average salvage value of the Damaged AFMs), provided that payment would be made by December 21, 2000. See Martin Aff., ¶25. Notably, Nan Ya never requested that Mr. Martin confirm in writing any purported agreement or compromise with respect to the second AFM, and the November 15, 2000 letter makes no mention of the second AFM. See Martin Aff., ¶29; Disputed Facts, ¶11.

Mr. Martin also received reports that Nan Ya had agreed at the November meeting to return the Damaged AFMs as well as the loaner AFM to Zygo. See Martin Aff., ¶25. Mr. Martin understood that the foregoing represented the complete terms of any agreement between Nan Ya and Zygo. See id.; Disputed Facts, ¶12. Notably, Mr. Martin was not informed by Mr. Smith -- or anyone else -- that there was any agreement to release Nan Ya from liability for the second AFM, or to in any way change the terms of the deal such that Nan Ya did not have to pay for the second AFM. See Martin Aff., ¶26; Disputed Facts, ¶10. Indeed, any such agreement, which would have consisted of releasing a nearly $700,000 claim in exchange for zero payment, would have been clearly beyond the scope of the authority given to Mr. Smith. See Martin Aff., ¶25; Disputed Facts, ¶6.

It was not until the instant lawsuit was filed by Royal that Zygo first learned of Nan Ya's claim that Zygo had released Nan Ya of its obligation to pay for the second AFM.[4]

## ARGUMENT

The facts set forth above and the concessions made in Nan Ya's moving papers illustrate that there was no release or modification of Nan Ya's obligations to pay for the second AFM. Specifically:

- Nan Ya admits that the second AFM was damaged by Lynden Air Freight and/or China Airlines.

- Nan Ya was holding the loaner AFM hostage, and costing Zygo more than $13,000 a month in rent. Nan Ya agreed to pay for the first AFM after months of intransigence. Zygo's position always was that Nan Ya purchased both AFMs F.O.B. U.S. Airport and had the risk of loss.

- The translation of the meeting minutes demonstrates that there was no release, or contract modification. In any event, the translation is ambiguous because the translated statement that "payment for goods need not be made" has no time frame and is susceptible to more than one meaning in the context of this case. Also, there is no evidence that these words were used in translating the document for Zygo's representative at the meeting. Moreover, these terms are not inconsistent with Zygo's position that it had placed the matter in the hands of its insurer.

- Zygo's representative at the November 2000 meeting had no authority to compromise Zygo's claim for the second AFM.

- Nan Ya concedes that Zygo received no consideration for the purported November "agreement."

- Nan Ya asked for a confirming letter from someone in authority at Zygo concerning the November "agreement." The confirming letter relates only to the first AFM. Nonetheless, Nan Ya would have this Court believe that an agreement was reached as to both AFMs, but Nan Ya needed confirmation only with the with regard to the first AFM (with a value to Nan Ya of $28,925), and that the alleged settlement concerning the second AFM (worth more than $650,000) could go undocumented except for the "meeting minutes."

---

[4] Although Nan Ya goes on at some length in its brief and statement of "undisputed" facts regarding Zygo's alleged communications with Royal, such facts are clearly immaterial to Nan Ya's motion. Zygo concedes in its Rule 9(c) statement that this information is not material. Accordingly, all of the detail at pages 10-12 of Nan Ya's brief should not be considered by the Court.

In sum, the basis of Nan Ya's motion is that there was an agreement at the November 2000 meeting by which Zygo released Nan Ya from liability for paying for the second AFM. As described below, this premise is wrong and summary judgment should be denied.

## I.    Summary Judgment Standard

Summary judgment may be granted only if the moving party can show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of demonstrating that no genuine dispute exists on any material factual issue. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Courts describe summary judgment as a "drastic procedural weapon because 'its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988) (quoting Donnelly v. Guion, 467 F.2d 290, 291 (2d Cir. 1972)).  Thus, in considering a summary judgment motion, the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994).  If the record contains evidence from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper.  Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995).  In particular, in cases involving the interpretation of a contract, "[w]here contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] improper." Aetna Casualty & Surety Co. v. Giesow, 412 F.2d 468, 471 (2d Cir. 1969).  See also, e.g. Bank of America National Trust & Savings

11

Assoc. v. Gillaizeau, 766 F.2d 709, 714-15 (2d Cir. 1985); Wards Co. v. Stamford Ridgeway Assoc., 761 F.2d 117, 120 (2d Cir. 1985).

**II.    There was no agreement at the November 2000 meeting regarding Nan Ya's obligation to pay for the Second AFM.**

There was no agreement to release Nan Ya at the November 2000 meeting and the minutes do not memorialize any such agreement. Tim Smith, Zygo's representative at the meeting, swore in his affidavit that he did not agree to release Nan Ya from liability for the second AFM. See Smith Aff., ¶9. Second, he did not have authority to so release Nan Ya. See Smith Aff., ¶10. Third, Mr. Smith did not understand that he was signing a contract, and thought that his signing indicated his presence at the meeting. Smith Aff., ¶ 11. Fourth, the translated meeting minutes do not reflect all of the discussions had by the parties at the November 2000 meeting. Indeed, Mr. Smith's affidavit states that the parties did discuss the return of the loaner AFM. See Smith Aff., ¶14. But, the translated meeting minutes make no mention of the loaner AFM. Fifth, the translation of the meeting minutes states at the very top of the page that the 'main content' of the meeting was the "discussion of the scrap value" of the Damaged AFMs. Graves Declaration, Exhibit 3. This language is consistent with Zygo's understanding of the purpose of the meeting, and wholly inconsistent with Nan Ya's claim that there was an agreement releasing Nan Ya from liability. Sixth, Nan Ya was well aware that Zygo had referred the matter to its insurer. See e.g. Graves Decl. Ex. 40. Seventh, after the meeting Nan Ya asked for a formal letter from Zygo's headquarters concerning the offset for scrap value. See e.g. Graves Decl. Ex. 14. Notably, Nan Ya did not ask for formal confirmation of the alleged discharge of a $650,000 obligation. Eighth, Zygo's confirming letter only mentions the scrap value offset, not the purported "release." Martin Aff., ¶25.

Accordingly, there was no agreement regarding liability for the second AFM at the November 2000 meeting. Certainly, there are at least disputed issues of fact as to whether there was ever such agreement. To the extent the November meeting minutes are at all accurate, they reflect only the fact that Nan Ya agreed to return the first and second AFMs. The parties had agreed to its scrap value and Zygo agreed to credit that value to the Damaged AFMs. Zygo was expecting to be paid by its insurer and its insurer could then seek payment from Nan Ya. Simply put, there was no agreement other than the determination of the salvage value and the offset against the amounts due.

**III.    Zygo did not release Nan Ya.**

Nan Ya's claim that the November 2000 meeting minutes is a release is wrong for a number of reasons. First, there is no language in the document representing Zygo's intent to immediately and forever discharge Nan Ya's obligation for the second AFM. Second, even if the Court can discern some intent to release Nan Ya, there was no consideration given in support of any purported release. Third, the translation of the November 2000 meeting minutes is ambiguous and there is a fact question as to whether it is a release.

**A.**     **The meeting minutes are not a release.**

This is the document that Nan Ya claims is an unambiguous release that discharged a

$650,000 liability:



P0002515

NY 000018

14

There is simply no precedent that would enable this Court to hold, as a matter of law, that these meeting minutes—not contract—written in Mandarin constitute an unambiguous release of Nan Ya's obligation to pay for the second AFM.

The comments to the Restatement (Second) of Contracts § 284 provide that "[a]lthough no particular form is required for an agreement to discharge a duty, the term 'release' has traditionally been reserved for a formal written statement by an obligee that the obligor's duty is discharged." Restatement (Second) of Contracts § 284 cmt. a (1981). This general statement of the law is consistent with the Second Circuit's view that a release must "contain an explicit, unequivocal statement of a present promise to release defendant from liability." Bank of America, 776 F.2d at 713 (applying New York law). A valid release must be "clear and unambiguous on its face and . . . knowingly and voluntarily entered into . . . ." Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 463 (2d Cir. 1998). The translated meeting minutes simply do not constitute a release.

Nan Ya's argument that the meeting minutes constitute an unambiguous release is that the meeting minutes are a contract, and the current *translation* (by language experts, not businessmen whose fluency in English has not been established) of the minutes state "payment for goods need not be made" amounts to a release. Both of these premises are incorrect. There was no agreement to release Nan Ya. And, even the current translation of the language in the minutes does not constitute a release. To "support" its argument, Nan Ya disingenuously says that the various translations of the minutes "all . . . state that Zygo *released* Nanya from any obligation to pay for the second device." Nan Ya's Memorandum of Law in Support of Motion for Summary Judgment ("Nan Ya Br."), at p. 15. (emphasis added). That simply is not true. The translations do not use the word "release." Nan Ya needs to rely on its self-serving *interpretation* of a translation to even make the argument that the minutes constitute a release.

15

The actual document and its translation simply do not indicate that the minutes are an unambiguous release. Unambiguous language must have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000) (citations omitted). The translation of the meeting minutes does not have such a precise meaning. There are any number of interpretations that can be placed on them. Looking only at the seven operative words, it is not possible to conclude that they only mean that Zygo intended to release Nan Ya from a large liability. The terms "release" and "discharge" are not used. The language used does not state that Zygo would never seek to recover the purchase price of the second AFM, or that there was an agreement not to sue Nan Ya. Moreover, Nan Ya has not cited any cases in which a court found an unambiguous release in which the terms "release" or "discharge" were not used in the operative document.

The Second Circuit Court of Appeals has stated that "because the 'law books look with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing], a release which purports to excuse a party from responsibility for misconduct is subject to the 'closest of judicial scrutiny." Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 515 (2d Cir. 2001). Such close scrutiny would necessarily reveal that there is no language in the translation that is commonly used to affect a release or discharge. Certainly, such strict scrutiny should not result in a finding that the vague language of the translation, let alone the original, reflects an actual intent to absolve Nan Ya from paying a debt of more than $650,000. Also, since the meeting minutes do not contain words generally associated with a release, the document should be construed against the drafter, Nan Ya. See, e.g. Rund v. Melillo, 63 Conn. App. 216, 222, 772 A.2d 774, 778 (2001).

16

Nan Ya's citations in support of its claim that the translated meeting minutes are unambiguous are inapposite. See Nan Ya Br. at 14-16. Most of the cases do not involve decisions on motions for summary judgment. All of the cases concern highly detailed, negotiated contracts or settlement agreements in which particular terms are being construed. Further, these cases do not involve the fundamental question of whether the documents even constitute a release.

For example, in <u>Talmadge Bros., Inc. v. Iroquois Gas Transmission Systems, L.P.</u>, 252 Conn. 479, 746 A.2d 1277 (Conn. 2000), (Nan Ya Br. at 14), the Court found the following language unambiguous with respect to a release:

> [T]hey release the defendant "from all actions, causes of action, debts, sums of money, agreements, promises, trespasses, damages judgments, executions, claims and demands whatsoever, in law, admiralty or equity . . . *by reason of any matter, cause or thing whatsoever, incident to the construction of the Pipeline, and any acts in connection therewith,* including, without limit, loss of or damage to oysters or other forms of shellfish . . . ."

<u>Id.</u> at 499, 746 A.2d at 1289 (emphasis in original) (citations omitted). Notably, this release contained traditional language that is understood to express a party's intent to discharge an obligation. Even with such express language the Court found it persuasive that "[a]fter a lengthy drafting process, and on the advice of counsel, the parties deliberately chose to use those particular words in the release provision." <u>Id.</u> at 500, 746 A.2d at 1289. Under these conditions the Court found the release unambiguous and that there was a "presumption of definitiveness," <u>Id.</u> at 497, 746 A.2d at 1288, in light of the manner in which the parties memorialized the agreement.

Obviously, in the present case, traditional release language was not used. Also, the meeting minutes were not the result of a drafting process that took advantage of the advice of

counsel. Rather, the minutes are (perhaps) on-the-spot notes, written in a foreign language. There was no give-and-take concerning the words that were used. Indeed, Zygo's representative at the meeting did not understand the minutes to be any sort of contract and signed the document only to note his presence at the meeting. See Smith Aff., ¶11.

Nan Ya's other cases (Nan Ya Br. at 14-15) are likewise inopposite.[5] See Pesino v. Atlantic Bank of New York, 244 Conn. 85, 709 A.2d 540 (Conn. 1998) (not a summary judgment motion and Court found that terms "recoveries" and "settlement" in detailed negotiated settlement agreement are not ambiguous); Lee v. BSB Greenwich Mortgage Limited Partnership, 267 F.3d 172 (2d Cir. 2001) (not a summary judgment motion and court finds that term "gross sales" is not ambiguous in negotiated stipulated judgment relating to multimillion dollar real estate transaction).

**B.    A valid release requires consideration.**

Even if the Court were willing to entertain the notion that the meeting minutes contained language that expressed Zygo's intent to release Nan Ya, there was no consideration for such an agreement. It is settled law that the party giving the release must receive something of value to which it was not otherwise entitled. Chaput v. Unisys Corp., 964 F.2d 1299, 1301 (2d Cir. 1992); Gorman v. Earmark, Inc., 968 F. Supp. 58, 62 (D. Conn. 1997). For consideration to exist in the exchange of a release, there must be mutual concessions. DiMartino v. City of Hartford, 636 F. Supp. 1241, 1249 (D. Conn. 1986). The adequacy of the consideration received "turns not on whether a party received as much as he might have had he litigated the dispute and won, but,

---

[5]    Nan Ya also cites two cases in which a court finds that the terms in an insurance agreement are unambiguous. Ranger Insurance Co. v. Kovach, 63 F.Supp.2d 174 (D. Conn. 1999); Hammer v. Lumberman's Mutual Casualty Co., 214 Conn. 573, 573 A.2d 699 (1990). However, under Connecticut law it is the "function of the court to construe the provisions of the contract of insurance." Ranger Insurance, at 181. Moreover, the meeting minutes in this case, written in Mandarin, are a far cry from the detailed insurance contracts that are the subject of those cases. Likewise, in Dubinsky v. Citicorp Mortgage, Inc., 48 Conn. App. 52, 708 A.2d 226 (Conn. App. Ct. 1998), the court

rather, whether he received something of value *to which he was not already unquestionably entitled*." Id. at 1250 (emphasis added).

If the Court were to accept Nan Ya's view, Zygo will have received nothing in exchange for the purported release of its approximately $650,000 claim. All that Nan Ya did at the November meeting was agree to pay off the first AFM (after it had already paid more than $552,000), return the loaner AFM (that was due to be returned about four months earlier), and return the Damaged AFMs (for which it had received an offset of the salvage value in the purchase price). Zygo was already entitled to the payment for the first microscope and return of the loaner. The return of the Damaged AFMs was in exchange for a setoff against the purchase price—not a $650,000 compromise.

Nan Ya does not even try to argue that there was consideration for the "release." At page 15, footnote 6 of its brief Nan Ya states that "the Court need not ask whether there was consideration for the compromise, because the November 13 agreement functioned as a modification or rescission of the prior contracts for the sale of goods." Thereafter, Nan Ya never claims that there was consideration for the release. But, Nan Ya cannot have it both ways. It cannot assert throughout its papers that the meeting minutes operate as a release, only to concede that there was no consideration. Understanding that the absence of consideration defeats its claim, it then states (only in the footnote) that the "agreement" is really a modification or recession, not a release. See, infra at 24-26. But, a release is different from a modification or rescission. And, as the Second Circuit has made clear, the terms of a release must be strictly construed. See Golden Pac. Bancorp, 273 F.3d at 515. If releases could simply be termed modifications of the underlying agreement, the consideration requirement would be reduced to a nullity.

---

found that a standard clause in a mortgage commitment form was unambiguous insofar as it merely recited the applicant's right under Connecticut law to receive a copy of a real estate appraisal.

Nan Ya's concession that there was no consideration is the only plausible view. The sales contracts were F.O.B. U.S. Airports meaning that Nan Ya had the risk of loss during the shipment to Taiwan. Conn. Gen. Stat. § 42a-2-319. Nan Ya has submitted no evidence that the AFMs were damaged when delivered by Zygo to Lyden International for transport on China Airlines. Further, Nan Ya concedes that the cause of the damage to the second AFM was "rough handling." Ku Decl. Ex. 2. Finally, Nan Ya also admitted that the damage was caused by Lynden International and China Airlines, not Zygo. See Nan Ya's Complaint against Lynden Air Freight and China Airlines ¶¶ 15, 26, 30, 33.

### C. The translated meeting minutes are ambiguous.

There is no release language in the translated meeting minutes and there is no consideration for a release. While Zygo contends that there was no release and the minutes demonstrate that fact, at the very least, the translated minutes are ambiguous and therefore Nan Ya's summary judgment motion may not be granted.

Nan Ya claims that the purported "agreement" contained in the translated meeting minutes is unambiguous. But its own brief belies that argument. It spends pages reciting selected excerpts of emails and correspondence and has submitted more than 70 exhibits trying to make a stretched patchwork that fits its theory. See Nan Ya Br., at pp. 3-12, 16-18. It then claims that the Court may look to this information as an interpretative aid. But, virtually none of the cases Nan Ya relies on for this proposition concern summary judgment motions. Accordingly, that precedent is meaningless with regard to what a court may consider in deciding a summary judgment motion. See cases cited at Nan Ya Br. at 16, 21.[6] Rather, when there is an ambiguity

---

[6] Only Reconstruction Finance Corp. v. United Distillers Products Corp., 113 F. Supp. 468 (D. Conn. 1952), aff'd, 204 F.2d 511 (2d Cir. 1953) concerns a summary judgment motion. There, the court construed a wartime government contract for the supply of ethyl alcohol, then a strategic material. The controversy concerned the price term of the supply contract. The court granted summary judgment in part, finding that the affidavits either did not

that permits the court to examine extrinsic evidence, summary judgment must not be granted. See, e.g. Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993); Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

By suggesting that this extensive evidence is relevant, Nan Ya essentially concedes that the minutes are ambiguous. Generally, ambiguous language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Golden Pac. Bancorp, 273 F.3d at 516. The question of whether the language in a release is ambiguous is a question of law. Albany Sav. Bank v. Halpin, 117 F.3d 669, 672 (2d Cir. 1997); Tourangeau v. Uniroyal, Inc., 117 F. Supp. 2d 178, 181 (D. Conn. 2000).

Nan Ya contends that the meeting minutes purport to reflect an unambiguous agreement that Nan Ya never had to pay for the second AFM. But it is equally reasonable that the discussions, if any, on this point could have been that Nan Ya need not immediately pay for the second AFM in order to obtain the offset of the salvage value, and that the matter would be handled by Zygo's insurance company in the usual course. Neither Nan Ya nor Zygo had any use for the second AFM. It was useless to Nan Ya and while it possessed the AFM, it owed Zygo the full contract amount. Zygo also had no use for the AFM, but had a buyer at salvage value. While it was willing to take back the machine and credit Nan Ya with the salvage value, there was no reason it would give up its claim for the full amount simply to effectuate the disposal of a worthless machine. Moreover, Zygo expected its insurance company would pay the claim. Any

comply with Rule 56, or did not create a fact issue. The present case there was either no agreement concerning the second AFM or there are obviously factual disputes in the record including, but not limited to, the fundamental question of whether there was any agreement between Nan Ya and Zygo with respect to the second AFM.

attempt to recoup that amount from Nan Ya would be Royal's obligation. Further, Nan Ya was adamantly refusing to return the loaner AFM.[7]

There are other indications in the translation that the meeting minutes are, at least, ambiguous:

- First, the document says at the top "meeting minutes" --- *not* "agreement" or "contract."

- Second, the "main content" of the meeting is the "discussion on disposition of scrap value." The document does not say that the main purpose of the meeting was to resolve any dispute concerning the payment of both sales contracts. Zygo always understood that the meeting concerned the scrap value. Martin Aff't; Smith Aff., ¶6.

- Third, the first three points under "Explanation" all *do* relate to the determination of scrap value.

  1. The first point identifies the scrap value of each machine;

  2. The second point indicates that Nan Ya's insurer agrees to pay the full amount for the first AFM less the average scrap value.

  3. The third point details the amount due based on the 80% that had already been paid less the scrap value.

- Fourth, the last point also relates to salvage value. The language is consistent with Nan Ya returning the second AFM without paying, at that time, the contract amount, minus the salvage value.

The words in the translated meeting minutes are certainly ambiguous and can be read to be something other than a release. Indeed, courts have found releases to be ambiguous even when they actually contain words that are generally associated with releases, and not the shorthand of the translated minutes.

---

[7] At pages 18-21 of its brief, Nan Ya makes an argument with respect to agency. The point of this argument is mysterious. Messrs. Martin and Smith were agents of Zygo with respect to the November meeting. Mr. Smith did not have authority to compromise Zygo's claim with regard to the second AFM, and did not. Mr. Martin sent the follow-up confirming letter that made no mention of the Second AFM. Mr. Wu was not even at the November 2000 meeting at which Nan Ya claims the agreement was made. His role in any preliminary conversations is thus irrelevant to the issue of any agreement was made at that time.

For example in <u>Golden Pac. Bancorp</u> the Second Circuit found the following language ambiguous:

> [Bancorp] . . . hereby releases the [FDIC] in its corporate capacity and in its capacity as receiver of the [Bank] . . . (c) from any and all claims which Bancorp ... has or may have arising from or with respect to the decision of the [OCC] to close the Bank on June 21, 1985.

<u>Golden Pacific</u>, 273 F.3d at 513. The Court found that there could be more than one reasonable interpretation of the release. Even though the release contained express language relating to the FDIC's role as a receiver, the Court determined that the language did not unambiguously release claims that might arise against the FDIC as a receiver.

Likewise, in <u>Bank of America</u> the Court found ambiguous a letter that contained the following: "In other words, you are not indebted to me for any of the matters referred to in any of these letters." 766 F.2d at 711. The Court found that the letter did not demonstrate, as a matter of law, that the author intended to affect a release.

Even <u>Garza v. Marine Transport Lines, Inc.</u>, 861 F.2d 23 (2d Cir. 1988), cited by Nan Ya (Nan Ya Br. 15), illustrates this principal. In <u>Garza</u>, the Second Circuit reversed the entry of summary judgment when the trial court found that the terms in a standard maritime repair contract unambiguously imposed a 60 day time limitation on indemnification claims. The Court found that there was more than one reasonable interpretation of the contract taken as a whole and therefore summary judgment was improper. There, the disputed phrase concerned an interpretation of the term "loss or damage." The plaintiff contended and the trial court concluded that the term referred to death or personal injury. The defendant contended that it could refer to damage to the vessel of other loss by the owner. The Second Circuit determined that both were reasonable interpretations, extrinsic evidence was admissible as an interpretive aid, and therefore it was improper to grant summary judgment. <u>See also</u> e.g., <u>Albany Savings Bank, FSB v.</u>

Halpin, 117 F.3d 669, 673 (2d Cir. 1997) (court finds the term "claim" ambiguous in a release);

Nonnenmann v. City of New York, 174 F.Supp. 2d 121, 128 (S.D.N.Y. 2001) (release

ambiguous where court cannot interpret the scope of release).

    If detailed language found in the above-referenced cases is found to be ambiguous, the

document in question is certainly ambiguous as to whether it even is a release. "Where

reasonable minds could be said to differ because the language the parties used in their written

contract is susceptible to more than one meaning -- each as reasonable as the other -- and where

extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact."

Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993).

## IV.    The meeting minutes do not constitute a modification of the sales contract for the Second AFM.

    In a footnote Nan Ya suggests that the translated meeting minutes are actually a

modification or rescission of the sales contract.  This is an obvious attempt to escape the strict

scrutiny that courts apply to purported releases.  It is also an obvious attempt to get around the

fact that there was no consideration for the purported release.  This argument must fail for at

least two reasons.  First, giving effect to Nan Ya's interpretation of the translated meeting minutes

would completely rework the original contract so that no vestige of the original agreement

stands.  Thus, the minutes would not be a modification but rather a new contract (a release),

subject to the consideration requirements of any stand-alone contract.  Second, even if this

statement is considered a modification of the original contract, it is not valid since the

24

modification was effectively extorted when Nan Ya held hostage the third microscope, loaned in good faith by Zygo.[8]

## A. The minutes do not memorialize an agreement to modify

Nan Ya does not even try to explain how the meeting minutes could constitute a modification or rescission of both sales contracts. See Nan Ya Br. at 15 n.6. The terms that Nan Ya is proposing the Court adopt is that despite the fact that Zygo fully performed and made two FOB shipments, those contracts were "modified" by Nan Ya paying for one, but not the other. That deal would be tantamount to no modification of the first contract, and a release as to the second. There is no commercial reason that Zygo decided, without consideration, to modify the sales contract (that it had already performed) to provide that even though Nan Ya bargained for the risk of loss of the AFM, Zygo simply decided to accept a ruined AFM instead of about $650,000. That is a fantasy without support in fact or law.

There is no language in the translated meeting minutes that indicate that the parties intended to modify the sales contract. This is unambiguously not a modification. "A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract, cancels some of them, but leaves the general purpose and effect undisturbed." Chi. Coll. of Osteopathic Med. v. George A. Fuller Co., 776 F.2d 189, 208 (7th Cir. 1985) (cited by Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots, 878 F.2d

---

[8] Nan Ya tries to suggest that the purported "agreement" was a rescission of the two sales contracts. That cannot be so, because the first contract was performed. Also, the second contract was not rescinded because Zygo performed. This principle is illustrated in comment a, illustration 2 of the Restatement (Second) of Contracts § 283:

> A and B make a contract under which A promises to paint B's house and B promises to pay $1,000. After A has finished the work, B's financial condition has become impaired, and A tells B, "You need never pay me the $1,000 that you owe me." There is no agreement of rescission and B's duty to pay A $1,000 is not discharged. The result is the same if the original contract results from B's offer to pay A $1,000 if A paints B's house and A's acceptance by doing the work.

41, 46 (2d Cir. 1989)).  In the present case, if one were to accept Nan Ya's reading, then the

original contract would be effectively nullified.  The translated meeting minutes do not explicitly

modify or rescind the previous contracts and any intent to do so cannot be read into this

document.  "For a valid modification, there must be mutual assent to the meaning and conditions

of the modification and the parties must assent to the same thing in the same sense if they are to

vary the contract in any way." Maluszewski v. Allstate Ins. Co., 640 A.2d 129, 133, 34 Conn.

App. 27, 34 (Conn. 1994) (quoting Lar-Rob Bus Corp. v. Fairfield, 170 Conn. 397, 402, 365

A.2d 1086 (1976)).  There can be no argument that the two sentences in Nan Ya's translation of

the minutes reflect mutual assent and a meeting of the minds to "modify" the sales contract.

Again, the minutes are unambiguous to the extent that there is no reasonable interpretation that it

is a modification of the sales contract.  But, ultimately "[w]hether the parties to a contract

intended to modify the contract is a question of fact" for the jury to decide.  Herbert S. Newman

and Partners, P.C., v. CFC Constr. Ltd. P'ship, 236 Conn. 750, 762, 674 A.2d 1313, 1320 (1996).

Thus, summary judgment is not an appropriate remedy where there is a factual dispute as there is

here.

### B. If the meeting minutes have any legal significance, Nan Ya did not act in good faith.

Zygo denies that it ever agreed, in words or substance, to release Nan Ya or modify the

sales contract for the Second AFM.  However, to the extent that the Court entertains the notion

that the meeting minutes have any legal significance, Zygo contends that it was essentially

coerced into signing the document because Nan Ya was holding the valuable loaner AFM

hostage.  As noted above, that machine was worth about $700,000 and Zygo had a customer

willing to rent it for $13,000 a month.  Accordingly, the meeting minutes cannot constitute a

---

Restatement (Second) of Contracts § 283 cmt. a, illus. 2 (1981).

26

modification of the contract under the Uniform Commercial Code because it was not procured in good faith.

Uniform Commercial Code § 2-209 (codified at Conn. Gen. Stat. § 42a-2-209 (2002)) relates to modifications, rescissions, and waivers of previously created sales contracts. Generally, the parties must exchange something of value to which they are not otherwise entitled in order for a contract modification to be valid. See Lamb v. Emhart Corp., 47 F.3d 551, 559 (2d Cir. 1995) (stating that "material modifications of a contract require additional consideration."). However, section 2-209 states that any modification under this statute "needs no consideration to be binding." Conn. Gen. Stat. § 42a-2-209(1) (2002). Since additional consideration is not necessary, any modification must be the product of good faith. See Conn. Gen. Stat. Ann. § 42a-2-209 cmt. 2 (West 2002); Conn. Gen. Stat. § 42a-1-203 (2002). Thus, "[t]he effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a 'modification' without legitimate commercial reason is ineffective as a violation of the duty of good faith." Conn. Gen. Stat. Ann. § 42a-2-209 cmt. 2 (West 2002). This is necessary because "the performance of the parties to a contract is typically not simultaneous [and] one party may find himself at the mercy of the other unless the law of contracts protects him." Wisconsin Knife Works v. Nat'l Metal Crafters, 781 F.2d 1280, 1285 (7th Cir. 1986). In the present case, summary judgment is not appropriate since there is evidence that Nan Ya used coercive tactics in order to extort the purported "modification."

Extorted modifications will not be given the force of law.[9] For example, in Erie County Water Authority to Use and Benefit of Price Bros. Co. v. Hen-Gar Construction Corp., 473 F.

---

[9] Judge Posner's hypothetical in Wisconsin Knife Works v. National Metal Crafters best illustrates the need for the good faith requirement in contract modifications:

Supp. 1310 (2d Cir. 1979), the buyer contracted for 5,390 linear feet of concrete pipe at $50 per foot. This pipe was necessary to complete a sewer system. After the original contract had been entered into, the seller requested an upward price adjustment to $50.75 per foot. The buyer, thinking that this was his only potential source of this pipe, consented and the agreement was memorialized in writing. Once the pipe was delivered the buyer refused to pay the increased price and the seller brought suit. The seller moved for summary judgment, alleging, among other things, that the modification was valid and enforceable. The court refused to grant summary judgment, citing a factual dispute and evidence of the buyer's belief that it had no option but to comply with the seller's demands. "These allegations are sufficient to raise an issue as to whether the contract modification was extorted and, thus, unenforceable. Since a court cannot resolve factual disputes through a trial by affidavit, the validity of the modified contract cannot be resolved by a motion for summary judgment." Id. at 1313. Thus, the court allowed the jury to resolve the factual dispute over the alleged contract modification. See also IPEC, Inc. v. International Lithographing Corp., 869 F.2d 1080 (7th Cir. 1989) (holding that a price modification to a sales contract was not enforceable when the buyer did not act in good faith when it used economic duress to obtain a substantially lower price).

In the present case, extreme duress was placed on Zygo. Acting in good faith after the unsuccessful shipment of two microscopes, Zygo loaned Nan Ya a third unit. This microscope

---

If A contracts to build a highly idiosyncratic gazebo for B, payment due on completion, and when A completes the gazebo B refuses to pay, A may be in a bind – since the resale value of the gazebo may be much less than A's cost – except for his right to sue B for the price. Even then, a right to sue for breach of contract, being costly to enforce, is not a completely adequate remedy. B might therefore go to A and say, "If you don't reduce your price I'll refuse to pay and put you to the expense of a suit"; and A might knuckle under. If such modifications are allowed, people in B's position will find it harder to make such contracts in the future, and everyone will be worse off.

Id. at 1285.

was worth about $700,000. The loan was only to last until the end of June 2000 and by that time, Zygo had a customer willing to rent it for more than $13,000 a month. During the negotiations over the payment for the first two AFM shipments Nan Ya effectively held this loaner microscope hostage and it is now claiming that the signed meeting minutes were the ransom it demanded. Nan Ya claims that, in exchange for Zygo's release of its $700,000 claim, if agreed to pay off the balance owed for the first microscope and to return the loaner microscope. Zygo, however, was already entitled to both payment for the first microscope and return of the loaner. Therefore, if Nan Ya received anything by having Mr. Smith sign the foreign language meeting minutes after giving him an (unknown) cursory translation, it used its leverage of holding the loaner AFM to exert undue economic duress on Zygo and acted in bad faith. The translated meeting minutes that Nan Ya has produced cannot be construed as a valid modification or rescission of the original contract.

CONCLUSION

For the foregoing reasons, Nan Ya has not established that Zygo released it from liability for the second AFM. The meeting minute notes do not constitute a release or modification of the sales contract. Further, there are, at least, disputed facts concerning the nature and scope of any agreement reached between the parties. Accordingly, Nan Ya's summary judgment motion should be denied.

RESPECTFULLY SUBMITTED,

DEFENDANT,
ZYGO CORPORATION

By: _____
Ian E. Bjorkman, ct 11648
Lori Rittman Clark, ct 19908
Wiggin & Dana
One CityPlace
Hartford, CT 06103-3402
Tel.: (860) 297-3700
Fax: (860) 525-9380
Its Attorneys