UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,       Case No.
                                           **CIV 3:01 1317 (JBA)**

                 Plaintiff,


       - against -


ZYGO CORPORATION,

                 Defendant.


-----------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

                 Third-Party Plaintiff,


       - against -


NAN YA TECHNOLOGY CORPORATION,

                 Third-Party Defendant.
-----------------------------------------------------------------X


**ROYAL INSURANCE COMPANY OF AMERICA'S**
**LOCAL RULE 56(a)(2) STATEMENT IN SUPPORT OF ITS OPPOSITION**
**TO ZYGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


**I.**    **Response to Zygo's Local Rule 56(a)(1) Statement**

           1.     Admit.

           2.     Admit.

           3.     Admit.

           4.     Admit.

           5.     Admit.

           6.     Admit.

           7.     Admit.

8.      Admit only that in late February 2000 Zygo shipped a third AFM to Nan Ya on a loaner basis, which was to be returned to Zygo by June 30, 2000. Further admit that Nan Ya needed an AFM urgently in order to perform calibration of manufacturing equipment being installed at its new $3 billion microchip wafer fabrication facility scheduled to begin operations soon. Ex. D (Smith at p. 47-51)[1]; Ex. E (Martin at p. 38-39). As there were very few manufacturers of AFM-type machines and the technology was relatively new to the industry, it was difficult if not impossible to obtain one of these on short notice. Ex. D (Smith at p. 51). Unless Zygo was able to deliver an AFM in good working condition to Nan Ya in time, Nan Ya might have to obtain such a machine from Veeco, a competitor of Zygo's, something Zygo very much wanted to avoid. See Ex. D (Smith at p. 90 & 108); Ex. E. (Martin at p. 42 & 74); Ex. UU (E-mail from Muckenhirn to Robinson of 1/28/00). Except as so admitted, deny the remaining statements in paragraph "8" of Zygo's Local Rule 56(a)(1) Statement.

9.      Admit only that after being notified that the second AFM had arrived damaged, Zygo personnel went to Taiwan to evaluate the potential cause and extent of damages. Except as so admitted, deny the remaining statements in paragraph "9" of Zygo's Local Rule 56(a)(1) Statement. Zygo's own agent, Billy Wu, thought that damage was likely caused by inadequate packaging. Ex. L (E-mail from Wu to Martin of 7/4/00); Ex. GG (Facsimile from Wu to Zygo of 2/15/00); Ex. HH (Facsimile from Wu to Zygo of 2/16/00). As set forth below, the adequacy of the packing is in dispute. Similarly, Nan Ya's experts determined the damage was caused by inadequate packaging. Ex. FF (Cathy Inspection Report 2/21/00); Ex. TT (Cathay Inspection Report of 2/19/00).

---

[1]  All references to exhibits refer to the exhibits annexed to the Affidavit of Geoffrey J. Ginos, executed July 29, 2004, submitted herewith.

10.    Deny. Zygo's Mr. Smith testified that it was his understanding Billy Wu settled the disputes between Nan Ya and Zygo pertaining to the two damaged AFMs. Ex. D (Smith at p. 216-17). As set forth below, a genuine issue of material fact exists as to whether Zygo attempted to collect from Nan Ya the amounts due to it for the First and Second AFMs, or instead, proposed various ways of settling said disputes, and ultimately settled the dispute over payment for the first and second damaged AFMs and the return of the loaner AFM.

11.    Admit.

12.    Admit.

13.    Admit only that Nan Ya refused to return the loaner AFM to Zygo on June 30, 2000, as per the terms of the loaner agreement Ex. II (Loaner Agreement), holding it hostage in order to pressure Zygo into agreeing to accept the loss of the second AFM as being for Zygo's account. Except as so admitted, deny the remaining statements and characterizations in paragraph "13" of Zygo's Local Rule 56(a)(1) Statement. Ex. AA (E-mails between Muckenhirn, Smith, and Monti of 6/26/00).

14.    Admit that Mr. Walch opined that the average salvage value for each of the damaged AFMs was $28,925.00, and otherwise deny paragraph 14.

15.    Deny inasmuch as Mr. Martin ultimately agreed that Zygo and Royal would bear the loss of the second damaged AFM.

16.    Admit.

17.    Admit.

18.    Deny inasmuch as more fully set forth below, a genuine issue of fact exists as to whether Zygo's agent, Billy Wu, in fact settled Zygo's disputes with Nan Ya prior to the November 13, 2000 meeting. Ex. D (Smith at p. 216-17).

3

19.    Admit that the meeting was conducted in both Mandarin Chinese and English and otherwise deny paragraph 19.

20.    Admit that at the conclusion of the November 13, 2000, settlement meeting, Mr. Smith was presented with a document written entirely in Mandarin Chinese. Except as so admitted, deny the remaining statements and characterizations in paragraph "20" of Zygo's Local Rule 56(a)(1) Statement including the characterization that Mr. Smith "was forced to rely upon a cursory verbal translation of the points contained in the document." Mr. Smith testified that a representative from Zygo's agent, Lee-Tech, provided a summary of the document before Mr. Smith signed and that when the document was passed around he signed it. Ex. D (Smith at p. 177-78).

21.    Admit that Mr. Smith signed the document and otherwise deny paragraph 21.

22.    Denied. Paragraph "22" of Zygo's Local Rule 56(a)(1) Statement calls for a legal conclusion as to the actual and/or apparent authority of Zygo's representative. In fact, Mr. Smith testified that he thought Zygo's agent, Billy Wu, had settled the dispute with Nan Ya. Ex. D (Smith at p. 216-17).

23.    Denied. On or before the November 13, 2000 meeting, Billy Wu, who had negotiated with Nan Ya on behalf of Zygo, understood that the parties were in agreement on settlement terms and he asked Mr. Martin to affirm this formally in writing to him so that he could pass this on to Nan Ya, requesting confirmation from Mr. Martin that: (1) Zygo would accept the salvage value estimated by Walch; (2) Zygo would manage one damaged AFM completely and the loss of two damaged machines would be shared equally; and (3) the salvage value for the first damaged AFM would be deducted from the balance owed by Nan Ya. Ex. U (E-mail chain

4

between Wu and Martin of 10/20/00 & 10/25/00); Ex. V (E-mail from Wu to Martin of 10/26/00).

Mr. Martin did just that, confirming in a letter, that he described as "a follow up to my email *regarding the agreement to resolve the Nanya/AFM issue*," that Zygo would engage, at its expense, Mr. Walch to perform an appraisal of the two AFM units "as soon as there is agreement with Nanya on the return of the loaner unit and payment of the balance of the first unit, less an average salvage value . . . ." Ex. W (Letter from Martin to Wu of 10/27/00) (emphasis added).

      24.    Admit.

      25.    Deny.  See paragraph "23" supra.

      26.    Admit.

      27.    Admit only that during 2000 and into mid-2001, Royal and Zygo, through its broker, Mathog & Moniello, communicated concerning the coverage for the Second AFM. Except as so admitted, deny the remaining statements and characterizations in paragraph "27" of Zygo's Local Rule 56(a)(1) Statement.  Royal's reasons for declination are set forth in its declination letter (Bjorkman Aff. Ex. 16) and the Complaint and were not "various and changing." Ex. A (Compl.).

      28.    Admit.

      29.    Admit.

      30.    Deny.  The Policy expressly provides, in relevant part under Clause 52, "The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed."  Ex. C (Policy Clause 52).  The Court is respectfully referred to the Policy for its complete terms and conditions.

      31.    Deny.  See paragraph "30" supra.

**II.**    **Statement Of Facts As To Which There Is A Genuine Issue To Be Tried**

1.    Matthew Weidman, the account executive at Zygo's insurance brokers, Mathog & Moniello, was responsible for preparing the insurance application that was sent to Royal on behalf of Zygo. Ex. MM (Weidman at pp. 33-36, 39-40 & 47-50).

2.    Mr. Weidman prepared the insurance application sent to Royal based on his knowledge of Zygo's operations and based on information he received from Zygo. Ex. MM (Weidman at pp. 36, 39-40 & 50-51).

3.    The quotes based on the insurance application that was sent to Royal and prepared by Allan Illias, the underwriter at Royal for the Zygo account, were discussed with Mathog & Moniello. Ex. KK (Illias at pp. 13, 68, 81-84 & 85-92); Ex. LL (Illias 1); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).

4.    Although he recalled seeing them, Mr. Weidman did not recall whether he spoke with anyone at Royal about the quotes prepared by Mr. Illias in April 1999. Ex. MM (Weidman at pp. 63-65).

5.    The Policy would have been sent to Zygo's brokers after it had been finalized so that they could "review the terms and conditions, [to] make sure they are as per agreed." Ex. KK (Illias at pp. 29-30).

6.    Mr. Illias was told that he could not get the Policy unless he acceded to certain requests by Zygo. Ex. KK (Illias at pp. 91-92).

7.    The Policy was the result of arms-length negotiations between Royal and Mathog & Moniello. Ex. KK (Illias at pp. 41, 68, 80-84 & 85-92); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).

8.    The insurance application sent to Royal noted that Zygo insured 100% of the goods it shipped. Mr. Illias understood this to mean that Zygo "had no contingent exposure"

6

because it "was responsible to cover the shipment from their warehouse to the final destination." Ex. KK (Illias at pp. 66-67); Ex. LL (Illias 1).

9.    Matthew Weidman never contradicted Mr. Illias' interpretation of the insurance application's. Consistent with Mr. Illias' reading, Mr. Weidman also understood the notation that Zygo insured 100% of the goods it shipped to mean that "the insured [here, Zygo] is responsible for the coverage on a shipment made to a client." Ex. MM (Weidman at pp. 51 & 54).

10.    Mr. Illias was assured by Mathog & Moniello that Zygo had "no contingent exposure." Ex. KK (Illias at pp. 68 & 153).

11.    Mr. Illias was told that Zygo wanted contingency insurance in the Policy because it had been included in Zygo's prior policy with AIG. Ex. KK (Illias at pp. 82-83).

12.    Zygo's marine open cargo policy with AIG did not provide contingency coverage to Zygo. Ex. RR (AIG Policy).

13.    A policy typically includes a "boilerplate form" and additional clauses requested by an insured. Ex. KK (Illias at p. 25).

14.    In addition to the standard clauses contained in Royal's manuscript form, Mathog & Moniello requested that the Policy include certain "enhancements" and "optional coverages." Ex. KK (Illias at pp. 41, 80-81 & 92); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).

15.    Clause 52, the contingency clause that Zygo claims provides it with unpaid vendor coverage in respect of the subject shipment, was not standard to Royal's policy. Ex. KK (Illias at p. 131).

7

16.    Clause 52 is one of the enhancements that was added to the "Approved Royal & SunAlliance manuscript form" at Mathog & Moniello's request. Ex. KK (Illias at pp. 81-83).

17.    Mr. Illias would never have included Clause 52 and the other "enhancements" and "option coverages" in the Policy "without a specific request" from Mathog & Moniello Ex. KK (Illias at p. 81).

18.    No separate rate for contingent cover needed to be included in the premium that Mr. Illias quoted to Zygo because Zygo's brokers had represented that Zygo normally insured 100% of its shipments. Ex. LL (Illias 1); Ex. KK (Illias at pp. 66-67, 72 & 74-75).

19.    The premium that was quoted to Zygo by Mr. Illias was calculated solely on the basis of "the exposure that [Mathog & Moniello was] advising" -- marine, inland, warehouse and war. Ex. KK (Illias at pp. 73-75); Ex. LL (Illias 1).

20.    Contingency coverage is not listed in the quotes prepared by Mr. Illias as being included in the Policy's .023% "Rate" to be applied against annual gross sales because, according to Clause 52's explicit terms, the rates for contingency coverage were "to be agreed" if and when Zygo declared its need for such coverage. Ex. C (Policy, Clause 52); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).

21.    The quotes' notation of the Policy's "Rate" gives a ".023% Combined rate for Marine, War, Exhibition, and Processing against annual gross sales," reflecting exactly the total rate calculated by Mr. Illias on his worksheet for those coverages and only those coverages, based on Zygo's insurance application. Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).

8

22.     Mr. Illias stated that the premium that he quoted to Zygo was "for all the coverages contained in the policy, excepting some of the optional clauses contained therein." Ex. KK (Illias at pp. 34-36; 54).

23.     "Optional coverage" is "a clause or an endorsement whereby the insured needs to know [advise] the carrier before using said coverage." Ex. KK (Illias at p. 57).

24.     Contingency insurance under Clause 52 was one type of optional, additional coverage included in the Policy. Ex. KK (Illias at pp. 131 & 136).

25.     Any premium charged for contingency coverage under the Policy was to be handled as a separate transaction, apart from the annual reporting that was set up. Ex. KK (Illias at p. 143).

26.     Clause 52 required Zygo "to report any contingent shipments" in advance. Ex. KK (Illias at pp. 136, 154 & 173-74).

27.     To avail itself of the contingency coverage option offered under Clause 52, Zygo would have to call Royal, explain the circumstances of the shipment and pay an additional premium thereon. Ex. KK (Illias at pp. 136-39; 172-74).

28.     It is "standard and customary" in the marine insurance industry for an insured to advise an insurer prior to a shipment that the shipment requires contingency insurance. Ex. KK (Illias at pp. 173-74).

29.     Zygo and/or Mathog & Moniello could have read the Policy before Zygo accepted it in order to determine whether the nature of the contingency coverage provided by Clause 52 was what Zygo needed and had specifically requested, but, they never bothered to do so. Ex. MM (Weidman at pp. 58, 74 & 77-80); Ex. E (Martin at pp. 45 & 50); Ex. QQ (Dressler at pp. 42-43).

9

30.     Clause 32 of the Policy imposes a duty upon Zygo to report losses in a timely manner and insure that Royal is "represented on all surveys" of damaged cargo. Ex. C (Policy Clause 32).

31.     Clause 43 of the Policy prohibits Zygo from impairing Royal's right to recover against third parties in respect of claims covered by the Policy, i.e., Royal's right to subrogation. Ex. C (Policy Clause 43).

32.     As fully set forth in Royal's Local Rule 56(a)(1) Statement accompanying its Motion for Summary Judgment on Bad Faith and Punitive Damages (herein incorporated by reference) (Docket No.137-40), genuine issues of material fact exists as to whether Zygo breached Royal's subrogation rights as a result of Zygo's failure to give timely notice of the damage to two AFMs, its failure to give any advance notice of the February 14, 2000, survey, its and long delays in providing even the most cursory information regarding the location of and contacts for the damaged AFMs, and its failure to do anything to safeguard that evidence.

33.     The first AFM was delivered on January 25, 2000, in seriously damaged condition. (Ex. TT at p. 1 (Cathay Inspection Report of 2/19/00)); Ex. BB (Walch at pp. 76-78).

34.     A joint survey of the first damaged AFM was held on January 26, 2000, at which Zygo was represented by its local agent, Lee-Tech Co., Ltd. ("Lee-Tech") and Nan Ya had a Marine and Cargo Surveyor from Cathay Inspection Co. survey the damaged instrument on its behalf. Ex TT. at p. 1 (Cathay Inspection Report of 2/19/00).

35.     Royal received no advance notice of said joint survey and was not represented there (Ex. BB (Walch at pp. 132-40, 148-49 & 194)), nor did Zygo ever arrange for any expert survey of the first damaged AFM for its own behalf (Ex. BB (Walch at pp. 21-22, 149 & 167-70)) or that of Royal (Ex. E (Martin at pp. 102-03)).

10

36.    Nan Ya's surveyors concluded from their inspection of the first AFM that it had been damaged as a result of a heavy shock or bump, and, most significantly, that, "*Insufficient packing can be made the reason of this damage.*" Ex. TT at p.1 (Cathay Inspection Report of 2/19/00).

37.    In January 2000, Nan Ya ordered from Zygo a second AFM (the "Cargo" or, as referred to in the pleadings, the "second AFM") to replace the first damaged AFM, for which Nan Ya provided a purchase order, but did not make an advance payment. Ex. A ¶¶ 44-45 (Compl.); Ex. B ¶¶ 98-100 (Answer); Ex. M (Letter from Martin to Wu of 7/10/00); Ex. Y (Purchase Order for Second AFM).

38.    On or about February 11, 2000, Nan Ya advised Zygo that a preliminary inspection of the second AFM carried out after it had been discharged in Taiwan had determined that, like the first damaged AFM, it too had been delivered in seriously damaged condition. See Ex. DD (Walch Report of 2/11/00); Ex. EE (Walch Report of 2/14/00).

39.    Another joint survey was held, once again with no notice to Royal and no surveyor in attendance for either Royal or Zygo (Zygo ignored its representative's suggestion that it have Royal attend (Ex. BB (Walch at pp. 132-40, 148-49 & 194); Ex. CC (Facsimile from Mathog & Moniello to Royal of 3/8/00)), and, once again, Nan Ya's surveyors blamed Zygo's bad packaging and refused to pay Zygo for any portion of the second AFM's $690,000 purchase price. See Ex. TT (Cathy Inspection Report of 2/21/00); Ex. L (E-mail from Wu to Martin of 7/4/00); Ex. CC (Facsimile from Mathog & Moniello to Royal of 3/8/00)(providing first notice of claim).

40.    In late February 2000, Zygo shipped a third "loaner" AFM to Nan Ya only after making Nan Ya sign a written agreement promising to return it by June 30, 2000. Ex. II (Loaner Agreement).

11

41.    Nan Ya needed an AFM urgently in order to perform calibration of manufacturing equipment being installed at its new $3 billion microchip wafer fabrication facility scheduled to begin operations soon. Ex. D (Smith at pp. 47-51); Ex. E (Martin at pp. 38-39).

42.    As there were very few manufacturers of AFM-type machines and the technology was relatively new to the industry, it was difficult if not impossible to obtain one of these on short notice. Ex. D (Smith at p. 51).

43.    Unless Zygo was able to deliver an AFM in good working condition to Nan Ya in time, Nan Ya might have to obtain such a machine from Veeco, a competitor of Zygo's, something Zygo very much wanted to avoid. See Ex. D (Smith at pp. 90 & 108); Ex. E. (Martin at pp. 42 & 74); Ex. UU (E-mail from Muckenhirn to Robinson of 1/28/00). In light of the foregoing, Zygo shipped the second AFM to Nan Ya without any advance payment and agreed to send the loaner. Ex. D (Smith at pp. 47-51); Ex. E (Martin at pp. 38-39).

44.    The scarceness of these machines explains why Zygo wanted the loaner back (Zygo had a customer for it — see Ex. P (E-mail from Martin to Wu of 9/21/00)), and that scarceness leveraged Zygo's refusal to supply promised training to Nan Ya in order to pressure it to release the machine (see Ex. AA (E-mails between Muckenhirn, Smith, and Monti of 6/26/00)), as well as Nan Ya's refusal to return the loaner in order to pressure Zygo into agreeing on a global settlement on both damaged AFMs (see Ex. T (E-mail from Martin to Wu of 10/16/00)).

45.    Zygo's and Nan Ya's negotiations on the two damaged AFMs went on for months, with Lee-Tech's president, Billy Wu, representing Zygo in those negotiations, but, Royal was kept in the dark about them, hearing after the fact and only indirectly that Nan Ya's and Zygo's disputes over the damaged AFMs had been settled, only when Royal's surveyor reported in August 2000 that his attempts to inspect the damaged machines in order to ascertain the nature,

extent and cause of the damage had been rebuffed by Mr. Wu on the grounds that no surveys would be needed since Mr. Wu had resolved those disputes. Ex. N (E-mail from Smith to Martin of 8/9/00); Ex. O (E-mail from Chung to Daneman of 8/25/00).

46.    As early as May 26, 2000, Zygo was proposing to Nan Ya that they share in the cost of the two damaged AFMs if Nan Ya would agree to pay for the loaner AFM, and purchase a fourth tool from Zygo. Ex. K ("Zygo Leetech – NAN YA AFM project status").

47.    By the end of June, Zygo's agent proposed providing Nan Ya with training withheld by Zygo on the loaner AFM in exchange for the last 20% owed on the first damaged AFM. Ex. AA (E-mails between Muckenhirn, Smith, and Monti of 6/26/00).

48.    Mr. Smith believed that because Nan Ya had refused to pay the balance due on the first damaged AFM, Zygo had not sent anyone to train Nan Ya's people in operating the loaner AFM, and that, since that machine was ". . . useless to them without training," it sat unused at Nan Ya's plant. Ex. D (Smith at pp. 115-16).

49.    After Billy Wu's meeting with Nan Ya on or about July 4, 2000, he told Mr. Martin that Nan Ya and its insurer still refused to pay for the damaged AFMs because the damage was due to inadequate packaging (even Mr. Wu, who was Zygo's representative and knowledgeable about such matters concurred in this (Ex. GG (Facsimile from Wu to Zygo of 2/15/00); Ex. HH (Facsimile from Wu to Zygo of 2/16/00)). Ex. L (E-mail from Wu to Martin of 7/4/00).

50.    Mr. Wu told Mr. Martin that the best settlement that Zygo could attain would be splitting the AFM damages with Nan Ya, with Nan Ya paying Zygo for only one of the damaged AFMs. See Ex. L (E-mail from Wu to Martin of 7/4/00).

51.    Mr. Martin asked Mr. Wu to continue his efforts to resolve the impasse, Zygo's proposal at this time, being that it repair the two damaged AFMs, with Nan Ya paying for the repair and for their full value, with Zygo working out a "favorable pricing deal" if Nan Ya also wanted to purchase the loaner AFM. Ex. M (Letter from Martin to Wu of 7/10/00).

52.    On August 9, 2000, Mr. Smith reported to Mr. Martin that he had spoken with Royal's surveyor, who had "indicated he had communicated with Billy Wu but that Mr. Wu had been uncooperative [i.e., had refused to arrange for Royal's surveyor to inspect the damaged AFMs] *indicating that he had already reached an agreement with Nanya*." Ex. N (E-mail from Smith to Martin of 8/9/00) (emphasis added).

53.    Mr. Smith testified that he too contacted Billy Wu after Mr. Smith spoke with Royal's surveyor, but that "Billy was uncooperative with me also, and *indicating that he had already made a deal or was working on a deal with Nan Ya.*" Ex. D (Smith at pp. 138-39) (emphasis added).

54.    Several days later, Royal's surveyor reported to Royal's Mr. Daneman that he had spoken to Messrs. Wu and Smith about the AFMs and recommended closing the claim because he had been told that the damage was probably caused by insufficient packing and a settlement of the dispute had been agreed, so that all that remained was Lee-Tech's evaluation of the salvage value. Ex. O (E-mail from Chung to Daneman of 8/25/00).

55.    Mr. Wu subsequently told Mr. Martin yet again that the "only" solution and the "conclusion for this project" was that Nan Ya and Zygo share in the costs of the damage to the two damaged AFMs and that Zygo should send an engineer to "evaluate the damage" [it is clear that this meant determine their salvage value – see Ex. T (E-mail from Martin to Wu of 10/16/00);

14

Ex. U (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00); Ex. W (Letter from Martin to Wu of 10/27/00); Ex. Q (E-mail from Wu to Martin of 9/22/00)].

56.    Mr. Martin responded positively to his agent's suggestions:  "I am working on setting up a trip for Kelvin Walsh [*sic*] to travel to Taiwan to evaluate the machines."  Ex. R (E-mail from Martin to Wu of 10/3/00).

57.    The next day, Billy Wu again told Mr. Martin that Nan Ya and Zygo, and their respective insurers, should share in the loss of the damaged AFMs. Ex. S (E-mail from Wu to Martin of 10/4/00).

58.    Mr. Martin informed Billy Wu that he was finalizing Mr. Walch's trip to inspect and assess the salvage value of ***both*** damaged AFMs and that he had placed a claim with Royal for the second damaged AFM, Ex. T (E-mail from Martin to Wu of 10/16/00), both steps consistent with the global settlement on both machines that Nan Ya had been demanding and Zygo's representative had been recommending for months.

59.    Billy Wu understood that the parties were now in agreement on settlement terms and he asked Mr. Martin to affirm this formally in writing to him so that he could pass this on to Nan Ya, requesting confirmation from Mr. Martin that: (1) Zygo would accept the salvage value estimated by Walch; (2) Zygo would manage one damaged AFM completely and the loss of two damaged machines would be shared equally; and (3) the salvage value for the first damaged AFM would be deducted from the balance owed by Nan Ya.  Ex. U (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00); Ex. V (E-mail from Wu to Martin of 10/26/00).

60.    Mr. Martin did just that, confirming in a letter, that he described as "a follow up to my email ***regarding the agreement to resolve the Nanya/AFM issue***," that Zygo would engage, at its expense, Mr. Walch to perform an appraisal of the two AFM units "as soon as

15

there is agreement with Nanya on the return of the loaner unit and payment of the balance of the first unit, less an average salvage value . . . ." Ex. W (Letter from Martin to Wu of 10/27/00) (emphasis added).

61.    In direct response to Nan Ya request for confirmation that Zygo agreed that Nan Ya's insurance company pay for the first damaged AFM while Zygo's insurance company paid for the second, Martin confirmed that Zygo "will, and has, filed a claim for the second unit shipped with its insurance company." Ex. W (Letter from Martin to Wu of 10/27/00). At no time did he mention any reservation of rights to sue Nan Ya on the second damaged AFM.

62.    On October 30, 2000, Mr. Wu forwarded what he regarded as Mr. Martin's formal acceptance of Nan Ya's proposed settlement to its parent, Formosa Plastics. Ex. X (Fax from Lee-Tech to Formosa Plastics of 10/30/00).

63.    On November 13, 2000, a meeting was held in Taipei regarding the damaged AFMs. Ex. D (Smith at pp. 161-63). Mr. Smith, Stan Lay of Lee-Tech, and Kelvin Walch attended the meeting for Zygo. Ex. D (Smith at p.163); Ex. SS (Meeting Minutes). Among the representatives for Nan Ya were Yaling Tsai, Tsung-wen Lien, Charles Hsieh, and Gary Chen Kuo. Ex. SS (Meeting Minutes). Minutes of the meeting were recorded, and Mr. Smith signed the minutes. Ex. D (Smith at p. 161). The English translation of meeting minutes was made an exhibit at the deposition of Mr. Smith, and is included as Ex. SS (Meeting Minutes); Ex. D (Smith at pp. 161-62).

64.    Because he had not been informed of the parties' progress in resolving their impasse on the two damaged AFMs and not provided with any specific instructions by Mr. Martin, Mr. Smith attended the meeting under the impression that issues remained open, Ex. D (Smith at pp. 174-75, 194), raising them at the meeting only to be repeatedly reassured by Lee-

16

Tech's representative that these had in fact been resolved. Ex. D (Smith at pp. 167, 201 & 215-17).

65.    Shortly after that meeting, Lee-Tech e-mailed Mr. Smith, copying Mr. Martin, stating their satisfaction **"that the problem of *two damaged* systems have been settled"** in the November 13th meeting. Ex. Z at 3 (E-mail chain, Lee-Tech to Smith of 11/13/00) (emphasis added). Mr. Martin did not contradict this, responding: "I want to thank all of you for the effort put in to resolve this situation." Ex. Z at 2 (E-mail chain, Martin to Lee-Tech of 11/13/00).

66.    Mr. Smith admitted that it was his understanding that on or before the November 13, 2000, settlement meeting, Billy Wu had already resolved the dispute with Nan Ya over payment for the damaged AFMs. Ex. D (Smith at pp. 216-17) (emphasis added).

67.    Mr. Smith, who felt at his deposition that he had been kept in the dark when Mr. Martin sent him to the November 13th admitted that Mr. Martin's e-mail (Ex. Z) was not surprising when considering the communications indicating negotiations between Mr. Wu and Mr. Martin. Ex. D (Smith at pp. 187-88).

Respectfully submitted,

NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE
Attorneys for Plaintiff/Third Party Plaintiff
Royal Insurance Company of America

By: *Geoffrey J. Ginos*
GEOFFREY J. GINOS, ESQ. (CT 19578)
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Tel: (212) 220-3830
Fax: (212) 220-3780
Gginos@NicolettiHornig.com
(FILE NO.: 21000055 JAVN/GJG)

17

LAW OFFICES OF ROBERT K. MARZIK, P.C.
1512 Main Street
Stratford, Connecticut  06615


**TO:**

Ian E. Bjorkman, Esq.
Wiggin & Dana
One Century Tower
New Haven, Connecticut 06508

Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing filing, "Royal Insurance Company of America's Local Rule 56(a)(2) Statement in Support of its Opposition to Zygo Corporation's Motion for Partial Summary Judgment" was sent *via* Federal Express this 29th day of June, 2004 to:

Honorable Janet Bond Arterton
United States District Court
141 Church Street
New Haven, Connecticut 06510.


Ian E. Bjorkman, Esq.
Wiggin & Dana
One Century Tower
New Haven, Connecticut 06508

Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

Robert K. Marzik, Esq.
Law Office of Robert K. Marzik, P.C.
1512 Main Street
Stratford, Connecticut 06615


GEOFFREY J. GINOS (CT 19578)