**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
-------------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

                    Plaintiff,                  Case No. CIV 3:01 1317 (JBA)

   - against -

ZYGO CORPORATION,

                    Defendant.

-------------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

                    Third-Party Plaintiff,

     - against -

NAN YA TECHNOLOGY CORPORATION,

                    Third-Party Defendant.

-------------------------------------------------------------------X

## ROYAL INSURANCE COMPANY OF AMERICA'S OPPOSITION TO ZYGO CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE    LAW OFFICES OF ROBERT K. MARZIK, P.C.
Wall Street Plaza                                 1512 Main Street
88 Pine Street, 7th Floor                      Stratford, Connecticut  06615
New York, New York 10005-1801
(212) 220-3830

Of Counsel
     John A.V. Nicoletti
     Geoffrey J. Ginos

               *Attorneys for Plaintiff / Third Party Plaintiff*
               *Royal Insurance Company of America*

**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT REQUIRED**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF MATERIAL FACTS ........................................................................1

      I.        FACTS MATERIAL TO CLAUSE 52's PROPER CONSTRUCTION .................1

      A.      The Royal Policy Was Negotiated At Arms Length On Behalf
            Of Zygo, A Sophisticated Corporation, By Its Own Experienced
            Insurance Brokers.........................................................................................1

      B.      Zygo's Insurance Brokers Request And Receive Royal's *Optional*
            Unpaid Vendor Coverage............................................................................3

      C.      Zygo And Its Insurance Brokers Receive And Accept The Policy,
            As Written, Without Even Taking The Trouble To Read It .....................5

      D.      The Court Has Ruled That The Policy Is Ambiguous As To
            Whether A Separate Declaration And Additional Premium Are
            Required For Unpaid Vendor Coverage Under Clause 52, And,
            Accordingly, Evidence Must Be Adduced At Trial Of The Parties'
            Intent With Respect Thereto ......................................................................9

      II.       FACTS MATERIAL TO ZYGO'S IMPAIRMENT OF ROYAL'S
            SUBROGATION RIGHTS...........................................................................10

      A.      The Policy Requires Zygo To Report Losses In A Timely Manner,
            Insure That Royal Is Represented At All Damage Surveys, And Do
            Nothing That Impairs Royal's Subrogation Rights Against Nan Ya....................10

      B.      Zygo Sells Two AFMs To Nan Ya, Both Of Which Arrive In
            Damaged Condition .................................................................................11

      C.      Zygo Releases Nan Ya Without Settlement Authority
            From Royal ...............................................................................................14

ARGUMENT.................................................................................................................19

POINT I

STANDARD OF REVIEW FOR A
MOTION FOR SUMMARY JUDGMENT...................................................................19

POINT II

CHOICE OF LAW.................................................................................................20

POINT III

CONTRA PROFERENTEM
CANNOT BE APPLIED IN THIS CASE ....................................................................20

    A.    The Contra Proferentem Rule Is Inapplicable........................................21

        1.    The rule does not apply where there is no ambiguity ................................21

        2.    The rule does not apply to a policy for commercial
            insurance negotiated by sophisticated parties .............................................21

    B.    The Contra Proferentem Rule Is One Of Last Resort And Cannot
        Be Applied On Zygo's Motion For Partial Summary Judgment ...........................24

POINT IV

ZYGO'S IMPAIRMENT OF
ROYAL'S SUBROGATION RIGHTS .........................................................................28

    A.    Preliminary Discussion .................................................................................28

    B.    Zygo's Blocking Of Royal's Inspection Of The Damaged AFMs..........................29

    C.    A Genuine Issue Of Fact Exists As To Whether Zygo Released
        Nan Ya From Payment For The Second Damaged AFM ......................................31

    D.    But For Zygo's Deliberate Invitation Of Legal Error, Additional
        Nan Ya Evidence Could Be Considered By The Court .........................................35

CONCLUSION....................................................................................................................39

ii

# TABLE OF AUTHORITIES

## CASES

American Home Assurance Co. v. Abrams,
  69 F. Supp. 2d 339 (D. Conn. 1999)...............................................................24, 25

Amnesty America v. Town of West Hartford,
  361 F.3d 113 (2d Cir. 2004)........................................................................... 36

Baisch v. Gallina,
  346 F.3d 366 (2d Cir. 2003)........................................................................... 29

Ball v. Bradley,
  34 Conn. 496 (1868) ....................................................................................... 24

Camp Delaware, Inc. v. Markel Ins. Co.,
  No. CV990080225S, 2001 WL 541451 (Conn. Super. May 4, 2001)...................... 25

Casey v. United States,
  161 F.Supp.2d 86(D.Conn.2001)..................................................................... 37

Celotex Corp. v. Catrett,
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).......................................... 19

Cooper v. RLI Ins. Co.,
  No. CV 9403617128, 1996 WL 367721(Conn. Super. June 3, 1996).................................22, 24

Crowley v. The Banking Center,
  No. CV87 23 75 99S, 1994 WL 685023 (Conn. Super. Nov. 29, 1994) ...........................24, 25

Dunn v. Progressive Northwestern Ins. Co.,
  No. 563462, 2003 WL 22708946 (Conn. Super. Nov. 4, 2003)............................... 21

Eagle Leasing Corp. v. Hartford Fire Ins. Co.,
  540 F.2d 1257 (5th Cir. 1976) ......................................................................... 22

First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co.,
  803 F.2d 1308 (3d Cir. 1986)........................................................................... 22

Gibson v. American Broadcasting Cos.,
  892 F.2d 1128 (2d Cir. 1989)........................................................................... 20

Israel v. State Farm Mutual Automobile Ins. Co.,
   259 Conn. 503, 789 A.2d 974 (2002) ............................................................. 21

ITC Investments, Inc. v. Employers Reinsurance Corp.,
   No. CV98115128, 2000 WL 1996233 (Conn. Super. Dec. 11, 2000)...................... 22

Jurrius v. Maccabees Mutual Life Ins. Co.,
   587 F. Supp. 1301 (D. Conn. 1984)................................................................. 25

Knight v. U.S. Fire Ins. Co.,
   804 F.2d 9 (2d Cir. 1986)............................................................................. 20

Linemaster Switch Corp. v. Aetna Life and Casualty Corp.,
   No. CV91-0396432S, 1995 WL 462270 (Conn. Super. Jul. 25, 1995) ................... 22

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .......................... 19

Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co.,
   255 Conn. 295, 765 A.2d 891 (2001) ...........................................................24-25

Page v. Connecticut Dep't of Public Safety,
   185 F. Supp. 2d 149 (D. Conn. 2002)............................................................. 19

Pokorne v. Gary,
   281 F. Supp. 2d 416 (D. Conn. 2003)............................................................. 25

Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,
   311 F.3d 226 (3d Cir. 2002)......................................................................... 21

Soares v. University of New Haven,
   154 F. Supp. 2d 365 (D. Conn. 2001) ............................................................ 20

Teano v. Hartford Life Ins. Co.,
   No. CV 980580409S, 2000 WL 966371 (Conn. Super. June 23, 2000).............. 24, 25

Trans Sport v. Starter Sportswear,
   964 F.2d 186 (2d Cir. 1992)......................................................................... 20

U.S. Fire Ins. Co. v. General Reinsurance Corp.,
   949 F.2d 569 (2d Cir. 1991)...................................................................... 22, 24

United Technologies Corp. v. American Home Assurance Co.,
   989 F. Supp. 128 (D. Conn. 1997)............................................................. 24, 25

iv

Vermont Teddy Bear Co. v. 1-800 Beargram Co.,
    373 F.3d 241 (2d Cir. 2004)................................................................................................ 37

## **STATUTES AND RULES**

Fed. R. Civ. P 56.................................................................................................................19

## **SECONDARY SOURCE**

2 Couch on Insurance (3rd ed. 2004)...........................................................................21, 24, 25

## PRELIMINARY STATEMENT

Plaintiff/Third-Party Plaintiff Royal Insurance Company of America ("Royal") submits this opposition to Defendant Zygo Corporation's ("Zygo") Motion for Partial Summary Judgment (the "Motion"). The Motion should be denied because of the clear existence of significant disputes as to facts material to the Motion, as amply evidenced by testimony and documentary evidence in the record that contradicts Zygo's alleged "undisputed" material facts.

## STATEMENT OF MATERIAL FACTS

### I.    FACTS MATERIAL TO CLAUSE 52's PROPER CONSTRUCTION

#### A.    The Royal Policy Was Negotiated At Arms Length On Behalf Of Zygo, A Sophisticated Corporation, By Its Own Experienced Insurance Brokers.

The claims asserted by Zygo against Royal in these proceedings allegedly arise under a marine open cargo policy (Policy No. POC102950), with an effective date of May 1, 1999, that was issued by Royal to Zygo as the named insured (the "Policy"). See Ex. C (Policy).[1]

Allan Illias was the underwriter at Royal for the Zygo account. Ex. KK (Illias at p. 13). Mr. Illias joined Royal in 1995 and specialized there in cargo insurance. Ex. KK (Illias at pp. 5-6). He remained with Royal through 2002[2], progressing from trainee to associate underwriter to underwriter and, finally, to senior underwriter. Ex. KK (Illias at pp. 6-7). At the time the Policy was written, Mr. Illias was authorized to independently write policies with limits of up to $5 million. Ex. KK (Illias at pp. 7, 10, 18-19 & 72-73). As a cargo underwriter, Mr. Illias would receive insurance applications

---

[1] References to exhibits are to those annexed to the Affidavit of Geoffrey J. Ginos, executed July 29, 2004, submitted herewith.

[2] By the time of his deposition, Mr. Illias had left Royal and was an underwriter at Chubb & Son. Ex. KK (Illias at p. 5).

from brokers, evaluate the risks involved in providing the requested coverage, determine acceptable pricing parameters and coverages and provide quotes to brokers for requested coverage. Ex. KK (Illias at p. 12).

Matthew Weidman was the account executive at Zygo's insurance brokers, Mathog & Moniello, who was responsible for preparing the insurance application that was sent to Royal on behalf of Zygo and on which the Policy's terms and structure of premiums were ultimately based. Ex. MM (Weidman at pp. 33-36, 39-40 & 47-50). Mr. Weidman prepared the application based on his knowledge of Zygo's operations and based on information he received from Zygo. Ex. MM (Weidman at pp. 36, 39-40 & 50-51). The application was then sent to Royal by Jeanette Zdanis, a marketing representative at Mathog & Moniello. Ex. MM (Weidman at pp. 33-38 & 54-55).

When Ms. Zdanis received a quote back from an insurer, she would pass it along to Mr. Weidman. Ex. MM (Weidman at p. 64). Mr. Weidman specifically recalled having seen the quotes prepared in April 1999 by Mr. Illias in response to Zygo's application. Ex. MM (Weidman at pp. 63-65); Ex. NN (Illias 2); Ex. OO (Illias 3). Mr. Weidman did not recall, however, whether he spoke with anyone at Royal about the quotes. Ex. MM (Weidman at p. 65). Mr. Illias, on the other hand, specifically recalled discussing the quotes with Zygo's brokers (Ex. KK (Illias at pp. 68, 81-84 & 85-92)), and he made notes based upon their conversations (Ex. KK (Illias at pp. 85-92); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4)).

Mr. Illias testified that each policy of insurance is different. Ex. KK (Illias at pp. 24-25). A policy typically includes a "boilerplate form" and additional clauses requested by an insured. Ex. KK (Illias at p. 25). Zygo's policy was no different in these regards. In addition to the standard clauses

2

contained in Royal's manuscript form, Mathog & Moniello requested that the Policy include certain "enhancements" and "optional coverages." Ex. KK (Illias at pp. 41, 80-81 & 92); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4). Clause 52, the contingency clause that Zygo claims provides it with unpaid vendor coverage in respect of the subject shipment, is one of the enhancement clauses that is not part of Royal's standard manuscript form but was added in response to a request by Zygo's brokers. Ex. KK (Illias at pp. 81-83 & 131).

**B.    Zygo's Insurance Brokers Request And Receive Royal's *Optional Unpaid Vendor Coverage.***

Mr. Illias received Zygo's application for insurance from Mathog & Moniello. Ex. KK (Illias at pp. 65-66). Among other things, the application noted that Zygo insured 100% of the goods it shipped. Ex. KK (Illias at pp. 66-67); Ex. LL (Illias 1). Mr. Illias understood this to mean that Zygo "had no contingent exposure," since it "was responsible to cover the shipment from their warehouse to the final destination." Ex. KK (Illias at pp. 66-67).[3]

Mr. Illias' usual practice in reviewing applications for insurance was to reduce all of the details contained in the submission to a single worksheet. Ex. KK (Illias at pp. 71-72); Ex. LL (Illias 1). Based on his review of Zygo's insurance application, Mr. Illias made no note in the worksheet for the Policy of any contingent exposure requiring inclusion of an additional premium component. Ex. KK (Illias. at p. 72); Ex LL (Illias 1). According to Mr. Illias, consistent with his practice in such

---

[3] When an assured normally insures all of its cargo shipments from shipment through delivery, as Zygo told Royal it did, should one its buyers refuse to pay for a lost or damaged shipment, the assured simply recovers the loss under its own standard cargo coverage, and so, contingency coverage need only be provided as a policy enhancement offered on an optional, as-needed basis, to be triggered by the assured's declaration that it needs and is willing to pay for that protection in respect of a particular shipment which its standard cargo coverage does not protect up through delivery to that buyer. Ex. KK (Illias at pp. 132-39); Ex. MM (Weidman at pp. 67-68).

matters, this omission indicated that there was "no contingent exposure," and that no separate rate for contingent cover needed to be included in the premium that he quoted to Zygo. Ex. KK (Illias at pp. 72 & 74-75). Instead, the premium that was quoted was calculated solely on the basis of "the exposure that they [i.e., Zygo's brokers] were advising" -- marine, inland, warehouse and war. Ex. KK (Illias at pp. 73-75); Ex. LL (Illias 1). If he were going to charge for contingent exposure as part of the Policy's standard premium rate, Mr. Illias would have noted a rate for that component of coverage in his summary. Ex. KK (Illias at pp. 74-75). But he did not because Zygo's brokers had represented that it normally insured 100% of its shipments. Ex. LL (Illias 1); Ex. KK (Illias at pp. 66-67).

Finding it strange that Zygo was requesting contingency insurance when it apparently had no contingency exposure, Mr. Illias called Mathog & Moniello shortly after receiving Zygo's insurance application to confirm that Zygo had "no shipments of a contingent nature." Ex. KK (Illias at pp. 68 & 81-82). Mr. Illias was assured that Zygo had "no contingent exposure." Ex. KK (Illias at pp. 68 & 153). Still curious, Mr. Illias asked what "they possibly need it for." Ex. KK (Illias at pp. 81-82). He was told only that it had been included in Zygo's prior policy with AIG, something which was, in fact, untrue. Ex. KK (Illias at pp. 82-83).[4]

Despite finding it odd that Zygo wanted contingency coverage, Mr. Illias did as he was requested and put Clause 52 in the Policy, in order to provide Zygo with the option of requesting

---

[4] Zygo's marine open cargo policy with AIG, the policy that immediately preceded Zygo's Policy with Royal, was not produced in these proceedings until just recently, after the close of discovery and more than six months after Royal first subpoenaed the document from Mathog & Moniello (Ex. VV (Notice of Subpoena of Non-Party Mathog & Moniello dated December 11, 2003)), despite repeated follow-up requests (Ex. WW (Correspondence between counsel for Royal, Zygo and Mathog & Moniello)), because Zygo said that it could not locate that policy. *The AIG policy in fact provided no contingency coverage whatsoever to Zygo.* Ex. RR (AIG Policy).

contingency coverage should the need arise in respect of a particular shipment. Ex. KK (Illias at pp.

153-54). The unpaid vendor clause, Clause 52, that Mr. Illias sent to Zygo's brokers states:

**CONTINGENCY**

52. It is agreed that on all shipments sold by the Assured on cost and freight or other terms whereby the Assured is not required to furnish ocean marine insurance, this Policy is extended (subject to all its terms and conditions) to cover only the interest of the Assured as an unpaid vendor from the time shipments become at the risk of the customer under the terms of sale until payment of draft but in no event beyond the time when this Company's risk would normally cease under the terms of this Policy.

It is further understood and agreed that in no event shall this insurance inure to the benefit of the buyer or his underwriter but in the event of a loss occurring which would be collectible hereunder but for such terms of sale and the Assured is unable to collect the purchase price from the buyer in regular course, this Company will advance the amount of such loss pending collection from the buyer. The Assured hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse this Company, the latter sharing the expense of such collection in proportion to its interest herein.

*The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed.*

Ex. C (Policy, Clause 52) (emphasis added).

### C. Zygo And Its Insurance Brokers Receive And Accept The Policy, As Written, Without Even Taking The Trouble To Read It.

Mr. Weidman prepared the insurance coverage application sent to Royal (Ex. MM (Weidman

at pp. 33-36, 39-40 & 47-50)) and indicated on that application that Zygo insured 100% of the goods

it shipped (Ex. MM (Weidman at p. 48); Ex. LL (Illias 1)). Mr. Weidman never contradicted Mr.

Illias' interpretation of that representation, nor did he offer any alternative interpretation. Instead,

consistent with Mr. Illias' reading, Mr. Weidman also understood this to mean that "the insured

5

[here, Zygo] is responsible for the coverage on a shipment made to a client." Ex. MM (Weidman at pp. 51 & 54).

Incredibly, Mr. Weidman testified that he did not know whether anyone at Mathog & Moniello ever reviewed the Policy at the time that it was issued by Royal and provided to Zygo's brokers in order to determine whether it contained the coverage Zygo wanted. Ex. MM (Weidman at pp. 74, 77 & 78-79). Even more remarkably, given his responsibilities as Zygo's insurance broker, *Mr. Weidman admitted that he has no recollection of ever reviewing the Policy himself in order to determine how, or even whether, the coverages Zygo had requested were being provided by the Policy!* Ex. MM (Weidman at p. 75).

Mr. Weidman claimed that he did not know whether anyone at Mathog & Moniello was charged with reviewing the actual wording of clauses in policies to make certain that it was acceptable and protected their clients. Ex. MM (Weidman at p. 79). Nor did he know whether anyone at Mathog & Moniello ever actually read Clause 52 in order to ascertain its meaning or its sufficiency prior to this dispute arising. Ex. MM (Weidman at pp. 79-80). Mr. Weidman does not recall ever having an occasion to read Clause 52 prior to the issuance of the Policy. Ex. MM (Weidman at p. 58). Nor does he recall having any discussions with Zygo about contingency coverage prior to the Policy being issued. Ex. MM (Weidman at p. 56). In fact, Mr. Weidman did not read Clause 52 for the first time until sometime between November 2000 and May 2001. Ex. MM (Weidman at pp. 58-59 & 73).

Lawrence Martin is the staff assistant to Zygo's president. Ex. E (Martin at p. 9). At the time that the Policy was issued, Mr. Martin had no involvement with the placement of insurance (Ex. E

6

(Martin at pp. 33 & 36)), but he was the contact for Mathog & Moniello in respect of the present

claims (Ex. E (Martin at pp. 45-46)). Mr. Martin did not read any portion of the Policy until after

this claim arose (Ex. E (Martin at p. 45)) and had never seen the entire Policy until it was shown to

him at his deposition (Ex. E (Martin at p. 50). Similarly, he did not discuss the contingency clause

with anyone at Zygo or at Mathog & Moniello until after the claim was denied by Royal. Ex. E

(Martin at pp. 47 & 49). In fact, Mr. Martin did not even know whether Zygo had contingency

insurance in its Policy. Ex. E (Martin at p. 48). Instead, Mr. Martin "left most of the insurance

issues up to [Zygo's] agent," Matt Weidman." Ex. E (Martin at p. 45). Even after reviewing the

contingency clause and discussing it with Mathog & Moniello, Mr. Martin had no "understanding

one way or the other" about whether Zygo's shipments had contingency coverage under the Policy.

Richard Dressler is Zygo's Vice President of Finance, a position he has held since joining that

company in February 2001. Ex. QQ (Dressler at p. 5). Zygo produced Mr. Dressler in response to

Royal's Notice of Deposition pursuant to Fed. R. Civ. P. 30(b)(6) on the issue of, inter alia, Zygo's

understanding of the Policy. Ex. QQ (Dressler at pp. 6-7). Mr. Dressler's responsibilities at Zygo

include coordinating with its insurance brokers to determine what type of insurance Zygo requires

and who that coverage should be placed with. Ex. QQ (Dressler at p. 12). Because Mr. Dressler

does not have an insurance background, he relies on the insurance brokers to recommend types of

coverage, potential insurers and premiums. Ex. QQ (Dressler at pp. 12-13). He does not discuss

individual clauses in an insurance policy with the insurance brokers but rather relies on a summary of

the policy prepared by the brokers that identifies the insurer, the types of coverage, any optional

coverages and the premiums. Ex. QQ (Dressler at pp. 13-14).

7

Mr. Dressler testified that he believes that the Policy provides Zygo contingency coverage in this case under Clause 52. Ex. QQ (Dressler at pp. 41-42). But, he readily admitted that he was no insurance expert:

> Q:    Do you feel qualified to interpret Clause 52 as an insurance expert?
>
> A:    The answer is no.

Ex. QQ (Dressler at p. 93).

**In fact, at the time of his Rule 30(b)(6) deposition, Mr. Dressler had never read the Policy or Clause 52**. Ex. QQ (Dressler at pp. 42-43). Instead, his basis for believing that the Policy provides coverage was the summary of coverage that he said had been prepared by the insurance brokers. Ex. QQ (Dressler at pp. 42-43). Since no such summary was ever prepared by Mathog & Moniello (at least, none was produced by them or by Zygo in response to Royal's discovery demands), the only "summary" that he can be referring to were the insurance quotes prepared by Royal which merely listed in a very summary fashion the categories of coverage offered under the Policy, without, however, setting out or summarizing any of its operative clauses. Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).

The only reference to Clause 52 in Royal's quotes is the bare listing of "Contingency" as an "enhancement" to the "Approved Royal & SunAlliance manuscript form." Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4). The quotes' notation of the Policy's "Rate" gives a ".023% Combined rate for Marine, War, Exhibition, and Processing against annual gross sales," reflecting exactly the total rate calculated by Mr. Illias on his worksheet for those coverages and only those coverages, based on Zygo's insurance application. Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4). Contingency

coverage is *not* listed there as being included in the .023% rate to be applied against annual gross sales because, according to Clause 52's explicit terms, the rates for contingency coverage were *"to be agreed"* if and when Zygo declared its need for such coverage. Ex. C (Policy, Clause 52) (emphasis added).

Mr. Dressler had the opportunity to read Clause 52 in its entirety at his deposition. Ex. QQ (Dressler at pp. 87-88). He was asked about his understanding of that clause's reporting requirements. Ex. QQ (Dressler at pp. 87-89). Mr. Dressler stated that he believed the clause required reporting shipments on a periodic basis. Ex. QQ (Dressler at pp. 88-89). His only basis for this understanding, however, was the operation and wording of an insurance policy Zygo had with another insurer. Ex. QQ (Dressler at pp. 89-92).

> **D.    The Court Has Ruled That The Policy Is Ambiguous As To Whether A Separate Declaration And Additional Premium Are Required For Unpaid Vendor Coverage Under Clause 52, And, Accordingly, Evidence Must Be Adduced At Trial Of The Parties' Intent With Respect Thereto.**

Judge Goettel denied Royal's prior motion for summary judgment, based on Zygo's admitted failure to declare the subject shipment and pay a separate premium thereon prior to this claim arising, because the Court felt that the Policy was ambiguous as to whether an advance declaration and an additional premium were required as a precondition for coverage under by Clause 52 or whether, as contended by Zygo, no such declaration or additional premium were needed because the Policy was of the annual reporting type, whose .023% premium rate applied to annual gross sales, encompassed unpaid vendor coverage as well as Marine, War, Exhibition and Processing coverage. <u>See</u> Order dated August 15, 2003. In so ruling, Judge Goettel raised several factual issues that he felt pertained

in light of said ambiguity, and on which he said no evidence had been adduced by either party. See id. at 21.

While, based on Clause 52's explicit requirement of a separate declaration and premium, Royal must respectfully disagree with the Court's ruling that the Policy is ambiguous, it could not be clearer from Judge Goettel's ruling that he believed that material factual disputes required the parties to adduce for his consideration at trial evidence extrinsic to the Policy's written terms, demonstrating their intent as to the proper interpretation and effect of Clause 52.    Zygo's present Motion is an improper attempt to circumvent that adjudication.

## II.    FACTS MATERIAL TO ZYGO'S IMPAIRMENT OF ROYAL'S SUBROGATION RIGHTS

### A.    The Policy Requires Zygo To Report Losses In A Timely Manner, Insure That Royal Is Represented At All Damage Surveys, And Do Nothing That Impairs Royal's Subrogation Rights Against Nan Ya.

The Policy imposes a duty upon Zygo to report losses in a timely manner and insure that Royal is "represented on all surveys" of damaged cargo.  Clause 32, "Reporting Losses," requires:

> *Any loss or damage to the property hereby insured must be promptly reported to the Company [i.e., Royal] or to the nearest Settling Agent of the Company and such Agent must be represented on all surveys and must approve proofs of loss and bills of expense.*  If there be no such Agent at or near the port or place where the loss is discovered or the expenses incurred, then such report must be made to the nearest representative of the American Institute of Marine Underwriters or to a Lloyds Agent, and his approval obtained as above.  *Failure to report loss or damage promptly and to file such proof of loss shall invalidate any claim under this Policy.*

Ex. C (Policy, Clause 32) (emphasis added).

The Policy prohibits Zygo from impairing Royal's right to recover against third parties in respect of claims covered by the Policy, i.e., Royal's right to subrogation.  Clause 43, "Subrogation

10

and Impairment of Recovery," states:

> It is a condition of this insurance that upon payment of any loss the Company shall be subrogated to all rights and claims against third parties arising out of such loss. *It is a further condition of this insurance that if the Assured or his or their assigns* have entered or shall enter into any special agreement whereby any carrier or bailee is released from its common law or statutory liability for any loss, *or have or shall have waived, compromised, settled or otherwise impaired any right of claim against a third party to which the Company would be subrogated upon payment of a loss without prior agreement of the Company and endorsement hereon, the Company shall be free from liability with respect to such loss,* but its right to retain or recover the premium shall not be affected.

Ex. C (Policy, Clause 43) (emphasis added).

### B.    Zygo Sells Two AFMs To Nan Ya, Both Of Which Arrive In Damaged Condition.

In about December 1999, Zygo contracted with Nan Ya Technology Corporation ("Nan Ya") in Taiwan for the sale of an Atomic Force Microscope (the "first AFM"). Ex. B ¶ 93 (Answer). Its purchase price was $690,000, FOB Delray Beach, Florida. Nan Ya paid 80% of this prior to shipment, with the balance due once it accepted delivery. Ex. B ¶ 93 (Answer).

The first AFM was delivered on January 25, 2000 (Ex. TT at p. 1 (Cathay Inspection Report of 2/19/00)), but Nan Ya told Zygo that it had arrived in seriously damaged condition. Ex. BB (Walch at pp. 76-78). A joint survey of the first damaged AFM was held on January 26, 2000, at which Zygo was represented by its local agent, Lee-Tech Co., Ltd. ("Lee-Tech") and Nan Ya had a Marine and Cargo Surveyor from Cathay Inspection Co. survey the damaged instrument on its behalf. Ex TT. at p. 1 (Cathay Inspection Report of 2/19/00). Royal received no advance notice of said joint survey and was not represented there (Ex. BB (Walch at pp. 132-40, 148-49 & 194)), nor did Zygo ever arrange for any expert survey of the first damaged AFM for its own behalf (Ex. BB

11

(Walch at pp. 21-22, 149 & 167-70)) or that of Royal (Ex. E (Martin at pp. 102-03)). Nan Ya's surveyors concluded from their inspection of the first AFM that it had been damaged as a result of a heavy shock or bump, and, most significantly, that, "***Insufficient packing can be made the reason of this damage.***" Ex. TT at p.1 (Cathay Inspection Report of 2/19/00) (emphasis added).

In January 2000, Nan Ya ordered from Zygo a second AFM (the "Cargo" or, as referred to in the pleadings, the "second AFM") to replace the first damaged AFM. See Ex. B ¶ 98 (Answer). On or about January 31, 2000, Nan Ya provided Zygo with a purchase order for the Cargo, again with a purchase price of $690,000. See Ex. A ¶¶ 44-45 (Compl.); Ex. Y (Purchase Order for Second AFM). This time, however, Zygo shipped this AFM to Nan Ya without receiving any payment in advance. See Ex. B ¶¶ 99 & 100 (Answer); Ex. M (Letter from Martin to Wu of 7/10/00).

On or about February 11, 2000, Nan Ya advised Zygo that a preliminary inspection of the second AFM carried out after it had been discharged in Taiwan had determined that, like the first damaged AFM, it too had been delivered in seriously damaged condition. See Ex. DD (Walch Report of 2/11/00); Ex. EE (Walch Report of 2/14/00).[5] Another joint survey was held, once again with no notice to Royal and no surveyor in attendance for either Royal or Zygo (Zygo ignored its representative's suggestion that it have Royal attend (Ex. BB (Walch at pp. 132-40, 148-49 & 194); Ex. CC (Facsimile from Mathog & Moniello to Royal of 3/8/00)), and, once again, Nan Ya's surveyors blamed Zygo's bad packaging and refused to pay Zygo for any portion of the second AFM's $690,000 purchase price. See Ex. TT (Cathy Inspection Report of 2/21/00); Ex. L (E-mail from Wu to Martin of 7/4/00); Ex. CC (Facsimile from Mathog & Moniello to Royal of

---

[5] The parties agree that the second AFM must have been damaged after it was loaded aboard the carrying aircraft at the U.S. airport and before it was inspected by Nan Ya in Taiwan, where said damage was first noted. See Ex. A ¶ 68 (Compl.); Zygo's L.R. 56(a)(1) Statement ¶ 6.

3/8/00)(providing first notice of claim). Zygo's unpaid vendor claim in this action is based **solely** on Nan Ya's refusal to pay for the second AFM.

In late February 2000, Zygo shipped a third "loaner" AFM to Nan Ya only after making Nan Ya sign a written agreement promising to return it by June 30, 2000. Ex. II (Loaner Agreement); Zygo's L.R. 56(a)(1) Statement ¶ 8. Nan Ya needed an AFM urgently in order to perform calibration of manufacturing equipment being installed at its new $3 billion microchip wafer fabrication facility scheduled to begin operations soon. Ex. D (Smith at pp. 47-51); Ex. E (Martin at pp. 38-39). As there were very few manufacturers of AFM-type machines and the technology was relatively new to the industry, it was difficult if not impossible to obtain one of these on short notice. Ex. D (Smith at p. 51). Unless Zygo was able to deliver an AFM in good working condition to Nan Ya in time, Nan Ya might have to obtain such a machine from Veeco, a competitor of Zygo's, something Zygo very much wanted to avoid. See Ex. D (Smith at pp. 90 & 108); Ex. E. (Martin at pp. 42 & 74); Ex. UU (E-mail from Muckenhirn to Robinson of 1/28/00). This is why Zygo shipped the second AFM to Nan Ya without any advance payment and agreed to send the loaner. Ex. D (Smith at pp. 47-51); Ex. E (Martin at pp. 38-39). The scarceness of these machines explains why Zygo wanted the loaner back (Zygo had a customer for it — see Ex. P (E-mail from Martin to Wu of 9/21/00)), and that scarceness leveraged Zygo's refusal to supply promise training to Nan in order to pressure it to release the machine (see Ex. AA (E-mails between Muckenhirn, Smith, and Monti of 6/26/00)), as well as Nan Ya's refusal to return the loaner in order to pressure Zygo into agreeing on a global settlement on both damaged AFMs (see Ex. T (E-mail from Martin to Wu of 10/16/00)).

**C.    Zygo Releases Nan Ya Without Settlement Authority
From Royal.**

Zygo's and Nan Ya's negotiations on the two damaged AFMs went on for months, with Lee-Tech's president, Billy Wu, representing Zygo in those negotiations, but, Royal was kept in the dark about them, hearing after the fact and only indirectly that Nan Ya's and Zygo's disputes over the damaged AFMs had been settled, only when Royal's surveyor reported in August 2000 that his attempts to inspect the damaged machines in order to ascertain the nature, extent and cause of the damage had been rebuffed by Mr. Wu on the grounds that no surveys would be needed since he had resolved those disputes. Ex. N (E-mail from Smith to Martin of 8/9/00); Ex. O (E-mail from Chung to Daneman of 8/25/00).

As early as May 26, 2000, Zygo was proposing to Nan Ya that they share in the cost of the two damaged AFMs if Nan Ya would agree to pay for the loaner AFM, and purchase a fourth tool from Zygo. Ex. K ("Zygo Leetech – NAN YA AFM project status"). By the end of June, Zygo's agent proposed providing Nan Ya with training withheld by Zygo on the loaner AFM in exchange for the last 20% owed on the first damaged AFM. Ex. AA (E-mails between Muckenhirn, Smith, and Monti of 6/26/00). Mr. Smith believed that because Nan Ya had refused to pay the balance due on the first damaged AFM, Zygo had not sent anyone to train Nan Ya's people in operating the loaner AFM, and that, since that machine was ". . . useless to them without training," it sat unused at Nan Ya's plant. Ex. D (Smith at pp. 115-16).

After Billy Wu's meeting with Nan Ya on or about July 4, 2000, he told Mr. Martin that Nan Ya and its insurer still refused to pay for the damaged AFMs because the damage was due to inadequate packaging (even Mr. Wu, who was Zygo's representative and knowledgeable about such

14

matters concurred in this (Ex. GG (Facsimile from Wu to Zygo of 2/15/00); Ex. HH (Facsimile from Wu to Zygo of 2/16/00)). Ex. L (E-mail from Wu to Martin of 7/4/00). Mr. Wu told Mr. Martin that the best settlement that Zygo could attain would be splitting the AFM damages with Nan Ya, with Nan Ya paying Zygo for only one of the damaged AFMs. See Ex. L (E-mail from Wu to Martin of 7/4/00). Mr. Martin asked Mr. Wu to continue his efforts to resolve the impasse, Zygo's proposal at this time, being that it repair the two damaged AFMs, with Nan Ya paying for this and for their full value, with Zygo working out a "favorable pricing deal" if Nan Ya also wanted to purchase the loaner AFM. Ex. M (Letter from Martin to Wu of 7/10/00).

On August 9, 2000, Mr. Smith reported to Mr. Martin that he had spoken with Royal's surveyor, who had "indicated he had communicated with Billy Wu but that Billy had been uncooperative [i.e., had refused to arrange for Royal's surveyor to inspect the damaged AFMs] *indicating that he had already reached an agreement with Nanya*." Ex. N (E-mail from Smith to Martin of 8/9/00) (emphasis added). In fact, Mr. Smith testified that he too contacted Billy Wu after Mr. Smith spoke with Royal's surveyor, but that "Billy was uncooperative with me also, and *indicating that he had already made a deal or was working on a deal with Nan Ya.*" Ex. D (Smith at pp. 138-39) (emphasis added).

Several days later, Royal's surveyor reported to Royal's Mr. Daneman that he had spoken to Messrs. Wu and Smith about the AFMs and recommended closing the claim because he had been told that the damage was probably caused by insufficient packing and a settlement of the dispute had been agreed, so that all that remained was Lee-Tech's evaluation of the salvage value. Ex. O (E-mail from Chung to Daneman of 8/25/00).

15

Mr. Wu subsequently told Mr. Martin yet again that the "only" solution and the "conclusion for this project" was that Nan Ya and Zygo share in the costs of the damage to the two damaged AFMs and that Zygo should send an engineer to "evaluate the damage" [it is clear that this meant determine their salvage value – see Ex. T (E-mail from Martin to Wu of 10/16/00); Ex. U (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00); Ex. W (Letter from Martin to Wu of 10/27/00); Ex. Q (E-mail from Wu to Martin of 9/22/00)].

Mr. Martin responded positively to his agent's suggestions: "I am working on setting up a trip for Kelvin Walsh [sic] to travel to Taiwan to evaluate the machines." Ex. R (E-mail from Martin to Wu of 10/3/00). The next day, Billy Wu again told Mr. Martin that Nan Ya and Zygo, and their respective insurers, should share in the loss of the damaged AFMs. Ex. S (E-mail from Wu to Martin of 10/4/00). Mr. Martin informed Billy Wu that he was finalizing Mr. Walch's trip to inspect and assess the salvage value of *both* damaged AFMs and that he had placed a claim with Royal for the second damaged AFM, Ex. T (E-mail from Martin to Wu of 10/16/00), both steps consistent with the global settlement on both machines that Nan Ya had been demanding and Zygo's representative had been recommending for months.

Billy Wu understood that the parties were now in agreement on settlement terms and he asked Mr. Martin to affirm this formally in writing to him so that he could pass this on to Nan Ya, requesting confirmation from Mr. Martin that: (1) Zygo would accept the salvage value estimated by Walch; (2) Zygo would manage one damaged AFM completely and the loss of two damaged machines would be shared equally; and (3) the salvage value for the first damaged AFM would be deducted from the balance owed by Nan Ya. Ex. U (E-mail chain between Wu and Martin of

16

10/20/00 & 10/25/00); Ex. V (E-mail from Wu to Martin of 10/26/00).

Mr. Martin did just that, confirming in a letter, that he described as "a follow up to my email *regarding the agreement to resolve the Nanya/AFM issue*," that Zygo would engage, at its expense, Mr. Walch to perform an appraisal of the two AFM units "as soon as there is agreement with Nanya on the return of the loaner unit and payment of the balance of the first unit, less an average salvage value . . . ." Ex. W (Letter from Martin to Wu of 10/27/00) (emphasis added). In direct response to Nan Ya request for confirmation that Zygo agreed that Nan Ya's insurance company pay for the first damaged AFM while Zygo's insurance company paid for the second, Martin confirmed that Zygo "will, and has, filed a claim for the second unit shipped with its insurance company." Ex. W (Letter from Martin to Wu of 10/27/00). At no time did he mention any reservation of rights to sue Nan Ya on the second damaged AFM. On October 30, 2000, Mr. Wu forwarded what he regarded as Mr. Martin's formal acceptance of Nan Ya's proposed settlement to its parent, Formosa Plastics. Ex. X (Fax from Lee-Tech to Formosa Plastics of 10/30/00).

On November 13, 2000, a meeting was held in Taipei regarding the damaged AFMs. Ex. D (Smith at pp. 161-63). Mr. Smith, Stan Lay of Lee-Tech, and Kelvin Walch attended the meeting for Zygo. Ex. D (Smith at p.163); Ex. SS (Meeting Minutes). Among the representatives for Nan Ya were Yaling Tsai, Tsung-wen Lien, Charles Hsieh, and Gary Chen Kuo. Ex. SS (Meeting Minutes). Minutes of the meeting were recorded, and Mr. Smith signed the minutes. Ex. D (Smith at p. 161).[6]

Because he had not been informed of the parties' progress in resolving their impasse on the two damaged AFMs and not provided with any specific instructions by Mr. Martin, Mr. Smith

---

[6] The English translation of meeting minutes was made an exhibit at the deposition of Mr. Smith, and is included as Ex. SS (Meeting Minutes); Ex. D (Smith at pp. 161-62).

17

attended the meeting under the impression that issues remained open, Ex. D (Smith at pp. 174-75, 194), raising them at the meeting only to be repeatedly reassured by Lee-Tech's representative that these had in fact been resolved.  Ex. D (Smith at pp. 167, 201 & 215-17).

> Q.    And Nan Ya's response on the request for payment that was made at the November 13th meeting was what?
>
> A.    I received no response from them, no direct response.  And when I question Stan Lay about, what is the direction, what is the path, I was told again, Billy will handle it.
>
> Q.    Just to be as accurate as you can, is your recollection that Stan said Billy indicated that Billy would work something out with them, or that he had taken care of it, it was covered, or what?
>
> A.    *It was my understanding that he had already handled it.*

Ex. D (Smith at pp. 216-17) (emphasis added).

Shortly after that meeting, Lee-Tech e-mailed Mr. Smith, copying Mr. Martin, stating their satisfaction "**that the problem of *two damaged* systems have been settled**" in the November 13th meeting.  Ex. Z at 3 (E-mail chain, Lee-Tech to Smith of 11/13/00) (emphasis added).  Mr. Martin did not contradict this, responding:  "I want to thank all of you for the effort put in to resolve this situation."  Ex. Z at 2 (E-mail chain, Martin to Lee-Tech of 11/13/00).

Mr. Smith, who felt at his deposition that he had been kept in the dark when Mr. Martin sent him to the November 13th meeting testified:

> Q.    So when you saw that Martin was saying here [Ex. Z at 2] "I thank you for resolving this," were you surprised, just a little?
>
> A.    *Certainly, but if you look at all the other e-mails that I was never copied on, never communicated with, it's not really surprising.*

* * *

A.     There were many e-mails flying back and forth.  Some I was copied on, most I was not.

Had Zygo authorized me or requested that I negotiate this, I would have executed it, I would have done that.  *But from the very beginning, it was a Lee-Tech negotiation all the way.  The [Nan Ya]  were his [Wu's] customers, that's what the AFM group wanted, that's what corporate wanted. They were involved with the tool.  They handled it, period*.

Ex. D (Smith at pp. 187-88) (emphasis added).

## ARGUMENT

## POINT I

## STANDARD OF REVIEW FOR A
## MOTION FOR SUMMARY JUDGMENT

The Court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating an absence of genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  After the moving party meets its initial burden, the burden then shifts to the adverse party who "may not rest upon the mere allegations or denials of the adverse party's pleadings," Fed. R. Civ. P. 56(e), because the "essence of summary judgment is to go beyond the pleadings to determine whether a genuine issue of material fact exists," Page v. Connecticut Dep't of Public Safety, 185 F. Supp. 2d 149, 156 (D. Conn. 2002).  Rather, the adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v.

19

<u>Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The adverse party

> ... must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise." <u>Trans Sport v. Starter Sportswear</u>, 964 F.2d 186, 188 (2d Cir. 1992) (citation and internal quotations omitted); <u>see also</u> <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).  "The possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present." <u>Gibson v. American Broadcasting Cos.</u>, 892 F.2d 1128, 1132 (2d Cir. 1989).

<u>Soares v. University of New Haven</u>, 154 F. Supp. 2d 365, 372 (D. Conn. 2001) (alteration in original).

## POINT II

## <u>CHOICE OF LAW</u>

In ruling on Royal's prior motion for summary judgment, Judge Goettel held that Connecticut law governed the Court's interpretation of the Policy.  Ex. JJ (Opinion, Goettel, Senior J., dated 8/15/03).

## POINT III

## <u>CONTRA PROFERENTEM</u><br><u>CANNOT BE APPLIED IN THIS CASE</u>

Mistakenly relying on the <u>contra proferentem</u> rule of contract construction, Zygo argues that if the Court finds the language in Clause 52 to be ambiguous, any such ambiguities should be construed against Royal.  <u>See</u> Defendant Zygo Corporation's Memorandum of Law in Support of its Motion for Partial Summary Judgment ("Zygo Memo.") at 25-26.  This argument must be rejected because the contra-insurer rule is inapplicable under the circumstances of this case.  Even if the rule were applicable, it would be improper to apply it at this stage of the case.

20

A.      **The Contra Proferentem Rule Is Inapplicable.**

1.      **The rule does not apply where there is no ambiguity.**

"The doctrine of contra proferentem applies . . . only if [the Court] conclude[s] that the language of the [Policy] is ambiguous." Israel v. State Farm Mutual Automobile Ins. Co., 259 Conn. 503, 509, 789 A.2d 974 (2002). If the Court determines that the language of Clause 52 is "plain, no such construction is to be applied." Dunn v. Progressive Northwestern Ins. Co., No. 563462, 2003 WL 22708946, *3 (Conn. Super. Nov. 4, 2003) (internal quotations and citation omitted).

Based on Clause 52's explicit and unambiguous requirement of a separate declaration and premium, Royal must respectfully disagree with Judge Goettel's ruling that the Policy is ambiguous with respect to those requirements.  Royal asks that this Court review the parties' submissions in respect of Royal's prior motion for summary judgment and make its own assessment on this critical point, whose proper resolution will avoid a trial that we believe is entirely unnecessary.

2.      **The rule does not apply to a policy for commercial
        insurance negotiated by sophisticated parties.**

Even if this Court agrees with Judge Goettel that Clause 52 is ambiguous, the contra proferentem doctrine would nonetheless be inapplicable under the specific facts of this case. One of the primary rationales behind the rule is that "insurance contracts are usually offered to the insured on a take-it-or-leave-it basis and as such are termed contracts of adhesion . . . ." 2 Couch on Insurance, § 22:24 (3d ed. 2004); see also Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 235 (3d Cir. 2002). Such a justification is not applicable, however, when the policy is negotiated by sophisticated commercial parties. See 2 Couch on Insurance, § 22:24, supra; Port Authority of New York and New Jersey, 311 F.3d at 235. Thus, courts have been

21

unwilling to apply the rule "in the commercial insurance field when the insured is not an innocent but

a corporation of immense size, carrying insurance premiums in six figures, managed by sophisticated

business men and represented by counsel on the same professional level as the counsel for insurers."

Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 (5th Cir. 1976); see also U.S.

Fire Ins. Co. v. General Reinsurance Corp., 949 F.2d 569, 574 (2d Cir. 1991); First State

Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co., 803 F.2d 1308, 1314

n. 5 (3rd Cir. 1986); ITC Investments, Inc. v. Employers Reinsurance Corp., No. CV98115128, 2000

WL 1996233, *3 (Conn. Super. Dec. 11, 2000); Linemaster Switch Corp. v. Aetna Life and Casualty

Corp., No. CV91-0396432S, 1995 WL 462270, *4-*5 (Conn. Super. Jul. 25, 1995); cf. Cooper v.

RLI Ins. Co., No. CV 9403617128, 1996 WL 367721, *6 n.1 (Conn. Super. June 3, 1996).

     This exception applies here. The Policy was indisputably not issued on a "take-it-or-leave-it"

basis.    Quite to the contrary, Zygo insisted that the Policy include specific provisions and

endorsements in addition to Royal's standard terms.    The Policy was the result of arms-length

negotiations between Royal and Zygo's long-term broker, Mathog & Moniello.

     Mr. Illias testified in detail about his discussions with Mathog & Moniello concerning the

preparation and drafting of the Policy. Ex. KK (Illias at pp. 68, 81-84 & 85-92). These discussions

are corroborated by Mr. Illias' contemporaneous notes of those discussions. Ex. KK (Illias at pp. 85-

92); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias 4).  Among other things, the conversations

concerned Mathog & Moniello's requests that the Policy include certain "enhancements" and "option

coverages." Ex. KK (Illias at pp. 41, 80-81 & 92); Ex. NN (Illias 2); Ex. OO (Illias 3); Ex. PP (Illias

4). Mr. Illias stated that he would never have provided these additional coverages "without a specific

22

request from a broker." Ex. KK (Illias at p. 81). The contingency coverage provided by Clause 52 was one of the specific enhancements requested by Mathog & Moniello. Ex. KK (Illias at pp. 81-83, 131).

Mr. Illias added other clauses to the Policy at Zygo's request as well. For example, the Policy included a profit-sharing agreement that was not standard to an ocean marine policy. Ex. KK (Illias at pp. 46-47). This was included because Zygo claimed that it "had it under the former policy and insisted on having it in this policy." Ex. KK (Illias at p. 47). Zygo's brokers also "insisted" on and received from Royal several endorsements to the Policy because they claimed that these too had been included in Zygo's previous policy. Ex. KK (Illias at pp. 47-48 & 92). Furthermore, Mr. Illias was told that he could not "get this policy" unless he acceded to certain requests by Zygo. Ex. KK (Illias at pp. 91-92).

Importantly, the contingency coverage option provided by Clause 52 was included in the Policy only because Zygo requested that form of coverage. Ex. KK (Illias at pp. 81-83). It was not standard to Royal's policy. Ex. KK (Illias at p. 131). Zygo and/or Mathog & Moniello could have read the Policy before Zygo accepted it in order to determine whether the nature of the contingency coverage provided by Clause 52 was what Zygo needed and had specifically requested, *but, they never bothered to do so.* Ex. MM (Weidman at pp. 58, 74, 77 & 78-80).

When Mr. Illias sent Zygo's brokers the Policy that he had drawn up based upon the information that they had provided to him, he naturally expected that they, like any other experienced and conscientious brokers, would review the Policy's terms to satisfy themselves that its provisions satisfied their client's insurance needs and were acceptably worded. Ex. KK (Illias at pp. 29-30).

23

Mr. Illias reasonably assumed that, if Zygo's brokers felt that any modifications to the Policy were needed, they would have informed him of this (Ex. KK (Illias at pp. 153-54)).

In light of the foregoing indisputable facts, the Policy is clearly not a contract of adhesion but was in fact arrived at by the parties as the result of arms-length negotiations in which Zygo, a sophisticated corporation, was represented throughout by its own experienced, long-term insurance brokers. The contra proferentem should not be applied under such circumstances.

**B.    The Contra Proferentem Rule Is One Of Last Resort And Cannot Be Applied On Zygo's Motion For Partial Summary Judgment.**

Even if the Court were to find that Clause 52 is ambiguous and that the contra proferentem rule could be applied in this case, Zygo's argument that any such ambiguities should be construed against Royal is premature. It is well established that the contra proferentem doctrine is a rule of last resort. See U.S. Fire Ins. Co., 949 F.2d at 573; Ball v. Bradley, 34 Conn. 496 (1868); Teano v. Hartford Life Ins. Co., No. CV 980580409S, 2000 WL 966371, *7 (Conn. Super. June 23, 2000); United Technologies Corp. v. American Home Assurance Co., 989 F. Supp. 128, 145 n. 19 (D. Conn. 1997) (Arterton, J.); see also 2 Couch on Insurance, § 22:16 (3d ed. 1995). It should not be applied until all other "aids to construction have been employed and have failed to resolve the ambiguity." United Technologies Corp., 989 F. Supp. at 145 n. 19; see also Ball, 34 Conn. at 496; Cooper, 1996 WL 367721 at *2-*6; Crowley v. The Banking Center, No. CV87 23 75 99S, 1994 WL 685023, *3 (Conn. Super. Nov. 29, 1994).

Instead, when a court determines that language in an insurance policy is ambiguous, it should first "consider extrinsic evidence . . . to ascertain the intent of the parties." American Home Assurance Co. v. Abrams, 69 F. Supp. 2d 339, 348 (D. Conn. 1999); see also Metropolitan Life Ins.

Co. v. Aetna Casualty and Surety Co., 255 Conn. 295, 306, 765 A.2d 891 (2001); Teano, 2000 WL

966371 at *7; 2 Couch on Insurance, §§ 22:14 and 22:16, supra.  In so doing, the court can determine

whether the parties, "by their acts, have placed a construction on the contract showing what was in

fact intended." 2 Couch on Insurance, §§ 22:14, supra; see also Teano, 2000 WL 966371 at *7.

Only after examining the parties' intentions and determining that an ambiguity cannot be resolved

thereby, should a court consider applying the contra proferentem doctrine.  See Metropolitan Life

Ins. Co., 255 Conn. at 306, 765 A.2d at 897 (internal quotations and citation omitted); Teano, 2000

WL 966371 at *8; American Home Assurance Co., 69 F. Supp. 2d at 348; United Technologies

Corp., 989 F. Supp. at 145 n. 19.

The issue of the parties' intent is, however, a "question of fact."  Pokorne v. Gary, 281 F.

Supp. 2d 416, 420 (D. Conn. 2003); see also Metropolitan Life Ins. Co., 255 Conn. at 306, 765 A.2d

at 897; Camp Delaware, Inc. v. Markel Ins. Co., No. CV990080225S, 2001 WL 541451, *4 (Conn.

Super. May 4, 2001); Crowley, 1994 WL 685023 at *4; Jurrius v. Maccabees Mutual Life Ins. Co.,

587 F. Supp. 1301, 1305 (D. Conn. 1984).  Summary judgment on this issue is thereby rendered

"inappropriate." Pokorne, 281 F. Supp. 2d at 420; see also Metropolitan Life Ins. Co., 255 Conn. at

306, 765 A.2d at 897; Camp Delaware, Inc., 2001 WL 541451 at *4; Crowley, 1994 WL 685023 at

*4; Jurrius, 587 F. Supp. at 1305.  Nonetheless, the testimony and documentary evidence in the

record demonstrates that Royal's reading of Clause 52 is reasonable.

Mr. Illias stated that the premium that he quoted to Zygo was "for all the coverages contained

in the policy, excepting some of the optional clauses contained therein." Ex. KK (Illias at pp. 34-36

& 54). He defined "optional coverage" as "a clause or an endorsement whereby the insured needs to

know [advise] the carrier before using said coverage." Ex. KK (Illias at p. 57). When asked how an insured would know what coverage was optional, Mr. Illias stated that the insured's broker should inform the insured of this and that the insured could also simply read the policy in order to ascertain this. Ex. KK (Illias at p. 57). If a broker had any questions about wording in a policy, Mr. Illias would expect the broker to call him and ask about it. Ex. KK (Illias at p. 154).

Contingency insurance under Clause 52 was one such type of *optional, additional coverage* included in the Policy. Ex. KK (Illias at pp. 131 & 136). Mr. Illias stated that any premium charged for contingency coverage would be handled as a separate transaction, apart "from the annual reporting that was set up." Ex. KK (Illias at p. 143). The Policy would have been sent to Zygo's brokers after it had been finalized so that they could "review the terms and conditions, [to] make sure they are as per agreed." Ex. KK (Illias at pp. 29-30).

Mr. Illias reads Clause 52 as requiring Zygo "to report any contingent shipments" in advance. Ex. KK (Illias at pp. 136, 154 & 173-74). As he explained, to avail itself of the contingency coverage option offered under Clause 52, Zygo would merely have to "pick up the phone, call their broker, call the underwriter and explain the circumstances and pay any additional premium thereon, if any, subject to underwriting information." Ex. KK (Illias at pp. 136-39 & 172-74). Mr. Illias stated that it is "standard and customary" in the industry for an insured to advise an insurer prior to a shipment that the shipment requires contingency insurance. Ex. KK (Illias at pp. 173-74). One hour's notification of a shipment was all that would be needed. Ex. KK (Illias at pp. 138-39). Mr. Illias did not advise Mathog & Moniello of the advance notification requirements for coverage under Clause 52 because he had been told that Zygo did not have any contingent exposure. Ex. KK (Illias

26

at pp. 153-54).  Then too, Clause 52 explicitly stated that a declaration had to be made and a premium paid, and he naturally assumed that Zygo and its brokers would take the trouble to review the Policy before accepting it.  Ex. KK (Illias at pp. 29-30 & 154).

Zygo, on the other hand, argues that Clause 52 does not require advance notification of a shipment.  See Zygo Memo. at 18-23.  It has not, however, presented any evidence to contradict Mr. Illias' understanding at the time that he drafted the Policy and offered it to Zygo, on the basis of Zygo's insurance application and his conversations with Zygo's brokers, that Zygo insured 100% of its shipments so that it normally had no contingency exposure and merely required unpaid vendor coverage as an option.  Zygo has not presented any such evidence because it cannot, as can be seen when one looks at the testimony of its own employees and its insurance brokers.[7]

Zygo cannot offer any factual testimony at trial as to its interpretation of Clause 52 at the time that it entered into the Policy for the simple reason that, apparently, neither it nor its insurance brokers could be bothered to read the Policy's terms until almost a year after they agreed to be bound by them and at least a full nine months after the subject claim arose.  Ex. MM (Weidman at pp. 58, 74 & 77-80); Ex. E (Martin at pp. 45 & 50); Ex. QQ (Dressler at pp. 42-43).  Mr. Weidman admitted that he has no recollection of ever reviewing the Policy in order to determine how, or even whether, the coverages Zygo had requested were being provided by the Policy.  Ex. MM (Weidman at p. 75).  He did not know whether anyone else at Mathog & Moniello ever reviewed the Policy at the time that it was issued.  Ex. MM (Weidman at pp. 74 & 77-79).  Mr. Weidman also did not recall having any discussions with Zygo about contingency coverage prior to the Policy being issued.  Ex. MM

---

[7] Zygo has listed no expert witness of any kind for trial to testify about this issue.

(Weidman at p. 56). There is, therefore, no basis for Zygo's interpretation of the meaning of Clause 52 in light of the circumstances under which the Policy was issued.

## POINT IV

## ZYGO'S IMPAIRMENT OF
## ROYAL'S SUBROGATION RIGHTS

### A.    Preliminary Discussion

Zygo argues that Royal's defense based on Zygo's alleged impairment of Royal's subrogation rights must be dismissed, because, according to Zygo, "Royal certainly cannot establish by a preponderance of the evidence that Zygo and Nan Ya settled their dispute over the loss of the Second AFM." Zygo's Memo. at 31. This argument, however, has three fatal flaws.

First, Zygo ignores that fact that there is abundant evidence in the record to support a finding that Zygo's claims should be denied because it has seriously impaired Royal's subrogation rights *not only by its release of Nan Ya, but also by*:

    (1)    failing to have the damaged AFMs inspected by an expert surveyor acting on Zygo's behalf at the joint survey held by Zygo and Nan Ya in February 2000 just after those damages were discovered;

    (2)    failing to give Royal any notice of that survey so that it could have its own experts attend; and

    (3)    failing to safeguard that evidence and provide Royal's experts in the months following the February 2000 joint survey with any opportunity to inspect the damaged AFMs, despite the fact that, at that survey, Nan Ya and its expert cargo surveyors, the only experts who ever got to inspect the AFMs before they were scrapped by Zygo, opined that the damages were due to bad packaging for which Zygo was responsible, with Nan Ya from that point on steadfastly basing its refusal to pay for the second AFM upon that alleged negligent packing.

28

Second, in its Motion, Zygo mistakenly places the burden on Royal to demonstrate by a preponderance of the evidence that Zygo released Nan Ya – but, that is not the standard applicable here. Zygo, as the party seeking summary judgment, is the one that bears the burden of demonstrating that there is no genuine issue as to any material fact, i.e., that, there is no evidence that could support a finding by the trier of fact that Zygo had released Nan Ya. See Fed. R. Civ. P. 56(c); see also Baisch v. Gallina, 346 F.3d 366, 371-72 (2d Cir. 2003) (stating summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party bears the burden of demonstrating the absence of a genuine issue of material fact).

Third, as demonstrated herein, the record establishes a genuine issue of material fact as to whether Zygo released Nan Ya.

### B.    Zygo's Blocking Of Royal's Inspection Of The Damaged AFMs

The extreme prejudice to Royal by Zygo's blatant breaches of Clauses 32 and 43 in denying Royal the opportunity to inspect the second damaged AFM on February 14, 2000, the last occasion on which Zygo's own engineer, Kelvin Walch, could confirm that evidence as being unspoiled, in and of itself warrants denial of Zygo's claims in this action. The considerable testimony and documentary evidence establishing those breaches by Zygo are discussed at length in Royal's prior motion for summary judgment, served on July 7, 2004 (Docket Nos. 136-29), so we will not repeat that discussion here, instead respectfully referring the Court to that motion presently under its consideration.

Zygo's failure to give timely notice of the damage to two AFMs, its failure to give any advance notice of the February 14, 2000, survey, its months of foot dragging and long delays in

29

providing even the most cursory information, its failure to do anything to safeguard the evidence, raise (at a minimum) a genuine issue of material fact as to whether Zygo's actions have impaired Royal's subrogation rights.  It is abundantly clear from the record that the only professional cargo surveyors, those hired by Nan Ya, who had an opportunity to inspect the damaged AFMs, concluded that their packaging was inadequate, a conclusion shared not only by Nan Ya, but also by Zygo's own local agent, Billy Wu.  See, e.g., Ex. TT (Cathy Inspection Report of 2/19/00); Ex. FF (Cathy Inspection Report of 2/21/00); Ex. GG (Facsimile from Wu to Zygo of 2/15/00); Ex. HH (Facsimile from Wu to Zygo of 2/16/00).  At the very least, it cannot be disputed that the inadequacy of Zygo's packaging as a possible cause of the subject damages had certainly been raised, and it was clear to Zygo that Nan Ya and its underwriters were using that as their reason for rejecting any responsibility in respect of the second AFM.  Zygo's failure to protect that evidence, to arrange for its own experts to examine it, and its deliberate blocking of any such inspection by Royal's experts severely impaired Royal's subrogation rights against Nan Ya, because Nan Ya alone had expert evidence on the point, and that evidence laid responsibility for the damages at Zygo's feet, exculpating Nan Ya and its underwriters.

At a minimum, that evidence and Zygo's actions in these regards raise a triable issue of fact as to whether Royal is entitled to decline coverage under the Policy as a result of said breach by Zygo of Royal's subrogation rights.  For Zygo to suggest that there is no admissible evidence of any such wrongdoing on its part and consequent prejudice to Royal sufficient to at least defeat Zygo's motion for summary judgment, where Zygo carries the burden of demonstrating an absence of material factual disputes, is without merit.

**C.    A Genuine Issue Of Fact Exists As To Whether Zygo Released
Nan Ya From Payment For The Second Damaged AFM.**

The record makes it abundantly clear that Zygo's and Nan Ya's negotiations on the two

damaged AFMs went on for months, with Lee-Tech's president, Billy Wu, representing Zygo in those

negotiations, but, Royal was kept in the dark about them, hearing after the fact and only indirectly

that Nan Ya's and Zygo's disputes over the damaged AFMs had been settled, only when Royal's

surveyor reported in August 2000 that his attempts to inspect the damaged machines in order to

ascertain the nature, extent and cause of the damage had been rebuffed by Mr. Wu on the grounds

that no surveys would be needed since he had resolved those disputes. Ex. O (E-mail from Chung to

Daneman of 8/25/00); see also Ex. N (E-mail from Smith to Martin of 8/9/00).

It was clear to Zygo throughout that Nan Ya and its insurers refused to pay for the damaged

AFMs because their surveyors had confirmed that said damages were due to inadequate packaging

(even Mr. Wu, who was Zygo's representative and knowledgeable about such matters concurred in

this). Ex. L (E-mail from Wu to Martin of 7/4/00); Ex. GG (Facsimile from Wu to Zygo of 2/15/00);

Ex. HH (Facsimile from Wu to Zygo of 2/16/00). And, Mr. Wu, the only Zygo representative

involved in settlement discussions with Nan Ya, repeatedly told Mr. Martin that the best settlement

that Zygo could attain, would be by sharing the cost of the AFM damages, with Nan Ya paying Zygo

for one AFM at most. Ex. L (E-mail from Wu to Martin of 7/4/00).

Zygo also knew that Royal's surveyor, attempting to get access to the damaged AFMs in

order to ascertain how and why they had been damaged, "had communicated with Billy Wu but that

Billy had been uncooperative *indicating that he had already reached an agreement with Nanya*."

Ex. N (E-mail from Smith to Martin of 8/9/00) (emphasis added). Mr. Smith testified that "Billy was

31

uncooperative with me also, and *__indicating that he had already made a deal or was working on a__* *__deal with Nan Ya.__*" Ex. D (Smith at pp. 138-39) (emphasis added).

Several days later, Royal's surveyor reported to Royal's Mr. Daneman that he had spoken to Messrs. Wu and Smith about the AFMs and recommended closing the claim because he'd been told that the damage was probably caused by insufficient packing and a settlement of the dispute had been agreed, so that all that remained was Lee-Tech's evaluation of the salvage value. Ex. O (E-mail from Chung to Daneman of 8/25/00).

Mr. Wu subsequently told Mr. Martin yet again that the "only" solution and the "conclusion for this project" was that Nan Ya and Zygo share in the costs of the damage to the two damaged AFMs and that Zygo should send an engineer to "evaluate the damage" [it is clear that this meant determine their salvage value – see Ex. T (E-mail from Martin to Wu of 10/16/00); Ex. U (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00); Ex. W (Letter from Martin to Wu of 10/27/00)], Ex. Q (E-mail from Wu to Martin of 9/22/00), and Mr. Martin responded positively to his agent's suggestions: "I am working on setting up a trip for Kelvin Walsh [*sic*] to travel to Taiwan to evaluate the machines." Ex. R (E-mail from Martin to Wu of 10/3/00). The next day, Billy Wu again told Mr. Martin that Nan Ya and Zygo, and their respective insurers, should share in the loss of the damaged AFMs. Ex. S (E-mail from Wu to Martin of 10/4/00). Mr. Martin informed Billy Wu that he was finalizing Mr. Walch's trip to inspect and assess the salvage value of *__both__* damaged AFMs and that he had placed a claim with Royal for the second damaged AFM, Ex. T (E-mail from Martin to Wu of 10/16/00), both steps consistent with the global settlement on both machines that Nan Ya had been demanding and Zygo's representative had been recommending for months.

32

Billy Wu understood that the parties were now in agreement on settlement terms and he asked Mr. Martin to affirm this formally in writing to him so that he could pass this on to Nan Ya, requesting confirmation from Mr. Martin that (1) Zygo would accept the salvage value estimated by Walch; (2) Zygo would manage one damaged AFM completely and the loss of two damaged machines would be shared equally; and (3) the salvage value for the first damaged AFM would be deducted from the balance owed by Nan Ya. Ex. U (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00).

Mr. Martin did just that, confirming in a letter, that he described as "a follow up to my email *regarding the agreement to resolve the Nanya/AFM issue*" Ex. W (Letter from Martin to Wu of 10/27/00) (emphasis added), that Zygo would engage, at its expense, Mr. Walch to perform an appraisal of both AFM units "as soon as there is agreement with Nanya on the return of the loaner unit and payment of the balance of the first unit, less an average salvage value" (Ex. W (Letter from Martin to Wu of 10/27/00)). In direct response to Nan Ya request for confirmation that Zygo agreed that Nan Ya's insurance company pay for the first damaged AFM while Zygo's insurance company paid for the second, Martin confirmed that Zygo "will, and has, filed a claim for the second unit shipped with its insurance company." At no time did he mention any reservation of rights to sue Nan Ya on the second damaged AFM. On October 30, 2000, Mr. Wu forwarded what he regarded as Mr. Martin's formal acceptance of Nan Ya's proposed settlement to its parent, Formosa Plastics. Ex. X (Fax from Lee-Tech to Formosa Plastics of 10/30/00).

Because he had not been informed of the parties' progress in resolving their impasse on the two damaged AFMs and not provided with any specific instructions by Mr. Martin, Mr. Smith

33

attended the November 13th "settlement" meeting under the impression that issues remained open,

Ex. D (Smith at p.174-75, 194), raising them at the meeting only to be repeatedly reassured by Lee-

Tech's representative that these had in fact been resolved. Ex. D (Smith at p. 167, 201 & 215-17).

The documentation generated after the November 13th meeting also indicates that Zygo and

Nan Ya had agreed on a global settlement of their disputes over both damaged AFMs. Shortly after

that meeting, Lee-Tech e-mailed Mr. Smith, copying Mr. Martin, stating their satisfaction "**that the

problem of *two damaged* systems have been settled**" in the November 13th meeting. Ex. Z at 3 (E-

mail chain, Lee-Tech to Smith of 11/13/00) (emphasis added). Mr. Martin did not contradict this,

responding: "I want to thank all of you for the effort put in to resolve this situation." Ex. Z at 2 (E-

mail chain, Martin to Lee-Tech of 11/13/00).

The repeated reassurances by Stan Lay to Mr. Smith at the November 13th meeting that Mr.

Wu had already resolved the impasse between Nan Ya and Zygo as to how the losses for the two

damaged AFMs would be allocated make sense in light of the settlement correspondence between

Messrs. Martin and Wu culminating in Martin's written confirmation of Zygo's acceptance of Nan

Ya's terms. Mr. Smith, who felt at his deposition that he'd been kept in the dark when Martin sent

him to the November 13th meeting testified that it was clear to him that, "from the very beginning, it

was a Lee-Tech negotiation all the way" in accordance with Zygo's desire that Mr. Wu negotiate

directly with Nan Ya. Ex. D (Smith at pp. 187-88).

Nan Ya had refused to pay for the second damaged AFM for nearly nine months (Ex. T), and

Mr. Martin believed that Nan Ya was holding the loaner "hostage" until Zygo agreed with Nan Ya's

settlement proposals. Ex. E (Martin at pp. 195-96). Mr. Martin admitted that there was no reason to

34

apply the average salvage value of both machines against the amount Nan Ya owed Zygo on the first damage AFM so long as Zygo was contesting Nan Ya's refusal to pay for the second damaged AFM. See, e.g., Ex. P (E-mail from Martin to Wu of 9/21/00). Yet, by the November 13th meeting, according to Zygo itself, Nan Ya agreed to pay for the first damaged AFM, less the *average salvage value for the two AFMs*, and agreed to return the loaner. That Nan Ya would do so without receiving any concession or release in return from Zygo makes no commercial sense and is simply not believable.

Royal respectfully submits that the admissible evidence discussed at length herein suffices to create adjudical disputes with respect to facts material to Zygo's apparent release of Nan Ya in breach of Royal's subrogation rights under the Policy.

### D.     But For Zygo's Deliberate Invitation Of Legal Error, Additional Nan Ya Evidence Could Be Considered By The Court.

Zygo presently argues that there is no admissible evidence that Royal can adduce that would support a finding that a release. While that is untrue, as demonstrated by the admissible evidence discussed herein, significant additional evidence that would otherwise be before this Court may not be admissible at trial unless this Court reverses Judge Goettel's clear error in granting Nan Ya's motion for summary judgment. This is in fact a state of affairs that Zygo helped engineer in order to remove Nan Ya from the case and make it more difficult for Royal to prove that Zygo had released Nan Ya.

The issue of whether Zygo released Nan Ya from any obligation to pay for the second damaged AFM, thereby breaching Royal's subrogation rights under the insurance policy with Zygo, was previously raised before this Court in Nan Ya's motion for summary judgment. In that motion,

35

Nan Ya submitted the declaration of Yaling Tsai, Tsung-wen Lien, Charles Hsieh, and Gary Chen

Kuo, each of whom represented Nan Ya and/or Nan Ya's interests at the November 13, 2000

settlement meeting. Ex. F ¶ 4 (Yaling Tsai Decl.); Ex. H ¶ 4 (Tsung-wen Lien Decl.); Ex. I ¶ 4

(Charles Hsieh Decl.); Ex. J ¶ 3 (Gary Chen Kuo Decl.). Yaling Tsai prepared meeting minutes that

outlined the parties' agreement. Ex. F ¶ 6 (Yaling Tsai Decl.). According to Yaling Tsai, "[m]y

summary was read out loud, and someone read it to Mr. Smith and Kelvin Walch who had prepared

the salvage values of the devices). Afterwards, everyone present signed the document." Id. ¶ 6 &

Exhibit "1" thereto (copy of the signed agreement).[8]    There is no dispute that Nan Ya's

representatives understood that a settlement had been reached on or before the November 13th

settlement meeting.    For example, according to Yaling Tsai's and Tsung-wen Lien's sworn

declarations, Nan Ya proposed that Nan Ya and its insurer would pay for the first damaged AFM and

would not be required to pay for the second. Ex. F ¶ 5 (Yaling Tsai Decl.); Ex. H ¶ 5 (Tsung-wen

Lien Decl.).    Similarly, Charles Hsieh and Gary Chen Kuo state in their respective sworn

declarations that the parties agreed that Nan Ya and its insurer would "cover the cost of one of the

damaged microscopes, but not the other." Ex. I ¶ 5 (Charles Hsieh Decl.); Ex. J ¶ 5 (Gary Chen Kuo

Decl.).

Zygo, as the moving party, bears the burden of demonstrating that the facially adequate

affidavits previously submitted by Nan Ya should not be considered as valid evidence in this instant

motion.    Amnesty America v. Town of West Hartford, 361 F.3d 113, 131 (2d Cir. 2004).

Admittedly, counsel for Royal cannot represent to the Court that Royal has a good faith basis to

---

[8] A copy of Chi-shyan Ling's translation of the signed agreement is attached as Exhibit "1" to the Declaration of Chi-shyan Ling, Exhibit "G" to the instant motion.

believe that Nan Ya's representatives will testify at trial because they work and live in Taiwan and Royal has been unable to secure Nan Ya's agreement to bring them to the United States for depositions or trial ever since Judge Goettel accepted Zygo's proposal to release Nan Ya from this litigation "not on the merits."

But, that decision was prompted by Zygo's proposal for a ruling not on the merits. Royal respectfully submits, however, that Judge Goettel's ruling is clearly erroneous, particularly when considering the Second Circuit's recent ruling in Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 245-47 (2d Cir. 2004), affirming that a determination of a motion for summary judgment must be made on the merits. Judge Goettel's ruling in this case explicitly failed to rule on the merits.

The District Court of Connecticut agrees that a "court may reconsider a prior ruling under three situations: 1) an intervening change in the controlling law; 2) the availability of new evidence; and 3) the need to correct a clear error of law or to prevent manifest injustice." Casey v. United States, 161 F. Supp. 2d 86, 91 (D. Conn. 2001) (citations omitted). Given Judge Goettel's explicit grant of summary judgment to Nan Ya "not on the merits" and the Second Circuit's unambiguous holding in Vermont Teddy Bear Co. that such a grant is not permissible, we submit that said grant constituted a clear error of law, a position taken by Nan Ya itself when it asked the Court to reconsider that ruling. See Docket Entry Nos. 78-80, 78-83 & 88-90.

Moreover, Judge Goettel's legally improper release of Nan Ya not on the merits notwithstanding the opposition and supporting papers filed by Zygo, a defendant with an interest in the motion's outcome and standing to oppose it, is, on its face, extremely prejudicial to Royal. If Nan

37

Ya is correct about the release, Zygo's claims must be dismissed due to its blatant impairment of Royal's subrogation rights. If Nan Ya is correct about the subject damages being due to Zygo's improper packing, once again, Zygo's claims must be dismissed. And if Nan Ya is wrong on both counts, Zygo should recover its claimed damages from Nan Ya, not Royal. To proceed to trial absent Nan Ya on this basis is manifestly unjust to Royal and exposes it to inconsistent results, as well as constituting a potential waste of judicial resource if the Second Circuit later reverses Judge Goettel's order on appeal, as we would expect it to.

Having failed to persuade Judge Goettel of the error of his dismissal, we respectfully submit that our request for this Court's reconsideration of that order's propriety is timely in view of your Honor's very recent assignment to this case, especially since that provides a last chance to correct said error before it is compounded by a trial that proceeds without the participation of Nan Ya, a central party to these disputes.

In view of the foregoing, Royal renews its request that the Court reconsider Judge Goettel's ruling on Nan Ya's motion for summary judgment or, at a minimum, accept into evidence the declarations of Nan Ya's representatives, submitted in conjunction with its motion for summary judgment, for the purpose of this motion for summary judgment to allow time for the Court to fully reconsider Judge Goettel's ruling.

## CONCLUSION

For the foregoing reasons, Zygo's motion for partial summary judgment should be **DENIED**.

Dated: July 29, 2004
   New York, New York

      Respectfully submitted,

    NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE

    By:  *Geoffrey J. Ginos*
       Geoffrey J. Ginos (ct. 19578)
       Wall Street Plaza
       88 Pine Street, 7th Floor
       New York, New York 10005-1801
       (212) 220-3830

       and

    LAW OFFICES OF ROBERT K. MARZIK, P.C.
    1512 Main Street
    Stratford, Connecticut  06615

    *Attorneys for Plaintiff / Third Party Plaintiff*
    *Royal Insurance Company of America*

39

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing filing, "Royal Insurance Company of America's Opposition to Zygo Corporation's Motion for Partial Summary Judgment" was sent *via* Federal Express this 29th day of June, 2004 to:

Honorable Janet Bond Arterton
United States District Court
141 Church Street
New Haven, Connecticut  06510.


Ian E. Bjorkman, Esq.
Wiggin & Dana
One Century Tower
New Haven, Connecticut 06508

Charlsa D. Broadus, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499

Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

Robert K. Marzik, Esq.
Law Office of Robert K. Marzik, P.C.
1512 Main Street
Stratford, Connecticut 06615


GEOFFREY J. GINOS (CT 19578)