UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | ) | |
| ROYAL INSURANCE COMPANY OF | ) | |
| AMERICA, | ) | |
| Plaintiff, | ) | Civil No. 3:01 CV 1317 (JBA) |
| | ) | |
| v. | ) | |
| | ) | |
| ZYGO CORPORATION, | ) | |
| Defendant. | ) | |
| | ) | July 30, 2004 |

### DEFENDANT ZYGO CORPORATION'S MEMORANDUM OF LAW
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Zygo Corporation ("Zygo") submits this memorandum in opposition to plaintiff Royal Insurance Company of America's ("Royal") motion for summary judgment dated July 7, 2004.

### INTRODUCTION

"Insureds in Connecticut can expect that insurers will *reasonably and adequately investigate claims* before denying coverage." *Uberti v. Lincoln Nat'l Life Ins. Co.*, 144 F. Supp. 2d 90, 104 (D. Conn. 2001) (Arterton, J.) (emphasis added). Further, "an insurer may not [deny] benefits on the basis of *unsupported determinations* resulting from its *arbitrary failure or refusal* to properly perform the claims examination function." *Id.* (emphasis added).

Here, in direct contravention of this clear statement of the law, Royal left Zygo's legitimate claim for insurance coverage unresolved and uninvestigated for over 16 months, ultimately denying the claim without providing any explanation whatsoever for the denial and simultaneously instituting this lawsuit in order to use the rules of discovery to determine, in the

first instance, whether coverage existed under the Policy. *See, e.g.,* Deposition of Joseph Daneman 46-48 (Daneman Dep.) (excerpts attached as Ex. 1 to the Affidavit of Ian E. Bjorkman in Support of Zygo Corporation's Opposition to Plaintiff's Motion for Summary Judgment, dated July 30, 2004 (hereinafter "Bjorkman Aff."). On these facts, it is clear that Royal ignored its duty to investigate Zygo's claim "reasonably and adequately." *See Uberti*, 144 F. Supp. 2d at 104. Throughout its Motion for Summary Judgment, Royal attempts to avoid this reality by misrepresenting the factual record , and relying on documents and other alleged evidence that will not be admissible at trial, in violation of Fed. R. Civ. P. 56(e). Ironically, Royal then has the audacity to accuse Zygo of violating Fed. R. Civ. P. 11 in pleading its counterclaims, while in the same breath admitting, quite shockingly, that it had absolutely "no knowledge or evidence pertaining to" an entire Count in its own Complaint. Royal's Memorandum of Law in Support of its Motion for Summary Judgment (hereinafter "Mem. of Law") at 12; Compl., Count 4.

Further, Royal argues that it is entitled to summary judgment based on a wholly inaccurate representation of Connecticut law. It fails to cite, even once, the two controlling and highly relevant decisions on insurer bad faith that this very Court decided in recent years. *See Uberti*, 144 F. Supp. 2d at 90; *United Technologies Corp. v. American Home Assur. Co.*, 118 F. Supp. 2d 181, 187-88 (D. Conn. 2000). In *United Technologies*, this Court already held that the two cases on which Royal bases its argument – *Bergen v. Standard Fire Ins. Co.*, Docket No. CV 93044099S, 1997 WL 809957 (Conn. Super. Ct. Dec. 31, 1997), and *McCauley Enterprises, Inc. v. New Hampshire Ins. Co.,* 716 F. Supp. 718 (D. Conn. 1989) – do not accurately reflect Connecticut law and/or do not address the availability of recovery based on procedural bad faith. *See United Technologies*, 118 F. Supp. 2d at 187-88.

Royal's Motion for Summary Judgment misrepresents the applicable facts and law in an attempt to pull the wool over the Court's eyes. However, the simple truth is that the material facts underlying Zygo's bad faith counterclaim are hotly contested. Moreover, even if the facts were not disputed, Royal simply is not entitled to judgment as a matter of law on Zygo's counterclaim. Accordingly, this Court must deny Royal's Motion for Summary Judgment.

## MATERIAL DISPUTED FACTS

Despite Royal's efforts to conjure a basis for summary judgment, the material facts regarding Royal's investigation of Zygo's claim and eventual denial of coverage are vigorously disputed. The parties disagree on a number of factual questions directly relevant to Zygo's claims, including:  whether Royal failed to undertake a reasonable and adequate independent investigation of Zygo's insurance claim, instead relying on unsubstantiated assertions made by Zygo's adversary as a basis for denying coverage; Royal's motives for failing to decide Zygo's entitlement to coverage for more than sixteen months after Zygo notified it of the claim; and whether the denial of coverage, and this lawsuit, were motivated by Zygo's decision to take its insurance business elsewhere, as opposed to any provision of the Policy. Royal's recitation of the relevant facts is intentionally misleading, with several notable omissions.

## I.    Royal Failed to Investigate the Claim Reasonably and Adequately.

Though Royal had unfettered access to Zygo personnel and contractors who were in the best position to know about the company's claim, and had notice of the claim very soon after the Atomic Force Microscope ("AFM" or "Cargo") was damaged, Royal failed to undertake reasonable and adequate efforts to investigate the claim. Royal received notice of the claim from Zygo on March 7, 2000, approximately 3 weeks after the damage had occurred. *See* Ex. D to Affidavit of Geoffrey J. Ginos in Support of Royal Insurance Company of America's Motion for

Summary Judgment (hereinafter "Ginos Aff."). The March 7 notice to Royal attached a February 14, 2000 email from Kelvin Walch, a contractor for Zygo who was the first person to inspect the damaged AFM. *Id.* The February 14 email provided to Royal contained information about the nature of the damage sustained by the AFM and the nature of the dispute between Nan Ya and Zygo that served as the basis for Zygo's claim. It also included Mr. Walch's contact information at the bottom of the email. Thus, on March 7, Royal had sufficient information in its possession to begin its independent investigation of Zygo's claim. Royal could have contacted Zygo – its customer – and/or Mr. Walch directly for further information about the damaged Cargo. It did not.

Further, by May 1, Royal received correspondence from Zygo's broker Mathog & Moniello ("M&M"), containing further contact information for individuals with knowledge relevant to the adjustment of Zygo's claim. Royal likely would have received detailed information on Zygo's claim even more quickly had it not relied exclusively on M&M to gather information on its behalf. Larry Martin, Zygo's Staff Assistant to the President, testified that he did not recall seeing Royal's March 8, 2000 letter to M&M requesting information. Deposition of Larry Martin (hereinafter "Martin Dep.") (excerpts attached as Ex. 2 to the Affidavit of Ian E. Bjorkman in Support of Zygo Corp.'s Opposition to Royal's Motion for Summary Judgment ("Bjorkman Aff.")) at 150-52. Mr. Martin further testified that, had he received Royal's request for information in March, he would have "informed somebody in March that they should be prepared to try and assist." *Id.* at 152.[1] Whether Royal acted in good faith when it neglected to contact Zygo directly for information regarding the claim and opted instead to write an

---

[1] When Mr. Martin was asked in August for relevant information, he immediately replied to M&M and instructed individuals to cooperate with an investigation that ultimately never took place. *See* Bjorkman Aff., Ex. 23.

occasional letter to M&M and otherwise ignore its duty to investigate the claim clearly presents a dispute of material fact.

In any event, Royal clearly had all of the information it needed to fully investigate Zygo's claim by May 1, 2000, at the latest. Royal then proceeded to do nothing with that information for many months. Mr. Daneman admitted that he never called Sylvain Muckenhirm or Timothy Smith, the contact people that M&M identified for Royal on or before May 1, 2000. Deposition of Joseph Daneman ("hereinafter "Daneman Dep.") (excerpts attached as Ex. 1 to Bjorkman Aff.) at 46-47. Mr. Daneman could not provide a reasonable explanation for his failure to contact these individuals. Instead, he testified that the only reason he didn't make these contacts was that, as a matter of courtesy to the broker, he usually does not contact assureds directly and keeps all communications going through the broker. *Id.* But this general practice of courtesy to the broker does not justify Mr. Daneman's complete failure to contact Mr. Muckenhirm and Mr. Smith, individuals with information directly relevant to Zygo's claim, when the broker itself provided Mr. Daneman with the contact information and expressly told him to contact these two individuals. *See* Ex. H to Ginos Aff.

Royal's contention that it proceeded in good faith and was prejudiced by M&M's alleged delay in responding to its requests for information is belied by other examples of its utter failure to do anything with the information it did receive from Zygo and M&M. To this day, no one from Royal has ever contacted Kelvin Walch to discuss the damage to the AFM. Walch Dep. at 284-85. Royal had Mr. Walch's contact information as early as March 7, 2000, when Zygo first notified Royal of this claim by forwarding Mr. Walch's e-mail, but it did nothing with that information. Royal cannot give any credible explanation for its total failure to investigate Zygo's claim. Why Royal sat on its rights and its obligation to investigate Zygo's claim, without

doing so much as picking up the telephone and calling anyone with knowledge about the damaged Cargo and Zygo's claim, clearly presents a disputed issue of material fact.

Royal claims that it attempted to assign a surveyor to inspect the Cargo but – like Royal – the surveyor did little, if anything, to investigate the claim. Royal's claim that its surveyor was denied access to the damaged AFM is simply not true.[2] Instead, the evidence shows that Royal's surveyor dragged its feet for many months, inexplicably neglected to contact the right people to institute a survey, and then expressly told Zygo's representative in Taipei, Timothy Smith, that it did not need to see the damaged AFM at all. Specifically:

- On May 19, 2000, Mr. Daneman wrote to Richard Chung of Royal & Sun Alliance in Taipei, asking him to arrange for a survey. *See* Ex. 6 to Bjorkman Aff. When Mr. Daneman sent this letter to Mr. Chung, he also faxed Mr. Chung at least 41 pages of documents. *See id.*; Daneman Dep. at 69-70. Mr. Daneman testified that the 42 page fax probably included "almost everything, if not everything, in my claim file at that time." Daneman Dep. at 70. Mr. Daneman also testified that, when he sent this letter to Mr. Chung, he "expected a preliminary report [from Mr. Chung or the appointed surveyor] within a few weeks." Daneman Dep. at 62.

- On June 5, 2000, Mr. Daneman sent Mr. Chung another letter asking for the current status of the survey. *See* Ex. 7 to Bjorkman Aff.; Daneman Dep. at 63.

---

[2] Royal's "factual" recitation summarizes its months of inaction in one sentence. *See* Royal's Local Rule 56(a)(1) Statement ¶ 34; Mem. of Law at 7. The chronology set forth in this brief (and notably omitted from Royal's brief) demonstrates that Royal did no independent investigation of this claim, despite having enough information to undertake this investigation and despite leading Zygo to believe for more than a year that it was investigating the claim.

- On June 15, 2000, Mr. Daneman sent an email to Mr. Chung, once again requesting an update on the status of the survey, and stating that he had not received any response to his May 19 and June 5 faxes. *See* Ex. 8 to Bjorkman Aff.; Daneman Dep. at 63.

- On June 19, 2000, a solid month after Royal first enlisted his help, Mr. Chung faxed Mr. Daneman with an update, stating "the damage cargo are not available to survey and according to the shipper's statement, they haven't put forward a claim of the damaged cargo." *See* Ex. 9 to Bjorkman Aff. On that same date, Mr. Daneman sent a letter to M&M, passing on Mr. Chung's comments verbatim, even though he didn't understand them. *See* Ex. 10 to Bjorkman Aff.; Daneman Dep. at 63-69. Mr. Chung's assertion that the "shipper" had not put forward a claim for the damaged cargo did not make any sense to Mr. Daneman, but instead of asking Mr. Chung to clarify who the "shipper" was, Mr. Daneman opted to parrot that very language in his letter to M&M without explanation. Daneman Dep. at 65, 68. Mr. Daneman took the representation in Mr. Chung's email that the Cargo was unavailable to survey "at face value," without doing any independent investigation of the matter. Daneman Dep. at 67. Accordingly, Mr. Daneman asked M&M to identify the location of the damaged AFM and a contact person to arrange the survey, *see* June 19, 2000 letter, even though Mr. Daneman's file (which he had faxed to Mr. Chung on May 19) already contained that very information. Daneman Dep. at 71-73.

- On August 1, 2000, M&M emailed Mr. Daneman information on "a couple of contacts that you should be able to get your surveyor in touch with." *See* Ex. 11 to Bjorkman Aff. Notably, the contact information for Tim Smith is the same information that M&M provided to Royal on or before May 1, 2000. Thus, three full months after M&M first sent this information to Royal, Royal still had not been contacted Mr. Smith. Mr. Smith

noted in his deposition that Royal never contacted him regarding the claim. *See* Deposition of Timothy Alvin Smith (hereinafter "Smith Dep.") (excerpts attached as Ex. 3 to Bjorkman Aff.) at 136-37.

- On August 1, 2000, Larry Martin e-mailed Tim Smith and Billy Wu instructing them to accommodate requests by Royal. *See* Ex. 12 to Bjorkman Aff. Mr. Smith was contacted, but the representative "never requested to visit the Nan Ya facility or I would have facilitated that." Smith Dep. at 135. Indeed, Royal was notified on or about August 8, 2000 that its representative had contacted Mr. Smith and asked for "pictures and documentation." Bjorkman Aff., Ex. 19. This information was provided to Royal. *Id.*

- On August 25, 2000, Mr. Chung emailed Mr. Daneman, stating that he had contacted the two people mentioned in M&M's August 1 email (Billy Wu and Tim Smith), and they "have no positive answer and didn't [sic] know the situation." *See* Ex. 12 to Bjorkman Aff. Mr. Chung advised Mr. Daneman to "ignore this claim and close this file." *Id.*

- On November 10, 2000, almost three months after receiving Mr. Chung's August email, Mr. Daneman sent a letter to M&M relaying the information in Mr. Chung's email. *See* Ex. 13 to Bjorkman Aff. The November 10, 2000 letter adopts almost verbatim the language Mr. Chung used in his August 25, 2000 email to Mr. Daneman. *Compare* documents; *see also* Daneman Dep. at 77. Mr. Daneman testified that there was "no particular reason" for the three month delay in relaying this information to M&M, except that "that's usually the time that I'm taking vacation," and "I'm working on many other claim files at the same time." Daneman Dep. at 77-78. Mr. Daneman further testified that his November 10, 2000 letter advised M&M that Royal would close its file with no claim payment based primarily on the assertion in Mr. Chung's email that the case had

been settled with Nan Ya, although Mr. Daneman did not know the basis for that assertion and did not follow up with Mr. Chung to find out where he had obtained this information, or with Zygo or M&M to hear their explanation for the discussions with Nan Ya. Daneman Dep. at 79-81.

- Mr. Walch testified in his deposition that, at roughly the same time that Mr. Daneman was seeking to close Zygo's file, he visited Nan Ya again and found the damaged AFM essentially intact and available for inspection. *See* Walch Dep. at 278-81. Thus, Royal could have, even at that late date, begun its investigation of the cause of the damage to the AFM and the nature of the dispute between Nan Ya and Zygo. It never did so.

- It was not until January 4, 2001, ten months after getting notice of the claim, that Royal even offered to contact Nan Ya's insurance company to gather information about the case. *See* Bjorkman Aff., Ex. 17. Then, about a month later, Royal actually gave instructions to its Taiwan office to contact Nan Ya. *See* Bjorkman Aff., Ex. 21; Daneman Dep. at 83-84. There is no evidence that Royal actually contacted Nan Ya. Certainly, the results of any communication between Royal and Nan Ya were not communicated to Zygo.

In sum, Royal never conducted a survey of the Cargo, despite ample opportunity to do so. More importantly, however, the fact that Royal never surveyed the damaged AFM undeniably played no role in the decision to deny coverage. Daneman Dep. at 74. Royal's claim adjuster testified:

> Q.    Mr. Daneman, did the fact that GAB Robins never surveyed the damaged material play any role in your decision to deny coverage of Zygo's claim?
>
> A.    No.

Daneman Dep. at 74.

## II. Royal Punished Zygo for Making a Claim and Placing its Business with Another Insurer.

After Royal spent over a year doing absolutely no independent investigation of Zygo's claim, instead relying on hearsay from others that the claim had settled and/or that the Cargo was unavailable to survey, the Policy was up for renewal on or about May 1, 2001. Royal at first refused to renew the Policy for another term of a year, insisting instead on a month-to-month arrangement. *See* Ilias Dep. at 146-48; Bjorkman Aff., Ex. 14. Notably, the premium deposit for each month was $20,833 – more than what Zygo used to pay for an entire year! *Id.* But, Royal also gave Zygo two quotes for an extension of coverage for one year. Royal offered to charge a premium of $100,000 deposit, adjusted against gross annual sales (as in the earlier policy) if Zygo dropped its claim for the damaged AFM. Royal made an alternative offer of a flat $250,000 premium if Zygo continued to pursue the claim for the AFM. *See* Bjorkman Aff., Ex. 20; Ilias Dep. at 149-152. In addition to this hold-up to try and force Zygo to drop its AFM claim, Royal deleted the contingency clause from the Policy effective May 1, 2001. *See* Bjorkman Aff., Ex. 15. Royal's underwriter, Mr. Ilias, testified that the contingency coverage was revoked because Zygo was "abusing" it – apparently, for Royal, making a single claim under the clause in over 2 years is "abusing" the Policy. Ilias Dep. at 151-55.

On June 29, 2001, Zygo informed Royal that it decided to take its insurance business elsewhere. *See* Ginos Aff., Exs. JJ, KK.[3] When the underwriter found out about this development, he told the claims adjuster, Mr. Daneman. Ilias Dep. at 160. Royal then suddenly sprang into action. With surprising speed (especially given Royal's sluggish pace during the

---

[3] Zygo's new policy with St. Paul's offered coverage, including contingency coverage, at substantially lower rates than those that Royal was offering.

investigation of Zygo's claim), Royal instituted the present lawsuit against Zygo on July 13, 2001 – within two weeks of learning that Zygo would no longer be a customer. Incredibly, Royal was so anxious to sue Zygo it had not even disclaimed coverage when it filed this case.

Three days after filing suit, on July 16, 2001, Royal sent Zygo a letter officially declining coverage under the Policy. Even at that late date, the letter does not give any reason for declining coverage, but only cites to a few of the policy provisions without applying the facts of the case to those clauses. Zygo's claim therefore was pending for a total of sixteen months, from March 7, 2000 to July 16, 2001. Royal does not want this Court to appreciate that fact. Royal's Memorandum of Law states more than once that it issued its declination letter on July 16, 2000, see Mem. of Law at 8, a date that is off by an entire year.

### III.    Royal has Prosecuted this Action in Bad Faith.

Evidence of Royal's bad faith in declining coverage can also be found in the manner in which it has prosecuted this action. Royal not only continues to deny coverage, but in doing so has taken completely unsupported positions.

- First, Royal sued Zygo claiming that Zygo had released Nan Ya. But, we now know that neither Royal nor its lawyers had any facts to back up that claim. Mr. Daneman, who authorized the suit on Royal's behalf, testified that he did not speak to anyone at Zygo or Nan Ya about whether there had been a settlement, but he knew from M&M that Zygo did not believe that it settled the issue. Daneman Dep. at 167-69. Daneman testified that he brought this suit as a means of investigating the issue. He said, "It was an unclear situation. That was also part of the reason for the suit; to try and clarify the situation. . . . ." Id. at 168-70. "It seemed to me the best way to resolve the situation was to institute suit, and during the discovery process it might be easier to obtain all the necessary

11

communications . . . " *Id.* at 184. But the only pre-litigation action Mr. Daneman took to find out about the alleged settlement was ask M&M about it and "instruct the surveyor to try to find out from Nan Ya's insurance company what went on. . ." *Id.* at 175-76.

- Second, when Zygo wanted to find out the basis for Royal's claim that Zygo settled the claim, it propounded interrogatories on that issue. *See* Royal's Responses to Zygo's First Set of Interrogatories, dated May 31, 2002 (attached as Ex. 21 to Affidavit of Ian E. Bjorkman in Support of Zygo's Motion for Partial Summary Judgment, dated July 7, 2004). Royal's responses to those interrogatories simply repeated, as fact, assertions made by Nan Ya in its own interrogatory responses. Mr. Daneman, who signed the interrogatory responses on behalf of Royal, had no idea whether Nan Ya's version of events was true. Daneman Dep. at 191-95. All he could say was that "it's a statement that has been provided by them [Nan Ya] and it's for the courts to decide, when parties have different positions, which position is the correct position." Daneman Dep. at 194. Of course, this begs the question of why Royal adopted Nan Ya's position against its own assured. It also begs the question of why the interrogatory responses do not say that the only investigation done on this issue was to ask M&M what had happened. Since the answer from M&M was that Zygo had not released Nan Ya, Royal could not have had a good faith basis to bring a claim that there was any release.

- Third, Royal moved for summary judgment in April 2003, arguing a position – that the contingency coverage was coextensive with the FOB coverage – that was not supported by its own witnesses. To the contrary, Royal's witnesses completely disclaimed that interpretation. *See* Zygo's Memorandum of Law in Support of its Motion for Summary Judgment, dated July 7, 2004, at 15-17.

**IV.    Royal's Statement of Facts Seeks to Distract the Court from the Real Issue.**

Instead of focusing on the relevant facts, Royal's Memorandum of Law focuses on side issues that do not appear anywhere in the pleadings and have nothing to do with whether Royal investigated Zygo's claim properly and in good faith. These issues are red herrings, and the Court should ignore them.

First, Royal claims that Zygo's notice of the claim was late, and implies that its investigation of the claim was somehow prejudiced. At the outset, Royal did not include any allegation of late notice anywhere in its pleadings. Moreover, because Zygo's claim is based on Nan Ya's failure to pay for the AFM, **not** the damage itself, notice to Royal on March 7 (approximately 3 weeks after the damage occurred) that Nan Ya was refusing to pay for the Cargo cannot be considered "late notice." More importantly, Royal cannot establish that it was prejudiced by any alleged delay in notification. *See, e.g.*, Deposition of Carroll Sneed ("hereinafter "Sneed Dep.") (excerpts attached as Ex. 18 to Bjorkman Aff.). For example, Joseph Daneman, Royal's claims adjuster, admitted that Royal's declination of coverage was not based on the fact that this claim was not reported until March 7. Daneman Dep. at 40. Mr. Daneman could not say whether Royal was actually prejudiced by the short delay in notification. *Id.* at 38-39. In truth, Royal clearly was **not** prejudiced by the alleged delay because – once it did receive notice of the claim on March 7 – it proceeded to do absolutely nothing to investigate the matter. Royal cannot prove that it would have done anything differently had it received notice any earlier.[4]

---

[4] The same logic applies to Royal's claims that Zygo failed to cooperate with its investigation by delaying in providing the contact information requested. First, Royal communicated only with M&M, not Zygo, and whether sending occasional letters to a non-responsive broker constitutes an adequate claims investigation is a disputed fact. Second, Royal had sufficient information and contacts to begin its investigation as soon as it was notified of the claim. Third, once M&M did

Second, Royal claims that the Cargo's packaging was inadequate, even though this issue does not appear anywhere in the pleadings. The packaging is wholly irrelevant, however, because Mr. Daneman testified that the alleged inadequacy of package had nothing to do with Royal's decision to decline coverage for Zygo's claim. Daneman Dep. at 75. Nor could it, because the Policy does not give Royal the right to determine what kind of packaging Zygo uses for its shipments. Royal fails to explain how the Cargo's packaging could have absolved Royal of its duty to investigate Zygo's claim properly and in good faith. Moreover, Royal cannot present a single piece of admissible evidence regarding the Cargo's packaging, precisely because it did no investigation of, and therefore has no firsthand knowledge of, the Cargo. Royal never inspected the Cargo and has no independent knowledge of the packaging that was used. Instead, to support its claim that the packaging was somehow lacking, Royal relies on hearsay in emails from Zygo's sales representative Billy Wu and a report from Nan Ya's surveyor.[5] None of this "evidence" would be admissible at trial, and this Court therefore should not consider it here. *See* Fed. R. Civ. P. 56(e); *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (parties cannot use inadmissible hearsay [on] summary judgment when that hearsay will not be reducible to admissible form at trial"). The entire packaging issue is nothing more than a sideshow, concocted at the eleventh hour to distract this Court and the parties from the real issues in this case.

---

respond to Royal's requests for information, Royal admittedly did absolutely nothing with those responses. Mr. Daneman admitted that he did not contact either person M&M listed as knowledgeable about the claim.

[5] Royal incorrectly states that Billy Wu " was very familiar with these types of AFM machines." Mem. of Law at 5. There is no evidence that Bill Wu has any expertise in AFMs or packaging, Indeed, the evidence is to the contrary. Kelvin Walch testified that Bill Wu did not attend the inspection of the damaged Cargo, He also testified that "Billy Wu is very much the senior executive . . . in his company . . . He's not a technical person in respect to the AFM at least." Walch Dep. at 196-200; *see also* Martin Dep. at 122-23.

Moreover, it is worth noting that Royal grossly misrepresents the conclusions that Nan Ya's surveyors reached about the cause of the damage to the second AFM. Royal asserts that "[a]t the February 14, 2000 joint survey, Nan Ya, its underwriters and the independent cargo surveyors engaged by Nan Ya concluded that inadequate packaging had caused the subject damages." Mem. of Law at 5; Rule 56 Statement of Facts ¶ 25. That is demonstrably false. In fact, Cathay Inspection Co., Ltd, Nan Ya's independent cargo surveyors, concluded in the General Cargo Survey Report that: "The *prime cause* of this damage is distinctly due to heavy shock/bump, rough handling of workers, tumble onto ground surface throughout the flight voyage, transferring/warehousing into storage of Air Cargo Terminal of CKS Int'l Airport." *See* Bjorkman Aff., Ex. 16 (emphasis added). The Report then concludes that insufficient packing is a secondary, possible cause of the damage. *Id.* Royal takes the Report's statement about a second, possible cause of the damage entirely out of context and completely fails to mention the independent surveyors' conclusion that the "prime cause" of the damage was rough handling, not the packaging. This kind of blatant misrepresentation to this Court is inexcusable, and demonstrates the weakness of Royal's motion.

## ARGUMENT

Royal is not entitled to summary judgment on Zygo's Third Counterclaim alleging that Royal acted in bad faith in handling Zygo's claim and ultimately deciding to deny Zygo's meritorious claim for coverage.[6]    To the contrary, Zygo has gathered powerful evidence

---

[6] Royal confusingly moves for summary judgment dismissing Zygo's "bad faith and punitive damage counterclaims." *see* Mem. of Law at 1. Zygo has never asserted any separate counterclaim for "punitive damages," *see* Amended Answer, Counterclaims, and Cross-Claim, and it has asserted several counterclaims arising out of Royal's wrongful conduct with respect to Zygo. Since Royal has only specifically challenged one of Zygo's actual counterclaims, its Third Counterclaim alleging Bad Faith, its remaining counterclaims are not subject to dismissal on summary judgment.

indicating that Royal indeed acted in bad faith when it failed to investigate Zygo's claim, sitting on its rights and obligations for sixteen months and then denying the claim out of hand when Zygo cancelled the Policy. The evidence would allow a reasonable fact finder to conclude that Royal ignored its duty to investigate this claim reasonably, and is more than sufficient to allow Zygo's claims for substantive and procedural bad faith to survive Royal's motion for summary judgment.

## I.    Summary Judgment Standard

Summary judgment is only appropriate "when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party carries the burden of demonstrating that there is no genuine material dispute of fact." *Citizens Communications Co. v. Trustmark Ins.,* 303 F. Supp. 2d 197, 205 (D. Conn. 2004) (internal citations omitted); Fed. R. Civ. P. 56(c). When determining if a genuine material dispute of fact exists, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133-34 (2d Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). As stated in a Connecticut case denying summary judgment on a claim based on the defendant's subjective motivations, "[s]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." *Suarez v. Dickmont Plastics Corp.,* 229 Conn. 99, 111, 639 A.2d 507, 513 (1994) (quoting *Batick v. Seymour*, 186 Conn. 632, 646-47, 443 A.2d 471, 478 (1982)); *Santone v. Liberty Mutual Ins. Co.,* No. CV980354105, 2003 WL 1787977 at **4 (Conn. Super. Ct. Mar. 18, 2003) (denying summary judgment on insured's bad

faith claim in part due to the difficulty of resolving "questions of motive, intent and subjective feelings and reactions" on a motion for summary judgment) (internal quotation marks omitted).

**II.    Genuine Issues of Material Fact Preclude Summary Judgment on Zygo's Claims for Substantive and Procedural Bad Faith.**

As detailed on Zygo's Local Rule 56(a)(2) Statement filed herewith, the material facts governing Royal's investigation of Zygo's claim are hotly contested.    For instance, what was Royal's intent when it sat on Zygo's claim for over 16 months, only to decline coverage after Zygo took its insurance business elsewhere?    Was Royal's investigation of Zygo's claim reasonable, where it did no independent analysis of the facts and based its decision on the unsubstantiated statements of third parties such as Nan Ya?    Did Royal act in bad faith following Zygo's submission of the claim, where it increased Zygo's rates substantially, unilaterally changed the terms of the Policy, and otherwise created a hostile environment for Zygo?    Was Royal's decision to decline coverage motivated by Zygo's decision to take its insurance business elsewhere?

These issues are disputed and material to the issue of whether Royal is liable on Zygo's counterclaim of bad faith.    Issues of intent and motive are rarely susceptible to resolution on summary judgment. *See, e.g., Ramseur v. Chase Manhattan Bank*, 865 F.2d 460 (2d Cir. 1989). Accordingly, due to the contested issues of fact, and the need to hear live witness testimony on the issues of Royal's motive and intent, this Court should deny Royal's motion for summary judgment out of hand.

**III.    Alternatively, Royal is Not Entitled to Judgment as a Matter of Law on Zygo's Claim of Substantive and Procedural Bad Faith.**

Even if the material facts were not disputed, this Court should deny Royal's Motion for Summary Judgment, because Royal is not entitled to judgment as a matter of law on Zygo's claim of bad faith insurance investigation.

Connecticut law recognizes two types of common-law claims for bad faith in the handling of insurance coverage: a claim for "substantive bad faith" arising out of an insurer's intentional failure to pay a meritorious claim for coverage, and a claim for "procedural bad faith" arising out of an insurer's deliberate failure to act reasonably towards the insured in processing the insured's claim for coverage. *See United Technologies*, 118 F. Supp. 2d at 187-89; *see also Uberti*, 144 F. Supp. 2d at 103-04 (holding that an insurer was liable for procedural bad faith in failing to "reasonably and adequately investigate claims before denying coverage").[7] Zygo's bad faith counterclaim plainly asserts that Royal committed acts evidencing both procedural and substantive bad faith. *See, e.g.,* Amended Answer, Counterclaims, and Cross-Claim ¶ 127 (asserting that Royal, *inter alia,* denied Zygo's valid claim for coverage and failed to fairly and adequately investigate Zygo's claim).

---

[7] Notably, Royal fails to cite to either *United Technologies* or *Uberti* in its Memorandum of Law. Instead, Royal grossly misstates Connecticut law by relying almost exclusively upon an unpublished Connecticut Superior Court decision, *Bergen v. Standard Fire Ins. Co.*, Docket No. CV 93044099S, 1997 WL 809957 (Conn. Super. Ct. Dec. 31, 1997), which this Court already has held "mischaracterizes" Connecticut law. Royal also relies on *McCauley Enterprises, Inc. v. New Hampshire Ins. Co.*, 716 F. Supp. 718 (D. Conn. 1989), another case that this Court addressed in *United Technologies*, holding that *McCauley* "does not reject the existence of a cause of action under Connecticut law for 'procedural bad faith,' but rather holds that the plaintiff failed to adduce sufficient evidence on such a claim to survive summary judgment." 118 F. Supp. 2d at 187. As with Royal's mischaracterization of the facts, discussed *supra*, this blatant misrepresentation of the applicable law is further evidence that Royal is grasping at straws, and its Motion for Summary Judgment is decidedly weak.

A.     **Royal's Handling of Zygo's Claim Constitutes Substantive Bad Faith.**

Insurance company behavior evidencing substantive bad faith includes, as articulated by

Conn. Gen. Stat. § 38a-816(6),

> (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; . . . (m) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; [and] (n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

*See United Technologies Corp.*, 118 F. Supp. 2d at 188 (citing unfair practices described in

Section 38a-816(6) as examples of substantive bad faith).

If compelling insureds to institute litigation in order to recover insurance proceeds

constitutes bad faith, *see* Conn. Gen. Stat. § 38a-816(6)(g), then surely Royal's behavior – ***suing***

***its own insured in lieu of investigating a claim*** – supports a strong inference of bad faith. Royal

admittedly did nothing to investigate Zygo's claim and knew nothing about the facts of the

matter. For that reason, according to Mr. Daneman, Royal instituted a lawsuit to "let the judge

decide which was the correct position." Daneman Dep. at 164. Mr. Daneman admittedly

"wanted to ***investigate through litigation*** to see if we could have all pertinent communications

produced through discovery to help resolve the issue." Daneman Dep. at 186 (emphasis added).

If this were appropriate behavior for an insurance company, then every insurance claim would

result in litigation, so the parties could "let the judge decide" coverage. But that would

completely obviate an insurer's obligation to investigate and adjust a claim in good faith. The

manner in which Royal instituted this action, and the reasons for suing Zygo, are strong evidence of Royal's bad faith.

Moreover, Royal's liability under the Policy is "reasonably certain,"[8] and it therefore acted in bad faith by failing to effectuate a "prompt, fair and equitable" settlement of the claim. *See* Conn. Gen. Stat. § 38a-816(6)(f).    Even Royal must concede that its 16-month "investigation" of Zygo's claim was anything but "prompt."    And it was far from fair and equitable for Royal – with no independent knowledge of the facts of the coverage issue or the alleged settlement with Nan Ya – to choose, sight unseen, to side with Nan Ya's version of events over that of its own insured.  Royal sued its insured based on hearsay from a third party, when it had absolutely no firsthand knowledge of the situation.  Royal's entire approach to Zygo's claim – do nothing, believe unsubstantiated hearsay, and file suit – creates a strong inference of its substantive bad faith.

Further, Royal failed "to promptly provide a ***reasonable explanation of the basis*** in the insurance policy ***in relation to the facts or applicable law*** for denial of a claim." Conn. Gen. Stat. § 38a-816(6)(n).  Royal's July 16, 2001 letter declining coverage for Zygo's claims was far from prompt, and provided absolutely no (let alone a reasonable) explanation of the basis for denying the claim.  The letter merely regurgitates various sections of the Policy, and then states that coverage will be denied.  Royal's purported declination letter did not even attempt to provide any analysis of the Policy's application to the facts as Royal understood them.  Indeed, Zygo does not entirely understand the exact basis for the denial of coverage. *See, e.g.,* Sneed Dep. at 117-20.  Apparently, neither does Royal, as it has tried to use the lack of specificity in its

---

[8] *See generally* Zygo's Memorandum of Law in Support of its Motion for Summary Judgment at 12-26.  Although Royal claims that it has "substantial defenses" to coverage, Ginos Aff., ¶ 3, its

declination letter to its advantage throughout this litigation – raising new issues and claims at the eleventh hour (such as the alleged late notice and inadequate packaging) even though they did not serve as the basis for denying coverage.

Together, the length of time Royal sat on Zygo's claim, the lack of any explanation for the declination of coverage, and the knee-jerk litigation (filed three days before the declination letter went out) in order to "discover the facts," are strong evidence of Royal's substantive bad faith in adjusting Zygo's claim. Indeed, the timeline of Royal's claim investigation leads to the "inference that [Royal] 'parked' [Zygo's] claims, while misleading or deceiving [its] insured into believing that productive steps towards claims resolution were underway." *United Technologies,* 118 F. Supp. 2d at 184.

### C.    Royal's Handling of Zygo's Claim Also Constitutes Procedural Bad Faith.

It is undeniable that "[i]nsureds in Connecticut can expect that insurers will reasonably and adequately investigate claims before denying coverage." *Uberti,* 144 F. Supp. 2d at 104. Insurer conduct amounting to procedural bad faith includes, as relevant here,

> (b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; . . . (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; [and] (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.

Section 38a-816(6); *see also United Technologies,* 118 F. Supp. 2d at 188 (citing quoted sections of 38a-816(6) as insurer practices "that would fall under the rubric of procedural bad faith").

In *Uberti,* for example, this Court rendered judgment after a bench trial for the plaintiff insured, finding that the insurer's investigation of his claim was significantly lacking. There, the insured received disability payments due to an injured knee for over two years before the

---

actions belie that claim – tellingly, Royal has not moved for summary judgment on coverage,

insurer's claim adjuster suddenly, and without any factual basis, concluded that the insured's injury was not a disability under the policy. The claims adjuster had no medical knowledge herself. She did not contact the orthopedist treating the insured's knee. Although the claims adjuster sent the insured a letter to arrange for an independent medical examination, she never followed through with scheduling that appointment. Over the course of two and a half years, the claims adjuster "did nothing further to update [the insured's] medical records, did not request an IME and did not press for any medical opinion on the crucial . . . issue [of the cause of the insured's knee injury]." 144 F. Supp. 2d at 96. On this basis, the Court concluded that the insurer had breached its duty of good faith and fair dealing:

> [The insurer's] senior claims examiner conducted no "investigation" of the cause of [the insured's] disability other than personally reading the collected records, forms and physician notes that were contained in her file on plaintiff. She possessed no medical education or specialized training that would allow her to make medical determinations, particularly on something as crucial as causation. . . More than two and one half years after [the insured's] claim was filed, without the IME [the claims examiner] had previously thought was necessary when she took over the claim, and without any medical opinion [on the cause of the insured's injury] . . . [the claims examiner] determined the insured claim [was not a disability under the policy].

*Id.* at 104 (internal quotation marks omitted). Accordingly, the claims examiner's "conjecture alone . . . [could not] provide a sufficient basis for a claim denial, and still be consistent with the duty of good faith and fair dealing." *Id.* at 105.

Similarly, here, Mr. Daneman admittedly had no expertise in the shipment, packaging, or operation of AFMs. Nonetheless, he never bothered to call anyone with direct knowledge about the damaged AFM at issue, despite ample opportunity to do so. Zygo's initial notice to Royal and M&M's subsequent correspondence on this claim provided contact information for various people with firsthand information about Zygo's claim. Mr. Daneman admittedly never called

---

despite its allegedly "substantial defenses."

them. While he did go to the trouble of hiring a surveyor, he never succeeded in obtaining a survey of the Cargo (just like the claims examiner's IME in *Uberti*). Further, Mr. Daneman accepted every statement his contact Mr. Chung uttered, even those that did not make any sense to him. *See* Bjorkman Aff., Exs. 12-13; Daneman Dep. at 77-78. After failing to undertake *any* meaningful independent investigation of Zygo's claim, Royal then took Nan Ya's allegations regarding settlement at face value, without investigating their validity at all. To this day, Royal has no firsthand knowledge of the dispute (and alleged settlement) between Zygo and Nan Ya. *See* Royal's Mem. of Law at 12. It then denied coverage without providing any reasoned explanation for that decision, and decided to sue Zygo instead of discharging its duty to adjust the claim. Royal admittedly does not know what happened with the Cargo, but it never made an effort to find out. However, Royal's "conjecture alone . . . [cannot] provide a sufficient basis for a claim denial, and still be consistent with [an insurer's] duty of good faith and fair dealing." *Uberti*, 144 F. Supp. 2d at 105.

Further, a decision to "park" Zygo's claims while "misleading [Zygo] into believing that productive steps towards claims resolution were underway" constitutes bad faith. *See United Technologies,* 118 F. Supp. 2d at 184. To be sure, Royal sat on Zygo's claim until July 2001, almost a year after it decided to "ignore this claim and close the file" in August 2000. *See* Bjorkman Aff., Ex. 12. That inexplicable delay is strong evidence of bad faith. *See United Technologies,* 118 F. Supp. at 185 (concluding that insurer was liable for procedural bad faith by sitting on a claim that it had already decided to deny). Royal then instituted litigation as an impermissible substitute for the good-faith investigation it was required to take before ruling on the validity of Zygo's claim. Moreover, Royal's decision to raise Zygo's rates dramatically and

refuse to renew coverage on prior terms in order to intimidate Zygo into compromising its legitimate claim was clear evidence of bad faith.

Royal's egregious treatment of Zygo over the course of seventeen months during which it failed to adjust a claim, despite its access to readily-available physical evidence, and its decision to file suit against Zygo as a substitute for gathering facts and properly investigating Zygo's claim, indicate procedural bad faith by Royal.

## CONCLUSION

For the reasons set forth in this memorandum, this Court must deny Royal's Motion for Summary Judgment.

DEFENDANT
ZYGO CORPORATION

By: _____
Ian E. Bjorkman (ct 11648)
Erika L. Amarante (ct 22393)
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT  06508-1832
Tel. 203-498-4496
Fax: 203-782-2889
ibjorkman@wiggin.com
Its Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 30th day of July 2004, a copy of the foregoing has been

mailed, postage prepaid, to the following:


Robert K. Marzik, Esq.
Law Offices of Robert K. Marzik, P.C.
1512 Main Street
Stratford, CT  06615

John A.V. Nicoletti, Esq.
Geoffrey J. Ginos, Esq.
Nicoletti, Hornig, Campise, Sweeney & Paige
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY  10005-1801

Daniel L. FitzMaurice, Esq.
Charlsa D. Broadus, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT  06103

C. Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA  94304-1050


Ian E. Bjorkman

\15160\1\46476.7