# EXHIBIT 1

1

2  UNITED STATES DISTRICT COURT

3  FOR THE DISTRICT OF CONNECTICUT
   - - - - - - - - - - - - - - - - - - -x
4  ROYAL INSURANCE COMPANY OF AMERICA, :

5          Plaintiff,

6          -against-                    Case No.
                                        3:01CV1317
7  ZYGO CORPORATION,                       (GLG)

8          Defendant.
                                        :
9  - - - - - - - - - - - - - - - - - - -x

10

11         DEPOSITION of JOSEPH DANEMAN, taken by

12  Defendant at the offices of Nicoletti, Hornig,

13  Camprise & Sweeney, 88 Pine Street, 7th Floor, New

14  York, New York 10005-1801, on Thursday, November 20,

15  2003, commencing at 10:20 a.m., before Karen Ann

16  Carney, a Certified Shorthand (Stenotype) Reporter and

17  Notary Public within and for the State of New York.

18

19

20

21

22

23

24

25

Page 21

***Daneman***

[1]
[2]  **A:** No.
[3]  **Q:** You basically would treat them the
[4] same, but some would be bigger deals than others?
[5]  **A:** Yes.
[6]  **Q:** When you started at Royal, who was
[7] your direct supervisor?
[8]  **A:** Tony Corsale.
[9]  **Q:** When, if ever, did that change to a
[10] different supervisor?
[11]  **A:** At some point he promoted somebody
[12] to supervisor, Susan Smith.
[13]  **Q:** Where did Tony Corsale work? Did he
[14] work in New York?
[15]  **A:** Yes, he worked in New York.
[16]  **Q:** I thought in one of the
[17] interrogatory responses it was a Charlotte
[18] address? Does Royal have an office in Charlotte?
[19]  **A:** Charlotte is the national
[20] headquarters. Tony's boss was in Charlotte, but
[21] Tony worked in New York.
[22]  **Q:** Who is Tony's boss?
[23]  **A:** That changed also.
[24] I think he has had a few bosses over
[25] the course of my five years there.

Page 22

***Daneman***

[1]
[2]  **Q:** If you know, do you know in the
[3] 2000-2001 time frame?
[4]  **A:** Probably Joe Mistretta.
[5]  **Q:** He worked in Charlotte?
[6]  **A:** I think so.
[7] I know after Royal acquired Orion,
[8] there were a lot of top executives that were in
[9] Hartford, I believe. And I know Joe Mistretta
[10] came from Orion and I'm not a hundred percent sure
[11] if Joe Mistretta relocated to Charlotte or whether
[12] Joe continued to operate out of Hartford.
[13]  **Q:** Was Tony Corsale a resident in the
[14] New York office for the five or so years you were
[15] there?
[16]  **A:** Yes.
[17]  **Q:** And do you know what his title was?
[18]  **A:** He was Claims VP, Marine Claims VP.
[19]  **Q:** And when did Susan Smith become your
[20] supervisor?
[21]  **A:** About two years ago.
[22]  **Q:** Do you recall whether she was your
[23] supervisor during the time of the Zygo claim?
[24]  **A:** I don't recall.
[25]  **Q:** When she became your supervisor,

Page 23

***Daneman***

[1]
[2] what was her title?
[3]  **A:** Supervisor.
[4]  **Q:** Before she was your supervisor, what
[5] was her title?
[6]  **A:** I believe she was an MCU
[7] Specialist-Field, also. Royal had — I was an
[8] MCU, actually, for cargo. Susan Smith was MCU
[9] for, I believe, P&I. And then we actually had
[10] another MCU adjuster for hull.
[11]  **Q:** Who was that?
[12]  **A:** Hull was Jim McDonald.
[13]  **Q:** And during the time you were at
[14] Royal, did you have anyone reporting to you?
[15]  **A:** No, not officially.
[16]  **Q:** Now, when you were at Royal, the
[17] underwriters — strike that.
[18]  There was an underwriter group; is
[19] that right?
[20]  **A:** Yes.
[21]  **Q:** And they were also in the New York
[22] office?
[23]  **A:** Yes.
[24]  **Q:** Were there other groups concerning
[25] Royal's business housed in the New York office?

Page 24

***Daneman***

[1]
[2]  **A:** Well, Royal had two offices in
[3] downtown Manhattan. Actually, I think they had
[4] more than two offices. They had offices in two
[5] different buildings. And the building in which
[6] the marine workers were located, they also had
[7] other divisions on another floor; but where the
[8] marine department was located; it was just the
[9] marine department.
[10]  **Q:** What I'm trying to get at, and
[11] probably I didn't ask it in the best way, I
[12] understand that there was an underwriting function
[13] and a claims function.
[14]  Were there other functions at
[15] Royal's offices in New York?
[16]  **A:** Not on the floor where I worked, no.
[17]  **Q:** When you became an adjuster at
[18] Royal, did you go through any training?
[19]  **A:** No.
[20]  **Q:** Was there a policy manual at Royal?
[21]  **A:** I believe there was a policy manual.
[22]  **Q:** What was in the policy manual?
[23]  **A:** I don't recollect.
[24] It would have been something that I
[25] would have looked at the first few months at

Page 37

[1]                     **Daneman**
[2] first notice to us was March 7, 2000, and this is
[3] a fax dated March 8, 2000, which would then be the
[4] day after.
[5]     **Q:** In this letter you ask for various
[6] information, right?
[7]     **A:** Yes.
[8]     **Q:** And then you note in the paragraph,
[9] third paragraph from the bottom, that the fax from
[10] Mathog & Moniello was dated March 7, 2000, which
[11] was the first report of claim to us, quote, "which
[12] is late notice to us. This has prejudiced our
[13] investigation for this loss and, consequently,
[14] prejudiced the assured's claim against the
[15] policy."
[16]     Can you tell me how receiving the
[17] notice on March 8th prejudiced Royal's
[18] investigation of the loss?
[19]     **A:** Well, the investigation would
[20] include ascertaining the cause of the loss and
[21] ascertaining who was responsible for the loss and
[22] ascertaining when the loss occurs. And the delay
[23] in reporting it to us makes it more difficult for
[24] the surveyor to ascertain those things than if the
[25] surveyor is appointed right away, as soon as or a

Page 38

[1]                     **Daneman**
[2] day after the delivery is made. It becomes more
[3] difficult for the surveyor to ascertain those
[4] things as time goes on.
[5]     **Q:** And as this claim progressed, is it
[6] your testimony that the fact that you didn't learn
[7] about this until March 7, 2000 actually prejudiced
[8] your investigation?
[9]     **A:** It may have prejudiced our
[10] investigation.
[11]     **Q:** Now that we know about what has
[12] happened, I'm asking you whether it did prejudice
[13] your investigation?
[14]     **MR. GINOS:** Now that we know
[15] what's happened? What are you asking
[16] him to assume as a basis for the
[17] question?
[18]     **MR. BJORKMAN:** I'll withdraw
[19] the question.
[20]     **Q:** Sir, did the fact that you learned
[21] about this claim on March 7, 2000 prejudice
[22] Royal's investigation of the claim?
[23]     **A:** It is difficult to say because if I
[24] had received location information about the
[25] damaged goods and contact information about

Page 39

[1]                     **Daneman**
[2] arranging for appointment of a surveyor of the
[3] damaged goods shortly after March 8th, and I sent
[4] the surveyor in there, then I would have found out
[5] whether or not it had prejudiced our
[6] investigation.
[7]     But my request went unresponded to
[8] for about two months. And by then it is just even
[9] more of a delay, increasing the prejudice of our
[10] investigation of the loss. The surveyor —
[11]     **Q:** I didn't ask you about anything that
[12] happened after March 8th. I'm trying to figure
[13] out the period between March 14th and —
[14] February 14 and March 7th.
[15]     **A:** It prejudiced our investigation
[16] because we weren't able to do the investigation
[17] promptly.
[18]     **Q:** So are you claiming that Royal
[19] denied coverage because this claim was not
[20] reported until March 7th?
[21]     **A:** No. We were just reserving our
[22] rights that if it developed that the claim
[23] investigation had been prejudiced because of the
[24] late notice, then that would have been a citation
[25] for declination of coverage.

Page 40

[1]                     **Daneman**
[2]     **Q:** But in this case that wasn't the
[3] reason for declination of coverage, right?
[4]     **MR. GINOS:** Clarification.
[5] You mean as of March 8th or as of the
[6] declination letter or ever at all?
[7]     **MR. BJORKMAN:** Ever.
[8]     **Q:** Learning about this on March 7th did
[9] not eventually become a reason that you declined
[10] coverage, right?
[11]     **A:** It wasn't a primary reason of
[12] declination of coverage.
[13]     **MR. BJORKMAN:** Mark this as
[14] the next exhibit.
[15]     (Document captioned Class
[16] Instruction, on letterhead of Royal &
[17] SunAlliance, bearing Bates Stamp No.
[18] RY 0028, was marked as Daneman Exhibit
[19] No. 7 for identification, as of this
[20] date.)
[21]                     **BY MR. BJORKMAN:**
[22]     **Q:** Showing you what has been marked as
[23] Exhibit 7, can you identify that (handing)?
[24]     **A:** (Perusing document.) This is a
[25] Royal form that I've written up, which is the form

Page 45

[1]                     **Daneman**

[2] through RY 00230, was marked as

[3] Daneman Exhibit No. 8 for

[4] identification, as of this date.)

[5]         BY MR. BJORKMAN:

[6]     **Q:** Can you identify Exhibit 8?

[7]     **A:** (Perusing document.) Exhibit 8 is a

[8] copy of correspondence from Matt Weidman of Mathog

[9] & Moniello to me, dated May 1, 2000.

[10]     **Q:** And you received this May 8th, is

[11] that right? Is that what that indicates —

[12]     **A:** (Perusing document.) Yes.

[13]     **Q:** — on the stamp on the side?

[14]     **A:** Yes.

[15]     **Q:** What did you indicate, what did you

[16] understand this memo to be?

[17]     **A:** Matt is responding to my previous

[18] inquiries for information, and generally giving a

[19] status report that it looks like the machines are

[20] going to be looked at for evaluation for repair

[21] estimates because they believe that they are

[22] fixable.

[23]     **Q:** On the second page Mr. Weidman gives

[24] you the name of Sullivan Muckenheim and gave you

[25] his phone number, his cell phone number and his

Page 46

[1]                     **Daneman**

[2] e-mail and said in this memo he is a good point of

[3] contact with follow-up questions.

[4]     Do you see that?

[5]     **A:** (Perusing document.) Yes.

[6]     **Q:** Did you ever call Mr. Muckenheim?

[7]     **A:** I don't recollect that I did.

[8]     **Q:** Why not?

[9]     **A:** (Perusing document.) Generally we

[10] try to keep the broker involved in the

[11] communication process because the broker likes to

[12] represent the assured.

[13]     Brokers typically don't like

[14] communication directly between underwriters and

[15] assureds because then they are left out of the

[16] loop; so, I try to funnel all my communications

[17] through the brokers so that they are always kept

[18] abreast of what is going on.

[19]     **Q:** Did you understand from

[20] Mr. Weidman's memo that he didn't want you to

[21] contact Mr. Muckenheim?

[22]     **A:** No, I didn't understand that from

[23] this memo.

[24]     **Q:** Other than wanting to generally keep

[25] the broker in the loop, is there any other reason

Page 47

[1]                     **Daneman**

[2] that you didn't call Mr. Muckenheim?

[3]     **A:** Not that I recollect.

[4]     **Q:** And Mr. Weidman also gave you the

[5] name and number and e-mail address for Tim Smith.

[6]     Did you contact Mr. Smith?

[7]     **A:** (Perusing document.) I did not

[8] contact Mr. Smith, but I believe the surveyor that

[9] I assigned may have contacted Mr. Smith, or made

[10] attempts to contact Mr. Smith.

[11]     **Q:** And do you remember why you didn't

[12] contact Mr. Smith?

[13]     **A:** Primarily to keep the communication

[14] simple and keep the broker in the loop, because

[15] once the underwriter starts communicating directly

[16] with the assured, then the broker is not getting

[17] direct communications and they start doing things

[18] third-hand and it can become confusing.

[19]     So, it is primarily to keep the

[20] broker as the main focal point of communication

[21] between the assured and underwriter.

[22]     **Q:** Let me ask you this: When you

[23] received this memo on May 8th, did you want to

[24] talk to Mr. Muckenheim and/or Mr. Smith?

[25]     **A:** I don't recollect specifically

Page 48

[1]                     **Daneman**

[2] whether I wanted to talk to them or not.

[3]     **Q:** You don't remember calling up to

[4] Mr. Weidman and saying, geez, I would like to talk

[5] to these fellows, why don't you stay on the line

[6] and we'll call them; you didn't do anything like

[7] that?

[8]     **A:** I had many telephone conversations

[9] with Mr. Weidman. I can't recollect a specific

[10] conversation about Mr. Muckenheim or Mr. Smith.

[11]     **Q:** No one from the broker prevented you

[12] in any way from calling Mr. Muckenheim or

[13] Mr. Smith, right?

[14]     **A:** Right.

[15]     **MR. BJORKMAN:** Mark this.

[16]     (One-page fax transmission

[17] dated May 12, 2000, to Matt Weidman,

[18] Mathog & Moniello Companies, from Joe

[19] Daneman, bearing Bates Stamp No. RY

[20] 00227, was marked as Daneman Exhibit

[21] No. 9 identification, as of this

[22] date.)

[23]         BY MR. BJORKMAN:

[24]     **Q:** Would you identify what has been

[25] marked as Exhibit 9?

Page 61

[1]                                   *Daneman*
[2]  time frame?
[3]     **A:** I must have had a conversation with
[4]  Mr. Ilias.
[5]     **Q:** You don't recall the substance of
[6]  the conversation?
[7]     **A:** I don't have a specific recollection
[8]  of the substance of the conversation.
[9]     **MR. BJORKMAN:** Mark this as
[10] the next exhibit.
[11]    (Fax transmission on
[12] letterhead of Royal & Sunalliance,
[13] dated May 19, 2000, to Richard Chung
[14] from Joe Daneman, was marked as
[15] Daneman Exhibit No. 13 for
[16] identification, as of this date.)
[17]             **BY MR. BJORKMAN:**
[18]    **Q:** Can you identify that letter that
[19] has been marked as Exhibit 13?
[20]    **A:** (Perusing document.) It's a copy of
[21] a fax from me to Richard Chung, dated May 19,
[22] 2000.
[23]    **Q:** And Mr. Chung is employed by
[24] SunAlliance; is that right?
[25]    **A:** Yes.

Page 62

[1]                                   *Daneman*
[2]    **Q:** What is his job?
[3]    **A:** I'm not sure what his job is, but he
[4]  arranges for surveys in the local region where he
[5]  works, which is in Taiwan.
[6]    **Q:** And after you sent this letter, what
[7]  did you expect was going to happen?
[8]    **A:** I expected that Richard Chung was
[9]  going to appoint a local surveyor in Taiwan to try
[10] and make contact with someone in Taiwan to see if
[11] they could arrange to take a look at the damaged
[12] goods and do a survey.
[13]    **Q:** Did you have an expectation in terms
[14] of how long that would take to occur?
[15]    **A:** I would expect a preliminary report
[16] within a few weeks.
[17]    **Q:** And, in fact, a surveyor was
[18] appointed in Taiwan, right?
[19]    **A:** I believe so.
[20]    **Q:** But a survey was never done, was it,
[21] by that surveyor appointed by Royal?
[22]    **A:** I believe that is correct.
[23]    **Q:** You never saw a report from the
[24] surveyor done by a surveyor appointed by Royal,
[25] right?

Page 63

[1]                                   *Daneman*
[2]    **A:** That's right.
[3]    **Q:** You sent a number of letters and
[4]  e-mails to Mr. Chung asking for an update on the
[5]  status, right?
[6]    **A:** I believe so.
[7]    **MR. BJORKMAN:** Mark that.
[8]    (Fax transmission dated June
[9]  19, 2000, to Matt Weidman from Joe
[10] Daneman, bearing Bates Stamp No. RY
[11] 00216, was marked as Daneman Exhibit
[12] No. 14 for identification, as of this
[13] date.)
[14]             **BY MR. BJORKMAN:**
[15]    **Q:** Would you identify what has been
[16] marked as Exhibit 14?
[17]    **A:** (Perusing document.) A copy of a
[18] fax from me to Mr. Weidman, dated June 19, 2000.
[19]    **Q:** Now, between the time you wrote your
[20] May 19th letter, which is Exhibit 13, and your
[21] May 14th letter, had you spoken to Mr. Chung
[22] about the status of the survey?
[23]    **A:** You mean the June .
[24]    **Q:** Between the May 19th letter to
[25] Mr. Chung and the June 19th letter to Mr. Weidman,

Page 64

[1]                                   *Daneman*
[2]  had you spoken to Mr. Chung?
[3]    **A:** I don't recollect that I spoke with
[4]  Mr. Chung.
[5]    **Q:** How did you get the information that
[6]  is in that first paragraph?
[7]    **A:** I probably received a fax or an
[8]  e-mail from Mr. Chung.
[9]    **Q:** What does it mean they had not, in
[10] that first paragraph, according to the shipper's
[11] statement, they have not put forward a claim of
[12] the damaged cargo?
[13]    **A:** I was probably quoting from a fax or
[14] e-mail from Mr. Chung.
[15]    **Q:** What does that mean?
[16]    **A:** I believe it means that NanYa is not
[17] putting in a claim for any damaged cargo.
[18]    **Q:** So NanYa is the shipper?
[19]    **A:** NanYa is the consignee.
[20]    **Q:** In this sentence who is the shipper?
[21]    **A:** The shipper is Zygo, but Mr. Chung
[22] may have been miscategorizing who NanYa was. I
[23] believe that Mr. Chung was referring to NanYa.
[24]    **Q:** You were trying to explain something
[25] to Mr. Weidman, right, when you wrote this letter?

Page 65

Daneman

[1]
[2]   A: I was probably just passing the
[3]   comments on verbatim to Mr. Weidman.
[4]   Q: Why would you do that?
[5]   A: To give him the exact same status
[6]   that I had. Whatever my agent or my surveyor was
[7]   going to tell me, I would basically pass that
[8]   information on to Mr. Weidman.
[9]   Q: You didn't say, "Dear Matt, I'm not
[10]  really sure what this means, but this is what my
[11]  surveyor says," do you?
[12]  A: No, I don't say that.
[13]  MR. BJORKMAN: Mark this as
[14]  15.
[15]     (Fax on letterhead of Richard
[16]  Chung to Joseph Daneman, dated June
[17]  19, 2000, bearing Bates Stamp No. RY
[18]  00218, was marked as Daneman Exhibit
[19]  No. 15 for identification, as of this
[20]  date.)
[21]     BY MR. BJORKMAN:
[22]  Q: Can you identify Exhibit 15?
[23]  A: (Perusing document.) It is a copy
[24]  of an e-mail from Mr. Chung to me, dated June 19,
[25]  2000.

Page 66

Daneman

[1]
[2]   Q: And it says, "Dear Joseph, Sorry for
[3]   delay in replying to your previous fax."
[4]     What did you understand that to
[5]   mean?
[6]   A: (Perusing document.) I had sent
[7]   Mr. Chung a fax, I guess, inquiring about status
[8]   and he was, I guess, now going to give me a status
[9]   in this e-mail, but I guess it was the time
[10]  between my previous fax and this June 19th fax
[11]  he felt was a delay.
[12]  Q: And then in this e-mail you're told
[13]  who had been appointed, right?
[14]  A: Yes.
[15]  Q: Do you know what GAB Robins is?
[16]  A: I believe that they are a survey
[17]  company.
[18]  Q: And why do you think that?
[19]  A: I have had — from my experience, I
[20]  know GAB in the United States, GAB Robins is a
[21]  survey company.
[22]  Q: And you were told that the cargo was
[23]  not available to survey, right?
[24]  A: Yes.
[25]  Q: Did you do anything to confirm that?

Page 67

Daneman

[1]
[2]   A: Well, that's why I passed the exact
[3]   communication on to Mr. Weidman, to let him know
[4]   what our surveyor, our agent was telling us so
[5]   that he could, if he felt there was any problems
[6]   with that statement, that he could assist.
[7]   Q: You received this e-mail on
[8]   June 19th, right?
[9]   A: Yes.
[10]  Q: And you sent this letter to Matt
[11]  Weidman on June 19th, right?
[12]  A: Yes.
[13]  Q: So you didn't take it upon yourself
[14]  to do any investigation to find out whether or
[15]  not, in fact, the cargo was not available to
[16]  survey, right?
[17]  A: No. I took that statement at face
[18]  value. The surveyor is saying the cargo is not
[19]  available to survey, I'm passing that on to see if
[20]  there are any problems with that.
[21]  Q: Did you find it to be unusual to
[22]  find that the cargo was not available to survey?
[23]  A: No; considering that it is three
[24]  months later, I didn't find that unusual. The
[25]  cargo could have easily been disposed of by now in

Page 68

Daneman

[1]
[2]   the three-month time period, from the time of the
[3]   shipment until the time I'm getting this message.
[4]   Q: What was the time period that you
[5]   thought the — strike that.
[6]     Did you learn that the cargo — let
[7]   me start again.
[8]     You understood at the time you got
[9]   this e-mail that you had asked for a survey a
[10]  month earlier, right?
[11]  A: Yes.
[12]  Q: And Mr. Chung wrote to you,
[13]  according to shipper's statement, they haven't put
[14]  forward a claim of the damaged cargo.
[15]     Do you see that?
[16]  A: (Perusing document.) Yes.
[17]  Q: Did you ask Mr. Chung what he meant
[18]  by that?
[19]  A: No.
[20]  Q: Why not?
[21]  A: Because I thought the person that
[22]  would have the most knowledge about what was going
[23]  on over there was the assured, which is why I
[24]  passed that information on to the broker, so that
[25]  they could then contact the assured and find out

Page 69

Daneman

[1]  what is going on.
[2]
[3]     Q: And then Mr. Chung writes,
[4]  "Therefore, it seems that we have an embarrassed
[5]  position in this case."
[6]     Do you know what he meant by that?
[7]     A: I believe he means that the surveyor
[8]  was embarrassed because he was making these
[9]  arrangements to do a survey over there and the
[10]  surveyor is being told there is nothing to survey.
[11]  So it appears that the surveyor seems to be asking
[12]  to survey something that is not there. So it
[13]  would appear to be embarrassing to the surveyor
[14]  that he has insufficient information about what is
[15]  going on.
[16]     Q: When you got this you thought that
[17]  GAB Robins had been making inquiries but hadn't
[18]  been able to survey the property, right?
[19]     A: Yes.
[20]     Q: And how would GAB Robins know who to
[21]  contact at NanYa?
[22]     A: Well, when I sent my fax of May 19th
[23]  to Mr. Chung requesting a survey, I enclosed 42
[24]  pages of documents that I had in my file, which
[25]  would be copies of correspondence and other

Page 70

Daneman

[1]
[2]  shipping documents. So there would have been
[3]  information on those documents.
[4]     Q: Well, what you sent to Mr. Chung
[5]  included survey reports you had already received,
[6]  right?
[7]     A: I don't remember.
[8]     Q: How do you remember you faxed 41
[9]  pages to him?
[10]     A: I faxed 42 documents because on
[11]  my — on Exhibit 13, the total number of pages I
[12]  sent with the fax is indicated as being 43. The
[13]  cover page would have been one page and there,
[14]  therefore, would have been 42 attachments to my
[15]  fax. This sounds like I probably faxed Mr. Chung
[16]  almost everything, if not everything in my claim
[17]  file at the time.
[18]     Q: And do you believe that also has the
[19]  address and who to contact at NanYa?
[20]     A: I believe there was information
[21]  somewhere within those documents in the
[22]  correspondence that I was faxing to Richard Chung
[23]  that had contact information.
[24]     Q: Mr. Chung wrote to you, "We have
[25]  asked an adjuster to issue the PLA."

Page 71

Daneman

[1]
[2]     What is PLA?
[3]     A: I believe that is Preliminary Loss
[4]  Adjustment.
[5]     Q: Who is the adjuster?
[6]     A: I believe he's referring to GAB
[7]  Robins.
[8]     Q: What would GAB Robins issue to you
[9]  if there had been no survey?
[10]     A: They might merely just issue a
[11]  statement of what they did, the attempts that they
[12]  made to do a survey and the results of those
[13]  failed attempts, if they were failed.
[14]     Q: Let me ask you this: Going back to
[15]  Exhibit 14, what makes you think that Mr. Chung
[16]  and GAB knew who to contact when you asked
[17]  Mr. Weidman where the machine is, the person to
[18]  contact, and the telephone numbers?
[19]     A: I'm sorry. Could you repeat the
[20]  question?
[21]     Q: Yes. I mean, I understood you to be
[22]  saying that you had faxed Mr. Chung all of the
[23]  documentation that you had and it must have
[24]  included contact information to survey the damaged
[25]  goods, right?

Page 72

Daneman

[1]
[2]     A: Yes.
[3]     Q: And then after receiving that e-mail
[4]  that said that, in fact, the goods had not been
[5]  surveyed, although you had asked for a survey a
[6]  month ago, you believed it was because they had
[7]  asked the right people and the equipment wasn't
[8]  available for inspection; right?
[9]     A: They made attempts to survey the
[10]  damaged goods and they weren't being provided with
[11]  the opportunity.
[12]     Q: How do you know that they made
[13]  attempts to survey the damaged goods?
[14]     A: Because when Mr. Chung says in his
[15]  e-mail that they have appointed GAB Robins to try
[16]  to contact the consignee and their agent to
[17]  conduct a survey, that indicates to me that that
[18]  is what GAB is going to do, they are going to make
[19]  attempts to contact the consignee and agent.
[20]     When he goes on to say the damaged
[21]  cargo is not available to survey, to me that
[22]  indicates they're making attempts and they're not
[23]  being given the opportunity. They cannot find the
[24]  damaged cargo to survey.
[25]     Q: The e-mail doesn't say Robins has

[1] **Daneman**

[2] tried to contact the consignee; just that they had

[3] been appointed to do that, right?

[4] **A:** Right.

[5] So what's the question?

[6] **Q:** You then asked Mr. Weidman for the

[7] information concerning where the damaged goods

[8] are, right?

[9] **A:** Right.

[10] **Q:** So what makes you believe that

[11] Robins had enough information to make the contacts

[12] to be told that it was not available?

[13] **A:** I thought he had enough information

[14] from the 42 documents that I enclosed to Richard

[15] Chung with my fax of May 19th.

[16] Now, when I get e-mail from Richard

[17] Chung indicating that apparently it's insufficient

[18] information, now I go back to Mr. Weidman and I'm

[19] asking him for the specific location and contact

[20] information for the survey.

[21] **Q:** And did you look at your file to see

[22] if you had given Mr. Chung enough information?

[23] **A:** I don't recollect.

[24] (Whereupon, at 12:20 o'clock

[25] p.m., a recess was taken to 12:25

[1] **Daneman**

[2] o'clock p.m.)

[3] (The deposition resumed with

[4] all parties present.)

[5] J O S E P H D A N E M A N, resumed and testified

[6] further as follows:

[7] BY MR. BJORKMAN:

[8] **Q:** Mr. Daneman, did the fact that GAB

[9] Robins never surveyed the damaged material play

[10] any role in your decision to deny coverage of

[11] Zygo's claim?

[12] **A:** No.

[13] **MR. GINOS:** If you led with

[14] that one, we could have avoided all

[15] the others.

[16] **Q:** Let me show you Exhibit 16.

[17] (Fax transmission dated

[18] November 10, 2000, to Matt Weidman

[19] from Joseph Daneman, bearing Bates

[20] Stamp No. RY 00202, was marked as

[21] Daneman Exhibit No. 16 for

[22] identification, as of this date.)

[23] BY MR. BJORKMAN:

[24] **Q:** Can you identify Exhibit 16?

[25] **A:** (Perusing document.) It is a fax

[1] **Daneman**

[2] from me to Mr. Weidman, dated November 10, 2000.

[3] **Q:** And it says in that fax that Royal

[4] is going to close its file with no claim payment,

[5] right?

[6] **A:** Yes.

[7] **Q:** When it says "under the

[8] circumstances," what circumstances are you

[9] referring to which caused you to close your file?

[10] **A:** Primarily what is laid out in my

[11] first paragraph.

[12] **Q:** And where you say "The loss was

[13] probably caused by insufficient packaging," how

[14] did you get that information?

[15] **A:** There was correspondence that had

[16] been supplied to me by the broker that indicated

[17] that.

[18] **Q:** Who came to that conclusion that it

[19] had been caused by insufficient packaging?

[20] **A:** I don't recollect.

[21] **Q:** If, in fact, the damage had not been

[22] caused by insufficient packaging, would that have

[23] changed your coverage decision?

[24] **A:** No.

[25] **Q:** What in that first paragraph led you

[1] **Daneman**

[2] to the determination that you would close your

[3] file with no claim payment?

[4] **A:** Primarily Taiwan Fire & Marine

[5] Insurance, who apparently is the insurance company

[6] for NanYa, they reportedly agreed to settle the

[7] claim at half the amount and the rest was

[8] reportedly going to be settled by Lee Tech, which

[9] is Zygo's Taiwan agent.

[10] **Q:** What did you do to satisfy yourself

[11] that that statement was true?

[12] **A:** I passed it on to the broker. If

[13] the broker of the assured had any doubts about

[14] that statement, then they're entitled to respond

[15] back, which is how I end my fax; if they have any

[16] questions or comments, please feel free to contact

[17] me.

[18] **Q:** Were you accepting as true that

[19] Taiwan Fire had agreed to settle the claim?

[20] **A:** I was accepting that at face value.

[21] **Q:** Where did you get that information

[22] from?

[23] **A:** Probably from a communication from

[24] Mr. Chung.

[25] **MR. BJORKMAN:** Mark that.

Page 77

**Daneman**

[1]
[2]     (E-mails, first to Mr. Chung
[3] from Joseph Daneman, dated August 2,
[4] 2000, bearing Bates Stamp No. RY
[5] 00204, was marked as Daneman Exhibit
[6] No. 17 for identification, as of this
[7] date.)

[8]          **BY MR. BJORKMAN:**

[9]     **Q:** Would you identify Exhibit 17?

[10]     **A:** (Perusing document.) It is a copy
[11] of two e-mails, one, the first is from me to
[12] Mr. Chung, dated August 2nd, and the second e-mail
[13] is from Mr. Chung to me, dated August 25, 2000.

[14]     **Q:** And is this e-mail from Mr. Chung
[15] dated August 25, 2000, the e-mail in which you
[16] learn that Taiwan Fire & Marine agreed to settle
[17] the claim?

[18]     **A:** (Perusing document.) That's the
[19] basis of my first paragraph in my November 10th
[20] fax to Mr. Weidman.

[21]     **Q:** Is there some reason it took you
[22] from August 25th to November 10th to tell
[23] Mr. Weidman that that is the information that you
[24] had?

[25]     **A:** No particular reason. Probably —

Page 78

**Daneman**

[1]
[2] that's usually the time that I'm taking vacation.
[3] I've got — even though I try to keep as up to
[4] date with files as possible, I'm working on many
[5] other claim files at the same time. This seemed
[6] to be a communication that was resolving the
[7] situation.

[8]     **Q:** Was it important to you to find out
[9] whether or not your assured agreed that the claim
[10] had been settled?

[11]     **A:** The assured's agent is part of this;
[12] so, the assured must know what is going on.

[13]     **Q:** The assured agent is part of what?

[14]     **A:** Part of the negotiations on settling
[15] the claim with NanYa.

[16]     **Q:** Where do you see that?

[17]     **A:** (Perusing document.) It says the
[18] rest of the amount will be settled by Lee Tech.
[19] Lee Tech is Zygo's agent.

[20]     **Q:** How do you know any of that is true?

[21]     **A:** There is other communication in my
[22] file from the broker that states that Lee Tech is
[23] Zygo's agent.

[24]     **Q:** No. In fact, Taiwan Fire & Marine
[25] insurance did not agree to settle the claim,

Page 79

**Daneman**

[1]
[2] right?

[3]     **A:** I don't know.

[4]     **Q:** Do you have any information that
[5] they did?

[6]     **A:** No.

[7]     **Q:** Did you talk to Mr. Chung about how
[8] he got this information about the settlement?

[9]     **A:** I don't recollect talking to
[10] Mr. Chung.

[11]     **Q:** Did you follow up with an e-mail
[12] asking him how he got that information?

[13]     **A:** I don't recollect following up with
[14] Mr. Chung.

[15]     **Q:** You write in Exhibit 16,
[16] "Furthermore, the assured does not have an
[17] insurable interest."

[18]     That's what you said months earlier,
[19] right? That was the position you had taken,
[20] right?

[21]     **A:** I believe so.

[22]     **Q:** So what about — strike that.
[23] In your November 10th letter are you
[24] telling Mr. Weidman that you are closing the file
[25] because of the settlement?

Page 80

**Daneman**

[1]
[2]     **A:** (Perusing document.) It's a
[3] combination of factors; one, it looks like this
[4] claim is being resolved and is going to go away,
[5] but also there is the insufficiency packaging
[6] situation, and also there is the assurable
[7] interest situation.

[8]     **Q:** Mr. Daneman, you just told me the —
[9]     (The record was read.)

[10]     **MR. BJORKMAN:** Go ahead.

[11]     **MR. GINOS:** Is there a pending
[12] question? I'm sorry.

[13]     **MR. BJORKMAN:** He was in the
[14] middle of an answer.

[15]          **BY MR. BJORKMAN:**

[16]     **Q:** The question was: Didn't you just
[17] say that the packaging didn't play any role in
[18] your decision whether or not to deny the claim?

[19]     **A:** That sounds a little bit different
[20] from the other question.

[21]     **Q:** What's the answer?

[22]     **MR. GINOS:** To which question?

[23]     **A:** There were several reasons for
[24] declination, so just because one may have been
[25] eliminated wouldn't eliminate the declination of

Page 81

**Daneman**

coverage, because there were other reasons.

Q: I appreciate that. I'm just trying to get your thought process.

It is my understanding that while you thought the loss was probably caused by insufficient packaging, that that wasn't the reason that you declined the coverage on November 10th?

A: That wasn't the primary reason that I declined. On November 10th is when I was going to close the file with no claim payment. The reason for the declination —

Q: That's a different issue, right? The reason you were going to close the file with regard to claim payment, without the — the no claim payment on November 10th, is because you thought the case had been settled; is that right?

A: That was the primary reason, as well as the assured didn't have an insurable interest; they didn't have the risk of loss.

(Multi-page document, first page dated December 12, 2000, to Joe Daneman from Matthew D. Weidman, with

Page 82

**Daneman**

attachments, bearing Bates Stamp Nos. RY 00196 through RY 00200, was marked as Daneman Exhibit No. 18 for identification, as of this date.)

BY MR. BJORKMAN:

Q: Can you identify that Exhibit 18?

A: (Perusing document.) That's a letter from Mr. Weidman to me, dated December 12, 2000, with four attachments.

Q: And in that letter from December 12th, Mr. Weidman disputes your contention that Zygo did not have an insurable interest, right?

A: (Perusing document.) Right.

Q: Did there come a time that you learned that Taiwan Fire & Marine had not settled the claim concerning the damaged property?

A: I don't think I ever learned exactly what went on over in Taiwan regarding settlement.

Q: Didn't you ask Mr. Chung to contact NanYa's insurance carrier to try and settle the claim?

A: I believe I asked Mr. Chung to inquire with NanYa's insurance carrier to try to

Page 83

**Daneman**

[1]
[2] find out the status of the settlement.
[3]      (Fax transmission dated
[4] February 5, 2001, to Richard Chung
[5] from Joe Daneman, bearing Bates Stamp
[6] No. RY 00149, was marked as Daneman
[7] Exhibit No. 19 for identification, as
[8] of this date.)
[9]            **BY MR. BJORKMAN:**
[10]     Q: Can you identify that, Exhibit 19?
[11]     A: (Perusing document.) That's a fax
[12] from me to Mr. Chung dated February 5, 2001.
[13]     Q: And you say in there, among other
[14] things, "Please ask Mr. Chen if they are willing
[15] to settle the loss for the machine in the second
[16] shipment, the same as they settled the loss for
[17] the machine in the first shipment."
[18]      Do you see that?
[19]     A: (Perusing document.) Yes.
[20]     Q: When you wrote this on February 5,
[21] 2001, you understood that Nanya's insurer had not
[22] settled the claim with respect to the second
[23] machine, right?
[24]     MR. GINOS: Are you asking him
[25] whether he believed that to be true or

Page 84

**Daneman**

[1] had been told it had been true or
[2] what? Because up until now, every
[3] single thing he has been told. You
[4] have been asking him why didn't you
[5] ascertain the truth of this. Now it
[6] sounds to — I'm not sure what you are
[7] asking him here.
[8]     MR. BJORKMAN: Can you read
[9] back the question?
[10]      (The record was read.)
[11]     A: I probably was under the impression
[12] that the settlement for the second machine was
[13] still unresolved.
[14]     MR. BJORKMAN: Mark this as
[15] 20.
[16]      (Document on letterhead of
[17] Mathog and Moniello, dated March 23,
[18] 2001, to Joseph Daneman from Carroll
[19] Sneed, bearing Bates Stamp Nos. RY
[20] 00103 and RY 00104, was marked as
[21] Daneman Exhibit No. 20 for
[22] identification, as of this date.)
[23]            **BY MR. BJORKMAN:**
[24]     Q: You received that document that has

ROYAL INSURANCE   v.
ZYGO CORP.

Page 97

***Daneman***

[2] said that.

[3]   **MR. GINOS:** That's what he

[4] said.

[5]   **A:** I don't recollect.

[6]   **Q:** You don't recollect.

[7] Okay. Do you remember the

[8] circumstances under which you first got that

[9] opinion letter?

[10]   **A:** I would have, in general I would

[11] have called up Mr. Nicoletti and told him —

[12]   **MR. GINOS:** Don't —

[13]   **Q:** I don't want to know what you said

[14] to him. I want to know if you remember in this

[15] instances the circumstance under which you got

[16] this opinion letter.

[17]   **MR. GINOS:** Do you remember?

[18] I don't want you to say anything about

[19] what the circumstances were other than

[20] what you already said on the record,

[21] that some sort of dispute arose and

[22] the general thing is we consulted

[23] attorneys.

[24]     What do you expect to get

[25] beyond here? What inference — you

Page 98

***Daneman***

[2] and I know you're fishing around here

[3] for some sort of inference

[4] connecting —

[5]   **MR. BJORKMAN:** Don't coach the

[6] witness. If you have an objection,

[7] state it.

[8]     I'll withdraw the question.

[9] I'll withdraw the question.

[10]   **MR. GINOS:** I have a right —

[11]   **MR. BJORKMAN:** There is no

[12] question pending.

[13]   **MR. GINOS:** I have a right to

[14] oppose you when you look to me —

[15]   **MR. BJORKMAN:** Let's have him

[16] go out of the room so he doesn't hear

[17] you coaching him.

[18]   **MR. GINOS:** Coaching him about

[19] what? I don't want you fishing for

[20] inferences —

[21]   **MR. BJORKMAN:** I don't care —

[22] hey, I'm going to ask —

[23]   **MR. GINOS:** — going through

[24] the back door to get attorney-client

[25] privileged information. You are not

Page 99

***Daneman***

[2] going to do that.

[3]   **MR. BJORKMAN:** I'm going to

[4] ask proper questions. If you have an

[5] objection, you have a privilege

[6] objection, you can state it. And I

[7] haven't asked one question that

[8] intrudes on the privilege and you know

[9] it. Okay?

[10]   **MR. GINOS:** No. Your

[11] question —

[12]   **MR. BJORKMAN:** I have a few

[13] questions.

[14]   **MR. GINOS:** Your question —

[15]   **MR. BJORKMAN:** It's a new

[16] question.

[17]   **MR. GINOS:** I have a right to

[18] respond to what you just said for the

[19] record.

[20]     For the record, your questions

[21] put to a lay person could easily end

[22] up like he said, and then I said to

[23] him —

[24]   **MR. BJORKMAN:** You are a good

[25] enough lawyer and you can make sure he

Page 100

***Daneman***

[2] doesn't say that. I preface —

[3]   **MR. GINOS:** I want to know a

[4] legitimate purpose.

[5]   **MR. BJORKMAN:** I don't care

[6] whether you see a purpose. You're my

[7] adversary. Of course you don't see —

[8]   **MR. GINOS:** Be careful because

[9] I'm going to direct him not to answer

[10] any more questions having to do with

[11] Mr. Nicoletti.

[12]   **MR. BJORKMAN:** Fine.

[13]   **MR. GINOS:** There is no

[14] purpose served, given the

[15] attorney-client privilege.

[16]   **MR. BJORKMAN:** Do what you

[17] have to do, okay.

[18]   **MR. GINOS:** Go ahead.

[19]   **MR. BJORKMAN:** Do what you've

[20] got to do.

[21]     **BY MR. BJORKMAN:**

[22]   **Q:** You wrote the letter on May 7th

[23] asking for a — basically that letter asks for

[24] additional information concerning the contingency

[25] clause, right?

Case 3:01-cv-01317-JBA    Document 155-2    Filed 07/30/2004    Page 13 of 22

JOSEPH DANEMAN                                                    ROYAL INSURANCE   v.
November 20, 2003                                                    ZYGO CORP.

Page 101

**Daneman**

[1]
[2]    **MR. GINOS:** May 2nd?
[3]    **MR. BJORKMAN:** May 7th.
[4]    **MR. GINOS:** May 7th is 23.
[5]    **MR. BJORKMAN:** Exhibit 23.
[6]    **THE WITNESS:** (Perusing
[7] document.)
[8]    **MR. GINOS:** You are asking him
[9] what the letter says. It speaks for
[10] itself.
[11]    What is the question?
[12]    **MR. GINOS:** I'm summarizing
[13] it. I'm trying to move on.
[14]    **MR. GINOS:** Ask him a specific
[15] question.
[16]    The letter speaks for itself.
[17] Then you —
[18]            **BY MR. BJORKMAN:**
[19]    **Q:** Mr. Daneman, prior to May 7th, did
[20] you have an understanding that Royal was going to
[21] proceed under the contingency clause?
[22]    **A:** You mean Zygo?
[23]    **Q:** Zygo? I'm sorry.
[24]    **A:** I didn't know at the time if they
[25] were proceeding under the contingency clause.

Page 102

**Daneman**

[1]
[2]    **Q:** You knew on May 7th when you wrote
[3] the letter?
[4]    **A:** I knew it was a possibility.
[5]    **Q:** You knew it was a possibility.
[6] And this May 7th letter on the
[7] second page asks for additional information
[8] concerning it, right, four paragraphs from the
[9] bottom?
[10]    **A:** (Perusing document.) Yes.
[11]    **Q:** And then after you sent this May
[12] 7th letter, you raised the reserve on this claim,
[13] didn't you?
[14]    **A:** I don't recollect.
[15]    (Document from Alan Ilias,
[16] dated May 9, 2001, bearing Bates Stamp
[17] No. RY 00364, was marked as Daneman
[18] Exhibit No. 24 for identification, as
[19] of this date.)
[20]            **BY MR. BJORKMAN:**
[21]    **Q:** Who is Chris Tye?
[22]    **A:** Chris Tye is the marine underwriting
[23] manager.
[24]    **Q:** He's a supervisor of Mr. Ilias?
[25]    **A:** Not the immediate supervisor, but

Page 103

**Daneman**

[1]
[2] would be in charge of all marine underwriters. I
[3] believe John Ellis would be the immediate
[4] supervisor of Mr. Ilias and John Ellis would
[5] report to Chris Tye. Chris Tye would be manager
[6] of all of the underwriters, marine underwriters.
[7]    **Q:** The first line of Exhibit — strike
[8] that. Did you ever see this e-mail before?
[9]    **A:** I don't recollect.
[10]    **Q:** It says in the first sentence,
[11] "Chris, Wanted to make you are aware of a large
[12] loss that will be posted by Joe Daneman tomorrow."
[13]    Do you see that?
[14]    **A:** (Perusing document.) Yes.
[15]    **Q:** Does that refresh your recollection
[16] as to whether or not you increased the reserve on
[17] Zygo's claim on or about May 10th of '01?
[18]    **A:** (Perusing document.) It doesn't
[19] refresh my recollection, but it indicates that in
[20] all likelihood I did change the reserve.
[21]    **Q:** And what did you change it to?
[22]    **A:** I don't recollect.
[23]    **Q:** Sitting here today, you don't know
[24] what the reserve is on the claim?
[25]    **A:** Yes.

Page 104

**Daneman**

[1]
[2]    **Q:** You do know?
[3]    **A:** I'm saying I don't know what the
[4] reserve is.
[5]    **Q:** Do you have any reason to believe it
[6] is anything different than the 700,000 you had
[7] originally put on it?
[8]    **A:** The only reason might be if somebody
[9] else had an idea if the reserve should have been
[10] something different than $10 or $700,000.
[11]    **Q:** And you don't have any recollection
[12] of any conversations on that issue?
[13]    **A:** No.
[14]    **Q:** Let's go back to Exhibit 23 for a
[15] second.
[16]    When you wrote that letter on May
[17] 7th, did you have an understanding as to whether
[18] there was any relationship between the contingency
[19] clause and the FOB clause?
[20]    **A:** I understood there could be a
[21] relationship between the contingency clause and
[22] the FOB clause.
[23]    **Q:** And what would that relationship
[24] have been?
[25]    **A:** If the assured was going to sell

ROYAL INSURANCE v.
ZYGO CORP.

JOSEPH DANEMAN
November 20, 2003

---

Page 145

[1]                         *Daneman*
[2] clauses, but mixed in with all this
[3] paper is a contingency clause claim
[4] which he just alluded to as having
[5] arisen, I guess a year ago,
[6] approximately.
[7]     I can have this entire file
[8] copied. You can reserve your rights
[9] if you feel, once you get all the
[10] documents, if you think it makes sense
[11] to call the witness back.
[12]     **MR. BJORKMAN:** Let's mark
[13] this.
[14]     (Document captioned
[15] Endorsement was marked as Daneman
[16] Exhibit No. 28 for identification, as
[17] of this date.)
[18]     **BY MR. BJORKMAN:**
[19]     **Q:** Would you identify Exhibit 28?
[20]     **A:** (Perusing document.) This is an
[21] endorsement attaching to and forming part of a
[22] policy issued to Trimex International.
[23]     **Q:** You were involved in a claim
[24] concerning the contingent liability endorsement,
[25] is that right, identified in Exhibit 28?

---

Page 146

[1]                         *Daneman*
[2]     **A:** (Perusing document.) Yes.
[3]     **Q:** And the contingent clause in this
[4] endorsement is Paragraph 3; is that right?
[5]     **A:** (Perusing document.) Yes.
[6]     **Q:** Paragraph 3 in Exhibit 28 is
[7] different than the terms of Paragraph 52 on
[8] Exhibit 2, right?
[9]     **A:** (Perusing document.) It is not
[10] identical.
[11]     **Q:** In fact, Exhibit 28 does not contain
[12] the language that is in Paragraph 52 of Exhibit 2,
[13] that is, the assured agrees to declare to this
[14] company the value of all shipments covered under
[15] the terms of this endorsement and pay premium
[16] thereon at rates to be agreed, right, that clause
[17] is not in Paragraph 3 of Exhibit 28?
[18]     **A:** (Perusing document.) Well, there is
[19] similar wording in Clause 3 of Exhibit 28.
[20]     **Q:** What's that?
[21]     **A:** (Perusing document.) In the
[22] beginning of the second paragraph it says, "In
[23] consideration of the declarations of all such
[24] shipments and the payment of premium thereon."
[25]     **Q:** What does that mean?

---

Page 147

[1]                         *Daneman*
[2]     **A:** It means that if the assured wants
[3] this contingent coverage, they have to declare it
[4] to Royal and they have got to pay additional
[5] premium.
[6]     **Q:** You don't know that just from
[7] reading this, right?
[8]     **A:** Yes. That's the way I interpret
[9] that first sentence of that second paragraph,
[10] Clause 3.
[11]     **Q:** It could also mean that at the same
[12] time they got this endorsement, they declared
[13] particular shipments and paid a premium on it,
[14] right?
[15]     **MR. GINOS:** Objection to the
[16] form.
[17]     You asked for his opinion. He
[18] gave it, you don't like it.
[19]     **MR. BJORKMAN:** I don't want to
[20] argue with you.
[21]     **A:** (Perusing document.) It says, "In
[22] consideration of the declarations of all such
[23] shipments," emphasizing the word "such," they are
[24] referring — to me that refers, I believe that
[25] refers back to the first paragraph of Clause 3

---

Page 148

[1]                         *Daneman*
[2] where it talks about the particulars where the
[3] assured might have a financial interest as opposed
[4] to an insurable interest.
[5]     **Q:** Prior to dealing with the Zygo
[6] claim, you never dealt with a claim under a
[7] contingency clause, right?
[8]     **A:** I don't recollect that I did.
[9]     **Q:** And if you look at Paragraph 52 of
[10] Exhibit 2, you believe 52 is not part of the basic
[11] coverage?
[12]     **A:** (Perusing document.) I believe that
[13] Clause 52 is not part of the coverage provided by
[14] the basic premium.
[15]     **Q:** I would like to direct your
[16] attention back to Paragraph 10 of the policy.
[17] Paragraph 10 talks about additional premium has to
[18] be paid, if required, right?
[19]     **A:** (Perusing document.) Yes.
[20]     **Q:** If you look at Paragraph 15, it also
[21] talks about an additional premium, right?
[22]     **A:** (Perusing document.) Yes.
[23]     **Q:** Would you refer to Paragraph 24?
[24]     **A:** (Perusing document.) Okay.
[25]     **Q:** It has an additional premium, right?

---

Page 161

[1]                      *Daneman*

[2]    **Q:** So all you're aware of is the text
[3] of Paragraph 52, right?
[4]    **A:** I'm aware of the text of Paragraph
[5] 52, and when I have come across a particular
[6] clause that might be invoked which requires
[7] additional reporting, I go and look for the report
[8] requesting that additional coverage. I'm not
[9] looking for a specific form. It can be any manner
[10] of form, a report, just so long as it has the
[11] information that identifies the shipment.
[12]    **Q:** What in Paragraph 52 tells you that
[13] it has to be some additional reporting other than
[14] what the company does routinely?
[15]    **A:** (Perusing document.) The last
[16] paragraph, the beginning of the last paragraph
[17] which states that "The assured agrees to declare
[18] to this company the value of all shipments covered
[19] under the terms of this endorsement."
[20]    **Q:** Do you have any reason to believe
[21] that Zygo did not declare to Royal the value of
[22] the shipment of the AFM that we have been
[23] discussing?
[24]    **A:** I looked for the report in the
[25] underwriter file and didn't find any such report

Page 162

[1]                      *Daneman*

[2] and then I consulted with Mr. Ilias if he was
[3] aware — if he had any other Zygo folder which
[4] might have had reports in it. And he advised that
[5] he did not have any reports.
[6]    **Q:** But you're aware that Zygo under the
[7] policy was required to declare their gross sales,
[8] right, in order to determine the premium, right?
[9]    **A:** In order to determine the basic
[10] premium, yes.
[11]    **Q:** You understood that, right.
[12] And do you have any reason to
[13] believe that in declaring their amount of gross
[14] sales, they didn't declare the value of the
[15] shipment that included the AFM?
[16]    **A:** I'm not sure what arrangements there
[17] may be between the underwriter and the broker as
[18] far as that is concerned.
[19]    **Q:** So all you know is that there was no
[20] separate declaration, right?
[21]    **A:** Right.
[22]    **Q:** Did you talk to Mr. Thomas Mulroy
[23] prior to issuing the July 16the declination
[24] letter?
[25]    **A:** I don't recollect that I did.

Page 163

[1]                      *Daneman*

[2]    **Q:** Did you talk to Robert Mooney
[3] concerning the declination of Zygo's claim?
[4]    **A:** I don't recollect that I did.
[5]    **Q:** Who is responsible at Royal for
[6] dealing with the lawyers representing Royal on
[7] this matter?
[8]    **A:** Can you rephrase the question?
[9]    **Q:** Sure.
[10] I want to know who Royal's contact
[11] is with Mr. Ginos and the Nicoletti firm with
[12] regard to this lawsuit.
[13]    **A:** I was the contact with Nicoletti's
[14] office regarding communication with this
[15] particular claim.
[16]    **Q:** You didn't authorize the
[17] commencement of the lawsuit, though, right?
[18]    **A:** I believe I did authorize the
[19] commencement of the lawsuit.
[20]    **Q:** Is there some reason that you
[21] authorized the commencement of the lawsuit prior
[22] to sending the declination letter to Zygo?
[23]    **MR. GINOS:** Which declination,
[24] the July?
[25]    **MR. BJORKMAN:** The July 16th

Page 164

[1]                      *Daneman*

[2] declination.
[3]    **A:** It seemed like there was a lot of
[4] back and forth just between Royal and the broker.
[5] And by instituting suit, we would then have
[6] everything come out, if there was any more
[7] additional information or documentation or
[8] communications come out with the suit through
[9] discovery.
[10]    **Q:** So you sued Zygo before you even
[11] sent them the letter; isn't that right?
[12]    **A:** I don't recollect the date. I don't
[13] have a copy of the suit in front of me.
[14]    (Whereupon, Mr. Bjorkman hands
[15] document to the witness.)
[16]    **A:** (Perusing document.) After looking
[17] at the complaint, it looks like the complaint was
[18] filed three days before the declination letter.
[19]    **Q:** When did you learn that Zygo hadn't
[20] renewed its policy?
[21]    **A:** I don't recollect. That wouldn't be
[22] something that I would be interested in, in any
[23] event.
[24]    **Q:** But you knew it before you sued
[25] them, didn't you?

166

Daneman

1  needed.

2       Q    So you went off on your own and sued

3  Zygo, not knowing whether they were a current

4  assured or talking to Mr. Ilias; is that your

5  testimony?

6       A    I would have consulted with

7  Mr. Corsale before filing suit, and I may have

8  advised Mr. Ilias of what I was going to do but

9  not to ask him about the status of the policy or

10  not to ask his approval.

11       Q    Tell me what you knew when you

12  decided to sue Zygo concerning the claim that Zygo

13  released NanYa, what is the basis for that claim,

14  sir?

15       A    Well, I recollect that there is

16  communication that was provided to me by the

17  broker which hasn't been presented to me during

18  this deposition, which indicates that early on

19  NanYa was not going to pay Zygo for the 20 percent

20  due Zygo on the first shipment and Zygo was not

21  going to return the loaner of the third shipment

22  when they were supposed to return it, and then --

23            MR. GINOS:  He misspoke.  He

24       said Zygo.

167

Daneman

1       A    Sorry.  NanYa was not going to

2  return the loaner of the third shipment to Zygo,

3  and at some time subsequent to that there is

4  indications that there is going to be a meeting in

5  Taiwan with NanYa and Zygo's agent; and that after

6  that I recollect reading some communication where

7  NanYa now agrees to pay the 20 percent balance due

8  to Zygo on the first shipment and agrees to return

9  the loaner to Zygo on the third shipment and,

10  therefore, there is the real possibility that --

11  and not pay Zygo on the second shipment, as if

12  that was part of the deal between Zygo and NanYa.

13       Q    Do you remember asking your assured

14  whether they released NanYa?

15       A    I believe that I asked.

16       Q    And do you remember their response?

17       A    I believe I would have to

18  double-check the correspondence --

19       Q    It is in there.  Look in Mr. Sneed's

20  letter.

21       A    (Perusing document.)  Mr. Sneed

22  advised on May 10, 2001 that Zygo, to its

23  knowledge, has not released NanYa from the

24  obligation to pay for the second shipment.

168

Daneman

1       Q    Did you think Mr. Sneed was lying?

2       A    No, I didn't think Mr. Sneed was

3  lying.

4       Q    In fact, you told him in a follow-up

5  letter that you acknowledged that --

6            MR. GINOS:  Objection.

7       Objection to the form of the question

8       as mischaracterizing what he says.

9            MR. BJORKMAN:  We'll read the

10       letter, Mr. Ginos.

11            MR. GINOS:  No.  We had

12       question and answer this morning and

13       he explained it then.

14            MR. BJORKMAN:  I asked it and

15       I'm going to ask it again in a form

16       that satisfies you.

17            MR. GINOS:  You didn't like

18       the answer.

19            MR. BJORKMAN:  I asked him if

20       he thought he was lying.  He said no.

21            MR. GINOS:  I'm referring to

22       this morning.

23            And not only that, but he

24       didn't finish his answer because you

169

Daneman

1       jumped in.

2  BY MR. BJORKMAN:

3       Q    Did you finish your answer?

4       A    No.

5       Q    Did you think Mr. Sneed was lying to

6  you when he said Zygo did not release NanYa?

7       A    No, I didn't think Mr. Sneed was

8  lying, but I thought Mr. Sneed was just passing on

9  information that was given to him.  So it was

10  hearsay to Mr. Sneed.

11       Q    Did you have direct information?

12  Did you call up anyone at Zygo --

13       A    No.

14       Q    -- and asked them?  Did you call

15  anyone up at NanYa and ask them?

16       A    No.

17       Q    So what was the nature of your

18  information that you had, sir, when you sued Zygo?

19            MR. GINOS:  Asked and

20       answered.

21            Go ahead.

22       A    It was an unclear situation.

23            That was also part of the reason for

24  the suit; to try and clarify the situation,

170

Daneman

1

2  because, as I mentioned before, there was other

3  communication that had been provided to me to

4  indicate that at some sort of meeting that went on

5  in Taiwan between Zygo and NanYa, where Zygo did

6  not inform us the meeting was going to take place

7  and didn't give us the opportunity to participate

8  in any discussions that were going to be involved

9  and related to the loss of the second shipment and

10  the payment of the second shipment, I felt like

11  there certainly seemed like the real possibility

12  that there was more information and communication

13  and documents out there that would help clarify

14  the situation.

15           (E-mail bearing Bates Stamp

16           No. RY 00078, was marked as Daneman

17           Exhibit No. 29 for identification, as

18           of this date.)

19           (E-mail bearing Bates Stamp

20           No. RY 0059 was marked as Daneman

21           Exhibit No. 30 for identification, as

22           of this date.)

23           (E-mail bearing Bates Stamp

24           No. RY 0060 was marked as Daneman

25           Exhibit No. 31 for identification, as

171

Daneman

1

2           of this date.)

3           (E-mail bearing Bates Stamp

4           Nos. RY 00205 through RY 00206 was

5           marked as Daneman Exhibit No. 32 for

6           identification, as of this date.)

7  BY MR. BJORKMAN:

8       Q   I'm showing you documents that have

9  been marked Exhibit 29, 30, 31 and 32 (handing).

10           MR. GINOS:  May I see them

11           just long enough so I can mark them?

12       Q   Those four documents, exhibits that

13  I gave you, can you tell me what, if anything, in

14  there, led you to believe that Zygo had released

15  NanYa?

16           MR. GINOS:  Can we establish

17           that he has seen these before or they

18           are from his file or anything else?

19       A   (Perusing document.)  On Exhibit

20  No. 31, an e-mail from Lee Tech, Zygo's agent, to

21  Zygo, the second --

22       Q   Hold on.

23       A   -- dated September 22, 2000, there

24  is some comments that create some doubt in my

25  mind.

172

Daneman

1

2       One of the comments is the

3  conclusion for this project is NanYa's insurance

4  company and Zygo share the loss of the two

5  machines.  I don't understand why Zygo would share

6  in the loss at all of these two machines.

7       And the next comment, Nanya has no

8  intention to repair the machine and their

9  insurance company also has no ability to sell the

10  damaged machines or parts.  That creates some

11  doubts in my mind.  It seems to me that there is

12  some sort of contentions going on over there in

13  Taiwan.

14       And the last comment on the e-mail,

15  "NanYa will return the loaner machine after solved

16  above problem."  Again, that creates some doubt in

17  my mind as to what is really going on over there

18  in Taiwan.

19       Q   When did you receive that e-mail?

20       A   This was an attachment to some

21  correspondence that was sent to me I believe by

22  the broker.  You have given it to me separately as

23  a separate document, so I don't know which piece

24  of correspondence it goes to.

25       Q   And you knew, you learned after

173

Daneman

1

2  September of 2000 that, in fact, the arrangement

3  set forth in that e-mail had not been finalized;

4  isn't that right?

5       A   What do you mean by the

6  "arrangement"?

7       Q   You know what you just alluded to in

8  that e-mail in terms of sharing of the loss and

9  that sort of thing, you know that didn't happen,

10  right?

11           MR. GINOS:  Objection.

12       A   I don't know that didn't happen.

13       Q   Well, you sent your surveyor, gave

14  instructions for your surveyor five months later

15  to negotiate with NanYa's insurer, didn't you?

16       A   No, that's not correct.  I didn't

17  instruct my surveyor to negotiate.  I instructed

18  my surveyor to try to find out what was going --

19  what the position of NanYa's insurance company was

20  with regards to the second claim.  I was trying to

21  get additional information regarding the situation

22  over there in Taiwan.

23       Q   So from September of 2000 you

24  harbored this fear that Zygo had released NanYa;

25  is that right?

174

Daneman

A       This e-mail is not copied to me, so
I don't know when I got this e-mail.  It may have
been the same month, it may have been a month
later, it may have been three months later.

Q       Is that e-mail the basis for your
contention that Zygo released NanYa?

MR. GINOS:  You mean sole
basis or part of it or was --

MR. BJORKMAN:  I'm asking him.

A       I'm not contending -- I'm not
alleging that categorically as a fact that NanYa
released -- excuse me -- that Zygo released NanYa.

I'm contending there is the real
possibility that may have occurred.  This is one
of the documents I believe which indicates that
that is a possibility.

Q       You know that you authorized Zygo to
be sued claiming that Zygo released NanYa, you
know that, right?

A       Can I take a look at the complaint?

Q       Sure.

A       (Perusing document.)

Q       No, you don't know that?

A       I don't recollect all the causes of

175

Daneman

action listed in the complaint.

Q       And at the time that you authorized
the suit, you weren't convinced that Zygo had, in
fact, released NanYa, right?

MR. GINOS:  Objection.

A       I knew that it was a possibility
that Zygo had released NanYa.  That would have
been one of the issues that I would have been
trying to get to the bottom of.  And if that is
part of the complaint, that would have been the
reason why that would have been part of the
complaint, to try and find out additional
information, communication and documentation to
help clarify what happened over in Taiwan between
NanYa and Zygo.

Q       One of the things that you did to
get to the bottom of it was to ask Mr. Sneed,
right?

A       Yes.

Q       And the other thing you did was to
sue Zygo, right?

A       Excuse me.  Ask Mr. Sneed and/or
Mr. Weidman.

Q       Right.

176

Daneman

A       And what was your next question?

Q       To get to the bottom of whether Zygo
released NanYa you asked Mr. Sneed and/or
Mr. Weidman, right?

A       Yes.

Q       And you got an answer, right?

A       Yes.

Q       The other thing you did to get to
the bottom of whether Zygo released NanYa was to
sue Zygo, right?

A       Yes, part of the reason.

Q       Did you do anything else to find out
whether or not Zygo actually released NanYa?

A       Other than instructing the surveyor
to try to find out from NanYa's insurance company
what went on, but it seemed like he was being
sort -- he was being stonewalled over in Taiwan.
He was not being provided full cooperation, which
is my take of what was going on with my surveyor
over in Taiwan.

Q       Wasn't being given full cooperation
by who?

A       Whoever he was contacting there over
in Taiwan.

177

Daneman

Q       You don't know who he contacted,
right?

A       I don't recollect who he
specifically contacted.

Q       Look at Exhibit 31.  You got that
one, didn't you?  Look at the first paragraph of
that.

A       (Perusing document.)  Well, excuse
me.

When you say surveyor, I'm thinking
GAB.  But, okay, if you mean surveyor and/or the
Royal office, I don't technically consider the
Royal office to be the surveyor.

Q       You don't know who the surveyor
contacted, do you?

A       I don't recollect.  I passed the
information that I have on to the Royal office in
Taiwan and I leave it to them to take that
information and make the necessary contacts that
they can to find out the information.  I don't
give them the detailed instructions.  I give them
generalized instructions.

Q       Did you do anything else to find out
whether Zygo had released NanYa?

182

Daneman

games.

If you don't know the answer, I don't want to you guess at it.

MR. BJORKMAN:  I'll withdraw the question.  It is not important.

BY MR. BJORKMAN:

Q    Mr. Daneman, do you have any reason to believe that Zygo did not make reasonable efforts to collect the purchase price for the AFM from NanYa?

A    That's a confusing situation, as I stated in my response to Exhibit No. 31, and there's other communication that I recollect where it is confusing about what is going on over in Taiwan with regards to all three of these shipments.

Q    Well, do you think Zygo tried to get paid from NanYa?

A    I believe initially they tried to get paid from NanYa.

Q    Do you think they made reasonable attempts to tried to get paid from NanYa?

A    I don't think I have enough information to say that they made reasonable

183

Daneman

attempts.

Q    What do you consider a reasonable attempt to get paid from someone, from a vendor?

A    Original demand for payment plus several follow-ups with some sort of definitive explanation from NanYa of why they weren't paying, that they refused to pay.

Q    Do you have any reason to believe Zygo didn't get that, didn't do that or get that explanation from NanYa?

A    I had no reason to believe it either way.  I don't think I have all of the -- it seems like there is other documentation and correspondence out there that would help clarify that situation, but I don't think I have all of it.

Q    How about now, what do you think now after the fact?

A    It still seems like there is a reasonable doubt that I don't have everything because there was a meeting -- there is other correspondence that I have that has been provided to me that indicates there was a meeting that went on over there, and I don't have documents from

184

Daneman

that meeting, and that meeting -- part of that meeting was the resolution of the payment for the second shipment.

Q    How do you know that?

A    I recollect that there was another document, a piece of correspondence which hasn't been provided to me in the deposition which indicated that there was going to be a meeting in Taiwan.

Q    How do you know what the resolution -- did you ever talk to anyone who ever attended that meeting?

A    No.

Q    Why not?

A    After so much time had gone by with this claim, over a year, I was still feeling like I had insufficient documentation, didn't have a complete set of correspondence and communications that went on.  It seemed to me the best way to resolve the situation was to institute the suit, and during the discovery process it might be easier to obtain all the necessary communications that might still be out there to help explain what went on each step of the way.

185

Daneman

Q    Turn to Page 8.

A    (Perusing document.)

(Whereupon, at 4:40 o'clock p.m., a recess was taken to 4:44 o'clock p.m.)

(The deposition resumed with all parties present.)

JOSEPH  DANEMAN, resumed and testified further as follows:

BY MR. BJORKMAN:

Q    Mr. Daneman, do you know that Royal sued NanYa?

A    Yes.

Q    Did you have anything to do with authorizing that?

A    Yes.

Q    And when you authorized the suit against NanYa, did you believe that Zygo had released NanYa from payment obligations for the second AFM?

A    I thought that by cross-claiming against NanYa, it would help produce documents and communications and correspondence which would help to resolve that issue.

186

Daneman

Q    Did you believe that Zygo had
released NanYa from its payment obligations on the
second AFM at the time you authorized suit against
NanYa?

A    I believed there was a possibility.

Q    Did you think it was 50/50?  What
did you think?

MR. GINOS:  Objection.

A    I wasn't assessing any particular
odds to it.  It didn't matter to me whether it was
20/80 or 80/20, so long as it was a possibility.
I wanted to investigate through litigation to see
if we could have all pertinent communications
produced through discovery to help resolve that
issue.

Q    And when Mr. Sneed and Mr. Weidman
told you that Zygo had not released NanYa, did you
ask for more information about that?

A    (Perusing document.)  Yes.

Q    Where?

A    My fax of May 15th, Exhibit 26,
which was dated five days after Mr. Sneed's
letter, wherein he advised that to his knowledge,
the "to" meaning the broker's knowledge, Zygo had

187

Daneman

not released NanYa.

Q    Where did you ask for more
information?  You are referring to the 5-15
letter?

A    Yes.

Q    That is Exhibit 26?

A    Yes.  The 5-15 letter also refers to
a May 7th letter, which is Exhibit 23.

(Perusing document.)  It was my
statement in the third paragraph that says --

Q    Of which?

A    Exhibit 26, 5-15 letter.

(Perusing document.)  The last
sentence which says, "If Zygo does not provide the
information requested."

Q    I'm missing you.  Where is it?

A    The third paragraph.  It is the last
sentence.

(Perusing document.)  "If Zygo does
not provide the information requested in our May
7th letter, as restated in part and supplemented
herein, this could lead to a forfeiture of
coverage under Royal's policy for the subject
loss."

188

Daneman

Q    Well, Mr. Sneed specifically
responded to your question concerning the release
issue, right?

A    To the best of its knowledge, I
thought there was a reasonable doubt that Mathog
and Moniello had all of the knowledge as to what
went on over in Taiwan.

Q    So you're claiming that that third
paragraph is a request for further information
concerning the release issue?

A    Concerning the whole issue over in
Taiwan about payment for the second shipment.

Q    What about your statement on the
next page where you say, "We further acknowledge
Zygo's representation that it has not released
NanYa from any obligations to pay for the second
shipment," after you wrote that you didn't ask for
any further information, did you?

A    I would have to review all my
correspondence after May 15th.

Q    Go ahead.  It is not much.

A    (Perusing document.)  Have you
provided me with all my correspondence after
May 15, 2001?

189

Daneman

MR. BJORKMAN:  Mark this.

(Letter dated July 13, 2000 to
Matt Weidman from Joseph Daneman,
bearing Bates Stamp No. Zygo-00241,
was marked as Daneman Exhibit No. 34
for identification, as of this date.)

A    (Perusing document.)  This is
July 13, 2000.

Q    My mistake.  I apologize.

A    (Perusing document.)  If there is no
other correspondence from me after May 15th until
my declination letter of July 16, 2001, then I
would not have made any more additional requests
beyond May 15, 2002, until the declination letter
was issued July 15th.

Q    Look at --

A    Excuse me.  July 16th.

Q    Look at Exhibit 33, which is the
interrogatory response.  Turn to Page 8.

A    (Perusing document.)  Okay.

Q    One of the contentions in the
complaint that was filed against Zygo is that at
no time did Zygo make any reasonable effort to
collect the purchase price from NanYa for the

190

Daneman

1    second AFM.

2            I asked Royal to set forth all the

3    facts that supported that contention.

4            And the answer is that this

5    contention that Zygo, in fact, did not make

6    reasonable efforts to collect the purchase price

7    is based on documents exchanged between the

8    parties previously produced, specifically

9    including documents bearing production control

10   numbers and certain Bates stamp numbers, and I've

11   given you all those documents that are cited

12   there.  Royal further bases its contention upon

13   its oral and written communications with Zygo and

14   its representatives prior to the commencement of

15   the first party action here.

16           Now, you didn't have any oral

17   communications with Zygo's representatives on this

18   subject after May 15th, right?

19       A   I may have had communications with

20   Mr. Weidman or possibly Mr. Sneed after May 15th.

21       Q   And they didn't tell you Zygo had

22   released NanYa or otherwise not made reasonable

23   efforts to collect, had they?

24       A   I don't recollect that they said

191

Daneman

1    that.

2        Q   All right.  Then it says that Royal

3    further incorporates herein NanYa's response to

4    Interrogatory No. 3 of Zygo's first set of

5    interrogatories to NanYa.

6            Now, did you know that NanYa had

7    responded to interrogatories from Royal?

8        A   I don't recollect NanYa's responses

9    to Royal's interrogatories.

10       Q   You never read those, right?

11       A   If Royal issued interrogatories, I

12   read them.  And if NanYa responded to provide

13   answers to Royal's interrogatories, then I read

14   them, too.

15       Q   So do you understand that Royal as a

16   company has adopted NanYa's response to

17   interrogatories?

18           Do you see that?

19       A   (Perusing document.)  Yes.

20       Q   And do you understand that you

21   signed these as being Royal's response, do you

22   understand that?

23       A   Yes.

24       Q   And is it true that you believe

192

Daneman

1    NanYa's version of what happened?

2        A   It is a real possibility.

3        Q   No.  No.  I'm asking you whether you

4    believe that what NanYa wrote down here is true?

5            MR. GINOS:  Objection as to

6        form and asked and answered.  This has

7        been covered several times.

8            MR. BJORKMAN:  It hasn't been

9        covered once.  It's the first time.

10           MR. GINOS:  No.  It's been

11       covered.  I object.

12           Go ahead.

13       A   I believe that it created a dispute

14   of positions between NanYa and Zygo, and that I

15   was willing to let the litigation go forth and let

16   the judge decide which was the correct position.

17   BY MR. BJORKMAN:

18       Q   What did it mean to you when you

19   read "Royal further incorporates herein NanYa's

20   response to Interrogatory No. 3 of Zygo's first

21   set of interrogatories to NanYa?"

22           What did you understand it to mean

23   that Royal incorporated the answer?

24       A   That Royal is providing this

193

Daneman

1    response from NanYa as a partial response to one

2    of Zygo's interrogatories, Interrogatory No. 10 to

3    Royal.

4        Q   So you didn't know whether that was

5    true or not, did you?

6            MR. GINOS:  Objection.

7        Q   What Royal put in its response to

8    the interrogatory, you didn't know whether that

9    was true or not, did you?

10           MR. GINOS:  Objection.

11       A   I didn't have all of the documents

12   that NanYa was apparently referring to when they

13   made this statement of facts.

14       Q   The question asks, Interrogatory No.

15   10 to Royal, "Please set forth all facts

16   supporting your contention (Royal's) that at no

17   time did Zygo make any reasonable effort to

18   collect the purchase price from NanYa for the

19   second AFM, as set forth in Paragraph 75 of the

20   complaint."

21           Then Royal recites NanYa's answers

22   in support of its contention.  And I'm asking you,

23   sir, you don't know whether this is true, do you?

24           MR. GINOS:  Objection again.

194

Daneman

```
1                    Daneman
2      A      NanYa's --
3      Q      Why can't you answer that question?
4  That's a yes or no question.
5             Do you know what is written here is
6  true?
7                    MR. GINOS:  He already
8             answered it.
9      A      It's a statement, it's a statement
10 provided by NanYa, so that's a fact, that this is
11 a statement that has been provided by them and
12 it's for the courts to decide which, when parties
13 have different positions, which position is the
14 correct position.
15     Q      Why didn't you put Zygo's position
16 in your answer to this interrogatory?
17                   MR. GINOS:  Objection.
18     A      I believe Zygo's position was
19 already explained in previous correspondence from
20 Zygo and Mathog and Moniello.
21     Q      That's not in response to this
22 interrogatory.  NanYa's position was set forth in
23 their own letters, right?
24     A      Repeat the question.
25                   MR. GINOS:  There isn't a
```

195

Daneman

```
1                    Daneman
2  question.  He's making an argument.
3                    MR. BJORKMAN:  I'll withdraw
4             the question.  I'll withdraw the
5             question.
6      Q      Look at the next question.  Please
7  identify all -- this is Zygo asking Royal to
8  please identify all persons with knowledge or
9  information concerning your contention, Royal's
10 contention that at no time did Zygo make
11 reasonable efforts to collect the purchase price
12 from NanYa for the second AFM.
13            You refer to different interrogatory
14 responses.  You again incorporate NanYa's response
15 to the interrogatory where it says two employees
16 of NanYa's corporate relative, Formosa Plastics
17 Group, acted as NanYa's agents and signed the
18 agreement on NanYa's behalf.
19            What agreement is being referred to
20 there?
21     A      This is a statement that NanYa is
22 making, so --
23     Q      But you signed it as true.
24                   MR. GINOS:  Can we move on?
25                   MR. BJORKMAN:  No, I'm not
```

196

Daneman

```
1                    Daneman
2  going to move on.
3                    MR. GINOS:  This is
4             ridiculous.
5                    MR. BJORKMAN:  You put this
6             garbage in the interrogatories.
7                    MR. GINOS:  It's not garbage.
8                    MR. BJORKMAN:  Quiet.  Quiet.
9                    MR. GINOS:  Don't tell me to
10            be quiet.
11                   MR. BJORKMAN:  I am going to
12            tell you.
13                   MR. GINOS:  This deposition is
14            at an end if you are going to tell me
15            to be quiet.  And we'll take it to the
16            Judge.  I have a right to --
17                   MR. BJORKMAN:  Let's do it
18            outside the presence of the witness.
19                   MR. GINOS:  I'll do it here on
20            the record.  That's the whole point.
21                   Outside the
22            presence of the witness.  Let the
23            witness stand aside if you want to
24            make a speech.
25                   MR. GINOS:  I'm not making
```

197

Daneman

```
1                    Daneman
2  speeches, but you're wasting our time
3  here.
4                    MR. BJORKMAN:  I am not.
5                    MR. GINOS:  It's a complete
6             waste of time.
7                    MR. BJORKMAN:  I want to know
8             what agreement is referred to in the
9             Royal --
10                   MR. GINOS:  It's in here.
11                   MR. BJORKMAN:  -- in Royal's
12            answers to interrogatories.
13                   MR. GINOS:  He told you.
14 BY MR. BJORKMAN:
15     Q      I want to know what agreement you
16 are referring to when you signed for Royal that
17 these people had knowledge of Zygo's efforts, what
18 agreement are you referring to?
19                   MR. GINOS:  Read 10 and 11
20            both.
21                   MR. BJORKMAN:  Tell him what
22            to do.
23                   MR. GINOS:  Absolutely.
24                   MR. BJORKMAN:  Why don't you
25            answer it?  You answer it.
```