# EXHIBIT 16

**ORIGINAL**



**CATHAY INSPECTION CO., LTD.**
Marine & Cargo Surveyors
Head Office: 2FL, No. 25, Sec. 2, Jen Ai Road,
Taipei, Taiwan, R.O.C.
總公司：台北市仁愛路二段25號2樓
TEL: 2391-3236~9(四線)  FAX: 2341-0919
E-mail: cathay88@ms33.hinet.net

Report No. __CIC-00-104__

Date: __Feb. 21, 2000__

Messrs. Nanya Technology Corp.

## GENERAL CARGO SURVEY REPORT

**APPLICANT:** Messrs. Nanya Technology Corp.
**DESCRIPTION**
**OF CARGOES:** One(1) set of SXM Sierra 300 Atomic Force Microscope(AFM).
**NAME OF VESSEL:** By Airfreight, from Miami, USA to Taipei.
MAWB No. 297-85859981 and HAWB No. 40133373.
**DATE OF ARRIVAL:** Arrived at CKS Int'l Airport on Feb. 7, 2000.
**CONSIGNEES:** Nanya Technology Corp.  (Ref. No. T900200-01)

This is to certify that at the request of the applicant, we, the undersigned Marine & Cargo Surveyor, did survey the above-mentioned cargo and report as follows:-

**Place & Date of**    At consignee's plant inside Hwa Ya Technology Park, Kueishan Hsiang,
**Survey held:**       Taoyuan Hsien, on Feb. 14, 2000, together with representatives of the under-
                       mentioned parties concerned for joint survey.

1/ Zygo Corporation, as maker.
2/ Lee-Tech Co., Ltd., as local agent.
3/ World International Corp., as cargo forwarding company.
4/ Taiwan Fire & Marine Insurance Co., Ltd., as cargo insurer.
5/ The cargo consignees.

**Date of Delivery:**   On Feb. 10, 2000, from Air Cargo Terminal of CKS Int'l Airport, Taoyuan.

**Marks & Nos.:**       NTC
                        4C T9002 00

**Packing of Cargo:**   Packed in four(4) plywood cases only.

The packing of one plywood case(No. 1/4, gross weight: 1,092 kgs) holding Main Unit of the AFM for which, we described as follows:-

The four(4) foots of Main Unit was fixed with screws on separable Z-shaped angles at one end, the other end was secured with screws (L: 50mm, Dia.: 5mm) on bottom wooden board of the plywood case.

The thickness of bottom wooden board is about 40mm, but the screws were screwed into the bottom board for about 35mm in depth, but not penetrate wholly through the bottom board.

The Main Unit of the AFM was over-wrapped with aluminium foil sheet inside plywood case numbered as No. 1/4 for identify while on unstripping for installation.

The thickness of plywood panel is about 15mm.   The plywood case was placed with 3 wooden skids and shock absorber at the base of the case.

1

Exhibit No. Freeman 37
11/20/03
FINK & CARNEY
CERTIFIED STENOTYPE REPORTERS
39 West 37th Street, 6th Floor NYC 10018  (212) 869-1500

RY   00061

**ORIGINAL**

| | |
|---|---|
| 國泰公證股份有限公司<br>**CATHAY INSPECTION CO., LTD.**<br>Marine & Cargo Surveyors<br>Head Office: 2FL, No. 25, Sec. 2, Jen Ai Road,<br>Taipei, Taiwan, R.O.C.<br>分公司：台北市仁愛路二段25號2樓<br>TEL: 2391-3236-9(四線)   FAX: 2341-0919<br>E-mail: cathay88@ms33.hinet.net | Report No.     CIC-00-104<br><br>Date:     Feb. 21, 2000<br><br>Messrs.   Nanya Technology Corp. |

<u>External Condition of Packing/Packages:</u>

During our survey, we note the condition as follows:

3 cases were acceptable, not surveyed.

1 case(C/No. 1/4); the packing panels had been opened by consignee previous to our attending. We were told by consignee that the one side panel of packing wooden case was slightly cracked prior to stripping by them.

After duly checking, we found that the said side panel on which, having been left signs of cracking/bump/scrape, the wrapping alu. foil sheet was torn, contents inside the case was wholly removed about 15cm in distance towards to one side from original position, due to the fixing screws on separable Z-shaped angles on bottom wooden board of the plywood case were loosen/off and deformed.   Machine was damaged.

4 cases in total.

<u>Result of Inspection:</u>

Description:  One(1) set of SXM Sierra 300 Atomic Force Microscope(AFM)
One(1) set of Main Unit
Model: MAGNASCOPE SXM 300
Serial Number : LSM3050A.
Part ID : LSM0010
Input Power: 115VAC, 50/60HZ, 15A.

Result:  a/ The Granite block was out of position 25mm approximately.

b/ All 3 Air Table Leveling Servo's and all 4 Air legs were deformed.

c/ The sample Stage was broken off the Stage drive T bar.

d/ The 2 super Invar strengthening bars were dash out from the bridgeplate and forced to the left end bracing bar was broken off.   This means that the Bridge Plate was distorted.

Note: The damaged Main Unit was therefore, rejected by consignee on the ground of this instrument is useless for them.

Owing to the Main Unit of SXM Sierra 300 Atomic Force Microscope(AFM) is a kind of extremely sensitive machine.   Because of lacking of maker's special instruments and fixture, it is very difficult to restore and calibrate locally.

Furthermore, we understood that there were no utility facilities available nor professional men here in Taiwan for such examination and calibration on the damaged Main Unit.

- 2 -

**ORIGINAL**



**國泰公證股份有限公司**
**CATHAY INSPECTION CO., LTD.**
Marine & Cargo Surveyors
Head Office: 2FL, No. 25, Sec. 2, Jen Ai Road,
Taipei, Taiwan, R.O.C.
總公司：台北市仁愛路二段25號2樓
TEL: 2391-3236-9(四線)   FAX: 2341-0919
E-mail: cathay88@ms33.hinet.net

Report No. __CIC-00-104__

Date: __Feb. 21, 2000__

Messrs.   Nanya Technology Corp.

---

By the above reason, the damaged Main Unit have to be sent back to original manufacturer for necessary inspection, repair, calibration and/or replacement.

<u>Opinion</u>:

In our opinion, the above-mentioned damage on the Main Unit could be arisen by the following reasons:-

(A) The prime cause of this damage is distinctly due to heavy shock/bump, rough handling of workers, throughout the flight voyage, transferring/warehousing into storage of Air Cargo Terminal of CKS Int'l Airport.

(B) Insufficient packing can be made the reason of this damage.

For further details, please note the paragraph "PACKING OF CARGO" in Page 1 of this certificate.

It is better to fasten tighten with foundation bolts (with nut) to fix the main body, however, the Z-shaped angle remains a gap between angle and bottom board at one end of the Z-shaped angle.   Unstable when swinging on the way of transportation and liable to collapse the machine.   See picture No. 4 & 4-1 attached hereunder.

Inside protection applied between the Main Unit and the plywood panel is poor, there are left open space (about 18cm each of open space at bothside) inside case.   It is needs to space with sponges/polylons in the gap of Main Unit and plywood panel against shock or swinging.

Suppose, the packing, the protection methods had been reinforced, the damages in question might be minimized or avoidable.

<u>Attachment</u>:   (1) Copy of Inbound Cargo Delivering Irregularity Report of Taipei Air Cargo Terminal.
(2) Copy of notice of cargo loss from consignee.
(3) 14 pictures.

CATHAY INSPECTION CO., LTD.

L. C. Chien
President

BY   00063



**CATHAY INSPECTION CO., LTD.**
國泰公證股份有限公司
Marine & Cargo Surveyors
Head Office: 2FL, No. 25, Sec. 2, Jen Ai Road,
Taipei, Taiwan, R.O.C.
總公司：台北市仁愛路二段25號2樓
TEL: 2391-3236~9(四線)  FAX: 2341-0919
E-mail: cathay88@ms33.hinet.net

Report No.: CIC-00-104
Supplementary

Date: Nov. 17, 2000

Messrs. Nanya Technology Corp.

### SUPPLEMENTARY REPORT TO OUR REPORT No. CIC-00-104

Re; One(1) set of SXM Sierra 300 Atomic Force Microscope (AFM)
By Airfreight, from Miami, USA to Taipei
MAWB No. 297-85859981 and HAWB No. 40133373
Arrived at CKS Int'l Airport on February 7, 2000.
Consignee: Nanya Technology Corp. (Ref. No. T900200-01)

Supposing that the above damaged Atomic Force Microscope(AFM) is sent bank to original manufacturer at USA for reconditioning, the supplier alleged that the reconditioning cost and the extra cost / expenses will be higher than the invoice / insured value. Furthermore, if the damaged consignment is able to be reconditioning by original manufacturer, but, the consignee still rejected the AFM Machine. Due to the manufacturer who can not to submit guarantee for functional performance.

Under this circumstance, we recommend to settle this case as Constructive Total Loss (CTL case) and deduct present salvage value is fair and reasonable.

**Invoice / Insured Value:**

The value of the sound Atomic Force Microscope(AFM) is US$ 690,000.00

**Salvage Value:**

On November 7 & 13, 2000, separately attend at the consignee's plant, Kueishan Country, Taoyuan County and consignee's meeting room of head office, Taipei for appraisal of salvage value of the above damaged AFM Machine and meeting together with representatives of consignee, cargo's insurer, cargo's local agent and cargo's overseas supplier.

According to a copy(2 pcs) of salvage value report dated November 9, 2000 which is submitted by consignee from ASH-Semi Services Limited, the salvage value of the damaged SXM LSM 3050A Atomic Force Microscope(AFM) is US$ 28,925.00 which is accepted by both of the insurer and the assureds.

**Attachment:** One(1) copy (2 pcs) of salvage value report from ASH-Semi Services Limited.

CATHAY INSPECTION CO., LTD.

L.C. Chien    President

DY    00064

# EXHIBIT 17



**ROYAL & SUNALLIANCE**

3 Pine Street, 28th Floor
Wall Street Plaza
New York, NY 10005
Tel. no. (212) 510-1770
Fax no. (212) 510-1780

## FAX TRANSMISSION

January 4, 2001

Total pages: 1

To: Matt Weidman
Mathog & Moniello Companies, Inc.
East Haven, CT
Fax no. (203) 468-3494

From: Joseph Daneman
Sr. Cargo Adjuster
Direct Phone: (212) 510-1768
E-mail: Joseph_Daneman@rsausa.com

Re: Assured: Zygo Corp.
Consignee: Nan Ya Technology Corp.
Policy no. POC-102950
Damaged SXM Machine
Our Ref. 1070008216

Dear Matt,

We refer to your fax dated December 12, 2000.
Re the FOB/FAS Shipments clause, there is no evidence that any damage occurred before the transfer of the cargo at the FOB point. Does the assured have any evidence that any damage occurred before the transfer of the cargo at the FOB point?
Re the Property Insured & Insurable Interest clause, the policy excludes shipments sold by the assured subject to terms of sale whereby the assured is not obligated to furnish ocean marine insurance. Financial interest is not the same as insurable interest. Did the assured receive written instructions to insure from the consignee prior to any known or reported loss, damage, or accident and prior to flying of the aircraft?
Re the proximate cause, there is no evidence verifying that any damage was cause by an external cause as a fortuity. Does the assured have any evidence that the damage was caused by an insured peril during the transit?
Re the damages, the surveyor assigned by our Taipei office did not receive any cooperation or accommodation in trying to arrange for survey of damages. Does the assured have any survey reports verifying the nature, extent, cause and/or minimization of loss?
To further the investigation, we offer, without prejudice and on a non-waiver basis, to request our Taipei office to contact the consignee's insurance company, Taiwan Fire & Marine Insurance Co., to inquire (1) if they have any survey reports that they are willing to furnish, and (2) if they are willing to settle the loss for the machine in the second shipment the same as they settled the loss for the machine in the first shipment. Please advise if the assured and consignee authorize us to proceed this way.
The foregoing is not an admission of liability and is strictly without prejudice. All rights and defenses available under the terms and conditions of the policy are hereby reserved.
Furthermore, no action previously taken or hereafter taken by the Company shall be construed as a waiver, nor shall the Company be estopped to rely upon any rights or defenses under the policy.
Should you have any questions or comments, please feel free to contact me. Thank you for your attention to this matter.

Best regards,

*Joe Daneman*

RY    00193

# EXHIBIT 18


```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3
 4
       ------------------------------x
 5    ROYAL INSURANCE COMPANY OF      |
      AMERICA                         |
 6              PLAINTIFF             |
                                      |CASE NO. 3:01 CV1317 (GLG)
 7    VS.                             |
                                      |
 8    ZYGO CORPORATION                |
                DEFENDANTS            |
 9    ------------------------------x
10
11
12
13            DEPOSITION OF:  Carroll D. Sneed
              DATE:  April 9, 2004
14            HELD AT:  Wiggin & Dana
              265 Church Street
15            New Haven, Connecticut 06510
16
17
18
19
20
21            Reporter:  Katrina Loda, LSR #00129
22
23
24
25    Job No: 158962
```

## Page 118

1 that states on these policy clauses and the language
2 therein that that's why they're declining coverage.
3    Q Well, for example, with regard to contingency
4 clause that's recited on that same page of the July
5 16 letter --
6        MR. WELDON: Page 2, 3. All right.
7        MR. GINOS: Is there a question?
8        MR. BJORKMAN: I didn't get a
9       chance to finish.
10   Q (By Mr. Bjorkman) For example, with regard to
11 the contingency clause is there anything in the
12 letter that explains why the contingency clause does
13 not provide coverage under the circumstances of the
14 case?
15   A No.
16   Q I'd like to direct your attention to the
17 paragraph that's after the resuscitation of the
18 contingency clause where Royal writes, moreover we
19 reserve the right to investigate further into the
20 sales agreements and all subsequent communications
21 including requesting all pertinent documentation
22 regarding payment of the invoice correspondence
23 caption to an order confirmation. What if anything
24 did you understand that to mean in the context of a
25 declination letter?

## Page 119

1   A Well, that to me to me would mean that that is
2 an outright declination of coverage under clause 52
3 because they reserved the right to develop additional
4 information as it pertains to that or they attempted
5 to reserve their right.
6   Q Now, in your 45 years of experience is that
7 something that's standard within a declination letter
8 to also reserve the right and continue to investigate
9 after you decline coverage?
10       MR. GINOS: Objection.
11   A It is not normally. You normally would not
12 decline an outright declination of coverage until you
13 complete your investigation and satisfied yourself
14 that there is no coverage.
15   Q Directing your attention to the first page of
16 the letter which is the second page of the Exhibit
17 Zygo 1.
18       MR. WELDON: That's it.
19   A Um-hum.
20   Q The property insured an insurable interest
21 clause is recited at least in part. Is it your
22 understanding that Zygo's claim was also
23 declined under this clause as well?
24   A Yes.
25   Q Now, when you received this letter did you

## Page 120

1 understand that Royal was declining the coverage as a
2 result of any problem with the packing of the AFM?
3   A Not specifically. They had raised a number of
4 issues as it pertained to coverage and they were
5 taking in my opinion a broad rush approach to this
6 declining for a number of reasons.
7   Q After you received the July 16, 2001 letter did
8 you change your opinion as to whether the policy
9 provided coverage for Zygo's loss?
10   A I did not.
11   Q So even after you received this you believe the
12 policy did cover Zygo's loss; is that right?
13   A That's correct.
14       MR. WELDON: You got a lot more?
15       MR. BJORKMAN: Not really.
16      I don't have any other questions.
17       MR. GINOS: Let's mark -- this will
18      just take a minute. Sneed 147, 148 --
19      what's the next, Exhibit Number 9.
20
21      (Plaintiff's Exhibit Sneed 9, 3/23/01
22      letter, was marked for identification.)
23
24 REDIRECT EXAMINATION BY: MR. GINOS
25

## Page 121

1   Q Mr. Sneed, will you look at Sneed 9. This is a
2 March 23, 2001 letter and is that a letter that you
3 drafted and sent to Mr. Daneman? I don't see your
4 signature on it so I'm just asking whether --
5   A Yes, it appears to be.
6   Q The only question I have about it is on page 2
7 of this letter it says in Matt Weidman's May 1, 2000
8 correspondence to you, first paragraph, first
9 sentence he refers to Zygo having a distributors
10 contract with IBM. I don't find and I have requested
11 this contract but in my feeling it could have
12 significance to the claim. I have obtained a copy
13 which is enclosed. Do you recall recollect in fact
14 sending to Mr. Daneman a copy of the IBM Zygo
15 distributor shipment agreement contract?
16   A It's -- I make reference to it here and I would
17 seriously doubt that I didn't include it.
18   Q Okay. The only other questions I have would
19 you -- can I have just for a second Exhibit 54?
20       MR. WELDON: I just note for the
21      record that we had gone over this exhibit
22      Daneman which is now Sneed 9 and Daneman
23      20.
24       MR. GINOS: I couldn't find it and
25      I know I didn't ask him that question

31 (Pages 118 to 121)

Esquire Deposition Services
1-800-944-9454

Page 114

1  A  Yes.
2  Q  Do you recall whether you prepared this after
3  receiving the May 15th letter that we just looked at?
4      MR. WELDON:  Can you read back his
5      last question for me please.
6
7      (Thereupon, the requested portion of the record
8      was read back by the court reporter.)
9
10 A  I believe that memo would strongly suggest that
11 that was written after I reviewed the May 15th letter
12 from Royal.
13 Q  And I'd like you to read into the record what
14 you wrote on under where it says follow-up date and
15 it looks to me like it says I just don't like but if
16 you can read that from there?
17 A  I just don't like Daneman's attitude.  He is
18 misrepresenting important parts -- I'm sorry
19 misinterpreting important parts of the coverage and
20 isn't willing to admit.  He's bowing his neck.
21 Whether right or wrong it would be unfortunate
22 if Zygo has to litigate to prove him wrong.
23 Q  What didn't you like about Mr. Daneman's
24 attitude?
25 A  Maybe attitude was not an entirely appropriate

Page 115

1  word but I didn't like a lot of what was happening in
2  this claim, the way it was happening, the way it was
3  being handled by Royal going back to the beginning
4  where they take a position fairly early on that they
5  had been prejudice with late reporting when in fact
6  based on all circumstances in my opinion as I said
7  earlier this was not a late reported claim for
8  damage.
9      And the fact that he was at that point in time
10 relying entirely on Matt Weidman and Mathog &
11 Moniello to develop a lot of significant and
12 important information surrounding this claim when in
13 my opinion, he or whomever at Royal should have
14 assigned people in the field to investigate or Zygo
15 to investigate Nan-Ya, IBM, the airlines or whoever
16 and I didn't see that as happening.  I just felt they
17 weren't giving proper and appropriate attention to a
18 $600,000 claim.
19 Q  What was your understanding of the purpose
20 of the exchange of letters between Mathog & Moniello
21 and Royal once you got involved?
22 A  Um --
23 Q  As we saw through the deposition you wrote
24 three or four letters and you received letters back
25 from Royal.  Did you have an understanding of why

Page 116

1  there was the letter writing process?
2  A  Well, my understanding was -- is that they were
3  raising questions of coverage and Mathog & Moniello
4  had a client in Zygo and it was up to Mathog &
5  Moniello to assist them in binding coverage for the
6  loss if it was felt it was in fact covered under the
7  policy and that's what I was called upon to do.  To
8  try to persuade Royal that your position is wrong as
9  to coverage.  You covered the loss and you should pay
10 it.
11 Q  Take a look at Martin 53 which is your June 14
12 letter.  And then again there is letter you drafted
13 but you and others signed; is that right?
14 A  That's correct.
15 Q  And this letter also reflects your opinion that
16 the Royal policy provided coverage for the Zygo loss;
17 right?
18 A  That is correct.
19 Q  Now, you say in the third paragraph on the
20 first page you have raised the question of valued
21 reporting as this pertains to clause 52.  It's our
22 opinion and interpretation that the policy is not the
23 quote "reporting form" close quote type.  Instead
24 values are subject to year end audit based on the
25 assured's gross sale for purpose of determining any

Page 117

1  additional premium due or returned premium.  Do you
2  see that?
3  A  Yes.
4  Q  Did anyone from Royal ever notify you why they
5  believe that was the incorrect interpretation under
6  the policy?
7  A  No.
8  Q  Take a look at Martin 54 which is the July 16,
9  2000 cover letter with --
10 A  Um-hum.
11 Q  You received both of these letters; right?
12 A  Yes, that's correct.
13 Q  And did you understand this, the second letter,
14 the one's that's addressed to Zygo Corporation, as to
15 be a notice of declination of coverage by Royal?
16 A  Yes.
17 Q  In this letter does Royal explain why it's
18 declining coverage?
19 A  Well, this letter cites certain clauses of the
20 policy most of which we've referred to previously
21 today and having cited those in this0 letters, the
22 letter goes on to say in view of the foregoing
23 circumstances, we regret to advise no other
24 alternative other than to decline recovery on behalf
25 of the company for the captioned claim.  So to me

Page 94

1 expertise in interpreting policy language such as the
2 clause that we just discussed?
3     MR. WELDON: Objection.
4     MR. BJORKMAN: Objection.
5 A I do.
6 Q And in reaching your conclusions with respect
7 to whether or not Zygo had coverage under the
8 contingency clause, did you consult with anyone else
9 outside of Mathog & Moniello?
10 A I did not.
11 Q I just need to make sure there's nothing else I
12 need to ask you on this. Would you look at clause 21
13 on page Zygo Bates number page ten. This is the
14 warehouse clause right under inchmaree clause. Are
15 you there at clause 21?
16 A I am.
17 Q My question and you can read the clause to
18 yourself carefully before answering, you see the note
19 at the bottom of clause 21 where it says it is
20 necessary for the assured to give prompt notice to
21 the company when they become aware of an event for
22 which they are quote "covered" under this policy and
23 the right to such cover is dependent upon compliance
24 with this coverage. You see that note?
25 A Yes.

Page 95

1 Q Did you consider that note in connection with
2 your analysis of whether or not Zygo had coverage?
3 A I did not.
4 Q I asked you earlier with respect to clause 32
5 and you can turn to it on Zygo 15, this has to do
6 with reporting losses. Do you see the clause?
7     MR. BJORKMAN: I'm sorry 32 we're
8     talking about.
9     MR. GINOS: Yeah.
10 Q (By Mr. Ginos) You see clause 32?
11 A Yes, sir.
12 Q I asked you some questions relating to whether
13 or not in your opinion Zygo had in fact promptly
14 reported these losses or damage to Royal and I
15 believe you said that what promptly is depends on the
16 circumstances. Do you recall that?
17 A Yes.
18 Q And I think, and correct me if I'm wrong, that
19 you identified one factor which would in your opinion
20 impact what is promptly as being when Zygo would --
21 knew that Nan-Ya was not going to pay for the
22 shipment. Do you recall that?
23     MR. BJORKMAN: Objection to the
24     form of the question.
25 A I recall saying something to that effect but

Page 96

1 the exact --
2 Q Let's put it in your words not mine because I
3 wanted to ask you about that. What would the factor
4 or factors be and I'm not speaking now in general
5 terms about with respect to AFM shipments. What in
6 your opinion are the factors that one would have to
7 consider in order to decide whether notice had been
8 promptly given with respect to these AFMs?
9     MR. BJORKMAN: Objection.
10 A The entire circumstances surrounding the entire
11 event.
12 Q But you have some familiarity with the event
13 and I'm asking you on the basis of your knowledge of
14 the facts in this case and the circumstances what do
15 you believe are the factors that should be considered
16 in deciding whether or not Zygo's notice to Royal of
17 these damages was prompt?
18     MR. BJORKMAN: Objection. It's
19     been asked and answered.
20     MR. WELDON: Objection.
21 A Let me answer that this way: I feel that
22 notice was prompt because I believe if I recall
23 correctly this loss occurred at some point in
24 February of 2000 and Royal knew about that loss as
25 early as March 7, 2000. That is not delayed notice

Page 97

1 in my opinion considering all of the circumstances.
2 We're dealing with an international shipment, we're
3 dealing with parties here in the U.S., we're dealing
4 with parties in Taiwan. You don't put all this
5 together in matter of 24 hours based on my experience
6 of a sales person, 45 years of experience.
7     In addition to that Royal took the position or
8 they've taken the position they were prejudiced
9 because of delayed notice. That's simply untrue
10 based on what I've seen because everything was still
11 in place, the property, the parties involved and
12 quite frankly in my opinion for whatever reasons they
13 chose not to assign the people to make the field
14 investigation in this claim and that's simply a no-no
15 when you're dealing with a loss of $600,000.
16     Royal in my opinion attempted to handle this
17 loss from a desk. Why, I don't know. I would have
18 never done it. But if I'd of been in the position of
19 management I would have had people in the field all
20 over this claim within reasonable time within a few
21 days after knowing about it. When did they first
22 assign someone after they knew about the claim? Not
23 immediately. So their position on prejudice in my
24 opinion based on my experience is totally unfounded.
25     MR. GINOS: Let me see if there's

25 (Pages 94 to 97)