# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Royal Insurance Company of America,       :
            Plaintiff,                    :
                                          :      No. 3:01cv1317(JBA)
v.                                        :
                                          :
Zygo Corporation,                         :
            Defendant.                    :
_____        :
Royal Insurance Company of America,       :
            Plaintiff,                    :
                                          :
v.                                        :
                                          :
Nan Ya Technology Corporation,            :
            Third-Party Defendant.        :
_____

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT ZYGO CORPORATION'S MOTION FOR
PARTIAL SUMMARY JUDGMENT [DOC. #143],
PLAINTIFF ROYAL INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT [DOC. #137],
AND THIRD-PARTY DEFENDANT NAN YA TECHNOLOGY CORPORATION'S
MOTION FOR SUMMARY JUDGMENT [DOC. #59]**

Plaintiff Royal Insurance Company of America ("Royal") and

Defendant Zygo Corporation ("Zygo") bring cross-motions for

partial summary judgment in this insurance contract dispute.

Royal also asks this Court to reconsider a predecessor judge's

non-merits grant of summary judgment to third-party defendant Nan

Ya Technology Corporation ("Nan Ya") for failure of opposition.

For the reasons that follow, Zygo's motion for summary judgment

is **GRANTED IN PART** as to Royal's Fifth Cause of Action concerning

limitation of liability, and **DENIED IN PART** as to Royal's third

and fourth causes of action and Zygo's first and fourth

1

counterclaims.  Royal's motion for summary judgment is **DENIED**.
The endorsement order of September 12, 2002 granting Nan Ya's
Motion for Summary Judgment, the endorsement order denying Nan
Ya's Motion for Reconsideration [doc. # 78], and the ruling [doc.
#105] denying Nan Ya's Second Renewed Motion for Clarification,
reported at 212 F.R.D. 444 (D. Conn. 2003), are **VACATED**.  Nan
Ya's Motion for Summary Judgment is **DENIED** on the merits.

## I.   FACTUAL BACKGROUND

The following facts are drawn from Royal and Zygo's Local
Rule 56(a)(1)-(2) statements [docs. ## 139, 145] as supported by
accompanying evidence, and evidence submitted by Nan Ya in
support of its motion for summary judgment.

Zygo asserts claims against Royal under a marine open cargo
insurance policy, which became effective May 1, 1999.  Zygo
distributes high-tech manufacturing equipment, including atomic
force microscopes ("AFM") that are used for extremely sensitive
measurements in the production of computer chips.  On January 31,
2000, Zygo sold an AFM to Nan Ya, a Taiwanese company.  This AFM
replaced a previous one Zygo sold to Nan Ya that had been damaged
in transit.  The terms of the purchase order for the second AFM
were "FOB [Free on Board] US Airport," meaning that Zygo was to
arrange delivery to an airport in the United States and Nan Ya
assumed the risk once the AFM was on board the airplane.

On February 11, 2000, Nan Ya advised Zygo that the second

AFM also had arrived damaged.  The parties agree that the damage occurred at some point between when the AFM was loaded onto the airplane in Miami and when it was unloaded in Taiwan.  On February 14, 2000, Zygo sent engineer Kelvin Walch to inspect the AFM and its packaging at Nan Ya's Taiwanese plant.  Mr. Walch believed that the AFM was damaged because it had been dropped on its side.  Nan Ya hired Cathay Inspection Co., Ltd. to inspect the AFM as well, and their conclusion was that "the prime cause of this damage is distinctly due to heavy shock/bump, rough handling of workers..." and that "insufficient packing can be made the reason of this damage."  Ginos Aff. Ex. FF.  Royal Insurance was not notified of the February 14 inspection, and consequently no Royal representative attended.  Because the AFM had arrived damaged, Nan Ya refused to pay any of the $690,000 due on the purchase price.  Zygo submitted an insurance claim to Royal for the second AFM on March 7, 2000.[1]

Nan Ya also refused to pay the balance due (20% of the purchase price) on the first damaged AFM.  In the meantime, Zygo sent a third "loaner" AFM to Nan Ya, because Nan Ya needed such an instrument immediately for its manufacturing operations and Zygo did not want to lose Nan Ya's business to a competitor.  The

---

[1] This notice of claim did not specify the grounds on which Zygo sought coverage.  See Bjorkman Aff., 7/7/04, Ex. 5.  It appears that Zygo did not clarify that it was seeking unpaid vendor coverage, under Clause 52 of the policy, until June 14, 2001.  See Bjorkman Aff., 7/30/04, Ex. 22; see also infra n. 4 (language of Clause 52).

loaner was to be returned to Zygo by June 30, 2000, but Nan Ya did not do so.  Zygo asserts that Nan Ya held the third AFM "hostage" as a bargaining chip.

In the summer and fall of 2000, Nan Ya and Zygo entered into discussions concerning the status of all three AFMs.  Zygo was represented by its agent Billy Wu of Lee Tech in Taiwan. Initially Zygo insisted that Nan Ya pay for both damaged AFMs in full and return the loaner.  Nan Ya refused, and countered with a proposal that Nan Ya and Zygo would split the losses:  Nan Ya would cover the cost of the first microscope and Zygo would bear the loss of the second, and an average salvage value would be calculated and subtracted from the price of both microscopes.  In July 2000, Wu told Zygo that Nan Ya's insurer had agreed to cover the cost of the first damaged AFM, and therefore Nan Ya would agree to pay Zygo the remaining 20% due on that microscope, less an agreed-upon salvage value.

At some point in August, 2000, Nan Ya apparently informed Royal that its insurer had agreed to settle the claim in half the amount owed, while Lee Tech, Zygo's corporate representative in Taiwan, would take care of the rest.  "Under such circumstances," wrote Richard Chung from Royal, "we recommend to ignore this claim and close this file."  Ginos Aff. Ex. O.

In September 2000, Larry Martin, staff assistant to the president of Zygo, received and acknowledged an email from Wu of Lee Tech stating, "The conclusion for this project is: Nan Ya's

4

insurance company and Zygo share the loss of the two machines. Nan [Ya] has no intention to repair the machine and their insurance company also has no ability to sell the damaged machines (or parts). So, they hope to return these two machines to Zygo when [they] close this case..." Ginos Aff. Ex. Q.[2] An average salvage value would be calculated and subtracted from the value of the machines. Then Nan Ya would return the loaner microscope. Id.

After this email exchange, Martin arranged for engineer Kelvin Walch to travel to Taiwan to determine the salvage value of the two microscopes. He sent a follow-up email to Wu on October 27, 2000, confirming their negotiating position, stating that Nan Ya will be responsible for paying the balance due on the first AFM and "I agree that Zygo will, and has, filed a claim for the second unit shipped with its insurance company and this claim is in their hands." Ginos Aff. Ex. W.

On November 13, 2000, a meeting was held with, among others, Walch and Timothy Smith, Zygo's Regional Director in Taiwan and Korea, in attendance. The meeting minutes, written in Mandarin

and not translated into English until this litigation, provide that Nan Ya's insurer (Taiwan Fire & Marine Insurance) would pay for the first damaged microscope, and in turn Nan Ya would pay

---

[2] Zygo argues in its reply brief [doc. #160] that written communications between Zygo, Nan Ya and Lee Tech are all inadmissible hearsay. However, Billy Wu indisputably is Zygo's agent, and communications between him and Zygo may constitute party-opponent admissions of Zygo in the Royal-Zygo litigation, and thus may be admissible under Fed. R. Evid. 801(d)(2).

Zygo the remaining 20% due on that microscope minus its salvage value. The minutes further state that the second AFM "will be returned to the manufacturer, no payment is required." Ginos Aff. Ex. SS. Smith signed the minutes on Zygo's behalf, but later claimed he did not know their contents because he does not read Chinese. He stated that when he asked for a quick translation, a Lee Tech representative told him there was "no substance" to the minutes. Smith Dep. at 178. Smith signed the meeting minutes only to confirm his attendance.

After the November 13 meeting, Lee Tech sent an email to Smith, copied to Martin, stating "It is glad that the problem of two damaged systems have been settled in today's meeting." Ginos Aff. Ex. Z. Martin replied to the email: "I want to thank all of you for the effort put in to resolve this situation." Id. The message continued concerning Walch packing up all three AFMs for shipment back to the United States. On November 15, 2000, Martin sent a letter to Nan Ya, in care of Lee Tech, confirming that Zygo agreed to allow Nan Ya to offset the salvage value of the first microscope against the 20% balance due on that machine. Martin Aff. Ex. 14. This agreement was contingent on payment being received by December 21, 2000. Id. The letter mentions nothing about the second microscope, a claim for which Zygo previously had submitted to Royal.

Royal never paid Zygo's claim on the second AFM, officially notifying Zygo of the denial of its claim on July 16, 2001 (three

6

days after Royal commenced this lawsuit).  The parties dispute
the steps, if any, Royal took to investigate the claim.  Royal
asserts that it tried to investigate Zygo's claim but Zygo
interfered with its efforts and refused to provide access to the
second damaged AFM.

Royal alleges that Zygo settled the claim with Nan Ya during
the November 13 meeting in Taiwan, and, under Clause 43 of the
policy concerning Royal's subrogated right of recovery from Nan
Ya, Royal was not required to pay Zygo's claim.[3]  Royal further
argues that it was not required to pay Zygo's claim because Zygo
never declared the AFM as a contingent shipment or paid an extra
premium, as Royal argues was required under Clause 52 of the
insurance contract.[4]

---

[3] Clause 43 reads:
#### SUBROGATION AND IMPAIRMENT OF RECOVERY
**43.**  It is a condition of this insurance that upon payment of any
loss [Royal] shall be subrogated to all rights and claims against
third parties arising out of such loss.  It is a further condition
of this insurance that if [Zygo] or his or their assigns have
entered or shall enter into any special agreement whereby any
carrier or bailee is released from its common law or statutory
liability for any loss, or have or shall have waived, compromised,
settled or otherwise impaired any right of claim against a third
party to which [Royal] would be subrogated upon payment of a loss
without prior agreement of [Royal] and endorsement hereon, [Royal]
shall be free from liability with respect to such loss, but its
right to retain or recover the premium shall not be affected.
Royal Compl. [doc. #1] ¶ 21.

[4] Clause 52 reads as follows:
#### CONTINGENCY
**52.** It is agreed that on all shipments sold by [Zygo] on cost and
freight or other terms whereby [Zygo] is not required to furnish
ocean marine insurance, this Policy is extended (subject to all its
terms and conditions) to cover only the interest of [Zygo] as an
unpaid vendor from the time shipments become at the risk of the
customer under the terms of sale until payment of draft but in no
event beyond the time when this Company's risk would normally cease
under the terms of this Policy.

Zygo takes the position that it did not settle its claim concerning payment for the second AFM with Nan Ya.  It also argues that Clause 52 of the policy did not require advance notice or an additional premium, because the insurance contract was payable by an annual premium calculated on the basis of Zygo's sales.  Zygo claims Royal acted in bad faith in failing to investigate or pay its insurance claim on the second AFM.

## II.  PROCEDURAL BACKGROUND

On July 13, 2001, Royal brought this action against Zygo, seeking a declaratory judgment that the insurance policy did not cover Zygo's loss on the second AFM.  Zygo counterclaimed for a declaratory judgment that its insurance claim was covered under the policy, and asserting claims for breach of contract and breach of implied covenant of good faith and fair dealing.  On October 10, 2001, Royal commenced a third party action, in its capacity "as the contingent/conditional subrogated insurer" of Zygo, against Nan Ya [doc. #18].

Nan Ya moved for summary judgment on the third party

---

It is further understood and agreed that in no event shall this insurance inure to the benefit of the buyer or his underwriter but in the event of a loss occurring which would be collectible hereunder but for such terms of sale and [Zygo] is unable to collect the purchase price from the buyer in regular course, [Royal] will advance the amount of such loss pending collection from the buyer. [Zygo] hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse [Royal], the latter sharing the expense of such collection in proportion to its interest herein.

[Zygo] agrees to declare to [Royal] the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed.
Royal Compl. ¶ 23.

complaint on June 13, 2002 [doc. #59].  Royal filed no opposition, although Zygo did [doc. #72].  Hon. Gerard Goettel, to whom this case was originally assigned before his retirement, granted Nan Ya's motion by endorsement order dated September 12, 2002: "Motion Granted absent objection from the Third Party Plaintiff.  This is not a ruling on the merits and will have no collateral estoppel effect in this litigation."  Nan Ya twice moved for reconsideration, requesting a ruling on the merits, which was denied.  Royal then moved for summary judgment [doc. #111] on its declaratory judgment claim, which was denied [doc. #125] on the grounds that the language of Clause 52 of the policy, concerning unpaid vendor coverage, is ambiguous as applied to the issue of coverage of the second damaged AFM.

Zygo now moves for summary judgment on its first and fourth counterclaims for a declaratory judgment that the policy covers the second AFM shipped to Nan Ya and that Royal breached the insurance contract by failing to pay the claim.  Zygo also moves for summary judgment on Royal's third count that Zygo failed to declare and pay a premium for the unpaid vendor coverage, Royal's fourth count that Zygo impaired Royal's subrogated right of recovery from Nan Ya, and Royal's fifth count that Royal's liability under the policy is limited to the cost of replacement parts for the AFM.  Royal has moved for summary judgment on Zygo's second and third counterclaims for bad faith refusal to pay or investigate Zygo's claim.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-1061 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988). If there is any evidence in the record regarding the issues on which summary judgment is sought from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). However, in the absence of any disputed material fact, summary judgment is appropriate. Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit

10

under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "[T]he mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment."  <u>Quarles v. General Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985).  For a dispute to be genuine, there must be more than "metaphysical doubt."  <u>Matsushita</u>, 475 U.S. at 586.

"Under Rule 56(c), in addition to showing the absence of a genuine issue of material fact, the moving party must show that he is 'entitled to a judgment as a matter of law.'"  <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 246 (2d Cir. 2004), <u>quoting</u> Fed. R. Civ. P. 56(c).  Thus, the Second Circuit has emphasized, it is the duty of the District Court to "review the motion ... and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law."  <u>Id.</u> at 246.

## IV.  ALLEGED SETTLEMENT BETWEEN ZYGO AND NAN YA

### A.  Zygo's Motion for Summary Judgment

Zygo moves for summary judgment on Royal's Fourth Cause of Action, which alleges that Zygo impaired and/or waived Royal's subrogated right of recovery from Nan Ya in violation of Clause 43 of the insurance policy.  In this count, Royal asserts that upon paying Zygo's contingency (unpaid vendor) coverage claim

under Clause 52, Royal should have all the rights of Zygo to seek payment from Nan Ya for the second AFM.  Royal Compl. ¶ 79.  This count further alleges that Zygo settled with Nan Ya at the November 13, 2000, meeting and thereby "impaired and/or waived" Royal's subrogated right of recovery against Nan Ya, in breach of Clause 43.  Id. at ¶ 80.  Because of Zygo's alleged breach, Royal maintains its policy did not cover Zygo's claim for the purchase price of the second AFM.  Id. at ¶ 81.

Zygo's motion argues that the undisputed evidence shows that Zygo never reached a settlement agreement with Nan Ya concerning the second AFM.  Zygo puts forth deposition testimony from Zygo Regional Manager Timothy Smith, Presidential Assistant Larry Martin, and engineer Kelvin Walch, retained by Zygo to estimate the salvage value of the two AFMs.  Smith, who attended the meeting on November 13, 2000 in Taiwan, testified that he was not privy to any communications between Martin and Lee Tech's Billy Wu (Zygo's corporate agent in Taiwan dealing with AFM sales), discussing a possible negotiating position for the meeting. Smith Dep. at 160.  He further testified that most of that meeting was conducted in Mandarin Chinese,[5] which he did not understand, and that at the end, he "left that meeting feeling that there had been no agreements..."  Id. at 175.  He testified

---

[5]In contrast, Kelvin Walch testified that "most of the meeting was English" and that "a lot of the conversation was with Tim [Smith]."  Walch Dep. at 256, 258. Smith himself acknowledged that as a general matter business meetings with foreign corporations in Taiwan are held in English.  Smith Dep. at 173-74.

that he signed the meeting minutes only to indicate that he was present, and that before signing he was assured by a Lee Tech representative that there was "no substance" to the document. Id. at 178.  Zygo argues that it never even saw the minutes or their English translation until this suit was instituted.

Walch, the engineer, stated that he was at the November 13 meeting to discuss his appraisal, not "commercial" matters. Walch Dep. at 258.  However, in contrast to Smith, he "came away from the meeting absolutely totally convinced that Nan Ya were [sic] agreeing to settle both cases," meaning "settle the payment on both tools ... Less the salvage values on each one." Id. Walch further stated that "Tim [Smith] came out quite happy as well, would be my impression.  He came out quite content that it was resolved." Id. at 259.

Zygo proposes that Walch's statement that Nan Ya would "settle payment" on both microscopes means that Walch believed that Nan Ya would pay Zygo in full for both AFMs.  However, this statement could also be interpreted to mean that Nan Ya agreed to follow through with its initial proposal, whereby it would pay for one microscope and Zygo would pay for the other. Additionally, Walch's statement that "it was resolved" is vague and could mean alternatively that the payment issue was agreed, the salvage value was agreed, the return of all of the AFMs was agreed, or any combination of these possibilities.

Larry Martin was not present at the November 13 meeting, and

13

his statements about it are subject to varying interpretations. His affidavit of August 15, 2002 states that he "was never informed by Mr. Smith, or anyone else, that there was any agreement to release Nan Ya from liability for the Second AFM, or to in any way change the terms of the deal such that Nan Ya did not have to pay for the second AFM. Indeed, any such agreement would have been beyond the scope of the authority given to Mr. Smith." Martin Aff. [doc. #75] ¶ 26. His deposition testimony was that he believed the "primary purpose" of the meeting "was to assess the salvage value and to resolve the ... payment balance on the second machine," suggesting at a minimum that he understood that the second AFM was a subject for discussion at the meeting. Martin Dep. at 211.[6]

The email chain between Martin, Smith, and Lee Tech after the November 13 meeting is also subject to varying interpretations. Martin's reply to Lee Tech's message stated, "I want to thank all of you for the effort put in to resolve this situation." Ginos Aff. Ex. Z. Whether Martin's reference to the "situation" pertains to payment for the two AFMs or shipment of the machines back to the United States, with payment details to be worked out later, cannot be determined on this record. Zygo maintains that Nan Ya was holding the loaner AFM "hostage," that

---

[6]Martin did testify that he told Wu that Zygo would file a claim with Royal for payment for the second AFM. Royal makes the point, however, that Martin did not convey his belief to either Wu or Nan Ya that Royal would, in turn, seek recovery from Nan Ya. Martin Dep. at 198.

14

Zygo was losing money because it wanted to rent the loaner to another company, and that it desperately wanted the machine back. Thus the "situation" could be the so-called hostage taking and not the payment for one or both AFMs.

Martin's post-meeting letter of November 15, 2000 to Nan Ya, which was written at Nan Ya's request, reflects Zygo's agreement to allow Nan Ya to offset the salvage value of the first AFM from the 20% balance that Nan Ya owed on that machine, without mention of the second AFM. See Martin Aff. Ex. 14.[7] From this communication a reasonable inference can be drawn either that Zygo did not believe that there had been resolution about payment for the second AFM at the meeting, or that the letter was written for a limited purpose and did not embody Zygo's entire understanding of its agreement with Nan Ya.

Given these unresolved intent issues raised by Zygo's own evidence, Zygo has not shown that it is entitled to summary judgment on Royal's fourth count.

## B.   Royal's Motion for Reconsideration

In its reply to Zygo's motion for summary judgment, Royal urges this Court to reconsider and set aside Judge Goettel's

---

[7]The letter reads: "I send this letter to Nan Ya to confirm that Zygo agrees to Nan Ya offsetting the salvage value or [sic] the 1st machine shipment against the balance due Zygo on the first machine.  The outstanding receivable on Zygo's books for this unit is $138,000 US dollars.  Reduced for the salvage value of $28,925, Zygo agrees to accept $109,075 as payment in full for the first shipped unit.  Zygo will honor this agreement provided Nan Ya makes payment of the $109,075 by December 21, 2000.  I believe this date is consistent with Nan Ya's intentions."

order granting Nan Ya's motion for summary judgment on the issue
of Nan Ya's alleged settlement with Zygo. Ordinarily, previous
rulings become the "law of the case" and, as a prudential matter,
will not be revisited. However, the law of the case doctrine is
a discretionary rule that "does not limit a court's power to
reconsider its own decisions prior to final judgment." Virgin
Atl. Airways Ltd. v. Nat'l. Mediation Bd., 956 F.2d 1245, 1255
(2d Cir. 1992). "The major grounds justifying reconsideration
are an intervening change of controlling law, the availability of
new evidence, or the need to correct a clear error or prevent
manifest injustice." DiLaura v. Power Auth. of State of N.Y.,
982 F.2d 73, 76 (2d Cir. 1992) (internal quotation marks and
citation omitted).

        Nan Ya's motion for summary judgment was not opposed by
Royal, nor did Royal join Zygo's opposition, claiming that to do
so would invite Rule 11 sanctions because Royal "had not been a
party to the settlement discussions and would have no firsthand
knowledge of what transpired." Royal Ins. v. Zygo Corp. [Ruling
on Second Renewed Motion for Reconsideration], 212 F.R.D. 444,
446 (D. Conn. 2003).[8] Because Royal was the only party to assert
claims against Nan Ya, Judge Goettel granted Nan Ya's motion
"absent opposition from the Third Party Plaintiff."

        The Court does not condone Royal's duplicitous conduct in

---

[8]Royal's position seems disingenuous in light of its allegations in its
complaint against Nan Ya that Zygo and Nan Ya had settled the dispute over
payment for the second AFM.

bringing a claim against Nan Ya, then neither defending nor withdrawing it, instead giving the appearance of seeking strategic advantage in the Royal-Zygo litigation. Yet the Court is constrained to correct a clear error of law, since the Second Circuit has made clear that a grant of summary judgment solely based on absence of opposition is inappropriate. "[T]he district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. If it has not, summary judgment is inappropriate...." Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001). In an opinion issued after Judge Goettel's order, the Second Circuit clarified that not only must the moving party demonstrate that there is no disputed issue of material fact, but it also must demonstrate that it is entitled to judgment as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (even absent opposition, "the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.").

Accordingly, the endorsement order granting Nan Ya's Motion for Summary Judgment, the endorsement order denying Nan Ya's Motion for Reconsideration, and the ruling on Nan Ya's Second Renewed Motion for Clarification will be vacated and Nan Ya's

motion for summary judgment will be considered on the merits asserted in Nan Ya's briefing.

### C.   Nan Ya's Motion for Summary Judgment

Nan Ya's motion for summary judgment is based on the same facts discussed above in relation to Zygo's motion for summary judgment.  Nan Ya argues that the meeting minutes of November 13, 2000 unambiguously show that Zygo and Nan Ya agreed to settle the claims for the two damaged AFMs so that Nan Ya would pay for one and Zygo would pay for the other.  Nan Ya further argues that Martin and Smith negotiated with Nan Ya within the scope of their employment, or had apparent authority to do so.  Finally, Nan Ya argues that parol evidence from Martin or Smith is not admissible to contradict the terms of what Nan Ya asserts is a written agreement.

Although Zygo filed an opposition to Nan Ya's motion, Zygo was not a party to the Royal-Nan Ya litigation.  As Judge Goettel found, this case does not fall under this Court's admiralty or maritime jurisdiction, so Royal cannot be said to have "tendered" Nan Ya to Zygo under Fed. R. Civ. P. 14(c).  Zygo could have moved to intervene in Royal's suit against Nan Ya; Royal could have moved to adopt Zygo's opposition to Nan Ya's motion for summary judgment; but no such steps were taken.  Since there are no claims between Zygo and Nan Ya, the Court cannot consider Zygo's opposition to Nan Ya's motion for summary judgment.  See Fed. R. Civ. P. 56(c) (opposition to summary judgment may be

18

filed by "adverse party.").

With or without an opposing memorandum, the Court must still consider Nan Ya's motion on its merits. <u>Vt. Teddy Bear</u>, 373 F.3d at 244. Having done so and for the reasons that follow, the Court concludes that Nan Ya has not "met its burden of demonstrating that no material issue of fact remains for trial," <u>Amaker</u>, 274 F.3d at 681, and therefore Nan Ya is not entitled to judgment as a matter of law.

### 1.    Ambiguity in Minutes of November 13 Meeting

Nan Ya asserts that the minutes of the alleged settlement meeting on November 13, 2000, are clear and unambiguous. The Court disagrees. Translated into English, the minutes state simply that the second AFM "will be returned to the manufacturer, no payment is required." Ginos Aff. Ex. SS. "No payment is required" could mean no payment would ever be required or no payment would be required at the time the second AFM was returned.

It is clear that the November 13 meeting did resolve the salvage value of each damaged AFM, and that Zygo agreed to average the salvage values and subtract the average from Nan Ya's balance due for each.[9] From this, it could be inferred that the November 13 meeting was to resolve all issues concerning payment for the second AFM, such that "no payment is required" was the

---

[9]Larry Martin testified: "I took the necessary steps to determine the salvage value of the <u>two</u> Damaged [sic] AFMs in order to fix the amount that was due and owing from Nan Ya." Martin Aff. ¶ 19 (emphasis supplied).

definitive outcome.  However, it is also possible to infer that, as Smith testified, the purpose of the meeting was to resolve the salvage value only, and that other payment issues would be resolved later by further negotiation.

Nan Ya's evidence also reflects ambiguity in the nature of the November 13 meeting minutes.  Nan Ya asserts that the minutes represent a written contract, signed by Smith on behalf of Zygo, waiving Zygo's right to collect payment on the second AFM.  As such, Nan Ya characterizes the minutes as a modification of an existing contract for the sale of goods.  Nan Ya is correct that the Uniform Commercial Code, as codified in Connecticut law, permits modifications to contracts for the sale of goods without additional consideration.  Id. at § 42a-2-209 ("An agreement modifying a contract within this article needs no consideration to be binding.").  Nan Ya also is correct that the U.C.C. does not require any particular written form in order to modify a contract.  See id.  However, whether the November 13 meeting minutes were actually intended to modify the sales contract is not reflected in the language of the document.  The words "contract," "agreement," and "modification" do not appear anywhere.  It is Nan Ya's burden as the moving party to show that both Nan Ya and Zygo intended the minutes to be a contractual modification and intended to be bound by an agreement to waive Nan Ya's payment obligation for the second AFM.  The minutes alone are insufficient to meet this burden.

20

## 2.    Uncertainty Regarding a Meeting of the Minds

Nan Ya asserts that the written meeting minutes evidence Zygo's intention to be bound by an agreement to release Nan Ya from payment for the second AFM.  Nan Ya argues that any subsequent factual allegations to the contrary are irrelevant. In the context of clearly expressed contract language, Nan Ya is correct, as ex post assertions of intentions, unexpressed during the negotiation of the contract, cannot defeat the formation of a contract where the written terms are unambiguous.  See Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1278 (2d Cir. 1989), 11 Williston on Contracts § 30:2 (4th ed.) ("Where a written memorial of the parties' bargain exists, the law can not recognize their ... intent, unless it is expressed or implied in the writing...").  Where the contract itself is unambiguous, "its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." Goodheart Clothing Co. v. Laura Goodman Enter., Inc., 962 F.2d 268, 272 (2d Cir. 1992), citing John D. Calamari & Joseph M. Perillo, Contracts 166-67 (3d ed. 1987).

Where, however, the writing is unclear, "the question of contract interpretation, being a question of the parties' intent, is a question of fact... ."  Goldberg v. Hartford Fire Ins. Co., 849 A.2d 368, 374 (Conn. 2004); see also Nationwide Mut. Ins. Co. v. Allen, 850 A.2d 1047, 1056 (Conn. App. 2004).  Since, as the Court has found, the November 13 minutes are ambiguous on their

21

face as to whether Zygo intended them to act as a waiver of its contractual right to payment for the second AFM, the parties' intent concerning agreements reached at the meeting is a question of fact.

Nan Ya's own evidence, discussed above in relation to Royal's opposition to Zygo's motion for summary judgment, shows that there are unresolved issues of material fact concerning Zygo's intentions with respect to the November 13 meeting.  The testimony of Martin, Smith, and Walch is contradictory and presents issues of credibility not appropriate for resolution at the summary judgment stage.  The November 15 letter from Martin to Zygo, confirming the salvage value off-set agreement, is silent on the subject of any agreement on payment for the second AFM, and his email of November 13 is unclear whether the "situation" resolved at that day's meeting was limited to the return of the three AFMs or involved payment as well.  Such evidence does not meet Nan Ya's burden of showing that there are no disputed issues of material fact entitling it to judgment.

### 3.  Scope of Smith's Apparent Authority

Nan Ya argues that even if Zygo did not expressly intend to be bound by an agreement to waive payment on the second AFM, Smith had apparent authority to sign such a waiver on behalf of Zygo, his employer.  Under Connecticut law, if the undisputed evidence shows that Smith had apparent authority as Zygo's agent, then Zygo, as the principal, will be bound by the contract.  See

22

<u>Updike, Kelly and Spellacy, P.C., v. Beckett</u>, 850 A.2d 145, 162 (Conn. 2004), <u>citing</u> <u>E. Paul Kovacs & Co. v. Alpert</u>, 429 A.2d 829, 832 (Conn. 1980); <u>Gordon v. Tobias</u>, 817 A.2d 683, 688 (Conn. 2003).

It is not disputed that Smith, a Zygo employee, was acting on Zygo's behalf for some purpose at the November 13 meeting. The questions are whether Smith had authority and intended to sign an agreement waiving all payment from Nan Ya for the second AFM. "The issue of apparent authority is ... determined based on two criteria. First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted the agent to act as having such authority. Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." <u>Gordon</u>, 817 A.2d at 689. (internal quotation marks and citation omitted).

In this case, it is undisputed that neither Smith nor Zygo ever informed Nan Ya of any limits to Smith's authority, and that the subject of payment for the second AFM previously had been discussed between Zygo, Lee Tech, and Nan Ya. However, Nan Ya has not shown that Smith himself knew before the November 13 meeting the topics for discussion at that meeting. The discussions that took place at the meeting, and how they

comported with the scope of authority granted by Zygo, are therefore crucial. Gary Chen Kou Chen, an employee of Taiwan Fire & Marine Insurance Co., Nan Ya's insurer, stated in an affidavit that a Lee Tech representative "translated Mandarin Chinese into English for Mr. Smith" and Mr. Walch during the meeting. Chen Aff. at ¶ 4. He did not say that Nan Ya itself provided a translator, and he cannot vouch for the accuracy of any informal translation made by a Lee Tech representative. Importantly, there is no evidence that the minutes themselves were translated.

Chen stated that "Nanya [sic] proposed [at the meeting] that Nanya, through Taiwan Fire & Marine Insurance Company, cover the cost of one of the damaged microscopes, but not the other." Id. at ¶ 4. He then stated that all present signed the meeting minutes "for the parties' acceptance of Nanya's proposal." Id. at ¶ 5. However, there is no evidence of discussion of the substance of Nan Ya's proposal from which oral agreement could be inferred to have been reached before the minutes were prepared and signed. The evidence is genuinely disputed whether Smith actually agreed on Zygo's behalf to waive the claim for payment from Nan Ya for the second AFM, or that he signed the minutes to bind Zygo to such a waiver.

Even if Smith acted as Zygo's agent, and Zygo cloaked him with authority to make some decisions on its behalf at the November 13 meeting, it is still Nan Ya's burden to show that,

24

"acting in good faith, [it] reasonably believed ... that [Smith] had the necessary authority to bind [Zygo] to [Smith's] action." Gordon, 817 A.2d at 689.  Without evidence showing that Smith discussed and agreed to the substance of the meeting minutes as reflecting the resolution Nan Ya now claims, Nan Ya cannot show that it reasonably believed Smith had the authority to agree to any settlement contained in the minutes on behalf of Zygo.  The circumstances thus far presented could lead to a reasonable inference that Nan Ya slipped the language about "no payment" into the meeting minutes, in Mandarin, without Smith's knowledge. The answer to this question will be reserved for the jury.

Because there are genuine issues of material fact, neither Zygo nor Nan Ya is entitled to summary judgment on the issue of whether the two companies reached a final settlement of their dispute over payment for the second microscope at the November 13 meeting.  The meeting minutes are ambiguous as to whether they constitute a contract or a modification of a contract, or what the contractual terms were.  Even assuming Smith had apparent authority to sign some type of agreement on behalf of Zygo, Nan Ya has not met its burden of showing that it reasonably believed that Smith's authority extended to the broad settlement urged. Thus, after consideration of Nan Ya's motion for summary judgment on its merits, the Court concludes that it must be denied.  After consideration of Zygo's motion for summary judgment on Royal's fourth count, and Royal's opposition thereto, the Court concludes

25

that Zygo's motion also must be denied.

## V.    REPORTING REQUIREMENT AND PAYMENT OF EXTRA CONTINGENCY PREMIUM UNDER CLAUSE 52

Zygo also moves for summary judgment on Royal's third claim, that Zygo failed to pay a contingency premium and report the AFM shipment in advance as allegedly required by Clause 52 of the insurance policy.  As is evident from Clause 52 itself, supra n.4, contingency coverage is back-up insurance coverage in case a vendee or its insurer fails to pay for goods received.  See Armada Supply Inc. v. Wright, 858 F.2d 842, 847 (2d Cir. 1988). The question in this case, whether the Contingency Clause (Clause 52) of the Royal-Zygo insurance policy covered Nan Ya's failure to pay for the second damaged AFM, was the subject of an August 15, 2003, ruling by Judge Goettel [doc. #144], who denied Royal's motion for summary judgment on this issue.  Judge Goettel identified two ambiguities in the language of Clause 52:  first, that the last paragraph of Clause 52 was unclear as to whether contingency coverage terminated the moment a shipment was delivered to a U.S. airport; and second, that the Schedule of Rates in the policy was unclear concerning whether an additional premium was required in advance of any contingency shipment, and whether Zygo was required to report the AFM shipment to Royal in advance if it wanted contingency coverage on that item.  This Court disagrees with Zygo's argument that discovery has resolved these ambiguities.  Many disputed issues remain concerning the

26

intent of the parties in drafting Clause 52 of the insurance
policy.

Alan P. Ilias, the Royal underwriter responsible for Zygo's
policy, testified that he believed when he wrote the policy that
Zygo had no need for contingency coverage because Zygo's
insurance brokers, Mathog & Moniello, told him that all of Zygo's
shipments required "a hundred percent primary coverage, [and]
there is no contingent exposure." Ilias Dep. at 66-68.
Nonetheless, apparently at Zygo's request, Ilias included the
contingency clause (Clause 52) in the policy. This was an
additional rider; it was not part of Royal's standard insurance
form. Ilias testified that the last paragraph of Clause 52
required Zygo to notify Royal and pay an additional premium in
advance of any contingency shipments: "That means if the insured
wished to utilize this option of contingency, they need to pick
up the phone, call their broker, call the underwriter and explain
the circumstances and pay any additional premium thereon, if any,
subject to underwriting information." Id. at 136.[10] He further
testified that the rate for contingency coverage would be
approximately 60% of the rate for general marine shipping
coverage (which for this policy was 0.023 cents per $100 of goods
sold). Ilias did not write a separate contingency rate into
Zygo's policy.

_____

[10]Ilias also admitted that Royal never provided insurance brokers with
instructions, other than the policy itself, for specially reporting contingent
coverage shipments. Ilias Dep. at 137.

Zygo's insurance brokers interpreted the policy entirely differently.  Matthew Weidman testified that, in his opinion, the 0.23 cents rate applied to "everthing that was covered under this policy."  Weidman Dep. at 201.  He further testified that at no time did Royal ever inform him that there would be a different rate for contingency shipments.  He stated that the policy was of an annual reporting type, meaning that all shipments, including contingency shipments, only needed to be reported to Royal once per year for calculation of the premium owed.  He did not recall any communication from Royal telling him that Zygo was required to declare each shipment for which it wanted contingency coverage.

Likewise, Carroll Sneed of Mathog & Moniello testified that he interpreted Clause 52 to cover Zygo's shipment of the AFM to Nan Ya.  He interpreted the last paragraph, which lists premiums "to be agreed," to mean that premiums on contingency shipments were within the general 0.023 cents rate that was agreed for the entire policy.  Sneed Dep. at 67-68.  He also concluded that, under the language of Clause 52, Zygo would not have had to report every contingency shipment separately.  Id. at 69.

It is evident from these three depositions that the principal players disagree as to their intent in drafting the contingency clause of the insurance policy.  Despite completion of discovery, there remain disputed issues of material fact concerning the parties' intent with respect to Clause 52 and

28

summary judgment may not be granted.

Zygo argues that, as a matter of Connecticut law, ambiguities in an insurance policy should be construed against Royal under the doctrine of <u>contra proferentem</u>. This doctrine states that "ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view...." <u>Israel v. State Farm Mut. Auto. Ins. Co.</u>, 789 A.2d 974, 977 (Conn. 2002) (internal citation and quotation marks omitted). It comes into play, however, only where "an ambiguity arises <u>that cannot be resolved by examining the parties' intentions ... .</u>" <u>Metropolitan Life Ins. Co. v. Aetna Casualty & Surety Co.</u>, 765 A.2d 891, 897 (Conn. 2001) (emphasis supplied). As the Second Circuit has held, interpreting New York law, the doctrine of <u>contra proferentem</u> "is used only as a matter of last resort after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." <u>U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.</u>, 949 F.2d 569, 573 (2d Cir. 1991). Where there remain disputed issues of material fact concerning the parties' intentions for contingency coverage under the policy, the Court concludes that it is inappropriate to apply that doctrine at the summary judgment stage. Testimony will be required on whether the parties intended that Zygo would have to separately report and pay a premium on each contingency shipment,

and therefore Zygo's motion for summary judgment on Royal's third claim must be denied.

## VI.  ZYGO'S FIRST AND FOURTH COUNTERCLAIMS

Zygo alleges as its First Counterclaim that Royal breached the insurance contract by refusing to cover Zygo's claim for the purchase price of the second AFM, and asserts as its Fourth Counterclaim that it is entitled to a declaratory judgment that its insurance claim is covered under the policy.  Zygo's Answer and Counterclaims [doc. #13] at ¶¶ 119, 131.  Zygo has moved for summary judgment on both counterclaims.  As Zygo acknowledges, the success of its motion on these counterclaims depends on the Court's determination that Clause 52 entitles Zygo to unpaid vendor coverage for Nan Ya's refusal to pay for the second AFM. See Zygo Mem. at 33.  Inasmuch as the Court has determined that Zygo is not entitled to summary judgment on the Clause 52 issue, its motion for summary judgment on the two counterclaims must be denied.

## VII. LIMITATION OF LIABILITY

Finally, Zygo moves for summary judgment on Royal's Fifth Cause of Action, in which Royal asserts "alternatively" that its liability for the second AFM is limited to the cost of replacement parts.  Royal Compl. ¶ 82-85.  Royal asserted this claim under Clause 39 of the policy, which reads:

> When the property insured under this Policy includes a machine consisting when complete for sale or use of several parts, that in case of loss or damage covered

by this insurance to any part of such machine, the
Company shall be liable only for the proportion of the
insured's value of the part lost or damaged, or at the
Company's option, for the cost and expense, including
labor and forwarding charges, of replacing or repairing
the lost or damaged part...

Id. at ¶ 83.  Zygo argues that this limitation of liability

defense under Clause 39 is inapplicable because it does not

relate to unpaid vendor coverage.  Royal's opposition [doc. #152]

does not address this issue.

On its face, Clause 39 relates to situations in which Royal

has insured a "machine."  At issue in the present case, however,

is unpaid vendor coverage--insurance for the balance due, not for

the machine itself.  Zygo is not asserting a claim for the actual

damage to the second AFM.  Zygo instead claims coverage from

Royal because Nan Ya has refused to pay for the second

microscope.  By its nature, unpaid vendor coverage would be in

the amount that Nan Ya owed to Zygo; it would not be calculated

with reference to the cost of replacement parts for the AFM.

There is no dispute of material fact relating to Royal's

fifth cause of action, and Royal has offered no legal theory to

support its fifth cause of action.  Therefore Zygo's motion for

summary judgment is granted as to this claim.

## VIII.    ROYAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Royal's motion for partial summary judgment targets Zygo's

second and third counterclaims, which allege bad faith refusal to

pay or investigate Zygo's insurance claim, based respectively on

the insurance contract and Connecticut tort principles.  The same law governs both the tort and contract theories.

### A.    Substantive Bad Faith: Failure to Pay

An insurer has a "duty 'to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy'..." Grand Sheet Metal Products Co. v. Protection Mut. Ins. Co., 375 A.2d 428, 430 (Conn. Supp. 1977), quoting Gruenberg v. Aetna Ins. Co., 510 P.2d 1032, 1037 (Cal. 1973).  Zygo alleges that it is entitled to payment under the policy, and Royal unreasonably withheld such payment.  Royal counters that it reasonably disputed Zygo's insurance claim.  To succeed on a motion for summary judgment on this claim, Royal must show that there are no disputed issues of material fact and that it was reasonable as a matter of law for Royal to dispute Zygo's claim.

The parties agree that the second AFM arrived damaged at Nan Ya's factory on February 11, 2000, and on February 14, Kelvin Walch inspected the machine on Zygo's behalf, along with representatives of Nan Ya and employees of Cathay Inspection Company.  Zygo did not alert Royal that this inspection was to take place, and no Royal representative attended.  Zygo filed a claim with Royal for the purchase price of the AFM on March 7, 2000.  A series of emails and letters then were exchanged between Zygo, Royal, and Zygo's insurance brokers Mathog & Moniello over the course of the next sixteen months.  Royal received word from

32

Nan Ya[11] that Zygo and Nan Ya had settled their dispute, and based at least in part upon this information, on August 25, 2000, Richard Chung from Royal "recommend[ed] to ignore this claim and close this file." Ginos Aff., 7/30/04, Ex. O. Royal issued a final notice of denial of Zygo's claim on July 16, 2001, almost one year later.

As discussed above, Zygo disputes that it ever settled its contract claim with Nan Ya. Zygo also argues that Royal's failure to investigate and verify the alleged settlement constitutes bad faith. Thus, the issues are whether Royal reasonably relied on perhaps erroneous information from its Taiwanese agent that the Zygo-Nan Ya dispute had been settled, knowing that the agent relied on information from Nan Ya (the potential defendant in a subrogation action by Royal) not Zygo, and whether the alleged settlement was, in fact, the basis for Royal's decision to deny the claim. Royal's claim denial letter simply quotes the language of Clauses 52 and 43 without explanation of how Royal believed those clauses applied to Zygo's claim, Bjorkman Aff. Ex. 16, leaving Royal's actual reason(s) for denying the claim unclear and an issue for resolution by a jury.

---

[11]The source of this information is unclear. Chung's email reads: "We have liaised with Billy Wu and Tim Smith... But they have no positive answer and didn't know the situation. According to Nan Ya's statement, they have 2 Policies on this journey. The loss probably caused by insufficient package... Taiwan Fire & Marine Insurance Co., Ltd. have agreed to settle this claim in half amount on amicable basic, and the rest amount will be settled by Lee Tech Co., Ltd. (Zygo Corp's Taiwan agent). Now they are awaiting for Lee Tech's offer of the salvage. Under such circumstance, we recommend to ignore this claim and close this file." Ginos Aff., 7/30/04, Ex. O.

Even if a jury finds that Royal reasonably relied on a report from Taiwan that Nan Ya and Zygo had settled, Royal would not necessarily be entitled to judgment as a matter of law. Under Clause 52 of the policy, Royal was required to "advance the amount of [the] loss pending collection from the buyer." Zygo was then obligated to cooperate in Royal's efforts to collect the unpaid balance from Nan Ya, with Zygo and Royal sharing the cost of collection in proportion to their interest. In other words, Royal was obligated under the contract to pay the coverage first and, if it ultimately determined that Nan Ya was justified in failing to pay its bill to Zygo, or that Zygo improperly settled the claim without Royal's permission, demand reimbursement from Zygo.

Unpaid vendor coverage, as discussed above, is insurance for the event that the buyer, Nan Ya, failed to pay the insured, Zygo. It is not related to any specific damage to the microscope, and there is nothing in Clause 52 turning on the reason the buyer gave for refusing or failing to pay. Here, Nan Ya apparently claimed in February 2000 that it owed Zygo nothing because that the damage to the second AFM was due to improper packaging. A prompt inspection would have been useful to Royal to dispute Nan Ya's assertions about the cause of the damage as the basis for nonpayment. However, even if improper packaging was eventually demonstrated, such that Nan Ya did not in fact owe any money to Zygo, a jury could still to find that under the

34

insurance contract Royal's required course of action was to pay Zygo's contingency coverage claim first, and then demand reimbursement from Zygo if and when it was determined that Nan Ya did not owe anything for the second microscope because of the improper packaging.  Thus Zygo's alleged failure to permit Royal to inspect the damaged AFM is not necessarily a successful defense to Zygo's claim under Clause 52 or Zygo's substantive bad faith counterclaim.

Given the disputed issues concerning Royal's reason for denial of Zygo's claim, and whether such denial was based on a reasonable dispute concerning the scope of the insurance policy, as well as the flawed nature of Royal's arguments under the terms of Clause 52, Royal's motion for summary judgment on the issue of substantive bad faith is denied.

**B.    Procedural Bad Faith: Failure to Investigate**

Zygo also asserts bad faith failure to investigate the claim, arguing that Royal did not send inspectors to Taiwan, did not contact individuals with knowledge of the insurance claim, took sixteen months to render a decision on the claim, and finally denied the claim without adequate explanation. Furthermore, Zygo argues, Royal refused to renew Zygo's policy and ultimately denied insurance coverage when Zygo decided to take its insurance business elsewhere.  Royal argues, on the other hand, that Zygo prevented them from investigating and failed to inform Royal of its alleged settlement discussions with

35

Nan Ya.

While the Connecticut Supreme Court has never squarely addressed the issue, this Court has held, relying on <u>Buckman v. People Exp., Inc.</u>, 530 A.2d 596 (Conn. 1987), that Connecticut common law would recognize a claim for "procedural bad faith," including failure to reasonably investigate an insurance claim. <u>United Technologies Corp. v. Am. Home Assurance Co.</u>, 118 F. Supp. 2d 181, 188-89 (D. Conn. 2000), <u>mod. after recon. on other grounds</u>, 237 F.Supp.2d 168 (D.Conn. 2001) ("...the Court predicts that the Connecticut Supreme Court would recognize a cause of action for procedural bad faith in the ... claims handling process..."); <u>see also</u> <u>Uberti v. Lincoln Nat'l Life Ins. Co.</u>, 144 F. Supp. 2d 90, 104 (D. Conn. 2001).

Recently, the Connecticut Supreme Court recognized a claim for procedural bad faith in the context of a construction surety bond. <u>PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.</u>, 838 A.2d 135, 153-54 (Conn. 2004). There, defendant National Fire Insurance Company of Hartford ("National") had agreed to issue surety bonds on behalf of a general contractor, Frank Mercede & Sons ("Mercede"). Mercede executed a written subcontract with Dominion Bridge, Inc., which in turn entered a subcontract with PSE. Eventually Dominion went bankrupt, and PSE demanded payment from Mercede for work completed on a construction project. Mercede refused to pay, but eventually National, Mercede's surety, paid PSE, in turn demanding indemnification from Mercede.

36

Mercede refused to pay because it was unaware of the settlement discussions between National and PSE and believed PSE not to be entitled to payments, and it cross-claimed against National for bad faith failure to investigate its defenses to PSE's claims. The jury found in Mercede's favor.

In upholding the verdict on the bad faith claim, the Connecticut Supreme Court found that the "evidence from which the jury reasonably could have concluded that National had acted in bad faith includes National's failure to conduct a sufficient investigation," by failing to put in writing, as required by the surety contract, which portions of PSE's claim it disputed, "engag[ing] in only a superficial review of PSE's claim," and waiting almost two years before referring the case to an in-house engineering expert. Id. at 153-54. However, negligent or unreasonable failure to investigate, alone, was held insufficient to find bad faith; Mercede was required to adduce evidence of "an improper motive" as well. Id. at 155. Mercede met this burden by showing that National settled the claim with PSE in National's own self-interest to avoid an investigation from the Connecticut insurance commissioner, rather than fulfilling its contractual obligations to Mercede:

> Obviously, what constitutes good faith or lack thereof depends on the facts of each case. In this instance, we conclude that the jury reasonably could have determined that National had breached the implied covenant of good faith and fair dealing based upon all the evidence supporting Mercede's claims that National, inconsistent with justified expectations and unfaithful

37

> to its duty under the implied covenant, both failed to
> investigate adequately and improperly settled PSE's
> claims solely out of self-interest.

Id. at 160.

While the facts of PSE Consulting are distinguishable from
the instant case because there the insurance company rather than
the insured entered into a settlement agreement, the reasoning of
PSE Consulting is applicable to Zygo's bad faith claim against
Royal. Thus, on summary judgment, it is Royal's burden to show
that there is no dispute of fact concerning Royal's investigation
of Zygo's claim or its motive for denying the claim, and that
Royal would be entitled to judgment as a matter of law.

The parties dispute both the steps Royal took, or failed to
take, to investigate Zygo's claim, see supra § VIII.A, as well as
Royal's motivations. Zygo argues that Royal improperly attempted
to get Zygo to drop its insurance claim for the second AFM by
threatening to charge higher premiums upon the renewal of the
policy unless Zygo agreed not to pursue the outstanding claim.
Zygo Opp. [doc. #154] at 10. Royal disputes Zygo's factual
assertion and claims that the increase in offered premiums was
undertaken in the normal course of business. See Royal Reply
[doc. #159] at 5. Royal's claim denial letter does not discuss
the company's reasons for its decision. The Court finds that
this factual dispute over Royal's motive is properly a question
for a jury.

**IX. Conclusion**

38

Accordingly, Royal's Motion for Partial Summary Judgment [doc. # 137] is **DENIED**. Zygo's Motion for Partial Summary Judgment [doc. # 143] is **GRANTED** as to Royal's fifth claim regarding limitation of liability, and **DENIED** as to Royal's third and fourth claims and Zygo's first and fourth counterclaims.

The endorsement order of September 12, 2002 granting Nan Ya's Motion for Summary Judgment, the endorsement order denying Nan Ya's Motion for Reconsideration, and the ruling on Nan Ya's Second Renewed Motion for Clarification, 212 F.R.D. 444 (D. Conn. 2003), are **VACATED**. Nan Ya's Motion for Summary Judgment [doc. #59] is **DENIED**.


IT IS SO ORDERED.


_____/s/_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 14th day of December, 2004.**

39