UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA,<br>     Plaintiff,<br><br>v.<br><br>ZYGO CORPORATION,<br>     Defendant. | Civil No. 3:01 CV 1317 (JBA)<br><br><br><br>January 18, 2005 |

**ZYGO CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE ALAN ILIAS FROM TESTIFYING ABOUT THE CUSTOM AND PRACTICE IN THE INSURANCE INDUSTRY AND TO PRECLUDE LEARNED TREATISE EVIDENCE**

Zygo respectfully submits this memorandum of law in support of its motion to preclude Alan Ilias from testifying about the custom and practice in the insurance industry relating to the declaration of shipments under a contingency policy. Mr. Ilias was not disclosed as an expert witness; he does not have the requisite experience to give such expert testimony; and such testimony is not included in his proposed trial testimony submitted by Royal and, thus, ought to be precluded. Further, Royal should be precluded from offering learned treatise evidence because it has not identified an expert witness, or identified the learned treatise in its proposed exhibit list or proposed witness statements.

**I.   Proposed Testimony Concerning "Custom and Practice" in the Insurance Industry Should Be Precluded.**

Alan Ilias was Royal's underwriter who was responsible for the Zygo policy. He was not disclosed as an expert witness. But, Royal's proposed findings of fact suggest that it intends to have him testify about the custom and practice in the insurance industry

relating to contingency coverage. *See* Royal's Proposed Findings of Fact ¶¶ 41, 80, 95. Such testimony should not be permitted.

Federal Rule of Evidence 701 was amended in 2000

> to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical or other specialized knowledge within the scope of Rule 702. By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 . . . .

Advisory Committee Note to 2000 Amendment to Federal Rule of Evidence 701 (citations omitted). Thus, Rule 701 permits lay witnesses to give opinion testimony as it relates to matters that they have personally observed. *See generally* 4 J. Weinstein, M. Berger, *Weinstein's Federal Evidence* ¶ 701.03[4][b], at 701-23 (2d ed. 2004). But, it is expressly designed to prevent lay witnesses from giving expert testimony.

Here, it appears that Royal is trying to slip in Mr. Ilias's testimony on issues that must be reserved for an expert witness. Certainly the issue of what, if anything, is standard practice relating to the declaration of shipments under contingency coverage is an issue of "specialized knowledge." Fed. R. Evid. 702. Courts in the Second Circuit recognize that experts ought to testify about an industry's custom and practice. *See, e.g., American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 265 F. Supp. 2d 240, 252-54 (S.D.N.Y. 2003) ("experts may testify as to the customary practices in a profession or industry"). There is no reason that a lay witness should be able to testify about such a specialized issue. Rule 702 clearly provides that such testimony may only be given by a witness who is qualified to do so.

Royal, however, never disclosed Mr. Ilias under Federal Rule of Civil Procedure 26 as an expert witness. Therefore, his opinions and credentials were never revealed or tested other than in a fact witness deposition. That is not surprising in light of the fact that Mr. Ilias testified that in his entire career only two insureds had ever called him to declare contingency shipments in advance. Ilias Dep. at 136-41 (attached as Exhibit 1). Only one of those shipments was actually declared as a contingency shipment. *Id.* at 140-41. Therefore, there is no reason to suggest that even if Royal had properly disclosed Mr. Ilias as an expert that he would be qualified to testify on the standard and custom for contingency shipments.

## II. Royal's Proposed Learned Treatise Evidence Should Be Precluded.

Royal's Proposed Findings of Fact, at paragraphs 46 and 47, refers to learned treatise evidence. However, under Federal Rule of Evidence 803(18) learned treatise evidence is admissible only through expert testimony. Material in a learned treatise is obviously hearsay. "[T]he exception [to the hearsay rule] applies only to materials that have been 'called to the attention of an expert witness upon cross examination or relied upon by the expert witness in direct examination.'" 5 J. Weinstein, M. Berger, *Weinstein's Federal Evidence* ¶ 803.20[1], at 803-122 (2d ed. 2004) (*citing e.g., Caruolo v. John Crane, Inc.,* 226 F.3d 46, 55 (2d Cir. 2000)). Since neither party disclosed an expert witness, the learned treatise evidence is inadmissible.

Further, the learned treatise material referred to in the Proposed Findings of Fact has not been listed on Royal's proposed exhibit list, or been referred to in its proposed witness statements. Accordingly, pursuant to the terms of the pre-trial order, the material should be precluded for this reason as well.

## CONCLUSION

For the foregoing reasons, Zygo's motion in limine to preclude Mr. Ilias's testimony concerning custom and practice, and to preclude the learned treatise material should be granted.

DEFENDANT
ZYGO CORPORATION

By: _____
Ian E. Bjorkman (ct 11648)
Erika L. Amarante (ct 22393)
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT 06508-1832
Tel. (203) 498-4496
Fax (203) 782-2889
Its Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 18th day of January 2005, a copy of the foregoing has been mailed, postage prepaid, to the following:

Robert K. Marzik, Esq.
Law Offices of Robert K. Marzik, P.C.
1512 Main Street
Stratford, CT 06615

John A.V. Nicoletti, Esq.
Geoffrey J. Ginos, Esq.
Nicoletti, Hornig, Campise, Sweeney & Paige
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY 10005-1801

Daniel L. FitzMaurice, Esq.
Charlsa D. Broadus, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103

C. Tait Graves, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050

_____
Ian E. Bjorkman

\15160\1\48816.2

# Exhibit 1

Case 3:01-cv-01317-JBA   Document 179   Filed 01/18/2005   Page 6 of 14

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - -x
ROYAL INSURANCE COMPANY OF AMERICA,         :

      Plaintiff,                            :

                                         :

      -against-                            Civil No.
                                       :3:01 CV 1317
ZYGO CORPORATION,                              (GLG)

      Defendant.                           :
- - - - - - - - - - - - - - - - - - - -x

      DEPOSITION of ALLAN P. ILIAS, taken by Defendant, at the offices of Messrs. Nicoletti, Hornig, Campise, Sweeney & Paige, Wall Street Plaza, 88 Pine Street, New York, New York 10005, on Tuesday, December 2, 2003, commencing at 10:40 o'clock a.m., before ANNETTE FORBES, a Certified Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

```
                                                                    2
 1

 2

 3      A P P E A R A N C E S:

 4
                Messrs. NICOLETTI, HORNIG, CAMPISE, SWEENEY
 5                & PAIGE
                      Attorneys for Plaintiff
 6                    Wall Street Plaza
                      88 Pine Street
 7                    New York, New York  10005-1801

 8         BY:   GEOFFREY J. GINOS, Esq., of Counsel

 9


10
                Messrs. WIGGIN & DANA, LLP
11                    Attorneys for Defendant
                      One Century Tower
12                    P.O. Box 1832
                      New Haven, Connecticut  06508-4400
13
           BY:   IAN E. BJORKMAN, Esq., of Counsel
14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                            136
1                          Ilias
2      they have warehouse coverage in Taiwan.
3            Q     But it does not cease once it's
4      loaded on the aircraft on an FOB sale?
5            A     If they have and take the option of
6      contingency, yes.
7            Q     The space insured agrees to, the
8      assured agrees to declare to this company the
9      value of all shipments covered under the terms of
10     this endorsement and pay premium thereon at rates
11     to be agreed.
12                 Do you see that?
13           A     Yes, I do.
14           Q     What does that mean?
15           A     That means if the insured wished to
16     utilize this option of contingency, they need to
17     pick up the phone, call their broker, call the
18     underwriter and explain the circumstances and pay
19     any additional premium thereon, if any, subject to
20     underwriting information.
21           Q     What would be the procedure by
22     which, just a phone call?
23           A     That's all we ask.
24           Q     You expected a call from Mathog &
25     Moniello to you?
```

```
                                                               137
 1                         Ilias
 2       A    To me.
 3       Q    And what information would you
 4  require?
 5       A    What the commodity is being shipped,
 6  new or used, the total insured value of the
 7  shipment, where it's going to or from, and the
 8  packing.
 9            And if this happened, I would ask,
10  you told me you have no contingent exposure,
11  that's changed, your operations changed. Because
12  their operations are changing, we would have to
13  take some corrective action in the policy.
14       Q    Was there anything written where the
15  broker is informed of this procedure for invoking
16  the contingency coverage?
17       A    In the policy.
18       Q    Anywhere other than the policy?
19       A    No.
20       Q    Is the assured given instructions in
21  terms of invoking the risk contingency coverage?
22            MR. GINOS:  Instructions from
23       whom?
24            MR. BJORKMAN:  From Royal.
25       A    Royal is not supposed to have any
```

```
                                                              138
  1                          Ilias
  2    contact with the assured.
  3         Q     Why is that?
  4         A     That's the way business is done.
  5               The broker is supposed to represent
  6    the interest of the assured.  They act as the
  7    intermediary, I suppose, would be a logical term
  8    to use.
  9               As I stated previously, direct
 10    contact with the client is rare.
 11         Q     So would you not require any written
 12    notification?
 13         A     I would never require anything in
 14    writing about notification, but I'm not sure the
 15    broker wanted something in writing back from me
 16    about agreeing to something.
 17         Q     When would you expect to be notified
 18    in order for the contingency coverage to be
 19    invoked?
 20         A     Before the shipment departed.
 21         Q     How long before the shipment
 22    departed?
 23         A     It all depends on the size of the
 24    shipment, but an hour.  Just to at least get the
 25    agreement in place and subject to them having the
```

139

Ilias

```
 1                                               
 2   full underwriting information I'm looking for, it
 3   really doesn't take all that long to set something
 4   up.
 5           Q    Under the contingency clause, isn't
 6   it true that that provides coverage, whether or
 7   not there is damage to the item being shipped?
 8           A    Could you repeat the question?
 9           Q    Isn't it true that the contingency
10   clause provides coverage, whether or not there is
11   damage to the item being shipped?
12           A    Yes.
13           Q    And the risk is that the customer
14   won't pay, right?
15           A    Correct.
16           Q    Have there been occasions where you
17   have got telephone calls for insureds invoking the
18   contingency clause?
19           A    I believe twice.  And it wasn't so
20   much -- yes, twice.
21           Q    What were the circumstances under
22   that?
23           A    They had shipments that they were
24   doing of a contingent nature which they were
25   calling up to get coverage for one thing, it was
```

```
                                                        140
 1                    Ilias
 2   accepted, terms changed, one did not --
 3         Q    What do you mean, the terms changed?
 4         A    The selling terms changed.
 5              At first they were going to be
 6   responsible for shipments, but subsequent to
 7   telling me that the contract was written in a
 8   different way whereby they were no longer
 9   responsible for it, it was going to be of a
10   primary nature for them.
11         Q    I'm confused.  Two different times
12   you have gotten calls?
13         A    Yes.
14         Q    Two different assureds?
15         A    Correct.
16         Q    And this is over the period of time
17   since 1996 to the present?
18         A    This is during my entire career,
19   yes.
20         Q    One of those instances you placed
21   the coverage?
22         A    Correct.
23         Q    And the other instance you didn't
24   place the coverage?
25         A    They changed the selling terms
```

141

1                         Ilias
2    around.
3         Q    Changed the selling terms so that?
4         A    My policy would be primary.
5         Q    Do you recall the nature of that
6    transaction where you actually did provide
7    contingency coverage?
8         A    What do you mean "nature of that
9    transaction"?
10        Q    What was being changed, the value of
11   where it was going.
12        A    No.  This was years ago.
13        Q    How do you go about determining a
14   premium for contingency coverage?
15        A    The basis that I was brought up
16   with, and obviously this can vary from company to
17   company, is 60 percent of the applicable marine
18   rate as a guesstimate.
19        Q    In the circumstances of Zygo, that
20   would be 60 percent of whatever number is being
21   used to come up with the .023 blended rate?
22        A    Correct.
23        Q    That would be in addition to
24   premiums that had already been paid?
25        A    It would be charged as a flat