# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA,<br>  Plaintiff, | )<br>)<br>)<br>) | Civil No. 3:01 CV 1317 (JBA) |
| v. | )<br>)<br>) | |
| ZYGO CORPORATION,<br>  Defendant. | )<br>) | January 18, 2005 |

**DEFENDANT ZYGO CORPORATION'S PROPOSED WITNESS STATEMENTS**

**I.**      **Lawrence Martin, 1189 Washington Street, Middletown, Connecticut.**   Mr. Martin is

the Staff Assistant to the President of Zygo Corporation.  Mr. Martin is expected to testify as to

the following:

     **A.  General Overview of Zygo.**  Mr. Martin will provide an overview of Zygo, generally

describing its business.  In sum, Zygo is a public company based in Middlefield, Connecticut.  It

is in the business of designing and manufacturing, among other things, electro-optical measuring

instruments and components.  Zygo's products are used in, among other areas, semiconductor

manufacturing and defense and aerospace systems.

     **B.  The Atomic Force Microscope Business.**  Mr. Martin will generally describe the

fact that the Atomic Force Microscopes ("AFM") that are involved in this case were designed

and manufactured by IBM.  IBM sold the product to Zygo, which was IBM's worldwide sales

representative pursuant to an agreement.  Zygo became IBM's distributor in or about 1999.  The

AFMS were manufactured at IBM's Delray Beach, Florida facility.  Zygo's selling price ranged

from $500,000 to $1 million based on the configuration.  In or about the middle of 2000, IBM

sold off its AFM business to a company known as Veeco, and terminated its agreement with Zygo. Veeco owned and manufactured an AFM product that competed with the IBM product. After the IBM/Veeco transaction there was no real market for the IBM AFMs. Mr. Martin may also generally testify concerning the market for AFMs, including Zygo's competition in this market. In particular, Mr. Martin may testify that after IBM abandoned its AFM programs in mid-2000 it would have been either impossible, or prohibitively expensive, to repair the damaged AFMs that were sold to Nan Ya. And, without Veeco's willingness to provide warranty service there was virtually no chance of reselling the AFMs.

C. **Zygo's transactions with Nan Ya.** Mr. Martin may generally explain Zygo's three transactions with Nan Ya relating to the AFMs. Mr. Martin is generally expected to testify that:

1.    In or about December 1999, Zygo contracted with Nan Ya Technology Corporation ("Nan Ya") for the sale of an Atomic Force Microscope ("the First AFM"). See Ex. 501. The total purchase price of the first AFM was $690,000. Id. The terms of sale were FOB Delray Beach, Florida, with an 80% payment due prior to shipment, by letter of credit, and the remaining 20% payment due when Nan Ya accepted the shipment in Taiwan. Id.

2.    In or about January 2000, Nan Ya advised Zygo that the first AFM had arrived seriously damaged. Nan Ya refused to pay Zygo the remaining amount due on the First AFM.

3.    Nan Ya insisted that Zygo ship a replacement AFM ("the Second AFM") immediately, because Nan Ya was in the middle of a project for which the AFM was urgently needed.

4.    On or about January 31, 2000, Nan Ya provided a purchase order in the amount of $690,000 for the Second AFM. See Ex. 502.

5.      In or about early February 2000, Zygo shipped the Second AFM to Nan Ya. Due to Nan Ya's urgent need for the Second AFM, Zygo did not require Nan Ya to post a letter of credit before shipping the Second AFM. Rather, Zygo shipped the Second AFM on an open account basis, FOB US Airport.

6.      In or about mid-February 2000, Nan Ya advised Zygo that the Second AFM had arrived in a damaged and unusable condition, and refused to pay Zygo for the Second AFM. Nan Ya also demanded that Zygo ship a third AFM.

7.      In late February 2000, Zygo shipped a third AFM (the "Loaner AFM") to Nan Ya on a loaner basis until June 30, 2000. See Ex. 504. The Loan Contract required Nan Ya to return the AFM to Zygo by the end of June 2000.

**D.  Zygo's efforts to collect the purchase price of the First and Second AFMs from Nan Ya.** Mr. Martin will testify concerning Zygo's attempts to recover the purchase price of the AFMs from Nan Ya. Among other things, Mr. Martin will testify that:

1.      Immediately following shipment of the Loaner AFM, Zygo commenced efforts to collect from Nan Ya the amounts due to it for the First and Second AFMs (collectively the "Damaged AFMs"). These efforts occurred via email, telephone and mail. See e.g. Exs. 513, 514.

2.      Zygo put its insurer, Royal, on notice of a potential claim on March 7, 2000 and continued its efforts to collect the purchase price of the AFMs from Nan Ya. Ex. 503.

3.      Nan Ya did not make clear at first whether it wanted Zygo to attempt to repair the damaged AFMs. See Ex. 513.

4.      Because Nan Ya indicated that it might want the AFMs repaired, Mr. Martin consulted with an engineer at IBM who designed the machine, who gave a "ballpark"

estimate, without looking at the damaged AFMs, of about $600,000 to repair both machines. See Ex. 514. That engineer would have needed to see the machines to give a firm repair estimate.

5.      Zygo always took the position that Nan Ya was required to pay the 20% balance due on the first machine and the full amount due on the Second AFM.

6.      Zygo gave notice to its sales representative in Taiwan, Lee Tech that Zygo had put in a claim with its insurer, Royal, with regard to the Second AFM. See e.g., Exs. 516, 520, 521, 523, 524, 526, 529. Mr. Martin will testify that he understood that Royal would be reimbursed for the cargo and that it would be up to the insurance company to pursue Nan Ya.

7.      By the fall of 2000 Nan Ya requested that the AFMs be evaluated for their salvage value. Ex. 522. Accordingly, Martin directed Kelvin Walch, an independent contractor retained by Zygo, to go to Taiwan to evaluate the salvage value of the two machines. Walch went to Nan Ya and determined that the average salvage value of each of the two machines was $28,925. Exs. 523, 525, 526, 527, 529, 530, 531.

**E.  Zygo did not release Nan Ya for payment of the Second Machine.**  Mr. Martin will testify that he was responsible for making company decisions with respect to collecting the payment from Nan Ya. He will further testify that he never authorized Timothy Smith, Kelvin Walch, Billy Wu or anyone else at the company Lee-Tech, in Taiwan, to inform Nan Ya that it did not have to pay for the Second AFM.

Mr. Martin will testify that in continuing communications with Nan Ya, Zygo consistently took the position that Nan Ya was responsible to pay for the Second AFM. Ultimately, Mr. Martin approved the concept that the average amount of the salvage value of both of the Damaged AFMs would be deducted from the amounts that were due from Nan Ya for both of the AFMs. Ex. 529. After making a claim with Royal, Mr. Martin understood that the

disposition of the Second AFM was no longer in Zygo's control. For example, on September 21, 2000, Mr. Martin indicated to Mr. Wu of Lee Tech that he understood that with regard to the First AFM Nan Ya agreed to pay the outstanding 20%, and that the disposition of the Second AFM was with Zygo's insurance company. Ex. 520. Also, in his September 21, 2000 letter to Mr. Wu, Mr. Martin indicated that Zygo had a willing customer and did not understand why Nan Ya would not return the Loaner AFM. Id.

Mr. Martin will also testify that on October 3, 16 and 25, 2000 he sent additional communications that further demonstrated his understanding that the disposition of the Second AFM was in the hands of Zygo's insurer. Exs. 524, 526, 527 respectively.

Mr. Martin will also testify that on or about October 27, 2000 he again sent a letter to Mr. Wu indicating that Zygo filed an insurance claim for the Second AFM, "and this claim is in their hands." Ex. 529. Moreover, he said that Zygo would "agree to accept the salvage value of both machines and the average salvage value will apply equally to both machines." Id. Mr. Martin will testify that in his view the only reason to apply a salvage value to the Second AFM was because Nan Ya still owed Zygo for that purchase. There would be no reason to apply a salvage value to the Second AFM if Zygo intended to release Nan Ya from its liability to pay for it.

Mr. Martin will also testify that he was aware that in November 2000, after the salvage value of the two Damaged AFMs was determined, a meeting was held among representatives of Nan Ya, Nan Ya's insurer, and Zygo. Timothy Smith was Zygo's representative at that meeting and Mr. Martin will testify that he did not authorize Mr. Smith to compromise Zygo's claim for the amount due on the Second AFM.

Mr. Martin will testify that he received reports that at the November meeting Nan Ya agreed to pay the balance due on the First AFM with a deduction for the average salvage value of

the two Damaged AFMs. He will further testify that he was asked to write a letter confirming Zygo's agreement. Ex. 533. Accordingly, on November 15, 2000 Mr. Martin sent a letter to Nan Ya confirming that Zygo agreed to offset the balance due on the First AFM by $28,925 provided that payment would be made by December 21, 2000. Ex. 534. Mr. Martin will testify that he also understood that Nan Ya also agreed to return the two Damaged AFMs and Loaner AFM.

Mr. Martin will testify that he was never informed by Mr. Smith, or anyone else, that there was any agreement to release Nan Ya from liability for the Second AFM, or to in any way change the terms of the deal such that Nan Ya did not have to pay for the Second AFM. Indeed, any such agreement would have been beyond the scope of the authority given to Mr. Smith or any other Zygo representative.

**F. Zygo's Insurance Claim and Cooperation with Royal**. Mr. Martin will testify that when it appeared that Nan Ya was unwilling to pay for the balance of the First AFM or the Second AFM, Zygo gave notice of the claim to its insurer Royal on or about March 7, 2000. Ex. 503. He will further testify that Zygo fully cooperated with Royal's investigation of the claim. Mr. Martin will testify that he personally provided contact information for Zygo representatives in Taiwan who Royal could contact concerning its investigation. Exs. 505, 515. He also will testify that he gave instructions to cooperate with Royal's investigation of the claim. Ex. 516. But, Royal never contacted Mr. Martin directly to obtain information or inform him of any alleged problems with Zygo's cooperation with the investigation. See also Exs. 517, 518.

**II.    Kelvin Walch, 73 Stanwell Road, Ashford, Middlesex England  TW153EQ**. Kelvin Walch is a former Zygo employee who has extensive experience in the engineering and servicing

6

of Atomic Force Microscopes. If called, Mr. Walch is expected to testify as to the following issues.

**A. Damage to the AFMs.** Mr. Walch will provide a general description of an Atomic Force Microscope and how it operates. He will generally describe that it is a high-tech measuring instrument that is used as a quality control tool in the manufacturing of microchips. He will also describe the precision components of the equipment.

Mr. Walch will also testify that he traveled to Taiwan in February 2000 and inspected the damaged AFMs. He will further testify that based on his experience with the AFM product it was his conclusion, based on his actual examination of the equipment, that the AFMs were essentially destroyed because of the damage that had been sustained. Ex. 503.

**B. Salvage value of AFMs.** Mr. Walch will testify that he undertook a valuation of the two damaged AFMs and determined their salvage value based on the usable remaining parts. Exs. 530, 531. He will testify that it was his conclusion that the AFMs were generally not repairable. While engineers at IBM might have been able to rebuild the machines at great cost using many new components, only IBM had the requisite know-how and ownership of the Intellectual Property to build the specific AFM. Since the IBM program was disbanding, there was no engineering team to support a rebuild. Mr. Walch will testify that he determined a salvage value for the two machines based on the salvageable parts in October/November 2000 during a return trip to Taiwan. He will further testify that he determined the salvage value for each of the two AFMs separately. The salvage value for the first AFM was $32,100, and the Second AFM was $25,750, the average salvage value of the two machines was $28,925. Mr. Walch evaluated the machines in November 2000. Exs. 530, 531.

Mr. Walch will also testify that Billy Wu, of Lee-Tech, did not attend any of the inspections of the AFM that were attended by Mr. Walch. He will also testify that he spoke to Billy Wu during February 2000 and that based on that conversation it was Mr. Walch's understanding that Mr. Wu had no expertise concerning the AFM product.

**C.** **The November meeting.** Mr. Walch will testify that he attended a meeting in Taiwan in November 2000 along with Timothy Smith of Zygo, and Stan Lay, an employee of Lee-Tech, and representatives of Nan Ya and its insurer. Mr. Walch will testify that at that meeting the Nan Ya representatives agreed to accept the salvage value of the two AFMs as determined by Mr. Walch. He will further testify that he was asked to create reports showing the salvage value of both AFMs to be the average salvage value of both. Accordingly, he created reports showing the salvage value of each AFM to be $28,925. Ex. 531. He will testify that he understood that Nan Ya had agreed to accept his determination of the salvage value for both of the AFMs. He will also testify that he did not understand that there was any agreement made between Nan Ya and Zygo at that meeting such that Nan Ya was released from having to pay for the Second AFM. Rather, Mr. Walch will testify that it was his view that Nan Ya had agreed to pay for both AFMs less the agreed-upon salvage value.

**D.** **Royal's failure to investigate Zygo's insurance claim.** Mr. Walch will testify that he was never contacted by Royal or anyone acting on Royal's behalf concerning the damaged AFMs.

**III.**    **Timothy Smith**, **41 Lane 146 Shing Yi Road, Peitou, Taipei, Taiwan.**  Mr. Smith is

Zygo's Managing Director to Asia Pacific.  If called, he is expected to testify on the following

matters.

   **A.  Zygo's AFM Program.**  Mr. Smith will testify that he was not directly responsible

for Zygo's AFM program in the Far East and that the AFM was not in his "product line."  He

will describe that the Program was generally administered by a separate Zygo business unit run

from the United States.  He will also testify that Lee-Tech Corporation in Taiwan was Zygo's

representative agent that sold Zygo's "KMS" product line into the semiconductor industry.  The

AFM was not part of the KMS line, but Lee-Tech was asked to assist with the AFMs.  Billy Wu

ran Lee-Tech.  Lee-Tech had its own sales and service organization and was an independent

entity.  Mr. Smith will testify that Mr. Wu also had an adversarial relationship with him because

Zygo represented competition with Lee-Tech for direct sales to the semiconductor industry.

Therefore, Mr. Wu was uncooperative at times with Mr. Smith.  Accordingly, Mr. Smith had

little involvement with the AFM product or contact with Nan Ya.

   **B.  Royal's failure to investigate Zygo's insurance claim.**  Mr. Smith will testify that

he understood that, as the senior Zygo employee in Taiwan, he was identified as a person that

Royal should contact concerning its investigation of the AFM claim.  Mr. Smith will testify that

he received instructions from Lawrence Martin of Zygo to cooperate with Royal's investigation.

Ex. 516.  To that end, Mr. Smith received an inquiry from Royal's representative Richard Chung

and Mr. Smith coordinated with Zygo's home office in Connecticut to provide Royal with

pictures and reports relating to the damaged AFMs.  Ex. 517.  Mr. Smith will also testify that he

offered to take the Royal representatives to Nan Ya to inspect the damaged AFMs, but that the

offer was refused.

**C.  The November Meeting with Nan Ya.**  Mr. Smith will testify that he attended a meeting in November 2000 with Kelvin Walch and representatives of Nan Ya and Nan Ya's insurance company.  Mr. Smith will testify that the meeting was conducted in both English and Mandarin Chinese.  He will also testify that he had not been privy to many of the email communications that preceded the meeting between Mr. Martin and Billy Wu although he was generally familiar with the fact that two AFMs shipped to Nan Ya had been destroyed en route. Mr. Smith will testify that he understood that he was to attend the meeting as Zygo's representative.  He will also testify that he was not authorized to release Nan Ya from its payment obligation on the Second AFM and that he made no such agreement at the meeting.

**IV.    Matthew Weidman, 91 Willow Road, Guilford, Connecticut  06437.**  Mr. Weidman is Zygo's insurance broker and currently an employee of Webster Financial Group.  During the relevant period Mr. Weidman was employed by an insurance broker, Mathog & Moniello Co. ("M&M"), which was acquired by Webster after the events that gave rise to this action.  If called, Mr. Weidman will likely testify as follows:

**A.    M&M's relationship with Zygo.**  Mr. Weidman will testify that he was the insurance broker with responsibility for the Zygo account.  Mr. Weidman will testify that he generally reviewed Zygo's insurance needs on an annual basis and made recommendations to senior management concerning coverage options for the coming year.  M&M's obligation was to obtain the needed coverage at advantageous rates.

**B.    Zygo's contingency coverage.**  Mr. Weidman will testify that M&M, on behalf of Zygo, expressly requested that Royal provide contingency, or unpaid vendor, coverage ("Clause 52") in its policy beginning in May 1999.  He will also testify that Zygo had contingency

coverage in the past, from other insurance companies, and that Royal agreed to provide contingency coverage upon Zygo's request. Mr. Weidman will further testify that the premium required under the Royal policy during the relevant period called for an initial payment of $20,000 and that figure would be adjusted based on Zygo's annual reported gross sales for the year. This was an "annual reporting" contract. Specifically, Zygo was required to pay $.023 per $100 of annual gross sales in premiums.

Mr. Weidman will also testify that neither M&M, nor Zygo to his knowledge, was ever notified that in order to obtain contingency coverage, shipments had to be declared to the insurance company prior to beginning the transport and that a separate premium had to be paid. Mr. Weidman will further testify that such a reporting and payment obligation would not make commercial sense in light of the fact that it would require additional reporting and payment obligations for virtually all of Zygo shipments because there is no way to know before a shipment whether the contingency coverage would be required. Mr. Weidman will further testify that he never informed Zygo that it had additional reporting and payment obligations relating to contingency coverage. Further, Mr. Weidman is expected to testify that the additional reporting and payment obligations are not expressly included in the Policy's clause 52.

      **C.**   **Zygo's claim and Royal's investigation**. Mr. Weidman will testify that, as demonstrated by voluminous correspondence, M&M fully cooperated with Royal's investigation of Zygo's claim. M&M collected information from Zygo, as requested, and passed it along to Royal. Also, M&M gave detailed responses to Royal's inquiries and notified Royal about, among other things, the fact that Zygo had not compromised its claim with Nan Ya. Mr. Weidman will also testify that M&M involved Carrol Sneed in the discussions with Royal in order to provide information and detailed analysis of Zygo's claim. At the time, Mr. Sneed was

an independent contractor of M&M with extensive claims experience. Mr. Weidman will further testify that Royal's July 16, 2001 letter does not provide a reason for Royal's refusal to cover the shipment.

**D.** **Negotiations for subsequent coverage.** Mr. Weidman will testify that he was involved in negotiating coverage for Zygo for the term beginning in May 2001. Mr. Weidman will testify that in May 2000 Royal renewed the policy with certain minor changes. He will further testify that in November 2000, Royal revoked Zygo's contingency coverage. Ex. 545. When the policy was set to expire in May 2001, Royal offered to continue the coverage (without a contingency clause) for an annual premium of $250,000. Ex. 547. It also offered the alternative of a lower premium if Zygo would drop its coverage claim for the Second AFM. Ex. 546. Royal extended the policy (without contingency coverage) for two months with premiums prorated on a $250,000 annual basis. Exs. 544, 558. Thereafter, M&M was able to place Zygo's insurance coverage with St. Paul at a much lower rate that included contingency coverage. Ex. 565. That policy included a separate rate for contingency coverage. Subsequent policies with St. Paul had one "all-in-rate" that combined the rate for primary and contingency coverage. Ex. 568.

Mr. Weidman will testify that Royal was notified on or about June 29, 2001 that Zygo would not renew its coverage with Royal. Ex. 561. Within two weeks, Royal sued Zygo (July 13, 2001) and on July 16, 2001 Royal issued to Zygo and M&M its letter declining coverage. Exs. 562, 563.

**V.**    **Joseph Daneman, c/o St. Paul's Travelers, 499 Thornall Street, Edison, New Jersey.**

Mr. Daneman is Royal's claims adjuster and was the company's Rule 30(b)(6) witness with

respect to:

1. The July 16, 2001 letter from Royal (Joseph Daneman) to Zygo (Lawrence Martin) declining liability under Policy No. POC-102905 (the "Policy").

2. Royal's decision to decline coverage under the policy.

   * * * *

4. Royal's investigation (if any) concerning transportation of, and the damage to, the two Atomic Force Microscopes (the "AFMs") referenced in Royal's complaint.

5. Royal's investigation (if any) relating to the salvage value of the AFMs.

6. All communications between Nan Ya (and its agents and representatives) and Royal (and its agents and representatives) relating to the AFMs and this litigation.

7. All communication between Mathog & Moniello and Royal (and its agents and representative) relating to the AFMs and this litigation.

8. All communication between Royal (and its agents and representatives) and Zygo (and its agents and representatives) relating to the Policy, any and all renewals of the Policy, the AFMs and this litigation.

9. Royal's investigation (if any) relating to Zygo's efforts to collect from Nan Ya the sales price of the AFMs.

10. Royal's investigation (if any) relating to Zygo's communications with Nan Ya relating to Nan Ya's responsibility for payment of the AFMs.

11. Royal's claim, and its investigation relating to the claim, that "Zygo has released or otherwise discharged Nan Ya from further responsibility from making payment for the replacement AFM" as alleged in Royal's Complaint.

12. Royal's claim that "at no time did . . . Zygo declare or report to . . . Royal the original or replacement AFM for "Contingency" coverage under the Policy.

13. Royal's claim, and its investigation relating to the claim, that Zygo impaired and/or waived Royal's rights of recovery against Nan Ya under the original Zygo/Nan Ya sales contract for the replacement AFM, as alleged in Royal's Complaint.

See Ex. 576. Mr. Daneman is expected to testify on the following subjects:

**A. Royal's decision to disclaim coverage.**    Mr. Daneman will testify that he decided on

behalf of Royal to disclaim coverage of the Zygo shipment under the contingency clause because

Zygo did not declare the shipment or make an additional premium payment prior to the transport

13

of the equipment to Taiwan.  However, Mr. Daneman will also testify that he had never before adjusted a claim concerning contingency coverage.  He will not be able to identify any language in the policy that expressly requires the shipment to be declared in advance or an additional premium to be paid.  Mr. Daneman will testify that other clauses in the policy refer specifically to additional premiums and reporting requirements.  Mr. Daneman will testify that he was not aware of any specific instructions that were given to Zygo concerning reporting obligations and that Zygo was required to understand the alleged reporting and additional premium requirements only from the language of the Policy.

Mr. Daneman will also testify that he does not interpret the contingency coverage as terminating when the AFM was loaded on the aircraft for the FOB shipment.

Mr. Daneman is also expected to testify that based on his understanding of the facts, Zygo made reasonable efforts to collect payments from Nan Ya.

**B.** **Royal's investigation of Zygo's claim**.  Mr. Daneman will testify that he was responsible for Royal's investigation of Zygo's claim.  He will testify that Royal received notice of Zygo's claim on or about March 7, 2000 (Ex. 503) and did not assign a surveyor to investigate the claim until mid-May 2000.  Exs. 506, 507, 508.  During the intervening two and one-half months, Royal did not directly contact Zygo for information, or contact Mr. Walch who inspected the equipment even though Royal had Mr. Walch's contact information.  Mr. Daneman will testify that he did not contact Zygo directly as a matter of "courtesy" to Zygo's insurance broker.

Mr. Daneman is also expected to testify that on May 19, 2000 he wrote to Richard Chung of Royal & Sun Alliance in Taipei, asking him to arrange for a survey.  Ex. 507.  Mr. Daneman will testify that he faxed Mr. Chung at least 41 pages of documents, or almost everything, if not

14

everything, in his claim file at the time. Mr. Daneman will further testify that he did not receive

any information from Mr. Chung until June 19, 2000. Exs. 509, 510, 511. That same day, Mr.

Daneman sent a letter to M&M passing along Mr. Chung's comments on the file even though

Mr. Daneman did not understand Mr. Chung's comments. Ex. 512. Mr. Daneman will also

testify that he did not contact Mr. Chung for a clarification of his message. Mr. Daneman did not

do any investigation of Mr. Chung's statements, but took them at face value. Mr. Daneman will

testify that he asked M&M to identify the location of the damaged AFM and identify the contact

information to arrange a survey even though his file already contained such information.

Mr. Daneman is also expected to testify that he again received contact information from

M&M on or about August 1, 2000, Ex. 515, and additional information on or about August 9,

2000. Ex. 518.

Mr. Daneman is then expected to testify that he received an email from Mr. Chung on or

about August 25, 2000 recommending that Royal ignore the claim and close the file. Ex. 519.

Mr. Daneman will also testify that he did not notify M&M that Royal was going to close its file

based on Mr. Chung's advice until almost three months later, on November 10, 2000. Ex. 532.

He is also expected to testify that there was no particular reason for the delay except that was the

period that he was usually taking vacation. Mr. Daneman will also testify that he took no action

to attempt to verify Mr. Chung's information, or even call Mr. Chung to discuss the matter.

Mr. Daneman is expected to testify that he received Mr. Walch's salvage evaluation (Ex.

535) and that on or about January 4, 2001 Royal offered to contact Nan Ya's insurance company

to gather information about Zygo's claim. Ex. 536. He will further testify that about one month

later Royal gave instructions to its Taiwan office to contact Nan Ya. Ex. 540A. Mr. Daneman

will testify that he does not know whether Nan Ya was ever contacted by Royal and, if so, the result of any such communication.

Mr. Daneman will also testify that he continued to make inquiries of M&M during 2001, and that M&M responded. Exs. 548, 549. Indeed, Mr. Daneman will testify that M&M told him that Zygo had not released Nan Ya and he acknowledged that position. Exs. 553, 556. He will also testify that Royal was provided with a return of claim letter that Zygo sent to Nan Ya. Ex. 559. See also Ex. 560.

Mr. Daneman will testify that Royal's failure to survey the equipment played no role in its decision to deny Zygo's claim.

Mr. Daneman will testify that it was his decision to deny coverage of Zygo's claim and to start a lawsuit against Zygo.

Mr. Daneman will testify that he never spoke with any representative of Nan Ya or Zygo. Rather, Mr. Daneman will testify that because he believed that there was a "possibility" of a settlement, it was better to bring a declaratory judgment action and then gain facts about the "possible" settlement through discovery. Mr. Daneman will testify that he answered interrogatory answers in this litigation by adopting the responses of Nan Ya, Ex. 570 even though he did not investigation to determine whether Nan Ya's version of events were true.


VI.    **Alan Ilias, c/o Chubb Group of Insurance Companies, 55 Water Street, New York, New York.** Alan Ilias was employed by Royal as an underwriter and was designated as the company's Rule 30(b)(6) witness with respect to the following issues.

      \* \* \* \*

2.    Royal's decision to decline coverage under the policy.

3.    Royal's interpretation of the Policy including, but not limited to, the Contingency Clause, paragraph 52.

\* \* \* \*

7.      All communication between Mathog & Moniello and Royal (and its agents and representative) relating to the AFMs and this litigation.

8.      All communication between Royal (and its agents and representatives) and Zygo (and its agents and representatives) relating to the Policy, any and all renewals of the Policy, the AFMs and this litigation.

\* \* \* \*

12.     Royal's claim that "at no time did . . . Zygo declare or report to . . . Royal the original or replacement AFM for "Contingency" coverage under the Policy.

\* \* \* \*

14.     Royal's conduct relating to renewals of this Policy, including but not limited to the terms proposed by Royal to Zygo for renewals of the Policy.

15.     The Royal/Zygo negotiations relating to renewals of the Policy.

16.     Zygo's payments of premiums to Royal under the Policy.

See Def. Ex. 576. Mr. Ilias is expected to testify on the following subject:

**A.      Coverage Issues.**

Mr. Ilias will testify that contingency coverage under clause 52 does not cease when the cargo is loaded on a vessel under an FOB contract.

Mr. Ilias will also testify that he does not know what the term "reported or not" means in Clause 1 of the Policy. Ex. 500.

Mr. Ilias will also testify that there is no express requirement in clause 52 that a shipment has to be declared prior to the voyage in order for contingency coverage to attach.

Mr. Ilias will testify that in his entire career he was only involved with two shipments, other than the Zygo claim, that concerned contingency coverage.

Mr. Ilias will testify that some provisions in the policy call for an "additional" premium to be paid, but that clause 52 does not use that language. He will testify that he understands the term "additional premium" as used in other provisions of the Policy to mean "extra in excess of the deposit premium."

Mr. Ilias will testify that the contingency coverage was included in the Policy at Zygo's (through M&M) specific request. He will also testify that the premium for contingency coverage is generally substantially lower than primary coverage and can be anywhere from 60% to 0% of the primary rate. Mr. Ilias will also testify that had he included a portion of Zygo's shipments to be covered on a contingency basis, its premium would have been lower than set forth in the policy.

Mr. Ilias will testify that had Zygo given Royal notice of the AFM shipment before it was sent, Royal would have charged Zygo about 60% of its usual premium for the shipment. That is, for the $690,000 value of the equipment, Royal would have charged about $76. In addition, Mr. Ilias will testify that he would have needed only about an hour's notice of the shipment and Royal would not have done any investigation concerning the shipment such as inspect the goods, or evaluate the creditworthiness of the customer before providing contingency coverage.

Mr. Ilias will testify that he cancelled Zygo's contingency coverage because Zygo "abused" the coverage by making a claim for the Second AFM. Ex. 545.

Mr. Ilias will testify that he made an offer to renew Zygo's coverage that called for an increase of the annual premium from $20,000 to $250,000. Mr. Ilias will further testify that he was willing to renew coverage for another year at a premium of $100,000 if Zygo would drop its coverage for claim for contingency for the second AFM. Ex. 546, 547.

**VII.** **Carroll Sneed, 6-A Lyle Court, Farmington, Connecticut 06052.** Carroll Sneed was an independent contractor who worked with M&M on the Zygo claim to Royal. Mr. Sneed had previously been employed by M&M and has worked as an adjuster of insurance claims since 1959. If called, Mr. Sneed is expected to testify to the following:

Mr. Sneed is expected to testify that he was contacted by Matthew Weidman to assist with respect to Zygo's claim to Royal concerning the Second AFM. Mr. Sneed is expected to testify concerning his investigation of the claim and his interpretation of the Contract. For example, Mr. Sneed is expected to testify that under the Policy Zygo was required to give notice to Royal of the claim at the point in time that Zygo realized that it would not be able to collect from Nan Ya.

Mr. Sneed is further expected to testify that because Zygo had not been paid for the Second AFM it had a claim under Clause 52 of the Policy. Mr. Sneed will also testify that the Policy is considered an "annual reporting" type of policy, meaning that premium is based on the insured's annual gross sales. He is also expected to testify that there are no provisions in the Policy that require reporting on any basis other than an annual report of gross sales. Further, Mr. Sneed will testify that Clause 52, specifically, does not state when Zygo was required to report shipments that were to be covered under that clause.

Mr. Sneed is also expected to testify that under Clause 52 of the Policy there was no need for Zygo to take reasonable means to collect from Nan Ya until Royal had made a payment under that provision.

Mr. Sneed is also expected to testify that Royal was not giving appropriate attention to Zygo's claim insofar as it expected Mr. Weidman to develop important information about the claim.

Mr. Sneed is also expected to testify that Royal's July 16, 2001 declination letter does not explain why the company is declining coverage under Clause 52.

Mr. Sneed is also expected to testify about the exchange of correspondence between M&M and Royal during March 2001 through July 2001.

**VIII.** **Richard Dressler, 8 Lord Brook, Cromwell, Connecticut.** Mr. Dressler is the former Chief Financial Officer of Zygo. If called, he is expected to testify about the general process that Zygo uses to obtain insurance coverage. He may also testify concerning negotiations with Royal for renewal coverage and Zygo's decision to obtain coverage from St. Paul's instead of Royal.

DEFENDANT
ZYGO CORPORATION

By: _____

Ian E. Bjorkman (ct 11648)
Erika L. Amarante (ct 22393)
Wiggin and Dana LLP
P.O. Box 1832
New Haven, CT 06508-1832
Tel. 203-498-4496
Fax: 203-782-2889
ibjorkman@wiggin.com
Its Attorneys

\15160\1\48728.3