# Exhibit H

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA,<br>  Plaintiff, | )<br>)<br>)<br>) | Civil No. 3:01 CV 1317 (JBA) |
| v. | )<br>)<br>) | |
| ZYGO CORPORATION,<br>  Defendant. | )<br>)<br>) | |
| | ) | January 18, 2005 |

## DEFENDANT ZYGO CORPORATION'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In preparation for trial, defendant Zygo Corporation ("Zygo") submits the following proposed findings of fact and conclusions of law:

### I.  FINDINGS OF FACT

#### A.  Brief Introduction

1.  This insurance dispute arises out of a Marine Open Cargo Policy (the "Policy") that Royal Insurance Company of America ("Royal") issued to Zygo in May 1999. *See* Def. Ex. 500 (Policy). Royal brought this declaratory judgment action alleging in three causes of action that losses incurred during a shipment from Zygo to Taiwan do not fall within the specific terms of the Policy. Compl., ¶¶ 1-76. In a fourth cause of action, Royal alleges that, even if the Policy might have covered the loss at issue, Zygo forfeited its right to recovery by allegedly settling its dispute with its customer Nan Ya Technologies ("Nan Ya"). Compl., 77-81.[1]

---

[1] Royal's Complaint also has a Fifth Cause of Action, but this Court recently granted Zygo's motion for summary judgment on that claim.

2.      Zygo counterclaimed against Royal for breach of contract, breach of the covenant of good faith and fair dealing, bad faith denial of insurance coverage, and a declaratory judgment that the loss of the Cargo is covered under the Policy.  *See* Zygo's Answer and Counterclaims ("Ans."), dated September 20, 2001

### B.    The Parties

3.      Zygo is a corporation duly organized under the laws of the State of Connecticut, with a principal place of business in Middlefield, Connecticut.  Ans., ¶ 87. Zygo is in the business of designing and manufacturing, among other things, electro-optical measuring instruments and components, such as the Atomic Force Microscope ("AFM") involved in this case.  *See* Witness Statement of Lawrence Martin.  Zygo's products are used in, among other areas, semiconductor manufacturing and defense and aerospace systems.  *Id.*  As Zygo regularly ships its high-tech devices around the world, it is and was at all times insured under a Marine Open Cargo Policy such as the Policy.  *Id.*

4.      Royal Insurance Company of America ("Royal") is an insurance company duly organized under the laws of the State of Illinois, with a principal place of business in Charlotte, North Carolina.  Compl., ¶ 4.

### C.    The Policy

5.      The Policy Royal issued to Zygo was in effect from May 1, 1999 through July 1, 2001.  *See* Def. Exs. 500, 544, 558 (Policy and monthly extensions to the Policy).

6.      Endorsement 3 to the Policy provides in relevant part as follows:

Effective May 1, 1999 an annual deposit premium of $18,000 shall be payable for the period May 1, 1999 through May 1, 2000 and annually thereafter on the anniversary date.  The annual deposit premium is payable in quarterly installments.

The Assured agrees to furnish this Assurer (within 30 days of the anniversary) with reports of gross sales for the policy year and the Assurer to calculate premium thereon at 0.23 per $100 of total gross sales (Marine and War) Earned premium in excess of the deposit shall be due and payable to this Assurer immediately.

In the event of cancellation, the Assurer will report all gross sales up to and including the date of cancellation and pay additional premiums as may be required.

Def. Ex. 500. The Policy also calls for a premium deposit of $2,000, for a total annual premium deposit of $20,000. This type of policy is known as an "annual reporting contract," because the insured is required to report its sales annually for an adjustment of the premium. *See* Witness Statements of Carroll Sneed, Matthew Weidman and Alan Ilias.

7.    Clause 55, styled "FOB/FAS Shipments," provides:

This Policy is extended to cover shipments sold by the Assured of F.O.B., F.A.S, cost and Freight or similar terms whereby the Assured is not obligated to furnish ocean marine insurance. This insurance attaches subject to Policy terms and conditions and continues until the goods are loaded on board the overseas vessel or until the Assured's interest ceases, whichever shall first occur. The particulars of all such shipments shall be reported promptly to the Assurer and premium paid on the amounts so declared at the rate of N/A for not exceeding thirty (30) days after attachment of risk. Extension of risk beyond thirty (30) days held covered at rates to be agreed.

Def. Ex. 500, ¶ 55.

8.    This dispute hinges on the interpretation of the Contingency (or "Unpaid Vendor") Clause. That Clause provides:

It is agreed that on all shipments sold by the Assured on cost and freight or other terms whereby the Assured is not required to furnish ocean marine insurance, this Policy is extended (subject to all its terms and conditions) to cover only the interest of the Assured as an unpaid vendor from the time shipments become at the risk of the customer under the terms of sale until payment of draft but in no event beyond the time when this company's risk would normally cease under the terms of this Policy.

3

It is further understood and agreed that in no event shall this insurance inure to the benefit of the buyer or his underwriter but in the event of a loss occurring which would be collectible hereunder but for such terms of sale and the Assured is unable to collect the purchase price from the buyer in regular course, this Company will advance the amount of such loss pending collection from the buyer. The Assured hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse this Company, the latter sharing the expense of such collection in proportion to its interest herein.

The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed.

Def. Ex. 500, ¶ 52.

9.      Contingency coverage is not a boilerplate provision in Marine Cargo Insurance Policies, and Zygo specifically requested contingency coverage to be included in the Policy. *See* Witness Statements of Alan Ilias and Matthew Weidman.

10.     The Policy does not specify a separate premium for contingency shipments, and it does not contain any instructions for separately reporting such shipments in advance. *See* Def. Ex. 500; Witness Statements of Alan Ilias, Joseph Daneman and Matthew Weidman.

11.     The Policy does not expressly provide that Zygo had to declare a shipment to Royal separately and in advance in order to obtain contingency coverage. *See* Def. Ex. 500; Witness Statements of Alan Ilias, Joseph Daneman and Matthew Weidman.

12.     The Policy does not expressly provide that, in order to obtain contingency coverage, Zygo had to pay a premium in addition to the $0.023 per $100 gross sales rate that is set out in the Policy's Schedule of Rates. *See* Def. Ex. 500; Witness Statements of Alan Ilias, Joseph Daneman and Matthew Weidman.

4

13.     Royal never told Zygo, or Zygo's broker Mathog & Moniello Companies, Inc. ("M&M"), in words or substance that Zygo was required to declare shipments in advance and pay an additional premium in order to obtain contingency coverage under Clause 52.  *See* Witness Statements of Alan Ilias, Matthew Weidman and Lawrence Martin.

**D.     Zygo's Shipments to Nan Ya**

14.     In December 1999, Nan Ya Technology Corporation ("Nan Ya") purchased an AFM from Zygo for $690,000 (the "First AFM").  Def. Ex. 501 (Order for First AFM).  The total purchase price of the First AFM was $690,000.  *Id.*  The terms of sale were as follows:  FOB[2] Delray Beach, Florida, with an 80% payment due prior to shipment, by letter of credit, and the remaining 20% payment due when Nan Ya accepted the shipment in Taiwan.  *Id.*  At Nan Ya's request, Zygo contracted with Lynden Air Freight ("Lynden Air") to deliver the Cargo to a United States airport for transport to Taiwan.  *Id.*

15.     In January 2000, Nan Ya advised Zygo that the First AFM had arrived in Taiwan seriously damaged.  *See* Witness Statement of Lawrence Martin.  Nan Ya desperately needed the AFM for its business, and it therefore issued a purchase order for another AFM (the "Cargo" or "Second AFM") at the same purchase price and with the same delivery terms as the First AFM.  *See* Def. Ex. 502 (Order for Second AFM).  The purchase price of the Second AFM was also $690,000, and the delivery terms for the Second AFM were "FOB U.S. Airport."  *Id.*  As with the First AFM, Zygo contracted

---

[2] "F.O.B. or Free on Board means that title to property passes from the seller to the buyer at the designated FOB point."  *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 842 n.2 (2d Cir. 1985) (citation omitted).

5

with Lynden Air Freight ("Lynden Air") to deliver the Cargo to a United States airport for transport to Taiwan. *Id.*

16.    In early February 2000, Zygo shipped the Second AFM to Nan Ya. Due to Nan Ya's urgent need for the Second AFM, Zygo did not require Nan Ya to obtain a letter of credit before shipping the Second AFM. Rather, Zygo shipped the Second AFM on an open account basis, FOB U.S. Airport. The Second AFM was also transported at Nan Ya's instructions from the United States to Taiwan by Lynden International via China Airlines.

17.    On or about February 11, 2000, Nan Ya notified Zygo that the Second AFM was damaged. There is no dispute that the Second AFM was not damaged at the time it was loaded on the aircraft for transit to Taiwan. Zygo personnel in Taiwan evaluated the potential cause and extent of the damage, and quickly determined that the Second AFM had been severely damaged.

18.    Because Nan Ya still did not have a workable AFM for its business, Zygo then shipped a third AFM ("the loaner AFM") to Nan Ya in late February 2000 on a loaner basis. Def. Ex. 504 (Temporary Loan Agreement). The loaner AFM was to be returned to Zygo by June 30, 2000. *Id.*

E.    **Zygo's Efforts to Collect from Nan Ya**

19.    Immediately after shipping the loaner AFM, Zygo made efforts to collect from Nan Ya the amounts due to it for the First and Second AFMs (The First AFM and Second AFM are referred to collectively as the "Damaged AFMs"). *See* Witness Statement of Lawrence Martin; *See e.g.* Def. Exs. 513, 514. Even though Nan Ya had the

risk of loss and the Cargo was likely damaged in Taiwan, Nan Ya refused to pay the $690,000 purchase price for the Second AFM. Witness Statement of Lawrence Martin.

20.    On or about March 7, 2000, Zygo, through its insurance broker, M&M, put Royal on notice of its claim regarding the Second AFM. *See* Def. Ex. 503.

21.    Nan Ya refused to return the loaner AFM to Zygo on June 30, 2000, as previously agreed and continued to hold the loaner AFM hostage during the summer and fall of 2000. Witness Statement of Lawrence Martin; *see also* Def. Exs. 520, 526. Accordingly, Zygo now found itself pursuing Nan Ya not only for payment for the Damaged AFMs, but also for return of the loaner AFM. Moreover, Nan Ya's refusal to return the loaner AFM created an additional financial hardship, because Zygo had a customer willing to lease the loaner AFM for about $13,000 per month. Witness Statement of Lawrence Martin; *see also* Def. Ex. 526.

22.    In light of Nan Ya's steadfast refusal to pay for the Second AFM and the fact that Zygo had filed a claim with Royal over this unit, Zygo understood that the disposition of the Second AFM was in Royal's hands. *See* Witness Statement of Lawrence Martin. Zygo's communications with Royal, Nan Ya and others throughout the summer and fall of 2000 reflect this understanding. Among these communications were emails and other correspondence from Lawrence Martin, Staff Assistant to the President of Zygo, the person charged with handling this matter. These documents clearly reflect the fact that Mr. Martin understood that the disposition of the Second AFM was the responsibility of Zygo's insurer. He testified that he understood that Zygo would be reimbursed for the Cargo and then it would be up to the insurance company to pursue Nan Ya. Def. Exs. 516, 518, 520, 521, 523, 524, 526, 529.

23.     At Nan Ya's request, Zygo took the necessary steps to determine the salvage value of the two damaged AFMs, in order to fix the amount that was due and owing from Nan Ya.  *See* Witness Statement of Lawrence Martin.  Def. Exs. 522, 523, 525, 526, 527, 529, 530, 531.  Kelvin Walch, an independent contractor involved in the servicing and repair of AFMs, determined that the average salvage value for each of the Damaged AFMs was $28,925.  Def. Exs. 530-31; *see also* Witness Statement of Kelvin Walch.  In addition, Lawrence Martin, Zygo's Staff Assistant to the President, approved the concept that the salvage values of both of the Damaged AFMs would be deducted from the amounts that were due from Nan Ya.  Witness Statement of Lawrence Martin; *see also* Def. Ex. 529.

**F.     The November 2000 Meeting**

24.     In November 2000, a meeting was held among representatives of Nan Ya, Nan Ya's insurer and Zygo.  *See* Witness Statements of Lawrence Martin, Timothy Smith and Kelvin Walch.  The purpose of the meeting was to establish the salvage values of the Damaged AFMs and to arrange for the return to the United States of all the AFMs, to the extent that Nan Ya decided not to retain either of the Damaged AFMs or purchase the loaner AFM.   Timothy Smith, Zygo's Regional Director in Taiwan, was Zygo's representative at the meeting.  Kelvin Walch also attended the meeting, as did Stan Lay of Lee-Tech, Inc., Zygo's sales representative in Taiwan.  Mr. Smith was not authorized to compromise Zygo's claim with regard to the Second AFM. *See* Witness Statements of Lawrence Martin and Timothy Smith.

25.     The meeting was conducted in Mandarin Chinese and English.  Mr. Smith does not speak Mandarin and did not understand all that was said by the Nan Ya

representatives. Although there was an informal translation, at no time did anyone attempt to provide Mr. Smith with a formal, word-for-word translation as the discussions were transpiring. *See* Witness Statement of Timothy Smith.

26. At the November meeting Nan Ya agreed to a formula for establishing the amount due from Nan Ya for the First AFM, and further agreed to pay Zygo the remaining amount due on the First AFM using that formula. *See* Witness Statement of Lawrence Martin. Nan Ya requested that Mr. Martin write a letter confirming Zygo's agreement to offset the salvage value on the First AFM. *Id., see also* Def. Ex. 533. Accordingly, on November 15, 2000, Mr. Martin sent a letter to Nan Ya confirming Zygo's agreement to offset the balance due on the first AFM by $28,925 (the average salvage value of the Damaged AFMs), provided that payment would be made by December 21, 2000. Def. Ex. 534.[3] Nan Ya never requested that Mr. Martin confirm in writing any purported agreement or compromise with respect to the Second AFM, and the November 15, 2000 letter makes no mention of the Second AFM. Def. Ex. 534. Eventually, Nan Ya did pay Zygo the amount it agreed to for the First AFM. *See* Witness Statement of Lawrence Martin. Nan Ya also eventually returned the Loaner AFM. *Id.*.

27. Mr. Martin understood that the foregoing represented the complete terms of any agreement between Nan Ya and Zygo. Witness Statement of Lawrence Martin. Mr. Martin was not informed by Mr. Smith -- *or anyone else* -- that there was any agreement to release Nan Ya from liability for the second AFM, or to change the terms of the deal in any way such that Nan Ya did not have to pay for the Second AFM. Witness Statements of Lawrence Martin and Timothy Smith. Indeed, any such agreement, which

---

[3] Zygo sold the Damaged AFMs for a total of $57,850. Def. Ex. 539; Witness Statement of Lawrence Martin.

would have consisted of releasing a nearly $700,000 claim in exchange for zero payment, would have been clearly beyond the scope of the authority given to Mr. Smith. *Id.*

### G.    Royal's "Investigation" of Zygo's Claim

28.    Although Royal had unfettered access to Zygo personnel and contractors who were in the best position to know about the company's claim, and had notice of the claim very soon after the AFM was damaged, Royal failed to undertake reasonable and adequate efforts to investigate the claim. Royal received notice of the claim from Zygo on March 7, 2000, approximately 3 weeks after the damage had occurred. *See* Def. Ex. 503. The March 7 notice to Royal attached a February 14, 2000 email from Kelvin Walch, a contractor for Zygo who was the first person to inspect the damaged AFM. *Id.* The February 14 email provided to Royal contained information about the nature of the damage sustained by the AFM and the nature of the dispute between Nan Ya and Zygo that served as the basis for Zygo's claim. It also included Mr. Walch's contact information at the bottom of the email. Thus, on March 7, Royal had sufficient information in its possession to begin its independent investigation of Zygo's claim. Royal could have contacted Zygo – its customer – and/or Mr. Walch directly for further information about the damaged Cargo. It did not.

29.    Further, by about May 1, Royal received correspondence from Zygo's broker, M&M, containing further contact information for individuals with knowledge relevant to the adjustment of Zygo's claim. Def. Ex. 505. Royal likely would have received detailed information on Zygo's claim even more quickly had it not relied exclusively on M&M to gather information on its behalf. Larry Martin, Zygo's Staff Assistant to the President, testified that he did not recall seeing Royal's March 8, 2000

letter to M&M requesting information. Witness Statement of Lawrence Martin. In fact, when Mr. Martin was asked in August for relevant information, he immediately replied to M&M and instructed individuals to cooperate with Royal's "investigation" that ultimately never took place. *See* Def. Ex. 516.

30.     Royal did not act in good faith when it neglected to contact Zygo directly for information regarding the claim and opted instead to write an occasional letter to M&M and otherwise ignore its duty to investigate the claim. In any event, Royal clearly had all of the information it needed to fully investigate Zygo's claim by about May 1, 2000, at the latest. *See* Def. Exs. 505, 507, 508. Royal then proceeded to do nothing with that information for many months. Mr. Daneman never called Sylvain Muckenhirm or Timothy Smith, the contact people that M&M identified for Royal. Witness Statement of Joseph Daneman. Mr. Daneman has no reasonable explanation for his failure to contact these individuals. Instead, he testified that the only reason he didn't make these contacts was that, as a matter of courtesy to the broker, he usually does not contact insureds directly and keeps all communications going through the broker. *Id.* But this general practice of courtesy to the broker does not justify Mr. Daneman's complete failure to contact Mr. Muckenhirm and Mr. Smith, individuals with information directly relevant to Zygo's claim, when the broker itself provided Mr. Daneman with the contact information and expressly told him to contact these two individuals. *See* Def. Exs. 505, 515.

31.     Royal's contention that it proceeded in good faith and was prejudiced by M&M's alleged delay in responding to its requests for information is belied by other examples of its utter failure to do anything with the information it did receive from Zygo

and M&M. To this day, no one from Royal has ever contacted Kelvin Walch to discuss the damage to the AFM. Witness Statement of Kelvin Walch. Royal had Mr. Walch's contact information as early as March 7, 2000, when Zygo first notified Royal of this claim by forwarding Mr. Walch's e-mail, but it did nothing with that information. Def. Ex. 503.

32.    Royal claims that it attempted to assign a surveyor to inspect the Cargo but – like Royal – the surveyor did little, if anything, to investigate the claim. *See* Def. Ex. 507. Royal's claim that its surveyor was denied access to the damaged AFM is simply not true. Instead, the evidence shows that Royal's surveyor dragged its feet for many months, inexplicably neglected to contact the right people to institute a survey, and then expressly told Zygo's representative in Taipei, Timothy Smith, that it did not need to see the damaged AFM at all. Witness Statement of Timothy Smith; Def. Exs. 509, 510, 511, 517.

33.    Specifically, on May 19, 2000, Mr. Daneman wrote to Richard Chung of Royal & Sun Alliance in Taipei, asking him to arrange for a survey. *See* Def. Ex. 507. When Mr. Daneman sent this letter to Mr. Chung, he also faxed Mr. Chung at least 41 pages of documents. *See id.*; Witness Statement of Joseph Daneman. According to Mr. Daneman, the 42-page fax probably included almost everything in his claim file at that time. Witness Statement of Joseph Daneman.

34.    On June 5, 2000, Mr. Daneman sent Mr. Chung another letter asking for the current status of the survey. *See* Def. Ex. 509.

35.    On June 15, 2000, Mr. Daneman sent an email to Mr. Chung, once again requesting an update on the status of the survey, and stating that he had not received any response to his May 19 and June 5 faxes. *See* Def. Ex. 510.

36.    On June 19, 2000, a solid month after Royal first enlisted his help, Mr. Chung faxed Mr. Daneman with an update, stating "the damage cargo are not available to survey and according to the shipper's statement, they haven't put forward a claim of the damaged cargo." *See* Def. Ex. 511. On that same date, Mr. Daneman sent a letter to M&M, passing on Mr. Chung's comments verbatim, even though he didn't understand them. *See* Def. Ex. 512; Witness Statement of Joseph Daneman. Mr. Chung's assertion that the "shipper" had not put forward a claim for the damaged cargo did not make any sense to Mr. Daneman, but instead of asking Mr. Chung to clarify who the "shipper" was, Mr. Daneman opted to parrot that very language in his letter to M&M without explanation.    Witness Statement of Joseph Daneman.    Mr. Daneman took the representation in Mr. Chung's email that the Cargo was unavailable to survey "at face value," without doing any independent investigation of the matter. *Id.* Accordingly, Mr. Daneman asked M&M to identify the location of the damaged AFM and a contact person to arrange the survey, *see* Def. Ex. 512, even though Mr. Daneman's file (which he had faxed to Mr. Chung on May 19) already contained that very information. *See* Def. Exs. 505, 507.

37.    On August 1, 2000, M&M emailed Mr. Daneman information on "a couple of contacts that you should be able to get your surveyor in touch with." *See* Def. Ex. 515. Notably, the contact information for Tim Smith is the same information that M&M provided to Royal on or before May 1, 2000. *Compare* Def. Ex. 515 *with* Def. Ex.

505. Three full months after M&M first sent this information to Royal, Royal still had not been contacted Mr. Smith. Witness Statement of Timothy Smith. *Id.*

38.    On August 1, 2000, Larry Martin e-mailed Tim Smith and Billy Wu instructing them to accommodate requests by Royal. *See* Def. Ex. 516. Mr. Smith was contacted, but the representative did not want to visit the Nan Ya facility to examine the Cargo. Witness Statement of Timothy Smith. Indeed, Royal was notified on or about August 8, 2000 that its representative had contacted Mr. Smith and asked for "pictures and documentation." This information was provided to Royal. Def. Exs. 517, 518.

39.    On August 25, 2000, Mr. Chung emailed Mr. Daneman, stating that he had contacted the two people mentioned in M&M's August 1 email (Billy Wu and Tim Smith), and they "have no positive answer and didn't [sic] know the situation." *See* Def. Ex. 519. Mr. Chung advised Mr. Daneman to "ignore this claim and close this file." Ex. 519.

40.    On November 10, 2000, two and one-half months after receiving Mr. Chung's August email, Mr. Daneman sent a letter to M&M relaying the information in Mr. Chung's email. *See* Def. Ex. 532. The November 10, 2000 letter adopts almost verbatim the language Mr. Chung used in his August 25, 2000 email to Mr. Daneman. *Compare* Def. Ex. 519 *with* Def. Ex. 532. Mr. Daneman testified that there was no particular reason for the three month delay in relaying this information to M&M. Witness Statement of Joseph Daneman. Mr. Daneman further testified that his November 10, 2000 letter advised M&M that Royal would close its file with no claim payment based primarily on the assertion in Mr. Chung's email that the case had been settled with Nan Ya, although Mr. Daneman did not know the basis for that assertion and did not

14

follow up with Mr. Chung to find out where he had obtained this information, or with Zygo or M&M to hear their explanation for the discussions with Nan Ya. *Id.*

41.    Mr. Walch testified that, at roughly the same time that Mr. Daneman was seeking to close Zygo's file, he visited Nan Ya again and found the damaged AFM essentially intact and available for inspection. *See* Witness Statement of Kelvin Walch. Thus, Royal could have, even at that late date, begun its investigation of the damage to the AFM and the nature of the dispute between Nan Ya and Zygo. It never did so.

42.    It was not until January 4, 2001, ten months after getting notice of the claim that Royal even offered to contact Nan Ya's insurance company to gather information about the case. *See* Def. Ex. 536. Then, about a month later, Royal actually gave instructions to its Taiwan office to contact Nan Ya. *See* Def. Ex. 540, 540A. There is no evidence that Royal actually contacted Nan Ya. Certainly, the results of any communication between Royal and Nan Ya were not communicated to Zygo.

43.    In sum, Royal never conducted a survey of the Cargo, despite ample opportunity to do so. More importantly, however, the fact that Royal never surveyed the damaged AFM undeniably played no role in the decision to deny coverage. Witness Statement of Joseph Daneman.

44.    Even though Royal told M&M that it would contact Nan Ya's insurer, Royal continued in its failure to conduct any meaningful investigation or cooperate with Zygo and its broker. For example, On February 5, 2001 Royal asked its agent in Taiwan, Mr. Chen to contact Nan Ya's insurance company. Def. Ex. 540A. That same day, Royal notified M&M that it would follow-up with its surveyor. Def. Ex. 540. But, there

is no evidence that Mr. Daneman ever again contacted the surveyor to follow-up on the situation.

45.    Then, in May 2001, Mr. Daneman again wrote to M&M stating that it was near the end of its investigation and asked that Zygo confirm that the Second AFM was shipped FOB and that Zygo had not yet been paid. Def. Ex. 548. M&M responded the next day with this information. Def. Ex. 549. In But, Royal continued to keep the case open for months.

46.    Further, after additional inquiries from Royal, M&M confirmed that Zygo had not released Nan Ya from liability for the Second AFM. Def. Ex. 553. On May 15, 2001, Mr. Daneman expressly acknowledged Zygo's representation that it had not released Nan Ya. Def. Ex. 556. Royal was even provided with a claim letter that Mr. Martin sent to Nan Ya, dated June 1, 2001, concerning the Second AFM. Ex 559. M&M followed up with yet another letter on June 14, 2001. Def. Ex. 560. And, Royal brought this action on July 13, 2001. Indeed, Royal's letter declining coverage does not explain the basis for the denial, it only cites various paragraphs of the Policy. Def. Ex. 562.

47.    Moreover, to the extent Royal takes the position that Zygo settled its claim with Nan Ya, it has presented no evidence of any settlement. Indeed, during the litigation Royal adopted Nan Ya's interrogatory responses as its own against its insured. Def. Ex. 570. Mr. Daneman conceded that he had no facts supporting the settlement at the time he authorized this action. Witness Statement of Joseph Daneman. Further, even after this action was commenced, counsel for Royal stated that it did not have any facts supporting the settlement claim. Def. Exs. 574-75. Rather, counsel for Royal stated in a letter to Zygo's counsel and later submitted to the Court that if the case proceeded, Royal would

take extensive discovery concerning the alleged settlement. Def. Exs. 573-74. After Royal had almost three years to conduct discovery the only evidence marshaled regarding the proposed settlement was the testimony of Zygo witnesses, all of whom denied releasing Nan Ya. Witness Statements of Lawrence Martin and Timothy Smith.

### H.    Royal "Punishes" Zygo for Making the Claim

48.    After Royal spent over a year doing absolutely no independent investigation of Zygo's claim, instead relying on hearsay from others that the claim had settled and/or that the Cargo was unavailable to survey, the Policy was up for renewal on or about May 1, 2001. Royal at first refused to renew the Policy for another term of a year, insisting instead on a month-to-month arrangement. *See* Def. Exs. 544, 558. Notably, the premium deposit for each month was $20,833 – more than what Zygo used to pay for an entire year! *Id.* But, Royal also gave Zygo two quotes for an extension of coverage for one year. *See* Def. Exs. 546, 547, 552. Royal offered to charge a premium of $100,000 deposit, adjusted against gross annual sales (as in the earlier policy) if Zygo dropped its claim for the damaged AFM. Royal made an alternative offer of a flat $250,000 premium if Zygo continued to pursue the claim for the AFM. In addition to this hold-up to try and force Zygo to drop its AFM claim, Royal deleted the contingency clause from the Policy effective May 1, 2001. *See* Def. Ex. 545. Royal's underwriter, Mr. Ilias, testified that the contingency coverage was revoked because Zygo was "abusing" it, Witness Statement of Alan Ilias– apparently, for Royal, making a single claim under the clause in over 2 years is "abusing" the Policy.

49.    On June 29, 2001, Zygo informed Royal that it decided to take its insurance business elsewhere. *See* Def. Ex. 561. Zygo's new policy with St. Paul's

offered coverage, including contingency coverage, at substantially lower rates than those that Royal was offering. See Def. Ex. 565.

50.     When Royal found out that Zygo would not renew the Policy, it suddenly sprang into action. With surprising speed (especially given Royal's sluggish pace during the investigation of Zygo's claim), Royal instituted the present lawsuit against Zygo on July 13, 2001 – within two weeks of learning that Zygo would no longer be a customer. Incredibly, Royal was so anxious to sue Zygo it had not even disclaimed coverage when it filed this case.

51.     Three days after filing suit, on July 16, 2001, Royal sent Zygo a letter officially declining coverage under the Policy. See Def. Exs. 562, 563. Even at that late date, the letter does not give any reason for declining coverage, but only cites to a few of the policy provisions without applying the facts of the case to those clauses. Id.

52.     Zygo's claim was pending for a total of sixteen months, from March 7, 2000 to July 16, 2001. Compare Def. Ex. 503 (notice of claim) with Def. Ex. 563 (declination letter).

53.     Instead of investigating the claim, as it was required to do, Royal chose to bring suit to discover the relevant facts. Witness Statement of Joseph Daneman.

**I.      Royal's Litigation Positions**

**(a)      Royal's Interpretation(s) of Contingency Coverage Under Clause 52.**

54.     In its motion for summary judgment before Judge Goettel, Royal asserted that since coverage would cease under the *FOB clause* when the Cargo was loaded on the vessel, the contingency coverage also ceases at that time. See Royal II, *4. Royal's

own witnesses do not agree with this position, and Royal has effectively waived this argument. Witness Statements of Joseph Daneman and Alan Ilias.

55.    Royal also claims that Clause 52 applies only to the extent Zygo separately declared each shipment and paid additional premiums before the shipment occurred.

56.    Clause 52 does not call for an "additional" premium, only a premium "to be agreed." Def. Ex. 500, ¶ 52. The parties agreed, in the Schedule of Rates, that Zygo would pay $.023 per $100 gross sales, reported annually. *Id.*, Schedule of Rates. There is no separate rate listed for contingency coverage, and therefore, on the face of the contract, contingency coverage is included in the $.023 premium.

57.    Had Royal considered Zygo's need for contingency coverage in the Schedule of Rates, the agreed-upon premium would have been *lower* than .023. Witness Statement of Alan Ilias. That is because contingency coverage is usually written for a premium that is at a rate of about 60% of the applicable marine coverage, and sometimes "can go as low as nothing." *Id.*

58.    In Mr. Ilias' entire career as an underwriter, only two insureds had ever called him to declare contingency shipments in advance. *Id.* Only one of those shipments was actually declared as a contingency shipment. *Id.* at 140-41.

59.    In Zygo's experience, none of its other insurance companies ever required Zygo to declare each shipment separately. *See* Def. Ex. 565; Witness Statement of Matthew Weidman.

60.    Had Royal wanted Zygo to declare shipments under the Contingency Clause on a different timeline (not annually), it easily could have so stated. Royal failed

19

to provide a deadline or timeline for reporting shipments under Clause 52, instead including the contingency shipments in the requirement for annual reporting of gross sales.

61.     A number of provisions in the Policy call for "additional" premiums at rates "to be agreed upon." *See, e.g.*, Def. Ex. 500, Clause 10 ("Accumulation" clause applies only where "<u>additional</u> premium paid if required"); Clause 15 ("Containerization, Consolidation, and Deconsolidation" clause applies beyond thirty days where "<u>additional</u> premium paid if required by the Company [i.e., Royal]"); Clause 21 (At least first 30 days covered the "Warehouse-to-Warehouse" clause applies under certain conditions "at a premium to be arranged"); Clause 24 ("Deviation" clause applies where "<u>additional</u> premium paid if required"); Clause 54 ("Difference in Conditions" clause recites that the insured agrees to "pay premium thereon at rates to be agreed"); Clause 56 ("Return Shipments" clause, the insured agrees to "pay premium, <u>if required</u>, at rates to be agreed"). If Royal, in drafting the Policy, was reserving its "right" to decline coverage wherever the Policy referred to premiums to be paid "at rates to be agreed" or "if required," a substantial portion of the Policy would be negated. Royal's underwriter Mr. Ilias could not explain the reason why some of these clauses refer to "additional" premiums, while Clause 52 does not. Witness Statement of Alan Ilias.

62.     Mr. Ilias also testified that, even though contingency coverage was included in the Policy (at Zygo's explicit request), he did not understand that Zygo really needed the coverage. *Id.* If Mr. Ilias understood that some portion of Zygo's shipments would require contingency, as opposed to primary, coverage, then he would have applied a lower rate to those specific shipments, or a lower blended rate to all of Zygo's gross

sales, to account for the contingency shipments. *Id.* Either way, the calculation would have resulted in a lower overall premium to Zygo.

63.    For example, Zygo's policy with St. Paul first calculated the rates for primary and contingency coverage separately – charging $0.31 per $100 for primary coverage, but only 50% of that rate for contingency coverage. *See* Def. Ex. 565-68; Witness Statement of Matthew Weidman. That policy was later changed to an "all-in" rate, like the Royal Policy, that used a single premium rate for all types of coverage. *Id.*

64.    Because Mr. Ilias allegedly believed that Zygo did not need contingency coverage (even though it had specifically requested the coverage in the Policy), the premium that Zygo was charged to cover its shipments did not include *any* discount for contingency coverage. Witness Statement of Alan Ilias. Simply stated, Zygo was paying a full premium on all its shipments, whether they required primary or contingency coverage. It obviously received the contingency coverage, but without the discount.

65.    Mr. Ilias further testified that if Zygo had given Royal notice before the shipment of the Second AFM, he would have charged it a separate premium of about 60% of the amount of its marine coverage that it paid under the terms of the contract. This premium would have been about $0.011 per $100 value. So, for the shipment of a $690,000 machine, (according to Royal) Zygo would have had to pay about a $76 premium. Witness Statement of Alan Ilias. Thus, Royal is claiming that it should not have to cover the shipment because Zygo failed to pay a premium that was substantially *less* than the premium charged under the terms of the Policy. While Mr. Ilias claims that this would have been an extra payment, it is unreasonable to conclude that Zygo would

have to report and pay again for a shipment at year end that it already paid for at the appropriate rate.

66.     Royal has no explanation of why a separate premium would be required. The insurer would not do anything differently in covering the shipment except extract the small extra payment.   Even though the Contingency Clause protects Zygo against nonpayment from a customer, the underwriter does nothing to determine the creditworthiness of the ultimate customer in determining the premium.   Witness Statement of Alan Ilias.  Mr. Ilias also testified that Royal would only need about one hour notice to place contingency coverage.  *Id.*  So, Royal did not need time to inspect the goods or evaluate the terms of the transaction.  In these circumstances, the alleged need to make a separate declaration and pay a separate premium does not make commercial sense or comport with the language of the Policy.

**67.**     According to representatives of Zygo's insurance broker M&M, the Policy required ***annual*** reporting of sales for the calculation of the premium, that the Policy's premium of $0.023 per $100 of sales included a premium for contingency coverage.  *See* Witness Statements of Matthew Weidman and Carroll Sneed.

### (b)     Royal Claims that Zygo Did Not Make Reasonable Efforts to Collect from Nan Ya.

68.     The plain language of Clause 52 provides that if there is a loss for which Zygo is unable to collect from its customer in the regular course, Royal "will ***advance*** the amount of such loss pending collection from the buyer." Zygo ***then*** "agrees to use all reasonable means to collect the full amount due from the buyer and reimburse [Royal], the latter sharing the expense of such collection . . . " *See* Def. Ex. 500, ¶ 52 (emphasis added).  Under Clause 52, Royal has to "share" the collection costs in "proportion to its

interest" in the amount of the loss. Since Zygo had $2.5 million in coverage, Royal is liable for the entire loss and for the entire cost of collection of the debt from Nan Ya.

69.    The clause requires Royal to pay a disputed claim first and then work together with Zygo to obtain reimbursement from the customer. *See* Witness Statement of Alan Ilias. Zygo's duty to use "reasonable efforts" to collect the amount from its customer does not kick in until after Royal has "advanced" the amount of the loss to Zygo. Before Royal's advance of the funds, Zygo's only obligation is to seek payment from its customer in the regular course, which Zygo did.

70.    Royal also asserts that Zygo "settled" the claim with Nan Ya, even though Royal admittedly has no knowledge or facts to support that contention. Compl., Def. Exs. 570, 573, 574-75. No one from Royal ever spoke with anyone that was present at the November 2000 meeting among Nan Ya, its insurer and Zygo, where the supposed "settlement" allegedly occurred. Witness Statements of Joseph Daneman, Timothy Smith and Kelvin Walch. Royal makes this baseless assertion, despite the uncontroverted facts that (1) Zygo denied having settled the claim with Nan Ya; and (2) Royal did not investigate the existence of a settlement other than ask M&M and its surveyor in Taiwan.

71.    Instead, Royal decided that since there was a "possibility" of a settlement, it was better to bring this declaratory judgment action first and ask questions later. Witness Statement of Joseph Daneman. During the course of this litigation, Royal still did not investigate or ask for discovery on its claim that Zygo and Nan Ya settled the dispute. *Id.*

72.    Royal's sole basis for claiming that Zygo settled its claim with Nan Ya is its adoption of Nan Ya's own self-interested representation. Zygo did not settle its claim