with Nan Ya. Zygo engaged in discussions with Nan Ya in an attempt to collect the purchase price of the Second AFM minus its salvage value, but it never entered into an agreement that released Nan Ya of its obligation to pay.

73.    Both Kelvin Walch and Timothy Smith, who were present at the November 13, 2000 meeting, insisted that Zygo did not enter into any agreement with Nan Ya regarding the payment of the second AFM. *See* Witness Statements of Kelvin Walch and Timothy Smith. Neither Walch nor Smith had any authority at that meeting to settle the claim on the Second AFM. *See id.*

74.    Mr. Martin testified that he never intended to settle the claim with Nan Ya, and it was not his understanding that a settlement on the second AFM had been reached at the meeting. Witness Statement of Lawrence Martin. In fact, Mr. Martin's November 15, 2000 letter confirming Zygo's arrangement with Nan Ya (sent at Nan Ya's request) does not even mention the Second AFM at all. *See* Def. Ex. 534.

75.    Clearly, no one from Royal has any personal knowledge of the alleged settlement agreement between Zygo and Nan Ya. In fact, after the district court granted Nan Ya's motion for summary judgment (which Royal failed to oppose), Royal's attorney sent a letter to Judge Goettel saying that, even though it alleged in its Complaint that Zygo had in fact settled with Nan Ya, "Royal . . . had no direct information or documentation with which to refute Nan Ya's assertions . . . . Indeed, if Royal had opposed Nan Ya's motion without any supporting evidence, it arguably ran the risk of committing a Rule 11 violation . . . ." Def. Ex. 574 (September 18, 2002 letter from Robert Marzik, Esq. to Judge Goettel).

76.     Royal did not have sufficient information to prove that Zygo had settled this claim with Nan Ya when it filed the complaint, when it answered Zygo's discovery requests, or when Nan Ya filed for summary judgment. It still does not have sufficient information to defeat this summary judgment motion.

**J.      Royal Engaged in Bad Faith**

77.     Royal's bad faith is evident from its failure to investigate Zygo's claim adequately or expeditiously – leaving it open and unanswered for sixteen months – as well as its failure to provide a reasoned basis for the eventual declination.

78.     Evidence of Royal's bad faith in declining coverage can also be found in the manner in which it has prosecuted this action. Royal not only continues to deny coverage, but in doing so has taken completely unsupported positions.

79.     First, Royal sued Zygo claiming that Zygo had released Nan Ya. But, we now know that neither Royal nor its lawyers had any facts to back up that claim. Mr. Daneman, who authorized the suit on Royal's behalf, testified that he did not speak to anyone at Zygo or Nan Ya about whether there had been a settlement, but he knew from M&M that Zygo did not believe that it settled the issue. Witness Statement of Joseph Daneman. Daneman testified that he brought this suit as a means of investigating the issue. *Id.*

80.     Second, when Zygo wanted to find out the basis for Royal's claim that Zygo settled the claim, it propounded interrogatories on that issue. *See* Def. Ex. 570 (Royal's Responses to Zygo's First Set of Interrogatories, dated May 31, 2002). Royal's responses to those interrogatories simply repeated, as fact, assertions made by Nan Ya in its own interrogatory responses. *Id.* at 8-10. Mr. Daneman, who signed the interrogatory

responses on behalf of Royal, had no idea whether Nan Ya's version of events was true. Witness Statement of Joseph Daneman. Of course, this begs the question of why Royal adopted Nan Ya's position against its own assured. It also begs the question of why the interrogatory responses do not say that the only investigation done on this issue was to ask M&M what had happened. Since the answer from M&M was that Zygo had not released Nan Ya, Royal could not have had a good faith basis to bring a claim that there was any release.

81.    Third, Royal refused to oppose Nan Ya's motion for summary judgment, and relayed to Zygo that it expected it to do so. *See* Def. Ex. 573. That position is plainly inconsistent with the terms of Clause 52, which requires Royal to take the lead on recovering any money from Nan Ya.

82.    Fourth, Royal moved for summary judgment in April 2003, arguing a position – that the contingency coverage was coextensive with the FOB coverage – that was not supported by its own witnesses. *See Royal II*, at *4. To the contrary, Royal's witnesses completely disclaimed that interpretation. Witness Statements of Alan Ilias and Joseph Daneman.

## II.    CONCLUSIONS OF LAW

### A.    Principles of Contract Interpretation

83.    Connecticut law applies when interpreting the Policy.    A federal court looks to state law in interpreting marine insurance policies. *See, e.g., Royal II*, at *2.

84.    The Policy should be interpreted as a whole, and to effectuate the intent of the parties. *Royal II*, at *3; *Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. 503, 509, 789 A.2d 974, 977 (2002); *see also R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 246 (2d Cir. 2002); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 453 (2d Cir. 1995).

85.    A court interpreting a contract must, "if possible, give operative effect to every provision in order to reach a reasonable result." *Royal II*, at *3 (quoting *Israel*, 259 Conn. at 509, 789 A.2d at 977); *O'Brien v. U.S. Fid. & Guar. Co.*, 235 Conn. 837, 843, 669 A.2d 1221, 1224 (1996).    As the Connecticut Appellate Court has held, "[w]e are reluctant to conclude that a contractual provision constitutes a meaningless gesture by the parties . . . . it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions." *Enfield Pizza Palace, Inc. v. Ins. Co. of Greater New York*, 59 Conn. App. 69, 75, 755 A.2d 931, 935 (2000) (internal quotation marks omitted); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

86.    These rules of construction – reading the contract as a whole, and giving effect, if possible, to every contract provision – are essential to the task of contract interpretation. They are not rules that come into play only after a contract has been found

ambiguous; indeed, courts must use these rules in determining *whether* a contract is ambiguous:

> [W]e must decide whether, reading the policy "from the perspective of a reasonable layperson in the position of the purchaser of the policy," the policy is ambiguous. *Ceci v. National Indem. Co.*, 225 Conn. 165, 168, 622 A.2d 545 (1993). In construing the document, we "look to the [policy] as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable result." *Hansen v. Ohio Cas. Ins. Co.*, 239 Conn. 537, 545-546, 687 A.2d 1262 (1996).

*Israel*, 259 Conn. at 509, 789 A.2d at 977.

87.    The Connecticut Supreme Court has recently reaffirmed the "well established principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters," *id.* at 508, 789 A.2d at 977 (internal quotation marks omitted), and held that "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Id.  See also Royal II*, at *4. Further, the rule that courts should read an insurance policy "from the perspective of a reasonable layperson in the position of the purchaser of the policy," *Israel*, 259 Conn. at 509, 789 A.2d at 977, does not depend on a finding of ambiguity, but is used in determining whether a policy is ambiguous. *Id.* (citing *Ceci v. National Indem. Co.*, 225 Conn. 165, 168, 622 A.2d 545 (1993)).

88.    According to the canon of *contra proferentem*, if this Court finds that the Policy is ambiguous, it should resolve ambiguities against Royal, the insurer and drafter, and find that coverage exists under the Contingency Clause. *See Royal II*, at *4. This canon of construction "is more rigorously applied in the context of insurance contracts than in other contracts." *Id.  See also Israel*, 259 Conn. at 509, 789 A.2d at 977.

89.    The Policy is unambiguous and clearly provides contingency coverage for the Second AFM. "Language does not become ambiguous solely because the parties offer conflicting interpretations during the course of litigation." *Royal II*, at \*2 (citing *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985)). Instead, ambiguity attaches only where "the words of an insurance contract are, without violence, susceptible of two equally reasonable interpretations." *See Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.*, 231 Conn. 756, 770, 653 A.2d 122, 130 (1995) (internal brackets omitted). *See also Israel*, 259 Conn. at 509-10, 789 A.2d at 977 (finding ambiguity where policy had internally inconsistent provisions). Here, there is nothing internally inconsistent in the Policy, and its terms clearly provide for annual reporting of gross sales, including contingency shipments, at the agreed-upon rates in the Schedule of Rates. Clause 52 by its express terms does not require Zygo to "declare . . . the value of the shipment" prior to the shipment itself. Indeed, the language requiring the disclosure simply of the "value" of the shipment as opposed to other specifics, such as the means of transit, the nature of the cargo, the ultimate customer, the destination, plainly refers to the annual "value" reporting that is the basis of the Policy's premium. Likewise, Clause 52 does not state that the insured needs to pay an "additional" premium for the shipment, only the rate "to be agreed." The parties did agree to one rate for all shipments. Also, if there is no reporting requirement for individual shipments, there is no reasonable basis to read into this clause a requirement that a new premium be negotiated on a per shipment basis. The language of Clause 52 does not support a separate reporting or premium requirement.

90.     Even if this Court found, which it does not, that Clause 52 were ambiguous, there is no basis to find that there is a separate reporting or premium requirement.    First, Royal's self-serving interpretation of the contract terms is unreasonable and can be sustained only by doing great violence to the plain language of the Policy. Royal has produced no evidence outside the Policy that demonstrates that its interpretation is correct and ought to be followed.    Royal has not produced any documents that demonstrate that Royal understood Clause 52 to create a separate reporting or premium requirements.

91.     Second, Royal has not produced any evidence that it ever informed Zygo of the alleged reporting and premium requirements.  To the extent that Clause 52 is deemed ambiguous, simply reading that provision would not be sufficient (particularly from the layman's point of view) to discern these "requirements."

92.     Third, Royal has not demonstrated that its interpretation is commercially reasonable. The evidence is that the premium that would have been charged in this case would have been nominal, and that Royal would not have done anything to assess the actual risk of the shipment. When Royal, in fact, would have done nothing except collect a small fee, there is not sufficient extrinsic evidence to support Plaintiff's contention that separate reporting and premiums were a prerequisite for coverage.

93.     Zygo, on the other hand, has provided extrinsic evidence that supports its position. It is undisputed that Zygo requested contingency coverage and that it was provided in the Policy. Zygo has also demonstrated that contingency coverage can be part of an annual reporting contract that has one "all-in" premium rate.

94.    Further, Zygo has demonstrated that there is no commercial reason for Royal to have required separate reporting. Unpaid vendor coverage is meant to protect the insured from not being paid by its customer, for any reason. Had Royal been given advance notice of the shipment it would not even have checked the creditworthiness of the customer, the very thing that the coverage is designed to insure. And, had Royal checked the creditworthiness of Nan Ya, which is part of the Formosa Group, a multi-billion dollar company, there is no reason that Royal would not have taken that risk.

95.    In sum, the extrinsic evidence concerning the interpretation of Clause 52 demonstrates that the reasonable interpretation is that it contained no separate reporting or premium requirement.

96.    Thus, even if the Court determined that the Policy were ambiguous, it would still rule in favor of Zygo because ambiguities in insurance contracts must be resolved against the drafter, in this case Royal. *Israel*, 259 Conn. at 509, 789 A.2d at 977. "This canon, commonly styled *contra proferentem*, is more rigorously applied in the context of insurance contracts than in other contracts." *Id.* Where the language of an insurance policy is ambiguous, therefore, a court "must construe the policy in a manner that affords coverage to the insured." Id. at 512, 789 A.2d at 978. The Connecticut Supreme Court has explained this rule as follows:

> The premise behind the rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of those interests . . . . A further, related rationale for the rule is that since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are to be resolved in favor of the latter.

*Id.* at 508, 789 A.2d at 977 (brackets and quotation marks omitted).

97.     The dispute between Zygo and Royal well illustrates the soundness of the canon of *contra proferentem*. In drafting the Policy at issue, Royal intended to give at least the appearance of contingency coverage, "extend[ing]" the Policy "to cover . . . the interest of the Assured as an unpaid vendor from the time shipments became at the risk of the customer under the terms of sale until payment of draft." Def. Ex. 500, Clause 52. It then (according to its litigation position) took away that coverage in the very same clause, by including an un-expressed requirement that contingency shipments be declared and paid for separately and in advance. To the extent that there is any ambiguity in the Policy, Royal was in the best position to correct it, and that is precisely why any ambiguity in the Policy must be construed against Royal. Zygo should not be made to suffer for Royal's inexactness of expression. Instead, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Israel*, 259 Conn. at 508, 789 A.2d at 977. Zygo's interpretation of the contract is objectively reasonable and comports with the language, purpose and policy of contingency clauses in insurance contracts.

**B.     Contingency Coverage Under the Policy (Clause 52)**

98.     Clause 52 of the Policy, concerning contingency coverage, provides full coverage for the AFM shipment. Contingency coverage is designed to "make [one set of] underwriters liable if [another set of] underwriters failed to pay on their primary coverage.'" *Royal II*, at *6 (quoting *Armada Supply, Inc. v. Wright*, 858 F.2d 842, 847 (2d Cir. 1988)). It is "intended to provide some form of extended coverage beyond what was otherwise provided in other coverage sections of the Policy." *Royal II*, at *6.

99.    Under Clause 52 of the Policy, Royal was required to "advance the amount of [the] loss pending collection from the buyer." Zygo was then obligated to cooperate in Royal's efforts to collect the unpaid balance from Nan Ya, with Zygo and Royal sharing the cost of collection in proportion to their interest. In other words, Royal was obligated under the contract to pay the coverage first and, if ultimately determined that Nan Ya was justified in failing to pay its bill to Zygo or that Zygo improperly settled the claim without Royal's permission, demand reimbursement from Zygo. In short, contingency coverage is not related to any specific damage to the AFM, and there is nothing in Clause 52 turning on the *reason* Nan Ya gave for refusing or failing to pay.

100.    Clause 52 of the Policy is not co-extensive with FOB coverage. To hold otherwise would render Clause 52 meaningless because it would provide no coverage. *Royal II,*. at *7.

101.    Zygo was not required to separately declare shipments and pay an additional premium for contingency coverage under Clause 52 of the Policy.

## C.    Royal Breached the Policy

102.    Royal breached the contract by declining coverage under the Policy. *See Metropolitan Life Ins. Co. v Aetna Cas. and Sur. Co.*, 249 Conn. 36, 59, 730 A.2d 51, 63-64 (1999) (where policy provides coverage, denial of coverage breached insurance contract). Royal also breached the contract by failing to follow the express terms of Clause 52, which provides that – even if coverage might not apply – Royal was to "advance [Zygo] the amount of such loss pending collection from the buyer [Nan Ya] . . . [and] shar[e with Zygo] the expense of collection" from the buyer.

103.    As damages for breach of contract, Zygo is entitled to the full purchase price of the AFM ($690,000), minus the salvage value it received for the Second AFM ($28,925) plus interest at the statutory rate of 10% from the date Zygo provided its notice of claim, March 7, 2000, for a total recovery of compensatory damages in the amount of $991,612.50. *See Chila v. Stuart*, 81 Conn. App. 458, 467, 840 A.2d 1176, 1182, *cert. denied*, 268 Conn. 917, 847 A.2d 311 (2004) ("The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed") (citation and internal quotation marks omitted); Conn. Gen. Stat. § 37-3a.; *Ferrato v. Webster Bank*, 67 Conn. App. 588, 596, 789 A.2d 472, 477, *cert. denied*, 259 Conn. 930, 793 A.2d 1084 (2002) (award of interest under § 37-3a requires wrongful withholding of money, but "wrongful is not synonymous with bad faith conduct. Rather, wrongful means simply that the act is performed without the legal right to do so.") (citation omitted).

### D.    Royal Breached the Implied Covenant of Good Faith and Fair Dealing

104.    Royal failed to honor and has breached its contractual duty of good faith and fair dealing owed to Zygo by refusing to pay Zygo's claim when it knew or should have known it was covered under the Policy, failing to investigate Zygo's claim fairly and adequately over the course of sixteen (16) months, and formally declining coverage only after Zygo declined to renew the Policy. *Buckman v. People Express, Inc.*, 205 Conn. 166, 170, 530 A.2d 596, 599 (1987) (recognizing "independent cause of action in tort arising from an insurer's common law duty of good faith"); *Grand Sheet Metal Prods. Co. v. Prot. Mut. Ins. Co.*, 34 Conn. Supp. 46, 375 A.2d 428 (Conn. Super. Ct.

1977) (recognizing claim for tortious breach of contract for insurer's bad faith refusal to pay claim); *Maher v. Connecticut Ins. Placement Facility*, 40 Conn. Supp. 299, 304, 494 A.2d 631, 635 (Conn. Super. Ct. 1985) (same); *St. Francis Hospital & Medical Center v. DeCaro*, Docket No. CV950705814S, 1996 WL 737461, at *2 (Conn. Super Ct. Dec. 9, 1996) (same).

105.    Zygo has been damaged by Royal's breaches in that it did not receive payment for a legitimate claim in the amount of $690,000 (minus the $28,925 salvage value for the Second AFM). Zygo is therefore entitled to collect $661,075, plus interest, totaling $991,612.50, as compensatory damages for Royal's breaches. *See Uberti v. Lincoln Nat'l Life Ins. Co.*, 144 F. Supp. 2d 90, 106-07 (D. Conn. 2001) (awarding compensatory damages for breach of covenant of good faith and fair dealing); Conn. Gen. Stat. § 37-3a. Furthermore, Zygo is entitled to collect punitive damages in the form of attorney's fees and costs because Royal's breaches were founded on wanton and outrageous tortious conduct. *L.F. Pace & Sons, Inc. v. Travelers Indem. Co.*, 9 Conn. App. 30, 46-50, 514 A.2d 766, 775-777 (1986) (permitting punitive damages for tortious breach of contract); *Uberti*, 144 F. Supp. 2d at 107 (recognizing that punitive damages may be awarded where insurer's conduct is malicious or outrageous).

### E.    The Settlement/Release Issue

106.    Zygo did not forfeit its right to coverage pursuant to Clause 43 of the Policy. Zygo pursued payment from Nan Ya diligently for many months, and submitted a claim to Royal only after it became clear that Nan Ya would not pay. Zygo continued to pursue Nan Ya for many months thereafter. Zygo never compromised Royal's ability to recover the purchase price of the Second AFM from Nan Ya.

107.    Under Connecticut law, a valid and binding settlement agreement exists only where there is "a ***mutual understanding*** of the terms that are definite and certain between the parties . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an ***identical understanding*** by the parties . . . . If the minds of the parties have not truly met, no enforceable contract exists." *L&R Realty v. Connecticut Nat'l Bank*, 53 Conn. App. 524, 524, 732 A.2d 181 (1999) (emphasis added). *See also Johnson v. Schmitz*, 237 F. Supp. 2d 183, 189, 192 (D. Conn. 2003) (Arterton, J.) (finding no valid and enforceable settlement agreement where there was no "meeting of the minds" between the parties).

108.    *Johnson v. Schmitz*, 237 F. Supp. 2d at 183, is particularly instructive in this regard. There, parties to an intellectual property lawsuit engaged in extensive settlement negotiations, with plaintiff's counsel and defense counsel eventually reaching a purported agreement. After the court had been advised of the "settlement," the plaintiff refused to sign the agreement, on the ground that he had not agreed to its terms. Defendants moved to enforce the settlement agreement. This Court denied that motion, finding that, due to miscommunication or misunderstanding between the plaintiff and his counsel, plaintiff had never assented to the terms of the purported settlement agreement. The Court held:

> [P]laintiff's counsel's representation to defendants that plaintiff had agreed to the terms of the Agreement is insufficient to establish plaintiff's understanding and assent to the terms of the Agreement such that it could be said to memorialize a meeting of the minds between Johnson and defendants and thus constitute a contract enforceable against plaintiff. *See, e.g., Windsor Hous. Auth. v. Fonsworth*, No. HDSP-107882, 2000 WL 949596 at *2 (Conn. Super. Jan. 28, 2000) ("A common intention or meeting of the minds of the negotiating parties themselves is essential to the making of an accord, and where one party understands an agreement of settlement to be one thing, and the other party understands it to be

36

> another, there is no meeting of the minds of the parties, regardless of what the attorney conducting the negotiations believes to be his client's understanding.").

*Id.* at 189-90. The Court then went on to hold that the plaintiff's attorney did not have actual or apparent authority to bind the plaintiff to a settlement agreement. *Id.* at 191-92.

109.    Similarly, there was no meeting of the minds at the November 13, 2000 meeting in this case. If anything, that meeting was rife with miscommunication and misunderstanding, as the meeting was conducted in Mandarin Chinese, which Zygo's representatives do not understand. More importantly, it is undisputed that none of the Zygo representatives present had the authority to bind Zygo to any such settlement. Zygo and Nan Ya never reached a mutual understanding, or meeting of the minds, on any settlement of the payment for the Second AFM. *L&R Realty*, 53 Conn. App. at 524; *Johnson*, 237 F. Supp. 2d at 189.

110.    Royal has not submitted *any* evidence concerning Nan Ya's state of mind as to the alleged "settlement." Clearly, Royal has not proved a "meeting of the minds" when there is only evidence of Zygo's intent. And, that evidence demonstrates that Zygo did not intend to release Nan Ya, but to leave the matter of payment for the Second AFM in the hands of its insurer, Royal (as contemplated by Clause 52). None of the contemporaneous correspondence from Mr. Martin indicates any willingness to relieve Nan Ya of its obligation to pay for the Second AFM. Indeed, Mr. Martin's willingness to agree to a salvage value for both AFMs reflects an understanding that Nan Ya continued to be responsible for that payment. There is no other logical reason for Nan Ya to agree to an offset on that equipment. Further, when asked by Royal, Mr. Martin sent a claim letter to Nan Ya. *See* Def. Ex. 559.

111.   By Royal's own admission during this lawsuit, it has no first hand knowledge of any alleged "settlement." *See* Def. Ex. 570, 574-574.  During the course of this suit it did not uncover any such evidence. Accordingly, the Court finds that as a matter of fact and law, Zygo did not release Nan Ya from liability for the Second AFM.

### F.   Zygo's Bad Faith Claims

112.   An insurer has a "duty to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy..." *Grand Sheet Metal,* 375 A.2d at 430.

113.   Connecticut law recognizes two types of common-law claims for bad faith in the handling of insurance coverage: a claim for "substantive bad faith" arising out of an insurer's intentional failure to pay a meritorious claim for coverage, and a claim for "procedural bad faith" arising out of an insurer's deliberate failure to act reasonably towards the insured in processing the insured's claim for coverage.  *See United Technologies Corp. v. American Home Assurance Co.*, 118 F. Supp. 2d 181, 187-89 (D. Conn. 2000); *see also Uberti*, 144 F. Supp. 2d at 103-04 (holding that an insurer was liable for procedural bad faith in failing to "reasonably and adequately investigate claims before denying coverage").  Zygo's bad faith counterclaim plainly asserts that Royal committed acts evidencing both procedural and substantive bad faith. *See, e.g.,* Ans. ¶ 127 (asserting that Royal, *inter alia,* denied Zygo's valid claim for coverage and failed to fairly and adequately investigate Zygo's claim).

114.   Insurance company behavior evidencing substantive bad faith includes, as articulated by Conn. Gen. Stat. § 38a-816(6),

> (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g)

compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; . . . (m) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; [and] (n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

*See United Technologies*, 118 F. Supp. 2d at 188 (citing unfair practices described in Section 38a-816(6) as examples of substantive bad faith).

115.    If compelling insureds to institute litigation in order to recover insurance proceeds constitutes bad faith, *see* Conn. Gen. Stat. § 38a-816(6)(g), then surely Royal's behavior – ***suing its own insured in lieu of investigating a claim*** – supports a strong inference of bad faith. Royal admittedly did nothing to investigate Zygo's claim and knew nothing about the facts of the matter. For that reason, according to Mr. Daneman, Royal instituted a lawsuit to discover facts and let the judge decide which was the correct position. Witness Statement of Joseph Daneman. Mr. Daneman admittedly wanted to ***investigate the claim Id.*** If this were appropriate behavior for an insurance company, then every insurance claim would result in litigation, so the parties could "let the judge decide" coverage. But that would completely obviate an insurer's obligation to investigate and adjust a claim in good faith. The manner in which Royal instituted this action, and the reasons for suing Zygo, are strong evidence of Royal's bad faith.

116.    Moreover, Royal's liability under the Policy is "reasonably certain," and it therefore acted in bad faith by failing to effectuate a "prompt, fair and equitable" settlement of the claim. *See* Conn. Gen. Stat. § 38a-816(6)(f). Even Royal must concede that its 16-month "investigation" of Zygo's claim was anything but "prompt." And it was

far from fair and equitable for Royal – with no independent knowledge of the facts of the coverage issue or the alleged settlement with Nan Ya – to choose, sight unseen, to side with Nan Ya's version of events over that of its own insured.  Royal sued its insured based on hearsay from a third party, when it had absolutely no firsthand knowledge of the situation.  Royal's entire approach to Zygo's claim – do nothing, believe unsubstantiated hearsay, and file suit – creates a strong inference of its substantive bad faith.

117.    Further, Royal failed "to promptly provide a *reasonable explanation of the basis* in the insurance policy *in relation to the facts or applicable law* for denial of a claim."  Conn. Gen. Stat. § 38a-816(6)(n) (emphasis added).  Royal's July 16, 2001 letter declining coverage for Zygo's claims was far from prompt, and provided absolutely no (let alone a reasonable) explanation of the basis for denying the claim.  The letter merely regurgitates various sections of the Policy, and then states that coverage will be denied.  *See* Def. Ex. 563.  Royal's purported declination letter did not even attempt to provide any analysis of the Policy's application to the facts as Royal understood them.  *Id.* Indeed, Zygo does not entirely understand the exact basis for the denial of coverage.  *See, e.g.,* Witness Statements of Carroll Sneed and Matthew Weidman.  Apparently, neither does Royal, as it has tried to use the lack of specificity in its declination letter to its advantage throughout this litigation.

118.    Together, the length of time Royal sat on Zygo's claim, the lack of any explanation for the declination of coverage, and the knee-jerk litigation (filed three days before the declination letter went out) in order to "discover the facts," are strong evidence of Royal's substantive bad faith in adjusting Zygo's claim.  Indeed, the timeline of Royal's claim investigation leads to the "inference that [Royal] 'parked' [Zygo's] claims,

while misleading or deceiving [its] insured into believing that productive steps towards claims resolution were underway." *United Technologies*, 118 F. Supp. 2d at 184.

119.    Royal's handling of Zygo's claim also constitutes procedural bad faith. While the Connecticut Supreme Court has never squarely addressed the issue, this Court has held, relying on *Buckman v. People Exp., Inc.,* 530 A.2d 596 (Conn. 1987), that Connecticut common law would recognize a claim for "procedural bad faith," including failure to reasonably investigate an insurance claim. *United Tech.,* 118 F. Supp. 2d at 188-89, mod. after recon. on other grounds, 237 F. Supp. 2d 168 (D. Conn. 2001) ("...the Court predicts that the Connecticut Supreme Court would recognize a cause of action for procedural bad faith in the ... claims handling process..."); *see also Uberti*, 144 F. Supp. 2d at 104.

120.    Recently, the Connecticut Supreme Court recognized a claim for procedural bad faith in the context of a construction surety bond. *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 307-08, 838 A 2d 135, 153-54 (Conn. 2004). There, defendant National Fire Insurance Company of Hartford ("National") had agreed to issue surety bonds on behalf of a general contractor, Frank Mercede & Sons ("Mercede"). Mercede executed a written subcontract with PSE. Eventually Dominion went bankrupt, and PSE demanded payment from Mercede for work completed on a construction project. Mercede refused to pay, but eventually National, Mercede's surety, paid PSE; in turn demanding indemnification form Mercede. Mercede refused to pay because it was unaware of the settlement discussions between National and PSE and believed PSE not to be entitled to payments, and it cross-claimed against National for bad

faith failure to investigate its defenses to PSE's claims. The jury found in Mercede's favor.

121.    In upholding the verdict on the bad faith claim, the Connecticut Supreme Court found that the "evidence from which the jury reasonably could have concluded that National had acted in bad faith includes National's failure to conduct a sufficient investigation," by failing to put in writing, as required by the surety contract, which portions of PSE's claim it disputed, "engag(ing) in only a superficial review of PSE's claim," and waiting almost two years before referring the case to an in-house engineering expert. *Id.* at 153. However, negligent or unreasonable failure to investigate, alone, was held insufficient to find bad faith; Mercede was required to adduce evidence of "in improper motive" as well. *Id.* at 155. Mercede met this burden by showing that National settled the claim with PSE in National's own self-interest to avoid an investigation from the Connecticut insurance commissioner, rather than fulfilling its contractual obligations to Mercede:

> Obviously, what constitutes good faith or lack thereof depends on the facts of each case. In this instance, we conclude that the jury reasonably could have determined that National had breached the implied covenant of good faith and fair dealing based upon all the evidence supporting Mercede's claims that National, inconsistent with justified expectations and unfaithful to its duty under the implied covenant, both failed to investigate adequately and improperly settled PSE's claims solely out of self-interest.

*Id.* at 160.

122.    It is undeniable that "[i]nsureds in Connecticut can expect that insurers will reasonably and adequately investigate claims before denying coverage." *Uberti,* 144 F. Supp. 2d at 104. Insurer conduct amounting to procedural bad faith includes, as relevant here,

(b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; . . . (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; [and] (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.

Section 38a-816(6); *see also United Technologies,* 118 F. Supp. 2d at 188 (citing quoted sections of 38a-816(6) as insurer practices "that would fall under the rubric of procedural bad faith"); *PSE Consulting,* 267 Conn. at 310 (an insurer's "failure to conduct an adequate investigation of a claim . . ., when accompanied by other evidence, reflecting an improper motive, properly *may* be considered evidence of . . . bad faith.") (emphasis in original).

123.   In *Uberti,* for example, this Court rendered judgment after a bench trial for the plaintiff insured, finding that the insurer's investigation of his claim was significantly lacking.  There, the insured received disability payments due to an injured knee for over two years before the insurer's claim adjuster suddenly, and without any factual basis, concluded that the insured's injury was not a disability under the policy.  The claims adjuster had no medical knowledge herself.  She did not contact the orthopedist treating the insured's knee.  Although the claims adjuster sent the insured a letter to arrange for an independent medical examination, she never followed through with scheduling that appointment.  Over the course of two and a half years, the claims adjuster "did nothing further to update [the insured's] medical records, did not request an IME and did not press for any medical opinion on the crucial . . . issue [of the cause of the insured's knee injury]."  144 F. Supp. 2d at 96.  On this basis, the Court concluded that the insurer had breached its duty of good faith and fair dealing:

> [The insurer's] senior claims examiner conducted no "investigation" of the cause of [the insured's] disability other than personally reading the collected records, forms and physician notes that were contained in her file on plaintiff. She possessed no medical education or specialized training that would allow her to make medical determinations, particularly on something as crucial as causation . . .   More than two and one half years after [the insured's] claim was filed, without the IME [the claims examiner] had previously thought was necessary when she took over the claim, and without any medical opinion [on the cause of the insured's injury] . . . [the claims examiner] determined the insured claim [was not a disability under the policy].

*Id.* at 104 (internal quotation marks omitted).   Accordingly, the claims examiner's "conjecture alone . . . [could not] provide a sufficient basis for a claim denial, and still be consistent with the duty of good faith and fair dealing." *Id.* at 105.

124.    Similarly, here, Mr. Daneman admittedly had no expertise in the shipment, packaging, or operation of AFMs.   Nonetheless, he never bothered to call anyone with direct knowledge about the damaged AFM at issue, despite ample opportunity to do so. Zygo's initial notice to Royal and M&M's subsequent correspondence on this claim provided contact information for various people with firsthand information about Zygo's claim. *See* Def. Ex. 503, 505. Mr. Daneman admittedly never called them. *See* Witness Statement of Joseph Daneman.   While he did go to the trouble of hiring a surveyor, he never succeeded in obtaining a survey of the Cargo (just like the claims examiner's IME in *Uberti*).   Further, Mr. Daneman accepted every statement his contact Mr. Chung uttered, even those that did not make any sense to him. *See* Witness Statement of Joseph Daneman. After failing to undertake *any* meaningful independent investigation of Zygo's claim, Royal then took Nan Ya's allegations regarding settlement at face value, without investigating their validity at all.   To this day, Royal has no firsthand knowledge of the dispute (and alleged settlement) between Zygo and Nan Ya.   It then denied coverage

without providing any reasoned explanation for that decision, and decided to sue Zygo instead of discharging its duty to adjust the claim. Royal admittedly does not know what happened with the Cargo, but it never made an effort to find out. However, Royal's "conjecture alone . . . [cannot] provide a sufficient basis for a claim denial, and still be consistent with [an insurer's] duty of good faith and fair dealing." *Uberti*, 144 F. Supp. 2d at 105.

125.    Further, a decision to "park" Zygo's claims while "misleading [Zygo] into believing that productive steps towards claims resolution were underway" constitutes bad faith. *See United Technologies*, 118 F. Supp. 2d at 184. To be sure, Royal sat on Zygo's claim until July 2001, almost a year after it decided to "ignore this claim and close the file" in August 2000. *See* Def. Ex. 519. That inexplicable delay is strong evidence of bad faith. *See United Technologies*, 118 F. Supp. at 185 (concluding that insurer was liable for procedural bad faith by sitting on a claim that it had already decided to deny). Royal then instituted litigation as an impermissible substitute for the good-faith investigation it was required to take before ruling on the validity of Zygo's claim. Moreover, Royal's decision to raise Zygo's rates dramatically and refuse to renew coverage on prior terms in order to intimidate Zygo into compromising its legitimate claim was clear evidence of the improper motive required for a finding of procedural bad faith. *PSE Consulting*, 267 Conn. at 310.

126.    Royal's egregious treatment of Zygo over the course of seventeen months during which it failed to adjust a claim despite its access to readily-available physical evidence, and its decision to file suit against Zygo as a substitute for gathering facts and properly investigating Zygo's claim together illustrate Royal's procedural bad faith.

127.    As damages for Royal's substantive and procedural bad faith, Zygo is entitled to collect compensatory damages of $991,612.50. *Uberti*, 144 F. Supp. 2d at 106-07 (awarding compensatory damages for insurer's bad faith). Furthermore, Zygo is entitled to collect punitive damages in the form of attorney's fees and costs because Royal's bad faith actions were founded on wanton and outrageous tortious conduct. *L.F. Pace & Sons,* 9 Conn. App. at 46-50, 514 A.2d at 775-777 (permitting punitive damages for tortious breach of contract); *Uberti*, 144 F. Supp. 2d at 107 (recognizing that punitive damages may be awarded where insurer's conduct is malicious or outrageous).

## III.    PROPOSED RELIEF

128.    As damages for breach of contract, Zygo is entitled to the full purchase price of the AFM ($690,000), minus the salvage value it received for the Second AFM ($28,925) plus interest at the statutory rate of 10% from the date Zygo provided its notice of claim, March 7, 2000, for a total recovery of compensatory damages in the amount of $991,612.50.

129.    Zygo is entitled to collect $690,000 minus the salvage value of $28,925, plus interest, totaling $991,612.50, as compensatory damages for Royal's breaches of the implied covenant of good faith and fair dealing. Furthermore, Zygo is entitled to collect punitive damages in the form of attorney's fees and costs because Royal's breaches were founded on wanton and outrageous tortious conduct.

130.    As damages for Royal's substantive and procedural bad faith, Zygo is entitled to collect compensatory damages of $991,612.50. Furthermore, Zygo is entitled to collect punitive damages in the form of attorney's fees and costs because Royal's bad faith actions were founded on wanton and outrageous tortious conduct.

DEFENDANT
ZYGO CORPORATION

By: _____
       Ian E. Bjorkman (ct 11648)
       Erika L. Amarante (ct 22393)
       Wiggin and Dana LLP
       P.O. Box 1832
       New Haven, CT  06508-1832
       Tel. 203-498-4496
       Fax: 203-782-2889
       ibjorkman@wiggin.com
       Its Attorneys