**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
--------------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

        Plaintiff,

    - against -                     Case No. CIV 3:01 1317 (JBA)

ZYGO CORPORATION,

        Defendant.

--------------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,

        Third-Party Plaintiff,

    - against -

NAN YA TECHNOLOGY CORPORATION,

        Third-Party Defendant.

--------------------------------------------------------------------X


**ROYAL INSURANCE COMPANY OF AMERICA'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE**



NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE    LAW OFFICES OF ROBERT K. MARZIK, P.C.
Wall Street Plaza                                  1512 Main Street
88 Pine Street, Seventh Floor                  Stratford, Connecticut 06615
New York, New York 10005                     (203) 375-4803
(212) 220-3830

Of Counsel                                     Of Counsel

    John A.V. Nicoletti                      Robert K. Marzik
    Geoffrey J. Ginos

*Attorneys for Plaintiff/Third-Party Plaintiff*
*Royal Insurance Company of America*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................1

POINT I

      ANY EXTRINSIC EVIDENCE OFFERED BY ZYGO
      OF THE PARTIES' INTENT MUST BE RESTRICTED
      TO THE PARTIES' INTENT AT THE TIME OF THE
      EXECUTION OF THE POLICY ....................................................................................1

      A.    Only Two Of The Witnesses Listed By Zygo Were Involved
           In The Actual Negotiation And Issuance Of The Policy .........................................2

           1.    Allan Ilias...............................................................................................2

           2.    Matthew Weidman...................................................................................2

           3.    Lawrence Martin.....................................................................................3

           4.    Richard Dressler......................................................................................4

           5.    Carroll Sneed .........................................................................................5

      B.    It Is The Intent Of The Parties At The Time Of The
           Execution Of The Policy That Controls.................................................................5

POINT II

      ROYAL'S PLEADINGS MUST BE LIBERALLY
      CONSTRUED TO ALLOW IT TO PRESENT ALL
      EVIDENCE SUPPORTING ITS ALLEGATION THAT
      ZYGO HAS WAIVED, COMPROMISED, SETTLED OR
      OTHERWISE IMPAIRED ROYAL'S SUBROGATION RIGHTS.....................................7

POINT III

      ZYGO SHOULD BE SANCTIONED
      FOR ITS SPOLIATION OF EVIDENCE ......................................................................10

      A.    The Law Of Spoliation.........................................................................................22

      B.    Because Litigation Was Reasonably Foreseeable,
           Zygo's Duty To Preserve Both Damaged AFMs
           Arose No Later Than February 14, 2000,
           Even If Royal Had Been Silent..............................................................................23

C.    Zygo's Willful Failure To Preserve The
       Damaged AFMs Was Highly Culpable ...............................................................25

       1.    Zygo's failure to preserve the damaged AFMs was willful.......................25

       2.    Zygo acted in bad faith in failing to preserve the damaged AFMs............25

       3.    At minimum, Zygo's failure to preserve the damaged AFMs
             was grossly negligent.................................................................................26

D.    Zygo's Failure To Preserve The Damaged AFMs Has
       Seriously Prejudiced Royal's Subrogation Rights................................................26

       1.    Because the damaged AFMs might have been helpful
             to rebut Nan Ya's defenses under the Second Sales
             Contract, Royal has suffered legal prejudice ............................................27

       2.    The damaged AFMs were unique and critically relevant ...........................29

E.    Zygo Should Be Most Severely Sanctioned .........................................................29

       1.    Dismissal of Zygo's claims under the Policy is the most
             appropriate and only adequate remedy for its spoliation ...........................29

       2.    In the alternative, Zygo should be precluded from
             offering any evidence about the alleged damaged AFMs..........................31

       3.    In the alternative, certain facts should be deemed
             to be admitted..............................................................................................31

       4.    In the alternative, the Court should draw adverse inferences ...................32

CONCLUSION.............................................................................................................33

## TABLE OF AUTHORITIES

**Cases**

Albany Ins. Co. v. United Alarm Service, Inc.,
194 F.Supp.2d 87 (D. Conn. 2002) ........................................................................ 26

Am. Export Isbrandten Lines, Inc. v. U.S.,
390 F. Supp. 63 (S.D.N.Y. 1975) .......................................................................... 30

American Casualty Co. of Reading, PA v. Idaho First Nat. Bank,
328 F.2d 138 (9th Cir. 1964) ................................................................................. 30

American Home Assurance Co. v. Abrams, 69 F.Supp.2d 339 (D. Conn. 1999) ...................... 5, 6

Beers v. General Motors Corp.,
97 Civ. 482, 1999 U.S. Dist. Lexis 12285 (N.D.N.Y. May 17, 1999)..................... 26, 27, 28, 30

Brancaccio v. Mitsubishi Motors Co.,
90 Civ. 7852, 1992 U.S. Dist. Lexis 11022 (S.D.N.Y. July 27, 1992) .......................... 27, 28, 30

Cine Forty-Second St. Theatre Corp. v. Allied Artist Picture Corp.,
602 F.2d 1062 (2d Cir. 1979) ................................................................................. 31

Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ................................................. 8

Consolidated Stores Intl. Corp. v. London Ins. and Reinsurance Market Association,
No. C2-96-1047, 2001 WL 1681139 (S.D. Ohio Oct. 24, 2001) ................................................. 9

Dillon v. Nissan Motor Co., 986 F.2d 263 (9th Cir. 1993) ................................................. 23, 27, 31

DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124 (2d Cir. 1998) ..................... 25, 26

Donato v. Fitzgibbons, 172 F.R.D. 75 (S.D.N.Y. 1997) ...................................................26, 31, 32

Firemen's Ins. Co. of Newark, N.J. v. Show, 110 F.Supp. 523 (D. Mont. 1953) ........................... 9

Gates Rubber Band Co. v. Bando Chem. Indus., Ltd.,
167 F.R.D. 90 (D. Colo. 1996) .............................................................................. 25

General Ins. Co. of Am. v. Fleeger, 389 F.2d 159 (5th Cir. 1968) ................................................. 30

Gmurzynska v. Hutton, 355 F.3d 206 (2d Cir. 2004) ..................................................................... 8

Hartford Acc. and Indem. Co. v. Chung,
37 Conn. Supp. 587, 429 A.2d 158 (Conn. Super. App. 1981) ................................. 27

Henkel Corp. v. Polyglass USA, Inc., 194 F.R.D. 454 (E.D.N.Y. 2000) .................. 24, 25, 28, 32

Hiern v. St. Paul-Mercury Indem. Co., 262 F.2d 526 (5th Cir. 1959)........................................... 30

Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446 (4th Cir. 2004) ..................................................... 22

In Re Wechsler, 121 F. Supp. 2d 404 (D. Del. 2000) ...................................................................... 25

Indem. Ins. Co. of N. Am. v. Liebert Corp.,
    99 Civ. 6675 (DC), 1998 WL 363834 (S.D.N.Y. June 29, 1998) ............................................ 25

Lasmo, PLC v. Ultramar Corp.,
    No. 3-95-CV-00371 (WWE), 1997 WL 289674 (D. Conn. Mar. 24, 1997) ............................... 6

Lester v. Resort Camplands Intern., Inc.,
    27 Conn. App. 59, 605 A.2d 550 (Conn. App. 1992) .................................................................. 6

Lomartira v. Am. Automobile Ins. Co.,
    245 F.Supp. 124 (D. Conn. 1965), aff'd, 371 F.2d 550 (2d Cir. 1967)........................................ 9

McKeown Distributors, Inc. v. GYP-Crete Corp., 618 F.Supp. 632 (D. Conn. 1985).................. 6

Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co.,
    255 Conn. 295, 765 A.2d 891 (2001) ..................................................................................... 5, 6

Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307 (2d Cir. 2000).................................................. 6, 7

Pace v. National R.R. Passenger Corp., 291 F.Supp.2d 93 (D. Conn. 2003) ........................ 24, 32

Pressy v. Patterson, 898 F.2d 1018 (5th Cir. 1990) .................................................................. 23, 31

Reilly v. Natwest Markets Group, Inc.,
    181 F.3d 253 (2d Cir. 1999), cert. denied, 528 U.S. 1119 (2000) ...................................... 23, 32

Rice v. U.S., 917 F. Supp. 17 (D.D.C. 1996)........................................................................... 24, 26

Schering Corp. v. Home Ins. Co., 712 F.2d 4 (2d Cir. 1983) ..................................................... 5, 6

Shaffer v. RWP Group, Inc., 169 F.R.D. 19 (E.D.N.Y. 1996) .................................. 23, 24, 25, 32

Shamis v. Ambassador Factors Corp.,
    34 F. Supp. 2d 879 (S.D.N.Y. 1999)............................................................... 23, 24, 28, 29, 32

Skeete v. McKinsey & Co., Inc.,
    91 Civ. 8093, 1993 U.S. Dist. Lexis 9099 (S.D.N.Y. July 7, 1993)......................................... 24

Swierkiewicz v. Sorema N. A.,
    534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)............................................................. 8, 9

Teano v. Hartford Life Ins. Co.,
    No. CV 980580409S, 2000 WL 966371 (Conn. Super. June 23, 2000); .................................... 6

Thiele v. Oddys Auto and Marine, Inc., 906 F. Supp. 158 (S.D.N.Y. 1995) ......................... 28, 30

Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68 (S.D.N.Y. 1991),
    aff'd, 89 Civ. 4252, 1992 WL 51570 (S.D.N.Y. March 9, 1992) .................................23, 24, 25

U.S. Fidelity & Guaranty Co. v. Putfark, 158 So. 9 (La. 1934) ................................................... 30

Unisys Corp. v. Legal Counsel, Inc.,
    768 F. Supp. 6 (D.D.C. 1991), affd, 15 F.3d 1160 (D.C. Cir. 1994)......................................... 30

Valentine v. Mercedes-Benz Credit Corp.,
    98 Civ. 1815, 1999 U.S. Dist. Lexis 15378 (S.D.N.Y. Sept. 30, 1999) .................................... 28

Vodusek v. Bayliner Marine Corp., 71 F.3d 148 (4th Cir. 1995)................................................. 23

West v. Goodyear Tire and Rubber Co., 167 F.3d 776 (2d Cir. 1999)................. 22, 23, 25, 28, 30

Wilberg Jewelry Corp. v. The Palatine Ins. Co., 205 F.Supp. 696 (S.D.N.Y. 1962) .................... 9

Zies v. Dept. of Soc. Servs. of Human Resources Admin.,
    112 F.R.D. 225 (E.D.N.Y. 1986)................................................................................................ 26

## Statutes

FED. R. CIV. P. 37 ...................................................................................................................... 23

## Other Authorities

2 Couch on Insurance, (3d ed. 1995). .......................................................................................... 6

42 C.J.S. Indemnity  60 (1991).................................................................................................. 30

## PRELIMINARY STATEMENT

Royal Insurance Company of America ("Royal") submits this Memorandum of Law in support of its motion in limine for an order: (i) declaring that, if the Court finds Clause 52 of the marine open cargo policy (the "Policy") that is the subject matter of this action is ambiguous, any extrinsic evidence offered by Zygo Corporation ("Zygo") of the intent of the parties is restricted to the parties' intent at the time of the execution of the Policy; (ii) construing Royal's claims so as to allow it to present any and all evidence relating to its allegation that Zygo has waived, compromised, settled or otherwise impaired Royal's subrogation rights; and (iii) sanctioning Zygo for its spoliation of evidence.

### POINT I

### ANY EXTRINSIC EVIDENCE OFFERED BY ZYGO OF THE PARTIES' INTENT MUST BE RESTRICTED TO THE PARTIES' INTENT AT THE TIME OF THE EXECUTION OF THE POLICY

Zygo's Proposed Witness Statement lists eight witnesses. Of the eight witnesses listed, only two were involved in the actual negotiation and issuance of the Policy. Allan Ilias, Royal's underwriter, and Matthew Weidman, Zygo's insurance broker, were the only representatives of either party involved in the formation of the Policy. Although Zygo may seek to offer the testimony of other witnesses on the parties' intent, their testimony should not be allowed on that subject because they are not in a position to provide the Court with evidence of either Zygo's or Royal's intentions at the time the Policy was executed.

**A.    Only Two Of The Witnesses Listed By Zygo Were Involved In The Actual Negotiation And Issuance Of The Policy**

**1.    Allan Ilias**

Allan Ilias was the underwriter at Royal responsible for the Zygo account. Ex. 3[1] (Ilias at p. 13); Ilias ETT.[2]  In April 1999, Mr. Ilias received Zygo's application for insurance from Zygo's insurance broker, Mathog & Moniello Companies, Inc. ("Mathog & Moniello").  Ex. 3 (Ilias at pp. 65-66); Ilias ETT; Ex. 18.  Mr. Ilias' usual practice in reviewing applications for insurance was to reduce all of the details contained in the submission to a single worksheet.  Ex. 3 (Ilias at pp. 71-72); Ilias ETT; Ex. 18.  Mr. Ilias testified at his deposition in detail about his discussions with Mathog & Moniello concerning the preparation and drafting of the Policy.  Ex. 3 (Ilias at pp. 68, 81-84 & 85-92); Ilias ETT.  These discussions are corroborated by Mr. Ilias' contemporaneous notes of those discussions.  Ex. 3 (Ilias at pp. 85-92); Ilias ETT; Ex. 19; Ex. 20; Ex. 21.  Among other things, the conversations concerned Mathog & Moniello's requests that the Policy include certain "enhancements" and "option coverages."  Ex. 3 (Ilias at pp. 41, 80-81 & 92); Ilias ETT; Ex. 19; Ex. 20; Ex. 21.

**2.    Matthew Weidman**

Matthew Weidman was the account executive at Mathog & Moniello responsible for the Zygo account.  Mr. Weidman was responsible for preparing the insurance application that was sent to Royal on behalf of Zygo and was also responsible for negotiating the terms and conditions of the Policy on behalf of Zygo.  Ex. 7 (Weidman at pp. 33-36, 39-40 & 47-50);

---

[1] References to "Ex. __" are to the exhibits attached to the Affidavit of Geoffrey J. Ginos, Esq., executed on January 18, 2005, in Support of Royal Insurance Company of America's Motion in Limine.

[2] Citations to a witness' name followed by "ETT" refers to the expected trial testimony of that witness.

Weidman ETT. Mr. Weidman prepared the application based on his knowledge of Zygo's operations and based on information he received from Zygo. Ex. 7 (Weidman at pp. 36, 39-40 & 50-51); Weidman ETT. Mr. Weidman recalled having seen the quotes prepared in April 1999 by Mr. Ilias in response to Zygo's application. Ex. 7 (Weidman at pp. 63-65); Weidman ETT; Ex. 19; Ex. 20. He does not recall, however, having any discussions with Zygo about contingency coverage prior to the Policy being issued.[3] Ex. 7 (Weidman at p. 56); Weidman ETT.

### 3.    Lawrence Martin

Lawrence Martin is the staff assistant to Zygo's president. Ex. 4 (Martin at p. 9); Martin ETT. At the time the Policy was issued, Mr. Martin had no involvement with the placement of insurance. Ex. 4 (Martin at pp. 33 & 36); Martin ETT. Mr. Martin did not read any portion of the Policy until after this claim arose (Ex. 4 (Martin at p. 45); Martin ETT) and had never seen the entire Policy until it was shown to him at his deposition (Ex. 4 (Martin at p. 50); Martin ETT). Similarly, he did not discuss Clause 52 with anyone at Zygo or Mathog & Moniello until after the claim was denied by Royal. Ex. 4 (Martin at pp. 47 & 49); Martin ETT. In fact, Mr. Martin did not even know whether Zygo had contingency insurance in its Policy. Ex. 4 (Martin at p. 48); Martin ETT. Instead, Mr. Martin "left most of the insurance issues up to [Zygo's] agent," Matt Weidman." Ex. 4 (Martin at p. 45); Martin ETT.

---

[3] Nor does Mr. Weidman recall ever having an occasion to read Clause 52 prior to the issuance of the Policy. Ex. 7 (Weidman at p. 58). In fact, Mr. Weidman did not read Clause 52 for the first time until sometime between November 2000 and May 2001. Ex. 7 (Weidman at pp. 58-59 & 73).

### 4.    Richard Dressler

Richard Dressler is Zygo's former Vice President of Finance.[4]  Dressler ETT.  Mr.
Dressler began working at Zygo in February 2001, almost two years after the Policy was first
issued. Ex. 2 (Dressler at p. 5); Dressler ETT.  Mr. Dressler testified at his deposition that he
believes that the Policy provides Zygo coverage under Clause 52. Ex. 2 (Dressler at pp. 41-42);
Dressler ETT.  At the time of his deposition, however, Mr. Dressler had not read either the
Policy or Clause 52. Ex. 2 (Dressler at pp. 42-43); Dressler ETT.  Instead, his basis for believing
that the Policy provides coverage was the summary of coverage that he said had been prepared
by Mathog & Moniello. Ex. 2 (Dressler at pp. 42-43); Dressler ETT.  As no such summary was
ever prepared by Mathog & Moniello (at least, none was produced by them or by Zygo in
response to Royal's discovery demands), the only "summary" that he can be referring to were the
insurance quotes prepared by Royal which merely listed in a very summary fashion the
categories of coverage offered under the Policy, without, however, setting out or summarizing
any of its operative clauses. Dressler ETT; Ex. 19; Ex. 20; Ex. 21.

Mr. Dressler had the opportunity to read Clause 52 in its entirety at his deposition. Ex. 2
(Dressler at pp. 87-88).  He was asked about his understanding of that clause's reporting
requirements. Ex. 2 (Dressler at pp. 87-89).  Mr. Dressler stated that he believed the clause
required reporting shipments on a periodic basis. Ex. 2 (Dressler at pp. 88-89); Dressler ETT.
His only basis for this understanding, however, was the operation and wording of an insurance
policy Zygo had with another insurer. Ex. 2 (Dressler at pp. 89-92); Dressler ETT.

---

[4] Zygo produced Mr. Dressler in response to Royal's Notice of Deposition pursuant to Rule
30(b)(6) of the Federal Rules of Civil Procedure on the issue of, inter alia, Zygo's understanding
of the Policy. Ex. 2 (Dressler at pp. 6-7).

5.    **Carroll Sneed**

Carroll Sneed is a former employee of Mathog & Moniello who worked with the broker as an independent contractor on Zygo's claim. Ex. 5 (Sneed at p. 6); Sneed ETT. Mr. Sneed first became aware of the damaged atomic force microscopes ("AFM") in early 2001 when Matthew Weidman approached him because of the coverage questions that had been raised by Royal. Ex. 5 (Sneed at pp. 15, 48 & 30); Sneed ETT. Mr. Sneed was asked to give an opinion as to whether the Policy provided coverage for Zygo's claim. Sneed ETT. Mr. Sneed came to the conclusion that Clause 52 provides coverage for Zygo's claim. Sneed ETT. The first time that Mr. Sneed reviewed Clause 52 was sometime between March 15, 2001 and May 8, 2001. Ex. 5 (Sneed at p. 40); Sneed ETT.

In reaching his conclusion that Clause 52 applies to this claim, Mr. Sneed did not consult with anyone from Zygo. Ex. 5 (Sneed at 94); Sneed ETT. Nor did he speak with Royal's underwriter. Ex. 5 (Sneed at p. 110); Sneed ETT. Mr. Sneed also did not discuss with anyone at Mathog & Moniello what information for the underwriting process was provided to Royal prior to the Policy being issued.[5] Ex. 5 (Sneed at pp. 70-71); Sneed ETT.

B.    **It Is The Intent Of The Parties At The Time Of The Execution Of The Policy That Controls**

Assuming, arguendo, the Court finds Clause 52 is ambiguous, Royal and Zygo may offer extrinsic evidence to support a particular interpretation of the clause. See Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983); Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co., 255 Conn. 295, 306, 765 A.2d 891, 897 (2001). The Court "must [] consider [the] extrinsic evidence . . . to ascertain the intent of the parties." American Home Assurance Co. v.

---

[5] It cannot even be argued that the remaining witnesses listed in Zygo's Proposed Witness Statement (Kevin Walch, Timothy Smith and Joseph Daneman) had any involvement with the Policy at any time other than for claims handling.

5

Abrams, 69 F.Supp.2d 339, 348 (D. Conn. 1999); see also Metropolitan Life, 255 Conn. at 306,

765 A.2d at 897; Teano v. Hartford Life Ins. Co., No. CV 980580409S, 2000 WL 966371, at *7

(Conn. Super. June 23, 2000); 2 Couch on Insurance, §§ 22:14 and 22:16 (3d ed. 1995). In so

doing, the Court can determine whether the parties, "by their acts, have placed a construction on

the contract showing what was in fact intended." 2 Couch on Insurance, §§ 22:14, supra; see

also Teano, 2000 WL 966371 at *7.

Importantly, though, it is the intent of the parties at the time of contracting that controls.

See, e.g., Schering Corp., 712 F.2d at 9; Lasmo, PLC v. Ultramar Corp., No. 3-95-CV-00371

(WWE), 1997 WL 289674, at *3 (D. Conn. Mar. 24, 1997); Lester v. Resort Camplands Intern.,

Inc., 27 Conn. App. 59, 68, 605 A.2d 550, 555 (Conn. App. 1992); McKeown Distributors, Inc.

v. GYP-Crete Corp., 618 F.Supp. 632, 641 (D. Conn. 1985). Extrinsic evidence of a party's

intent at some other time should be excluded from consideration. See Olin Corp. v. Ins. Co. of

N. Am., 221 F.3d 307, 319 (2d Cir. 2000).

In Olin, an insurer argued that a term in several insurance policies was ambiguous and

that the district court had erred in not allowing it to present the testimony of one of its former

underwriters on the meaning of the term. See 221 F.3d at 319. The Second Circuit found that

"[e]ven if the policy language was ambiguous, we doubt that [the underwriter] was in a position

to give testimony that would have been of significant help to the district court in attempting to

discern the meaning of the language contained in the [] policies . . . ." Olin, 221 F.3d at 319.

Noting that "'the parties have a right to present extrinsic evidence of their intent,'" the court of

appeals emphasized that the evidence must be of the parties' intent "'*at the time of contracting.*'"

Id. (emphasis in original) (quoting Schering, 712 F.2d at 9). It then found that the underwriter

was not "in charge of [the] account when [the policies were] purchased . . . and therefore was

unlikely to have been in a position to provide the court with such evidence." Id. The court of appeals concluded, that the "district court did not abuse its discretion by excluding [the underwriter's] testimony." Id.

Of the eight witnesses listed in Zygo's Proposed Witness Statement, only two were involved in the actual negotiation and issuance of the Policy. Other than Royal's underwriter, Mr. Weidman is the only witness listed by Zygo who was involved in the Policy's formation. There is no basis to believe that any of the other witnesses are in a position to provide the Court with evidence of either Zygo's or Royal's intentions at the time the Policy was executed. That is not surprising. Mr. Weidman has stated that he does not recall speaking with anyone at Zygo about contingency coverage prior to the Policy being issued.[6]  Ex. 7 (Weidman at p. 56); Weidman ETT. Therefore, Zygo should be precluded from offering testimony by anyone other than Mr. Ilias or Mr. Weidman on the parties' intent at the time the Policy was executed.

**POINT II**

**ROYAL'S PLEADINGS MUST BE LIBERALLY
CONSTRUED TO ALLOW IT TO PRESENT ALL
EVIDENCE SUPPORTING ITS ALLEGATION THAT
ZYGO HAS WAIVED, COMPROMISED, SETTLED OR
OTHERWISE IMPAIRED ROYAL'S SUBROGATION RIGHTS**

In its Proposed Findings of Fact, Zygo summarizes Royal's Fourth Cause of Action as stating that "even if the Policy might have covered the loss at issue, Zygo forfeited its right to recovery by allegedly settling its dispute with its customer Nan Ya Technologies . . . ." Zygo's Proposed Findings of Fact ¶ 1. Royal's pleadings should not be so restrictively construed as to

---

[6] Even if Mr. Weidman had discussed contingency coverage with Zygo prior to the Policy being issued, the discussions would not have concerned the Contingency Clause itself because Mr. Weidman did not read Clause 52 before the Policy was issued. Ex. 7 (Weidman at pp. 58-59 & 73).

limit the Fourth Cause of Action to being based solely on whether its subrogation rights have been impaired by Zygo's release of Nan Ya.

In its Fourth Cause of Action, Royal alleges that "Zygo, because of its breach of the conditions under Clause 43 of the Policy, can make no claim under the Policy and therefore, there is no coverage for the subject claim under the Policy." Ex. 1 (Complaint ¶ 81). Clause 43 provides, in pertinent part, that Royal shall be "free from liability" under the Policy if Zygo has "waived, compromised, settled or otherwise impaired any right of claim against a third party to which [Royal] would be subrogated . . . ." Ex. "A" to Ex. 1 (Complaint); see also Ex. 1 (Complaint ¶ 78). Royal alleges in its Complaint that "Zygo has impaired and/or waived plaintiff Royal's rights of recovery against Nan Ya under the original Zygo/Nan Ya sales contract for the replacement AFM." Ex. 1 (Complaint ¶ 80). The Fourth Cause of Action does not limit itself to alleging that Royal's subrogation rights have been impaired *solely* by Zygo's release of Nan Ya. Instead, the allegations in the Fourth Cause of Action give Zygo sufficient notice under the Federal Rules of Civil Procedure that Royal is claiming that there is no coverage under the Policy because, inter alia, Zygo has breached Clause 43 of the Policy.

To satisfy the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must simply give fair notice of what the claim is and the grounds upon which it rests. See Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); see also Gmurzynska v. Hutton, 355 F.3d 206, 208-09 (2d Cir. 2004). The pleader is not, however, required to set forth in detail the facts upon which the claim is based. See Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz, 534 U.S. at 512, 122 S.Ct.

8

992 (citations omitted); <u>see also</u> <u>Firemen's Ins. Co. of Newark, N.J. v. Show</u>, 110 F.Supp. 523,

529-530 (D. Mont. 1953).  "The . . . simplified pleading system . . . was adopted to focus

litigation on the merits of a claim."  <u>Swierkiewicz</u>, 534 U.S. at 512, 122 S.Ct. 992 (citing <u>Conley</u>,

355 U.S. at 48, 78 S.Ct. 99).  "Other provisions of the Federal Rules of Civil Procedure are

inextricably linked to Rule 8(a)'s simplified notice pleading standard.  Rule 8(e)(1) states that

'[n]o technical forms of pleading or motions are required, and Rule 8(f) provides that '[a]ll

pleadings shall be so construed as to do substantial justice.'"  <u>Swierkiewicz</u>, 534 U.S. at 513-14,

122 S.Ct. 992; <u>see also</u> <u>Lomartira v. Am. Automobile Ins. Co.</u>, 245 F.Supp. 124, 129 (D. Conn.

1965), <u>aff'd</u>, 371 F.2d 550 (2d Cir. 1967); <u>see also</u> <u>Firemen's Ins. Co.</u>, 110 F.Supp. at 529-530.

    Construing Royal's pleadings liberally, it can be seen that one of the claims in Royal's

Complaint is that there is no coverage under the Policy and that the grounds upon which the

claim is based are that Zygo has breached Clause 43 by impairing and/or waiving Royal's

subrogation rights.  Ex. 1 (Complaint ¶¶ 80-81).  This gives fair notice to Zygo that its

impairment of Royal's subrogation rights is an issue in this case.  <u>Cf.</u> <u>Consolidated Stores Intl.</u>

<u>Corp. v. London Ins. and Reinsurance Market Association</u>, No. C2-96-1047, 2001 WL 1681139,

*at 4-*5 (S.D. Ohio Oct. 24, 2001); <u>Wilberg Jewelry Corp. v. The Palatine Ins. Co.</u>, 205 F.Supp.

696, 699-700 (S.D.N.Y. 1962).  The Fourth Cause of Action must be liberally construed such

that the allegation that Zygo has "impaired and/or waived plaintiff Royal's rights of recovery

against Nan Ya under the original Zygo/Nan Ya sales contract for the replacement AFM"

encompasses any and all such impairments.  This would include not only Zygo's release and/or

discharge of Nan Ya but also: (i) any impairment of Royal's subrogation rights against Nan Ya

by virtue of Zygo's failure to properly survey the evidence represented by the damaged second

AFM; (ii) Zygo's failure to preserve and protect that evidence; and (iii) Zygo's failure to provide

Royal with any reasonable opportunity to inspect or survey the damaged second AFM in order to obtain any evidence needed to refute Nan Ya's defense under the sales contract that it had no obligation to pay for that the second AFM as its surveyors had determined that the damage thereto was due to insufficient packing for which Zygo was responsible. Therefore, Royal should be permitted to offer evidence of any and all ways in which Zygo has impaired and/or waived Royal's subrogation rights.

**POINT III**

**ZYGO SHOULD BE SANCTIONED
FOR ITS SPOLIATION OF EVIDENCE**

Zygo's agent, Lee Tech, and Nan Ya's surveyors conducted a joint survey of the damaged First AFM on January 26, 2000 (the "First Joint Survey"). Ex. 33 (Cathay Survey Report, dated 2/19/2000). Nan Ya's surveyors concluded from their inspection and evaluation of the damage suffered by the First AFM that this had occurred as the result of a heavy shock or bump, and, most significantly, that "***Insufficient packing can be made the reason of this damage***." Id. at 3 (emphasis added).

Royal received no advance notice from Zygo of the First Joint Survey and was not represented there. Ex. 6 (Walch at pp. 132-40, 148-49 & 194); Walch ETT. Nor did Zygo ever arrange for any expert survey of the damaged First AFM on either its own behalf (Ex. 6 (Walch at pp. 21-22, 149 & 167-70); Walch ETT) or on behalf of Royal (Ex. 4 (Martin at pp. 102-03); Martin ETT).

*If,* as claimed herein by Zygo, it believed that the Policy afforded it with unpaid vendor coverage in respect of the Second AFM, it logically follows that it must have believed that it had such coverage in respect of the First AFM as well. If that was so, the mere possibility that Nan Ya's expert evidence of the insufficiency of the First AFM's packaging by Zygo might be used

10

by Nan Ya to justify its refusal to pay for the First AFM under the terms of the First Sales Contract should have been obvious to Zygo and both common sense and prudence would have required that Zygo (1) have the damaged First AFM surveyed on its own behalf by a qualified cargo surveyor (Lee Tech were not qualified surveyors) in order to evaluate the sufficiency of its packing; and (2) preserve and protect that evidence and provide Royal with an opportunity to conduct a similar inspection on its own behalf, as required by the Policy.

Zygo's failure to take either of these steps prejudiced any subrogation rights that Royal might have with respect to the damaged Second AFM (again, assuming that Zygo did in fact believe it had such coverage despite having failed to declare either of these cargoes). This is because the evidence pertaining to the alleged insufficiency of the First AFM's packaging was at least potentially relevant to Nan Ya's assertion that it had no obligation to pay Zygo under the Second Sales Contract, based on its surveyors' conclusion after their February 14, 2000 inspection of the damaged Second AFM (less than three weeks after they had inspected the First AFM) that insufficiency of the Second AFM shipment's packaging was to blame for its damage as well.

Nan Ya refused to pay the remaining 20% of the purchase price due on the damaged First AFM under the First Sales Contract and insisted that Zygo immediately ship the replacement Second AFM to Nan Ya. Although Nan Ya refused to pay the $138,000 unpaid balance of the First AFM's purchase price for almost a year following the First Joint Survey, asserting that it had no obligation to do so since it believed that the damage to that AFM had been caused by insufficient packing for which Zygo was responsible under the First Sales Contract, Zygo never gave any notice of an occurrence or claim to Royal in respect of the damaged First AFM, nor did it ever arrange to have that AFM surveyed on its own behalf.

Zygo's failure to do so certainly appears to contradict its present, strident insistence that it intended that the Policy contain "unpaid vendor" coverage as part of its standard coverage, and it also suggests, in the alternative, an awareness on Zygo's part these AFMs' packaging was, in fact suspect, so that the last thing it wanted was for Royal's surveyors to inspect them. Both of these possibilities find support in the events that followed.

The Second AFM was shipped to Nan Ya, which then advised Zygo on February 11, 2000 that it too had arrived at Nan Ya's facility in damaged condition. Ex. 23 (Memo from Walch to Muckenhirn dated 2/11/200). In response to that notice, on or about February 11, 2000, Kevin Walch conducted an initial, but very limited, inspection of that AFM on Zygo's behalf. Ex. 6 (Walch at pp. 95-96); Walch ETT; Ex. 23 (Memo from Walch to Muckenhirn, dated 2/11/2000). Mr. Walch was an engineer employed by Zygo to assist its customers, including Nan Ya, with the installation and repair of AFMs, (Ex. 6 (Walch at pp. 18-20); Walch ETT), and both he and the staff assistant to Zygo's president, Larry Martin, admit that, at the time of these events, Mr. Walch was *not qualified as an expert in the rigging and packaging of AFMs or in conducting a forensic analysis of transit damage suffered by them in order to determine the cause of that damage and the adequacy of their packaging* (Ex. 6 (Walch at pp. 21-22 & 169-70; Walch ETT; Ex. 4 (Martin at pp. 102-03); Martin ETT).

Mr. Walch limited his preliminary inspection of the damaged Second AFM on February 11, 2000 to removing only one or two wooden panels of its outside protective packing so that he could look inside to ascertain whether and to what extent it had been damaged. Ex. 6 (Walch at p. 96); Walch ETT. Mr. Walch so limited his inspection because he knew *how important it was to retain the damaged Second AFM in its original as-delivered condition without disturbing the evidence it represented until such time as a joint survey could be conducted by all*

12

*interested parties*, thereby providing to them a fair opportunity to have their respective experts inspect the damage in order to ascertain its nature, extent and possible causes, as well as that AFM's economic repairability and salvage value.  Ex. 6 (Walch at pp. 96-99 & 122-25); Walch ETT; Ex. 23 (Memo from Walch to Muckenhirn, dated 2/11/2000).

Mr. Walch believed, based on this cursory inspection, that the machine had suffered severe damage and *might* not be repairable *and that the parties and their insurers would need to survey the damaged Second AFM*.  Ex. 6 (Walch at pp. 101-02, 105-06 & 108-14); Walch ETT; Ex. 23 (Memo from Walch to Muckenhirn, dated 2/11/2000).

Consistent with Mr. Walch's understanding of just how important such a joint survey would be, he suggested to his superior, Sylvain Muckenhirn, the Director of Zygo's AFM Group, in a February 11, 2000 report of his preliminary inspection, that Zygo *notify Royal of the scheduled February 14, 2000 joint survey* so that Royal could arrange for its own representatives, including a cargo damage expert or surveyor, to attend and inspect the Second AFM.  Ex. 6 (Walch at pp. 124-26); Walch ETT; Ex. 23 (Memo from Walch to Muckenhirn, dated 2/11/2000).

Despite this very obvious and sensible suggestion, *Zygo gave no notice to Royal of the upcoming survey, and, as a result, no one attended the February 14, 2000 joint survey on Royal's behalf*.  Mr. Walch saw no one at the survey who was represented as being from Royal. Ex. 6 (Walch at pp. 132-40, 148-49 & 194); Walch ETT.   Nor did Zygo ever engage any cargo packaging expert on its own behalf to survey the damaged Second AFM, relying instead on Mr. Walch, who, by his own admission, was not qualified to do any expert forensic analysis of the Second AFM's damage in order to ascertain the cause(s) of the damage and the sufficiency of

13

that AFM's packaging. Ex. 6 (Walch at pp. 21-22, 149 & 169-70); Walch ETT; Ex. 4 (Martin Dep. Tr. at 102-03); Martin ETT.

Mr. Walch's inspection and so-called "evaluation" at Nan Ya's facility on February 14, 2000 of the damage suffered by the Second AFM was in fact conducted jointly by Zygo and Nan Ya (the "Second Joint Survey"). Ex. 24 (Memo from Walch to Muckenhirn, dated 2/14/2000); Ex. 6 (Walch at pp. 148 & 152); Walch ETT. Nan Ya was represented at the Second Joint Survey not only by its own personnel but also by Nan Ya's insurer and professional cargo surveyors from Cathay Inspection Co. acting on Nan Ya's behalf, who inspected and evaluated that damage. Ex. 6 (Walch at pp. 148-49 & 152); Walch ETT; Ex. 24 (Memo from Walch to Muckenhirn, dated 2/14/2000); Ex. 27 (Cathay Survey Report, dated 2/21/2000); Ex. 33 (Cathay Survey Report, dated 2/19/2000).

Nan Ya's personnel, its insurer's representative and Nan Ya's surveyors all concluded and informed Zygo that, based upon the First and Second Joint Surveys, in their opinion, the cause of the damage to both the First and Second AFMs was their insufficient packing, which they felt had been unable to protect them from the rough handling and shocks that the AFMs had been subjected to. Ex. 23 (Memo from Walch to Muckenhirn, dated 2/11/2000); Ex. 25 (Correspondence from Wu to Monti, dated 2/15/2000); Ex. 26 (Correspondence from Wu to Muckenhirn, dated 2/16/2000); Ex. 27 (Cathay Survey Report, dated 2/21/2000); Ex. 33 (Cathay Survey Report, dated 2/19/2000); Ex. 32 (Email from Chiang to Muckenhirn, dated 2/11/2000); Ex. 34 (Email from Lee-Tech to Martin, dated 7/4/2000).

Even Zygo's local Taiwanese agent, Billy Wu, the President of Lee Tech, who was very familiar with these types of AFM machines, remarked to Zygo that the packaging seemed very inadequate for such a delicate and expensive instrument, and was quite dissimilar from the

14

packaging done for similar machines by Zygo's competitor Veeco. Ex. 25 (Correspondence from Wu to Monti, dated 2/15/2000); Ex. 26 (Correspondence from Wu to Muckenhirn, dated 2/16/2000).

Nan Ya told Mr. Walch on February 14, 2000 that, since the damage to the Second AFM was due to insufficient packaging for which Zygo, not Nan Ya, was responsible under the Second Sales Contract, Nan Ya had no obligation to pay for the Second AFM, a position that it has steadfastly maintained to this day (see Nan Ya's Answer to Royal's Third-Party Complaint, alleging insufficient packing as a defense to any liability on its part to either Royal or Zygo in respect of the Second AFM as its Twenty-Second Affirmative Defense). Zygo had, in fact, supervised and was responsible for the rigging and packaging of the Second AFM, which was done at the manufacturer's Florida facility by rigging contractors hired by the manufacturer under supervision of Zygo personnel. Ex. 4 (Martin at pp. 244-46); Ex. 30 (E-mail from Weidman to Martin, dated 6/8/2001).

It was obvious to Mr. Walch from Nan Ya's vociferous claims of inadequate packaging at the Second Joint Survey on February 14, 2000 that insurance claims might be lodged against the packing company or the manufacturer, and he reported this to Mr. Muckenhirn. Ex. 6 (Walch at pp. 105 & 130; Walch ETT; Ex. 36 (forwarding internal memo from Walch to Muckenhirn, dated 2/14/2000).

Mr. Walch admitted that *it was important to ensure that the damaged Second AFM would be preserved as evidence*, making certain that none of that evidence was removed or was altered from its original state on arrival at Nan Ya's loading dock *so that it could be inspected by experts representing the various parties and their underwriters*. Ex. 6 (Walch at pp. 149-50 & 217-18; Walch ETT; Ex. 23 (Memo from Walch to Muckenhirn, dated 2/11/2000).

15

Mr. Walch also testified that, after completion of Second Joint Survey, Zygo probably could have removed that damaged Second AFM from Nan Ya's premises and stored it safely at Zygo's Taiwanese offices, where its security could be assured, but it did not do so, and, instead, *merely left that AFM sitting unattended at Nan Ya's open loading dock.* Ex. 6 (Walch at pp, 217-18 & 295-96); Walch ETT.

Mr. Walch asked Nan Ya's loading dock personnel not to disturb the damaged Second AFM, *but he admitted that he did not know whether or how portions of that evidence may have been taken away, altered or otherwise lost* (Ex. 6 (Walch at pp. 218, 245-48 & 293-94); Walch ETT), and he admitted that when he re-inspected the damaged Second AFM in November 2000 in order to ascertain its salvage value, *he made no effort to determine whether its evidentiary integrity had been compromised,* since by then, he regarded it as only so much scrap (Ex. 6 (Walch at pp. 245-48 & 293-96); Walch ETT).

Mr. Walch was not aware of any access ever given by Zygo to Royal in respect of an inspection of these AFMs (Ex. 6 (Walch at pp. 205 & 218-19); Walch ETT), but, the fact of the matter is that, even if, months later, such an opportunity had been afforded to Royal, Zygo's abandonment of this evidence on Nan Ya's loading dock, without any meaningful safeguards in place to insure that it would not be tampered with or altered, effectively negated the evidentiary value of any such survey. Even if it had not been altered, this would have been made moot, however, since in the months following the Second Joint Survey, Zygo ignored, delayed and ultimately frustrated all of Royal's considerable efforts to survey this evidence.

In fact, as is evident from the discussion that follows, Zygo went so far as to tell Royal on two separate occasions that Zygo did not consider that it had a claim under the Policy in respect of the damaged Second AFM, waiting until March 23, 2001, more than thirteen months after the

Second Joint Survey and more than four months after it had disposed of both the damaged First and Second AFMs, to inform Royal for the very first time that Zygo was considering "unpaid vendor" coverage under the Policy.[7] Just how egregious Zygo's spoliation of this evidence was can be seen when one traces its frustration of Royal's efforts to see the damaged Second AFM.

Despite Mr. Walch's suggestion to Mr. Muckenhirn on February 11, 2000 that Royal be notified of the upcoming Second Joint Survey so that it could send its own expert to attend there, Zygo waited until March 7, 2000, three weeks after the Second Joint Survey's completion and Zygo's abandonment of the damaged Second AFM on Nan Ya's loading dock, before notifying Royal of the subject damages. Ex. 36 (Correspondence from Merati to Royal, dated 3/7/2000).

Promptly after receiving this late notice of claim from Zygo, the very next day, March 8, 2000 Royal's claims manager, Joseph Daneman, notified Zygo that Royal would assign a surveyor to inspect the damaged Second AFM (the only AFM for which Zygo had provided a notice of occurrence) and he asked Zygo to advise him of said cargo's location and to provide him with a contact name, telephone and fax number so that the inspection could be arranged. Ex. 8 (Letter from Daneman to Merati, dated 3/8/2000).

Almost two weeks passed after Mr. Daneman's request without any response from Zygo, and so, on March 20, 2000, he wrote again to Zygo asking for the information needed to arrange the inspection of the damaged Second AFM. Ex. 37 (Letter from Daneman to Merati, dated 3/20/2000). Another month passed with still no response from Zygo, and on April 19, 2000, Mr. Daneman wrote yet again to Zygo, asking for the cargo's location and contact information so

---

[7] In fact, it was not until June 14, 2001, that Zygo (through its brokers) first confirmed that it was seeking coverage under Clause 52 (the "Contingency Clause"). Ex. 31 (Letter from Sneed to Daneman, dated 6/14/2001).

that Royal could send its own surveyor to inspect the damage. Ex. 38 (Letter from Daneman to Merati, dated 4/19/2000).

On April 28, 2000, Mr. Ilias spoke with Mr. Weidman, *who advised him that Zygo would not be advancing a claim under the Policy in respect of the damaged Second AFM*, as reflected in Mr. Ilias' notes of that conversation: "It is Matts (sic) opinion this will not be a claim since Zygo was not responsible for the shipment." Ex. 39 (Ilias' Handwritten notes).

On May 8, 2000, Zygo finally provided Royal with the requested contact information. Ex. 9 (Memo from Weidman to Daneman, dated 5/1/2000). This was almost three full months after completion of the Second Joint Survey and Zygo's abandonment of the damaged Second AFM on Nan Ya's loading dock, two months after Royal requested contact information in order to conduct a survey, and ten days after Mr. Weidman told Mr. Ilias that Zygo would not be advancing a claim.

On May 12, 2000, Mr. Daneman, believing after his review of the matter that it involved a potential claim for transit damage occurring after the cargo had been loaded aboard the aircraft for overseas shipment, so that under Clause 55 of the Policy, Zygo had no insurable interest, wrote to Zygo informing it that, since Zygo had no insurable interest, Royal would not be assigning a surveyor to inspect the cargo. Ex. 10 (Letter from Daneman to Weidman, dated 5/12/2000).

At the time that Mr. Daneman wrote the May 12th letter, no one at Mathog & Moniello or at Zygo had raised Clause 52 as the possible basis for any claim under the Policy. The first time that any allusion was made to Mr. Daneman by Mathog & Moniello with respect to such a possibility was in a letter dated March 23, 2001. Ex. 35 (Letter from Sneed to Daneman, dated 3/23/2001). Zygo did not officially advance this as the basis of a claim against Royal until it

confirmed this in a letter dated June 14, 2001. Ex. 31 (Letter from Sneed to Daneman, dated 6/14/2001).

Just one week after the May 12th letter, on May 19, 2000, Mr. Daneman asked Royal's surveyors in Taiwan to arrange for an independent survey in order to ascertain the cause of the damage to the Second AFM, advising Zygo's broker on the same day that he was doing so on a without prejudice basis. Ex. 11 (Letter from Daneman to Weidman, dated 5/19/2000). Mr. Daneman did so not because he believed that Zygo had any insurable interest in the goods but, rather, because Mr. Ilias had recommended that a survey be conducted, provided it did not imply an admission of coverage, and because such a survey seemed prudent and should not be at all expensive or difficult to arrange. Ex. 42 (Correspondence from Ilias to Carroll, dated 5/18/2000).

From May 12, 2000, when Mr. Daneman informed Zygo that Royal would not assign a surveyor because Zygo had no insurable interest, up to May 19, 2000, when he notified it that he would assign a surveyor, the damaged Second AFM was still sitting unsecured on Nan Ya's loading dock where Zygo had abandoned it, and thus, as a practical matter, Mr. Daneman's May 12, 2000 letter in no way prejudiced Zygo or changed the indisputable fact of Zygo's failure to take any meaningful steps to preserve and protect that evidence.

In fact, shortly after receiving Mr. Daneman's May 12th letter, Mr. Weidman spoke with Mr. Ilias and advised him for a second time that Zygo did not have a claim under the Policy in respect of the damaged Second AFM, as reflected in Mr. Ilias's notes of that conversation: *"he [Mr. Weidman] does not think this is a claim. He asked how one withdrew a claim and [I] advised him to send a letter to Joe* [Daneman]." Ex. 40 (Handwritten notes) (emphasis added).

19

On May 19, 2000, when Mr. Daneman advised Mr. Weidman that Royal had assigned a surveyor to investigate the matter, he also stated: "Also, please note that (1) the assured has not proven an insurable interest in this shipment, (2) the consignee has arranged for insurance for this shipment, (3) the consignee has apparently filed a claim with their insurance company, and (4) the consignee's insurance company has apparently declined liability for the claim due to insufficient and/or improper packaging." Ex. 11 (Letter from Daneman to Weidman, dated 5/19/2000). Neither Zygo nor Mathog & Moniello had raised Clause 52 as a basis for coverage as of this point in time.

Despite repeated attempts by Royal over the succeeding months to arrange for an inspection of the damaged Second AFM, Royal's surveyor was never given access to it and it was disposed of by Zygo without any such inspection having taken place. Ex. 12 (Letter from Daneman to Weidman, dated 6/19/2000); Ex. 13 (Letter from Daneman from Weidman, dated 11/10/2000); Ex. 17 (Letter from Daneman to Weidman, dated 7/13/2000); Ex. 28 (Letter from Daneman to Weidman, dated 7/21/2000).

After months of requesting Zygo's assistance in conducting a survey of the damaged Second AFM, with Zygo uncooperative, at best, and often obstructionist, Royal advised Mathog & Moniello on November 10, 2000 (three days before Zygo's settlement meeting with Nan Ya) that it was closing its file on the subject claim because, inter alia: (1) Royal's Taiwan surveyor had communicated with Lee Tech's Billy Wu and Zygo's Tim Smith, but they were unable to provide any answers regarding the AFMs; (2) *the damage was apparently due to insufficient packaging because damage occurred to not one but two AFMs back-to-back; and (3) Nan Ya's insurer agreed to "settle this claim at half the amount on an amicable basis,"* and the rest will reportedly be settled by Lee-Tech Co., Ltd. (Zygo Corp.'s Taiwan agent); and (4) the insured

20

does not have an insurable interest. Ex. 13 (Letter from Daneman from Weidman, dated 11/10/2000).

*A month passed without any response from Zygo* and then, on December 12, 2000, eleven months after the subject damage occurred and *two weeks after both the damaged First and Second AFMs had been shipped to their salvage purchaser in California on or about November 20, 2000* (Ex. 43 (Correspondence from Lee-Tech to Martin, dated 11/20/2000)), Mr. Weidman wrote to Mr. Daneman arguing for the first time that Zygo had an insurable interest because Zygo had delivered the second machine *without* securing a letter of credit (Ex. 14 (Letter from Weidman to Daneman, dated 12/12/2000)).

In response to Mr. Weidman's letter, Mr. Daneman explained to Mr. Weidman the very obvious fact that the Policy (as per Clause 3, Property Insured and Insurable Interest) did not provide coverage for shipments like this one, for which Zygo did not have an obligation to furnish ocean marine insurance. Ex. 29 (Letter from Daneman to Weidman, dated 1/4/2001). With respect to Clause 55 (FOB/FAS Shipments), Mr. Daneman explained that coverage was extended only to the transfer point of the cargo at the airport (the "free on board" location) and there was no evidence that the subject damage had occurred prior to loading on the overseas aircraft. Ex. 29 (Letter from Daneman to Weidman, dated 1/4/2001). To this point, Zygo had still not raised any "unpaid vendor" claim under the Policy.

Additionally, because of the evidence demonstrating insufficient packaging, Mr. Daneman explained to Mr. Weidman that Zygo had failed to establish the proximate cause of the damage was an external fortuity that was an insured peril. Ex. 29 (Letter from Daneman to Weidman, dated 1/4/2001). Lastly, *Mr. Daneman again informed Mr. Weidman that*

*Royal's Taipei surveyors had not received cooperation or accommodation in trying to arrange for a survey of the damage.* Ex. 29 (Letter from Daneman to Weidman, dated 1/4/2001).

Over a month later, Mr. Weidman had still not responded to Mr. Daneman's January 4, 2001 letter, and so Mr. Daneman again wrote to Mr. Weidman on February 5, 2001 and stated: "[A]s we have not received a response to the coverage issues raised in our last fax, we conclude that the Policy does not provide coverage. If you disagree with our coverage position, we ask that you advise us accordingly setting forth the reasons that you believe that there is coverage with supporting information and documentation." Ex. 41 (Letter from Daneman to Weidman, dated 2/5/2001).

*It was not until more than a year after Mathog & Moniello first gave notice to Royal of the damage to the Second AFM, that on March 23, 2001, Zygo raised for the first time even the possibility of a claim under Clause 52.* Ex. 15 (Letter from Sneed to Daneman, dated 3/23/2001). And, it was fifteen months after Zygo first informed Royal of the damage to the Second AFM, that Mathog & Moniello finally wrote to Royal to confirm that Zygo was in fact advancing the "unpaid vendor" claim that is the subject of this action. Ex. 16 (Letter from Martin to Daneman, dated 6/14/2001).

## A.    The Law Of Spoliation

Spoliation of evidence is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire and Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). "It has long been the rule that spoliators should not benefit from their wrongdoing." West, 167 F.3d at 779 (citation omitted). Spoliation "is not a substantive claim or defense but a 'rule of evidence' . . . ." Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 450 (4th Cir. 2004) (citation omitted).

"Consequently, a party need not indicate its intent to invoke the spoliation rule in the pleadings." Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995) (citing Donohoe v. American Isuzu Motors, Inc., 155 F.R.D. 515, 520 (M.D. Pa. 1994)).

The Court has authority to impose sanctions on a party who has destroyed evidence. See Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999). First, "[i]t is well-settled that the Court has the inherent power to sanction a party that destroys relevant and discoverable evidence." Shaffer v. RWP Group, Inc., 169 F.R.D. 19, 24 (E.D.N.Y. 1996); see also West, 167 F.3d at 779 (citation omitted). Second, under Rule 37 of the Federal Rules of Civil Procedure, the Court may sanction a party where spoliation prevents that party from complying with its discovery obligations. See West, 167 F.3d at 779; Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991), aff'd, 89 Civ. 4252, 1992 WL 51570 (S.D.N.Y. March 9, 1992).

The sanctions available to the Court under these two sources of authority are comparable. See Dillon v. Nissan Motor Co., 986 F.2d 263, 268 (9th Cir. 1993). Sanctions may include: (1) dismissal of a claim; (2) a preclusion order; (3) an order deeming specific facts admitted; (4) an adverse inference; and (5) monetary sanctions. See West, 167 F.3d at 779-80; Pressy v. Patterson, 898 F.2d 1018, 1024 (5th Cir. 1990); Turner, 142 F.R.D. at 78.

## B. Because Litigation Was Reasonably Foreseeable, Zygo's Duty To Preserve Both Damaged AFMs Arose No Later Than February 14, 2000, Even If Royal Had Been Silent

"'In determining whether a court should exercise its authority to impose sanctions for spoliation, a threshold question is whether a party had any obligation to preserve the evidence.'" Shaffer, 169 F.R.D. at 24 (citation omitted). The duty to preserve is an affirmative one, independent of a request that the evidence be retained. See Shamis v. Ambassador Factors

23

Corp., 34 F.Supp.2d 879, 889 (S.D.N.Y. 1999); Shaffer, 169 F.R.D. at 24; Rice v. U.S., 917

F.Supp. 17, 19 (D.D.C. 1996); Skeete v. McKinsey & Co., Inc., 91 Civ. 8093, 1993 WL 256659

(S.D.N.Y. July 7, 1993); Turner, 142 F.R.D. at 73 (citation omitted). "A party is under an

obligation to preserve the evidence when the party has notice that the evidence is relevant to

litigation or when it should have known that the evidence may be relevant to future litigation."

Pace v. National R.R. Passenger Corp., 291 F.Supp.2d 93 (D. Conn. 2003) (citations and internal

quotations marks omitted); see also Turner, 142 F.R.D. at 73 (holding that the obligation to

preserve evidence may arise prior to the filing of a complaint); Shaffer, 169 F.R.D. at 24; Henkel

Corp. v. Polyglass USA, Inc., 194 F.R.D. 454, 456 (E.D.N.Y. 2000). "This obligation [runs] first

to counsel, who [has] the duty to advise his client of the type of information potentially relevant

to the lawsuit and of the necessity of preventing its destruction. Similarly, [a party's] corporate

managers [are] responsible for conveying this information to the relevant employees.

[Accordingly], it is no defense . . . that particular employees were not on notice." Turner, 142

F.R.D. at 73 (internal citations omitted).

Zygo was under an obligation to preserve the damaged First and Second AFMs because it

was on notice that said evidence might be relevant to future litigation between Nan Ya and Royal

as subrogee to Zygo's sales contract claims against Nan Ya.   That such litigation was likely or

reasonably foreseeable and that said evidence would be relevant to it is indisputable. Zygo knew

no later than by the conclusion of the Second Joint Survey on February 14, 2000 that the

damaged First and Second AFMs were evidence that should be preserved and protected and

properly evaluated by a qualified expert in order to obtain evidence refuting the evidence

obtained on those issues by Nan Ya's surveyors. Accordingly, Zygo's obligation to preserve both

of these damaged AFMs arose by no later than February 14, 2000 because the AFMs were

24

clearly the most central evidence on the issues of liability and damages. Cf. Turner, 142 F.R.D. at 73 (citations omitted); see also Shaffer, 169 F.R.D. at 24; Henkel, 194 F.R.D. at 456.

### C.    Zygo's Willful Failure To Preserve The Damaged AFMs Was Highly Culpable

"Once a duty to preserve has been established, a court must then assess: (1) the relative fault of the litigant against whom sanctions are sought; (2) the degree of prejudice suffered by the movant due to the destruction or loss of the evidence at issue; and (3) the appropriate sanction." Indem. Ins. Co. of N. Am. v. Liebert Corp., 99 Civ. 6675 (DC), 1998 WL 363834, at *3 (S.D.N.Y. June 29, 1998) (citation omitted).   In assessment of relative fault, culpability sufficient to warrant dismissal of a spoliator's claim exists where there is "[1] willfulness, [2] bad faith, or [3] fault on the part of the sanctioned party." West, 167 F.3d at 779 (citation omitted).

### 1.    Zygo's failure to preserve the damaged AFMs was willful.

The first source of severe culpability - a willful failure to preserve evidence - has been characterized as "*any* intentional failure as distinguished from involuntary noncompliance.  No wrongful intent need be shown." Gates Rubber Band Co. v. Bando Chem. Indus., Ltd., 167 F.R.D. 90, 103 (D. Colo. 1996) (citation omitted) (emphasis added).  The failure to preserve the damaged Second AFM was not the result of an "involuntary noncompliance," such as an accidental or inadvertent destruction of the evidence. Gates, 167 F.R.D. at 103; In re Wechsler, 121 F.Supp.2d 404, 419 (D. Del. 2000).  Zygo's willful failure to preserve the second AFM was a conscious and intentional act.

### 2.    Zygo acted in bad faith in failing to preserve the damaged AFMs.

As for the second source of severe culpability - bad faith - a party acts in bad faith if it destroys evidence with a reckless or conscious disregard for its discovery obligations. See DLC

25

Management Corp. v. Town of Hyde Park, 163 F.3d 124, 136 (2d Cir. 1998); Donato v. Fitzgibbons, 172 F.R.D. 75, 82 n.7 (S.D.N.Y. 1997); Rice, 917 F. Supp. at 19.  Zygo's representatives demonstrated bad faith in their obvious intent to prevent Royal from examining the most critical evidence in the sales contract disputes between Zygo and Nan Ya relating to the damaged First and Second AFMs.  Given all the circumstances, Zygo's failure to preserve the damaged AFMs constitutes bad faith, in reckless and conscious disregard of its obligations to under the Policy.[8]

### 3.    At minimum, Zygo's failure to preserve the damaged AFMs was grossly negligent.

As for the third source of severe culpability, "*any* fault of the sanctioned party" may be sufficient to warrant dismissal, see Beers v. General Motors Corp., No. 97-CV-482 (NPM/DNH), 1999 WL 325378, at *4 (N.D.N.Y. May 17, 1999) (citation omitted) (emphasis in original), and "'[f]ault' in this context extends to at least gross negligence."  Zies v. Dept. of Soc. Servs. of Human Resources Admin., 112 F.R.D. 223, 227 (E.D.N.Y. 1986) (citation omitted).

### D.    Zygo's Failure To Preserve The Damaged AFMs Has Seriously Prejudiced Royal's Subrogation Rights

Under Connecticut law, "subrogation is the right of the insurer to be put in the position of its insured so that it may pursue recovery from third parties who are legally responsible to the insured for a loss paid by the insurer."  Albany Ins. Co. v. United Alarm Service, Inc., 194 F.Supp.2d 87, 93 (D. Conn. 2002).  "It is from the very nature of a contract of insurance as a contract of indemnity that the insurer, upon paying to the insured the amount of a loss, total or partial, becomes, without any formal assignment or any express stipulation to that effect in the

---

[8]  Clause 32 of the Policy provides that "Any loss or damage to the property hereby insured must be promptly reported to [Royal] or to the nearest Settling Agent of [Royal] and such Agent must be represented on all surveys . . . ."  Exhibit "A" to Ex. 1 (Complaint).  Royal was not represented at either the First or Second Joint Surveys in violation of this provision.

policy, subrogated in a corresponding amount to the insured's right of action against the person responsible for the loss." Hartford Acc. and Indem. Co. v. Chung, 37 Conn. Supp. 587, 590-91, 429 A.2d 158, 160-61 (Conn. Super. App. 1981). Clause 43 specifically provides that Royal "shall be subrogated to all rights and claims against third parties arising out of [a] loss" under the Policy. Exhibit "A" to Complaint.

> ### 1.   Because the damaged AFMs might have been helpful to rebut Nan Ya's defenses under the Second Sales Contract, Royal has suffered legal prejudice.

A party is prejudiced when the destruction of evidence prevents the inspection and testing of that evidence and, as a result, frustrates a party's ability to prepare for trial or defend the case against it. See Dillon, 986 F.2d at 265-66; Beers, 1999 WL 325378 at *5-*7; Brancaccio v. Mitsubishi Motors Co., Inc., No. 90 CIV. 7852 (RWS), 1992 WL 189937 (S.D.N.Y. Jul. 27, 1992).

In Dillon, the plaintiffs sued the defendant car manufacturer under a defective design theory. 986 F.2d at 265-66. Although plaintiffs produced the parts of the car it alleged were defective, the rest of the vehicle was destroyed before suit was filed. See Id. One of the experts testified that the vehicle would have been "helpful in the reconstruction of the accident." Id. at 267. The trial court found that the vehicle data that was available from plaintiffs' experts was not an adequate substitute for the actual vehicle, and that "it [was] certain beyond doubt that defendants . . . suffered prejudice as evidence which may have [proved] helpful to the defense [was] destroyed." Id. at 267-68. The appellate court upheld the trial court's finding that the defendants had been prejudiced by the inability to inspect and perform tests on the damaged vehicle. See id. at 268.

Similarly, in Beers, the plaintiff was injured by a fan installed on a truck manufactured by the defendant. 1999 WL 325378, at *1. As part of the plaintiff's expert's inspection, the fan was disassembled, "which irreparably altered its condition at the time of the accident. Moreover, plaintiff's counsel never notified [the defendant] that the flex fan was to be taken apart, gave it the opportunity to be present, or allowed it to inspect the flex fan first. . . . No video or photographs were taken at the time of disassembly." Id. The fan was subsequently lost. See id. The court found that the defendant was prejudiced because its defense revolved "around pre-accident damage to the very item missing, [and] it [was] unable to effectively show that the fan blade broke for reasons other than a defect." Id. at *5. The court also noted that not only was the defendant's primary defense thwarted but also that the defendant was denied any "other defenses an inspection may have revealed." Id. at *6; see also Henkel, 194 F.R.D. at 457; Shamis, 34 F. Supp. 2d at 889-90; Valentine v. Mercedes-Benz Credit Corp., 98 Civ. 1815, 1999 WL 787657, at * (S.D.N.Y. Sept. 30, 1999); West v. Goodyear Tire and Rubber Co., 92 Civ. 0938, 1998 WL 60942 (S.D.N.Y. Feb. 13, 1998), vacated on other grounds, 167 F.3d 776 (2d Cir. 1999); Thiele v. Oddy's Auto and Marine, Inc., 906 F. Supp. 158, 162-63 (S.D.N.Y. 1995); Brancaccio, 1992 WL 189937.

In view of the factual background discussed above, Zygo cannot be heard to argue that it cooperated with Royal, that it gave Royal a fair opportunity to survey the damaged AFMs or that Royal somehow gave informed consent to that evidence's disposal. If, as Zygo now claims, it never settled its disputes with Nan Ya relating to the unpaid purchase price of the Second AFM, given the fact that Nan Ya has insisted from the outset that it had no obligation to pay Zygo because the damage to both the First and Second AFMs was due to insufficient packing for

which Zygo was responsible under the subject sales contracts,[9] then Zygo had to have known of the importance of this evidence to Royal in any subrogated action against Nan Ya.   Given the evidence in the record before the Court, it is clear that Zygo's destruction of this critical evidence was willful and deliberate.  The severe prejudice to Royal's subrogated interests is equally clear.

2.    The damaged AFMs were unique and critically relevant.

"While some showing that the destroyed evidence would have been relevant to the contested issue(s) is required, 'care should be taken' not to require too specific a level of proof." Shamis, 34 F.Supp.2d at 889 (citation omitted).  Any evidence that would have been gained from the damaged First and Second AFMs would have been unique, highly significant and of profound relevance, so that Zygo's failure to preserve them has prejudiced any rights in subrogation that Royal may have against Nan Ya to the highest possible degree.

**E.    Zygo Should Be Most Severely Sanctioned**

1.    Dismissal of Zygo's claims under the Policy is the most appropriate and only adequate remedy for its spoliation.

Zygo's high culpability and the tremendous prejudice suffered by Royal each independently make dismissal of Zygo's claims under the Policy the most appropriate sanction. In view of Zygo's willful, bad faith failure to preserve the damaged First and Second AFMs in

---

[9]  The sales contract provides, in pertinent part:

> 7. Packing:  Equipments/materials covered by this order shall be packed in such a manner as will be adequate for seaborne or airborne export shipment as the case may be. ***Such packing must be sufficient to secure safe arrival at destination fully covering such overseas shipping hazards as rough handling and possible collision.***  For any loss or damage in transit attributable to improper packing, Buyer may at its own discretion either take compensation or request replacement from the Seller in accordance with provisions specified in above mentioned paragraph 5.

Ex. 22 (Order Confirmation, consisting of two pages) (emphasis added).

reckless disregard of its obligations under the Policy, "[d]ismissal is appropriate." Cf. West, 167 F.3d at 779 (citation omitted). Moreover, the irreparable harm that this destruction of evidence has done to Royal's ability to prepare for trial and defend against Zygo's claims herein and to refute Nan Ya's contract defense of insufficient packaging in any subsequent trial of Royal's subrogated claims against Nan Ya, should coverage be found to exist, makes dismissal of Zygo's claims under the Policy the only adequate remedy for said spoliation. Cf. Beers, 1999 WL 325378 at *4; Thiele, 906 F. Supp. at 162-63; Brancaccio, 1992 WL 189937.

Dismissal is particularly appropriate in the instant case because Zygo's claim against Royal is founded solely upon contractual indemnity. "Any act or omission on the part of the indemnitee in breach of his duty under the contract of indemnity that increases the indemnitor's risk or liability or otherwise injures his rights and remedies *discharges* the indemnitor from his liability under the indemnity contract, at least to extent of the injury so occasioned." 42 C.J.S. Indemnity § 60 ("Discharge") (1991) (emphasis added; citations omitted); see also U.S. Fidelity & Guaranty Co. v. Putfark, 158 So. 9, 10 (La. 1934); Hiern v. St. Paul-Mercury Indem. Co., 262 F.2d 526, 528-29 (5th Cir. 1959); American Casualty Co. of Reading, PA v. Idaho First Nat. Bank, 328 F.2d 138, 142-45 (9th Cir. 1964); General Ins. Co. of Am. v. Fleeger, 389 F.2d 159, 161 n.3 (5th Cir. 1968); Unisys Corp. v. Legal Counsel, Inc., 768 F.Supp. 6, 8 (D.D.C. 1991), aff'd, 15 F.3d 1160 (D.C. Cir. 1994); Am. Export Isbrandten Lines, Inc. v. U.S., 390 F. Supp. 63, 68-70 (S.D.N.Y. 1975) ("a party seeking indemnity is under an obligation to take reasonable measures in the course of that litigation to protect the interests of the party from whom it seeks indemnification").

Zygo's highly culpable breach of its duty to preserve evidence has greatly increased Royal's risk and potential liability as an indemnitor and gravely prejudiced Royal's rights and

remedies, thus discharging Royal of any duty to indemnify Zygo for the alleged damage to the Second AFM, regardless of whether or not the causes of such losses would otherwise be within the scope of the Policy. Dismissal of Zygo's claims herein is therefore the most appropriate and only adequate remedy.

### 2. In the alternative, Zygo should be precluded from offering any evidence about the alleged damaged AFMs.

In the alternative, if the Court decides not to dismiss Zygo's claims under the Policy, it should issue a preclusion order. See Dillon, 986 F.2d at 267-68; Donato, 172 F.R.D. at 84. An order precluding a spoliator from presenting evidence or witnesses is appropriate where the spoliator acted with bad faith or gross negligence. See Cine Forty-Second St. Theatre Corp. v. Allied Artist Picture Corp., 602 F.2d 1062, 1064 (2d Cir. 1979); Dillon, 986 F.2d at 268-69; Donato, 172 F.R.D. at 84. Zygo acted in bad faith, or at least with gross negligence, when it failed to preserve the damaged First and Second AFMs in reckless disregard of its obligations under the Policy. The Court should preclude Zygo from presenting evidence or witness testimony at trial relating to the nature, extent and/or cause(s) of the damage suffered by the First and Second AFMs.

### 3. In the alternative, certain facts should be deemed to be admitted.

In the alternative, should the Court decide not to preclude Zygo from presenting AFM related evidence, it should issue an order deeming certain facts to be admitted. See Pressy, 898 F.2d at 1024. An order deeming certain facts admitted is appropriate where the spoliator acted negligently or recklessly, see id., as Zygo, at minimum, did here. The Court should deem the following facts as admitted by Zygo: (i) Zygo's packaging of the First and Second damaged AFMs was insufficient and not up to industry standards; (ii) that the damages suffered by the

31

First and Second damaged AFMs was due solely to the aforesaid insufficiency of said packaging; and (iii) that Zygo's failure to properly safeguard and preserve said evidence greatly impaired Royal's defenses in this action and Royal's rights in subrogation against Nan Ya should coverage be found to exist.

### 4.    In the alternative, the Court should draw adverse inferences.

In the alternative, the Court should draw an adverse inference from Zygo's failure to preserve the damaged First and Second AFMs. See Henkel, 194 F.R.D. at 457; Shamis, 34 F.2d at 890; Donato, 172 F.R.D. at 81; Shaffer, 169 F.R.D. at 28; Rice, 917 F. Supp. at 20-21. No finding of bad faith is necessary to impose such a sanction. See Shaffer, 169 F.R.D. at 26. The culpable state of mind required to impose an adverse inference is that "the evidence was destroyed knowingly, even if without intent to [breach a duty to preserve it], or negligently." Pace v. National R.R. Passenger Corp., 291 F.Supp.2d 93 (D. Conn. 2003) (citations and internal quotations marks omitted). The Second Circuit endorsed this view in Reilly, holding that "a finding of bad faith or intentional misconduct is not a sine qua non to sanctioning a spoliator with an adverse inference instruction." 181 F.3d at 267-68 (citation omitted).

Thus, even leaving aside the ample proof of Zygo's bad faith, gross negligence and conscious, reckless disregard of its obligations under the Policy, the Court should at minimum infer that the destroyed AFMs would have supported Royal's assertions that: i) Zygo's packaging of the First and Second damaged AFMs was insufficient and not up to industry standards; (ii) the damages suffered by the First and Second damaged AFMs was due solely to the aforesaid insufficiency of said packaging; and (iii) Zygo's failure to properly safeguard and preserve said evidence greatly impaired Royal's defenses in this action and Royal's rights in subrogation against Nan Ya should coverage be found to exist.

32

## CONCLUSION

For the foregoing reasons, Royal's motion in limine should be granted.

Dated: January 18, 2005
New York, New York

                      Respectfully submitted,

                      LAW OFFICES OF ROBERT K. MARZIK, P.C.
                      1512 Main Street
                      Stratford, Connecticut  06615
                      (203) 375-4803

                            - and -

                      NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE

By:       *Geoffrey J. Ginos*
                      GEOFFREY J. GINOS (CT 19578)
                      Wall Street Plaza
                      88 Pine Street, Seventh Floor
                      New York, New York 10005-1801
                      Tel: (212) 220-3830
                      Fax: (212) 220-3780
                      gginos@nicolettihornig.com
                      (FILE NO.:  21000055 JAVN/GJG)

                      *Attorneys for Plaintiff/Third-Party Plaintiff*
                      *Royal Insurance Company of America*

33

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing filing, "**Memorandum of Law in Support of Royal's Motion in Limine**," was sent *via* first class mail, postage prepaid this 18th day of January, 2005 to:

> Honorable Janet Bond Arterton
> United States District Judge,
> United States District Court
> for the District of Connecticut
> 141 Church Street
> New Haven, Connecticut 06510
>
> Ian E. Bjorkman, Esq.
> Wiggin & Dana
> One Century Tower
> New Haven, Connecticut 06508
>
> Charlsa D. Broadus, Esq.
> Day, Berry & Howard LLP
> City Place I
> Hartford, Connecticut 06103-3499
>
> Tait Graves, Esq.
> Wilson Sonsini Goodrich & Rosati
> 650 Page Mill Road
> Palo Alto, California 94304-1050
>
> Robert K. Marzik, Esq.
> Law Office of Robert K. Marzik, P.C.
> 1512 Main Street
> Stratford, Connecticut 06615

GEOFFREY J. GINOS (CT 19578)