UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,     :

                     Plaintiff,     :

         -against-     :

ZYGO CORPORATION,     :

                  Defendant.     :
------------------------------------------------------------------X
ROYAL INSURANCE COMPANY OF AMERICA,     :

             Third-Party Plaintiff,     :

         -against-     :

NAN YA TECHNOLOGY CORPORATION,     :

            Third-Party Defendant.     :
------------------------------------------------------------------X

**Case No.:**
**3:01 CV 1317 (JBA)**

## PLAINTIFF ROYAL INSURANCE COMPANY OF AMERICA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

     Pursuant to the Court's Amended Scheduling Order (of January 6, 2005), Royal Insurance Company of American respectfully submits the following proposed findings of fact and conclusions of law:

## I.    ROYAL'S PROPOSED FINDINGS OF FACTS

## INTRODUCTION

     1.    The counter-claims asserted by Zygo Corporation ("Zygo") in these proceedings against Royal Insurance Company of America ("Royal") allegedly arise under a Marine Open Cargo Policy (policy no. POC102950), with an effective date of May 1, 1999 (the "Policy"), that was issued by Royal to Zygo as the named insured. See Ex. P-11 (Policy)).

2.      Royal brought this declaratory judgment action alleging that Zygo's claims herein are barred by the Policy's terms and conditions because:

a.      Under the subject Zygo-Nan Ya sales transaction which was on an F.O.B. U.S. Airport basis, Zygo had no responsibility to insure the subject Atomic Force Microscope's ("AFM") transit from that F.O.B. load port to Taiwan (Compl., ¶¶63-65);

b.      under Clause 55, the Policy's coverage ended at said F.O.B. load port, and, if the subject cargo was damaged, that said damage had occurred after its delivery to that point (Compl., ¶¶66-69);

c.      Zygo had no coverage under Clause 52 because it failed to declare the subject AFM's value or pay any premium thereon for such coverage and had also failed to use all reasonable means to collect the full price due from Nan Ya for that AFM as required by that clause (Compl., ¶¶70-76); and

d.      Zygo had breached Clause 43's condition of insurance that Zygo "not waive, compromise, settle or otherwise impair any right of claim against a third party to which Royal would be subrogated upon payment of a loss" in that Zygo had "impaired and/or waived" (¶80) Royal's rights of recovery against Nan Ya under the original Zygo/Nan Ya sales contract for that AFM. (Compl., ¶¶ 77-81).

3.      Zygo counterclaimed against Royal for breach of contract, breach of the covenant of good faith and fair dealing, bad faith denial of insurance coverage, and a declaratory judgment that said AFM's damages were covered under the Policy. *See* Zygo's Answer and Counterclaims ("Ans."), dated September 20, 2001

4.      Royal, in its reply to Zygo's counterclaims, rejected all of those claims, denying, inter alia, Zygo's allegations offered in support therof that Zygo: (a) had cooperated with Royal and given it all requested information (Royal asserting, by way of example, that said AFM's location been revealed to it only ten business days before the date of Royal's Reply); (b) provided Royal with any fair opportunity to inspect said damaged AFM; (c) had properly

2

mitigated its damages by its sale of that AFM, whose repair cost appeared to be well below its insured value, as evidenced by Zygo's own estimate of that repair cost.

## THE PARTIES

5.    At all times material to this action, Royal was an insurance company duly organized under and existing by virtue of the laws of the State of Illinois, having a principal place of business in Charlotte, North Carolina and with an office and place of business in New York, New York, duly licensed to conduct business in, *inter alia,* the States of Connecticut and Massachusetts, and was in the business of underwriting and insuring marine risks, including but not limited to issuing first-party contracts of insurance for air cargo transit coverages. Compl. ¶ 4

6.    Zygo is a corporation duly organized under the laws of the State of Connecticut, with a principal place of business in Middlefield, Connecticut. Ans., ¶ 87. Zygo is in the business of designing and manufacturing, among other things, electro-optical measuring instruments and components, such as the Atomic Force Microscope ("AFM") involved in this case. *See* Witness Statement of Lawrence Martin. Zygo's products are used in, among other areas, semiconductor manufacturing and defense and aerospace systems. *Id.* As Zygo regularly ships its high-tech devices around the world, it is and was at all times insured under a Marine Open Cargo Policy such as the Policy. *Id.*

## THE POLICY

7.    Allan Ilias was the underwriter at Royal for the Zygo account. (Ilias ETT; Ilias Dep. Tr. p. 13), and he having joined Royal as an underwriter trainee after graduating college in 1995, focusing on cargo insurance. (Ilias Expected Trial Testimony ("ETT"); Ilias Dep. Tr. at 5-6).

8.    Mr. Ilias remained with Royal through 2002, progressing from trainee to associate underwriter to underwriter and, finally, to senior underwriter, (Ilias ETT; Ilias Dep. Tr. at 6-7), and at the time that the Policy was written, he was authorized to independently write policies with limits of up to $5 million. (Ilias ETT; Ilias Dep. Tr. at 7; 10; 18-19; 72-73).

9.    As a cargo underwriter, Mr. Ilias would receive submissions from brokers, evaluate risks, deliberate pricing parameters and coverages, provide quotes to brokers and, as needed, would subsequently negotiate and/or communicate with them with respect to policy coverage and terms. (Ilias ETT; Ilias Dep. Tr. at 12).

10.    Zygo's estimated annual dollar volume of goods shipped in 1999 was $58,000,000 for foreign shipments and $47,700,000 domestically and had operations in five locations in three states. (Ilias ETT; Ex. P-56 (Zygo's Application for Marine Insurance)).

11.    At all times relevant, Mathog & Moniello Companies, Inc. ("M&M) was a corporation duly organized and existing by virtue of, or otherwise licensed or authorized to do business under, the laws of the State of Connecticut and/or one of the other states of the United States, with an office and place of business at 100 South Shore Drive (P.O. Box 120650, East Haven, Connecticut 06542.

12.    M&M was Zygo's insurance broker and agent for purposes of obtaining the insurance coverage offered under the Policy. (Compl. ¶ 10; Answer ¶ 10; Weidman ETT; Weidman Dep. Tr. at 20; 29; 211).

13.    Matthew Weidman began working as an account executive at M&M in October 1995. (Weidman ETT; Weidman Dep. Tr. at 8; 17-18).

14.    Mr. Weidman first became involved with the Zygo account in early 1996. (Weidman ETT; Weidman Dep. Tr. at 20; 29; 211), and was the account executive at M&M who

was responsible for preparing the insurance application that was sent to Royal on behalf of Zygo in respect of the Policy.  (Weidman ETT; Weidman Dep. Tr. pp. 33-36, 39-40; 47-50).

        15.    Mr. Weidman does not recall ever having an occasion to read Clause 52, titled the "Contingency Clause" in the Policy (sometimes referred to by the parties herein as the "unpaid vendor clause") that Zygo alleges provides it with coverage for its claims in this action) prior to the issuance of the Policy.  (Weidman ETT; Weidman Dep. Tr. at 58).

        16.    Mr. Weidman does not recall having any discussions with Zygo about contingency coverage prior to the Policy being issued.  (Weidman ETT; Weidman Dep. Tr. at 56).

        17.    Mr. Weidman did not read Clause 52 for the first time until sometime between November 2000 and May 2001.  (Weidman ETT; Weidman Dep. Tr. at 58-59; 73).

        18.    Mr. Weidman is not an underwriter (Weidman ETT; Weidman Dep. Tr. at 197), and he has no knowledge or experience that would enable him to determine how premiums are set for contingency coverage.  (Weidman ETT; Weidman Dep. Tr. at 61-62).

        19.    Zygo's claim in this action was Mr. Weidman's first exposure to an unpaid vendor claim.  (Weidman ETT; Weidman Dep. Tr. at 16-17; 57).

        20.    At his prior job at Liberty Mutual, Mr. Weidman does not recall any cases or disputes dealing with unpaid vendor or contingency coverage.  (Weidman ETT; Weidman Dep. Tr. at 15-16).

        21.    Mr. Weidman attended two seminars on marine insurance while at M&M. Weidman at 13-14.  He does not recall the substance of the seminars or whether they discussed marine cargo coverage or contingency coverage.  (Weidman ETT; Weidman Dep. Tr. at 14-15).

        22.    Mr. Weidman does not recall attending any seminars relating to unpaid vendor coverage.  (Weidman ETT; Weidman Dep. Tr. at 17).

23.    Prior to acquiring the Zygo insurance account, Mr. Weidman does not recall any involvement at M&M with marine cargo insurance or claims. (Weidman ETT; Weidman Dep. Tr. at 18-20).

24.    Prior to the Policy's issuance, Mr. Weidman was involved as an account executive at M&M with the issuance of between 1 and 5 marine cargo policies, (Weidman ETT; Weidman Dep. Tr. at 56-57), and he has "no idea" whether unpaid vendor or contingency coverage was included under those policies. (Weidman ETT; Weidman Dep. Tr. at 57).

25.    In view of the foregoing, it is quite apparent that, at the time that Mr. Weidman was negotiating the Policy on Zygo's behalf, he had, at best, very limited knowledge of and experience with marine cargo insurance; had virtually nil, if any, knowledge of and experience with contingency or unpaid vendor insurance coverage; was not an underwriter; and had no knowledge or experience with respect to how premiums are set for contingency coverage. (Weidman ETT; Weidman Dep. Tr. at 14-20; 33-36, 39-40 & 47-50; 57; 61-62; 197)

26.    The insurance application sent to Royal by Jeanette Zdanis, a marketing representative at M&M (the "Insurance Application") (Weidman ETT; Weidman Dep. Tr. at 33-38; 54-55) was prepared by Mr. Weidman based on his knowledge of Zygo's operations and information he received from Zygo, and stated that Zygo insured 100% of the goods it shipped. (Ilias ETT; Ilias Dep. Tr. at 66-67; Ex. P-56 (Zygo's Application for Marine Insurance); Weidman ETT; Weidman Dep. Tr. at 36; 38-40; 47-51).

27.    Mr. Ilias understood this to mean that Zygo "had no contingent exposure" because it was responsible to provide insurance cover in respect of its cargo shipments covering them from Zygo's warehouse to their final destination, wherever that might be. (Ilias ETT; Ilias Dep. Tr. at 66-67).

28.    Mr. Weidman never contradicted Mr. Ilias' interpretation of the Insurance Application's statement that Zygo insured 100% of the goods it shipped (Ilias ETT; Weidman ETT; Weidman Dep. Tr. at 48, 51-56, 149-51).

29.    Consistent with Mr. Ilias' reading of the Insurance Application's statement, Mr. Weidman also understood the statement that Zygo insured 100% of the goods it shipped meant that "the insured [here, Zygo] is responsible for [providing] the [insurance] coverage on a shipment made to a client [of Zygo's]." (Weidman ETT; Weidman Dep. Tr. at 51 & 54).

30.    Mr. Weidman does not recall having had any discussions with Zygo prior to Royal's issuance of the Policy in which Zygo told him that it wanted unpaid vendor coverage or contingency coverage. (Weidman ETT; Weidman Dep. Tr. at 56).

31.    The Insurance Application stated that Zygo made air shipments of its merchandise to the Pacific Rim valued at $58,700,000 annually.    (Ilias ETT; Ex. P-56 (Zygo's Application for Marine Insurance)).

32.    In the course of its negotiation of the Policy with Mr. Ilias, M&M told him that Zygo was paying $33,000 annually for its marine cargo insurance on an annual sales volume of $50,000,000, which Mr. Ilias estimated in his notes as equaling "approx .07% against sales." (Ilias ETT; Ilias Dep. Tr. at 76).

33.    M&M also told Mr. Ilias in the course of their negotiations that Zygo wanted to have contingency coverage in the Policy. (Ilias ETT; Ilias Dep. Tr. at 81).

34.    Finding it strange that Zygo was requesting contingency insurance when, based upon its representation in the Insurance Application that it insured "100%" of its shipments, so that it had no contingency exposure, Mr. Ilias called M&M to confirm that Zygo had "no shipments of a contingent nature." (Ilias ETT; Ilias Dep. Tr. at 68; 81-82).

35.    Mr. Ilias was assured by M&M that Zygo had "no contingent exposure." (Ilias ETT; Ilias Dep. Tr. at 68; 153).

36.    Still curious, Mr. Ilias asked M&M what "they [Zygo] possibly need it for." (Ilias ETT; Ilias Dep. Tr. at 81-82).

37.    Mr. Ilias was told by M&M only that it [contingency cover] had been included in Zygo's prior marine open cargo policy, which had been issued by American Home Assurance Company of the American International Group, Inc. ("AIG", the "AIG Policy"). (Ilias ETT; Ilias Dep. Tr. at 82-83, Ex. P-56 (Zygo's Application for Marine Insurance); Weidman ETT; Weidman Dep. Tr. at 107-08; Ex. P-184 (Correspondence from Kelly to Jeannette, dated 4/28/1998); Cf. P-193 (AIG Policy, with no Contingency Endorsement)).

38.    Mr. Ilias had not seen the AIG Policy and did not know what reporting requirements that policy had with respect to contingency coverage, what premiums were paid by Zygo in respect of that coverage, whether it was offered as an optional enhancement which had to be requested or anything else about said coverage, including whether, in fact, the AIG Policy contained unpaid vendor coverage in any form – he simply took the word of M&M that some unspecified form of such coverage had been provided in Zygo's preceding AIG Policy and that Zygo wanted optional contingency coverage to be included in the Policy. (Ilias ETT; Ilias Dep. Tr. at 83; 154).

39.    Neither M&M nor Zygo nor anyone else ever told Mr. Ilias anything more concerning the nature of that alleged prior contingency coverage or its reporting requirements nor did anyone provide him with a copy of the AIG Policy at the time that he was negotiating the Policy, nor did M&M, Zygo or anyone else ever do so while the Policy was in effect. (Ilias ETT).

40.    Contrary to what M&M had told Mr. Ilias, the AIG open marine cargo policy which Zygo was seeking to replace with coverage from Royal in fact did not provide any contingency coverage to Zygo, even on an optional basis. (Ilias ETT; Ex. P-193 (AIG Policy)).

41.    Mr. Ilias stated that it is "standard and customary" in the industry for an insured to advise an insurer prior to a shipment that the shipment requires contingency insurance, when such coverage has been provided only as an optional enhancement. (Ilias ETT; Ilias Dep. Tr. at 173-74).

42.    As little as just one hour's advance notice by an assured over the phone that it required contingency coverage for a particular upcoming shipment was all that would be needed in such circumstances, so long as sufficient information (e.g., nature and value of cargo, shipment destination, identity of buyer, and any potentially pertinent information regarding prior losses, claims or problems in respect of such shipments) was provided to the underwriter, enabling him to assess the risk, decide whether he wished to accept it and price a premium for the requested additional coverage which the assured would have to agree to pay. (Ilias ETT; Ilias Dep. Tr. at 138-39)

43.    On at least two occasions during his career, Mr. Ilias has received telephone calls invoking a contingency clause in this manner. (Ilias ETT; Ilias Dep. Tr. at 139-40).

44.    Unpaid vendor coverage is an enhancement that can be added to an open marine cargo policy if an assured requests it and the insurer and the assured agree on its terms. (Ilias ETT; Ilias Dep. Tr. at 81-83).

45.    Since unpaid vendor coverage enhances an open marine cargo policy by extending its existing coverage, to understand just what unpaid cover does and does not include,

it must be remembered that an open marine cargo policy covers the risks of loss or damage to cargo caused by insured perils during its transportation. (Ilias ETT)

> 46.    Contingency coverage has been described in one insurance treatise published by the Insurance Institute of America as:

> > ***Contingent Insurance*** In addition to the coverage for F.O.B./F.A.S. shipments described above, an assured selling under those terms may wish to have coverage under his or her own cargo policy for the entire duration of such shipments during ocean transit. When this type of coverage, known as contingent insurance, ***is added*** to the seller's open cargo policy, ***it is often added as an endorsement*** . . . .

> > \* \* \*

> > The assured who obtains contingent insurance in other instances (and there are many who do for business reasons) relies first upon the buyer's insurance and the buyer's integrity. If, however, for any reason the buyer does not honor his or her financial obligations, either in part or totally, ***and physical loss or damage occurs that would otherwise be covered under the shipper's policy***, the shipper's underwriter guarantees payment for the loss of or damage to the goods insured in the form of a loan to the assured. Thus, if the assured should ever recover from the consignee the amount originally defaulted by the consignee, the assured would reimburse his or her underwriter for the amount of the loan.

Arthur E. Brunck, Victor P. Simone, C. Arthur Williams, Jr., Ph.D., Vol. II <u>Ocean Marine Insurance</u> 100-01 (1st ed. 1988) (emphasis added).

> 47.    Another **insurance** treatise describes contingency coverage as:

> > In certain circumstances the seller might, after the sale of the goods, still have a contingent interest in them. For example, the seller of goods sold on f.o.b. (free on board) terms will usually insure the goods from his factory or warehouse up to 'f.o.b.', i.e. up to the point of shipment, when the risk in the goods passes to the buyer and the seller's interest ceases. It is obvious that the seller has an ordinary insurable interest in the goods up to that point. The insurance from 'f.o.b.' on to the final destination will be effected by the buyer as a separate insurance in his own name. It sometimes happens, however, that for some reason the buyer does not take up the documents and in the event of that contingency the ownership of and risk in the goods will remain with, or revert to, the seller. The contingent interest after shipment can be

insured by the seller, *in addition to the ordinary insurance* on the goods in the seller's name up to 'f.o.b.'.

R.J. Lambeth, Templeman On Marine Insurance 117-18 (6th ed.) (emphasis added).

48.     In order for coverage under Policy Clause 52, the "unpaid vendor clause," to apply to a loss, including the one claimed herein by Zygo, seven conditions must have been satisfied:

(1) Zygo must have declared to Royal that it intended to ship a cargo for which such coverage was needed, describing briefly the nature and value of the cargo and providing such other minimal information as would enable Royal to assess the risk involved (e.g.,shipping destination and buyer's identity and potentially pertinent information regarding prior losses, claims or problems in respect of such shipments);

(2) At the time of said declaration, Royal must have decided that this was a risk that it was willing to cover and must have indicated to Zygo that it would accept the risk;

(3) Zygo must have agreed to pay and must have paid any premium that Royal set for that requested coverage;

(4) Zygo must have complied with any special preconditions set by Royal for said coverage, such as Royal's inspection and approval of the cargo's export packaging if there had been prior losses due to confirmed or alleged improper packaging of prior shipments of this type;

(5) Zygo's buyer, in this instance, Nan Ya, must have refused to pay some portion or all of the purchase price owed to Zygo;

(6) Zygo must have attempted but been unable to collect said amount from Nan Ya in the regular course of its business; and

(7) The subject cargo must have been lost or damaged during transport due to a peril covered under the Policy.

(Ilias ETT).

49.     Only if *all* of these conditions were satisfied (only nos. 5 and 6 were), would Zygo be entitled to have Royal advance it funds covering the cargo loss or damage under the unpaid vendor coverage provided by the Policy Clause 52. (Ilias ETT).

11

50.    If Clause 52 is triggered by Zgyo's declaration of its need for unpaid vendor coverage for a particular shipment and Zygo's agreement to pay the premium required for that coverage, Clause 52 provides Zygo with an insurable interest in respect of that cargo, so that, in the event that damage to the cargo by an insured peril occurs during its transport to Zygo's buyer and said buyer refuses to pay Zygo for that cargo, the Policy's coverage for insured perils is extended beyond the FOB/FAS loading point at which such coverage would otherwise terminate under Clause 55. (Ilias ETT).

51.    In the absence of coverage under Clause 52 for the damaged Second AFM, pursuant to Clause 55, all coverage under the Policy for that AFM ceased once it had been delivered by Zygo to the U.S. F.O.B. loading point for loading aboard the aircraft taking it to Nan Ya in Taiwan. (Illias ETT; Ilias Dep. Tr. at 133-36).

52.    Clause 55 provides, inter alia, that the "premium paid" on FOB/FAS shipments would be "at the rate of *N/A*" (emphasis added), and, according to Mr. Ilias, he added that "N/A" to the blank spot in which an additional premium for Clause 55's extension of coverage would have otherwise been inserted in order to indicated that the premium for coverage under Clause 55 was included in the combined .023 Rate set for standard coverage in the Policy's Schedule of Rates. (Ilias ETT).

53.    In contrast, Clause 52 provides, inter alia, that Zygo will "pay premium . . . at rates to be agreed," and, according to Mr. Ilias, this indicates that, in the event that Zygo requested Clause 52's optional coverage and he agreed to provide this, the premium for that additional coverage was not included in the combined .023 Rate covering standard coverage but would instead be calculated separately based upon his assessment of the risk involved. (Ilias ETT; Ilias Dep. Tr. at 62-63; 138-39, 141-43)

54. Such coverage would exist in those circumstances even if an assured's sales contract for the subject shipment made the buyer responsible for insuring the cargo against transit damage occurring after FOB loading, although, once Royal advanced funds to Zygo covering such cargo damage, Clause 52 would obligate Zygo to "use all reasonable means to collect the full amount due from the buyer and reimburse this Company [i.e., Royal], the latter sharing the expense of such collection in proportion to its interest herein." (Ilias ETT).

55. However, unpaid vendor cover is to be distinguished from credit insurance which, regardless of whether a shipment suffers damage or loss in transit, covers a buyer's refusal to pay for that cargo, or its inability to pay due to insolvency or bankruptcy. (Ilias ETT).

56. Policy Clause 52 does *not* provide credit insurance, since it is an extension of the Policy's coverage of damage and loss caused to cargo by insured perils occurring during its shipment and does not protects a seller against non-payment when said goods have not suffered such damage or loss. (Ilias ETT).

57. Even if damage occurred to cargo in respect of which Zygo had obtained unpaid vendor coverage under Clause 52, since that clause explicitly states that it is subject to all of the Policy's terms and conditions, such coverage would only cover damage or loss (e.g. constructive total loss, mysterious disappearance or theft) caused during covered transit by a fortuitous, insured peril. (Illias ETT))

58. Had Zygo informed Ilias when it applied for the Policy that a percentage of its cargo shipments were not fully insured by it and could be expected to therefore require unpaid vendor coverage beyond the FOB loading point at which Clause 55 otherwise terminated coverage, Ilias would have calculated a separate premium component for that additional coverage and added this to the premium rate for standard coverage, and no declaration and

separate premium would have been required of Zygo, the unpaid vendor coverage then being part of standard coverage paid for based upon Zygo's end-of-year declarations of sales volumes to which the standard rate (now greater than .023 per $100 as it would have included an *additional* component for the additional unpaid vendor coverage) would be applied.  (Ilias ETT).

59.    Clause 52, the contingency clause that Zygo claims provides it with unpaid vendor coverage in respect of the subject shipment, was not standard to Royal's policy (Ilias ETT; Ilias Dep. Tr. at 131) and is one of the enhancements that Mr. Ilias added to the "Approved Royal & SunAlliance manuscript form" at M&M's request - its optional contingency coverage was included in the Policy only because M&M specifically requested it (Ilias ETT; Ilias Dep. Tr. at 81-83, 131, 136, 153-54).

60.    Mr. Ilias' usual practice in reviewing applications for insurance was to reduce all of the details contained in the submission to a single sheet of paper.  (Ilias ETT; Ilias Dep. Tr. at 71-72; Ex. P-56 (Zygo's Application for Marine Insurance)).

61.    In reviewing and summarizing Zygo's submission, Mr. Ilias made no note of any contingent exposure.  (Ilias ETT; Ilias Dep. Tr. at 72); Ex. P-56 (Zygo's Application for Marine Insurance).

62.    According to Mr. Ilias, this omission in his notes indicated to him that there was "no contingent exposure" and that no rate for contingent insurance would be included in the premium he quoted to Zygo.  (Ilias ETT; Ilias Dep. Tr. 72; 74-75).

63.    Instead, the premium that was quoted to Zygo was calculated on the basis of the exposure that Zygo advised Mr. Ilias it had – namely marine, inland, warehouse and war risks, and no additional premium component for unpaid vendor coverage was included therein .  (Ilias ETT; Ilias Dep. Tr. 73-75); Ex. P-56 (Zygo's Application for Marine Insurance)).

64.     If he were going to charge for contingent exposure, Mr. Ilias would have noted a rate for that type of coverage in his summary. (Ilias ETT; Ilias Dep. Tr. at 74-75). He did not. (Ex. P-56 (Zygo's Application for Marine Insurance)).

65.     No separate rate for contingent cover needed to be included in the premium that Mr. Ilias quoted to Zygo because Mr. Weidman had represented that Zygo normally insured 100% of its shipments. Ex. P-56 (Zygo's Application for Marine Insurance); Ilias ETT; Ilias Dep. Tr. at 66-67, 72 & 74-75).

66.     Contingency coverage is not listed in the quotes prepared by Mr. Ilias as being included in the Policy's .023% "Rate" to be applied against annual gross sales because, according to Clause 52's explicit terms, the rates for contingency coverage were "to be agreed" if and when Zygo declared its need for such coverage. Ilias ETT; Ilias Dep. Tr. at ?? ; Ex. P-11 (Policy, Clause 52); Ex. P-56 (Zygo's Application for Marine Insurance); Ex. P-57 (Letter from Ilias to Zdanis, dated 4/21/1999); Ex. P-58 (Letter from Ilias to Zdanis, dated 4/22/1999); Ex. P-59 (Letter from Ilias to Zdanis, dated 4/23/1999).

67.     The Policy contains a number of provisions which offer to Zygo additional coverage if Zygo needs and requests such coverage and agrees to pay any additional premium therefor that may be demanded by Zygo:

(a) Clause 10: If insured property accumulates due to causes beyond the assured's control "which exceeds the limits expressed by this Policy," coverage can be extended up to a maximum of twice the Policy's normal limit of liability, "provided notice be given to the Company as soon as such accumulation is known to the Assured, and additional premium paid if required."

(b)  Clause 15: Standard coverage extends to insured property being containerized, consolidated or deconsolidated on the premises of carriers, consolidators, freight forwarders or similar entities, for a maximum period of 30 days.  Such coverage can be extended beyond the 30 day limit, "provided that written notice is given" and "additional premium paid if required."

(c)  Clause 21: The Policy's 15 day and 30 day time limits on described transshipment and warehouse-to-warehouse coverage can be extended beyond the limits and conditions stated in Clause 21 "at a premium to be arranged" if this is required by circumstances beyond the assured's control.

(d)  Clause 24:  Policy cover is not vitiated by the assured's unintentional errors in describing the vessel, voyage or its interest in the shipment, or, by deviation, overcarriage, change of voyage, transshipment or any other interruption of ordinary transit due to causes beyond the assured's control, provided that such changed circumstances, which obviously may involve increased risks, are reported to Royal and "additional premium paid if required."

(e)  Clause 54:  On all shipments purchased by the assured on C.I.F. terms, the Policy covers the difference in conditions between such other insurance and the Policy's terms and conditions, provided that the assured declares such shipments and pays "premium thereon at rates to be agreed."

(f)  Clause 56: Policy coverage is "extended" to shipments which must be returned because they cannot be delivered or because they are refused, provided that these situations are reported as soon as practicable after they become known and additional premium is paid for this extended coverage if required.

(Ilias ETT; Ilias Dep. Tr. at 54-64).

68.     According to Mr. Ilias, "[a]dditional premium paid, if required" in Clause 24 and "held covered at rates to be agreed" in Clause 55 mean the same thing, (Ilias ETT; Ilias Dep. Tr. at 61-62), and, "And the additional premium paid, if required" in Clause 24 and "unpaid premium thereon at rates to be agreed" in Clause 54 also mean basically the same thing.  (Ilias ETT; Ilias Dep. Tr. at 62-63).

69.     Royal has a standard form of insurance policy, the manuscript form or "boilerplate form" as it is sometimes referred to, that it used as a template in this instance, adding additional clauses to this to provide coverage requested by Zygo.  (Ilias ETT; Ilias Dep. Tr. at 25).

70.     Anything that is outside of the scope of the Policy's standard coverage, i.e., additions to or extension of that coverage, would not be covered unless the insured came to Royal to request that coverage and ageed to pay any additional premium requested by Royal in respect thereof.  (Ilias ETT; Ilias Dep. Tr. at 52-53).

71.     Clause 52 is one of the clauses that is not part of Royal's manuscript form. (Ilias ETT; Ilias Dep. Tr. at 131)

72.     The quotes prepared by Mr. Ilias, based on the Insurance Application were discussed by him with M&M, M&M.  (Ilias ETT; Ilias Dep. Tr. at 13, 68, 81-84 & 85-92); Exhibit from Royal's Opp to Zygo's Sum Judg LL (Ilias 1); Ex. P-56 (Zygo's Application for Marine Insurance); Ex. P-57 (Letter from Ilias to Zdanis, dated 4/21/1999); Ex. P-58 (Letter from Ilias to Zdanis, dated 4/22/1999); Ex. P-59 (Letter from Ilias to Zdanis, dated 4/23/1999)).

73.     Mr. Weidman specifically recalled having seen the quotes prepared in April 1999 by Mr. Ilias in response to Zygo's application.  (Weidman ETT; Weidman Dep. Tr. at 63-65; Ex. P-57 (Letter from Ilias to Zdanis, dated 4/21/1999); Ex. P-58 (Letter from Ilias to Zdanis, dated

4/22/1999)), but could not recall whether he spoke with anyone at Royal about the quotes. (Weidman ETT; Weidman Dep. Tr. 65).

74. Mr. Ilias, on the other hand, specifically recalled discussing the quotes with M&M (Ilias ETT; Ilias Dep. Tr. at 68; 81-84; 85-92)), and he made notes about their conversations (Ilias ETT; Ilias Dep. Tr. at 87-88); Ex. P-57 (Letter from Ilias to Zdanis, dated 4/21/1999); Ex. P-58 (Letter from Ilias to Zdanis, dated 4/22/1999); Ex. P-59 (Letter from Ilias to Zdanis, dated 4/23/1999)).

75. The Policy was the result of arms-length negotiations between Royal and Zygo's brokers, M&M (Ilias ETT; Ilias Dep. Tr. at 41, 68, 80-84 & 85-92); Ex. P-57 (Letter from Ilias to Zdanis, dated 4/21/1999); Ex. P-58 (Letter from Ilias to Zdanis, dated 4/22/1999); Ex. P-59 (Letter from Ilias to Zdanis, dated 4/23/1999)); Weidman ETT.

76. The premium for the Policy's standard coverage that was quoted to Zygo by Mr. Ilias was calculated solely on the basis of "the exposure that [M&M] advising" – i.e., solely the marine, inland, warehouse and war risks that M&M had described in the Insurance Application and in their discussions with Mr. Ilias. (Ilias ETT; Ilias Dep. Tr. at 73-75); Ex. P-56 (Zygo's Application for Marine Insurance).

77. The quotes' notation of the Policy's "Rate" gives a ".023% Combined rate for Marine, War, Exhibition, and Processing against annual gross sales," reflecting exactly the total rate calculated by Mr. Ilias on his worksheet for those coverages and only those coverages, based on Zygo's insurance application. Ex. P-57 (Letter from Ilias to Zdanis, dated 4/21/1999); Ex. P-58 (Letter from Ilias to Zdanis, dated 4/22/1999); Ex. P-59 (Letter from Ilias to Zdanis, dated 4/23/1999); Ilias ETT; Ilias Dep. Tr. at 44).

78.    Mr. Ilias stated that the premium that he quoted to Zygo was "for all the standard coverage contained in the Policy and did not apply to its optional, additional coverage explicitly offered in provisions like Clause 52 on the basis that an additional premium would be required if such coverage was requested." (Ilias ETT; Ilias Dep. Tr. at 34-36; 54).

79.    Policy Clause 1's reference to "reported or not" has nothing to do with Clause 52 and instead merely confirms that, consistent with other Policy clauses, the assured has an obligation to report and pay premiums on all shipments coming under the Policy - if it does not, the insurer is entitled to receive the premiums due thereon and then has the option to deny coverage on a claim because the shipment was not reported, an option that is in fact rarely chosen in practice so long as the premium has been paid. (Ilias ETT ).

80.    Clause 52's meaning, requirements and effect are well-established in the marine insurance industry, and Royal's interpretation of that clause at the time that the Policy was negotiated was in accordance with that industry practice. (Ilias ETT)

81.    Clause 3 of the Policy provides:

**PROPERTY INSURED & INSURABLE INTEREST**
3.    This Policy covers, for account of whom it may concern, shipments of lawful goods and merchandise consisting principally of:

> New electro-optical measuring components, parts and related equipment *in approved export packing*

> Under or on deck, consigned to or shipped by others for account or control of the Assured or in which the Assured has the risk of loss, *but excluding shipments either sold or purchased by the Assured subject to terms of sale (or purchase) whereby the Assured is not obligated to furnish Ocean Marine insurance*. Notwithstanding the foregoing, this Policy also covers all shipments of lawful goods and merchandise for the account of others from whom the Assured has received written instructions to insure provided

> such instructions are received prior to any known or reported
> loss, damage, or accident and prior to sailing of the vessel.

(Ex. P-11 (Policy, Clause 3)(emphasis added)).

82.    Pursuant to Clause 3, Zygo was obligated to insure that covered cargoes were properly packaged so as to protect them from handling and perils reasonably to be expected to occur in the course of shipment.  (Ilias ETT).

83.    Pursuant to Clause 3, such packaging had to confirm with industry standards for the cargoes and shipments involved, and, Royal had the right to demand that it be permitted to inspect and approve that packaging as a condition of coverage.  (Ilias ETT).

84.    Clause 32 of the Policy provides:

**REPORTING LOSSES**
32.    *Any loss or damage to the property hereby insured must be promptly reported to the Company or to the nearest Settling Agent of the Company and such Agent must be represented on all surveys and must approve proofs of loss and bills of expense.* If there be no such Agent at or near the port or place where the loss is discovered or the expenses incurred, then such report must be made to the nearest representative of the American Institute of Marine Underwriters or to a Lloyds Agent, and his approval obtained as above. *Failure to report loss or damage promptly and to file such proof of loss shall invalidate any claim under this Policy.*

(Ex. P-11 (Policy, Clause 32) (emphasis added)).

85.    Clause 32 imposes a duty upon Zygo to report losses in a timely manner and insure that Royal is "represented on all surveys" of damaged cargo.  Ilias ETT; Ex. P-11 (Policy, Clause 32).

86.    Clause 43 of the Policy provides:

**SUBROGATION AND IMPAIRMENT OF RECOVERY**
43.    It is a condition of this insurance that upon payment of any loss the Company shall be subrogated to all rights and claims against third parties arising out of such loss.  It is a further

condition of this insurance that if the Assured or his or their assigns have entered or shall enter into any special agreement whereby any carrier or bailee is released from its common law or statutory liability for any loss, or have or shall have waived, compromised, settled or otherwise impaired any right of claim against a third party to which the Company would be subrogated upon payment of a loss without prior agreement of the Company and endorsement hereon, the Company shall be free from liability with respect to such loss, but its right to retain or recover the premium shall not be affected.

(Ex. P-11 (Policy, Clause 43)).

87.     Clause 43 prohibits Zygo from impairing Royal's right to recover against third parties in respect of claims covered by the Policy, i.e., Royal's right to subrogation.  (Ex. P-11 (Policy, Clause 43); Ilias ETT).

88.     Clause 52 of the Policy provides:

**CONTINGENCY**

52.     *It is agreed that on all shipments sold by the Assured on cost and freight or other terms whereby the Assured is not required to furnish ocean marine insurance, this Policy is extended (subject to all its terms and conditions) to cover only the interest of the Assured as an unpaid vendor from the time shipments become at the risk of the customer under the terms of sale until payment of draft but in no event beyond the time when this Company's risk would normally cease under the terms of this Policy.*

It is further understood and agreed that *in no event shall this insurance inure to the benefit of the buyer or his underwriter* but in the event of a loss occurring which would be collectible hereunder but for such terms of sale and the Assured is unable to collect the purchase price from the buyer in regular course, this Company will advance the amount of such loss pending collection from the buyer.  The Assured hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse this Company, the latter sharing the expense of such collection in proportion to its interest herein.

21

> *The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed.*

Ex. P-11 (Policy, Clause 52)(emphasis added)).

89.    Breaking Clause 52's language down, its meaning and effect are as follows:

a.    "It is agreed that on all shipments sold by the Assured on cost and freight or other terms whereby the Assured is not required to furnish ocean marine insurance, this Policy is extended" means that Policy coverage is extended beyond the FOB/FAS loading point at which coverage for such shipments would otherwise be terminated pursuant to Clause 55, subject, of course, to Clause 52's terms and conditions;

b.    "(subject to all its terms and conditions)" means that said extended coverage is subject to all of the Policy's other terms and conditions, including, e.g., Clause 43 prohibition against Zygo's impairment of Royal's subrogation rights, Clause 11 definition of covered perils, Clause 32's reporting requirements, Clause 3's approved packaging requirements, etc.

c.    "to cover only the interest of the Assured as an unpaid vendor" confirms that Clause 52 does not per se extend coverage for cargo damage or loss incurred in transit, but rather, only coverage if the buyer refuses to pay Zygo and such damage or loss has occurred;

d.    "from the time shipments become at the risk of the customer under the terms of sale until payment of draft" confirms that where, as here, the sale was on an FOB basis, the subject coverage was in place from the time the cargo was loaded aboard the carrying vessel and aircraft and title and risk have passed to the buyer up until payment is made;

e.    "but in no event beyond the time when this Company's risk would normally cease under the terms of this Policy" means that that there is no unpaid vendor coverage in the event that the subject damage occurred to the goods after they had been delivered to the buyer, since the Policy covers only damage occurring in transit, on a warehouse to warehouse basis;

f.    "in no event shall this insurance inure to the benefit of the buyer or his underwriter" confirms that this is not credit insurance;

g.    "but in the event of a loss occurring which would be collectible hereunder but for such terms of sale" confirms that one condition of coverage is that damage or loss must have occurred to the cargo during shipment that would have been covered by the Policy but for the fact that the Zygo-Nan Ya sale was on an FOB basis that shifted title and risk and the obligation to insure the cargo against damage in transit to Nan Ya;

h.    "and the Assured is unable to collect the purchase price from the buyer in regular course," confirms that for coverage to apply, Zygo must have made reasonable attempts to collect the purchase price from Nan Ya but was unable to do so;

i.    "this Company will advance the amount of such loss pending collection from the buyer" means that if all of Clause 52's conditions and requirements are satisfied, Royal must advance the unpaid portion of the purchase price to Zygo, pending collection of those funds from Nan Ya, and this is predicated on Zygo being entitled to such collection from its buyer;

j.    "The Assured hereby agrees to use all reasonable means to collect the full amount due from the buyer and reimburse this Company, the latter sharing the expense of such collection in proportion to its interest herein, the latter sharing the expense of such collection in proportion to its interest herein" confirms that if coverage exists under Clause 52 and Royal has advanced the unpaid purchase price to Zygo, Zygo thereafter is obliged to use all reasonable means to collect the full amount due from Nan Ya, with Royal sharing the expense of such collection in proportion to its interest therein; and

k.    "The Assured agrees to declare to this Company the value of all shipments covered under the terms of this endorsement and to pay premium thereon at rates to be agreed" obliges Zygo to declare the value of all shipments for which it wants Clause 52's additional coverage and thereafter must pay whatever premium Zygo and Royal have agreed for such coverage.

(Ilias ETT)

90.    Assuming that Zygo had declared the subject shipment and requested unpaid vendor coverage therefore, in the absence of Mr. Ilias's prior knowledge of losses, claims

or problems such as improper packaging that had occurred in respect of such shipments and that would have indicated an increased risk warranting a higher premium or Royal's refusal to issue such coverage, the basis for the premium under Clause 52 would typically be set by Ilias at approximately 60% of the applicable marine rate. (Ilias ETT; Ilias Dep. Tr. at 141).

91.     The premium for contingency coverage under Clause 52 would be a one-time flat fee for a particular shipment. (Ilias ETT; Ilias Dep. Tr. at 141-42).

92.     Clause 52 required Zygo "to report any contingent shipments" in advance. (Ilias ETT; Ilias Dep. Tr. 136, 154 & 173-74) - the underwriter must be notified before the shipment departs. (Ilias ETT; Ilias Dep. Tr. at 138), and as little as one hour's advance notification of a shipment might be all that would be needed. (Ilias ETT; Ilias Dep. Tr. at pp. 138-39).

93.     Written notification is not necessary under Clause 52, and (Ilias ETT; Ilias Dep. Tr. at 138) to avail itself of contingency coverage under Clause 52, Zygo would be required to do no more than "pick up the phone, call their broker, call the underwriter and explain the circumstances and pay any additional premium thereon, if any, subject to underwriting information." (Ilias ETT; Ilias Dep. Tr. at 136; 172-73).

94.     The information an underwriter would require would be what the commodity being shipped is, whether it is new or used, the total insured value of the shipment, where the shipment is going to or from, and the packaging of the shipment. (Ilias ETT; Ilias Dep. Tr. at 137).

95.     Mr. Ilias did not advise M&M of the advance notification requirements for coverage under Clause 52 because he had been told that Zygo did not have any contingent exposure. (Ilias ETT; Ilias Dep. Tr. at 153-54), because Clause 52's declaration requirement is explicit (Ilias ETT), and because it is "standard and customary" in the marine insurance industry for an insured to

24

advise an insurer prior to a shipment that the shipment requires contingency insurance. (Ilias ETT; Ilias Dep. Tr. at 173-74).

96.    What Clause 52 means when it states that the policy is extended to cover only the interest of the assured as an unpaid vendor from the time that a shipment becomes at risk of the customer is that the Policy is broadened to cover shipments that Royal's insured is otherwise not responsible to provide insurance for, i.e., damage or loss incurring in transit after the FOB loading at which Clause 55 would otherwise terminate such coverage. (Ilias ETT; Ilias Dep. Tr. at 131-32, Ilias ETT).

97.    What Clause 52 means when it states "but in no event beyond the time when this company's risk would normally cease under the terms of this policy" is that, under no circumstances, will Clause 52 exceed any limits and conditions applied elsewhere, e.g., Clauses 21 and 22's termination of coverage once the goods have arrived at their final destination, in this case, Nan Ya's facility in Taiwan. (Ilias ETT; Ilias Dep. Tr. at 132).

98.    Clause 55 of the Policy provides:

**FOB/FAS SHIPMENTS**
55.    This Policy is extended to cover shipments sold by the Assured of (*sic*) F.O.B., F.A.S., cost and Freight or similar terms whereby the Assured is not obligated to furnish ocean marine insurance. This insurance attaches subject to Policy terms and conditions and continues until the goods are loaded on board the overseas vessel or until the Assured's interest ceases, whichever shall first occur. The particulars of all such shipments shall be reported promptly to the Assurer and premium paid on the amounts so declared at the rate of N/A for not exceeding thirty (30) days after attachment of risk. Extension of risk beyond thirty (30) days held covered at rates to be agreed.

Ex. P-11 (Policy, Clause 55).

99.    A FOB/FAS shipment can have contingency coverage under Clause 52 if the insured opts for such coverage. (Ilias ETT; Ilias Dep. Tr. at 133-34). Once the shipment is loaded at the FOB load point, here, for example, the aircraft carrying the subject AFMs to Nan Ya, the contingency coverage would go into effect, assuming that Zygo had properly declared said cargoes and agreed to pay premiums for such coverage as required by Clause 52. (Ilias ETT; Ilias Dep. Tr. at 133-34).

100.    The Policy was sent to M&M after it had been finalized so that it could "review the terms and conditions, [to] make sure they were as agreed." (Ilias ETT; Ilias Dep. Tr. at 29-30), and if Mr. Weidman had any questions about or objections to any wording in the Policy, including, that contained in Clause 52, Mr. Ilias would have expected him to raise these with him. (Ilias ETT; Ilias Dep. Tr. at 154).

101.    Zygo and/or M&M could have read the Policy before Zygo accepted it in order to determine whether the nature of the contingency coverage provided by Clause 52 was what Zygo had intended, but, they never bothered to do so. (Weidman ETT; Weidman Dep. Tr. at 58, 74 & 77-80; Martin Dep. Tr. at 45 & 50; Dressler at pp. 42-43.

102.    Mr. Weidman does not know whether anyone at M&M reviewed the Policy at the time it was issued to determine whether it contained the coverage Zygo wanted. (Weidman ETT; Weidman Dep. Tr. at 74; 77; 78-79).

103.    Mr. Weidman does not recall reviewing the Policy himself to ensure that the coverages Zygo wanted were being provided by the Policy. (Weidman ETT; Weidman Dep. Tr. at 75).

104.     Lawrence Martin is the staff assistant to Zygo's president.  (Martin Dep. Tr. at 9), and at the time the Policy was issued, Mr. Martin had no involvement with the placement of Zygo's insurance (Martin ETT;Martin Dep. Tr. at 33; 36).

105.     Mr. Martin was the contact for M&M at Zygo on this claim.  (Martin ETT; Martin Dep. Tr. at 45-46).

106.     Mr. Martin did not read any portion of the Policy until after this claim arose (Martin ETT; Martin Dep. Tr. at 45) and had never seen the entire Policy until it was shown to him at his deposition (Martin ETT; Martin Dep. Tr. at 50).

107.     Similarly, Mr. Martin did not discuss the contingency clause with anyone at Zygo or at M&M until after the claim was denied by Royal (Martin ETT; Martin Dep. Tr. at 47; 49).

108.     In fact, Mr. Martin did not even know whether Zygo had contingency insurance in its Policy.  (Martin ETT; Martin Dep. Tr. at 48).

109.     Mr. Martin "left most of the insurance issues up to [Zygo's] agent," Matt Weidman.  (Martin ETT; Martin Dep. Tr. at 45).

110.     After reviewing the contingency clause and discussing it with M&M, Mr. Martin had no "understanding one way or the other" about whether Zygo's shipments had contingency coverage under the Policy.  (Martin ETT; Martin Dep. Tr. at 236).

111.     Richard Dressler is Zygo's Vice President of Finance, a position he has held since joining that company in February 2001.  (Dressler ETT; Dressler Dep. Tr. at 5).

112.     Zygo produced Mr. Dressler in response to Royal's Rule 30(b)(6) Notice of Deposition on the issue of, inter alia, Zygo's understanding of the Policy.  (Dressler ETT; Dressler Dep. Tr. at 6-7).

113.    Mr. Dressler's responsibilities at Zygo include coordinating with its insurance brokers to determine what type of insurance Zygo requires and who that coverage should be placed with. (Dressler ETT; Dressler Dep. Tr. at 12).

114.    Because Mr. Dressler does not have an insurance background, he relies on the insurance brokers to recommend types of coverage, potential insurers and premiums. (Dressler ETT; Dressler Dep. Tr. at 12-13).

115.    Mr. Dressler does not discuss individual clauses in an insurance policy with the insurance brokers but rather relies on a summary of the policy prepared by the brokers that identifies the insurer, the types of coverage, any optional coverages and the premiums. (Dressler ETT; Dressler Dep. Tr. at 13-14).

116.    Mr. Dressler believes that the Policy provides Zygo contingency coverage in this case under Clause 52. (Dressler Dep. Tr. at 41-42), but his sole basis for this was the summary of coverage prepared by the insurance brokers (Dressler Dep. Tr. at 42-43) - at the time of his deposition, Mr. Dressler had never read the Policy or Clause 52. (Dressler ETT; Dressler Dep. Tr. at 42-43).

## THE DAMAGED AFMS

117.    In or about January 2000, Zygo shipped an AFM, (the "First AFM") to its customer Nan Ya's facility in Taiwan, under a purchase order sales contract between them (the "First Sales Contract"), pursuant to which, Nan Ya had made advance payment to Zygo of 80% of the First AFM's $690,000 purchase price.  Zygo was subsequently advised by Nan Ya that the First AFM had arrived at its facility in severely damaged and unusable condition.  Stipulated Fact ("SF")

118.    A joint survey of the damaged First AFM was held on January 26, 2000 (the "First Joint Survey").  At the First Joint Survey, Zygo was represented by its agent in Taiwan, Mr.

Billy Wu, the President of Lee-Tech, and Nan Ya had a Marine and Cargo Surveyor from Cathay Inspection Co. ("Nan Ya's Surveyors") attend and survey the damaged First AFM on Nan Ya's behalf. Ex. P-133 (Cathay Survey Report, dated 2/19/2000)).

119.    Nan Ya's Surveyors concluded from their inspection and evaluation of the damage suffered by the First AFM that this had occurred as the result of a heavy shock or bump, and, most significantly, that "Insufficient packing can be made the reason of this damage." Ex. P-133 (Cathay Survey Report, dated 2/19/2000)).

120.    Royal received no advance notice from Zygo of the First Joint Survey and was not represented there (Daneman ETT; Walch ETT; Walch Dep. Tr. at 132-40, 148-49 & 194). Nor did Zygo ever arrange for any expert survey of the first damaged AFM on its own behalf (Walch Dep. Tr. at 21-22, 149 & 167-70) or that of Royal (Daneman ETT; Martin Dep. Tr. at 102-03).

121.    Nan Ya refused to pay the remaining 20% of the purchase price due on the First AFM under the First Sales Contract and insisted that Zygo ship a replacement AFM (the "Second AFM") to Nan Ya immediately, because it was in the middle of a project for which that AFM was urgently needed.  SF

122.    Although Nan Ya failed refused to pay the $138,000 unpaid balance of the First AFM's purchase price for almost a year following the First Joint Survey, asserting that it had no obligation to do so since it believed that the damage to that AFM had been caused by insufficient packing for which Zygo was responsible under the First Sales Contract, Zygo never gave any notice of an occurrence or claim to Royal in respect of the damaged First AFM.  (Weidman ETT; Daneman ETT)