123.    On or about January 31, 2000, Nan Ya provided a purchase order sales contract to Zygo in the amount of $690,000 (the "Second Sales Contract") for the Second AFM.  SF

124.    Due to Nan Ya's urgent need for the Second AFM, Zygo shipped this to Nan Ya in early February 2000 without requiring that Nan Ya obtain a letter of credit securing 80% or indeed any portion of the Second AFM's $690,000 purchase price prior to Zygo's shipment of the Second AFM.  SF

125.    Both the First and Second Sales Contracts were FOB U.S. Airport, with title and risk as well as the obligation to insure the AFMs against damage or loss occurring during their shipment from that loading point to Nan Ya passing to Nan Ya.  SF

126.    Nan Ya obtained such insurance from Taiwan Fire & Marine Insurance Company, Ltd. ("Nan Ya's Insurer") and ultimately filed claims with that insurer in respect of damage suffered by both AFMs.  SF

127.    The Second AFM was loaded in good order and condition aboard an aircraft at a U.S. FOB load port for transport to Nan Ya, and Nan Ya subsequently advised Zygo that the Second AFM, like the First AFM, had arrived at Nan Ya's facility in damaged condition.  SF

128.    In response to that notice, on or about February 11, 2000, Mr. Kelvin Walch conducted an initial inspection of the second damaged AFM that was very limited.  (Walch ETT; Walch Dep. Tr. at 95-96; Ex. P-83 (Memo from Walch to Muckenhirn, dated 2/11/2000)).

129.    Mr. Walch was an engineer employed by Zygo to assist its customers, including Nan Ya, with the installation and repair of AFMs, (Walch Dep. Tr. at 18-20), and both he and the Staff Assistant to Zygo's President, Mr. Larry Martin, admit that, at the time of these events, Mr. Walch was not qualified as an expert in the rigging and packaging of AFMs or in conducting a forensic analysis of transit damage suffered by them in order to determine the cause of that damage

and the adequacy of their packaging.  (Walch ETT; Walch Dep. Tr. at 21-22, 169-70); Martin ETT; Martin Dep. Tr. at 102-03)).

130.    Mr. Walch limited his preliminary inspection of the damaged Second AFM on February 11, 2000  to removing only one or two wooden panels of its outside protective packing so that he could look inside to ascertain whether it had in fact been severely damaged.  (Walch ETT; Walch Dep. Tr. at 95).

131.    Mr. Walch so limited his inspection in this manner because he knew how important it was to retain the damaged AFM in its original as-delivered condition without disturbing the evidence it represented until such time as a joint survey could be conducted by all interested parties, thereby providing to them a fair opportunity to have their respective experts inspect the damage in order to ascertain its nature, extent and possible causes, as well as that AFM's economic repairability and salvage value.  (Walch ETT; Walch Dep. Tr. at 96-99, 122-25); Ex. P-83 (Memo from Walch to Muckenhirn, dated 2/11/2000)).

132.    Mr. Walch believed, based on this cursory inspection, that the machine had suffered severe damage and might not be repairable and that the parties and their insurers would need to survey the damaged AFM.  (Walch ETT; Walch Dep. Tr. at 101-02, 105-06; 108-14); Ex. P-83 (Memo from Walch to Muckenhirn, dated 2/11/2000)).

133.    Consistent with Mr. Walch's understanding of just how important such a joint survey would be, he suggested to his superior, Mr. Sylvain Muckenhirn, the Dirctor of Zygo's AFM Group, in a February 11, 2000 report of his preliminary inspection that Zygo notify its insurer Royal of the scheduled February 14, 2000 joint survey so that Royal could arrange for its own representatives, including a cargo damage expert or surveyor, to attend and inspect the Second

AFM. (Walch ETT; Walch Dep. Tr. at 124-26); Ex. P-83 (Memo from Walch to Muckenhirn, dated 2/11/2000)).

134.    Despite said suggestion by Mr. Walch, Zygo gave no such notice to Royal of the upcoming survey, and, as a result, no one attended the February 14, 2000 joint survey on Royal's behalf – Mr. Walch saw no one at the survey who was represented as being from Royal. (Walch ETT; Walch Dep. Tr. at 132-40, 148-49, 194; Daneman ETT; see also P-166 (first notice of occurrence by Zygo to Royal on 3/7/2000, well after the survey).

135.    Nor did Zygo ever engage any cargo packaging expert on its own behalf to survey the damaged Second AFM, relying instead on Mr. Walch, who, by his own admission, was not qualified to do any expert forensic analysis of the Second AFM's damage in order to ascertain the cause(s) of the damage and the sufficiency of that AFM's packaging. (Walch ETT; Walch ETT; Walch Dep. Tr. at 21-22, 149, 169-70; Martin ETT; Martin Dep. Tr. at 102-03).

136.    Zygo never had the damaged Second AFM inspected, tested or analyzed by anyone qualified to offer any expert opinion with respect to the inadequacy of the damaged Second AFM's packaging alleged by Nan Ya, at any trial adjudicating these issues between Royal, as Zygo's subrogated insurer, and Nan Ya, which has raised said alleged inadequacy as a contractual defense to having to pay either Zygo or Royal for said AFM. (Walch Dep. Tr. at 21-22, 169-70; Walch ETT; Martin Dep. Tr. at 102-03; Martin ETT).

137.    Zygo's failure to so survey the damaged AFM constituted a breach of its Policy obligations under Clause 43 not to impair any subrogation rights that Royal might have against Nan Ya in the event that coverage was found to exist for said damage, inasmuch as said failure severely prejudiced said rights by depriving Royal of unique and critical evidence it would need to refute Nan Ya's Survey reports confirming that bad packaging for which Zygo was

responsible under the Sales Contract for said AFM had caused the subject damages. (Ilias ETT; Daneman ETT)

138.    Mr. Walch's inspection and "evaluation" at Nan Ya's facility on February 14, 2000 of the damage suffered by the Second AFM was in fact conducted jointly by Zygo and Nan Ya (the "Zygo–Nan Ya Survey"). (Ex. P-84 (Memo from Walch to Muckenhirn, dated 2/14/2000); Walch ETT; Walch Dep. Tr. at 148, 152).

139.    Nan Ya was represented at the Zygo-Nan Ya Survey not only by its own personnel but also by Nan Ya's Insurer, as well as by cargo surveyors from the Cathay Inspection Co. acting on Nan Ya's behalf ("Nan Ya's Surveyors") who inspected and evaluated that damage. (Walch ETT; Walch Dep. Tr. at 148-49, 152).

140.    Nan Ya's personnel, Nan Ya's Insurer's representative, Nan Ya's Surveyors and even Zygo's own AFM agent in Taiwan, Mr. Billy Wu, the president of Lee Tech, Ltd., all concluded and informed Zygo that, based upon the First and Second Joint Surveys, in their opinion, the cause of the damage to both the First and Second AFMs were their insufficient packing, which they felt had been unable to protect them from the rough handling and shocks that they had been subjected to. (Walch ETT; Ex. P-83 (Memo from Walch to Muckenhirn, dated 2/11/2000); Ex. P-85 (Correspondence from Wu to Monti, dated 2/15/2000); Ex. P-86 (Correspondence from Wu to Muckenhirn, dated 2/16/2000); Ex. P-130 (Email from Chiang to Muckenhirn, dated 2/11/2000); Ex. 138 (Email from Lee-Tech to Martin, dated 7/4/2000); Ex. P-90 (Cathay Survey Report, dated 2/21/2000)).

141.    Even Zygo's local Taiwanese agent, Billy Wu, the President of Lee Tech, who was very familiar with these types of AFM machines, remarked to Zygo that said packaging seemed very inadequate for such a delicate and expensive instrument, and was quite dissimilar

33

from the packaging done for similar machines by Zygo's competitor Veeco. (Martin ETT; Walch ETT; Ex. P-85 (Correspondence from Wu to Monti, dated 2/15/2000); Ex. P-86 (Correspondence from Wu to Muckenhirn, dated 2/16/2000)).

142.    Nan Ya told Mr. Walch on February 14, 2000 that, since the damage to the Second AFM was due to insufficient packaging for which Zygo, not Nan Ya, was responsible under the Second Sales Contract, Nan Ya had no obligation to pay for the Second AFM (Walch Dep. Tr. at 105; Ex. P-83 (E-mail from Walch to Muckenhirn, dated 2/18/2000 and memo dated 2/17/2000); Walch ETT)), a position that it has steadfastly maintained to this day (see Nan Ya's Answer to Royal's Third Party Complaint, alleging insufficient packing as a defense to any liability on its part to either Royal or Zygo in respect of the Second AFM).

143.    Zygo had in fact supervised and was responsible for the rigging and packaging of the second AFM, which was done at the manufacturer IBM's Florida facility by IBM-hired rigging contractors under supervision of Zygo personnel. (Martin ETT; Martin Dep. Tr. at 244-46; Ex. P-123 (E-mail from Weidman to Martin, dated 6/8/2001).

144.    It was obvious to Mr. Walch from Nan Ya's claims of inadequate packaging at the February 14, 2000 joint survey that insurance claims might be lodged against the packing company or IBM, and he reported this to Mr. Muckenhirn, the Director of Zygo's AFM Group. (Walch ETT; Walch Dep. Tr. at 105; Ex. P-166 (forwarding internal memo from Walch to Muckenhirn, dated 2/14/2000)).

145.    Mr. Walch admitted that it was important to insure that said damaged AFM would be preserved as evidence, making sure that none of that evidence was removed or was altered from its original state on arrival at Nan Ya's loading dock so that it could be

inspected by experts representing the various parties and their underwriters. (Walch ETT; Walch Dep. Tr. at 149-50, 217-18; Ex. P-83 (Memo from Walch to Muckenhirn, dated 2/11/2000)).

146.    Mr. Walch also testified that, after completion of the February 14, 2000 joint survey, Zygo probably could have removed that damaged Second AFM from Nan Ya's premises and stored it safely at Zygo's Taiwanese offices, where its security could be assured, but it did not do so, and, instead, merely left that AFM at Nan Ya's loading dock. (Walch ETT; Walch Dep. Tr. at 217-18, 295-96)).

147.    Mr. Walch asked Nan Ya's loading dock personnel to not disturb the damaged Second AFM, but he admitted that he did not know whether or how portions of that evidence may have been taken away, altered or otherwise lost. (Walch ETT; Walch Dep. Tr. at 218, 245-48, 293-94)), and he admitted that when he re-inspected the damaged Second AFM in November 2000 in order to ascertain its salvage value, he made no effort to determine whether its evidentiary integrity had been compromised, since by then, he regarded it as only so much scrap. (Walch ETT; Walch Dep. Tr. at 245-48, 293-96).

148.    Given Zygo's abandonment of the damaged Second AFM on Nan Ya's loading dock without any meaningful safeguards in place to insure that it would not be tampered with or altered, even if months after the February 14, 2000 Second Joint Survey Zygo had finally afforded Royal with any opportunity to survey said AFM (something that Zygo failed to do), the reliability of any such survey would have been nil, or at minimum, called into serious doubt by Zygo's failure to do anything to preserve and protect that critical evidence. (Daneman ETT).

149.    Mr. Walch was not aware of any access ever given by Zygo to Royal in respect of an inspection of these AFMs. (Walch ETT; Walch Dep. Tr. at 205, 218-19).

150.     The evidence pertaining to the alleged insufficiency of the First AFM's packaging was at least potentially relevant to Nan Ya's assertion that it had no obligation to pay Zygo, based on its surveyors' conclusion after their February 14, 2000 inspection of the damaged Second AFM (less than three weeks after they had inspected the First AFM) that insufficiency of the Second AFM shipment's packaging was to blame for its damage as well. (Daneman ETT).

151.     Zygo's failure have the damaged First and Second AFMs surveyed by a qualified cargo surveyor or to invite Royal to attend at least the February 14, 2000 Second Joint Survey, together with Zygo's failure thereafter to preserve and protect either damaged AFM and give Royal a reasonable opportunity to inspect and evaluate them, severely prejudiced Royal's ability to refute Nan Ya's claims that said damages had been caused by insufficient packaging for which Zygo, not Nan Ya, was responsible (Daneman ETT), and constituted breaches of Zygo's obligations under Clause 43 of the Policy. (Daneman ETT; Ilias ETT).

152.     Despite the foregoing, including Mr. Walch's suggestion to Mr. Muckenhirn on February 11, 2000 that Royal be notified of the February 14, 2000 joint survey so that it could send its own expert to attend there, Zygo waited until March 7, 2000, three weeks after that survey's completion before notifying Royal of the subject damages.   (Ex. P-166 (Daneman ETT; Correspondence from Merati to Royal, dated 3/7/2000).

## ZYGO FRUSTRATES ROYAL'S EFFORTS TO SURVEY THE DAMAGED SECOND AFM AND TWICE TELLS ROYAL THAT IT IS NOT CLAIMING ANY COVERAGE

153.     Promptly after receiving this late notice of claim from Zygo, the very next day, March 8, 2000, Royal's claims manager, Joseph Daneman, notified Zygo that Royal would assign a surveyor to inspect the damaged AFMs and he asked Zygo to advise him of said cargo's location and to provide him with a contact name, telephone and fax number so that this

36

inspection could be arranged. (Daneman ETT; Ex. P-16 (Letter from Daneman to Merati, dated 3/8/2000)).

154.  Almost two weeks passed after Mr. Daneman's request without any response from Zygo, and so, on March 20, 2000, he wrote again to Zygo asking again for the information needed to arrange the damaged Second AFM's inspection (Mr. Daneman never received any notice of claim from Zygo with respect to the damaged First AFM). (Daneman ETT; Ex. P-197 (Letter from Daneman to Merati, dated 3/20/2000).

155.  Another month passed with still no response from Zygo, and on April 19, 2000, Mr. Daneman wrote yet again to Zygo, asking for the location of the damaged First AFM and contact information so that Royal could send its own surveyor to inspect it. (Daneman ETT; Ex. P-198 (Letter from Daneman to Merati, dated 4/19/2000)).

156.  On April 28, 2000 Mr. Ilias spoke with Mr. Weidman, who advised him that Zygo would not be advancing a claim under the Policy in respect of the damaged Second AFM, as reflected in Mr. Ilias's notes of that conversation: "It is Matts opinion this will not be a claim since Zygo was not responsible for the shipment." (Ex. P-199 (Ilias' Handwritten notes)).

157.  On May 8, 2000, almost three full months after completion of the Zygo-Nan Ya Joint Survey and Zygo's effective abandonment of the damaged Second AFM on Nan Ya's loading dock, two months after Royal requested contact information in order to conduct a survey, and ten days after Mr. Weidman told Mr. Ilias that Zygo would not be advancing a claim, Royal was provided by Zygo with said requested contact information. (Daneman ETT; Ex. P-18 (Memo from Weidman to Daneman, dated 5/1/2000)).

158.  On May 12, 2000, Mr. Daneman, believing after his review of the matter that it involved a potential claim for transit damage occurring after the cargo had been loaded

aboard the aircraft for overseas shipment, so that under Clause 55, Zygo had no insurable interest, wrote to Zygo informing it that, since Zygo had no insurable interest, Royal would not be assigning a surveyor to inspect the cargo. (Daneman ETT; Ex. P-19 (Letter from Daneman to Weidman, dated 5/12/2000)).

159.    At the time that Mr. Daneman wrote said May 12, 2000 letter, no one at M&M or Zygo had raised Clause 52 as the possible basis for any claim under the Policy – the first time that any allusion was made to him by M&M with respect to such a possibility was in a letter dated March 23, 2001, and Zygo did not officially advance this as the basis of a claim against Royal until its confirm this in a letter dated July 14, 2001. (Daneman ETT)

160.    Just one week after the May 12th letter, on May 19, 2000, Mr. Daneman asked Royal's surveyors in Taiwan to arrange for an independent survey in order to ascertain the cause of the damage to the Second AFM, advising Zygo's broker Mr. Weidman that same day that he was doing so on a without prejudice basis. (Daneman ETT; Ex. P-21 (Letter from Daneman to Weidman, dated 5/19/2000)).

161.    Mr. Daneman did so not because he believed that Zygo had any insurable interest in the circumstances, but, rather because Mr. Ilias had recommended that a survey be conducted, provided it did not imply an admission of coverage, and because such a survey seemed prudent and should not be at all expensive or difficult to arrange. (Daneman ETT; Ex. P-22 (Letter from Ilias to Carroll, dated 5/18/2000).

162.    From May 12, 2000 when Mr. Daneman informed Zygo that Royal would not assign a surveyor because Zygo had no insurable interest, up to May 19, 2000 when he notified it that he would, the damaged Second AFM was still sitting unsecured on Nan Ya's loading dock where Zygo had left it, and thus, as a practical matter, Mr. Daneman's May 12,

38

2000 letter in no way prejudiced Zygo (Weidman ETT; Martin ETT) or changed the indisputable fact of Zygo's failure to take any meaningful steps to preserve and protect that evidence (Daneman ETT).

163.   In fact, shortly after receiving Mr. Daneman's May 12th letter, Mr. Weidman spoke with Mr. Ilias and advised him for a second time that Zygo did not have a claim under the Policy in respect of the damaged Second AFM, as reflected in Mr. Ilias's notes of that conversation: "he [Weidman] does not think this is a claim. He asked how one withdrew a claim and [I] advised him to send a letter to Joe [Daneman]." (Ilias ETT; Ex. P-200 (Handwritten notes)).

164.   On May 19, 2004, when Mr. Daneman advised Mr. Weidman that Royal had assigned a surveyor to investigate the matter, he also stated: "Also, please note that (1) the assured has not proven an insurable interest in this shipment, (2) the consignee has arranged for insurance for this shipment, (3) the consignee has apparently filed a claim with their insurance company, and (4) the consignee's insurance company has apparently declined liability for the claim due to insufficient and/or improper packaging." (Daneman ETT; Ex. P-21 (Letter from Daneman to Weidman, dated 5/19/2000)).

165.   Despite repeated attempts by Royal over the succeeding months to arrange for an inspection of the damaged Second AFM, Royal's surveyor was never given access to it and it was disposed of by Zygo without any such inspection having taken place. (Daneman ETT; Ex. P-24 (Letter from Daneman to Weidman, dated 6/19/2000); Ex. P-44 (Letter from Daneman to Weidman, dated 7/13/2000); Ex. P-98 (Letter from Daneman to Weidman, dated 7/21/2000); Ex. P-26 (Letter from Daneman from Weidman, dated 11/10/2000)).

166. After months of requesting from Zygo its assistance in conducting the survey it had requested and with Zygo uncooperative (at best, and at worst being an obstructionist), Royal advised Weidman of M&M on November 10, 2000 (three days before Zygo's settlement meeting with Nan Ya) that it was closing its file with no claim payment because, inter alia: (1) Royal's Taiwan surveyor had communicated with Billy Wu and Tim Smith, but they were unable to provide answers regarding the AFMs; (2) the damage was apparently due to insufficient packaging because damage occurred to not one but two AFMs back-to-back; and (3) Nan Ya's insurer agreed to "settle this claim at half the amount on an amicable basis, and the rest will reportedly be settled by Lee-Tech Co., Ltd. (Zygo Corp.'s Taiwan agent); and (4) the insured does not have an insurable interest. (Daneman ETT; Ex. P-26 (Letter from Daneman from Weidman, dated 11/10/2000)).

167. A month passed without any response from Zygo and then, on December 12, 2000, Mr. Weidman wrote to Mr. Daneman and for the very first time asserted that Zygo had an insurable interest in the damaged Second AFM, this because Zygo had shipped it to Nan Ya *without* first securing a letter of credit – to this point in time, neither M&M nor Zygo nor anyone else had mentioned Clause 52 or unpaid vendor coverage as a possible basis for any claim by Zygo under the Policy (Daneman ETT; Ex. P-28 (Letter from Weidman to Daneman, dated 12/12/2000)).

168. In response to Weidman's letter, Mr. Daneman explained to Mr. Weidman that the Policy (as per Clause 3, Property Insured and Insurable Interest) did not provide coverage for shipments for which Zygo did not have an obligation to furnish ocean marine insurance. (Ex. P-115 (Daneman ETT; Letter from Daneman to Weidman, dated 1/4/2001)).

169.  With respect to Clause 55 (FOB/FAS Shipments), Mr. Daneman told Mr. Weidman in said letter that coverage was extended only to the transfer point of the cargo at the airport (the free on board location) and there was no evidence the damage occurred prior to loading on the overseas aircraft.  (Daneman ETT; Ex. P-115 (Letter from Daneman to Weidman, dated 1/4/2001)).

170.  Additionally, because of the evidence demonstrating insufficient packaging, Mr. Daneman explained to Mr. Weidman that Zygo had failed to establish the proximate cause of the damage was an external fortuity that was an insured peril.  (Daneman ETT; Ex. P-115 (Letter from Daneman to Weidman, dated 1/4/2001)).

171.  Mr. Daneman yet again informed Mr. Weidman that Royal's Surveyors had not received any cooperation or accommodation from Zygo or from Zygo's agents in trying to arrange for a survey of the damaged Second AFM.  Ex. P-115 (Daneman ETT; Letter from Daneman to Weidman, dated 1/4/2001)).

172.  Over a month later, Mr. Weidman had still not responded to Daneman's January 4, 2001, letter, so Mr. Daneman wrote to him on February 5, 2001, and stated: "[A]s we have not received a response to the coverage issues raised in our last fax, we conclude that the Policy does not provide coverage.  If you disagree with our coverage position, we ask that you advise us accordingly setting forth the reasons that you believe that there is coverage with supporting information and documentation."  (Daneman ETT; Ex. P-201 (Letter from Daneman to Weidman, dated 2/5/2001)).

**ZYGO RAISES CLAUSE 52 FOR THE VERY FIRST TIME**

173.  It was not until over a year after M&M first gave notice to Royal of the damage to the Second AFM, that on March 23, 2001, Zygo (through Mr. Carroll Sneed of

M&M) had reviewed Clause 52 (Contingency) and, according to Sneed "feel it could well be applicable under the circumstances of this loss, should it be proven that coverage does not otherwise exist." (Daneman ETT; Ex. P-30 (Letter from Sneed to Daneman, dated 3/23/2001)).

174.   In a quick succession of letters, Mr. Daneman responded to Mr. Sneed's letter (wherein Clause 52 was raised for the first time) by requesting: confirmation that Zygo was in fact seeking coverage under Clause 52; confirmation of what steps Zygo had taken to collect any unpaid purchase price for said AFM from Nan Ya; an affidavit confirming that Zygo had not been paid for that AFM; proof that said shipment had been declared pursuant to Clause 52's requirements and that Zygo had paid any additional premium required thereunder; documents evidencing Zygo's protection of Royal's subrogation rights against Nan Ya; and any evidence of Zygo's release of Nan Ya in respect of said AFM .  (Daneman ETT; Ex. P-32 (Letter from Daneman to Sneed, dated 5/2/2001); Ex. P-33 (Letter from Daneman to Weidman, dated 5/7/2001)).

175.   Mr. Sneed responded, only in part, to Daneman's letter and refused to state whether or not Zygo was pursuing a claim under Clause 52.   Rather, Sneed stated that whether Zygo was pursuing payment under Clause 52 "is an option of the Royal, not Zygo . . . ." (Daneman ETT; Ex. P-35 (Letter from Sneed to Daneman, dated 5/10/2001)).

176.   Fifteen months after Zygo first informed Royal of the damage to the Second AFM, Larry Martin of Zygo, together with Messrs. Sneed and Weidman wrote to Royal and stated:  "To clarify with regard to whether or not Zygo is pursuing the claim under policy Clause 52 (Contingency). (*sic*)  Subject to Royal producing substantial evidence that the loss is not otherwise covered, Zygo will opt to pursue payment under Clause 52" – the very first

confirmation that Zygo was pursuing a claim under Clause 52. (Daneman ETT; Ex. P-37 (Letter from Martin to Daneman, dated 6/14/2001)).

177.    Having previously set forth its rationales for why coverage did not exist (as set out above), Royal issued a final declination letter in respect of Zygo's only unpaid vendor claim, that had officially been raise only a month earlier, half a year after Zygo had disposed of the damaged First and Second AFMs without having given Royal any reasonable opportunity to inspect either of them.    (Daneman ETT; Ex. P-14 (Letter from Daneman to Zygo, dated 7/16/2001).

178.    That July 16, 2000 letter from Royal set out the Policy provisions whose breach or non-compliance with by Zygo had resulted in denial of coverage.  (Daneman ETT; Ex. P-14 (Letter from Daneman to Zygo, dated 7/16/2001)).

179.    As a result of additional improper packaging claims Royal received for other AFM shipments by Zygo out of one of Zygo's facilities in Florida, Royal added an addendum to the Policy in July 2000 that required Zygo to notify Royal 72 hours in advance of any shipments from Florida.  (Ilias ETT; Ilias Dep. Tr. at 118-119; 155; Ex. P-65 (Letter from Ilias to Weidman, dated 7/24/2000); Daneman ETT).

180.    The purpose of this advance notification was to allow Royal to have the shipment's packaging inspected in order to determine its sufficiency and ensure that the AFM would arrive at thire destination in good condition. (Ilias ETT; Ilias Dep. Tr. at 118-19).

181.    Following the posting of the large loss report (P-63 (Large Loss Report, dated 4/28/2000)), Zygo opted to renew the Policy with Royal effective May 1, 2000.  (Ilias ETT; Ex. P-212 (Correspondence from Zdanis to Ilias, dated 5/1/2000)).

182.    In July 2000, Mr. Ilias advised Mr. Weidman that Royal would be sending a notice of cancellation, but the Policy remained in effect.  (Ilias ETT; Ex. P-65 (Letter from Ilias to Weidman, dated 7/24/2000)).

183.    In September 29, 2000, Mr. Ilias wrote to Mr. Weidman, stating that Royal intended to cancel the Policy effective November 1, 2000, due to the losses Zygo had incurred.  (Ilias ETT; Ex. P-205 (Letter from Ilias to Weidman, dated 9/29/2000)).

184.    In November, Mr. Weidman asked for an extension and Mr. Ilias again extended coverage.  (Ex. P-206 (Letter from Ilias to Weidman, dated 11/1/2000); Ex. P-207 (E-mail from Ilias to Weidman, dated 11/9/2000); Ex. P-208 (Ilias ETT; E-mail from Ilias to Weidman, dated 11/2/2000)).

185.    Mr. Ilias told Mr. Weidman in either March or April 2001 that, because of Zygo's loss history, Royal no longer wanted to be Zygo's ocean marine carrier.  (Ilias ETT; Ilias Dep. Tr. at 148); Ex. P-209 (Ilias ETT; Correspondence from Ilias to Weidman, dated 4/17/2001); Ex. P-210 (E-mails between Ilias and Weidman, dated 5/8/2001 and 5/10/2001)).

186.    Mr. Weidman said that he would try to find another carrier to be Zygo's ocean marine carrier.  (Ilias ETT; Ilias Dep. Tr. 148).

187.    One month later, Mr. Weidman requested that Royal extend the Policy for one month to give Zygo more time to find another carrier because Zygo was having difficulties placing its coverage with another carrier.  (Ilias ETT; Ilias Dep. Tr. at 148; Ex. P-211 (Handwritten note)).

188.    Royal granted Zygo the requested one month extension of the Policy period from May 1, 2001 to June 1, 2001.  (Ilias ETT; Ilias Dep. Tr. at 148).

189. When Zygo still could not find a carrier to place its ocean marine coverage with, Mr. Ilias told Mr. Weidman that Royal would be willing to renew the Policy subject to certain changes in the terms and conditions of the Policy. (Ilias ETT; Ilias Dep. Tr. at 149).

190. Royal was willing to renew the Policy if, inter alia, the contingency clause was removed and, because of Zygo's loss history, Zygo agreed to pay an increased premium. (Ilias ETT; Ilias Dep. Tr. 151-52).

191. At this time, pursuant to Endorsement No. 16, Clause 52, the Contingency Clause, was removed from the Policy effective May 1, 2001, more than a year after Zygo had already once renewed the Policy with Royal. (Ilias ETT; P-70 (Endorsement No. 16)).

192. Royal *never* made Zygo's withdrawal of its claim relating to the Second AFM a condition for Royal's renewal of the Policy. (Ilias ETT).

193. *Mr. Weidman asked Mr. Ilias to provide* two pricing options for renewal of the Policy, requesting that one option be based upon the reserve and Zygo's paid loss history, and asked that the second option be based upon Zygo's withdrawing its claim. (Ilias ETT; Ilias Dep. Tr. at 150; Exs. P-68 & 69 (Ilias ETT; Options presented by Mr. Ilias to Mr. Weidman, captioned Zygo Corporation Renewal Specifications 5/1/01 - 5/1/02 Policy Term)).

194. Mr. Ilias provided Mr. Weidman the requested renewal specifications. (Ilias ETT; Ilias Dep. Tr. at 150-51).

195. Due to Zygo's continued inability to find a replacement carrier, Royal granted Zygo a second one month extension of the Policy period from June 1, 2001 to July 1, 2001. (Ilias ETT; Ilias Dep. Tr. at 159).

45

196.   Zygo ultimately decided not to renew the Policy with Royal and it placed its ocean marine coverage with another carrier.  (Ilias ETT; Ilias Dep. Tr. at 160).

197.   On June 8, 2001, Zygo's insurance manager, Richard Dressler, notified Zygo's insurance brokers that Zygo had decided to obtain Ocean Cargo coverage from the St. Paul Insurance company because of the lower premiums St. Paul offered, and because, Royal had declined to offer any contingency [i.e., unpaid vendor] coverage in connection with any extension or renewal of the Zygo-Royal Policy.  (Dressler ETT; Ex. P-54 (E-mail from Dressler to Weidman, dated 6/8/2001)).

198.   In that email notice, Mr. Dressler noted that Zygo's pending claim with Royal [now before this Court] was "going to be difficult," and that, whether or not Zygo continued to obtain marine insurance from Royal would "probably not influence their [i.e., Royal's] decision on that claim one way or the other."  (Dressler ETT; Dressler Dep. Tr. 48-54; Ex. P-54 E-mail from Weidman to Dressler, dated 6/8/2001)).

## THE ZYGO-NAN YA SETTLEMENT NEGOTIATIONS

199.   Because of Nan Ya's urgent need for an AFM and the fact that Nan Ya still did not have a workable AFM for its business after Zygo had shipped the First and Second AFMs to it, Zygo shipped a third AFM (the "Loaner AFM") to Nan Ya in late February 2000 on a loaner basis.  Def. Ex. 504 (Temporary Loan Agreement).  The loaner AFM was to be returned to Zygo by June 30, 2000.  SF

200.   Nan Ya refused to return the loaner AFM to Zygo on June 30, 2000, as previously agreed, and continued to hold the loaner AFM hostage during the summer and fall of 2000 in order to apply pressure on Zygo to agree to Nan Ya's proposal that they settle their disputes with respect to how responsibility should be allocated between them for the damages suffered by

46

the First and Second AFMs by agreeing that Nan Ya and its underwriters would be responsible for the First AFM and that Zygo and its underwriters would be responsible for the second, with the parties agreeing upon and sharing equally those AFMs' salvage value. Martin ETT; Witness Statement of Lawrence Martin; see also Def. Ex. 520.

201.    As early as May 26, 2000, Zygo was proposing to Nan Ya that they share in the cost of the two damaged AFMs if Nan Ya would agree to pay for the loaner AFM, and purchase a fourth AFM from Zygo. (Martin ETT; Ex. P-202 Zygo Leetech – Nan Ya AFM project status)).

202.    By the end of June, Zygo's agent, Lee Tech, proposed providing Nan Ya with training being withheld by Zygo on the loaner AFM in exchange for the last 20% owed on the damaged First AFM. (Ex. P-137 (Smith ETT; E-mails between Muckenhirn, Smith, and Monti of 6/26/00)).

203.    Mr. Smith believed that because Nan Ya had refused to pay the balance due on the damaged First AFM, Zygo had not sent anyone to train Nan Ya's people in operating the loaner AFM, and that, since that machine was ". . . useless to them without training," it sat unused at Nan Ya's plant. (Smith ETT; Smith Dep. Tr. at 115-16).

204.    After Billy Wu's meeting with Nan Ya on or about July 4, 2000, he told Mr. Martin that Nan Ya and its insurer still refused to pay for the damaged AFMs because the damage was due to inadequate packaging (even Mr. Wu, who was Zygo's representative and knowledgeable about such matters concurred in Nan Ya's assessment of that packaging (Ex. P-85 (Correspondence from Wu to Monti, dated 2/15/2000); Ex. P-86 (Facsimile from Wu to Zygo of 2/16/00)). (Ex. P-138 (Email from Lee-Tech to Martin, dated 7/4/2000)).

205.    Mr. Wu told Mr. Martin that the best settlement that Zygo could attain with Nan Ya would be splitting the AFM damages as Nan Ya had proposed, with Nan Ya paying Zygo

for only one of the damaged AFMs.  (Martin ETT; Ex. P-138 (Email from Lee-Tech to Martin, dated 7/4/2000)).

206.    Mr. Martin asked Mr. Wu to continue his efforts to resolve the impasse, Zygo's proposal at this time, being that it repair the two damaged AFMs, with Nan Ya paying for the repair and for their full value, with Zygo working out a "favorable pricing deal" if Nan Ya also wanted to purchase the loaner AFM.  (Martin ETT; Ex. P-140 (Letter from Martin to Wu, dated 7/10/2000)).

207.    On August 9, 2000, Mr. Smith reported to Mr. Martin that he had spoken with Royal's surveyor, who had "indicated he had communicated with Billy Wu but that Mr. Wu had been uncooperative [i.e., had refused to arrange for Royal's surveyor to inspect the damaged AFMs] *indicating that he had already reached an agreement with Nanya*."  (Smith ETT; Martin ETT; Ex. P-46 (E-mail from Smith to Martin of 8/9/00) (emphasis added)).

208.    Mr. Smith testified that he too contacted Billy Wu after Mr. Smith spoke with Royal's surveyor, but that "Billy was uncooperative with me also, and *indicating that he had already made a deal or was working on a deal with Nan Ya.*"  (Smith ETT; Smith Dep. Tr. 138-39) (emphasis added)).

209.    Zygo's and Nan Ya's negotiations on the two damaged AFMs went on for months with Lee-Tech's president, Billy Wu, representing Zygo in those negotiations, but, Royal was kept in the dark about them, hearing after the fact and only indirectly that Nan Ya's and Zygo's disputes over the damaged AFMs had been settled, only when Royal's surveyor reported in August 2000 that his attempts to inspect the damaged machines in order to ascertain the nature, extent and cause of the damage had been rebuffed by Mr. Wu on the grounds that no surveys would be needed

48

since Mr. Wu had resolved those disputes. (Martin ETT; Daneman ETT; Ex. P-46 (E-mail from Smith to Martin of 8/9/00); Ex. P-27 (E-mail from Daneman to Chung, dated 8/2/2000)).

210. Royal's surveyor reported to Royal's Mr. Daneman that he had spoken to Messrs. Wu and Smith about the AFMs and recommended closing the claim because he had been told that the damage was probably caused by insufficient packing and a settlement of the dispute had been agreed, so that all that remained was Lee-Tech's evaluation of the salvage value. (Daneman ETT; Ex. P-27 (E-mail from Chung to Daneman of 8/25/00)).

211. Mr. Wu subsequently told Mr. Martin yet again that the "only" solution and the "conclusion for this project" was that Nan Ya and Zygo share in the costs of the damage to the two damaged AFMs and that Zygo should send an engineer to "evaluate the damage" [it is clear that this meant determine their salvage value (Martin ETT; Ex. P-148 (E-mail from Martin to Wu of 10/16/00); Ex. 149 (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00); Ex. P-168 (Letter from Martin to Wu of 10/27/00); Ex. P-144 (E-mail from Wu to Martin of 9/22/00)).

212. Mr. Martin responded positively to his agent's suggestions: "I am working on setting up a trip for Kelvin Walsh [*sic*] to travel to Taiwan to evaluate the machines." (Martin ETT; Ex. P-106 (E-mail from Martin to Wu of 10/3/00).

213. The next day, Billy Wu again told Mr. Martin that Nan Ya and Zygo, and their respective insurers, should share in the loss of the damaged AFMs. (Martin ETT; Ex. P-147 (E-mail from Wu to Martin of 10/4/00)).

214. Mr. Martin informed Billy Wu that he was finalizing Mr. Walch's trip to inspect and assess the salvage value of ***both*** damaged AFMs and that he had placed a claim with Royal for the damaged Second AFM (Ex. P-148 (E-mail from Martin to Wu of 10/16/00)), both

49

steps consistent with the global settlement on both machines that Nan Ya had been demanding and Zygo's representative had been recommending for months. (Martin ETT; Walch ETT).

215.    Billy Wu understood that the parties were now in agreement on settlement terms and he asked Mr. Martin to affirm this formally in writing to him so that he could pass this on to Nan Ya, requesting confirmation from Mr. Martin that: (1) Zygo would accept the salvage value estimated by Walch; (2) Zygo would manage one damaged AFM completely and the loss of two damaged machines would be shared equally; and (3) the salvage value for the damaged First AFM would be deducted from the balance owed by Nan Ya. (Martin ETT; Ex. P-149 (E-mail chain between Wu and Martin of 10/20/00 & 10/25/00)).

216.    Mr. Martin did just that, confirming in a letter, that he described as "a follow up to my email *regarding the agreement to resolve the Nanya/AFM issue*," that Zygo would engage, at its expense, Mr. Walch to perform an appraisal of the two AFM units "as soon as there is agreement with Nanya on the return of the loaner unit and payment of the balance of the first unit, less an average salvage value . . . ." (Martin ETT; Ex. P-168 (Letter from Martin to Wu of 10/27/00) (emphasis added)).

217.    In direct response to Nan Ya request for confirmation that Zygo agreed that Nan Ya's insurance company pay for the damaged First AFM while Zygo's insurance company paid for the second, Martin confirmed that Zygo "will, and has, filed a claim for the second unit shipped with its insurance company." (Martin ETT; Ex. P-168 (Letter from Martin to Wu of 10/27/00)).

218.    At no time did Mr. Martin mention any reservation of rights to sue Nan Ya on the damaged Second AFM. (Martin ETT; Ex. P-168 (Letter from Martin to Wu of 10/27/00))

219.    On October 30, 2000, Mr. Wu forwarded what he regarded as Mr. Martin's formal acceptance of Nan Ya's proposed settlement to its parent, Formosa Plastics. (Martin ETT; Ex. P-203 (Fax from Lee-Tech to Formosa Plastics of 10/30/00)).

220.    On November 13, 2000, a meeting was held in Taipei regarding the damaged AFMs. (Smith Dep. Tr. at 161-63). Mr. Smith, Stan Lay of Lee-Tech, and Kelvin Walch attended the meeting for Zygo. (Walch ETT; Smith ETT; Smith Dep. Tr. at 163; Ex. P-150 (Meeting Minutes)).

221.    Among the representatives for Nan Ya were Yaling Tsai, Tsung-wen Lien, Charles Hsieh, and Gary Chen Kuo. (Smith ETT; Ex. P-150 (Meeting Minutes)). Minutes of the meeting were recorded, and Mr. Smith signed the minutes. (Smith ETT; Smith Dep. Tr. at 161).

222.    Because he had not been informed of the parties' progress in resolving their impasse on the two damaged AFMs and had not been provided with any specific instructions by Mr. Martin, Mr. Smith attended the meeting under the impression that issues remained open (Smith Dep. Tr. at 174-75, 194), raising these issues at the meeting only to be repeatedly reassured by Lee-Tech's representative that they had in fact already been resolved. (Smith ETT; Smith Dep. Tr. at 167, 201 & 215-17).

223.    Shortly after that meeting, Lee-Tech e-mailed Mr. Smith, copying Mr. Martin, stating their satisfaction "**that the problem of *two damaged* systems have been settled**" in the November 13th meeting. (Smith ETT; Martin ETT; Ex. P152 (E-mail chain, Lee-Tech to Smith of 11/13/00) (emphasis added)).

224.    Mr. Martin did not contradict this, responding: "I want to thank all of you for the effort put in to resolve this situation." (Martin ETT; Ex. P152 (E-mail chain, Lee-Tech to Smith of 11/13/00)).

225.    Mr. Smith admitted that it was his understanding, based on his review at his deposition for the first time of the aforesaid communications, that, on or before the November 13, 2000, settlement meeting, Billy Wu had already resolved the dispute with Nan Ya over payment for the damaged AFMs. (Smith ETT; Smith Dep. Tr. at 216-17).

226.    Mr. Smith, who felt at his deposition that he had been kept in the dark when Mr. Martin sent him to the November 13th admitted that Mr. Martin's e-mail (Ex. P152 (E-mail chain, Lee-Tech to Smith of 11/13/00)) was not surprising when considering the communications indicating negotiations between Mr. Wu and Mr. Martin. (Smith ETT; Smith Dep. Tr. at 187-88).

## II.    ROYAL'S PROPOSED CONCLUSIONS OF LAW

227.    Zygo has failed to show that it is entitled to recover under the Policy.

228.    The Second Circuit has repeatedly affirmed the power of a second judge to grant summary judgment despite another judge's previous denial of summary judgment where there is a change in the law or facts warranting overruling the prior decisions. Rite Aid Corp. v. American Home Products Corp., No. 02-CV-4432, 2003 WL 21250547, at *4 (E.D.N.Y. Apr. 16, 2003).

229.    Notwithstanding the practice of refusing to reopen what has been decided, the general rule in the Second Circuit is that judges of coordinate jurisdiction may disregard each others' rulings, so long as the party relying on the provisions is not prejudiced. Wright v. Cayan, 817 F.2d 999, 1002 n.3 (2d Cir. 1987), cert. denied 484 U.S. 853, 108 S. Ct. 157 (1987).

230.    The Second Circuit's "long-established view [is] that the law of the case is, at best, a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided. Thus, judges of coordinate jurisdiction are not bound by each others rulings, but are free to disregard them if they so choose. The only limitation placed upon a trial judge's decision to disregard a previous ruling by a judge of coordinate jurisdiction is that prejudice not ensue to the party seeking the benefit of the doctrine. United States v. Birney, 686 F.2d 102, 107 (2d Cir. 1982).

231.    A "court may reconsider a prior ruling under three situations: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct a clear error of law or to prevent manifest injustice." Casey v. United States, 161 F. Supp. 2d 86, 91 (D. Conn. 2001) (citing authorities).

232.    The Court, based upon its reading of the Policy and consideration of the parties' briefing of Royal's Motion for Summary Judgment and/or upon its consideration of all of the pertinent evidence adduced at trial and arguments made and authorities and supports cited in Royal's and Zygo's Pre-Trial Memoranda, has the discretion to:

    a.    reverse J. Goettel's earlier erroneous ruling denying Royal's Motion for Summary Judgment on the mistaken grounds that Policy Clause 52 is ambiguous and that parole evidence must therefore be adduced at trial as to the parties' intent with respect thereto; and

    b.    rule that said provision is not ambiguous, so that, in view of Zygo's admission that it did not declare its need for unpaid vendor coverage in respect of the subject cargo prior to the subject loss and neither agreed to pay nor paid any separate, additional premium for such coverage as explicitly required by Clause 52, Zygo has no such coverage and all of its claims herein must be dismissed.

233.    An insurance policy should be interpreted as a whole, and to effectuate the intent of the parties. Israel v. State Farm Mutual Automobile Ins. Co., 259 Conn. 503, 509, 789 A.2d 974, 977 (2002).

234.    In interpreting the insurance policy, the court must, if possible, give operative effect to every provision in order to reach a reasonable result. O'Brien v. U.S. Fid. & Guar. Co., 235 Conn. 837, 843, 669 A.2d 1221, 1224 (1996).

235.    It cannot be assumed that the parties intended to insert inconsistent and repugnant provisions. Enfield Pizza Palace, Inc. v. Insurance Co. of Greater New York, 59 Conn. App. 69, 75, 755 A.2d 931, 935 (Conn. App. Ct. 2000).

236.    Where two clauses which are apparently inconsistent may be reconciled by a reasonable construction, that construction must be given. Shawmut Bank Connecticut, N.A. v. Connecticut Limousine Service, Inc., 40 Conn. App. 268, 273, 670 A.2d 880, 883 (Conn. App. Ct. 1996); cert. denied, 236 Conn. 915, 673 A.2d 1143 (Conn. 1996); Century 21 Access America v. Lisboa, No. CV03081901, 2003 WL 21805547, at *4 (Conn. Super. Ct. July 22, 2003).

237.    The law requires that, whenever reasonably possible, courts should interpret contract language so as to reconcile arguably contradictory clauses. Contracts should be read to minimize conflicts, and one clause should yield to another only where the two are unmistakably inconsistent. McKeown Distributors, Inc. v. GYP-Crete Corp., 618 F. Supp. 632, 640 (D. Conn. 1985).

238.    The court must decide whether, reading the policy from the perspective of a reasonable layperson in the position of the purchaser of the policy, the policy is ambiguous. In construing the document, the court must look at the policy as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. Israel v. State Farm Mutual Automobile Ins. Co., 259 Conn. 503, 509, 789 A.2d 974, 977 (2002).

239.    "[U]pon acceptance of an insurance policy and in the absence of fraud or misrepresentation, an insured is charged with knowledge of all of the terms and conditions of the policy." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 122 (2d Cir. 1990)(citations omitted).

240.    "[A]n insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes." Metropolitan Life Ins. Co. v. Aetna Casualty

and Surety Co., 255 Conn. 295, 305, 765 A.2d 891 (2001) (citations and quotations marks omitted).

241.    "[U]nambiguous terms are to be given their plain and ordinary meaning." Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co., 255 Conn. 295, 305, 765 A.2d 891 (2001) (citations and quotations marks omitted); see also Dunn v. Progressive Northwestern Ins. Co., No. 563462, 2003 WL 22708946, at *3 (Conn. Super. Nov. 4, 2003).

242.    "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co., 255 Conn. 295, 306, 765 A.2d 891 (2001) (citations and quotations marks omitted).

243.    The "mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." Nationwide Mut. Ins. Co. v. Allen, 83 Conn. App. 526, 538, 850 A.2d 1047, 1056 (Conn. App. 2004), cert. denied, 271 Conn. 907, 859 A.2d 562 (Conn. 2004).

244.    Clause 52 is not ambiguous because:

   a.    its language is clear and unambiguous on its face and when read together with the rest of the policy, and that language is not explicitly contradicted by any other policy language, including, that found in Endorsement No. 3, entitled "Annual Marine Deposit Premium," or that found in the Policy's "Schedule of Rates";

   b.    as Clause 52 explicitly provides to Zygo additional coverage by extending coverage for cargo damage or loss caused by insured perils beyond the FOB loading point at which that cover would otherwise terminate pursuant to Clause 55, explicitly conditioned, however, upon Zygo's declaration of its need for that coverage for a

particular cargo and its payment of an additional premium therefor, the only reasonable and logical construction of Endorsement No. 3, entitled "Annual Marine Deposit Premium" and the Policy's "Schedule of Rates is that these provisions only cover the Policy's standard coverage;

   c.   as it is reasonable to interpret Clause 52, Endorsement No. 3 and the Policy's "Schedule of Rates together in the aforesaid manner, the Court must do so, pursuant to the well-established principle of contract construction followed in this and other circuits that, when parties' contract clauses can be interpreted together in a reasonable manner so as to give effect to all of them, this must be done in preference to interpreting them in a manner that negates one or more of them, thereby frustrating the contracting parties' intent.

245. If the Court were to find that Clause 52 is ambiguous, Royal may introduce "extrinsic evidence . . . to support a particular interpretation" of the clause. Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co., 255 Conn. 295, 306, 765 A.2d 891 (2001) (citations and quotations marks omitted).

246. A court may consider the extrinsic evidence "to ascertain the intent of the parties." American Home Assurance Co. v. Abrams, 69 F. Supp. 2d 339, 348 (D. Conn. 1999); see also Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co., 255 Conn. 295, 306, 765 A.2d 891 (2001); Teano v. Hartford Life Ins. Co., No. CV 980580409S, 2000 WL 966371, at *7 (Conn. Super. June 23, 2000; 2 Couch on Insurance, §§ 22:14 and 22:16 (3d ed. 1995). In so doing, the court can determine whether the parties, "by their acts, have placed a construction on the contract showing what was in fact intended." 2 Couch on Insurance, §§ 22:14 (3d ed. 1995); see also

Teano v. Hartford Life Ins. Co., No. CV 980580409S, 2000 WL 966371, *7 (Conn. Super. June 23, 2000).

247.    It is the intent of the parties at the time of contracting that controls.  See, e.g., Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 319 (2d Cir. 2000); Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983); Lasmo, PLC v. Ultramar Corp., No. 3-95-CV-00371 (WWE), 1997 WL 289674, at *3 (D. Conn. Mar. 24, 1997); Lester v. Resort Camplands Intern., Inc., 27 Conn. App. 59, 68, 605 A.2d 550, 555 (Conn. App. 1992); McKeown Distributors, Inc. v. GYP-Crete Corp., 618 F.Supp. 632, 641 (D. Conn. 1985).  Extrinsic evidence of a party's intent at some other time should be excluded from consideration.  See Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 319 (2d Cir. 2000).

248.    Just because a third party determines that words of an insurance policy are ambiguous many months after policy has been issued should not change the mutual intent of parties. See Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co., 641 F. Supp. 297, 310 (E.D. Pa. 1986), aff'd sub nom., Appeal of Rich Maid Kitchens, Inc., 833 F.2d 307 (3d Cir. 1987); Reliance Ins. Co. v. Keystone Shipping Co., 102 F. Supp. 2d 181, 195 (S.D.N.Y. 2000), aff'd, 7 Fed. Appx. 111, No. 00-7950, 2001 WL 345184 (2d Cir. Apr. 05, 2001).

249.    "When a contract term is ambiguous, (t)he oft-repeated rule is that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words, in the light of the circumstances surrounding the execution of the writing and in the light of the object of the parties in executing the contract." Marcus v. Marcus, 175 Conn. 138, 141, 394 A.2d 727, 729 (Conn. 1978) (internal quotation marks and citations omitted).

250.    When procuring insurance for a person, a broker becomes the agent of that person for that purpose.  See, e.g., Lewis v. Michigan Millers Mut. Ins. Co., 154 Conn. 660, 664, 228

A.2d 803, 806 (1967); Passarello v. Lexington Ins. Co., 740 F. Supp. 933, 935 (D. Conn. 1990) (holding that, under Connecticut law, broker is agent of insured in negotiating policy).

251.    An insurance broker's knowledge and acts are binding upon an insured.    See Hayat Carpet Cleaning Co. v. Northern Assur. Co., Limited, of London, 69 F.2d 805 (2d Cir. 1934) (holding that a representation of an insurance broker, whom the insured had procured to obtain a policy, was within the broker's authority and binding on insured); Compania L'Union De Paris v. Goldsmith, 8 F.2d 134, 137 (1st Cir. 1925) (Insured held bound by riders attached to policies, though signed by agent without knowledge of their meaning.); Prusky v. Prudential Ins. Co. of Am., No. Civ.00-2783, 2001 WL 34355665, at *27 (E.D. Pa. Oct. 30, 2001)(imputing "any information" the insured's brokers "knew at the time of the contract's formation" to the insured), aff'd, No. 02-1004, 2002 WL 1774064 (3d Cir. 2002); Chloe Z Fishing Co., Inc. v. Odyssey Re (London) Ltd., 109 F. Supp. 2d 1236, 1251 (S.D. Cal. 2000); Kearns v. Minnesota Mut. Life Ins. Co., 75 F. Supp. 2d 413, 422 (E.D. Pa. 1999)(holding that, under the law of agency, broker was insured's representative in the formation of the insurance contract, any consent by the broker, within the scope of his dealings with the insurer, was binding on the insured, and any information the broker knew at the time of the contract's formation was imputed to the insured); Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co., 641 F. Supp. 297, 309 (E.D. Pa. 1986), aff'd sub nom., Appeal of Rich Maid Kitchens, Inc., 833 F.2d 307 (3d Cir. 1987); Eagle Star & British Dominions v. Tadlock, 22 F. Supp. 545, 548 (S.D. Cal. 1938).

252.    Even though an insured has little knowledge of the exact terms of an insurance policy, this does not excuse it from being bound by the negotiated terms of the agreement, where it has relied on its agent to provide it with adequate insurance coverage, so that it is bound by the

insurance policy procured by the agent. <u>See</u> <u>Rich Maid Kitchens, Inc. v. Pennsylvania</u> <u>Lumbermens Mut. Ins. Co.</u>, 641 F. Supp. 297, 309 (E.D. Pa. 1986), <u>aff'd sub nom.</u>, <u>Appeal of</u> <u>Rich Maid Kitchens, Inc.</u>, 833 F.2d 307 (3d Cir. 1987); <u>Eagle Star & British Dominions v.</u> <u>Tadlock</u>, 22 F. Supp. 545, 548 (S.D. Cal. 1938).

253.    If Clause 52 is ambiguous, the intent of the parties was that Zygo have available to it through that clause, the option of separately declaring a cargo for which it needed unpaid vendor coverage, providing Royal with the information that Royal needed to assess that risk and obtaining such coverage from Royal if Zygo agreed to pay and did pay any additional premium required by Royal therefor above and beyond the premium provided in the Policy for standard coverage, and complied with any other conditions set by Royal in respect of such coverage.

254.    Only after examining the parties' intentions and determining that an ambiguity cannot be resolved thereby, should a court consider applying the <u>contra proferentem</u> doctrine. <u>See</u> <u>Israel v. State Farm Mutual Automobile Ins. Co.</u>, 259 Conn. 503, 509, 789 A.2d 974 (2002); <u>Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co.</u>, 255 Conn. 295, 306, 765 A.2d 891, 897 (2001) (internal quotations and citation omitted); <u>Teano v. Hartford Life Ins. Co.</u>, No. CV 980580409S, 2000 WL 966371, at *8 (Conn. Super. June 23, 2000); <u>American Home Assurance</u> <u>Co. v. Abrams</u>, 69 F. Supp. 2d 339, 348 (D. Conn. 1999); <u>United Technologies Corp. v.</u> <u>American Home Assurance Co.</u>, 989 F. Supp. 128, 145 n. 19 (D. Conn. 1997) (Arterton, J.).

255.    The <u>contra proferentem</u> doctrine, however, is a rule of last resort. <u>See</u> <u>U.S. Fire</u> <u>Ins. Co. v. General Reinsurance Corp.</u>, 949 F.2d 569, 573 (2d Cir. 1991); <u>Ball v. Bradley</u>, 34 Conn. 496 (1868); <u>Teano v. Hartford Life Ins. Co.</u>, No. CV 980580409S, 2000 WL 966371, *7 (Conn. Super. June 23, 2000); <u>United Technologies Corp. v. American Home Assurance Co.</u>,